**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**MIDLAND DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 15-70094 rbk |
| RREAF O&G PORTFOLIO #2 LLC ET | § | (Chapter 11) |
| AL.,[1] | § | (Joint Administration Requested) |
| | § | |
| DEBTORS. | § | |

**DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS**
**APPROVING USE OF CASH COLLATERAL AND**
**GRANT OF ADEQUATE PROTECTION**

RREAF O&G Portfolio #2 LLC and its affiliated debtor entities, as debtors and debtors in possession (collectively, the "Debtors"), file this *Emergency Motion for Approval of Interim and Final Use of Cash Collateral and Grant of Adequate Protection* (the "Motion"). In support of the Motion, the Debtors would respectfully show the Court as follows:

## I. Jurisdiction and Procedural Background

1.       The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This Motion concerns the administration of the estates; and therefore, it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2.       Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.       On the date of this Motion (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), commencing the above-referenced cases (collectively, the "Cases").

---

[1] The Debtors and the last four digits of their tax identification numbers are RREAF O&G Portfolio #2 LLC (7815), RREAF O&G Portfolio #2 Manager, LLC (9297), RREAF O&G Portfolio #3 LLC. (8084), and RREAF O&G Portfolio #3 Manager, LLC (1741).

4.      Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

5.      As of the date of this Motion, no official committee of unsecured creditors has been appointed.

6.      Contemporaneously with the filing of this Motion, the Debtors filed the Debtors' Emergency Motion for Joint Administration of Cases and their Debtors' Request for Emergency Consideration of Certain "First Day" Matters.

## II. <u>Background</u>

### A.      The Debtors

7.      The Debtors, collectively, own eight hotel properties.  Two of the properties are located in Midland, Texas, and the remaining six properties are located in Andrews, Texas, Cuero Texas, Hobbs, New Mexico, Pearsall, Texas, Pecos, Texas and Port Arthur, Texas.  Each of the properties is branded with well known franchises, or "flags."

8.      Seven of the hotel properties are owned by RREAF O&G Portfolio #2 LLC ("<u>Portfolio #2</u>"), and one property is owned by RREAF O&G Portfolio #3 LLC ("<u>Portfolio #3</u>"). The managing member of Portfolio #2 is RREAF O&G Portfolio #2 Manager, LLC ("<u>#2 Manager</u>") and the managing member of Portfolio #3 is RREAF O&G Portfolio #3 Manager, LLC ("<u>#3 Manager</u>").

9.      The Debtors' hotel properties are located in areas with high concentrations of oil and gas activity.  Accordingly, the Debtors' business is closely tied to the oil and gas labor market, as many of the workers in these areas do not live in the area and therefore require hotel accommodations.

B.      **Loans from Spectrum**

10.     Portfolio #2 and #2 Manager are parties to a Loan Agreement dated as of April 30, 2014 (as amended from time to time, the "Portfolio #2 Loan Agreement") with Spectrum Origination, LLC ("Spectrum"), as lender.  The original term of the loan evidenced by the Portfolio #2 Loan Agreement was one year, but the term was extended pursuant to a forbearance agreement to May 20, 2015.  As of the Petition Date, the aggregate principal amount outstanding under the Portfolio #2 Loan Agreement is approximately $39,118,351 (the "Portfolio #2 Debt").

11.     Portfolio #3 and #3 Manager are parties to a Loan Agreement dated as of November 21, 2014 (as amended from time to time, the "Portfolio #3 Loan Agreement") with Spectrum, as lender.  The original term of the loan evidenced by the Portfolio #3 Loan Agreement was approximately 6 months, but the term of that loan was also extended pursuant to a forbearance agreement to May 20, 2015.  As of the Petition Date, the aggregate principal amount outstanding under the Portfolio #3 Loan Agreement is approximately $5,128,000 (the "Portfolio #3 Debt").

12.     Collectively, the Portfolio #2 Loan Agreement  and Portfolio #3 Loan Agreement are referred to herein as the "Loan Agreements" and the Portfolio #2 Debt and the Portfolio #3 Debt is referred to as the "Spectrum Debt").  Upon information and belief, Spectrum asserts that it has a lien on substantially all of the Debtors' assets to secure the Spectrum Debt.

13.     Based upon current appraisals obtained in April, 2015, the value of the Debtors' hotel properties is $57,000,000, as compared to Spectrum's alleged debt of approximately $44,246,351.  Accordingly, even assuming that the Spectrum Debt and alleged liens are valid, the Debtors have over $12.75 million in equity in the hotel properties, which is more than 28% of the Spectrum Debt.

