**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**MIDLAND DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **RREAF O&G PORTFOLIO #2 LLC;** | § | **LEAD CASE NO. 15-70094-rbk** |
| | § | |
| **RREAF O&G PORTFOLIO #2 MANAGER LLC;** | § | **CASE NO. 15-70095-rbk** |
| | § | |
| **RREAF O&G PORTFOLIO #3 LLC;** | § | **CASE NO. 15-70096-rbk** |
| | § | |
| **RREAF O&G PORTFOLIO #3 MANAGER LLC;** | § | **CASE NO. 15-70097-rbk** |
| | § | |
| **Jointly Administered Debtors.** | § | **Chapter 11** |
| | § | |
| | § | **(Jointly Administered Under** |
| | § | **CASE NO. 15-70094-rbk)** |
| | § | |

**EMERGENCY MOTION FOR ORDER AUTHORIZING ACCEPTANCE OF
FINANCING PROPOSAL AND FUNDING OF LENDER'S DUE DILIGENCE DEPOSIT**

RREAF O&G PORTFOLIO #2 LLC ("Portfolio #2"), RREAF O&G PORTFOLIO MANAGER #2 LLC ("#2 Manager"), RREAF O&G PORTFOLIO #3 LLC ("Portfolio #3"), and RREAF O&G PORTFOLIO #3 MANAGER LLC ("#3 Manager"), the above-referenced debtors and debtors in possession (collectively, the "Debtors"), hereby submit this Motion (the "Motion") for entry of an order authorizing Debtors to pursue a financing proposal made by Atalaya Capital Management, LP ("Atalaya") and to submit an expense deposit of $100,000 to Atalaya to induce Atalaya to commence due diligence and credit analysis with respect to the financing proposal. In support of its Motion, the Debtors respectfully state as follows:

## Jurisdiction

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this proceeding is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are Section 363 of Title 11 of the United States Code and Rule 4001(b) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules").

## Background

**A.      The Debtors**

3.      On July 8, 2015 (the "Petition Date"), the Debtors commenced their cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their property as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee, examiner, or official committee of unsecured creditors has been appointed in the Debtors' bankruptcy cases.

4.      The Debtors, collectively, own eight hotel properties.  Two of the properties are located in Midland, Texas, and the remaining six properties are located in Andrews, Texas, Cuero Texas, Hobbs, New Mexico, Pearsall, Texas, Pecos, Texas and Port Arthur, Texas.  Each of the properties is branded with well-known franchises, or "flags."

5.      Seven of the hotel properties are owned by Portfolio #2, and one property is owned by Portfolio #3.  The sole member of Portfolio #2 is #2 Manager and the sole member of Portfolio #3 is #3 Manager.

**B.      Loans from Spectrum**

6.      Portfolio #2 and #2 Manager are parties to a Loan Agreement dated as of April 30, 2014 (as amended from time to time, the "Portfolio #2 Loan Agreement") with Spectrum

Origination, LLC ("Spectrum"), as lender.  The original term of the loan evidenced by the Portfolio #2 Loan Agreement was one year, but the term was extended pursuant to a forbearance agreement to May 20, 2015.  As of the Petition Date, the aggregate principal amount outstanding under the Portfolio #2 Loan Agreement is approximately $39,118,351 (the "Portfolio #2 Debt").

7.      Portfolio #3 and #3 Manager are parties to a Loan Agreement dated as of November 21, 2014 (as amended from time to time, the "Portfolio #3 Loan Agreement") with Spectrum, as lender.  The original term of the loan evidenced by the Portfolio #3 Loan Agreement was approximately 6 months, but the term of that loan was also extended pursuant to a forbearance agreement to May 20, 2015.  As of the Petition Date, the aggregate principal amount outstanding under the Portfolio #3 Loan Agreement is approximately $5,128,000 (the "Portfolio #3 Debt").

8.      Collectively, the Portfolio #2 Loan Agreement  and Portfolio #3 Loan Agreement are referred to herein as the "Loan Agreements" and the Portfolio #2 Debt and the Portfolio #3 Debt is referred to as the "Spectrum Debt").  Upon information and belief, Spectrum asserts that it has a lien on substantially all of the Debtors' assets to secure the Spectrum Debt.

9.      Based upon current appraisals obtained in April, 2015, the value of the Debtors' hotel properties is $57,000,000, as compared to Spectrum's alleged debt of approximately $44,246,351.  Accordingly, even assuming that the Spectrum Debt and alleged liens are valid, the Debtors have over $12.75 million in equity in the hotel properties, which is more than 28% of the Spectrum Debt.

10.      The Loan Agreements with Spectrum were entered into as a bridge facility to assist the Debtors in acquiring the hotel properties.  Despite the fact that during the last year the Debtors have made all required interest payments on the Spectrum Debt and have made over $3 million of

principal payments, Spectrum has been unwilling to extend the term of the loans. Accordingly, the Debtors are actively pursuing several sources of refinance of the Spectrum Debt.