14.     The Loan Agreements with Spectrum were entered into as a bridge facility to assist the Debtors in acquiring the hotel properties.  Despite the fact that during the last year, the Debtors

have made all required interest payments on the Spectrum Debt and have made over $3 million of principal payments, Spectrum has been unwilling to extend the term of the loans. Accordingly, the Debtors are actively pursuing several sources of refinance of the Spectrum Debt.

15. Despite the Debtors' payment of all interest on the Spectrum Debt (even after maturity), as well as substantial principal payments, Spectrum has also been unwilling to provide the Debtors a reasonable amount of time to refinance the Spectrum Debt. The Debtors attempted to negotiate a forbearance agreement prior to the Petition Date, which would have allowed the Debtors time to obtain a refinance of the Spectrum Debt. Unfortunately, Spectrum demanded that in return for a limited amount of time, the Debtors must agree to execute "deeds in lieu" that would be released, without notice, at any time that Spectrum determined an alleged default occurred, or upon a date certain if the Spectrum Debt was not refinanced. Because of the substantial equity in the Debtors' properties, the Debtors were unwilling to execute documents that would allow Spectrum to reap value above and beyond the Spectrum Debt, without any ability for the Debtors to challenge Spectrum's actions.

16. On July 6, 2015, Spectrum sent notice to the Debtors' bank (Wells Fargo) to direct funds to Spectrum's account, thereby cutting off the Debtors' ability to operate certain of its properties. Because Spectrum asserts a lien on the Debtors' remaining funds, and presumably asserts that the funds constitute "Cash Collateral," the Debtors filed this Motion to use Cash Collateral.

## C. The Debtors' Operations

17. The Debtors' hotels are managed and operated by Channel Point Hospitality LLC ("Channel Point") pursuant to management agreements (the "Management Agreements") entered into with respect to each of the 8 hotel properties. Among other things, the Management Agreements provide that Channel Point will furnish employees at each hotel, and such employees

are employees of Channel Point or Channel Point's affiliates, not the Debtors.  The Debtors are obligated to provide Channel Point with sufficient funds to operate the hotels, including funds necessary to pay employees.  Further, the Debtors are obligated to pay Channel Point certain management fees in connection with management of the Debtors' properties, including a fee of 3% of gross revenue, along with certain other accounting and revenue-management fees payable under the management agreements.

18.     Currently, each of the Debtors' hotel properties is cash flow positive (net of debt-service obligations as the Debtors' secured debt recently matured), and therefore, payment of operating expenses from Cash Collateral should not diminish in any way Spectrum's alleged lien position.  Rather, continued operation of the properties will preserve, if not enhance, the Debtors' hotel properties - - Spectrum's alleged collateral.

**D.      The Chapter 11 Cases**

19.     The Debtors filed for bankruptcy protection in order to protect and preserve the Debtors' estates while the Debtors continue to pursue a refinancing (or restructure) of the Spectrum Debt.  The first step in preserving the Debtors' estates is allowing use of Cash Collateral for continued operation of the Debtors' hotel properties.

### III.  Relief Requested

20.     Pursuant to Bankruptcy Code §§ 361 and 363, the Debtors request, *inter alia*, (a) interim authority to use the alleged Cash Collateral of Spectrum; (b) authority to use Cash Collateral on a final basis following the conclusion of a final hearing on this Motion; and (c) the grant of adequate protection to Spectrum to the extent of any diminution in value of Spectrum's alleged lien position as a result of Cash Collateral use.

**A.      Immediate Need for Use of Cash Collateral**

21.     Bankruptcy Code § 363(c) provides, in relevant part:

(c)       (1) If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

(2)       The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless –

(A)       each entity that has an interest in such cash collateral consents; or

(B)       the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363 (c).

22.       The Debtors have an immediate need to use Cash Collateral to continue to operate their businesses. Without such funds, the Debtors will not be able to pay costs and expenses, including, but not limited to, general and administrative operating expenses that will arise in the administration of these cases.

23.       The Debtors request interim authorization to use Cash Collateral until a final order granting further use of Cash Collateral can be entered. The Debtors are without sufficient funds, other than Cash Collateral, to operate for fourteen or more days until a final hearing on this Motion can be held. The Debtors' inability to timely pay the costs and expenses set forth herein will result in immediate and irreparable harm to their estates. Because the Debtors' request for interim authorization seeks the use of only that amount of Cash Collateral as is necessary to avoid immediate and irreparable harm to the value of their estates pending a final hearing, their request complies with Rules 4001(b)(2) and 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

24.       The Debtors also request that the Court authorize them to continue to use Cash Collateral on a final basis, subject to a final hearing on Cash Collateral use.