11.     The Debtors attempted to negotiate a forbearance agreement prior to the Petition Date, which would have allowed the Debtors time to obtain a refinance of the Spectrum Debt. Unfortunately, Spectrum demanded that in return for a limited amount of time, the Debtors must agree to execute "deeds in lieu" that would be released, without notice, at any time Spectrum determined an alleged default occurred, or upon a date certain if the Spectrum Debt was not refinanced. Because of the substantial equity in the Debtors' properties, the Debtors were unwilling to execute documents that would allow Spectrum to reap value above and beyond the Spectrum Debt, without any ability for the Debtors to challenge Spectrum's actions.

12.     On July 6, 2015, Spectrum sent notice to the Debtors' bank (Wells Fargo) to direct funds to Spectrum's account, thereby cutting off the Debtors' ability to operate certain of their properties.

13.     On July 17, 2015, less than 10 days after the Petition Date, Spectrum filed a motion for relief from the automatic stay [Docket No. 47](the "Spectrum Lift Stay Motion"), seeking relief permitting Spectrum to foreclose on the Debtors' assets. Spectrum argues that it is entitled to that relief not because of any lack of equity in the properties, but instead based on Spectrum's argument that the Debtors *waived* the automatic stay in a prepetition forbearance agreement that expired May 20, 2015. Further, Spectrum claims that there is cause for relief from the automatic stay because the Debtors have not yet refinanced the Spectrum Debt. While the Debtors will address the Spectrum Lift Stay Motion in due course, there is not cause for relief from the automatic stay here. Rather, this Motion is the first step in eliminating Spectrum's debt and preserving value for other stakeholders.

C.      **Atalaya Refinance Proposal**

14.      Prior to the Petition Date, the Debtors were in negotiation with several financing sources (including Atalaya) regarding a potential refinance of the Spectrum Debt.  However, because of the actions taken by Spectrum, the Debtors were forced to file bankruptcy before a refinancing could be completed.  After the Petition Date, the Debtors renewed discussions with Atalaya, which led to the refinancing proposal that is the subject of this Motion.

15.      Atalaya and the Debtors (subject to Court approval) have reached agreement on the terms of a $45 million senior secured credit facility (the "Atalaya Proposal"), a true and correct copy of which is attached hereto as Exhibit A.  The Atalaya Proposal is summarized as follows:

| | |
|---|---|
| **Amount of Facility:** | Up to $45 million |
| **Interest Rate:** | LIBOR plus 9% |
| **Term:** | 24 months, with a 12 month extension option, exercisable on certain conditions |
| **Original Issue Discount:** | 1% of loan amount |
| **PIP Reserve:** | $1 million, funded at close |
| **Amortization:** | $250,000 per quarter, beginning 15 months after closing; excess cash flow sweep beginning at the end of 2016 |
| **Deposit:** | $100,000, to be applied to expenses incurred by Atalaya |

16.      The funds under the Atalaya Proposal would be used (together with cash on hand if necessary) to satisfy the Spectrum Debt.  The Atalaya Proposal is a marked improvement over the Spectrum Debt.  First, the term of the financing set forth in the Atalaya Proposal is 24-36

months, which is materially longer than the original term of the Spectrum Debt. Further, the interest rate, at LIBOR plus 9%, is less than the 12.5% interest rate charged by Spectrum.

**Relief Requested**

17.     The Debtors request authorization to (i) accept and counter-sign the Atalaya Proposal, and (ii) pay to Atalaya the expense deposit of $100,000[1] required to permit Atalaya to conduct its due diligence necessary to commit to extend credit as provided in the Atalaya Proposal.

**Basis for Relief**

18.     The Debtors currently have no third party commitment for refinancing the Spectrum Debt. The nature of the market for financing of the type sought by the Debtors is such that any lender making a financing proposal would require the potential borrower to pay the potential lender's costs and expenses associated with due diligence, appraisals, audit fees, legal fees and disbursements, consultant fees, syndication fees, recording fees and other costs and expenses incurred in connection with underwriting, credit analysis and closing (should a closing occur). Potential borrowers also customarily would have to provide an advance against which the prospective lender may apply its expenses.

19.     The Atalaya Proposal, should a financing transaction be consummated, is expected to provide sufficient financing (together with cash on hand) to meet the Debtors' needs for refinancing the Spectrum Debt. The Debtors anticipate that the refinancing would occur either through confirmation of a plan of reorganization or through a structured dismissal of the cases.

20.     As financing proposals of this sort would typically require, the Atalaya Proposal requires the Debtors to pay all of Atalaya's costs and expenses incurred in connection with the

---

[1] The Debtors propose to allocate and pay the deposit as follows: $88,500 from Portfolio #2 and $11,500 from Portfolio #3, which equates to the relative proportions of the Portfolio #2 Debt and Portfolio #3 Debt to the total Spectrum Debt.

Atalaya Proposal, including due diligence costs and expenses, attorneys fees, consultant fees, appraisal fees, audit fees, travel and transportation expenses, copying expenses, filing and recording fees and Atalaya's costs of enforcing its rights under the proposal ("<u>Atalaya Due Diligence Costs</u>").

21.     The Atalaya Proposal requires the Debtors to deposit the sum of $100,000 with Atalaya as an advance against (and in order to repay) Atalaya Due Diligence Costs incurred.  The terms of the Atalaya Proposal, including those terms requiring payment of expenses and a deposit against expenses are consistent with terms typically found in proposals for financing of the type contemplated by the proposal.