B.      **Grant of Adequate Protection**

25.     Bankruptcy Code § 363(e) provides that "on request of an entity that has an interest in property used . . . or proposed to be used . . ., the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." Bankruptcy Code § 361 sets forth a non-exclusive list of forms of adequate protection, which include periodic cash payments, additional liens, replacement liens, and other forms of relief. 11 U.S.C. § 361. A determination of adequate protection is decided on a case-by-case basis, involving a consideration of the "nature of the creditor's interest in the property, the potential harm to the creditor as a result of the property's decline in value and the method of protection." *In re Braniff Airways, Inc.*, 783 F.2d 1283, 1286 (5th Cir. 1986). The purpose of adequate protection is to ensure that a secured party's economic position is not worsened because of the filing of a bankruptcy case. *See In re DeSardi*, 340 B.R. 790, 804 (Bankr. S.D. Tex. 2006).

26.     The Debtors propose to adequately protect the alleged interest of Spectrum in their prepetition collateral in a number of ways. First, Spectrum is substantially oversecured and holds a sizeable equity cushion in its alleged collateral. As set forth above, the value of the prepetition collateral is approximately $57 million, which substantially exceeds the sum total of the indebtedness to Spectrum (approximately $44 million), and the resulting equity cushion of almost 30% will protect Spectrum against any decrease in the value of its interests in the prepetition collateral for the duration of the requested use of Cash Collateral.  *See In re Las Torres Development*, L.L.C., 413 B.R. 687, 695–96 (Bankr. S.D. Tex. 2009)("case law is clear that an equity cushion of 20% or more constitutes adequate protection").

27.     Second, the Debtors propose to grant Spectrum replacement liens. Subject to prior perfected and unavoidable liens and security interests and only to the extent of any actual diminution in the value of the Spectrum's interest in Cash Collateral as a result of the Debtors' use

thereof, the Debtors propose to grant Spectrum replacement liens[2] upon: (a) all assets in which Spectrum held a validly perfected lien as of the Petition Date (the "Prepetition Collateral"), and (b) all property acquired by the Debtors after the Petition Date that is of the exact nature, kind or character as the Prepetition Collateral. The Debtors anticipate that those replacement liens will adequately protect Spectrum for the use of Cash Collateral. The Debtors do not propose to grant Spectrum liens in avoidance actions under chapter 5 of the Bankruptcy Code or the proceeds thereof.

28.    Third, the Debtors will provide Spectrum ample information relating to projected revenues and expenses, and actual revenue and expenses. This information will enable Spectrum to monitor its interests in the Prepetition Collateral and Cash Collateral. Reporting of financial information is also a sufficient form of adequate protection. *See, e.g., Mutual Benefit Life Ins. Co. v. Stanley Station Assocs., L.P. (In re Stanley Station Assocs., L.P.)*, 140 B.R. 806, 809 (D. Kan. 1992) ("In addition, we believe the request of MBL for 'timely filing of proper monthly operating reports . . .' falls within the ambit of adequate protection . . . .").

## C.    Request for Immediate Relief

29.    Bankruptcy Rule 6003 prohibits the payment of prepetition claims, or other use of property outside the ordinary course of business, within the first twenty-one (21) days of these Cases, except as necessary to prevent immediate and irreparable harm. For the reasons stated previously herein, the Debtors submit that the relief requested is necessary to prevent immediate and irreparable harm to the Debtors' estates.

---

[2] The liens requested herein would be effective upon the Petition Date and without the necessity of the execution by the Debtors of additional mortgages, security agreements, pledge agreements, financing statements, or other documents.

30.     Furthermore, to successfully implement the foregoing, the Debtors request a waiver of the notice requirements of Bankruptcy Rule 6004(a) and the fourteen (14) day stay under Bankruptcy Rule 6004(h) (to the extent applicable). The exigent nature of the relief sought herein justifies immediate relief, which is necessary for the Debtors to be able to continue to operate their businesses and preserve value in their estates.

### **Prayer**

The Debtors respectfully request that this Court enter an Order (a) authorizing, on an interim and final basis, the Debtors' use of Cash Collateral; (b) granting adequate protection to Spectrum as more particularly set forth herein; and (c) granting them such other and further relief to which they may be justly entitled.

Dated: July 8, 2015

Respectfully submitted,

*/s/ Brent R. McIlwain*
Robert W. Jones
robert.jones@hklaw.com
Brent R. McIlwain
brent.mcilwain@hklaw.com
Brian Smith
brian.smith@hklaw.com
Holland & Knight LLP
200 Crescent Court, Suite 1600
Dallas, TX 75201
Telephone:    (214) 964-9500
Facsimile:    (214) 964-9501

Proposed Counsel for the
Debtors and Debtors in Possession