22.     Section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing.  Use of estate property outside the ordinary course of business is authorized if the debtor demonstrates a sound business justification for it.  *See In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226-27 (5th Cir. 1986)(affirming bankruptcy court's approval of a transaction outside the ordinary course of business following the demonstration by the debtors of a reasonable business justification for the transaction); *In re ASARCO LLC*, 441 B.R. 813, 832 (S.D. Tex. 2010)(affirming payment of expense reimbursements to potential bidders in order to induce participation in auction of estate assets under Bankruptcy Code Section 363(b) where debtors were able to establish a reasonable business justification for such payments).

23.     The Debtors submit that entry of an order authorizing acceptance of the Atalaya Proposal is necessary and appropriate in that entering into the Atalaya Proposal is a proper exercise of the Debtor's business judgment.   The Debtors' properties have value well above the Spectrum Debt, yet Spectrum continues, through the Spectrum Lift Stay Motion, to seek to exercise remedies

to reap the benefits of the Debtors' equity cushion, to the detriment of other stakeholders in this case.  Without a refinancing, the Debtors will be forced to waste valuable estate assets litigating with Spectrum over the Spectrum Debt and Spectrum's ability to exercise remedies.  Acceptance of the Atalaya Proposal is in the best interests of the Debtors' stakeholders and constitutes sound business judgment, as the Atalaya Proposal represents the first step in retiring the Spectrum Debt and clearing the way for a successful emergence from these cases.

24.     When examining a debtor's exercise of business judgment, once a debtor articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *See Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 678 (N.D. Tex. 2011); *Official Comm. Of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation omitted).  Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." *Id.*  To satisfy its burden, it is not enough for an objector simply to raise and argue an objection.  Rather, an objector is required to produce some evidence respecting its objections.  *See Mann v. GTCR Golder Rauner, L.L.C.*, 483 F. Supp. 2d 884, 902 (D. Ariz. 2007)("… the business judgment presumption is a rule of evidence that places the *initial burden of proof on the plaintiff.*")(emphasis in original).

## Request for Immediate Relief

25.     To successfully implement the foregoing, the Debtors request a waiver of the notice requirements of Bankruptcy Rule 6004(a) and the fourteen (14) day stay under Bankruptcy Rule 6004(h) (to the extent applicable). The exigent nature of the relief sought herein justifies immediate relief, which is necessary for the Debtors to be able to move forward with the Atalaya Proposal.

WHEREFORE, the Debtors respectfully request that the Court:  (i) enter an order granting the relief requested herein; and (ii) grant such other and further relief to the Debtors as the Court may deem proper.

Dated July 21, 2015                                    Respectfully submitted,

                                                       */s/ Brent R. McIlwain*
                                                       Robert W. Jones
                                                       robert.jones@hklaw.com
                                                       Brent R. McIlwain
                                                       brent.mcilwain@hklaw.com
                                                       Brian Smith
                                                       brian.smith@hklaw.com
                                                       Holland & Knight LLP
                                                       200 Crescent Court, Suite 1600
                                                       Dallas, TX  75201
                                                       Telephone:     (214) 964-9500
                                                       Facsimile:     (214) 964-9501


                                                       Proposed Counsel for the
                                                       Debtors and Debtors in Possession

## <u>Exhibit A</u>

**Atalaya Proposal**

(see attached)



# RREAF PORTFOLIO LOAN ORIGINATION – TERM SHEET

*Summary of terms and conditions of proposed Loan – July 20, 2015*

**<u>NON-BINDING; FOR DISCUSSION PURPOSES ONLY</u>**

| I. PARTIES | |
|---|---|
| *Borrower:* | The Properties (as defined below and listed on Exhibit A attached hereto) shall be collectively owned by one or more newly-formed, bankruptcy remote, special purpose entities whose sole purpose is to own the Properties (each a "**Borrower**" and collectively, the "**Borrowers**"). <br><br> The Borrowers, together with the Guarantors (as defined below), are each sometimes individually referred to as a "**Credit Party**" and collectively, as the "**Credit Parties**". |
| *Debtors:* | RREAF O&G Portfolio #2 LLC, RREAF O&G Portfolio #2 Manager LLC, RREAF Portfolio #3 LLC, and RREAF Portfolio #3 Manager LLC (collectively, the "**Debtors**"). |
| *Guarantors:* | RREAF Holdings, LLC ("**Parent**") and key individual principals of Parent to be determined shall each provide a customary limited indemnity guaranty covering "bad" acts, including certain "full recourse" events (e.g., fraud and voluntary bankruptcy). <br><br> The Guarantors shall also provide an environmental indemnity guaranty in favor of Lender (as defined below). |
| *Lender:* | One or more funds, accounts or investment vehicles managed by Atalaya Capital Management LP, and/or its investors and partners ("**Lender**") |
| *Agent:* | Atalaya Administrative LLC ("**Agent**") |
| II. STRUCTURE | |
| *Loan:* | Lender will commit to extend to Borrower a senior-secured term loan (the "**Loan**"). The Loan shall be secured by a first-priority mortgage on each of the Properties and a first-priority lien on the other Collateral (as defined below). |
| *Loan Amount:* | The lesser amount of (i) $44,000,000 and (ii) 75.0% of the aggregate appraised value of the Properties as determined by Lender, in its sole discretion. Upon request by the Borrower, the Loan Amount may be increased to $45 million, subject to approval by the Lender in its sole discretion. |

ATALAYA
CAPITAL MANAGEMENT LP

| | |
|---|---|
| *Use of Proceeds:* | The proceeds from the Loan shall be used to (i) refinance existing debt secured by the Properties which will be identified prior to the Closing Date, (ii) fund the PIP Reserve (as defined below) and (iii) pay Loan closing fees and expenses. |
| *Closing Date:* | August 31, 2015; subject to completion of due diligence, receipt of applicable internal approvals, negotiation and execution of the Loan Documents (defined hereinafter), and satisfaction of all closing conditions, in all cases satisfactory to Lender in its sole and absolute discretion. |
| *Maturity:* | The Maturity Date of the Loan shall be twenty-four (24) months from the Closing Date ("**Maturity Date**").<br><br>On the Maturity Date, all of the then outstanding and unpaid obligations, fees, costs, other expenses and/or amounts, interest, principal, Make-Whole Premium and Exit Fee, with respect to the Loan, shall be immediately due and payable in full to Lender, without prior notice to Borrower. |
| *Extension Option:* | The Borrower, at its option, may elect to extend the Maturity Date to the date that is twelve (12) months from the Maturity Date (the "**Extension Option**"); provided that, (i) no default or Event of Default (as defined below) has occurred and is continuing, (ii) total Net Operating Income (subject to a standard definition thereof) for the Properties is greater than $9 million in aggregate and (iii) the then-outstanding Loan Amount divided by the total value of the Properties (as determined by an appraiser engaged by Lender, to the sole satisfaction of Lender) does not exceed 70.0%. The Borrower must notify the Lender of the election of the Extension Option no later than one (1) month prior to the Maturity Date and no sooner than three (3) months prior to such date.<br><br>In addition, the Borrower shall pay to the Lender the Extension Fee (as defined below) at the time of (and as a mandatory condition to) exercise of the Extension Option. |
| *Extension Fee:* | 1.50% multiplied by the then outstanding Loan Amount at the time of exercise of the Extension Option. |
| *PIP Reserve:* | On the Closing Date, the Lender will fund, from the proceeds of the Loan, a property improvement plan reserve ("**PIP Reserve**") in an amount equal to $1,000,000. The PIP Reserve shall be held in an account maintained by Lender and pledged to Lender as Collateral for the Loan. In addition, 4.0% of Total Revenue (subject to a standard definition thereof) generated by the Properties shall be deposited monthly in the PIP Reserve. Amounts in the PIP Reserve shall |

A T A L A Y A

CAPITAL MANAGEMENT LP

| | |
|---|---|
| | be used by Borrower as required by property improvement plans between Parent and hotel franchisors.<br><br>The PIP Reserve shall be outstanding principal on the Loan and shall bear interest at the Interest Rate. |
| *Collateral:* | The Borrower shall grant Lender a perfected, first priority mortgage and security interest in the following real property and other assets of Borrower (the "**Collateral**"):<br><br>   i.     The real property (and structures thereon) listed on Exhibit A of this Term Sheet (the "**Properties**");<br>  ii.     All of the present and future property and assets, real and personal, of the Borrower, including, but not limited to, machinery and equipment, inventory and other goods, accounts receivable, leaseholds, fixtures, bank accounts, reserve accounts, general intangibles, financial assets, investment property, intellectual property rights, chattel paper, insurance proceeds, contract rights, franchise agreements, hedge agreements, documents, instruments, indemnification rights, tax refunds and cash; and<br> iii.    All proceeds and products of the property and assets described above.<br><br>As additional collateral for the Loan, Parent shall grant Lender a perfected, first priority equity pledge with respect to all present and future membership interests or shares of capital stock of (or other ownership or profit interests in) each of the Borrowers.<br><br>All Collateral shall be free and clear of other liens, claims and encumbrances, except for permitted liens, claims, and encumbrances to be mutually agreed upon by Borrower and Lender on the Closing Date. |
| *Sale or Transfer of Assets:* | No direct or indirect transfers of the equity ownership interests of the Borrower or of the Collateral, or any direct or indirect changes of control, shall be permitted without written approval by the Lender and any such unapproved matters shall be an immediate Event of Default.<br><br>Notwithstanding the foregoing, in the absence of any default or Event of Default and subject to other customary conditions, the Borrower may sell each Property at or above certain release prices equal to 125% of the allocable Loan Amount for |



each Property ("**Release Price**"). 100% of the proceeds from the sale of a Property (net of reasonable third-party closing costs and expenses) shall be used to:

    i.     First, repay all outstanding accrued interest or fees then owed pursuant to the Loan (including, without limitation, the Exit Fee and Make Whole Premium);

    ii.    Second, repay outstanding principal owed pursuant to the Loan in amount equal to the applicable Release Price; and

    iii.   Third, any remaining amounts to the Borrower.

| **III. RATES, FEES AND REPAYMENT** |
|---|

| | |
|---|---|
| *Interest Rate:* | The Loan will accrue cash interest at LIBOR Rate + 9.00% (the "**Cash Rate**"). |
| | The term "LIBOR Rate" shall mean 30-day LIBOR, in accordance with a customary and appropriate definition thereof, and the basis for calculating accrued interest and the interest periods for the Loan based on the LIBOR Rate shall be customary and appropriate for financings of this type. At no time shall the LIBOR Rate be less than 1.00%. |
| | Cash interest (i) will be calculated based upon a year of 360 days for actual days elapsed, (ii) shall accrue monthly, and (iii) shall be payable monthly. |
| *Original Issue Discount:* | 1.00% of the Loan Amount shall be structured as an original issue discount; it being understood and agreed by Borrower that such original issue discount amount shall not be funded on the Closing Date, but shall be deemed to be outstanding principal on the Loan, shall accrue interest at the interest rate as if funded and shall be due and payable (in its entirety) upon the Maturity Date (or earlier acceleration of the Loan in accordance with its terms). |
| *Default Interest Rate:* | If an Event of Default (defined hereinafter) has occurred and is continuing under the Loan, the Interest Rate herein shall be increased by 5.00%. |
| *Mandatory Amortization and Excess Cash Flow Payments::* | Mandatory quarterly amortization payments, each equal to $250,000 will be required on the first payment date beginning in the 15th month from the Closing Date and on the first payment date of each subsequent calendar quarter thereafter. |
| | At the end of each calendar year, the Borrower shall be required to repay principal under the Loan according to the following schedule: |

| | |
|---|---|
| 2015: | 0% of Excess Cash Flow from the Properties |

ATALAYA
CAPITAL MANAGEMENT LP

|  |  |
|---|---|
| 2016: | 15% of Excess Cash Flow from the Properties |
| 2017: | 25% of Excess Cash Flow from the Properties |

|  |  |
|---|---|
| | The definition of Excess Cash Flow shall be determined prior to the Closing Date and shall be fully defined in the Loan Documents. For the avoidance of doubt, the Exit Fee (defined below) shall apply to all mandatory amortization payments (including Excess Cash Flow Payments). |
| *Prepayment:* | The Borrower may prepay or repay the Loan at any time (in whole or, in the absence of a default or an Event of Default, in part), subject to the Exit Fee and Make Whole Premium provisions below. |
| *Exit Fee:* | Upon prepayment or repayment of the Loan (in whole or in part), including with respect to all mandatory amortization payments, a fee of 1.00% of all or such portion of the Loan Amount repaid shall be payable by the Borrower to the Lender on such day of prepayment or repayment ("**Exit Fee**"). For the avoidance of doubt, the Exit Fee shall be due and payable upon repayment at any time before, on, or after, the Maturity Date. |
| *Make Whole Premium:* | "**Make Whole Premium**" shall mean, with respect to any voluntary prepayment made on or before the one year anniversary of the Closing Date, an amount equal to all interest which would have been paid (based upon the then-current LIBOR Rate) on the prepaid amount for the period commencing on the date of prepayment through and including the one year anniversary of the Closing Date. |
| *Administrative Fee:* | A non-refundable, fully-earned and non-proratable administrative fee of $12,500 will be payable to the Agent for its own account payable quarterly in advance. The first payment will be due on the Closing Date and each subsequent payment will be due on the first day of each subsequent calendar quarter until the Loan is repaid in full. |
| **V.  MISCELLANEOUS** | |
| *Indemnification:* | The Credit Parties hereby agree to indemnify and hold harmless Lender, Agent and their respective members, managers, partners, affiliates, subsidiaries, officers, directors, employees, agents and advisors (each an "**Indemnified Party**"), from and against all losses, liabilities, obligations, judgments, claims, damages or expenses that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or relating to this Term Sheet, the Loan, the transactions contemplated by the Loan Documents, the Borrower's |



use of Loan proceeds or the commitments, including, but not limited to, reasonable attorneys' fees (including the allocated cost of internal counsel) and settlement costs, except to the extent any such loss, liability, claim, obligation, judgment, damage or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. This indemnification provision shall survive and continue for the benefit of all such persons or entities, notwithstanding any failure of the Loan to close.

| *Conditions Precedent to Funding:* | Conditions precedent customary for this type of financing all of which shall be satisfactory to Lender and its counsel at their sole discretion, including, without limitation: |
|---|---|

    i)    Completion of Lender's business, legal, and Collateral due diligence, including but not limited to, (A) meetings with Borrower and Guarantor management teams, (B) review of material agreements, (C) UCC, tax lien, judgment, bankruptcy and litigation searches and background checks on Credit Parties and any other relevant persons or key principals, (D) corporate structure, and review of Borrower's and Guarantor's books and records and (E) review of engineering / property condition, environmental, zoning, title and survey related to the Properties and/or Collateral;

    ii)    Payment of all accrued and unpaid expenses that are payable by the Borrower (outside the ordinary course of business) and payment and/or escrow of applicable taxes and insurance premiums;

    iii)    Negotiation and execution of satisfactory legal documentation, including, without limitation, (A) a promissory note (the "**Promissory Note**"), (B) a mortgage and security agreement relating to the Properties and other assets to be mortgaged and pledged to the Lender (the "**Security Agreement**"), (C) an assignment of leases and rents (the "**ALR**"), (D) an environmental indemnity agreement (the "**Environmental Indemnity**"), (E) a "bad boy" indemnity guaranty ("**Indemnity Guaranty**"), (F) hotel franchisor comfort letters ("**Comfort Letters**") and (G) a collateral assignment and subordination of the property management agreement (the "**Collateral Assignment and Subordination Agreement**") (collectively, with other loan documentation, which Lender may require to consummate the Loan (the "**Loan Documents**");

    iv)    Evidence that the Lender shall have a valid and perfected first priority lien and security interest in the Collateral, including, without limitation, general and collateral releases from prior

ATALAYA
CAPITAL MANAGEMENT LP

|  |  |
|---|---|
|  | lenders, customary corporate and estoppel certificates, appropriate legal opinions and appropriate landlord/mortgagee/bailee waivers; and |
|  | v) There shall have occurred no material adverse change in or effect on: (A) the business, condition (financial or otherwise), assets, liabilities (actual or contingent), operations, management, performance, properties, or prospects of the Credit Parties or the Collateral, (B) the ability of Borrower to perform its obligations under the Loan Documents or (C) the ability of the Lender to enforce the Loan Documents (any of the foregoing being a "**Material Adverse Change**"), in each case, in the Lender's sole judgment, at any time prior to the Closing; and |
|  | vi) Absence of any action, suit, investigation or proceeding pending or, to the knowledge of the Borrower, threatened in any court or before any arbitrator or governmental authority that could reasonably be expected to have a Material Adverse Change. |
| *Events of Default and Covenants:* | Prior to the Closing Date, Lender and Borrower shall negotiate a complete set of events of default ("**Events of Default**") and covenants regarding the Loan that are customary for a transaction of this nature.<br><br>If an Event of Default has occurred and is continuing, at the election of the Lender at its sole discretion, all outstanding principal, interest, fees and other obligations owed with respect to the Loan shall be due and payable immediately to Lender and Lender shall be entitled to exercise all of its rights and remedies pursuant to the Loan Documents. |
| *Property Management:* | During the term of the Loan, Borrower agrees to maintain Aimbridge Hospitality ("**Aimbridge**") or another third party property manager (approved by Lender in its sole discretion) to manage the Properties. |
| *Cash Management:* | Cash management accounts under the sole dominion and control of Lender established at First Republic Bank, or another financial institution acceptable to Lender, satisfactory to the Lender at its sole discretion, including applicable deposit account control agreements. |
| *Representations / Warranties:* | Usual and customary for mortgage financings generally and for this transaction, with exceptions for any defaults and violations triggered as a result of the bankruptcy proceedings of the owners of the Properties commenced during July, 2015 (and with no exceptions for any defaults and violations relating to subsequent bankruptcy proceedings), in particular, including, but not limited to: (i) corporate existence and status; (ii) corporate power and authority, |



|  | enforceability; (iii) no violation of law, contracts or organizational documents; (iv) no material litigation; (v) accuracy and completeness of specified financial statements and other information and no material adverse change; (vi) no required governmental or third party approvals or consents; (vii) use of proceeds and not engaging in business of purchasing/carrying margin stock; (viii) valid ownership of property and assets (including, intellectual property and licenses), free and clear of liens, charges and other encumbrances (except for permitted encumbrances to be agreed), and insurance matters; (ix) status under Investment Company Act; (x) ERISA matters; (xi) environmental matters; (xii) tax matters; (xiii) accuracy of disclosure; (xiv) compliance with laws; (xv) subsidiaries; (xvi) no default; (xvii) perfected liens, security interests and charges; (xviii) status of and compliance with material agreements; (xix) compliance with franchisor hotel agreements and (xx) solvency. |
|---|---|
| *Expenses:* | Whether or not the transactions contemplated by this Term Sheet are ultimately consummated, the Credit Parties shall reimburse Lender for all of its reasonable out-of-pocket costs and expenses without prior approval relating to the proposed Loan, including, but not limited to, legal fees, professional advisory fees, search fees, filing and recording fees, financial examination fees, collateral appraisal fees, costs related to background checks and other due diligence or other costs and expenses reasonably incurred Lender ("**Expenses**"). The Credit Parties will also pay the expenses of the Lender in connection with the enforcement of any of the Loan Documents. |
| *Deposit:* | Subject to bankruptcy court approval, a fully-earned, non-refundable deposit equal to $100,000 to induce Lender to proceed with its consideration of the proposed Loan ("**Deposit**"). The Lender may from time to time request an additional deposit if Expenses exceed or are reasonably likely to exceed the then current amount of the Deposit and any Expenses beyond the amount of the Deposit shall be promptly paid by the Credit Parties on demand or on the Closing Date. |
| *Governing Law:* | State of New York. |

The Credit Parties, on behalf of themselves and their subsidiaries, acknowledge that the provisions described above (other than those adjacent to the Indemnification, Expenses, Deposit, and Exclusivity headings, which for the avoidance of doubt are expressly binding) are non-binding and do not purport to summarize all of the conditions, covenants, representations, warranties and other provisions that would be contained in definitive loan documentation for the Loan. This Term Sheet is not an agreement to extend credit. Any agreement of the Lender to extend credit to the Borrower is subject to completion of due diligence as well as the negotiation and execution of definitive transaction documentation to the sole



satisfaction of Lender.  Notwithstanding the foregoing, the Credit Parties acknowledge the binding nature of, and agree to comply with, the provisions adjacent to the Indemnification, Expenses, Deposit, and Exclusivity headings.  The undersigned signatories hereunder represent and warrant that this Term Sheet has been duly authorized, executed and delivered by the Credit Parties.

*[Remainder of this page left intentionally blank - Signature page to follow]*



ATALAYA
CAPITAL MANAGEMENT LP

This Term Sheet will be considered null and void if it is not executed and delivered to Lender on or before 5:00pm EST on July 22, 2015.

Agreed and Accepted by the Debtors,
(subject to bankruptcy court approval)

RREAF O&G PORTFOLIO #2 LLC

By: _____

Name: KIP SOWDEN

Title: CEO

Date: 7-20-2015

RREAF O&G PORTFOLIO #2 MANAGER LLC

By: _____

Name: KIP SOWDEN

Title: CEO

Date: 7-20-2015

RREAF O&G PORTFOLIO #3 LLC

By: _____

Name: KIP SOWDEN

Title: CEO

Date: 7-20-2015

RREAF O&G PORTFOLIO #3 MANAGER LLC

By: _____

Name: KIP SOWDEN

Title: CEO

Date: 7-20-2015

Agreed and Accepted by Atalaya Capital
Management LP

By: _____

Name: _____

Title: _____

Date: _____



This Term Sheet will be considered null and void if it is not executed and delivered to Lender on or before 5:00pm EST on July 22, 2015.

Agreed and Accepted by the Debtors,
(subject to bankruptcy court approval)

RREAF O&G PORTFOLIO #2 LLC

By: _____

Name: _____

Title: _____

Date: _____

RREAF O&G PORTFOLIO #2 MANAGER LLC

By: _____

Name: _____

Title: _____

Date: _____

RREAF O&G PORTFOLIO #3 LLC

By: _____

Name: _____

Title: _____

Date: _____

RREAF O&G PORTFOLIO #3 MANAGER LLC

By: _____

Name: _____

Title: _____

Date: _____

Agreed and Accepted by Atalaya Capital
Management LP

By: _____

Name: **Robert M. Flowers**
Authorized Signatory

Title: _____

Date: 7/21/15

780 Third Avenue, 27th Floor, New York, NY 10017   Tel. (212) 201-1910   Fax (917) 464-7350



**EXHIBIT A – List of Properties**

| #   | Flag               | Address                    | City        | State |
|-----|--------------------|----------------------------|-------------|-------|
| 1.  | Best Western       | 308 Park Heights           | Cuero       | TX    |
| 2.  | Country Inn        | 920 West Interstate 20     | Midland     | TX    |
| 3.  | Holiday Inn Express| 412 South IH 35 South      | Pearsall    | TX    |
| 4.  | La Quinta          | 7540 Memorial Highway      | Port Arthur | TX    |
| 5.  | Comfort Suites     | 110 Raul Florez Boulevard  | Pecos       | TX    |
| 6.  | La Quinta          | 3312 North Lovington Highway| Hobbs      | NM    |
| 7.  | Oakwood Suites     | 601 S. Main Street         | Andrews     | TX    |
| 8.  | Comfort Inn        | 910 West IH-20             | Midland     | TX    |

## **<u>Certificate of Service</u>**

I certify that on July 21, 2015, a copy of the foregoing document was served by (i) the

Electronic Case Filing System for the United States Bankruptcy Court for the Western District of

Texas, and (ii) via facsimile, e-mail, or first class mail as indicated, on the attached service list.

 */s/ Brian Smith*

Brian Smith

## **Master Service List**

(See Attached)

**In re: RREAF O&G Portfolio #2 LLC, et al.:  Master Service List as of July 21, 2015**

| Debtors and their Counsel | | |
|---|---|---|
| In re RREAF O&G Portfolio #2 LLC, et al.<br>4245 North Central Expressway<br>Suite 420<br>Dallas, TX 75205 | Holland & Knight LLP<br>c/o Robert W. Jones &<br>Brent McIlwain<br>200 Crescent Court, Suite 1600<br>Dallas, TX 75201<br>Fax:  (214) 964-9501<br>Email:brent.mcilwain@hklaw.com<br>(via ECF) | |
| **Prepetition Secured Lenders and Counsel** | | |
| Spectrum Origination LLC<br>1250 Broadway, 19th Floor<br>New York, NY 10001<br>Attn: Peter Locke | King & Spalding LLP<br>c/o Sarah Borders<br>1180 Peachtree Street, NE<br>Atlanta, GA 30309<br>Email:  sborders@kslaw.com<br>(via ECF) | |
| **Office of the United States Trustee** | | |
| United States Trustee<br>615 E. Houston, Suite 553<br>San Antonio, TX 78205<br>USTPRegion07.SN.ECF.usdoj.gov<br>(via ECF) | | |
| **Consolidated Twenty Largest Unsecured Creditors** | | |
| Channel Point Hospitality<br>2500 N. Dallas Pkwy, Suite 600<br>Plano, TX 75093<br>Fax: 972-265-6288<br>c/o Holland O'Neil<br>Gardere Wynne Sewell LLP<br>honeil@gardere.com<br>ebaker@gardere.com<br>(via ECF) | Choice Hotels International<br>Attn: Travel Agent Program<br>PO Box 79882<br>Baltimore, MD 21279<br>Fax: 301-592-6200<br>Fax: 301-592-6275<br>(via first class mail) | LaQuinta Franchising LLC<br>Attn: Rochelle Mitchel<br>PO Box 612587<br>Dallas, TX 75261<br>Fax: 214-596-6015<br>(via first class mail) |
| Country Inns & Suites<br>SDS 12-0586<br>PO Box 86<br>Minneapolis, MN 55486<br>Fax: 763-212-3401<br>Fax: 763-515-5126<br>(via first class mail) | Intercontinental Hotels Group<br>PO Box 101074<br>Atlanta, GA 30392<br>Fax: 770-604-2107<br>(via first class mail) | HD Supply Facilities<br>PO Box 509058<br>San Diego, CA 92150<br>Fax: 800-930-4930<br>Fax: 800-859-8889<br>(via first class mail) |
| Time Warner Cable<br>PO Box 60074<br>City of Industry, CA 91716<br>Fax: 704-945-5858<br>(via first class mail) | Town of Pecos City<br>PO Box 929<br>Pecos, TX 79722<br>Fax: 432-445-6670<br>(via first class mail) | Bizzell, Neff & Galloway PA<br>PO Box 12346<br>Pensacola, FL 32591<br>Fax: 850-438-9256<br>(via first class mail) |
| Sysco West Texas<br>PO Box 5910<br>Lubbock, TX 79408<br>Fax: 806-747-3966<br>(via first class mail) | US Foodservice<br>PO Box 840396<br>Dallas, TX 75284<br>Fax: 972-487-6281<br>(via first class mail) | Tax Trust Account<br>c/o Muni Services LLC<br>PO Box 830725<br>Birmingham, AL 35283<br>Fax: 205-254-2963<br>Fax: 205-423-4099<br>(via first class mail) |

**In re: RREAF O&G Portfolio #2 LLC, et al.: Master Service List as of July 21, 2015**

| | | |
|---|---|---|
| United Healthcare c/o JP Morgan<br>131 S. Dearborn - 6th Floor<br>Attn: UNET Lockbox 22561<br>Chicago, IL 60603<br>(via first class mail) | Allredge Gardens LP<br>PO Box 50005<br>Midland, TX 79710<br>Fax: 432-687-6876<br>(via first class mail) | Suddenlink<br>PO Box 660365<br>Dallas, TX 75266<br>Fax: 866-935-2589<br>(via first class mail) |
| Best Western International Inc.<br>PO Box 53505<br>Phoenix, AZ 85072<br>Fax: 602-957-5641<br>(via first class mail) | Guest Supply<br>PO Box 910<br>Monmouth Junction, NJ 08852<br>Fax: 800-772-7676<br>Fax: 609-514-2692<br>(via first class mail) | Ecolab<br>PO Box 70343<br>Chicago, IL 60673<br>Fax: 651-225-3098<br>(via first class mail) |
| Sysco Central Texas Inc.<br>1260 Schwab Road<br>New Branfels, TX 78132<br>Fax: 855-219-2205<br>(via first class mail) | City of Hobbs<br>200 East Broadway<br>Hobbs, NM 88240<br>Fax: 575-397-9334<br>(via first class mail) | |
| **Notices of Appearances and Other Parties Receiving Notice** | | |
| Channel Point Hospitality<br>2500 N. Dallas Pkwy, Suite 600<br>Plano, TX 75093<br>Fax: 972-265-6288<br>c/o Holland O'Neil<br>Gardere Wynne Sewell LLP<br>honeil@gardere.com<br>ebaker@gardere.com<br>(via ECF) | Midland County, Texas<br>c/o Laura J. Monroe<br>Perdue, Brandon, Fielder, Collins &<br>Mott, L.L.P.<br>P.O. Box 817<br>Lubbock, TX 79408<br>Fax: (806) 744-9953<br>lmonroe@pbfcm.com<br>(via ECF) | Sysco Central Texas and<br>Sysco West Texas<br>c/o Darryl S. Laddin<br>Arnall Golden Gregory LLP<br>171 17th Street, NW, Suite 2100<br>Atlanta, GA 30363<br>darryl.laddin@agg.com<br>maureen.weaver@agg.com<br>(via ECF) |
| LaQuinta Franchising LLC<br>c/o Gregory G. Hesse<br>Hunton & Williams LLP<br>1445 Ross Avenue, Suite 3700<br>Dallas, TX 75202<br>ghesse@hunton.com<br>lmckenery@hunton.com<br>(via ECF) | Reeves County, Frio County, and<br>Frio CAD<br>c/o David Aelvoet<br>Linebarger Goggan Blair &<br>Sampson, LLP<br>711 Navarro Street, Suite 300<br>sanantonio.bankruptcy@publicans.com<br>(via ECF) | City of Beaumont<br>c/o Clayton Mayfield<br>Linebarger Goggan Blair & Sampson,<br>LLP<br>1148 Park Street<br>Beaumont, TX 77701<br>beaumont.bankruptcy@publicans.com<br>(via ECF) |
| Edge Landscaping<br>c/o Richard T. Chapman<br>Anderson, Smith, Null & Stofer,<br>L.L.P.<br>One O'Connor Plaza, Seventh Floor<br>PO Box 1969<br>Victoria, TX 77902<br>(via ECF) | | |
| | | |