**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**MIDLAND DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **RREAF O&G PORTFOLIO #2 LLC;** | § | **LEAD CASE NO. 15-70094-rbk** |
| | § | |
| **RREAF O&G PORTFOLIO #2 MANAGER LLC;** | § | **CASE NO. 15-70095-rbk** |
| | § | |
| **RREAF O&G PORTFOLIO #3 LLC;** | § | **CASE NO. 15-70096-rbk** |
| | § | |
| **RREAF O&G PORTFOLIO #3 MANAGER LLC;** | § | **CASE NO. 15-70097-rbk** |
| | § | |
| **Jointly Administered Debtors.** | § | **Chapter 11** |
| | § | |
| | § | **(Jointly Administered Under** |
| | § | **CASE NO. 15-70094-rbk)** |
| | § | |

**NOTICE OF FILING OF AMENDED PLAN SUPPLEMENT TO THE SECOND
AMENDED PLAN OF REORGANIZATION OF RREAF O&G PORTFOLIO #2
LLC, RREAF O&G PORTFOLIO #2 MANAGER LLC, RREAF O&G
PORTFOLIO #3 LLC, AND RREAF O&G PORTFOLIO #3 MANAGER LLC
PROPOSED BY THE DEBTORS AND SPECTRUM
ORIGINATION LLC, AS MODIFIED**

PLEASE TAKE NOTICE that on December 10, 2015, the above-captioned

debtors and debtors-in-possession (collectively, the "Debtors"), filed their *Plan of*

*Reorganization of RREAF O&G Portfolio #2 LLC, RREAF O&G Portfolio #2 Manager*

*LLC, RREAF O&G Portfolio #3 LLC, and RREAF O&G Portfolio #3 Manager LLC*

[Docket No. 147], which was amended by the *First Amended Plan of Reorganization of*

*RREAF O&G Portfolio #2 LLC, RREAF O&G Portfolio #2 Manager LLC, RREAF O&G*

*Portfolio #3 LLC, and RREAF O&G Portfolio #3 Manager LLC* [Docket No. 157] and

the *Second Amended Plan of Reorganization of RREAF O&G Portfolio #2 LLC, RREAF*

*O&G Portfolio #2 Manager LLC, RREAF O&G Portfolio #3 LLC, and RREAF O&G Portfolio #3 Manager LLC* [Docket No. 211] the (as amended, "Plan").[1]

PLEASE TAKE FURTHER NOTICE that attached hereto as Exhibits A-H are one or more documents, instruments, or schedules, which collectively, constitute the amended and restated Plan Supplement for the Plan.

PLEASE TAKE FURTHER NOTICE that the Plan Supplement is integral to, part of, and incorporated by reference into the Plan. The documents included in the Plan Supplement have not yet been approved by the Bankruptcy Court.

PLEASE TAKE FURTHER NOTICE that the Debtors and Spectrum Origination LLC reserve all rights to amend, modify, or supplement all or any portion of the Plan Supplement (including, without limitation, any of the exhibits attached hereto) in accordance with the Plan and at any time prior to the Plan's Effective Date.

Dated: February 18, 2016

/s/ Brent R. McIlwain
Robert W. Jones
Brent R. McIlwain
Brian Smith
Holland & Knight LLP
200 Crescent Court, Suite 1600
Dallas, TX  75201
Telephone:     (214) 964-9500
Facsimile:      (214) 964-9501
Robert.Jones@HKlaw.com
Brent.Mcilwain@HKlaw.com
Brian.Smith@HKlaw.com

Counsel for the
Debtors and Debtors in Possession

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

## **Exhibit A**

**Amended and Restated Charter Documents**

(see attached)

#38342300

**CERTIFICATE OF AMENDMENT**
**TO**
**CERTIFICATE OF FORMATION**
**OF**
**RREAF O&G PORTFOLIO #2 MANAGER LLC**

This Certificate of Amendment to Certificate of Formation of RREAF O&G Portfolio #2 Manager LLC, a Delaware limited liability company (the "Company"), dated as of February __, 2016, has been duly executed and is being filed by the undersigned, as an authorized person, in accordance with the provisions of 6 Del. C. §18-202, to amend the Certificate of Formation of the Company, as filed in the office of the Secretary of State of the State of Delaware (the "Secretary of State") on March 20, 2014 (the "Certificate").

1.      The name of the Company is RREAF O&G Portfolio #2 Manager LLC.

2.      A new Article FIFTH is hereby added to Certificate to read as follows:

"FIFTH:  The Company shall not issue nonvoting equity securities.  All classes of voting equity securities issued by the Company shall have an appropriate distribution of voting power."

Provision for making this Certificate of Amendment is contained in an order of the United States Bankruptcy Court for the Western District of Texas, Midland Division in a Chapter 11 case under the United States Bankruptcy Code in In re: RREAF O&G Portfolio #2 LLC; RREAF O&G Portfolio #2 Manager LLC; RREAF O&G Portfolio #3 LLC; RREAF O&G Portfolio #3 Manager LLC, Chapter 11 Jointly Administered Under Case No. 15-70094-rbk.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Amendment to Certificate of Formation as of the date first-above written.

By: _____
Name:
Title:

15497275_1

**CERTIFICATE OF AMENDMENT**
**TO**
**CERTIFICATE OF FORMATION**
**OF**
**RREAF O&G PORTFOLIO #2 LLC**

This Certificate of Amendment to Certificate of Formation of RREAF O&G Portfolio #2 LLC, a Delaware limited liability company (the "Company"), dated as of February __, 2016, has been duly executed and is being filed by the undersigned, as an authorized person, in accordance with the provisions of 6 <u>Del. C.</u> §18-202, to amend the Certificate of Formation of the Company, as filed in the office of the Secretary of State of the State of Delaware (the "Secretary of State") on March 20, 2014 (the "Certificate").

1.      The name of the Company is RREAF O&G Portfolio #2 LLC.

2.      A new Article FIFTH is hereby added to Certificate to read as follows:

"FIFTH: The Company shall not issue nonvoting equity securities. All classes of voting equity securities issued by the Company shall have an appropriate distribution of voting power."

Provision for making this Certificate of Amendment is contained in an order of the United States Bankruptcy Court for the Western District of Texas, Midland Division in a Chapter 11 case under the United States Bankruptcy Code in In re: RREAF O&G Portfolio #2 LLC; RREAF O&G Portfolio #2 Manager LLC; RREAF O&G Portfolio #3 LLC; RREAF O&G Portfolio #3 Manager LLC, Chapter 11 Jointly Administered Under Case No. 15-70094-rbk.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Amendment to Certificate of Formation as of the date first-above written.

By: _____
Name:
Title:

15497275_1

**CERTIFICATE OF AMENDMENT**
**TO**
**CERTIFICATE OF FORMATION**
**OF**
**RREAF O&G PORTFOLIO #3 MANAGER LLC**

This Certificate of Amendment to Certificate of Formation of RREAF O&G Portfolio #3 Manager LLC, a Delaware limited liability company (the "Company"), dated as of February __, 2016, has been duly executed and is being filed by the undersigned, as an authorized person, in accordance with the provisions of 6 <u>Del. C.</u> §18-202, to amend the Certificate of Formation of the Company, as filed in the office of the Secretary of State of the State of Delaware (the "Secretary of State") on September 16, 2014 (the "Certificate").

1. The name of the Company is RREAF O&G Portfolio #3 Manager LLC.

2. A new Article FIFTH is hereby added to Certificate to read as follows:

"FIFTH: The Company shall not issue nonvoting equity securities. All classes of voting equity securities issued by the Company shall have an appropriate distribution of voting power."

Provision for making this Certificate of Amendment is contained in an order of the United States Bankruptcy Court for the Western District of Texas, Midland Division in a Chapter 11 case under the United States Bankruptcy Code in In re: RREAF O&G Portfolio #2 LLC; RREAF O&G Portfolio #2 Manager LLC; RREAF O&G Portfolio #3 LLC; RREAF O&G Portfolio #3 Manager LLC, Chapter 11 Jointly Administered Under Case No. 15-70094-rbk.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Amendment to Certificate of Formation as of the date first-above written.

By: _____
Name:
Title:

15497275_1

**CERTIFICATE OF AMENDMENT**
**TO**
**CERTIFICATE OF FORMATION**
**OF**
**RREAF O&G PORTFOLIO #3 LLC**


This Certificate of Amendment to Certificate of Formation of RREAF O&G Portfolio #3 LLC, a Delaware limited liability company (the "Company"), dated as of February __, 2016, has been duly executed and is being filed by the undersigned, as an authorized person, in accordance with the provisions of 6 <u>Del. C.</u> §18-202, to amend the Certificate of Formation of the Company, as filed in the office of the Secretary of State of the State of Delaware (the "Secretary of State") on September 16, 2014 (the "Certificate").

1.　　　The name of the Company is RREAF O&G Portfolio #3 LLC.

2.　　　A new Article FIFTH is hereby added to Certificate to read as follows:

"FIFTH:  The Company shall not issue nonvoting equity securities.  All classes of voting equity securities issued by the Company shall have an appropriate distribution of voting power."


Provision for making this Certificate of Amendment is contained in an order of the United States Bankruptcy Court for the Western District of Texas, Midland Division in a Chapter 11 case under the United States Bankruptcy Code in In re: RREAF O&G Portfolio #2 LLC; RREAF O&G Portfolio #2 Manager LLC; RREAF O&G Portfolio #3 LLC; RREAF O&G Portfolio #3 Manager LLC, Chapter 11 Jointly Administered Under Case No. 15-70094-rbk.


IN WITNESS WHEREOF, the undersigned has executed this Certificate of Amendment to Certificate of Formation as of the date first-above written.



By: _____
Name:
Title:

15497275_1

**<u>Exhibit B</u>**

**New RREAF Manager LLC Agreements**

(see attached)

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT
OF
RREAF O&G PORTFOLIO #2 MANAGER LLC

This Amended and Restated Limited Liability Company Agreement (this "Agreement") of RREAF O&G Portfolio #2 Manager LLC (the "Company") is entered into as of the ___ day of February 2016 by Spectrum Origination LLC, as the sole member (the "Member").

The Company has been organized as a Delaware limited liability company by the filing of Certificate of Formation under and pursuant to the Delaware Limited Liability Company Act, as amended from time to time (6 Del. C. §18-101, et seq.) (the "Act") and the adoption of the Limited Liability Company Agreement of the Company dated as of April 30, 2014 (the "Original LLC Agreement".  The Company previously adopted an Amended and Restated Limited Liability Company Agreement (the "First A&R LLC Agreement") which amended and restated the Original LLC Agreement.  This Agreement amends and restates the First A&R LLC Agreement.  The Member hereby agrees as follows:

1.     Name.  The name of the limited liability company is RREAF O&G Portfolio #2 Manager LLC (the "Company").

2.     Purpose.  The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is engaging in any lawful act or activity for which limited liability companies may be formed under the Act (including without limitation investing in and acting as managing member of other companies and acquiring, managing and disposing of real and personal property), and engaging in any and all activities necessary or incidental to the foregoing.

3.     Registered Office.  The address of the registered office of the Company in the State of Delaware is c/o the Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, New Castle County, Delaware 19808.  The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is the Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, New Castle County, Delaware 19808.

4.     Members.  The names and the business, residence or mailing addresses of the initial Member is as follows:

| Name | Address |
|------|---------|
| Spectrum Origination LLC | c/o Spectrum Group Management LLC<br>1250 Broadway, 19th Floor<br>New York, New York 10001 |

5.    <u>Powers</u>.  The business and affairs of the Company shall be managed by the Member acting as Managing Member.  The Member shall have the power and authority to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers and authorities, statutory or otherwise, possessed by members or managers of limited liability companies under the laws of the State of Delaware.  In connection with the foregoing, the Member is hereby authorized and empowered to act through any person designated by the Member to carry out any and all of the Member's powers and authorities under this Agreement, and to delegate any and all of the powers and authorities that the Member possesses under this Agreement to any person designated by the Member.  Spectrum Origination LLC is hereby designated as an authorized person, within the meaning of the Act, to execute, deliver and file the certificate of formation of the Company (and any amendments and/or restatements thereof) and any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.  The Company may (i) acquire, hold and dispose of interests (whether by the making of investments or otherwise and on such terms and conditions as the Member may determine) in other entities, including as a partner of a partnership, a member of a limited liability company and a stockholder of a corporation, and (ii) borrow money (on such terms and conditions as the Member may determine) in connection with its business.

6.    <u>Dissolution</u>.  The Company shall dissolve, and its affairs shall be wound up, upon the first to occur of the following:  the written consent of the Member, the death, retirement, resignation, incapacity or bankruptcy of the Member or the occurrence of any other event which terminates the continued membership of the Member in the Company, or the entry of a decree of judicial dissolution under Section 18-802 of the Act.

7.    <u>Capital Contributions</u>.  The Member has contributed no cash or property to the Company, and is not required to make any additional capital contribution to the Company.

8.    <u>Allocation of Profits and Losses</u>.  The Company's profits and losses shall be allocated to the Member.

9.    <u>Distributions</u>.  Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Member.

10.    <u>Assignments</u>.  The Member may assign in whole or in part then Member's limited liability company interest in the Company.

11.    <u>Resignation</u>.  The Member may resign from the Company.

12.    <u>Admission of Additional Members</u>.  One or more additional members of the Company may be admitted to the Company with the consent of the Member.

13.    <u>Liability of Members</u>.  The Member shall not have any liability for the obligations or liabilities of the Company except to the extent provided in the Act.

14.    <u>Governing Law</u>.  This Agreement shall be governed by, and construed under, the laws of the State of Delaware, all rights and remedies being governed by said laws.

2

    **IN WITNESS WHEREOF**, the undersigned, intending to be legally bound hereby, has duly executed this Amended and Restated Limited Liability Company Agreement as of the date set forth above.

        SPECTRUM ORIGINATION LLC


        By: _____
        Name:
        Title:

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT
OF
RREAF O&G PORTFOLIO #2 LLC

This Amended and Restated Limited Liability Company Agreement (this "Agreement") of RREAF O&G Portfolio #2 LLC (the "Company") is entered into as of the ___ day of February 2016 by RREAF O&G Portfolio #2 Manager LLC, as the sole member (the "Member").

The Company has been organized as a Delaware limited liability company by the filing of Certificate of Formation under and pursuant to the Delaware Limited Liability Company Act, as amended from time to time (6 Del. C. §18-101, et seq.) (the "Act") and the adoption of the Limited Liability Company Agreement of the Company dated as of April 30, 2014 (the "Original LLC Agreement".  The Company previously adopted an Amended and Restated Limited Liability Company Agreement (the "First A&R LLC Agreement") which amended and restated the Original LLC Agreement.  This Agreement amends and restates the First A&R LLC Agreement.  The Member hereby agrees as follows:

1.  Name.  The name of the limited liability company is RREAF O&G Portfolio #2 LLC (the "Company").

2.  Purpose.  The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is engaging in any lawful act or activity for which limited liability companies may be formed under the Act (including without limitation investing in and acting as managing member of other companies and acquiring, managing and disposing of real and personal property), and engaging in any and all activities necessary or incidental to the foregoing.

3.  Registered Office.  The address of the registered office of the Company in the State of Delaware is c/o the Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, New Castle County, Delaware 19808.  The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is the Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, New Castle County, Delaware 19808.

4.  Members.  The names and the business, residence or mailing addresses of the initial Member is as follows:

| Name | Address |
|---|---|
| RREAF O&G Portfolio #2 Manager LLC | c/o Spectrum Group Management LLC<br>1250 Broadway, 19th Floor<br>New York, New York 10001 |

5.      Powers.  The business and affairs of the Company shall be managed by the Member acting as Managing Member.  The Member shall have the power and authority to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers and authorities, statutory or otherwise, possessed by members or managers of limited liability companies under the laws of the State of Delaware.  In connection with the foregoing, the Member is hereby authorized and empowered to act through any person designated by the Member to carry out any and all of the Member's powers and authorities under this Agreement, and to delegate any and all of the powers and authorities that the Member possesses under this Agreement to any person designated by the Member.  Spectrum Origination LLC is hereby designated as an authorized person, within the meaning of the Act, to execute, deliver and file the certificate of formation of the Company (and any amendments and/or restatements thereof) and any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.  The Company may (i) acquire, hold and dispose of interests (whether by the making of investments or otherwise and on such terms and conditions as the Member may determine) in other entities, including as a partner of a partnership, a member of a limited liability company and a stockholder of a corporation, and (ii) borrow money (on such terms and conditions as the Member may determine) in connection with its business.

6.      Dissolution.  The Company shall dissolve, and its affairs shall be wound up, upon the first to occur of the following:  the written consent of the Member, the death, retirement, resignation, incapacity or bankruptcy of the Member or the occurrence of any other event which terminates the continued membership of the Member in the Company, or the entry of a decree of judicial dissolution under Section 18-802 of the Act.

7.      Capital Contributions.  The Member has contributed no cash or property to the Company, and is not required to make any additional capital contribution to the Company.

8.      Allocation of Profits and Losses.  The Company's profits and losses shall be allocated to the Member.

9.      Distributions.  Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Member.

10.     Assignments.  The Member may assign in whole or in part then Member's limited liability company interest in the Company.

11.     Resignation.  The Member may resign from the Company.

12.     Admission of Additional Members.  One or more additional members of the Company may be admitted to the Company with the consent of the Member.

13.     Liability of Members.  The Member shall not have any liability for the obligations or liabilities of the Company except to the extent provided in the Act.

14.     Governing Law.  This Agreement shall be governed by, and construed under, the laws of the State of Delaware, all rights and remedies being governed by said laws.

2

**IN WITNESS WHEREOF**, the undersigned, intending to be legally bound hereby, has duly executed this Amended and Restated Limited Liability Company Agreement as of the date set forth above.

RREAF O&G PORTFOLIO #2
MANAGER LLC


By: _____
Name:
Title:

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT
OF
RREAF O&G PORTFOLIO #3 MANAGER LLC

This Amended and Restated Limited Liability Company Agreement (this "Agreement") of RREAF O&G Portfolio #3 Manager LLC (the "Company") is entered into as of the ___ day of February 2016 by Spectrum Origination LLC, as the sole member (the "Member").

The Company has been organized as a Delaware limited liability company by the filing of Certificate of Formation under and pursuant to the Delaware Limited Liability Company Act, as amended from time to time (6 Del. C. §18-101, et seq.) (the "Act") and the adoption of the Limited Liability Company Agreement of the Company dated as of April 30, 2014 (the "Original LLC Agreement". The Company previously adopted an Amended and Restated Limited Liability Company Agreement (the "First A&R LLC Agreement") which amended and restated the Original LLC Agreement. This Agreement amends and restates the First A&R LLC Agreement. The Member hereby agrees as follows:

1.     Name.  The name of the limited liability company is RREAF O&G Portfolio #3 Manager LLC (the "Company").

2.     Purpose.  The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is engaging in any lawful act or activity for which limited liability companies may be formed under the Act (including without limitation investing in and acting as managing member of other companies and acquiring, managing and disposing of real and personal property), and engaging in any and all activities necessary or incidental to the foregoing.

3.     Registered Office.  The address of the registered office of the Company in the State of Delaware is c/o the Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, New Castle County, Delaware 19808. The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is the Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, New Castle County, Delaware 19808.

4.     Members.  The names and the business, residence or mailing addresses of the initial Member is as follows:

| Name | Address |
|---|---|
| Spectrum Origination LLC | c/o Spectrum Group Management LLC<br>1250 Broadway, 19th Floor<br>New York, New York 10001 |

5.     <u>Powers</u>.  The business and affairs of the Company shall be managed by the Member acting as Managing Member.  The Member shall have the power and authority to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers and authorities, statutory or otherwise, possessed by members or managers of limited liability companies under the laws of the State of Delaware.  In connection with the foregoing, the Member is hereby authorized and empowered to act through any person designated by the Member to carry out any and all of the Member's powers and authorities under this Agreement, and to delegate any and all of the powers and authorities that the Member possesses under this Agreement to any person designated by the Member.  Spectrum Origination LLC is hereby designated as an authorized person, within the meaning of the Act, to execute, deliver and file the certificate of formation of the Company (and any amendments and/or restatements thereof) and any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.  The Company may (i) acquire, hold and dispose of interests (whether by the making of investments or otherwise and on such terms and conditions as the Member may determine) in other entities, including as a partner of a partnership, a member of a limited liability company and a stockholder of a corporation, and (ii) borrow money (on such terms and conditions as the Member may determine) in connection with its business.

6.     <u>Dissolution</u>.  The Company shall dissolve, and its affairs shall be wound up, upon the first to occur of the following:  the written consent of the Member, the death, retirement, resignation, incapacity or bankruptcy of the Member or the occurrence of any other event which terminates the continued membership of the Member in the Company, or the entry of a decree of judicial dissolution under Section 18-802 of the Act.

7.     <u>Capital Contributions</u>.  The Member has contributed no cash or property to the Company, and is not required to make any additional capital contribution to the Company.

8.     <u>Allocation of Profits and Losses</u>.  The Company's profits and losses shall be allocated to the Member.

9.     <u>Distributions</u>.  Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Member.

10.     <u>Assignments</u>.  The Member may assign in whole or in part then Member's limited liability company interest in the Company.

11.     <u>Resignation</u>.  The Member may resign from the Company.

12.     <u>Admission of Additional Members</u>.  One or more additional members of the Company may be admitted to the Company with the consent of the Member.

13.     <u>Liability of Members</u>.  The Member shall not have any liability for the obligations or liabilities of the Company except to the extent provided in the Act.

14.     <u>Governing Law</u>.  This Agreement shall be governed by, and construed under, the laws of the State of Delaware, all rights and remedies being governed by said laws.

**IN WITNESS WHEREOF**, the undersigned, intending to be legally bound hereby, has duly executed this Amended and Restated Limited Liability Company Agreement as of the date set forth above.

SPECTRUM ORIGINATION LLC

By: _____

Name:

Title:

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT
OF
RREAF O&G PORTFOLIO #3 LLC

This Amended and Restated Limited Liability Company Agreement (this "Agreement") of RREAF O&G Portfolio #3 LLC (the "Company") is entered into as of the ___ day of February 2016 by RREAF O&G Portfolio #3 Manager LLC, as the sole member (the "Member").

The Company has been organized as a Delaware limited liability company by the filing of Certificate of Formation under and pursuant to the Delaware Limited Liability Company Act, as amended from time to time (6 <u>Del. C.</u> §18-101, <u>et seq.</u>) (the "Act") and the adoption of the Limited Liability Company Agreement of the Company dated as of April 30, 2014 (the "Original LLC Agreement". The Company previously adopted an Amended and Restated Limited Liability Company Agreement (the "First A&R LLC Agreement") which amended and restated the Original LLC Agreement. This Agreement amends and restates the First A&R LLC Agreement. The Member hereby agrees as follows:

1.     <u>Name</u>.  The name of the limited liability company is RREAF O&G Portfolio #3 LLC (the "Company").

2.     <u>Purpose</u>.  The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is engaging in any lawful act or activity for which limited liability companies may be formed under the Act (including without limitation investing in and acting as managing member of other companies and acquiring, managing and disposing of real and personal property), and engaging in any and all activities necessary or incidental to the foregoing.

3.     <u>Registered Office</u>.  The address of the registered office of the Company in the State of Delaware is c/o the Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, New Castle County, Delaware 19808.  The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is the Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, New Castle County, Delaware 19808.

4.     <u>Members</u>.  The names and the business, residence or mailing addresses of the initial Member is as follows:

| Name | Address |
|---|---|
| RREAF O&G Portfolio #3 Manager LLC | c/o Spectrum Group Management LLC 1250 Broadway, 19th Floor New York, New York 10001 |

5.      <u>Powers</u>.  The business and affairs of the Company shall be managed by the Member acting as Managing Member.  The Member shall have the power and authority to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers and authorities, statutory or otherwise, possessed by members or managers of limited liability companies under the laws of the State of Delaware.  In connection with the foregoing, the Member is hereby authorized and empowered to act through any person designated by the Member to carry out any and all of the Member's powers and authorities under this Agreement, and to delegate any and all of the powers and authorities that the Member possesses under this Agreement to any person designated by the Member.  Spectrum Origination LLC is hereby designated as an authorized person, within the meaning of the Act, to execute, deliver and file the certificate of formation of the Company (and any amendments and/or restatements thereof) and any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.  The Company may (i) acquire, hold and dispose of interests (whether by the making of investments or otherwise and on such terms and conditions as the Member may determine) in other entities, including as a partner of a partnership, a member of a limited liability company and a stockholder of a corporation, and (ii) borrow money (on such terms and conditions as the Member may determine) in connection with its business.

6.      <u>Dissolution</u>.  The Company shall dissolve, and its affairs shall be wound up, upon the first to occur of the following:  the written consent of the Member, the death, retirement, resignation, incapacity or bankruptcy of the Member or the occurrence of any other event which terminates the continued membership of the Member in the Company, or the entry of a decree of judicial dissolution under Section 18-802 of the Act.

7.      <u>Capital Contributions</u>.  The Member has contributed no cash or property to the Company, and is not required to make any additional capital contribution to the Company.

8.      <u>Allocation of Profits and Losses</u>.  The Company's profits and losses shall be allocated to the Member.

9.      <u>Distributions</u>.  Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Member.

10.     <u>Assignments</u>.  The Member may assign in whole or in part then Member's limited liability company interest in the Company.

11.     <u>Resignation</u>.  The Member may resign from the Company.

12.     <u>Admission of Additional Members</u>.  One or more additional members of the Company may be admitted to the Company with the consent of the Member.

13.     <u>Liability of Members</u>.  The Member shall not have any liability for the obligations or liabilities of the Company except to the extent provided in the Act.

14.     <u>Governing Law</u>.  This Agreement shall be governed by, and construed under, the laws of the State of Delaware, all rights and remedies being governed by said laws.

**IN WITNESS WHEREOF**, the undersigned, intending to be legally bound hereby, has duly executed this Amended and Restated Limited Liability Company Agreement as of the date set forth above.

RREAF O&G PORTFOLIO #3
MANAGER LLC


By: _____

Name:

Title:

## **Exhibit C**

**New Management Agreement**

(see attached)

#38342300

**MANAGEMENT AGREEMENT**

between

**RREAF O&G PORTFOLIO #2 LLC**
as Owner

and

**CHANNEL POINT HOSPITALITY LLC**
as Manager

FOR

**LA QUINTA INNS & SUITES HOBBS**
3312 North Lovington Highway
Hobbs, New Mexico 88240

# MANAGEMENT AGREEMENT

This Management Agreement (the "**Agreement**") made this ___ day of February 2016 between RREAF O&G PORTFOLIO #2 LLC, a Delaware limited liability company (**"Owner"**), as Owner, and **CHANNEL POINT HOSPITALITY LLC**, a Texas limited liability company (**"Manager"**), as Manager.

## RECITALS:

A.      Owner is the fee owner of the Hotel (as defined below).

B.      Manager is experienced in the management and operation of hotels, directly and through affiliated entities.

C.      Owner and Manager desire to enter into this Agreement for the management and operation of the Hotel in accordance with the terms and conditions and subject to the limitations contained in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner and Manager covenant and agree as follows:

## ARTICLE 1
## DEFINITIONS, TERMS AND REFERENCES

1.1      Definitions. In this Agreement and any Exhibits, the following terms shall have the following meanings:

"**Account Category**" shall include the major account categories set forth in Exhibit A attached hereto and made a part hereof as well as other major account categories, which are applicable to the Hotel consistent with the Statement of Income as defined by the Uniform System of Accounts or otherwise approved by Owner.

"**Accounting Fee**" shall have the meaning set forth in Article 11.

"**Accounting Period**" shall mean each calendar month (whether of 28, 29, 30 or 31 days) during each Fiscal Year.

"**Affiliate**" shall mean any person or entity that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with another person or entity. The term "**control**" (and correlative terms) shall mean the power, whether by contract, equity ownership or otherwise, to direct the policies or management of a person or entity. Without limiting the foregoing, an "**Affiliate**" also includes any partner or a partnership of any party to this Agreement, any member or membership parties thereto and any corporation, partnership, individual or trust related to or controlling or controlled by such partnership, individual or trust related to or controlling or controlled by such partnership party or its partners

or such membership party or its members. A natural person is related to another natural person if he or she is a spouse, parent, or lineal descendant of the other person.

"**Allocated Services**" shall mean certain support services that Manager obtains from a third party and provides on a central or regional basis to the hotels that it manages because such support services can be provided on a more efficient, effective and economical basis to each individual Manager managed hotel if the expenses of such support services are shared by other Manager managed hotels. Such support services include services in the areas of sales and marketing, food and beverage, human resources, insurance, technology, training and payroll (each such service, an "**Allocated Service**"; collectively, the "**Allocated Services**"). Owner and Manager agree that Manager shall provide Allocated Services to the Hotel and that the Hotel's portion of the cost thereof shall constitute a Gross Operating Expense so long as (i) the costs of the Allocated Services are allocated in good faith on a uniform, fair, equitable and proportionate basis among the Hotel and the other Manager managed hotels benefiting therefrom; and (ii) the Allocated Services shall not include services that do not benefit the Hotel; and (iii) the cost of the Allocated Services are either (a) included by Manager in each Annual Operating Budget or (b) otherwise approved in writing by Owner. The cost of the Allocated Services and the allocation of that cost to the Hotel and other Manager managed hotels shall be subject to audit by Owner pursuant to the terms of Section 10.3 of this Agreement. Manager further agrees that the benefit of any discounts or rebates received by Manager with respect to any of the Allocated Services shall be passed on to the Hotel on a proportionate basis as compared to other hotels managed by Manager or its Affiliates.

"**Annual Operating Budget**" shall mean an annual operating projection for the Hotel prepared and submitted by Manager to Owner and approved by Owner for each Fiscal Year pursuant to Section 4.4(a).

"**Annual Plan**" shall mean an annual business plan for the operation of the Hotel prepared by the Manager and approved by the Owner, which shall include the Annual Operating Budget, the Approved Capital Budget, the Marketing Plan and the Management Plan and any other material included therein by Manager as provided in Section 4.4.

"**Approved Capital Budget**" shall have the meaning set forth in Section 4.4(b).

"**Base Fee**" shall have the meaning set forth in Article 11.

"**Building and Appurtenances**" shall mean (i) the 68 room hotel building located on the Premises, and (ii) landscaping and other related facilities, together with all installations located at, or used in connection with the operation of the building for hotel purposes including, without limitation, any swimming pools, health club and recreational facilities, walkways, parking facilities, heating, lighting, sanitation equipment, air conditioning, laundry facilities, refrigeration, built-in kitchen equipment, and elevators.

"**Capital Budget**" shall mean Manager's proposed estimate of FF&E and Capital Improvements submitted to Owner each Fiscal Year pursuant to Section 4.4(b).

"**Capital Improvements**" shall have the meaning set forth in Section 8.2 hereof.

"**Commencement Date**" shall mean the date on which Manager assumes the management and operation of the Hotel under this Agreement for the benefit of Owner.

"**Competitive Set**" shall mean the properties listed on Exhibit E attached hereto and any revisions to such list agreed upon by Owner and Manager from time to time.

"**CPI**" shall mean the Consumer Price Index for All Urban Consumers, United States City Average, All Items (1982-84=100), issued by the Bureau of Labor Statistics of the United States Department of Labor.

"**Default Rate**" shall mean the lesser of (i) the Prime Rate plus four percent (4%) per annum or (ii) the highest lawful rate permitted by applicable Legal Requirements from time to time.

"**Effective Date**" shall mean the date of this Agreement as set forth on page 1 hereof.

"**Event of Default**" shall mean any of the events described in Article 16, provided that any condition contained therein for the giving of notice or the lapse of time, or both, has been satisfied.

"**Executive Personnel**" shall mean the general manager and the director of sales of the Hotel.

"**Fiscal Year**" shall mean the fiscal year that ends on the last day of each calendar year. The first Fiscal Year shall be the period commencing on the Commencement Date and ending on December 31st of the same calendar year in which the Commencement Date occurs. The words "full Fiscal Year" shall mean any Fiscal Year containing not fewer than 365 days. A partial Fiscal Year after the end of the last full Fiscal Year and ending with the expiration or earlier termination of the Term shall constitute a separate Fiscal Year.

"**Furniture, Fixtures and Equipment**" or "**FF&E**" shall mean all furniture, furnishings, wall coverings, fixtures, carpeting, rugs, fine arts, paintings, statuary, decorations, and hotel equipment and systems (including the costs associated with the purchase, installation and delivery thereof) located at, or used in connection with, the operation of the Building and Appurtenances as a hotel, including without limitation, major equipment and systems required for the operation of kitchens, bars, laundry and dry cleaning facilities, office equipment, dining room wagons, major material handling equipment, major cleaning and engineering equipment, telephone systems, computerized accounting and vehicles (including the costs associated with the purchase, installation and delivery thereof) together with all replacements therefor and additions thereto, but in all events excluding Operating Equipment and Supplies.

"**GOP Threshold**" ████████████████████████████████
████████████████████████████████████████████████████████████████

"**Gross Operating Expenses**" shall mean the following expenses actually incurred in the operation of the Hotel:

1.    Cost of sales; salaries, wages, bonuses, payroll taxes; the cost of social insurance which shall include, but not be limited to, life, medical, disability insurance, retirement and other benefits incurred by Manager related to Hotel Employees;

2.    Departmental expenses; administrative and general expenses; the cost of third party vendor sources engaged to print payroll checks and reports or to perform any other services hereunder; the Accounting Fee; the Revenue Management Fee; advertising and business promotion for the Hotel; franchise fees, chain reservation fees and all other fees relating to the License Agreement; the cost of utilities, service contracts; and repairs and maintenance;

3.    The cost of replacing Operating Equipment and Supplies and Inventories as defined herein.

4.    The cost of uncollectible accounts receivables as reasonably determined by the Manager.

5.    The Owner-approved costs and expenses of technical consultants and operational experts for specialized services in connection with non-routine hotel work including roofing consultants, environmental engineers and others.

6.    The cost of insurance as set forth in this Agreement.

7.    The Management Fee.

8.    Real estate and personal property taxes levied or assessed against the Hotel and other like charges.

9.    Allocated Services.

10. All other costs and expenses incurred in connection with the operation of the Hotel and otherwise approved as part of the Annual Plan or Annual Operating Budget, including but not limited to Reimbursable Expenses.

11. Risk management costs.

12. Legal services related to Hotel Employees or Hotel operations or services.

13. Other amounts expressly set forth in this Agreement or the Annual Operating Budget as being included in Gross Operating Expenses.

All costs and fees of any Independent Public Accountants or other third parties who perform services approved by Owner (other than services provided by any Independent Public Accountants or other third parties in connection with services and/or reports required to be provided by Owner pursuant to the License Agreement) shall be paid by Owner and shall not constitute Gross Operating Expenses.

Except to the extent that the travel budget for Manager's personnel is included as a line item in the Annual Operating Budget, no part of Manager's central office overhead or general or

**Management Agreement – Page 4**

administrative expenses including the cost of travel by Manager's corporate or regional officers (other than Allocated Services) or for travel related to any other hotel operated by Manager or its Affiliates shall be deemed to be part of Gross Operating Expenses and all such costs and expenses shall be the sole responsibility of Manager.

"**Gross Operating Profit**" or "**GOP**" shall mean the amount of the remainder of Gross Revenues of the Hotel less the departmental expenses and undistributed expenses of the Hotel.

"**Gross Revenues**" shall mean for any applicable Accounting Period, all revenues and receipts of every kind derived from the Hotel and all departments and parts thereof during such Accounting Period, as finally determined on an accrual basis in accordance with the Uniform System of Accounts, including, but not limited to, revenues and income (both cash and credit transactions) before commissions and discounts for prompt or cash payments, from the rental of rooms and lobby space, exhibit or sales space of any kind, including without limitation, charges for reservations, deposits and cancellation fees not refunded to guests; income from vending machines, health club membership fees, wholesale and retail sales of merchandise, service fees and charges, business interruption insurance claims (but only for periods during the operating term) in respect of the Hotel, condemnation awards for temporary use of the Hotel, license, lease and concession fees and rentals (but not including the gross receipts of any licensees, lessees and concessionaires), food and beverages sales, and other sales of every kind conducted by, through or under Manager in connection with the Hotel. Gross Revenues shall not include (i) Federal, state and municipal excise, sales and use taxes or similar impositions collected directly from patrons or guests or included as part of the sales price of any goods or services; (ii) gratuities or service charges collected and paid to employees; (iii) credits or refunds to guests; (iv) proceeds arising from the sale or other disposition of property described in Section 1231 of the Internal Revenue Code or of capital assets; (v) proceeds from condemnation and payments received on account of insurance policies (other than the proceeds from business interruption insurance and from condemnation awards for temporary use of the Hotel when received); (vi) proceeds from claims for damages suffered by Manager or Owner, unless in recompense for a lost revenue item; and (vii) interest earned on the Reserve or Permitted Investments.

"**Hotel**" shall mean (a) the Building and Appurtenances and the Premises owned by Owner and (b) all FF&E, all Operating Equipment and Supplies, and all Inventories owned by Owner located at 3312 North Lovington Highway, Hobbs, New Mexico 88240.

"**hotel**" shall mean any hotel (other than the Hotel), inn, motor inn, motor hotel, motel, suite hotel, conference center, meeting center or any other facility providing either or both of short-term lodging and meeting arrangements.

"**Hotel Employees**" shall have the meaning set forth in Section 4.2.

"**Independent Public Accountant**" shall mean a nationally recognized firm of independent certified public accountants having hotel accounting experience, designated from time to time by Owner, subject to Manager's rights of approval, reasonably exercised.

"**Inventories**" shall mean "Inventories of Supplies" as defined in the Uniform System of Accounts, such as soap, toilet paper, stationery, writing pens, food and beverage inventories,

paper products, menus, expendable office and kitchen supplies, fuel, supplies and items similar to any of the foregoing.

"**Legal Proceedings**" shall mean all complaints, counterclaims or cross-claims filed in a court of competent jurisdiction, any notice of any claim of violation of any legal requirement by any governmental agency or authority, or any summons or other legal process, in each instance by or against the Hotel or by or against Owner, or Manager in connection with the Hotel.

"**Legal Requirements**" shall mean (a) all laws, ordinances, statutes, regulations and orders relating to the Hotel and the Premises now or hereafter in effect, including but not limited to, environmental laws and (b) all terms, conditions, requirements and provisions of (i) all Permits; (ii) all leases; and (iii) all liens, restrictive covenants and encumbrances affecting the Hotel or the Premises or any part thereof.

"**License Agreement**" shall mean the franchise or license agreement, if any, from time to time entered into by Owner with respect to the branding and operation of the Hotel. For the purposes of this definition, the following terms used in said section shall have the following meaning: "**Licensor**" shall mean the franchisor or licensor under the franchise or license agreement from time to time entered into by Owner with respect to the branding and operation of the Hotel; "**Licensee**" shall mean Owner; and the "**Manual**" shall mean the Licensor's operating manual and other manuals for Licensor described in its standard license agreement.

"**Major Renovations**" shall mean a contemporaneously made set or series of alterations, additions and/or improvements to the Hotel with a total cost in excess of $100,000 (or a lesser amount in the event a project with a total cost less than $100,000 requires material design and purchasing and installation services related thereto and/or results in a material alteration in the design of the Hotel), but shall not include any Repairs or Maintenance with respect to Capital Improvements or FF&E.

"**Manager**" shall have the meaning set forth in the introductory section of this Agreement.

"**Management Fee**" shall mean the Accounting Fee**,** Revenue Management Fee and Base Fee, all as set forth in Article 11 hereof.

"**Management Plan**" shall have the meaning set forth in Section 4.4(d).

"**Marketing Plan**" shall mean an annual marketing plan for the Hotel prepared and submitted by Manager to Owner and approved by Owner in each Fiscal Year pursuant to Section 4.4(c).

"**Mortgage**" shall mean, collectively, each of the documents evidencing or securing current or future indebtedness on the Hotel in favor of a third party lender or financial institution or any successor thereto or replacement thereof (the "**Lender**").

"**Net Operating Income**" or "**NOI**" shall mean the result of Gross Revenues less Gross Operating Expenses.

"**Open for Business**" shall mean the period of time during which all or substantially all of the Hotel is open for business to the general public.

"**Operating Account**" shall mean a special account or accounts, bearing the name of the Hotel, established by Manager in a federally insured bank or trust company selected by Owner.

"**Operating Equipment and Supplies**" shall mean supply items which constitute "Operating Equipment and Supplies" under the Uniform System of Accounts, all miscellaneous serving equipment, linen, towels, uniforms, silver, glassware, china and similar items.

"**Operating Standards**" shall mean the operation of the Hotel in a manner consistent with (i) the requirements under the License Agreement; (ii) the condition of the Hotel as of the Commencement Date (or, following completion of a Renovation, the condition of the Hotel as of the completion of the Renovation), normal wear and tear excepted; (iii) the condition and level of the operation of hotels of comparable class and standing to the Hotel in its market area; (iv) then current market conditions regarding rental rates and lease terms and conditions with respect to Hotels of comparable class and standing to the Hotel (including but not limited to the Competitive Set); and (v) then current business and management practices (including those related to compliance with Legal Requirements) applicable to the management, operation, leasing, maintenance and repair of a hotel comparable in size, character and location to the Hotel.

"**Owner**" shall have the meaning set forth in the introductory section of this Agreement.

"**Performance Standard**" shall have the meaning set forth in Section 18.2.

"**Permits**" shall mean all governmental or quasi-governmental licenses and permits, including but not limited to any certificate of occupancy, business licenses and liquor licenses.

"**Permitted Investments**" shall mean (subject to modification, addition or deletion from time to time at the option of Owner by written request to Manager) all of which shall be in the name of Owner:

      (a)     interest-bearing deposit accounts (which may be represented by certificates of deposit, time deposit open account agreements or other deposit instruments) in commercial banks having a combined capital and surplus of not less than $50,000,000; or

      (b)     all other investments approved by Owner.

"**Premises**" shall mean the land on which the Hotel is located, which land is described in Exhibit B attached hereto.

"**Prime Rate**" shall mean the rate per annum announced, designated or published from time to time by JP Morgan Chase Bank N.A. as its "prime", "reference" or "base" rate of interest for commercial loans.

"**Reimbursable Expenses**" shall mean all travel, lodging, entertainment, telephone, facsimile, postage, courier, delivery, employee training and other expenses incurred by Manager

**Management Agreement – Page 7**

in accordance with the standard policies for expenses incurred by Manager on its own behalf and which are directly related to its performance of this Agreement, but in no event will Reimbursable Expenses include or duplicate expenses for Manager's overhead or Allocated Services.

"**Renovation**" shall mean a renovation of any portion of the Hotel during the Term, pursuant to a plan proposed by Manager and approved by Owner to, among other things, bring the Hotel to a physical condition that satisfies the standards under the License Agreement and to operate in a manner consistent with the assumptions for the then-current Annual Operating Budget and then-current Annual Plan. A Renovation shall be carried out at the expense of Owner pursuant to plans and specifications and a schedule prepared by Manager and approved by Owner and, to the extent required under the License Agreement, by Licensor.

"**Repairs and Maintenance**" shall have the meaning as defined in Section 8.1.

"**Reserve**" shall mean an account maintained as a Permitted Investment for Reserve for replacement of FF&E and/or Capital Improvements, as described in Section 7.1 and funded as provided in Section 7.2.

"**Revenue Data Publication**" shall mean Smith's STR Report, a monthly publication distributed by Smith Travel Research, Inc., or an alternative source, reasonably satisfactory to both parties, of data regarding the average daily rate, occupancy and RevPAR of hotels in the general area of the Hotel, including, without limitation, the Competitive Set.

"**Revenue Management Fee**" shall have the meaning as defined in Section 11.

"**Revenue Per Available Room**" or "**RevPAR**" shall mean for any Test Period the number derived by dividing (i) net room revenue (in accordance with the Uniform System of Accounts), by (ii) the number of available guest rooms in the subject hotel.

"**RevPAR Threshold**"



"**State**" shall mean the State in which the Hotel is located or other as designated.

"**Term**" shall mean the term of this Agreement, which shall be an initial five (5) year term commencing on the Commencement Date and expiring on the fifth (5th) anniversary of the Commencement Date, as such Term may be extended or shortened as expressly set forth in this Agreement or as otherwise agreed to by Owner and Manager.

"**Termination Fee**"



"**Test Period**" shall mean each twelve (12) month period during the Term commencing on the first day of the seventh (7th) calendar month following the Commencement Date and each subsequent three (3) calendar months thereafter. In the event that this Agreement shall terminate on a date other than the last day of a calendar year, the last Test Period shall end on the date of termination. The term "full Test Period" means any Test Period containing not fewer than 365 days.

"**Third Party Purchaser**" shall have the meaning set forth in Section 18.1.

"**Unavoidable Interruptions**" shall mean interruptions in the operation of or access to the Hotel or any of its essential services on account of an interruption in any one or more of the utility services described in Section 13.2, or on account of labor disputes, strikes, lockouts, fire or other casualty, war, terrorist actions, acts of God and other similar causes beyond the reasonable control of the party claiming an unavoidable interruption, but never financial inability. Other than obligations accruing prior to the occurrence of such event of Unavoidable Interruption or obligations that, if not performed, would cause a material adverse effect on the Hotel or its operations (for instance, the requirement to maintain the Permits or insurance obligations hereunder), the obligations of the party hereunder shall be suspended during the period of an Unavoidable Interruption.

"**Uniform System of Accounts**" shall mean the Uniform System of Accounts for Hotels, 10th Revised Edition, 2006, as published by the Hotel Association of New York City, Inc. or any later edition thereof.

"**Working Capital**" shall mean and refer to the funds which are reasonably necessary for the day-to-day operation of the Hotel's business, including, without limitation, amounts sufficient for the maintenance of petty cash funds, operating bank accounts, receivables, payrolls, prepaid expenses, advance deposits, funds required to maintain inventories, and amounts due to/or from Manager and/or Owner less accounts payable and accrued current liabilities.

1.2     **Terminology**. All personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, shall include all genders; the singular shall include the plural, and the plural shall include the singular. The titles of Articles, Sections and Subsections in

this Agreement are for convenience only, and neither limit nor amplify the provisions of this Agreement, and all references in this Agreement to Articles, Sections, Subsections, paragraphs, clauses, sub-clauses or exhibits shall refer to the corresponding Article, Section, Subsection, paragraph, clause or sub-clause of, or exhibit attached to, this Agreement, unless specific reference is made to the articles, sections or other subdivisions of, or exhibits to, another document or instrument.

1.3     **Exhibits**. All exhibits and other attachments attached hereto are by this reference made a part of this Agreement.

### ARTICLE 2
### MANAGEMENT OF HOTEL

Owner hereby engages and appoints Manager, pursuant to the terms of this Agreement, to operate and manage the Hotel, and Manager hereby agrees and contracts to plan, operate, repair and manage the Hotel pursuant to the terms of this Agreement.

Subject to the terms of this Agreement, Hotel operations shall be under the exclusive supervision and control of Manager, which, except as otherwise specifically provided in this Agreement, shall be responsible for the proper and efficient operation**,** maintenance and repair of the Hotel in accordance with the terms of this Agreement. Except as specifically set forth in this Agreement, Manager shall have discretion and control respecting matters relating to management and operation of the Hotel, including, without limitation, charges for rooms and commercial space, credit policies, food and beverage services, other Hotel services, employment policies, granting of concessions or leasing of shops and agencies within the Hotel, receipt, holding and disbursement of funds, maintenance of bank accounts, procurement of inventories, supplies and services, promotion and publicity and, in general, all activities necessary for operation of the Hotel.

Manager shall devote its knowledge, experience and efforts to operate and manage the Hotel pursuant to this Agreement in a businesslike manner in accordance with the Operating Standards. Manager shall make available to Owner the full benefit of the judgment, experience and advice of the members of Manager's organization and staff with respect to the policies pursued by Owner in operating, maintaining, and servicing the Hotel.

### ARTICLE 3
### TERM

3.1     **Term**. The initial Term automatically shall be extended beyond the initial Term for additional terms of one (1) year each, unless Owner provides written notice to Manager not less than one hundred twenty (120) days prior to the end of the initial Term or the then-current extended Term, as applicable, of Owner's intent not to extend the Term of the Agreement. Notwithstanding the foregoing, the Agreement may be terminated prior to the scheduled expiration of the Term or any extension thereof, (i) without cause by Owner during the first six (6) months following the Commencement Date, provided that Owner provides Manager with not less than thirty (30) days written notice of termination prior to the effective date of such termination, or (provided that in the event that the Workers' Adjustment and Retraining Act, 29

USC, Sec 2101, et seq. (the WARN Act") is applicable to such termination and the replacement manager identified by Owner fails or refuses to retain a sufficient number of employees at the Property so as not to cause a "mass layoff" or "plant closing" under the WARN Act, Owner will extend the effective date of termination to allow the required notices to be provided under the WARN Act, (ii) upon the sale of the Hotel to a bona fide Third Party Purchaser, as provided in Article 18 hereof, provided that Owner provides Manager with not less than sixty (60) days written notice of such termination; and (ii) as otherwise provided in Articles 15, 16, 17 and 18.

3.2     **Surrender.** On the expiration or sooner termination of the Term, Manager shall quit and surrender the Premises to Owner in the condition required pursuant to this Agreement and take such other actions as contemplated by Article 20 hereof.

## ARTICLE 4
## USE AND OPERATION OF THE HOTEL

4.1     **Operation**. Manager shall be the sole and exclusive manager of the Hotel during the Term and shall operate the Hotel in accordance with the Operating Standards and the provisions of this Agreement. Manager shall act in a fiduciary capacity with respect to the proper protection of and accounting for Owner's assets. In this capacity, Manager shall deal at arm's length with Owner and all third parties, and Manager shall manage the Hotel in a manner which shall serve the Owner's interests at all times.

4.2     **Employment**.

(a)     Subject to the terms of this Agreement, Manager shall select, employ, promote, transfer, compensate, terminate where appropriate, supervise, direct, train, and assign the duties of the Executive Personnel and, through the Executive Personnel, a sufficient number of personnel whom Manager reasonably determines to be necessary or appropriate for the proper, adequate and safe operation and management of the Hotel (collectively, the "**Hotel Employees**"). In connection therewith, Manager agrees to cause an employee or employees located in the corporate office of Manager, at no additional cost to Owner, to handle revenue management and sales management for this Property, together with other properties managed by Manager for Owner and its Affiliates. All such employees of the Hotel shall be employees of Manager or Manager's Affiliate. In addition, Manager may, from time to time, assign one or more of its employees to the staff of the Hotel on a full-time, part-time or temporary basis. Notwithstanding the provisions of this Section 4.2 or any other provision of this Agreement, all costs, expenses and liabilities relating to Hotel Employees shall be expenses of operating the Hotel and the responsibility of Manager for acts or omissions of Hotel Employees (or, for Hotel Employees who allocate their time between multiple hotels, an appropriate allocation of the costs for such Hotel Employees) shall not extend beyond responsibility for the gross negligence or willful misconduct of, or the willful violation of Legal Requirements by the Executive Personnel. Manager acknowledges that such Executive Personnel have the duties specified in the first sentence of this Section 4.2 with respect to other Hotel Employees. Manager will negotiate with any union lawfully entitled to represent such employees and may execute collective bargaining agreements or labor contracts resulting therefrom that have been approved by Owner. Manager shall fully comply with all Legal Requirements having to do with worker's compensation, social security, unemployment insurance, hours of labor, wages, working conditions, and other

employer-employee related subjects. With respect to matters of employment, this Agreement is not one of agency by the Manager for Owner but one with the Manager engaged independently in the business of managing properties on its own behalf as an independent contractor (as defined in §856(d)(3) of the Internal Revenue Code with regards to Owner and any Affiliates thereof). The cost of all employment arrangements shall be charged as Gross Operating Expenses of the Hotel and shall be accrued in accordance with generally accepted accounting principles; provided, however, relocation expenses which exceed the budgeted relocation expenses provided in the Annual Plan, shall not be charged as a Gross Operating Expense without the prior approval of Owner, such approval not to be unreasonably withheld, conditioned or delayed. The costs provided for in the immediately preceding sentence shall include, by way of example and not limitation, all reasonable costs and expenses (including, without limitation, all employment related expenses incurred by Manager with respect to the Hotel Employees), such as severance pay, unemployment compensation and health insurance and related costs (i.e., in order to comply with COBRA-type regulations) as a result of the termination of employees and which shall have been paid or accrued in accordance with generally accepted accounting principles. Manager shall use commercially reasonable efforts and exercise reasonable care to select qualified, competent, and trustworthy employees. The Hotel's general cashier and all employees having check signing authority shall be adequately bonded to the satisfaction of Owner and the cost of such bonds shall be an expense of the Hotel. To the extent possible and reasonably available, Manager shall use local labor to fill non-Executive Personnel positions in the operation of the Hotel. Owner may at any time consult or communicate with Manager regarding any of the Hotel Employees, but will not interfere in the day-to-day activities of Hotel Employees. The Manager shall not discriminate against any employee or applicant for employment because of race, color, religion, national origin, ancestry, age, sex or sexual orientation, and all employment advertising shall indicate that Manager and Owner are each an Equal Opportunity Employer as that term is defined under Legal Requirements.

Notwithstanding anything to the contrary contained in this Agreement, the following subparagraphs (b) and (c) shall apply to any liability that may, from time to time, arise out of the Employee Retirement Income Security Act of 1974 ("**ERISA**") and the Multi-employer Pension Plan Amendments Acts of 1980 ("**MEPPA**"), respectively, as from time to time amended.

(b)     Employee Benefits: Any Hotel Employees who are not then represented by a collective bargaining representative shall be entitled to participate in the incentive programs, profit sharing and/or other employee retirement, disability, health, welfare or other benefit plan or plans then made available by Manager to similarly situated employees of other hotels managed by Manager, in accordance with their respective terms. Manager will have the right to charge the Hotel with its allocable share of the cost of any such plan or plans and any contributions to be made thereunder provided that such charges and contributions shall be determined by Manager in good faith on a uniform basis with respect to charges and contributions imposed for the same or similar plans at other hotels then managed by Manager, subject to Legal Requirements. Manager's rights under this Subsection (b) shall be subject to the condition that Manager shall not put into effect any amendment to any existing plan, or adopt any additional plan, which is not imposed upon all other similarly situated hotels managed by Manager.

**Management Agreement – Page 12**

Upon the expiration or termination of this Agreement, the sale of the Hotel or other similar event, Manager shall cooperate with the Owner with respect to disposition of such plan or plans (or plan assets) in a mutually satisfactory manner, all in compliance with then applicable Legal Requirements.

(c)     Collective Bargaining or Other Multi-employer Plans: Manager and Owner agree that with respect to any withdrawal liability arising under any collective bargaining agreement or other "multi-employer plan" (as defined in Section 3(37) of ERISA) in which the Hotel Employees become participants, the obligations of the parties shall be determined as follows:

(1)     Withdrawal liability arising with respect to Hotel Employees shall be the responsibility of Owner, and Owner shall either pay the amount of such withdrawal liability directly to such plan or reimburse Manager for withdrawal liability payments made to such plan by Manager with respect to Hotel Employees (including withdrawal liability arising after the sale or other termination of this Agreement, provided that such liability arises as a result of such sale, disposition, termination or other similar event). To the extent permitted under then applicable laws, regulations and agreements, Manager shall cooperate with Owner in structuring transactions and transferring actual or contingent withdrawal liability to a successor in ownership or purchaser of the Hotel in accordance with "relief" provisions of ERISA, such as ERISA Section 4204 or then applicable statutory or regulatory provisions of a similar nature.

(2)     For purpose of this subparagraph (c), the term "withdrawal liability" shall mean the actual amount assessed by and payable to a multi-employer pension fund upon a complete or partial withdrawal of the Hotel or Hotel Employees from such fund. Manager shall cooperate with Owner in challenging a plan's assessment of such liability, provided that all costs of litigation, arbitration or other procedures shall be paid by Owner (including any bonds that must be posted). If Manager or its Affiliates have employees at other locations who participate in the same multi-employer plan as Hotel Employees, Owner shall be charged with and be responsible only for multi-employer plan withdrawal liability arising solely with respect to the participation of Hotel Employees in such plan.

4.3     **Legal Proceedings**. Legal Proceedings of a "non-extraordinary nature" (hereafter defined), may be instituted by Manager, in accordance with guidelines and policies determined from time to time by Manager and Owner, in the name of Manager or the Hotel or Owner and by counsel designated by Manager pursuant to such guidelines and policies. Legal Proceedings of an "extraordinary nature" (hereafter defined) shall require Owner's prior approval of the proceedings and counsel approved by Owner. Manager shall furnish Owner with quarterly status reports with respect to all Legal Proceedings of an extraordinary nature. In addition, Manager shall have the right to defend, through counsel designated by Manager, Legal Proceedings of a non-extraordinary nature against Owner or Manager resulting from the operation of the Hotel. The defense of Legal Proceedings against the Hotel of an extraordinary nature (including, without limitation, any aspect of any claims against Manager or Owner arising out of the operation of the Hotel as to which the insurance company denies coverage) shall be coordinated with Owner, designated counsel shall be subject to Owner's reasonable approval and Manager shall furnish Owner with quarterly status reports with respect to such actions. All claims against Owner and/or Manager arising out of the management or operation of the Hotel which (i) are not covered by insurance shall be promptly communicated to Owner and (ii) are covered in whole or

**Management Agreement – Page 13**

in part by insurance shall be promptly forwarded by Manager to the appropriate insurer (with a copy thereof to Owner in the case of claims against Owner). Legal Proceedings of a "non-extraordinary nature" shall be proceedings in which the monetary exposure is less than $50,000 that are (i) initiated by Manager or Owner relating to the operation of the Hotel for matters such as collections, maintenance of licenses and permits, enforcement of contracts and proceedings against Hotel tenants; and/or (ii) defense of actions against the Owner or Manager resulting from the operation of the Hotel, for matters such as guest claims for loss of property or injury to persons and claims relating to employment or the application for employment at the Hotel. Legal Proceedings of an "extraordinary nature" shall mean all other Legal Proceedings.

4.4     **Annual Plan**. On or before the date that is forty-five (45) days following the Commencement Date, Manager shall submit to Owner an Annual Plan ("**Annual Plan**") for the remaining portion of the Fiscal Year in which the Commencement Date occurs and Owner either shall accept the initial Annual Plan submitted to Owner as provided above or shall submit to Manager a detailed list of Owner's objections or questions to the Annual Plan. Owner and Manager shall meet and discuss Owner's Annual Plan objections and shall coordinate expeditiously and in good faith to agree upon an Annual Plan for the remaining portion of the Fiscal Year in which the Commencement Date occurs. On or before November 15th of each year following the Commencement Date, Manager shall submit to Owner an Annual Plan for the next Fiscal Year and on or before December 15th of each year following the Commencement Date, Owner either shall accept the Annual Plan submitted to Owner as provided above or shall submit to Manager a detailed list of Owner's objections or questions to the Annual Plan ("**Owner's Annual Plan Objections**"). Within fifteen (15) days after Manager's receipt of Owner's Annual Plan Objections, Owner and Manager shall meet and discuss Owner's Annual Plan Objections with the goal of agreeing upon an Annual Plan for the subject Fiscal Year. Owner, as part of Owner's Annual Plan Objections, shall have the right to object to the entire Annual Plan or to any specific item or items contained in the Annual Plan. In the event Owner objects to the Annual Plan or any specific item or items of expense in the Annual Plan and Owner and Manager are unable to reach agreement thereon as provided above prior to commencement of the Fiscal Year in question, pending such agreement, the Annual Plan or the specific item or items of expense (not revenue) in question shall be suspended and replaced for such period that the Annual Plan or such item(s) are in question by an amount equal to the lesser of (i) that proposed by Manager for such Fiscal Year, or (ii) if an objection to the entire Annual Plan, the Actual Gross Operating Expenses for the immediately preceding Fiscal Year subject to an adjustment equal to the percentage increase in the CPI over the last twelve (12) month period immediately preceding the start of the Fiscal Year in question, or (iii) if an objection to a specific item or items of expense in the Annual Plan, such item or items of expense for the immediately preceding Fiscal Year subject to an adjustment for each item equal to the percentage increase in the CPI over the twelve (12) month period immediately preceding the start of the Fiscal Year in question.

(a)     The Annual Operating Budget shall be prepared in accordance with the Uniform System of Accounts. The proposed Annual Operating Budget shall incorporate Manager's good faith reasonable estimates of the items of revenue and expense contained therein and shall contain the proposed budget for operations for the succeeding Fiscal Year. When approved by Owner, the proposed Annual Operating Budget shall be the approved Annual Operating Budget.

Any revisions, substitutions or additions to the Annual Operating Budget must be approved by the Owner in writing.

As part of the budgeting process, Manager shall provide to Owner, with each proposed Annual Operating Budget, a complete list of all service and other contracts anticipated for the Fiscal Year which is the subject of the Annual Operating Budget having a liability to the Hotel in excess of $25,000 for such Fiscal Year for or covering the Hotel and the payments or expenditures connected or anticipated therewith. So long as any service or other contracts fall within the following guidelines, Owner's approval thereof shall not be required, but Manager shall nevertheless promptly report to Owner the execution of (and provide Owner with a true and complete copy of) each such contract having a liability to the Hotel of in excess of $25,000:

> (i)      The term of such contract shall be no longer than one (1) year; and

> (ii)     Each contract must be terminable by Owner or Manager without payment or penalty upon not more than thirty (30) days' notice.

In addition, Manager shall provide to Owner for Owner's review, a written schedule for the Hotel listing all executive and management employees to be employed "on-site" in the direct management of the Hotel including, but not limited to the positions of General Manager, Director of Sales, Chief Engineer and the portfolio sales and revenue manager. These schedules shall include such employee's title or job description and the salary range including additional compensation or prerequisites such as lodging, meals, maintenance, moving expenses, bonus/incentive compensation and the like. In the event that any employee's services are shared with (or subsidized through a sharing arrangement with) another hotel, the employee shall be identified together with a description of his/her responsibilities and the amount and source of any subsidy, together with a breakdown of the relative time expended with respect to the Hotel and each other hotel. If Owner notifies Manager that Owner does not believe that some or all of the scheduled wages and salaries are reasonable and customary as required above, then Manager shall promptly provide to Owner a wage and salary survey that supports the scheduled wages and salaries. No proposed amendment including changes in salary or other compensation shall be effective unless the salary or other compensation as changed is reasonable and customary as required above.

(b)      The Capital Budget shall be prepared in accordance with the Uniform System of Accounts. The Capital Budget shall contain the proposed budget for expenditures from the Reserve and the budget for expenditures for Capital Improvements and FF&E for the succeeding Fiscal Year for (i) additions to and substitutions, replacements and renewals of FF&E and (ii) certain non-routine repairs and maintenance to the Project which are normally capitalized under generally accepted accounting principles such as exterior and interior repainting, resurfacing building walls, floors, roof and parking areas, replacing folding walls and similar items. Manager shall submit good faith reasonable estimates for Capital Improvements and for FF&E for the Fiscal Year following the Fiscal Year otherwise covered by the Annual Operating Budget. When approved by Owner, the Capital Budget, or such items as may be specifically approved by Owner, shall be collectively referred to in this Agreement as the "Approved Capital Budget". Approval of the Capital Budget constitutes an authorization for Manager to expend money for Capital Improvements and for FF&E as provided in the Approved Capital Budget, unless the

**Management Agreement – Page 15**

Owner's approval thereof specifically requires Manager to obtain additional approvals prior to commencing such work. Any revisions, substitutions or additions to the Approved Capital Budget must be approved by Owner in writing.

Competitive bid rules outlined in Section 4.5 will be observed at all times by Manager for any purchases of Capital Improvements and/or FF&E.

(c)     On or before the date that is thirty (30) days following the Commencement Date, Manager shall submit to Owner the Marketing Plan, which Marketing Plan shall contain advertising, sales and promotional plans prepared by Manager to be used in connection with the marketing of the Hotel and the portfolio of hotels owned by Owner and managed by Manager. On or before November 15th of each year following the Commencement Date, Manager shall submit to Owner an Annual Plan for the next Fiscal Year.  When approved by Owner, the proposed Marketing Plan shall be the approved Marketing Plan. Any revision, substitution or additions to the Marketing Plan must be approved by Owner in writing. The Marketing Plan shall be written with the goal of achieving Gross Revenues as submitted in the Annual Operating Budget for the Fiscal Year or, if less than a full Fiscal Year, the period between the Commencement Date and the December 31 next following the Commencement Date. Manager shall not use Owner's name in any advertising or promotional material without Owner's expressed prior written approval.

(d)     The Management Plan shall contain (i) estimated contributions and distributions from or to Owner; (ii) a leasing plan for the leasing of concessions and other space in the Hotel; (iii) plans and budgets for the disposition and replacement of FF&E; and (iv) such management issues, proposals and projections or modifications as Manager may recommend for the efficient management of the Hotel including but not limited to proposals and assessments as to the Hotel's position in the market, market opportunities, franchise affiliation and disposition strategies. When approved by Owner, the proposed Management Plan shall be the approved Management Plan.

4.5     **Competitive Bidding**. All contracts for repairs, Capital Improvements, FF&E, food and services exceeding $10,000 shall be awarded on the basis of competitive bidding (provided, however, that Manager will not be required to obtain competitive bids for any service for which a single provider exists), solicited in the following manner:

(a)     A minimum of two (2) written bids shall be obtained for each purchase or contract that exceeds $10,000, up to $25,000. Purchases over $25,000 will require a minimum of three (3) bids.

(b)     Each bid will be solicited in a uniform format.

(c)     Subject to approval by Owner, Manager may accept a low bid if the expenditure is for an approved item in the budget and will not result in an excess of the annual budgeted Account Category of the applicable Capital Budget or Annual Operating Budget.

(d)     If Manager desires to accept a bid other than the lowest bid, then Manager shall so advise Owner in writing and recommend that such bid be accepted, with support for such recommendation.

**Management Agreement – Page 16**

(e)     Owner shall have the right to accept or reject any and all bids for repairs, Capital Improvements, FF&E or foods and services that are not the lowest bid; such acceptance shall not be unreasonably withheld or delayed.

(f)     Manager may request Owner to waive in writing competitive bidding rules for a specific item or service.

In its operation of the Hotel under this Agreement, Manager may purchase goods, supplies and services from itself, Owner or Owner's representatives, or any Affiliates of any of the foregoing so long as the prices and terms thereof are at arm's length and otherwise competitive with, and are not less favorable than prices and terms which could be obtained from independent parties and, if required by Section 4.5, are in compliance with competitive bidding rules, provided that Manager will obtain Owner's consent (not to be unreasonably withheld) regarding any such arrangement.

4.6     **Labor Relations**. Manager shall have no right to enter into any collective bargaining agreement concerning any employees of the Hotel without the prior written approval of Owner, which may be granted or withheld in its sole discretion. Upon Owner's approval of any such agreement, Manager shall be responsible to perform such agreements. To the extent applicable, Manager: (a) represents that it is an equal opportunity employer as described in Section 202 of Executive Order 11246 dated September 24, 1965, as amended, and as such agrees to comply with the provisions of Paragraphs 1 through 7 of Section 202 of said Executive Order during the performance of this Agreement, (b) agrees to comply with the affirmative action requirements of Part 60.741 of Title 41, Code of Federal Regulations, with respect to handicapped workers during the performance of this Agreement, (c) agrees to comply with the affirmative action requirements of Part 60.250 of Title 41, Code of Federal Regulations, with respect to Disabled Veterans and Veterans of the Vietnam Era during the performance of this Agreement, and (d) shall submit to Owner in the form approved by the Director of the Office of Federal Contract Compliance, U.S. Department of Labor, a certification that Manager does not and will not maintain any facilities that provide for their employees in a segregated manner, or permit their employees to perform their services at any location under its control, where segregated facilities are maintained, and that Manager will obtain a similar certification from its contractors.

4.7     **Liquor License**. INTENTIONALLY OMITTED.

4.8     **Employee Discount**. To the extent Manager, Owner or any of their respective Affiliates owns or has any equity interest in other hotels and provides a discounted rate to the employees at such other hotels, such party agrees to provide the same discounted rate (subject to availability and black-out periods) to the employees of the other parties named in this Section 4.8 to the extent allowed under the management and ownership agreements affecting such other hotels.

4.9     **Forms**. Manager shall prepare or cause to be prepared for execution by Owner all forms, reports and returns, if any, required to be filed by Owner under applicable law with respect to the operation of the Hotel; however, Manager shall not be obligated to prepare any of Owner's income tax returns. Without limitation, Manager shall timely prepare and deliver, as

required by law, an Internal Revenue Service Tax Form 1099 with respect to payments made during a calendar year to third party contractors and professionals.

4.10 **Notice of Violations**. Manager shall promptly notify Owner in writing of any written notice received from any regulatory or governmental body regarding an actual or perceived violation of any Legal Requirements.

## ARTICLE 5
## RELATIONSHIP OF PARTIES

Except as provided in Section 4.2(a), Owner and Manager acknowledge and agree that this Agreement creates an agency relationship; provided, however, that (a) each Hotel Employee shall be the employee of Manager or Manager's Affiliate and not of Owner, (b) Manager's authority is subject to the terms and conditions of this Agreement, and (c) nothing in this Agreement shall constitute, or be construed to be, or create, a partnership, joint venture or lease or employment arrangement between Owner and Manager with respect to the Hotel or the operation thereof. Employees or agents of Manager are not by this Agreement or by any actions of Owner and/or Manager hereunder made employees of Owner, and are not entitled to the benefits provided by Owner or its Affiliates to its employees, including but not limited to, group insurance, leave and pension plan. This Agreement shall not be deemed at any time to be an interest in real estate or a lien or security interest of any nature against the Hotel, the Premises or any other land used in connection with the Hotel, or any equipment, fixtures, inventory, motor vehicles, contracts, documents, accounts, notes, drafts, acceptances, instruments, chattel paper, general intangibles, or other personal property now existing or that may hereafter be acquired or entered into with respect to the Hotel or the operation thereof.

## ARTICLE 6
## ADVERTISING

Subject to and in strict compliance with the provisions of the License Agreement, Manager shall arrange and contract for all advertising, which Manager may reasonably deem necessary, in accordance with Section 4.4, for the operation of the Hotel. So long as the License Agreement may be in effect, Manager generally shall advertise the Hotel under the name "– Petrol Inn & Suites" or such other name as Owner may designate or approve.

## ARTICLE 7
## RESERVE FOR FF&E

7.1 **Reserve for Replacement of FF&E**. The Reserve shall be funded pursuant to Section 7.2, and Manager shall use amounts in the Reserve to cover the cost of FF&E expenditures and Capital Improvements, as described in Section 4.4 in conjunction with the Approved Capital Budget. All FF&E, Capital Improvements and the Reserve shall be the property of Owner.

7.2 **Transfers to Reserve for FF&E**. Commencing on the Commencement Date and continuing thereafter during the remainder of the Term, Manager shall deposit monthly into the Reserve for FF&E an amount equal to the amounts required by Lender and/or by Licensor;

provided that in no event will the amounts to be deposited monthly into the Reserve be less than an amount equal to four percent (4%) of Gross Revenues throughout the remainder of the Term.

7.3     **Annual Adjustment**. At the end of each Fiscal Year and following receipt by Manager of the annual accounting referred to in Article 10, an adjustment will be made to such annual account, if necessary and if available, so that the appropriate amount shall have been deposited in the Reserve.

7.4     **Maintenance of Reserve**. Checks or other documents of withdrawal shall be signed by representatives of Manager who shall be bonded or otherwise insured pursuant to the "crime – Theft of Money and Securities" coverage set forth on Exhibit D to this Agreement. The proceeds from the sale of FF&E no longer needed for the operation of the Hotel shall be deposited in the Reserve, but not be credited against the obligation to deposit cash in such fund for the then current Fiscal Year. All interest earned or accrued on amounts invested from the Reserve shall be added to the Reserve (but shall not be credited against Owner's obligations to fund the Reserve), and shall not constitute Gross Revenues or be included therein.

7.5     **Accumulation of Reserve and Additional Cost of FF&E and Capital Improvements**. Owner and Manager acknowledge and agree that portions of the Reserve may, from time to time in accordance with the then-current Annual Plan, be used for more significant expenditures than could be reserved for in a single year.  Accordingly, at the end of each Fiscal Year, any amounts remaining in the Reserve shall be carried forward to the next Fiscal Year, and shall be in addition to the amount to be reserved in the next Fiscal Year. In the event at any time there are insufficient funds in the Reserve for any Fiscal Year to pay the cost of FF&E in accordance with the Annual Operating Budget and the Approved Capital Budget, then Owner will, at Owner's option, within sixty (60) days after request therefor by Manager, either provide the additional cash to the Manager to pay for such excess or authorize the funding of such cash from Net Operating Income.

7.6     **Final Remittance**. Upon expiration or termination of this Agreement, Manager shall remit all remaining amounts in the Reserve forthwith to Owner.

## <u>ARTICLE 8</u>
## REPAIRS AND MAINTENANCE AND CAPITAL IMPROVEMENTS

8.1     **Repairs and Maintenance**. Manager shall, from time to time, make such expenditures from Gross Revenues for repairs and maintenance including service contracts ("**Repairs and Maintenance**") as required by the Lender, the License Agreement, the Legal Requirements, the then current Annual Plan or as necessary to maintain the Hotel in good operating condition in compliance with the License Agreement and otherwise in the condition required by this Agreement, including but not limited to repairs and maintenance of HVAC, mechanical and electrical systems, exterior and interior repainting, resurfacing building walls and parking areas, waterproofing of exterior surfaces of floors, roofs, and replacement of plate glass, or the like. It is Owner's intent that the sums allocated for Repairs and Maintenance in accordance with the then current Annual Plan are to be fully expended during that Fiscal Year exclusively for the purposes identified in such Annual Plan. Except in the event of an emergency due to casualty, act of God or otherwise under circumstances in which it would be unreasonable

to seek to obtain prior approval (and provided that Manager shall notify Owner of any such expenditure within a reasonable time given the nature and scope of the emergency), all expenditures for the foregoing shall be as provided in the Annual Operating Budget and the Approved Capital Budget. If any such Repairs or Maintenance shall be made necessary by any condition against the occurrence of which Owner has received the guaranty or warranty of the builder or the Hotel or of any supplier of labor or materials for the Hotel or of any supplier of labor or materials for the construction of the Hotel, then Manager may invoke said guarantees or warranties in Owner's or Manager's name and Owner shall cooperate in all reasonable respects with Manager in the enforcement thereof.

8.2    **Capital Improvements**. Owner may, from time to time, at its sole expense, make such structural repairs, replacements, substitutions, alterations, additions or improvements (exclusive of FF&E) ("**Capital Improvements**") in or to the Hotel as Owner shall determine are necessary to comply with the Operating Standards. If Capital Improvements included in the definition of Building and Appurtenances shall be required at any time during the Term by the terms of any Mortgage, the License Agreement, to maintain the Hotel in good operating condition or by reason of any Legal Requirements, or because Manager and Owner jointly agree upon the desirability thereof, then in such event all such Capital Improvements shall be made with as little hindrance to the operation of the Hotel as reasonably possible. Notwithstanding the foregoing, as long as the Hotel can continue to operate without interruption, Owner shall have the right to contest the need for any such Capital Improvements required by any Legal Requirements and may postpone compliance therewith, if so permitted by law and if such postponement will not expose Manager to any civil or criminal liability. All recommendations by Manager of Capital Improvements shall be submitted in conjunction with the Capital Budget for the Fiscal Year described in Section 4.4(b). In the event that Owner elects to perform Major Renovations to the Hotel, Owner shall have the right to cause (i) Manager, or (ii) a third party, to oversee the performance of the Major Renovations for which oversight, if Manager is overseeing the Major Renovations, Manager shall be paid a project management fee (in addition to the Management Fee) equal to three percent (3%) of the budgeted hard cost items including contingency and any Owner-approved changes of the Major Renovations (the "**Project Fee**"). With respect to (i) Major Renovations as contemplated by this Agreement which Owner elects to have Manager oversee and (ii) improvements that are not Major Renovations, Manager shall oversee such projects in a reasonably prudent manner.

8.3    **Service Contracts**. Manager, without requiring the consent of Owner, shall enter into any contract for cleaning, maintaining, repairing or servicing the Hotel or any of the constituent parts of the Hotel as Manager deems necessary for the operation of the Hotel, except as specifically provided in Section 4.4 or 4.5. Manager shall submit the listing of service contracts entered into for the Hotel required pursuant to Section 4.4(a). Unless otherwise approved by Owner, all service contracts shall: (a) be in the name of Owner or Owner's nominee, (b) to the extent customary, include a provision for cancellation thereof by Owner or Manager upon not more than thirty (30) days written notice, and (c) shall require that all contractors provide evidence of such insurance as is customarily carried by other contractors involved in similar servicing arrangements.

8.4    **Liens**. Owner and Manager shall cooperate and use all commercially reasonable efforts to prevent any liens from being filed against the Hotel that arise from any maintenance,

changes, repairs, alterations, improvements, renewals or replacements in or to the Hotel. If any such liens are filed, Manager shall, subject to the availability of funds therefor in the Operating Accounts or as otherwise supplied by Owner, obtain the release thereof prior to the institution of legal proceedings in connection therewith. The cost of obtaining such release shall be included in Gross Operating Expenses, unless the imposition of the lien results from a default by Owner or Manager, in which event the cost of obtaining such release shall be borne by such defaulting party.

8.5 **Notice of Unavoidable Interruptions**. In the event of any occurrence constituting an Unavoidable Interruption, Manager shall promptly notify Owner of such occurrence and shall keep Owner informed as to the extent and impact thereof on the Hotel.

## ARTICLE 9
## WORKING CAPITAL AND BANK ACCOUNTS; DISTRIBUTION OF NET OPERATING INCOME

9.1 **Working Capital**. Owner shall provide initial Working Capital in the amount of $_____ in addition to the value of all Inventories. Owner shall at all times cause sufficient funds to be on hand in the Operating Accounts to assure the timely payment of all current liabilities of the Project, including but not limited to Gross Operating Expenses, all other costs and expenses incurred in connection with the Project pursuant to this Agreement and the performance by Manager of its obligations under this Agreement, all fees, charges and reimbursements payable to Manager hereunder and all amounts required hereunder to be transferred into the Reserve. In no event shall Owner permit the balance in the Operating Accounts to be less than an amount equal to the estimated monthly operating expenses of the Project as reflected in the then current Annual Operating Budget. From time to time, upon five (5) days prior written notice from Manager that such funds are required, Owner shall furnish to Manager funds that Manager deems reasonably necessary to assure that the Project shall have adequate working capital as herein provided. In the event Owner fails to supply required working capital in accordance with the provisions of this Section or if Manager otherwise deems such action to be necessary, Manager may use all or part of the funds in the Reserve to supplement the Operating Accounts in order to defray or pay the Project's operating costs and expenses, to the extent permitted by the Mortgage. Owner shall promptly reimburse the Reserve for all sums so used or transferred. All unexpended Working Capital, Inventories and Operating Equipment and Supplies purchased with Working Capital shall remain the property of Owner.

9.2 **Operating Account**. All funds (exclusive of funds deposited in the Reserve and house banks at the Hotel) received by Manager in the operation of or otherwise relating to the Hotel, and funds for Working Capital provided by Owner or retained by Manager from Gross Revenues, shall be deposited in the Operating Account. Manager shall inform such bank in writing that the funds deposited in the Operating Account are owned solely by the Owner. Manager shall not deposit funds attributable to any other property into the Operating Account. To the extent permitted by the Mortgage, amounts in the Operating Account may be temporarily withdrawn and invested by Manager in any Permitted Investments, having due regard for the timing of cash needs, but in no event shall such funds be co-mingled by Manager with any other funds. From the Operating Account, Manager shall pay all Gross Operating Expenses (other than the excess FF&E if funded by or through Owner) before any penalty or interest accrues thereon,

**Management Agreement – Page 21**

however, taking into account sound cash management. All interest earned or accrued on amounts invested from the Operating Account shall be added to the Operating Account. All checks or other documents of withdrawal from the Operating Account shall be signed by representatives of Manager except as provided in Section 9.3 hereof.

9.3    **Maintenance of Operating Account**. Subject to Section 9.4, the Operating Account shall be opened and maintained at all times by Manager and Owner and checks and other documents of withdrawal shall be signed by representatives of Manager who are covered by the required fidelity bond or otherwise insured pursuant to the "Crime – Theft of Money and Securities" coverage set forth on Exhibit D. The Operating Account and any other bank accounts approved by Owner shall be in Owner's name (for example, "*[Owner's name]* d/b/a/ *[Hotel name]*").

Manager shall not change the bank or open or close any bank account described in this Article 9 without Owner's prior written approval. Owner, in its sole and absolute discretion, may in writing direct Manager to change any such bank, signatories or arrangements. The bank in which the Operating Account is located shall be informed by Manager in writing that the funds in such account are held in trust for Owner and that any checks for more than $10,000.00 shall be required to be signed by two (2) authorized signatories on the account.

9.4    **Final Remittance**. Upon the expiration or termination of this Agreement, after payment of all Gross Operating Expenses for which bills were received to such date, Manager's Management Fee, Reimbursable Expenses, any Termination Fee and any other amounts then due and payable to Manager, all remaining amounts in (i) the Reserve, (ii) the Operating Account and (iii) the Permitted Investments, shall be transferred forthwith to Owner by Manager. Owner shall pay Manager any remaining Management Fee, any Termination Fee, Reimbursable Expenses and any other amounts then due and payable and Owner shall pay, or cause to be paid, and shall hold Manager harmless from and against all Gross Operating Expenses accrued in accordance with generally accepted accounting principles and invoices related to Gross Operating Expenses received after Manager has so transferred all funds.

9.5    **Distribution of Excess Cash**. Together with the financial report provided for in Section 10.2(b), Manager shall distribute to Owner all sums in the Operating Accounts in excess of the then working capital requirements of the Hotel determined in accordance with Section 9.1 of this Agreement.

**ARTICLE 10**
**BOOKS, RECORDS AND STATEMENTS**

10.1    **Books and Records**. Manager shall keep full and adequate books of account and other records reflecting the results of operation of the Hotel in accordance with the Uniform System of Accounts and generally accepted accounting principles. The books of account and all other records relating to or reflecting the operation of the Hotel shall be kept either at the Hotel or at Manager's corporate offices and shall be available to Owner and its representatives and its auditors or accountants, at all reasonable times for examination, audit, inspection and transcription at Owner's sole cost and expense. All of such books and records pertaining to the Hotel including, without limitation, books of account, guest records and front office records at all

times shall be the property of Owner and shall not be removed from the Hotel's or Manager's offices by Manager without Owner's approval and consent. Upon any termination of this Agreement, all of such books and records forthwith shall be turned over to Owner at a location designated by Owner so as to insure the orderly continuance of the operation of the Hotel, but such books and records shall thereafter be available to Manager at all reasonable times for inspection, audit, examination and transcription for a period of two (2) years.

10.2    **Financial Reports**.

(a)    Manager shall deliver to Owner within twenty (20) days following the close of each Accounting Period a monthly profit and loss statement reflecting a comparison of periodic and year-to-date actual revenues and expenses with the Annual Operating Budget as well as a periodic and year-to-date comparison of such actual revenues and expenses with those of the prior Fiscal Year.

(b)    Further, Manager shall provide to Owner within twenty (20) days following the close of each Accounting Period a report prepared in accordance with the example set forth in Exhibit C attached hereto and made a part hereof, which include without limitation, forward bookings, accounts receivable, accounts payable and a monthly sales overview report.

(c)    Further, within seventy-five (75) days after the end of each Fiscal Year, Manager shall deliver to Owner an annual accounting, showing the results of operation of the Hotel during the Fiscal Year and a computation of Gross Revenues, Gross Operating Expenses, and Net Operating Income, if any, and any other information necessary to make the computations required hereby or which may be requested by Owner, all for such Fiscal Year. The annual accounting for any Fiscal Year shall be controlling over the interim accountings for such Fiscal Year. Owner shall have the right to conduct an audit of the books.

(d)    Further, Manager shall prepare and deliver any additional reports or information as Owner is required to provide under the License Agreement.

10.3    **Audits by Owner**. Owner shall have the right to audit, conducted either by Owner's internal personnel or by a third party auditor retained by Owner at its expense, all items of expense and revenue under this Agreement including, but not limited to, Gross Revenues, Gross Operating Expenses, depreciation, the Management Fee and Reserve. Manager shall cooperate and assist with such audit. In the event that an audit reflects an underpayment to Owner or Manager or an overpayment to Manager or Owner, Manager shall correct same by a corrective payment to Owner or Manager, as appropriate, within ten (10) days following notice of the audit results to Manager, subject to Owner's and Manager's right to challenge the audit results in accordance with the provisions of Article 30 of this Agreement. If an audit determines any weaknesses or need for reasonable changes in the internal control systems pertaining to the safeguarding of Owner's assets, Manager will promptly make all necessary changes.

10.4    **Segregation of Accounts**. In any instance where Manager manages several properties for Owner, Manager shall segregate the income and expenses of each property so that Gross Revenues from each property will be applied only to the bills and charges from that property.

## ARTICLE 11
## MANAGER'S MANAGEMENT FEES; TIMING OF
## PAYMENT TO MANAGER

11.1   **Fees.** For each Fiscal Year or portion thereof, Manager shall receive, by a distribution made by Manager out of Gross Revenues at the end of each Accounting Period in respect of its management services hereunder, a fee (collectively, the "**Management Fee**") calculated as follows:

(a)   a base fee (the "**Base Fee**") in an amount equal to ███████████ of Gross Revenues in respect of any applicable period; plus

(b)   an accounting fee (the "**Accounting Fee**") for accounting services provided by Manager's corporate employees on a "centralized" basis in the amount of ███████ ████████████████████████████████████████████████████████████████ plus

(c)   a revenue management fee (the "**Revenue Management Fee**") for an allocation of Manager's revenue management services to be provided by Manager's corporate employees on a "centralized" basis in the amount of █████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████.

The Management Fee generally shall be computed separately for each Fiscal Year and shall not be accumulated from Fiscal Year to Fiscal Year. Owner shall reimburse Manager for all Reimbursable Expenses incurred by it in connection with the performance of this Agreement. Any such amount shall be payable within thirty (30) days of billing, and upon request of Owner, Manager shall provide a statement showing in reasonable detail the nature and amount of such expenses, together with supporting documentation reasonably requested by Owner.

11.2   **Treatment of Proceeds of Business Interruption Insurance and Condemnation Awards**. In the event of a casualty or condemnation for temporary use resulting in the payment of business interruption insurance (with respect to such casualty) or a condemnation award (with respect to such condemnation for temporary use), the amount of such proceeds shall be considered a part of Gross Revenues for the purpose of computing Manager's Management Fee.

## ARTICLE 12
## INSURANCE

12.1   **Insurance**. Throughout the Term, Manager (unless Owner shall by notice in writing to Manager elect to provide the property and casualty insurance coverage required hereunder) shall provide and maintain the insurance in the minimum amounts and types set forth

on **Exhibit D** to this Agreement, the costs of which shall be charged as part of Gross Operating Expenses.

12.2    **Modification of Insurance**. Owner may require Manager to increase the limits of the above insurance coverage and may require Manager to carry other or additional reasonable and customary insurance. All premiums on any increased limits of, or other or additional, insurance coverage required by Owner under the immediately preceding sentence shall be included in the Gross Operating Expenses. In no event shall insurance coverage be less than that required by Lender, the License Agreement or to comply with Legal Requirements.

12.3    **Contractor's Insurance**. Manager shall require that all major contractors on or about the Hotel Premises have coverage at the contractor's sole expense in the minimum types and amounts set forth in **Exhibit D** to this Agreement. Manager shall require contractors that are not major contractors to carry such insurance coverage that is customary in the applicable trade or industry. A major contractor shall mean any contractor (i) receiving compensation in excess of $25,000 per year (subject to adjustment for adjustments in the CPI between the Commencement Date and the date of such services) or (ii) performing hazardous services. Manager must obtain the Owner's permission in writing to waive any of the above requirements. Higher amounts may be required if the work to be performed is sufficiently hazardous in nature. Manager shall obtain and keep on file a Certificate of Insurance for each such major contractor that shows that the contractor is so insured.

12.4    **Form of Policies**. All insurance required by Sections 12.1, 12.2 and 12.3 shall be in such form and with such companies as shall be reasonably satisfactory to Owner provided that such company shall have a minimum Best rating of A- Class VIII, or as otherwise approved by Owner and Manager, and shall comply with the requirements of any Mortgage and the License Agreement. All property damage insurance shall name Owner as insured, and so long as the Hotel is mortgaged pursuant to any Mortgage or otherwise shall be subject to a standard mortgagee clause in favor of the mortgagee or mortgagees. All other insurance (excepting only the professional liability and workers' compensation lines of coverage) shall be in the name of Owner and Manager. The workers' compensation policy shall name Owner as an additional insured. Policies of insurance (to the extent applicable) shall (i) provide that the insurance company will have no right of subrogation against any mortgagee, Owner, Manager or any of their respective affiliated or subsidiary companies or the agents or employees thereof and (ii) provide that the proceeds thereof in the event of loss or damage shall, to the extent payable to any mortgagee, be payable notwithstanding any act of negligence or breach of warranty by Owner or Manager which might otherwise result in the forfeiture or nonpayment of such insurance proceeds.

12.5    **Certificates**. For the purpose of insuring compliance with the provisions of Article 12, Manager shall furnish to the Owner certificates for all insurance required to be maintained pursuant to this Article 12 within five (5) days prior to renewal. All such certificates shall specify that the policies to which they relate cannot be canceled or modified on less than thirty (30) days' prior written notice to Owner. In the event Owner procures any insurance under this Section 12, Owner shall have the responsibilities set forth in the two preceding sentences for the benefit of Manager.

**Management Agreement – Page 25**

12.6    **Waiver of Subrogation**. Owner and Manager each waive their respective rights of subrogation against each other.

12.7    **Mortgage Requirements**. Insurance shall be maintained in a manner consistent with the terms and conditions of any Mortgage and any conflict between those terms and conditions and the provisions of this Agreement shall be resolved in favor of the Mortgage.

## ARTICLE 13
## REAL AND PERSONAL PROPERTY TAXES; UTILITIES

13.1    **Taxes**. Manager shall, on behalf of Owner, pay from the Gross Revenues, on or before the dates the same become delinquent, with the right to pay the same in installments to the extent permitted by law, all real estate taxes, all personal property taxes and all betterment assessments levied against the Hotel or any of its component parts. Manager shall promptly deliver to Owner all notices of assessments, valuations and similar documents to be filed by Manager or Owner, which are received from taxing authorities by Manager. Owner shall have the right to hire property tax consultants or like professionals that reasonably provide economic benefits to Owner and the costs thereof shall be a part of Gross Operating Expenses. Notwithstanding the foregoing obligations of Manager, Owner may elect to contest the validity or the amount of any such tax or assessment, provided that such contest does not materially jeopardize Manager's rights under this Agreement. Manager agrees to cooperate with Owner and execute any documents or pleadings required for such purpose, provided Owner agrees to reimburse Manager for any out-of-pocket costs occasioned to Manager by any such contest. At Owner's election, all costs relating to any such contest may be included in Gross Operating Expenses.

13.2    **Utilities, Etc**. Manager shall promptly pay all fuel, gas, light, power, water, sewage, garbage disposal, telephone and other utility bills currently as they are incurred in connection with the Hotel from the Gross Revenues or Working Capital.

## ARTICLE 14
## USE OF NAME

14.1    **Name**. During the Term of this Agreement, the Hotel shall at all times be known and designated as the "La Quinta Inns & Suites Hobbs" or by such other name as from time to time may be agreed upon by Owner and Manager. Manager shall make or cause to be made any fictitious name filings or disclosures required by the laws of the State with respect to the use of such name for or in connection with the Hotel. Manager shall not use or employ such name unless such use fully complies with the terms of the License Agreement, if any.

## ARTICLE 15
## DAMAGE OR DESTRUCTION; CONDEMNATION

15.1    **Damage or Destruction**.

(a)    If the Hotel or any portion thereof shall be damaged or destroyed at any time or times during the Term by fire, casualty or any other cause commonly covered by fire and extended coverage insurance and the cost of repairing such damage and restoring the Hotel to

substantially its condition immediately prior to such damage or destruction, as reasonably estimated by Owner based upon estimates Owner receives from contractors and other reasonable and customary evidence, will not exceed the sum of $250,000 plus adjustments to reflect increases in the CPI for each Fiscal Year after 2014 exclusive of the cost of the foundation and footings ("**Minimum Cost**"), Owner will, at its own cost and expense (subject to Owner's receipt of insurance proceeds sufficient to pay such costs and expenses) and with due diligence repair and/or restore the Hotel so that after such repair and/or restoration, the Hotel shall be in substantially the same condition as it was immediately prior to such damage or destruction.

(b)     If the cost of such repair and/or restoration will, as so reasonably estimated by Owner, exceed the Minimum Cost, then Owner shall, within one hundred twenty (120) days after such damage or destruction, elect by notice to Manager either (x) to carry out such repair and/or restoration, in which case Owner shall complete such repair and/or restoration pursuant to the last sentence of Section 15.1(a) or (y) to terminate this Agreement; should Owner so elect to terminate this Agreement, Owner shall pay to Manager the Termination Fee.

(c)     In the case of damage or destruction which Owner is not required by the preceding provisions of this Section 15.1 to repair or restore and where Owner has not elected under said preceding provisions to terminate this Agreement, Owner shall undertake to notify Manager, within one hundred twenty (120) days after such damage or destruction, whether or not Owner will so repair and/or restore such damage or destruction. If Owner, within such one hundred twenty (120) day period either (i) advises Manager that Owner will not so repair and/or restore such damage or destruction or (ii) fails to advise Manager of Owner's decision, Manager may terminate this Agreement by written notice to Owner, or Owner may terminate this Agreement by such notice to Manager; in either case such written notice must be given within one hundred fifty (150) days after such damage or destruction and neither party shall be entitled to any payment on account of such termination. If in such event Owner within such one hundred twenty (120) day period notifies Manager that Owner will so repair and/or restore such damage or destruction, then neither Owner nor Manager shall have a right to terminate this Agreement on account of such damage or destruction.

15.2     **Condemnation**. If the whole of the Hotel shall be taken or condemned in any eminent domain, condemnation, compulsory acquisition or like proceeding by any competent authority or if such a portion thereof shall be taken or condemned as to make it imprudent or unreasonable, in the sole opinion of Owner, to use the remaining portion as a hotel of the type and class immediately preceding such taking or condemnation, then the Term shall terminate as of the date title vests in the condemning authority. Manager has no interest in any award paid to Owner and Manager shall make no claim against the condemnor for any loss to its business as a result of such condemnation or otherwise. If only a part of the Hotel shall be taken or condemned and the taking or condemnation of such part does not, in the opinion of Owner, make it unreasonable or imprudent to operate the remainder as a hotel of the type and class immediately preceding such taking or condemnation, this Agreement shall not terminate, and so much of any award to Owner shall be made available as shall be reasonably necessary for making alterations or modifications of the Hotel, or any part thereof, so as to make it a satisfactory architectural unit as a hotel of similar type and class as prior to the taking or condemnation.

15.3    **Mortgage Requirements**. Actions as to damage or destruction and condemnation shall be taken only in a manner that is consistent with the terms and conditions of the Mortgage and any conflict between those terms and conditions and the provisions of this Agreement shall be resolved in favor of the Mortgage.

**ARTICLE 16**
**EVENTS OF DEFAULT**

16.1    **Manager Defaults**. Each of the following shall constitute an Event of Default by Manager:

(a)    The failure of Manager to pay any sum of money (or, if required by the Mortgage, to deposit into the lockbox account within two (2) business days of receipt) to Owner provided for herein when the same is payable, if such failure is not cured within five (5) days after written notice specifying such failure is given by Owner to Manager.

(b)    An assignment by Manager in violation of the provisions of Article 23 hereof.

(c)    If Manager shall fail to keep, observe or perform any other material covenant, agreement, term or provision of this Agreement to be kept, observed or performed by Manager and such failure shall continue for a period of thirty (30) days after written notice specifying such failure given by Owner to Manager, or if Manager due to any act or omission on the part of Manager and without the fault of Owner, shall fail to maintain the Permits and such failure shall continue for a period of thirty (30) days after written notice specifying such failure given by Owner to Manager; provided that if such failure is incapable of cure within such thirty (30) day period, then the cure period shall be extended provided that Manager commenced the cure during such initial thirty (30) day period and thereafter diligently and continuously pursues the cure thereof to completion.

(d)    If because of any act or omission on the part of Manager, and without the fault of Owner, either (i) the License Agreement or (ii) any required license for the sale of alcoholic beverages at the Hotel, is at any time suspended, terminated or revoked for a period of more than thirty (30) consecutive days, provided, however, if, at the end of such thirty (30) day period the cure has not been effectuated notwithstanding Manager's diligent and continuous attempts to cure, then the cure period shall be extended for an additional period of ninety (90) days.

(e)    If Manager shall fail to maintain and operate the Hotel in accordance with the standards required under Section 4.1 and such failure shall not be due to a refusal on the part of Owner to approve the Annual Plan submitted by Manager under Section 4.4 or Owner's failure to properly provide funds requested pursuant to the provisions of Section 9.1 and such failure shall continue for a period of sixty (60) days after written notice by Owner to Manager specifying the matters or conditions which constitute the basis for such Event of Default, provided that if such failure is not reasonably capable of cure within such sixty (60) day period, then the cure period shall be extended provided that Manager commences the cure during such initial sixty (60) day period and thereafter diligently and continuously pursues the cure thereof to completion.

(f)　　If Manager shall apply for or consent to the appointment of a receiver, trustee or liquidator of Manager or of all or a substantial part of its assets, admit in writing its inability to pay its debts as they come due, make a general assignment for the benefit of creditors, take advantage of any insolvency law, or file an answer admitting the material allegations of a petition filed against Manager in any bankruptcy, reorganization or judgment or decree shall be entered by any court of competition jurisdiction, on the application of a creditor, adjudicating Manager bankrupt or insolvent or approving a petition seeking reorganization of Manager or appointing a receiver, trustee or liquidator of Manager or of all or a substantial part of its assets or a decree shall continue unstayed and in effect for any period of ninety (90) consecutive days.

(g)　　The filing of a voluntary petition in bankruptcy or insolvency or a petition for liquidation or reorganization under any bankruptcy law by Manager, or Manager shall consent to, acquiesce in, or fail timely to controvert, an involuntary petition in bankruptcy, insolvency or an involuntary petition for liquidation or reorganization filed against it.

(h)　　The filing against Manager of a petition seeking adjudication of Manager as insolvent or seeking liquidation or reorganization or appointment of a receiver, trustee or liquidator of all or a substantial part of Manager's assets, if such petition is not dismissed within ninety (90) days.

(i)　　Failure of Manager (but excluding such a failure which results from the failure by Owner to provide the necessary funds therefor) to maintain at all times throughout the term hereof all of the insurance required to be maintained by Manager under Article 12, if such failure is not cured within fifteen (15) days after written notice specifying such failure is given by Owner to Manager.

(j)　　The fraud, gross negligence, willful misconduct or criminal conduct of or by Manager and, to the extent same has a material adverse effect on the Hotel or Owner, the General Manager, in connection with the Hotel.

16.2　　**Owner Defaults**. Each of the following shall constitute an Event of Default by Owner:

(a)　　The failure of Owner to pay or furnish to Manager any money Owner is required to pay or furnish to Manager in accordance with the terms hereof on the date the same is payable, if such failure is not cured within five (5) days after written notice specifying such failure is given by Manager to Owner. If any sum of money is not paid within five (5) days following the date same becomes due and payable under this Agreement, and Manager has advanced such sum on behalf of Owner, such sum shall bear interest at the Default Rate from the date Manager advanced such sum on behalf of Owner until the date Owner actually pays such sum. If the failure to pay relates to the Management Fee, such sum shall bear interest at the Default Rate from the date due until the date actually paid.

(b)　　If because of a default under the Mortgage, if any, not caused by the act or omission of Manager, the Mortgage shall be foreclosed, or the Hotel sold in lieu of foreclosure.

(c)　　If Owner shall apply for or consent to the appointment of a receiver, trustee or liquidator of Owner of all or a substantial part of its assets, or admit in writing its inability to pay

its debts as they come due, make a general assignment for the benefit of creditors, take advantage of any insolvency law, or file an answer admitting the material allegations of a petition filed against Owner in any bankruptcy, reorganization or insolvency proceeding, or if an order, judgment or decree shall be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating Owner a bankrupt or insolvent or approving a petition seeking reorganization of Owner or appointing a receiver, trustee or liquidator of Owner or of all or a substantial part of its assets, and such order, judgment or decree shall continue unstayed and in effect for any period of ninety (90) consecutive days.

(d)     The filing of a voluntary petition in bankruptcy or insolvency or a petition for liquidation or reorganization under any bankruptcy law by Owner, or Owner shall consent to, acquiesce in, or fail timely to controvert, an involuntary petition in bankruptcy, insolvency or an involuntary petition for liquidation or reorganization filed against it.

(e)     The filing against Owner of a petition seeking adjudication of Owner as insolvent or seeking liquidation or reorganization or appointment of a receiver, trustee or liquidator of all or a substantial part of Owner's assets, if such petition is not dismissed within ninety (90) days.

(f)     Failure of Owner to maintain at all times throughout the term hereof all of the insurance required to be maintained by Owner under Article 12, if such failure is not cured within fifteen (15) days after written notice specifying such failure is given by Manager to Owner.

(g)     The failure of Owner to perform, keep or fulfill any of the other covenants, undertakings, obligations or conditions set forth in this Agreement, or the failure of Owner to approve expenditures or to authorize procedures necessary to maintain the standards of the Hotel in accordance with the Operating Standards, if such failure shall continue for a period of thirty (30) days after written notice by Manager or Licensor to Owner specifying the matters or conditions which constitute the basis for such Event of Default, provided that if such failure is incapable of cure within such thirty (30) day period, then the cure period shall be extended for up to an additional thirty (30) days provided that Owner commences the cure during such initial thirty (30) day period and thereafter diligently and continuously pursues the cure thereof.

## ARTICLE 17
## TERMINATION UPON EVENT OF DEFAULT; OTHER REMEDIES

17.1     **Termination**. Upon the occurrence of an Event of Default, in addition to and cumulative of any and all rights and remedies available to the non-defaulting party under this Agreement, at law or in equity, the non-defaulting party may: (i) terminate this Agreement without penalty, effective upon receipt of written notice of termination to the defaulting party, provided that termination may be effective immediately in the case of fraud, gross negligence, willful misconduct, criminal conduct or misappropriation of funds; and (ii) pursue any and all other remedies available to the non-defaulting party at law or in equity. In addition to and cumulative of the foregoing, upon the occurrence of any Event of Default on the part of Owner, all Management Fees, Reimbursable Expenses and all other sums payable to Manager under this Agreement shall be immediately due and payable without notice. In no event shall (i) the provisions of this Agreement with respect to the payment of a Termination Fee upon the

termination of this Agreement under certain circumstances be construed as defining or limiting the amount recoverable by Manager from Owner by reason of any Event of Default on the part of Owner; or (ii) entitle Manager to receive a Termination Fee in the event of a termination by reason of any Event of Default on the part of Manager

17.2 **Manager's Rights to Perform**.

(a) If Owner shall fail to make any payment or to perform any act required of Owner pursuant to this Agreement, Manager may (but shall not be obligated to), without further notice to, or demand upon, Owner and without waiving or releasing Owner from any obligations under this Agreement, make such payment (either with its own funds or with funds withdrawn for such purpose from the Operating Accounts or the Reserve) or perform such act. Manager agrees to provide written notice to Owner within five (5) days after Manager exercises its rights in the preceding sentence. All sums so paid by Manager and all necessary incidental costs and expenses incurred by Manager in connection with the performance of any such act, together with interest thereon at the Default Rate from the date of making such expenditure by Manager, shall be payable to Manager on demand.

(b) Manager shall have the right to set-off against any payments to be made to Owner by Manager under any provision of this Agreement and against all funds from time to time in the Operating Accounts and the Reserve, any and all liabilities of Owner to Manager. Manager may withdraw from the Operating Accounts and the Reserve from time to time such amounts as Manager deems desirable in partial or full payment of all or any portion of said liabilities, the amount of such withdrawals to be paid by Owner to Manager on demand and to be replaced in the respective account and fund.

## ARTICLE 18
## OWNER'S ADDITIONAL TERMINATION RIGHTS

18.1 **Sale of the Hotel**. If Owner proposes to sell or otherwise dispose of the Hotel or Owner's interests therein, to a bona fide third-party (the "**Third-Party Purchaser**") during the Term, this Agreement will terminate effective upon the consummation of the closing of such sale. Owner shall provide Manager with written notice of termination of this Agreement not less than sixty (60) days prior to the scheduled date of closing of the sale of the Hotel; provided, however, if such a sale does not actually occur, the notice of termination shall be deemed ineffective.

18.2 **Performance Standard**.





## ARTICLE 19
## AREA OF PROTECTION

19.1

## ARTICLE 20
## TRANSFER TO OWNER UPON TERMINATION

Upon any termination of this Agreement, whether due to the occurrence of an Event of Default or otherwise, Manager shall cooperate with Owner and shall execute all documents or instruments requested by Owner in connection with the transfer, all without consideration to Manager (provided that, if such termination is due to a reason other than a default by Manager under this Agreement, Owner will reimburse Manager for Manager's reasonable expenses to effect such transfer) or the imposition of liability by Manager, to Owner or its nominee of the Permits and the License Agreement used or useful in connection with the operation of the Hotel. Without limiting the generality of the foregoing, Manager shall cause its officials, subject to restrictions provided in any License Agreement or related agreement, to provide all sales lists and customer contacts to Lender and to execute any necessary documents and to visit licensing authorities along with Owner's representatives in order to expedite (i) the orderly transfer to Owner or its designee of the Permits and the License Agreement (ii) the renewal thereof to Owner or Owner's designee if appropriate. In the event that this Agreement terminates due to

**Management Agreement – Page 32**

any reason other than a default by Manager under this Agreement, a sufficient number of Hotel Employees will be hired by Owner or its successor, assign or designee, and retained for at least 90 days thereafter, so as not to cause a "mass layoff" or "plant closing", as defined in the Workers Adjustment and Retraining Act, 29 USC, sec 2101 et seq.

## ARTICLE 21
## NOTICES

All notices, elections, acceptances, demands, consents and reports (collectively "notice") provided for in this Agreement shall be in writing and shall be given to the other party at the address set forth below or at such other address as any of the parties hereto may hereafter specify in writing.

To Owner:          RREAF O&G PORTFOLIO #2 LLC
                   C/O Spectrum Origination LLC
                   1253 Springfield Avenue, Suite 201
                   New Providence, New Jersey 07974
                   Attention: Jeffrey Schaffer

With a copy to:
                   Spectrum Group Management LLC
                   1250 Broadway, 19th Floor
                   New York, New York 10001
                   Attention: Peter Locke

To Manager:        Channel Point Hospitality LLC
                   2500 North Dallas Parkway
                   Suite 600
                   Plano, Texas 75093

With a copy to:    Carla S. Moreland, Esq.
                   5112 Briargrove Lane
                   Dallas, Texas 75287

Such notice or other communication may be given by Federal Express or other nationally recognized overnight carrier or by electronic facsimile in which case notice shall be deemed given upon confirmed delivery. Notice may be mailed by United States registered or certified mail, return receipt requested, postage prepaid, deposited in a United States post office or a depository for the receipt of mail regularly maintained by the post office. If mailed, then such notice or other communication shall be deemed to have been received by the addressee on the fifth (5th) day following the date of such mailing. Such notices, demands, consents and reports may also be delivered by hand, in which case it shall be deemed received upon delivery.

## ARTICLE 22
## CONSENT AND APPROVAL

Except as herein otherwise provided, whenever in this Agreement the consent or approval of Manager or Owner is required, such consent or approval shall not be unreasonably withheld or delayed. Such consent or approval shall also be in writing only and shall be executed only by an authorized officer or agent of the party granting such consent or approval.

## ARTICLE 23
## NON-ASSIGNABILITY

This Agreement shall not be assignable by Manager or Owner; provided however, that Owner shall be entitled to assign this Agreement to an Affiliate; and Manager shall (i) be entitled to assign this Agreement to an Affiliate of such party as part of a modification to such party's company structure in which all or substantially all of such party's assets are transferred to an Affiliate of such party; and (ii) have the right to assign its rights to receive payments under this Agreement as security for indebtedness or other obligations.

## ARTICLE 24
## INDEMNITY

24.1    **Indemnity by Manager**.



24.2    **Indemnity by Owner**. To the extent that Manager shall not be fully covered by insurance required to be maintained pursuant to this Agreement or if, after giving effect to the provisions of Section 24.1(b) of this Agreement, Gross Revenues are not sufficient to pay all Liabilities, Owner shall indemnify, defend and hold harmless Manager and its directors, officers, employees and agents from and against any damages, loss, liability, cost, action, cause, claim or expense, including attorneys' fees, arising out of, or incurred in connection with the management and operation of the Hotel.

**Management Agreement – Page 34**

24.3 **Survival**. The provisions of this Article 24 shall survive the expiration or earlier termination of this Agreement.

**ARTICLE 25**
**PARTIAL INVALIDITY**

In the event that any one or more of the phrases, sentences, clauses or paragraphs contained in this Agreement shall be declared invalid by the final and unappealable order, decree or judgment of any court, this Agreement shall be construed as if such phrases, sentences, clauses or paragraphs had not been inserted, unless such construction would substantially destroy the benefit of the bargain of this Agreement to either of the parties hereto.

**ARTICLE 26**
**MISCELLANEOUS**

26.1 **Disputes**. Whenever any issue or dispute arises under this Agreement relating to the Annual Operating Budget, the Approved Capital Budget and or the calculation and payment of the Reserves, and the Management Fee, such issue or dispute shall be resolved utilizing the Uniform System of Accounts and the by application of generally accepted accounting principles consistently applied.

26.2 **Further Assurances**. Owner and Manager shall execute and deliver all other appropriate supplemental agreements and other instruments, and take any other action necessary to make this Agreement fully and legally effective, binding and enforceable as between them and as against third parties.

26.3 **Waiver**. The waiver of any of the terms and conditions of this Agreement on any occasion or occasions shall not be deemed a waiver of such terms and conditions on any future occasion.

26.4 **Successors and Assigns**. Subject to and limited by Article 23, this Agreement shall be binding upon and inure to the benefit of Owner, its successors and permitted assigns, and shall be binding upon and inure to the benefit of Manager, its successors and permitted assigns.

26.5 **Governing Law**. This Agreement shall be construed, both as to its validity and as to the performance of the parties, in accordance with the laws of the State of Texas.

26.6 **Compliance with Mortgage and License Agreement**. In carrying out their respective duties and obligations under the terms of this Agreement, Owner and Manager shall use commercially reasonable good faith efforts to take no action that could reasonably be expected to constitute a material default under any Mortgage or the License Agreement and will use commercially reasonable good faith efforts to take such actions as are reasonably necessary to comply therewith. Notwithstanding the foregoing or anything in this Agreement to the contrary, if there is a breach by Owner under the Mortgage and such breach is the result of the failure of Manager, such breach shall not be a default by Manager under this Agreement (and Manager shall have no liability therefore) unless such default and/or failure is specifically provided for in Section 16.1 of this Agreement and the applicable notice and cure periods provided for such breach and/or failure, if any, have expired.

26.7    **Amendments**. This Agreement may not be modified, amended, surrendered or changed, except by a written document signed by the Owner and Manager agreeing to be bound thereby.

26.8    **Estoppel Certificates**. Owner and Manager agree, at any time and from time to time, as requested by the other party, upon not less than ten (10) days' prior written notice, to execute and deliver to the other a statement certifying that this Agreement is unmodified and in full force and effect (or if there have been modifications, that the same are in full force and effect as modified and stating the modifications), certifying the dates to which required payments have been paid, and stating whether or not, to the best knowledge of the signer, the other party is in default in performance of any of its obligations under this Agreement, and if so, specifying each such default of which the signer may have knowledge, it being intended that such statement delivered pursuant hereto may be relied upon by others with whom the party requesting such certificate may be dealing.

26.9    **Inspection Rights**. Owner and Lender shall have the right to inspect the Hotel and examine the books and records of Manager pertaining to the Hotel at all reasonable times during the Term upon reasonable notice to Manager, and Owner and the holder of any Mortgage shall have access to the Hotel and the books and records pertaining thereto at all times during the Term to the extent necessary to comply with the terms of any Mortgage, all to the extent consistent with applicable law and regulations and the rights of guests, tenants and concessionaires of the Hotel.

26.10    **Subordination**. This Agreement, any extension hereof and any modification hereof shall be subject and subordinate to a Mortgage as provided therein and, in the event of a foreclosure or deed in lieu of foreclosure, subject to the terms of any subordination agreement with Lender, this Agreement shall terminate unless otherwise assumed by Lender in writing. The provisions of this Section shall be self-operative and no further instrument of subordination shall be required; however, Manager will execute and return to Owner (or to Lender, as designated by Owner) such documentation as Owner or Lender may reasonably request to evidence the subordination of this Agreement to the Mortgage. In the event of any refinancing of the Property, Manager shall cooperate in all reasonable respects with Owner in effecting such refinancing.

26.11    **Effect of Approval of Plans and Specifications**. Owner and Manager agree that in each instance in this Agreement or elsewhere wherein Manager is required to give its approval of plans, specifications, budgets and/or financing, no such approval shall imply or be deemed to constitute an opinion by Manager, nor impose upon Manager any responsibility for the design or construction of additions to or improvements of the Hotel, including but not limited to structural integrity or life/safety requirements or adequacy of budgets and/or financing. The scope of Manager's review and approval of plans and specifications is limited solely to the adequacy and relationship of spaces and aesthetics of the Hotel in order to comply with the Operating Standards.

26.12    **Entire Agreement**. This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof, superseding all prior agreements or undertakings, oral or written.

26.13    **Time is of the Essence**. Time is of the essence in this Agreement.

26.14    **Interpretation**. No provision of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have structured or dictated such provision.

26.15    **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and need not be signed by more than one of the parties hereto and all of which shall constitute one and the same agreement.

26.16    **No Electronic Transactions**. The parties hereby acknowledge and agree that this Agreement shall not be executed, entered into, altered, amended or modified by electronic means. Without limiting the generality of the foregoing, the parties hereby agree that the transactions contemplated by this Agreement shall not be conducted by electronic means, except as specifically set forth in Article 21 of this Agreement.

26.17    **Prohibited Persons and Transactions**.

(a)    Manager is not, and shall not become, a person or entity with whom U. S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including those named in OFAC's Specially Designated and Blocked Person's List) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, or Support Terrorism), or other governmental action (such persons and entities being "**Prohibited Persons**").

(b)    Owner is not and shall not become a Prohibited Person.

26.18    **Confidentiality.** Owner and Manager agree to keep the terms and conditions of all leases and other occupancy agreements in effect at the Hotel (if any) and all other accruements relating to the Hotel, together with all information and data obtained, possessed, or generated by Manager in connection with the Hotel (collectively, "**Privileged Information**"), strictly confidential and not to make any public announcements or any disclosures to any third parties, either orally or in writing, with respect to any Privileged Information without the express written consent of the other party hereunder; provided, however, the restrictions imposed hereby shall not apply to any Privileged Information (1) which is required to be disclosed in order to comply with any law, ordinance, governmental decree or any rule, regulation or decree of any interested governmental body or (2) which must otherwise be disclosed to relevant third parties, including accountants, attorneys and lenders, in the course of reasonable and diligent management and operation of the Hotel or the business of Owner, or any subsidiary or Affiliate of Owner or Manager. If Manager makes such disclosure, it shall notify such third party of this provision and of the requirement of Owner for confidentiality. The provisions of this Section 26.18 shall survive the expiration or termination of this Agreement

26.19    **No Third Party Rights**. This Agreement shall inure solely to the parties hereto. Notwithstanding any other provision of this Agreement, no third party shall have any rights pursuant to the terms of this Agreement.

## ARTICLE 27
## NO REPRESENTATIONS AS TO INCOME OR FINANCIAL SUCCESS OF HOTEL

In entering into this Agreement, Manager and Owner acknowledge that neither Owner nor Manager has made any representation to the other regarding projected earnings, the possibility of future success or any other similar matter respecting the Hotel, and that Manager and Owner understand that no guarantee is made to the other as to any specific amount of income to be received by Manager or Owner or as to the future financial success of the Hotel.

## ARTICLE 28
## REPRESENTATIONS OF MANAGER

In order to induce Owner to enter into this Agreement, Manager does hereby make the following representations and warranties:

(a)     the execution of this Agreement is permitted by the certificate of formation and partnership agreement of Manager and this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of Manager enforceable in accordance with the terms hereof;

(b)     to the best knowledge of Manager, there is no claim, litigation, proceeding or governmental investigation pending, or, as far as is known to Manager, threatened, against or relating to Manager, the properties or business of Manager or the transactions contemplated by this Agreement which does, or may reasonably be expected to, materially and adversely affect the ability of Manager to enter into this Agreement or to carry out its obligations hereunder, and to the best knowledge of Manager, there is no basis for any such claim, litigation, proceedings or governmental investigation, except as has been fully disclosed in writing to Owner and Lender; and

(c)     neither the consummation of the transactions contemplated by this Agreement on the part of Manager or to be performed, nor the fulfillment of the terms, conditions and provisions of this Agreement, conflicts with or will result in the breach of any of the terms, conditions or provisions of, or constitute a default under, any agreement, indenture, instrument or undertaking to which Manager is a party or by which it is bound.

## ARTICLE 29
## REPRESENTATIONS OF OWNER

In order to induce Manager to enter into this Agreement, Owner does hereby make the following representations and warranties:

(a)     the execution of this Agreement is permitted by the Limited Liability Company Agreement of Owner and this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of Owner enforceable in accordance with the terms hereof;

(b)     there is no claim, litigation, proceeding or governmental investigation pending, or as far as is known to Owner, threatened, against or relating to Owner, the properties or business

of Owner or the transactions contemplated by this Agreement which does, or may reasonably be expected to, materially and adversely affect the ability of Owner to enter into this Agreement or to carry out its obligations hereunder, and there is no basis for any such claim, litigation, proceedings or governmental investigation, except as has been fully disclosed in writing to Manager; and

(c)     neither the consummation of the transactions contemplated by this Agreement by this Agreement on the part of Owner to be performed nor the fulfillment of the terms, conditions and provisions of this Agreement, conflicts with or will result in the breach of any of the terms, conditions or provisions of, or constitute a default under, any agreement, indenture, instrument or undertaking to which Owner is a party or by which it is bound.

## ARTICLE 30
## DISPUTE RESOLUTION

Except as specifically provided in Section 4.4 of this Agreement, Owner and Manager agree that any dispute between the parties related to or arising out of this Agreement that cannot be amicably settled by the parties hereunder, shall first be submitted for non-binding mediation before resorting to any litigation, equitable proceeding or other enforcement action. Such mediation shall be held within a twenty-five mile radius of the Hotel (or such other location mutually agreed by the parties) and the parties shall cooperate in good faith to agree on a mediator who shall be a retired or semi-retired judge having at least ten (10) years of experience on the bench hearing complex commercial transactions. If the parties hereto have failed to designate, by a joint written statement, a mediator within thirty (30) days following the date of a written request therefor by either Manager or Owner to the other, then either Owner or Manager may notify the local office of the American Arbitration Association ("**AAA**") or JAMS and request such entity to select a person to act as the mediator to assist in the resolution of the dispute. The mediation will be a non-binding conference between the parties conducted in accordance with the applicable rules and procedures of AAA or JAMS (as determined by the mediator). The compensation of the mediator and all related expenses shall be borne equally by the parties, each of whom shall bear their own costs, irrespective of the outcome of the mediation. If any dispute remains unresolved between the parties after the mediation is complete, then either party shall be entitled to pursue its rights and remedies at law or in equity. The provisions of this Article 30 shall survive the expiration or earlier termination of this Agreement.

## ARTICLE 31
## ADDITIONAL OBLIGATIONS OF MANAGER

Manager acknowledges that Owner is vitally interested in the qualifications of the individuals designated as the general manager and the director of sales of the Hotel. Manager shall, from time to time, consult with Owner and obtain Owner's approval as to the appointment of individuals to such positions; provided, however, Owner and Manager acknowledge that nothing in this Article is intended to limit or negate the authority of Manager elsewhere provided in this Agreement to remove and replace, in its sole discretion, the general manager and/or director of sales of the Hotel.

## ARTICLE 32
## TERMINATION OF THE LICENSE AGREEMENT

Owner reserves and shall have the absolute right in its sole and unfettered discretion, at any time and without the consent or approval of (but with notice to) Manager, to terminate the License Agreement, provided, however, that (i) Owner shall have no such right in order to establish its own independent operations, such as an operation without a franchise or license or in its own hotel name; (ii) in the event of such a termination by Owner, Manager shall have the right of approval (which right shall be reasonably exercised) of any new franchise or license for the Hotel; and (iii) if Owner's decision to terminate the License Agreement is made without the consent of Manager, then the provisions of Section 18.2 of this Agreement shall no longer apply.

## ARTICLE 33
## RECOURSE

Any provision of this Agreement to the contrary notwithstanding, Manager hereby agrees that no personal, partnership or corporate liability of any kind or character (including, without limitation, the payment of any judgment) whatsoever now attaches or at any time hereafter under any condition shall attach to Owner or any of Owner's constituent entities and affiliates or any mortgagee for payment of any amount payable under this Agreement or for the performance of any obligation under this Agreement. The exclusive remedies of Manager for the failure of Owner to perform any of its obligations under this Agreement shall be to proceed against the interest of Owner in and to the Hotel for Manager's actual, out-of-pocket damages (and not any consequential, punitive or exemplary damages), and Owner shall not be personally liable for any deficiency.

*The rest of this page is intentionally left blank.*

   IN WITNESS WHEREOF, Owner has caused this Agreement to be executed and its seal affixed by its partners duly authorized thereunto and Manager has caused this Agreement to be executed and its seal affixed by its officer duly authorized thereunto, the day and year first above written, in duplicate.

**<u>OWNER</u>**:

**RREAF O&G PORTFOLIO #2 LLC**

By: _____
Name: Jeff Schaffer
Title: Chief Executive Officer

**<u>MANAGER</u>**:

**CHANNEL POINT HOSPITALITY LLC**

By: _____
Name: _____
Title: _____

**<u>Signature Page to Management Agreement – Page Solo</u>**
LA QUINTA INNS & SUITES HOBBS

# EXHIBIT A

## MAJOR ACCOUNT CATEGORIES

Room Sales
Telephone Sales
Food Sales
Beverage Sales
Miscellaneous Income

Room Expense
Telephone Expense
Food Expense
Beverage Expense
Miscellaneous Expense

A&G
Management Fee
Advertising & Business Promotion
R&M
H-L-P

Property Tax
Insurance
CEP Reserve
Leases

**Exhibit A – Solo Page**

**EXHIBIT B**

**DESCRIPTION OF PREMISES**

Tract A of the Replat of Tracts A, B and C, Block Thirty-Four (34), Second Unit of the North Acres Subdivision to the City of Hobbs, Lea County, New Mexico, as said Replat is recorded in Book 1415, Page 302, Lea County Records, Lea County, New Mexico.

**EXHIBIT C**

## EXAMPLE OF MONTHLY TRANSACTIONS REPORT

```
10/09/12  11:35 am                              P&L EXAMPLE ENTITY                                    Jay  Page:   1
                                                INCOME STATEMENT
                                                End of Year 2012

ACTUAL      %     BUDGET     %    LAST YEAR     %                          ACTUAL     %     BUDGET     %    LAST YEAR     %
-------  -----  --------  -----  ---------  -----                          ------  -----  --------  -----  ---------  -----
      0   0.00         0   0.00          0   0.00  Total Avl Rooms              0   0.00         0   0.00          0   0.00
      0   0.00         0   0.00          0   0.00  # Room/Occ %                 0   0.00         0   0.00          0   0.00
      0   0.00         0   0.00          0   0.00  Revenue/Average Rate         0   0.00         0   0.00          0   0.00
      0   0.00         0   0.00          0   0.00  RevPar                       0   0.00         0   0.00          0   0.00

      0   0.00         0   0.00          0   0.00  -----------REVENUES----------
      0   0.00         0   0.00          0   0.00  Rooms                        0   0.00         0   0.00          0   0.00
      0   0.00         0   0.00          0   0.00  F&B Revenue                  0   0.00         0   0.00          0   0.00
      0   0.00         0   0.00          0   0.00  Communications               0   0.00         0   0.00          0   0.00
      0   0.00         0   0.00          0   0.00  Minor Op Depts.              0   0.00         0   0.00          0   0.00
      0   0.00         0   0.00          0   0.00  Rent/Other                   0   0.00         0   0.00          0   0.00
-------  -----  --------  -----  ---------  -----                          ------  -----  --------  -----  ---------  -----
      0   0.00         0   0.00          0   0.00  TOTAL REVENUES               0   0.00         0   0.00          0   0.00

                                                  ----DEPARTMENTAL EXPENSES----
      0   0.00         0   0.00          0   0.00  Rooms                        0   0.00         0   0.00          0   0.00
      0   0.00         0   0.00          0   0.00  Food & Beverage              0   0.00         0   0.00          0   0.00
      0   0.00         0   0.00          0   0.00  Communications               0   0.00         0   0.00          0   0.00
      0   0.00         0   0.00          0   0.00  Minor Operating              0   0.00         0   0.00          0   0.00
      0   0.00         0   0.00          0   0.00  Rent & Other                 0   0.00         0   0.00          0   0.00
-------  -----  --------  -----  ---------  -----                          ------  -----  --------  -----  ---------  -----
      0   0.00         0   0.00          0   0.00  TOTAL DEPARTMENTAL EXPENSES  0   0.00         0   0.00          0   0.00

                                                  -----DEPARTMENTAL PROFIT-----
      0   0.00         0   0.00          0   0.00  Rooms                        0   0.00         0   0.00          0   0.00
      0   0.00         0   0.00          0   0.00  Food & Beverage              0   0.00         0   0.00          0   0.00
      0   0.00         0   0.00          0   0.00  Communications               0   0.00         0   0.00          0   0.00
      0   0.00         0   0.00          0   0.00  Minor Op Depts               0   0.00         0   0.00          0   0.00
      0   0.00         0   0.00          0   0.00  Rent/Other                   0   0.00         0   0.00          0   0.00
-------  -----  --------  -----  ---------  -----                          ------  -----  --------  -----  ---------  -----
      0   0.00         0   0.00          0   0.00  GROSS OPER INCOME            0   0.00         0   0.00          0   0.00

                                                  ----UNDISTRIBUTED EXPENSES----
      0   0.00         0   0.00          0   0.00  Admin & General              0   0.00         0   0.00          0   0.00
      0   0.00         0   0.00          0   0.00  Advertising                  0   0.00         0   0.00          0   0.00
      0   0.00         0   0.00          0   0.00  Sales/Marketing              0   0.00         0   0.00          0   0.00
      0   0.00         0   0.00          0   0.00  Repairs/Maintenance          0   0.00         0   0.00          0   0.00
      0   0.00         0   0.00          0   0.00  Energy                       0   0.00         0   0.00          0   0.00
-------  -----  --------  -----  ---------  -----                          ------  -----  --------  -----  ---------  -----
      0   0.00         0   0.00          0   0.00  TOTAL UNDISTRIBUTED          0   0.00         0   0.00          0   0.00

      0   0.00         0   0.00          0   0.00  GROSS OPERATING PROFIT       0   0.00         0   0.00          0   0.00
```

**Exhibit C – Page 1**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
INCOME STATEMENT
End of Year 2012

jay  Page:    2

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Management Fee | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Franchise Fee | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | INCOME BEFORE FIXED CHARGES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ---------FIXED/OTHER--------- | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL FIXED/OTHER | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | EBITDA | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | PROFORMA  N O I | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | DEBT, DEPR/AMORT, CAP & OTHER | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL DEBT, DEPR/AMORT, CAP & | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | NET INC AVAIL/ TAXES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | --ADD BACKS & SUBTRACTIONS-- | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | NET OPERATING INCOME | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 2**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOMS DEPARTMENT
End of Year 2012

Jay  Page:    3

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUE | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | NET REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES / WAGES | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENTAL PROFIT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 3**

6444430v.1

10/08/12  11:35 am

P&L EXAMPLE ENTITY
ROOMS DEPARTMENT
End of Year 2012

jay  Page:    4

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 4**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOM STATISTICS
End of Year 2012

jay  Page:    5

| ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | OCCUPIED ROOMS | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL TRANSIENT | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL GROUP | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL SOLD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL OCCUPIED | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL AVAILABLE ROOMS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 5**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOM STATISTICS
End of Year 2012

jay  Page:  6

| ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUE/AVERAGE RATES | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL TRANSIENT | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL GROUP | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL PAYING RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL ROOMS OTHER | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | OVERALL ROOM RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | REVPAR | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 6**

10/05/12 11:35 am

P&L EXAMPLE ENTITY
ROOM STATISTICS
End of Year 2012

jay Page: 7

| ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | Guest Services | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL SALARIES / WAGES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | BENEFITS | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL BENEFITS | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL WAGES & BENEFITS | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | DEPARTMENTAL PROFIT | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |

**Exhibit C – Page 7**

6444430v.1

10/05/12  11:35 am                                   P&L EXAMPLE ENTITY                                      jay  Page:    8
                                                     ROOM STATISTICS
                                                     End of Year 2012

ACTUAL      CPOR/%      BUDGET      CPOR/%     LAST YEAR  CPOR/%                         ACTUAL      CPOR/%      BUDGET      CPOR/%     LAST YEAR  CPOR/%
----------  ------    ----------   ------    ----------  ------                        ----------   ------    ----------   ------    ----------  ------

                                                     OTHER EXPENSES
                                                     --------------

----------           ----------            ----------                                 ----------            ----------            ----------
        0  $   0.00           0  $   0.00           0  $   0.00  TOTAL OTHER EXPENSES          0  $   0.00           0  $   0.00           0  $   0.00
==========           ==========            ==========                                 ==========            ==========            ==========

**<u>Exhibit C – Page 8</u>**
6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
FOOD & BEVERAGE CONSOLIDATED
End of Year 2012

Jay  Page:  5

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | FOOD REVENUE | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | NET FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUE | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | NET BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUE | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | NET OTHER REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 9**

6444430v.1

10/09/12  11:35 am

F&L EXAMPLE ENTITY
FOOD & BEVERAGE CONSOLIDATED
End of Year 2012

jay  Page:  10

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OVERALL NET FOOD COST | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OVERALL NET BEVERAGE COST | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OTHER COST | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL COST OF GOODS SOLD | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | GROSS PROFIT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES/WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL GENERAL | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES/WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Payroll Taxes & Benefits | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENTAL PROFIT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**<u>Exhibit C – Page 10</u>**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
FOOD & REVENUE CONSOLIDATED
End of Year 2012

jay  Page:   11

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|--------|---|--------|---|-----------|---|---|--------|---|--------|---|-----------|---|
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 11**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

Jay  Page:  12

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & RPOR | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL BEVG REVENUE & RPOR | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 12**

10/09/12 11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

Jay Page: 13

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ROOM SERVICE | | | | | | |
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | =========================== | | | | | | |
| | | | | | | RESTAURANT 1 | | | | | | |
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | =========================== | | | | | | |
| | | | | | | BANQUETS | | | | | | |
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 13**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

jay  Page:   14

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.30 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | =========================== | | | | | | |
| | | | | | | CATERING | | | | | | |
| | | | | | | COVERS | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.30 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | =========================== | | | | | | |
| | | | | | | BANQUETS & CATERING | | | | | | |
| | | | | | | COVERS | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.30 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | =========================== | | | | | | |
| | | | | | | LOUNGE 1 | | | | | | |
| | | | | | | BEVG REVENUE & BPCR | | | | | | |

**Exhibit C – Page 14**
6444430v.1

```
10/09/12  11:35 am                        P&L EXAMPLE ENTITY                                    Jay  Page:   15
                                            F&B STATISTICS
                                          End of Year 2012

    ACTUAL    CALC     BUDGET    CALC    LAST YEAR  CALC                          ACTUAL    CALC     BUDGET    CALC    LAST YEAR  CALC
   --------- ------   --------- ------   --------- ------                        --------- ------   --------- ------   --------- ------
        0  $   0.00        0  $   0.00        0  $   0.00   TOTAL BEVG REVENUE & RPOR          0  $   0.00        0  $   0.00        0  $   0.00

                                                           ------------------------------
                                                           RESTAURANT 2
                                                           ------------------
                                                           COVERS & CAPTURE
                                                           ------------------
        0      0.00        0      0.00        0      0.00   TOTAL COVERS & CAPTURE            0      0.00        0      0.00        0      0.00
                                                           FOOD REVENUE & AVG CHECK
   --------- ------   --------- ------   --------- ------   ------------------------
        0  $   0.00        0  $   0.00        0  $   0.00   TOTAL FOOD REVENUE & AVG CHECK    0  $   0.00        0  $   0.00        0  $   0.00
                                                           BEVG REVENUE & % FOOD
   --------- ------   --------- ------   --------- ------   ---------------------
        0      0.00        0      0.00        0      0.00   TOTAL BEVG REVENUE & % FOOD       0      0.00        0      0.00        0      0.00

                                                           ------------------------------
                                                           LOUNGE 2
                                                           ------------------
                                                           BEVG REVENUE & RPOR
   --------- ------   --------- ------   --------- ------   -------------------
        0  $   0.00        0  $   0.00        0  $   0.00   TOTAL BEVG REVENUE & RPOR         0  $   0.00        0  $   0.00        0  $   0.00

                                                           ------------------------------
                                                           CONFERENCE CENTER
                                                           ------------------
                                                           COVERS & CAPTURE
                                                           ------------------
        0      0.00        0      0.00        0      0.00   TOTAL CAPTURE & COVERS            0      0.00        0      0.00        0      0.00
                                                           FOOD REVENUE & AVG CHECK
   --------- ------   --------- ------   --------- ------   ------------------------
        0  $   0.00        0  $   0.00        0  $   0.00   TOTAL FOOD REVENUE & AVG CHECK    0  $   0.00        0  $   0.00        0  $   0.00
                                                           BEVG REVENUE & % FOOD
```

**Exhibit C – Page 15**

10/09/12  11:35 am                                    P&L EXAMPLE ENTITY                                              jay  Page:  16
                                                        F&B STATISTICS
                                                       End of Year 2012

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ------------------------ | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ============================== | | | | | | |
| | | | | | | IN ROOM BAR | | | | | | |
| | | | | | | REVENUE & RPOR | | | | | | |
| 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | TOTAL REVENUE & RPOR | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |
| | | | | | | ========================== | | | | | | |

**Exhibit C – Page 16**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOM SERVICE
End of Year 2012

jay  Page:   17

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 17**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
RESTAURANT 1
End of Year 2012

jay  Page:   18

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 18**

6444430v.1

P&L EXAMPLE ENTITY
BANQUETS & CATERING
End of Year 2012

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | CATERING | | | | | | |
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 19**

10/05/12  11:35 am             P&L EXAMPLE ENTITY             Jay Page:  20
                       BANQUETS & CATERING
                       End of Year 2012

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | TOTAL BANQUETS & CATERING | | | | | | |
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL COMBINED REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARY / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 20**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
BANQUETS & CATERING
End of Year 2012

Jay  Page:   21

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | BANQUETS | | | | | | |
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 21**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
LOUNGE 1
End of Year 2012

jay  Page:   22

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPT REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 22**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
COMMUNICATIONS
End of Year 2012

joy Page:  23

| ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% | | ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUES | | | | | | |
| 0  $ | 0.00 | 0  $ | 0.00 | 0  $ | 0.00 | TOTAL PHONE REVENUE | 0  $ | 0.00 | 0  $ | 0.00 | 0  $ | 0.00 |
| 0  $ | 0.00 | 0  $ | 0.00 | 0  $ | 0.00 | NET PHONE REVENUE | 0  $ | 0.00 | 0  $ | 0.00 | 0  $ | 0.00 |
| 0  $ | 0.00 | 0  $ | 0.00 | 0  $ | 0.00 | TOTAL INTERNET REVENUE | 0  $ | 0.00 | 0  $ | 0.00 | 0  $ | 0.00 |
| 0  $ | 0.00 | 0  $ | 0.00 | 0  $ | 0.00 | NET INTERNET REVENUE | 0  $ | 0.00 | 0  $ | 0.00 | 0  $ | 0.00 |
| 0  $ | 0.00 | 0  $ | 0.00 | 0  $ | 0.00 | NET COMBINED REVENUES | 0  $ | 0.00 | 0  $ | 0.00 | 0  $ | 0.00 |
| | | | | | | COSTS OF SALES | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | COS PHONE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | COS INTERNET | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COST OF ALL SALES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | GROSS PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Payroll Taxes & Benefits | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TTL WAGES & BENEFITS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 23**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
IN HOUSE MOVIES
End of Year 2012

Jay  Page:  24

| ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% | | ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUES | | | | | | |
| 0  $ | 0.00 | 0  $ | 0.00 | 0  $ | 0.00 | NET REVENUE | 0  $ | 0.00 | 0  $ | 0.00 | 0  $ | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 24**

6444430v.1

10/05/12  11:35 am                          P&L EXAMPLE ENTITY                                    Jay  Page:   25
                                               GUEST LAUNDRY
                                             End of Year 2012

| ACTUAL | RPOR/% | BUDGET | RPRO/% | LAST YEAR | RPOR/% | | ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUES | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | NET REVENUE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | GROSS PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TTL WAGES & BENEFITS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 25**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
RENTS & OTHER INCOME
End of Year 2012

jay Page:   26

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SPACE RENTALS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL RENTALS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | COMMISSIONS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL COMMISSIONS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | MISCELLANEOUS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL MISCELLANEOUS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL RENTS/OTHER INCOME | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 26**

10/05/12  11:35 am            P&L EXAMPLE ENTITY            jay  Page:   27
                                A&G
                        End of Year 2012

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL A&G EXP | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**<u>Exhibit C – Page 27</u>**

6444430v.1

10/05/12  11:35 am             P&L EXAMPLE ENTITY             jay  Page:   28
                                  SALES & MARKETING
                                 End of Year 2012

| ACTUAL | % | BUDGET | % | LAST YEAR | % |  | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  | GROUP |  |  |  |  |  |  |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL GROUP | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
|  |  |  |  |  |  | TRANSIENT |  |  |  |  |  |  |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Newspaper | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL TRANSIENT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
|  |  |  |  |  |  | OTHER EXPENSES |  |  |  |  |  |  |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Contingency | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL NON-MEDIA | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | GRAND TTL ADVERTISING | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 28**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
SALES & MARKETING
End of Year 2012

jay  Page:   29

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Incentive/Svc Charge | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALES & ADVERTISING | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 29**

6444430v.1

10/05/12  11:35 am          P&L EXAMPLE ENTITY          jay  Page:  30
REPAIRS & MAINTENANCE
End of Year 2012

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Grnds & Land - Outdoor | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Rent - Equipment | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL R&M EXPENSE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 30**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ENERGY
End of Year 2012

jay  Page:  31

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL ENERGY | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL ENERGY | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 31**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
FIXED & OTHER CHARGES
End of Year 2012

jay  Page:  32

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | FEES | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FEES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | RENTS | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL RENTS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | LEASES | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL LEASES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | INSURANCE | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL INSURANCE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | REAL ESTATE TAXES | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REAL ESTATE TAXES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER TAXES | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER TAXES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | PARTNERSHIP EXPENSES | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL PARTNERSHIP EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | INTEREST EXPENSE | | | | | | | |

**Exhibit C – Page 32**

6444430v.1

P&L EXAMPLE ENTITY
FIXED & OTHER CHARGES
End of Year 2012

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL INTEREST EXPENSE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | REIT LEASE | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REIT LEASE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | MISC NON EBITDA | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL MISC NON EBITDA | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | DEPRECIATION/AMORTIZATION 40T | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPRECIATION & AMORTIZAT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | FFE & ADDBACKS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FFE & ADDBACKS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FIXED EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 33**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
EE CAFE
End of Year 2012

Jay Page:   34

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES / WAGES | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL EE CAFE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Allocation to PTER | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | FINAL EE CAFE TOTAL | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 34**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
PT & EE
End of Year 2012

jay  Page:  35

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | TAXES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL TAXES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | HEALTH INSURANCE | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL HEALTH INSURANCE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 401k Match | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL PT & EE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

% Column is % Total Wages

**Exhibit C – Page 35**
6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
PT & ER
End of Year 2012

Jay  Page:   36

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | DISTRIBUTED TO: | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DISTRIBUTION | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 36**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
PT & EB
End of Year 2012

Jay  Page:   37

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|--------|---|--------|---|-----------|---|---|--------|---|--------|---|-----------|---|
| | | | | | | SALARIES, WAGES & INCENTIVES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Total Food & Beverage | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | GROSS TTL WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | S&W, INCENTIVES, PAID TIME OFF | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Lounge 1 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Total Foood & Beverage | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL ALL PAID WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 37**

6444430v.1

10/08/12  11:35 am

P&L EXAMPLE ENTITY
HOUSE LAUNDRY
End of Year 2012

jay  Page:  38

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES & WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | DISTRIBUTED TO: | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DISTRIBUTION | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 38**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay  Page:   39

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **CASH** | | | | | |
| TOTAL CASH | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **SEMI-RESTRICTED CASH** | | | | | |
| TOTAL SEMI-RESTRICTED CASH | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **RECEIVABLES** | | | | | |
| TOTAL RECEIVABLES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **INVENTORIES** | | | | | |
| TOTAL INVENTORIES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **OPERATING EQUIPMENT** | | | | | |
| TOTAL OPERATING EQUIPMENT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Exhibit C – Page 39**
6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay  Page:  40

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| PREPAIDS | | | | | |
| TOTAL PREPAIDS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| FIXED ASSETS | | | | | |
| Accum Amortization | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL FIXED ASSETS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OTHER ASSETS | | | | | |
| TOTAL OTHER ASSETS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL ASSETS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Exhibit C – Page 40**

6444430v.1

10/08/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay  Page:  41

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| **LIABILITIES** | | | | | |
| **PAYABLES** | | | | | |
| TOTAL PAYABLES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **DEPOSITS** | | | | | |
| TOTAL DEPOSITS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **OF TAXES AND WITHHOLDINGS** | | | | | |
| TOTAL OF TAXES AND WITHHOLDING | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **ACCRUED OPERATING EXPENSES** | | | | | |
| TTL ACCRUED OPERATING EXPENSES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Exhibit C – Page 41**

6444430v.1

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay Page:  42

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| DUE TO/FROM ACCOUNTS | | | | | |
| Due to ZZ St Paul | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Due to REIT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL DUE TO/FROM ACCOUNTS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OTHER LIABILITIES | | | | | |
| TOTAL OTHER LIABILITIES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| NOTES PAYABLE | | | | | |
| TOTAL NOTES PAYABLE | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL LIABILITIES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OWNERS EQUITY | | | | | |
| Retained Earn - Prior Years | 0.00 | 0.00 | 0.00 | 695.02- | 695.02 |
| Retained Earn - Current Yr | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL OWNERS EQUITY | 0.00 | 0.00 | 0.00 | 695.02- | 695.02 |
| TOTAL LIAB. & OWNERS EQUITY | 0.00 | 0.00 | 0.00 | 695.02- | 695.02 |

**Exhibit C – Page 42**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFTK REPORT
End of Year 2012

jay  Page:  43

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | FULL TIME EQUIVALENT | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | SUMMARY HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOTEL | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | SUMMARY WAGES & AVG RATE | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 43**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFIS REPORT
End of Year 2012

Jay Page:   44

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ROOMS DEPARTMENT | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL OCCUPIED ROOMS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Room Attendant - Total | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | House Attendant - Total | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | Room Attendant - Total | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | House Attendant - Total | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL WAGES & AVG RATE | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| | | | | | | HOURS & FTE | | | | | | |
| | | | | | | FOOD & BEVERAGE SUMMARY | | | | | | |
| | | | | | | FOOD COVERS | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PROD / TOTAL COV | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVERAGE RATE | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL WAGES & AVG RATE | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 44**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFTX REPORT
End of Year 2012

jay  Page:  45

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ============================== | | | | | | |
| | | | | | | A&G | | | | | | |
| | | | | | | HOURS & FTE | | | | | | |
| | | | | | | ------------ | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 45**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY KPI$ REPORT
End of Year 2012

Jay Page:  46

| | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ROOM SERVICE | | | | | | | | | | | | | |
| HOURS & PRODUCTIVITY | | | | | | | | | | | | | |
| TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| WAGES & AVG RATE | | | | | | | | | | | | | |
| TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| HOURS & FTE | | | | | | | | | | | | | |
| TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| RESTAURANT 1 | | | | | | | | | | | | | |
| HOURS & PRODUCTIVITY | | | | | | | | | | | | | |
| TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| WAGES & AVG RATE | | | | | | | | | | | | | |
| TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| HOURS & FTE | | | | | | | | | | | | | |
| TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| RESTAURANT 2 | | | | | | | | | | | | | |
| HOURS & PRODUCTIVITY | | | | | | | | | | | | | |
| TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 46**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFIR REPORT
End of Year 2012

Jay  Page:  47

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL WAGES & AVG RATE | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| | | | | | | HOURS & FTE | | | | | | |
| 0 0.00 | | 0 0.00 | | 0 0.00 | | TOTAL HOURS & FTE | 0 0.00 | | 0 0.00 | | 0 0.00 | |
| | | | | | | ============================= | | | | | | |
| | | | | | | BANQUETS & CATERING | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 0.00 | | 0 0.00 | | 0 0.00 | | TOTAL HOURS & PRODUCTIVITY | 0 0.00 | | 0 0.00 | | 0 0.00 | |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL WAGES & AVG RATE | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| | | | | | | HOURS & FTE | | | | | | |
| 0 0.00 | | 0 0.00 | | 0 0.00 | | TOTAL HOURS & FTE | 0 0.00 | | 0 0.00 | | 0 0.00 | |
| | | | | | | ============================= | | | | | | |
| | | | | | | CONFERENCE CENTER | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 0.00 | | 0 0.00 | | 0 0.00 | | TOTAL HOURS & PRODUCTIVITY | 0 0.00 | | 0 0.00 | | 0 0.00 | |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL WAGES & AVG RATE | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| | | | | | | HOURS & FTE | | | | | | |

**Exhibit C – Page 47**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY RPTS REPORT
End of Year 2012

jay Page:   49

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

============================
LOUNGE 1

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL REVENUE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

HOURS & PRODUCTIVITY

| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

WAGES & AVG RATE

| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

HOURS & FTE

| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

============================
LOUNGE 2

HOURS & PRODUCTIVITY

| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

WAGES & AVG RATE

| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

HOURS & FTE

| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Exhibit C – Page 48**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFTK REPORT
End of Year 2012

jay Page:  49

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|--------|------|--------|------|-----------|------|---|--------|------|--------|------|-----------|------|
| | | | | | | =================================== | | | | | | |
| | | | | | | IN ROOM BASE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL OCCUPIED ROOMS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & HRS PER OCC ROOM | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & HOURS PER OCC RO | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 49**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFTK REPORT
End of Year 2012

Jay  Page:  50

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|--------|------|--------|------|-----------|------|---|--------|------|--------|------|-----------|------|
| | | | | | | CONTRACT LABOR | | | | | | |
| | | | | | | HOURS & FTE | | | | | | |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | FOOD & BEVERAGE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |
| 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | TOTAL WAGES & AVG RATE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |

**Exhibit C – Page 50**

6444430v.1

**EXHIBIT D**

**INSURANCE REQUIREMENTS**

1.    **Insurance Requirements for the Hotel**:

General Liability - $1,000,000 per Occurrence/$2,000,000 General and Product Liability Aggregate per Location

Including:
1.  Products and Completed Operations
2.  Contractual Liability
3.  Personal Injury
4.  Incidental Medical Malpractice
5.  Molestation and Abuse are not Excluded
6.  Punitive Damages unless Excluded by Public Policy
7.  Fellow Employee Coverage
8.  Garage Keepers Liability
9.  Liquor Liability
10. Blanket Additional Interests
    a.  All Managers or Lessors of Premises
    b.  All mortgagors of Premises
    c.  Vendors
    d.  Volunteer Workers
    e.  As required by Contract
11. Severability of Interests
12. Waiver of Subrogation as Required by Contract
13. Terrorism not Excluded or Sub-Limited
14. No Deductible/SIR
15. Coverage is Designated to the Scheduled Premises and is Primary and Non-Contributory

Commercial Automobile - $1,000,000 – Any Auto

Including:
1.  Medical Payments - $5,000 per person
2.  Personal Injury Protection – As required by State
3.  Property Protection Insurance – As required by State
4.  Uninsured Motorists - $1,000,000 Limit
5.  Underinsured Motorists - $1,000,000 Limit
6.  Physical Damage (Owned and Hired Autos) – Comprehensive $1,000 Deductible
7.  Physical Damage (Owned and Hired Auto) – Collision $1,000 Deductible
8.  Auto Loan/Lease Gap Coverage

Umbrella Liability - $25,000,000 per Occurrence/ $25,000,000 Aggregate per Location

     Including:
1. Retained Limit – 0
2. Follows Scheduled Underlying Policies

Workers Compensation – Provided in All States except as Provided by the State Funds of – ND, OH, WA, WV, WY

Medical Benefits – Statutory
1. Indemnity – Statutory
2. Employers Liability - $500,000
    a. Each Accident
    b. Disease - Each Employee
    c. Disease – Policy Limit

Crime - $1,000,000 Occurrence Limit S/T/A $10,000 per Occurrence Deductible Covering:
1. Employee Theft
2. Forgery or Alteration
3. Computer Fraud
4. Funds Transfer Fraud
5. Theft of Money & Securities
    a. Inside the Premises
    b. Outside the Premises

Guest Property - $10,000 Limit per Occurrence
1. $1,000 deductible
2. Liability Governed by Statute

Professional Liability - $1,000,000 Each Claim / $2,000,000 Aggregate for All Claims
1. Claim Includes Identifiable Loss and Defense Cost
2. A $25,000 Deductible Applies to Loss and Defense

Employment Practices Liability
1. $2,000,000 Aggregate for All Loss Combined (Including Defense Cost)
2. Retention $25,000

2. **Insurance Requirements for Major Contractors**:

(a) Worker's Compensation - Statutory amount or its equivalent under applicable law.

(b)　　Employer's Liability - $500,000 minimum, where required by applicable or equivalent law.

(c)　　Comprehensive General Liability; **either**

　　　　(i)　　$100,000 Bodily Injury per Person
　　　　　　　$300,000 per Occurrence
　　　　　　　$100,000 Property Damage

　　　　　　　　**-or-**

　　　　(ii)　　$1,000,000 combined single limit

**EXHIBIT E**

**COMPETITIVE SET**



**Exhibit E – Solo Page**

6444430v.1

**MANAGEMENT AGREEMENT**

between

**RREAF O&G PORTFOLIO #2 LLC**
as Owner

and

**CHANNEL POINT HOSPITALITY LLC**
as Manager

FOR

**LA QUINTA INNS & SUITES PORT ARTHUR**
7540 Memorial Boulevard
Port Arthur, Texas 77640

## MANAGEMENT AGREEMENT

This Management Agreement (the "**Agreement**") made this ___ day of February 2016 between **RREAF O&G PORTFOLIO #2 LLC**, a Delaware limited liability company (**"Owner"**), as Owner, and **CHANNEL POINT HOSPITALITY LLC**, a Texas limited liability company (**"Manager"**), as Manager.

### RECITALS:

A.      Owner is the fee owner of the Hotel (as defined below).

B.      Manager is experienced in the management and operation of hotels, directly and through affiliated entities.

C.      Owner and Manager desire to enter into this Agreement for the management and operation of the Hotel in accordance with the terms and conditions and subject to the limitations contained in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner and Manager covenant and agree as follows:

## ARTICLE 1
## DEFINITIONS, TERMS AND REFERENCES

1.1      Definitions. In this Agreement and any Exhibits, the following terms shall have the following meanings:

"**Account Category**" shall include the major account categories set forth in Exhibit A attached hereto and made a part hereof as well as other major account categories, which are applicable to the Hotel consistent with the Statement of Income as defined by the Uniform System of Accounts or otherwise approved by Owner.

"**Accounting Fee**" shall have the meaning set forth in Article 11.

"**Accounting Period**" shall mean each calendar month (whether of 28, 29, 30 or 31 days) during each Fiscal Year.

"**Affiliate**" shall mean any person or entity that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with another person or entity. The term "**control**" (and correlative terms) shall mean the power, whether by contract, equity ownership or otherwise, to direct the policies or management of a person or entity. Without limiting the foregoing, an "**Affiliate**" also includes any partner or a partnership of any party to this Agreement, any member or membership parties thereto and any corporation, partnership, individual or trust related to or controlling or controlled by such partnership, individual or trust related to or controlling or controlled by such partnership party or its partners

or such membership party or its members. A natural person is related to another natural person if he or she is a spouse, parent, or lineal descendant of the other person.

"**Allocated Services**" shall mean certain support services that Manager obtains from a third party and provides on a central or regional basis to the hotels that it manages because such support services can be provided on a more efficient, effective and economical basis to each individual Manager managed hotel if the expenses of such support services are shared by other Manager managed hotels. Such support services include services in the areas of sales and marketing, food and beverage, human resources, insurance, technology, training and payroll (each such service, an "**Allocated Service**"; collectively, the "**Allocated Services**"). Owner and Manager agree that Manager shall provide Allocated Services to the Hotel and that the Hotel's portion of the cost thereof shall constitute a Gross Operating Expense so long as (i) the costs of the Allocated Services are allocated in good faith on a uniform, fair, equitable and proportionate basis among the Hotel and the other Manager managed hotels benefiting therefrom; and (ii) the Allocated Services shall not include services that do not benefit the Hotel; and (iii) the cost of the Allocated Services are either (a) included by Manager in each Annual Operating Budget or (b) otherwise approved in writing by Owner. The cost of the Allocated Services and the allocation of that cost to the Hotel and other Manager managed hotels shall be subject to audit by Owner pursuant to the terms of Section 10.3 of this Agreement. Manager further agrees that the benefit of any discounts or rebates received by Manager with respect to any of the Allocated Services shall be passed on to the Hotel on a proportionate basis as compared to other hotels managed by Manager or its Affiliates.

"**Annual Operating Budget**" shall mean an annual operating projection for the Hotel prepared and submitted by Manager to Owner and approved by Owner for each Fiscal Year pursuant to Section 4.4(a).

"**Annual Plan**" shall mean an annual business plan for the operation of the Hotel prepared by the Manager and approved by the Owner, which shall include the Annual Operating Budget, the Approved Capital Budget, the Marketing Plan and the Management Plan and any other material included therein by Manager as provided in Section 4.4.

"**Approved Capital Budget**" shall have the meaning set forth in Section 4.4(b).

"**Base Fee**" shall have the meaning set forth in Article 11.

"**Building and Appurtenances**" shall mean (i) the 63 room hotel building located on the Premises, and (ii) landscaping and other related facilities, together with all installations located at, or used in connection with the operation of the building for hotel purposes including, without limitation, any swimming pools, health club and recreational facilities, walkways, parking facilities, heating, lighting, sanitation equipment, air conditioning, laundry facilities, refrigeration, built-in kitchen equipment, and elevators.

"**Capital Budget**" shall mean Manager's proposed estimate of FF&E and Capital Improvements submitted to Owner each Fiscal Year pursuant to Section 4.4(b).

"**Capital Improvements**" shall have the meaning set forth in Section 8.2 hereof.

"**Commencement Date**" shall mean the date on which Manager assumes the management and operation of the Hotel under this Agreement for the benefit of Owner.

"**Competitive Set**" shall mean the properties listed on Exhibit E attached hereto and any revisions to such list agreed upon by Owner and Manager from time to time.

"**CPI**" shall mean the Consumer Price Index for All Urban Consumers, United States City Average, All Items (1982-84=100), issued by the Bureau of Labor Statistics of the United States Department of Labor.

"**Default Rate**" shall mean the lesser of (i) the Prime Rate plus four percent (4%) per annum or (ii) the highest lawful rate permitted by applicable Legal Requirements from time to time.

"**Effective Date**" shall mean the date of this Agreement as set forth on page 1 hereof.

"**Event of Default**" shall mean any of the events described in Article 16, provided that any condition contained therein for the giving of notice or the lapse of time, or both, has been satisfied.

"**Executive Personnel**" shall mean the general manager and the director of sales of the Hotel.

"**Fiscal Year**" shall mean the fiscal year that ends on the last day of each calendar year. The first Fiscal Year shall be the period commencing on the Commencement Date and ending on December 31st of the same calendar year in which the Commencement Date occurs. The words "full Fiscal Year" shall mean any Fiscal Year containing not fewer than 365 days. A partial Fiscal Year after the end of the last full Fiscal Year and ending with the expiration or earlier termination of the Term shall constitute a separate Fiscal Year.

"**Furniture, Fixtures and Equipment**" or "**FF&E**" shall mean all furniture, furnishings, wall coverings, fixtures, carpeting, rugs, fine arts, paintings, statuary, decorations, and hotel equipment and systems (including the costs associated with the purchase, installation and delivery thereof) located at, or used in connection with, the operation of the Building and Appurtenances as a hotel, including without limitation, major equipment and systems required for the operation of kitchens, bars, laundry and dry cleaning facilities, office equipment, dining room wagons, major material handling equipment, major cleaning and engineering equipment, telephone systems, computerized accounting and vehicles (including the costs associated with the purchase, installation and delivery thereof) together with all replacements therefor and additions thereto, but in all events excluding Operating Equipment and Supplies.

"**GOP Threshold**" ████████████████████████████████

"**Gross Operating Expenses**" shall mean the following expenses actually incurred in the operation of the Hotel:

**Management Agreement – Page 3**

1.    Cost of sales; salaries, wages, bonuses, payroll taxes; the cost of social insurance which shall include, but not be limited to, life, medical, disability insurance, retirement and other benefits incurred by Manager related to Hotel Employees;

2.    Departmental expenses; administrative and general expenses; the cost of third party vendor sources engaged to print payroll checks and reports or to perform any other services hereunder; the Accounting Fee; the Revenue Management Fee; advertising and business promotion for the Hotel; franchise fees, chain reservation fees and all other fees relating to the License Agreement; the cost of utilities, service contracts; and repairs and maintenance;

3.    The cost of replacing Operating Equipment and Supplies and Inventories as defined herein.

4.    The cost of uncollectible accounts receivables as reasonably determined by the Manager.

5.    The Owner-approved costs and expenses of technical consultants and operational experts for specialized services in connection with non-routine hotel work including roofing consultants, environmental engineers and others.

6.    The cost of insurance as set forth in this Agreement.

7.    The Management Fee.

8.    Real estate and personal property taxes levied or assessed against the Hotel and other like charges.

9.    Allocated Services.

10.  All other costs and expenses incurred in connection with the operation of the Hotel and otherwise approved as part of the Annual Plan or Annual Operating Budget, including but not limited to Reimbursable Expenses.

11.  Risk management costs.

12.  Legal services related to Hotel Employees or Hotel operations or services.

13.  Other amounts expressly set forth in this Agreement or the Annual Operating Budget as being included in Gross Operating Expenses.

All costs and fees of any Independent Public Accountants or other third parties who perform services approved by Owner (other than services provided by any Independent Public Accountants or other third parties in connection with services and/or reports required to be provided by Owner pursuant to the License Agreement) shall be paid by Owner and shall not constitute Gross Operating Expenses.

Except to the extent that the travel budget for Manager's personnel is included as a line item in the Annual Operating Budget, no part of Manager's central office overhead or general or

**Management Agreement – Page 4**

administrative expenses including the cost of travel by Manager's corporate or regional officers (other than Allocated Services) or for travel related to any other hotel operated by Manager or its Affiliates shall be deemed to be part of Gross Operating Expenses and all such costs and expenses shall be the sole responsibility of Manager.

"**Gross Operating Profit**" or "**GOP**" shall mean the amount of the remainder of Gross Revenues of the Hotel less the departmental expenses and undistributed expenses of the Hotel.

"**Gross Revenues**" shall mean for any applicable Accounting Period, all revenues and receipts of every kind derived from the Hotel and all departments and parts thereof during such Accounting Period, as finally determined on an accrual basis in accordance with the Uniform System of Accounts, including, but not limited to, revenues and income (both cash and credit transactions) before commissions and discounts for prompt or cash payments, from the rental of rooms and lobby space, exhibit or sales space of any kind, including without limitation, charges for reservations, deposits and cancellation fees not refunded to guests; income from vending machines, health club membership fees, wholesale and retail sales of merchandise, service fees and charges, business interruption insurance claims (but only for periods during the operating term) in respect of the Hotel, condemnation awards for temporary use of the Hotel, license, lease and concession fees and rentals (but not including the gross receipts of any licensees, lessees and concessionaires), food and beverages sales, and other sales of every kind conducted by, through or under Manager in connection with the Hotel. Gross Revenues shall not include (i) Federal, state and municipal excise, sales and use taxes or similar impositions collected directly from patrons or guests or included as part of the sales price of any goods or services; (ii) gratuities or service charges collected and paid to employees; (iii) credits or refunds to guests; (iv) proceeds arising from the sale or other disposition of property described in Section 1231 of the Internal Revenue Code or of capital assets; (v) proceeds from condemnation and payments received on account of insurance policies (other than the proceeds from business interruption insurance and from condemnation awards for temporary use of the Hotel when received); (vi) proceeds from claims for damages suffered by Manager or Owner, unless in recompense for a lost revenue item; and (vii) interest earned on the Reserve or Permitted Investments.

"**Hotel**" shall mean (a) the Building and Appurtenances and the Premises owned by Owner and (b) all FF&E, all Operating Equipment and Supplies, and all Inventories owned by Owner located at 7540 Memorial Boulevard, Port Arthur, Texas 77640.

"**hotel**" shall mean any hotel (other than the Hotel), inn, motor inn, motor hotel, motel, suite hotel, conference center, meeting center or any other facility providing either or both of short-term lodging and meeting arrangements.

"**Hotel Employees**" shall have the meaning set forth in Section 4.2.

"**Independent Public Accountant**" shall mean a nationally recognized firm of independent certified public accountants having hotel accounting experience, designated from time to time by Owner, subject to Manager's rights of approval, reasonably exercised.

"**Inventories**" shall mean "Inventories of Supplies" as defined in the Uniform System of Accounts, such as soap, toilet paper, stationery, writing pens, food and beverage inventories,

paper products, menus, expendable office and kitchen supplies, fuel, supplies and items similar to any of the foregoing.

"**Legal Proceedings**" shall mean all complaints, counterclaims or cross-claims filed in a court of competent jurisdiction, any notice of any claim of violation of any legal requirement by any governmental agency or authority, or any summons or other legal process, in each instance by or against the Hotel or by or against Owner, or Manager in connection with the Hotel.

"**Legal Requirements**" shall mean (a) all laws, ordinances, statutes, regulations and orders relating to the Hotel and the Premises now or hereafter in effect, including but not limited to, environmental laws and (b) all terms, conditions, requirements and provisions of (i) all Permits; (ii) all leases; and (iii) all liens, restrictive covenants and encumbrances affecting the Hotel or the Premises or any part thereof.

"**License Agreement**" shall mean the franchise or license agreement, if any, from time to time entered into by Owner with respect to the branding and operation of the Hotel. For the purposes of this definition, the following terms used in said section shall have the following meaning: "**Licensor**" shall mean the franchisor or licensor under the franchise or license agreement from time to time entered into by Owner with respect to the branding and operation of the Hotel; "**Licensee**" shall mean Owner; and the "**Manual**" shall mean the Licensor's operating manual and other manuals for Licensor described in its standard license agreement.

"**Major Renovations**" shall mean a contemporaneously made set or series of alterations, additions and/or improvements to the Hotel with a total cost in excess of $100,000 (or a lesser amount in the event a project with a total cost less than $100,000 requires material design and purchasing and installation services related thereto and/or results in a material alteration in the design of the Hotel), but shall not include any Repairs or Maintenance with respect to Capital Improvements or FF&E.

"**Manager**" shall have the meaning set forth in the introductory section of this Agreement.

"**Management Fee**" shall mean the Accounting Fee**,** Revenue Management Fee and Base Fee, all as set forth in Article 11 hereof.

"**Management Plan**" shall have the meaning set forth in Section 4.4(d).

"**Marketing Plan**" shall mean an annual marketing plan for the Hotel prepared and submitted by Manager to Owner and approved by Owner in each Fiscal Year pursuant to Section 4.4(c).

"**Mortgage**" shall mean, collectively, each of the documents evidencing or securing current or future indebtedness on the Hotel in favor of a third party lender or financial institution or any successor thereto or replacement thereof (the "**Lender**").

"**Net Operating Income**" or "**NOI**" shall mean the result of Gross Revenues less Gross Operating Expenses.

"**Open for Business**" shall mean the period of time during which all or substantially all of the Hotel is open for business to the general public.

"**Operating Account**" shall mean a special account or accounts, bearing the name of the Hotel, established by Manager in a federally insured bank or trust company selected by Owner.

"**Operating Equipment and Supplies**" shall mean supply items which constitute "Operating Equipment and Supplies" under the Uniform System of Accounts, all miscellaneous serving equipment, linen, towels, uniforms, silver, glassware, china and similar items.

"**Operating Standards"** shall mean the operation of the Hotel in a manner consistent with (i) the requirements under the License Agreement; (ii) the condition of the Hotel as of the Commencement Date (or, following completion of a Renovation, the condition of the Hotel as of the completion of the Renovation), normal wear and tear excepted; (iii) the condition and level of the operation of hotels of comparable class and standing to the Hotel in its market area; (iv) then current market conditions regarding rental rates and lease terms and conditions with respect to Hotels of comparable class and standing to the Hotel (including but not limited to the Competitive Set); and (v) then current business and management practices (including those related to compliance with Legal Requirements) applicable to the management, operation, leasing, maintenance and repair of a hotel comparable in size, character and location to the Hotel.

"**Owner**" shall have the meaning set forth in the introductory section of this Agreement.

"**Performance Standard**" shall have the meaning set forth in Section 18.2.

"**Permits**" shall mean all governmental or quasi-governmental licenses and permits, including but not limited to any certificate of occupancy, business licenses and liquor licenses.

"**Permitted Investments**" shall mean (subject to modification, addition or deletion from time to time at the option of Owner by written request to Manager) all of which shall be in the name of Owner:

      (a)    interest-bearing deposit accounts (which may be represented by certificates of deposit, time deposit open account agreements or other deposit instruments) in commercial banks having a combined capital and surplus of not less than $50,000,000; or

      (b)    all other investments approved by Owner.

"**Premises**" shall mean the land on which the Hotel is located, which land is described in Exhibit B attached hereto.

"**Prime Rate**" shall mean the rate per annum announced, designated or published from time to time by JP Morgan Chase Bank N.A. as its "prime", "reference" or "base" rate of interest for commercial loans.

"**Reimbursable Expenses**" shall mean all travel, lodging, entertainment, telephone, facsimile, postage, courier, delivery, employee training and other expenses incurred by Manager

in accordance with the standard policies for expenses incurred by Manager on its own behalf and which are directly related to its performance of this Agreement, but in no event will Reimbursable Expenses include or duplicate expenses for Manager's overhead or Allocated Services.

"**Renovation**" shall mean a renovation of any portion of the Hotel during the Term, pursuant to a plan proposed by Manager and approved by Owner to, among other things, bring the Hotel to a physical condition that satisfies the standards under the License Agreement and to operate in a manner consistent with the assumptions for the then-current Annual Operating Budget and then-current Annual Plan. A Renovation shall be carried out at the expense of Owner pursuant to plans and specifications and a schedule prepared by Manager and approved by Owner and, to the extent required under the License Agreement, by Licensor.

"**Repairs and Maintenance**" shall have the meaning as defined in Section 8.1.

"**Reserve**" shall mean an account maintained as a Permitted Investment for Reserve for replacement of FF&E and/or Capital Improvements, as described in Section 7.1 and funded as provided in Section 7.2.

"**Revenue Data Publication**" shall mean Smith's STR Report, a monthly publication distributed by Smith Travel Research, Inc., or an alternative source, reasonably satisfactory to both parties, of data regarding the average daily rate, occupancy and RevPAR of hotels in the general area of the Hotel, including, without limitation, the Competitive Set.

"**Revenue Management Fee**" shall have the meaning as defined in Section 11.

"**Revenue Per Available Room**" or "**RevPAR**" shall mean for any Test Period the number derived by dividing (i) net room revenue (in accordance with the Uniform System of Accounts), by (ii) the number of available guest rooms in the subject hotel.

"**RevPAR Threshold**" ████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████

"**State**" shall mean the State in which the Hotel is located or other as designated.

"**Term**" shall mean the term of this Agreement, which shall be an initial five (5) year term commencing on the Commencement Date and expiring on the fifth (5th) anniversary of the Commencement Date, as such Term may be extended or shortened as expressly set forth in this Agreement or as otherwise agreed to by Owner and Manager.

"**Termination Fee**" ████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████



"**Test Period**" shall mean each twelve (12) month period during the Term commencing on the first day of the seventh (7th) calendar month following the Commencement Date and each subsequent three (3) calendar months thereafter.  In the event that this Agreement shall terminate on a date other than the last day of a calendar year, the last Test Period shall end on the date of termination.  The term "full Test Period" means any Test Period containing not fewer than 365 days.

"**Third Party Purchaser**" shall have the meaning set forth in Section 18.1.

"**Unavoidable Interruptions**" shall mean interruptions in the operation of or access to the Hotel or any of its essential services on account of an interruption in any one or more of the utility services described in Section 13.2, or on account of labor disputes, strikes, lockouts, fire or other casualty, war, terrorist actions, acts of God and other similar causes beyond the reasonable control of the party claiming an unavoidable interruption, but never financial inability. Other than obligations accruing prior to the occurrence of such event of Unavoidable Interruption or obligations that, if not performed, would cause a material adverse effect on the Hotel or its operations (for instance, the requirement to maintain the Permits or insurance obligations hereunder), the obligations of the party hereunder shall be suspended during the period of an Unavoidable Interruption.

"**Uniform System of Accounts**" shall mean the Uniform System of Accounts for Hotels, 10th Revised Edition, 2006, as published by the Hotel Association of New York City, Inc. or any later edition thereof.

"**Working Capital**" shall mean and refer to the funds which are reasonably necessary for the day-to-day operation of the Hotel's business, including, without limitation, amounts sufficient for the maintenance of petty cash funds, operating bank accounts, receivables, payrolls, prepaid expenses, advance deposits, funds required to maintain inventories, and amounts due to/or from Manager and/or Owner less accounts payable and accrued current liabilities.

    1.2    **Terminology**. All personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, shall include all genders; the singular shall include the plural, and the plural shall include the singular. The titles of Articles, Sections and Subsections in

**Management Agreement – Page 9**

this Agreement are for convenience only, and neither limit nor amplify the provisions of this Agreement, and all references in this Agreement to Articles, Sections, Subsections, paragraphs, clauses, sub-clauses or exhibits shall refer to the corresponding Article, Section, Subsection, paragraph, clause or sub-clause of, or exhibit attached to, this Agreement, unless specific reference is made to the articles, sections or other subdivisions of, or exhibits to, another document or instrument.

1.3 **Exhibits**. All exhibits and other attachments attached hereto are by this reference made a part of this Agreement.

**ARTICLE 2**
**MANAGEMENT OF HOTEL**

Owner hereby engages and appoints Manager, pursuant to the terms of this Agreement, to operate and manage the Hotel, and Manager hereby agrees and contracts to plan, operate, repair and manage the Hotel pursuant to the terms of this Agreement.

Subject to the terms of this Agreement, Hotel operations shall be under the exclusive supervision and control of Manager, which, except as otherwise specifically provided in this Agreement, shall be responsible for the proper and efficient operation**,** maintenance and repair of the Hotel in accordance with the terms of this Agreement. Except as specifically set forth in this Agreement, Manager shall have discretion and control respecting matters relating to management and operation of the Hotel, including, without limitation, charges for rooms and commercial space, credit policies, food and beverage services, other Hotel services, employment policies, granting of concessions or leasing of shops and agencies within the Hotel, receipt, holding and disbursement of funds, maintenance of bank accounts, procurement of inventories, supplies and services, promotion and publicity and, in general, all activities necessary for operation of the Hotel.

Manager shall devote its knowledge, experience and efforts to operate and manage the Hotel pursuant to this Agreement in a businesslike manner in accordance with the Operating Standards. Manager shall make available to Owner the full benefit of the judgment, experience and advice of the members of Manager's organization and staff with respect to the policies pursued by Owner in operating, maintaining, and servicing the Hotel.

**ARTICLE 3**
**TERM**

3.1 **Term**. The initial Term automatically shall be extended beyond the initial Term for additional terms of one (1) year each, unless Owner provides written notice to Manager not less than one hundred twenty (120) days prior to the end of the initial Term or the then-current extended Term, as applicable, of Owner's intent not to extend the Term of the Agreement. Notwithstanding the foregoing, the Agreement may be terminated prior to the scheduled expiration of the Term or any extension thereof, (i) without cause by Owner during the first six (6) months following the Commencement Date, provided that Owner provides Manager with not less than thirty (30) days written notice of termination prior to the effective date of such termination, or (provided that in the event that the Workers' Adjustment and Retraining Act, 29

USC, Sec 2101, et seq. (the WARN Act") is applicable to such termination and the replacement manager identified by Owner fails or refuses to retain a sufficient number of employees at the Property so as not to cause a "mass layoff" or "plant closing" under the WARN Act, Owner will extend the effective date of termination to allow the required notices to be provided under the WARN Act, (ii) upon the sale of the Hotel to a bona fide Third Party Purchaser, as provided in Article 18 hereof, provided that Owner provides Manager with not less than sixty (60) days written notice of such termination; and (ii) as otherwise provided in Articles 15, 16, 17 and 18.

3.2 **Surrender.** On the expiration or sooner termination of the Term, Manager shall quit and surrender the Premises to Owner in the condition required pursuant to this Agreement and take such other actions as contemplated by Article 20 hereof.

## ARTICLE 4
## USE AND OPERATION OF THE HOTEL

4.1 **Operation**. Manager shall be the sole and exclusive manager of the Hotel during the Term and shall operate the Hotel in accordance with the Operating Standards and the provisions of this Agreement. Manager shall act in a fiduciary capacity with respect to the proper protection of and accounting for Owner's assets. In this capacity, Manager shall deal at arm's length with Owner and all third parties, and Manager shall manage the Hotel in a manner which shall serve the Owner's interests at all times.

4.2 **Employment**.

(a) Subject to the terms of this Agreement, Manager shall select, employ, promote, transfer, compensate, terminate where appropriate, supervise, direct, train, and assign the duties of the Executive Personnel and, through the Executive Personnel, a sufficient number of personnel whom Manager reasonably determines to be necessary or appropriate for the proper, adequate and safe operation and management of the Hotel (collectively, the "**Hotel Employees**"). In connection therewith, Manager agrees to cause an employee or employees located in the corporate office of Manager, at no additional cost to Owner, to handle revenue management and sales management for this Property, together with other properties managed by Manager for Owner and its Affiliates. All such employees of the Hotel shall be employees of Manager or Manager's Affiliate. In addition, Manager may, from time to time, assign one or more of its employees to the staff of the Hotel on a full-time, part-time or temporary basis. Notwithstanding the provisions of this Section 4.2 or any other provision of this Agreement, all costs, expenses and liabilities relating to Hotel Employees shall be expenses of operating the Hotel and the responsibility of Manager for acts or omissions of Hotel Employees (or, for Hotel Employees who allocate their time between multiple hotels, an appropriate allocation of the costs for such Hotel Employees) shall not extend beyond responsibility for the gross negligence or willful misconduct of, or the willful violation of Legal Requirements by the Executive Personnel. Manager acknowledges that such Executive Personnel have the duties specified in the first sentence of this Section 4.2 with respect to other Hotel Employees. Manager will negotiate with any union lawfully entitled to represent such employees and may execute collective bargaining agreements or labor contracts resulting therefrom that have been approved by Owner. Manager shall fully comply with all Legal Requirements having to do with worker's compensation, social security, unemployment insurance, hours of labor, wages, working conditions, and other

employer-employee related subjects. With respect to matters of employment, this Agreement is not one of agency by the Manager for Owner but one with the Manager engaged independently in the business of managing properties on its own behalf as an independent contractor (as defined in §856(d)(3) of the Internal Revenue Code with regards to Owner and any Affiliates thereof). The cost of all employment arrangements shall be charged as Gross Operating Expenses of the Hotel and shall be accrued in accordance with generally accepted accounting principles; provided, however, relocation expenses which exceed the budgeted relocation expenses provided in the Annual Plan, shall not be charged as a Gross Operating Expense without the prior approval of Owner, such approval not to be unreasonably withheld, conditioned or delayed. The costs provided for in the immediately preceding sentence shall include, by way of example and not limitation, all reasonable costs and expenses (including, without limitation, all employment related expenses incurred by Manager with respect to the Hotel Employees), such as severance pay, unemployment compensation and health insurance and related costs (i.e., in order to comply with COBRA-type regulations) as a result of the termination of employees and which shall have been paid or accrued in accordance with generally accepted accounting principles. Manager shall use commercially reasonable efforts and exercise reasonable care to select qualified, competent, and trustworthy employees. The Hotel's general cashier and all employees having check signing authority shall be adequately bonded to the satisfaction of Owner and the cost of such bonds shall be an expense of the Hotel. To the extent possible and reasonably available, Manager shall use local labor to fill non-Executive Personnel positions in the operation of the Hotel. Owner may at any time consult or communicate with Manager regarding any of the Hotel Employees, but will not interfere in the day-to-day activities of Hotel Employees. The Manager shall not discriminate against any employee or applicant for employment because of race, color, religion, national origin, ancestry, age, sex or sexual orientation, and all employment advertising shall indicate that Manager and Owner are each an Equal Opportunity Employer as that term is defined under Legal Requirements.

Notwithstanding anything to the contrary contained in this Agreement, the following subparagraphs (b) and (c) shall apply to any liability that may, from time to time, arise out of the Employee Retirement Income Security Act of 1974 ("**ERISA**") and the Multi-employer Pension Plan Amendments Acts of 1980 ("**MEPPA**"), respectively, as from time to time amended.

(b)      Employee Benefits: Any Hotel Employees who are not then represented by a collective bargaining representative shall be entitled to participate in the incentive programs, profit sharing and/or other employee retirement, disability, health, welfare or other benefit plan or plans then made available by Manager to similarly situated employees of other hotels managed by Manager, in accordance with their respective terms. Manager will have the right to charge the Hotel with its allocable share of the cost of any such plan or plans and any contributions to be made thereunder provided that such charges and contributions shall be determined by Manager in good faith on a uniform basis with respect to charges and contributions imposed for the same or similar plans at other hotels then managed by Manager, subject to Legal Requirements. Manager's rights under this Subsection (b) shall be subject to the condition that Manager shall not put into effect any amendment to any existing plan, or adopt any additional plan, which is not imposed upon all other similarly situated hotels managed by Manager.

Upon the expiration or termination of this Agreement, the sale of the Hotel or other similar event, Manager shall cooperate with the Owner with respect to disposition of such plan or plans (or plan assets) in a mutually satisfactory manner, all in compliance with then applicable Legal Requirements.

(c)     Collective Bargaining or Other Multi-employer Plans: Manager and Owner agree that with respect to any withdrawal liability arising under any collective bargaining agreement or other "multi-employer plan" (as defined in Section 3(37) of ERISA) in which the Hotel Employees become participants, the obligations of the parties shall be determined as follows:

(1)     Withdrawal liability arising with respect to Hotel Employees shall be the responsibility of Owner, and Owner shall either pay the amount of such withdrawal liability directly to such plan or reimburse Manager for withdrawal liability payments made to such plan by Manager with respect to Hotel Employees (including withdrawal liability arising after the sale or other termination of this Agreement, provided that such liability arises as a result of such sale, disposition, termination or other similar event). To the extent permitted under then applicable laws, regulations and agreements, Manager shall cooperate with Owner in structuring transactions and transferring actual or contingent withdrawal liability to a successor in ownership or purchaser of the Hotel in accordance with "relief" provisions of ERISA, such as ERISA Section 4204 or then applicable statutory or regulatory provisions of a similar nature.

(2)     For purpose of this subparagraph (c), the term "withdrawal liability" shall mean the actual amount assessed by and payable to a multi-employer pension fund upon a complete or partial withdrawal of the Hotel or Hotel Employees from such fund. Manager shall cooperate with Owner in challenging a plan's assessment of such liability, provided that all costs of litigation, arbitration or other procedures shall be paid by Owner (including any bonds that must be posted). If Manager or its Affiliates have employees at other locations who participate in the same multi-employer plan as Hotel Employees, Owner shall be charged with and be responsible only for multi-employer plan withdrawal liability arising solely with respect to the participation of Hotel Employees in such plan.

4.3     **Legal Proceedings**. Legal Proceedings of a "non-extraordinary nature" (hereafter defined), may be instituted by Manager, in accordance with guidelines and policies determined from time to time by Manager and Owner, in the name of Manager or the Hotel or Owner and by counsel designated by Manager pursuant to such guidelines and policies. Legal Proceedings of an "extraordinary nature" (hereafter defined) shall require Owner's prior approval of the proceedings and counsel approved by Owner. Manager shall furnish Owner with quarterly status reports with respect to all Legal Proceedings of an extraordinary nature. In addition, Manager shall have the right to defend, through counsel designated by Manager, Legal Proceedings of a non-extraordinary nature against Owner or Manager resulting from the operation of the Hotel. The defense of Legal Proceedings against the Hotel of an extraordinary nature (including, without limitation, any aspect of any claims against Manager or Owner arising out of the operation of the Hotel as to which the insurance company denies coverage) shall be coordinated with Owner, designated counsel shall be subject to Owner's reasonable approval and Manager shall furnish Owner with quarterly status reports with respect to such actions. All claims against Owner and/or Manager arising out of the management or operation of the Hotel which (i) are not covered by insurance shall be promptly communicated to Owner and (ii) are covered in whole or

in part by insurance shall be promptly forwarded by Manager to the appropriate insurer (with a copy thereof to Owner in the case of claims against Owner). Legal Proceedings of a "non-extraordinary nature" shall be proceedings in which the monetary exposure is less than $50,000 that are (i) initiated by Manager or Owner relating to the operation of the Hotel for matters such as collections, maintenance of licenses and permits, enforcement of contracts and proceedings against Hotel tenants; and/or (ii) defense of actions against the Owner or Manager resulting from the operation of the Hotel, for matters such as guest claims for loss of property or injury to persons and claims relating to employment or the application for employment at the Hotel. Legal Proceedings of an "extraordinary nature" shall mean all other Legal Proceedings.

4.4 **Annual Plan**. On or before the date that is forty-five (45) days following the Commencement Date, Manager shall submit to Owner an Annual Plan ("**Annual Plan**") for the remaining portion of the Fiscal Year in which the Commencement Date occurs and Owner either shall accept the initial Annual Plan submitted to Owner as provided above or shall submit to Manager a detailed list of Owner's objections or questions to the Annual Plan. Owner and Manager shall meet and discuss Owner's Annual Plan objections and shall coordinate expeditiously and in good faith to agree upon an Annual Plan for the remaining portion of the Fiscal Year in which the Commencement Date occurs. On or before November 15th of each year following the Commencement Date, Manager shall submit to Owner an Annual Plan for the next Fiscal Year and on or before December 15th of each year following the Commencement Date, Owner either shall accept the Annual Plan submitted to Owner as provided above or shall submit to Manager a detailed list of Owner's objections or questions to the Annual Plan ("**Owner's Annual Plan Objections**"). Within fifteen (15) days after Manager's receipt of Owner's Annual Plan Objections, Owner and Manager shall meet and discuss Owner's Annual Plan Objections with the goal of agreeing upon an Annual Plan for the subject Fiscal Year. Owner, as part of Owner's Annual Plan Objections, shall have the right to object to the entire Annual Plan or to any specific item or items contained in the Annual Plan. In the event Owner objects to the Annual Plan or any specific item or items of expense in the Annual Plan and Owner and Manager are unable to reach agreement thereon as provided above prior to commencement of the Fiscal Year in question, pending such agreement, the Annual Plan or the specific item or items of expense (not revenue) in question shall be suspended and replaced for such period that the Annual Plan or such item(s) are in question by an amount equal to the lesser of (i) that proposed by Manager for such Fiscal Year, or (ii) if an objection to the entire Annual Plan, the Actual Gross Operating Expenses for the immediately preceding Fiscal Year subject to an adjustment equal to the percentage increase in the CPI over the last twelve (12) month period immediately preceding the start of the Fiscal Year in question, or (iii) if an objection to a specific item or items of expense in the Annual Plan, such item or items of expense for the immediately preceding Fiscal Year subject to an adjustment for each item equal to the percentage increase in the CPI over the twelve (12) month period immediately preceding the start of the Fiscal Year in question.

(a) The Annual Operating Budget shall be prepared in accordance with the Uniform System of Accounts. The proposed Annual Operating Budget shall incorporate Manager's good faith reasonable estimates of the items of revenue and expense contained therein and shall contain the proposed budget for operations for the succeeding Fiscal Year. When approved by Owner, the proposed Annual Operating Budget shall be the approved Annual Operating Budget.

Any revisions, substitutions or additions to the Annual Operating Budget must be approved by the Owner in writing.

As part of the budgeting process, Manager shall provide to Owner, with each proposed Annual Operating Budget, a complete list of all service and other contracts anticipated for the Fiscal Year which is the subject of the Annual Operating Budget having a liability to the Hotel in excess of $25,000 for such Fiscal Year for or covering the Hotel and the payments or expenditures connected or anticipated therewith. So long as any service or other contracts fall within the following guidelines, Owner's approval thereof shall not be required, but Manager shall nevertheless promptly report to Owner the execution of (and provide Owner with a true and complete copy of) each such contract having a liability to the Hotel of in excess of $25,000:

(i)     The term of such contract shall be no longer than one (1) year; and

(ii)    Each contract must be terminable by Owner or Manager without payment or penalty upon not more than thirty (30) days' notice.

In addition, Manager shall provide to Owner for Owner's review, a written schedule for the Hotel listing all executive and management employees to be employed "on-site" in the direct management of the Hotel including, but not limited to the positions of General Manager, Director of Sales, Chief Engineer and the portfolio sales and revenue manager. These schedules shall include such employee's title or job description and the salary range including additional compensation or prerequisites such as lodging, meals, maintenance, moving expenses, bonus/incentive compensation and the like. In the event that any employee's services are shared with (or subsidized through a sharing arrangement with) another hotel, the employee shall be identified together with a description of his/her responsibilities and the amount and source of any subsidy, together with a breakdown of the relative time expended with respect to the Hotel and each other hotel. If Owner notifies Manager that Owner does not believe that some or all of the scheduled wages and salaries are reasonable and customary as required above, then Manager shall promptly provide to Owner a wage and salary survey that supports the scheduled wages and salaries. No proposed amendment including changes in salary or other compensation shall be effective unless the salary or other compensation as changed is reasonable and customary as required above.

(b)     The Capital Budget shall be prepared in accordance with the Uniform System of Accounts. The Capital Budget shall contain the proposed budget for expenditures from the Reserve and the budget for expenditures for Capital Improvements and FF&E for the succeeding Fiscal Year for (i) additions to and substitutions, replacements and renewals of FF&E and (ii) certain non-routine repairs and maintenance to the Project which are normally capitalized under generally accepted accounting principles such as exterior and interior repainting, resurfacing building walls, floors, roof and parking areas, replacing folding walls and similar items. Manager shall submit good faith reasonable estimates for Capital Improvements and for FF&E for the Fiscal Year following the Fiscal Year otherwise covered by the Annual Operating Budget. When approved by Owner, the Capital Budget, or such items as may be specifically approved by Owner, shall be collectively referred to in this Agreement as the "Approved Capital Budget". Approval of the Capital Budget constitutes an authorization for Manager to expend money for Capital Improvements and for FF&E as provided in the Approved Capital Budget, unless the

Owner's approval thereof specifically requires Manager to obtain additional approvals prior to commencing such work. Any revisions, substitutions or additions to the Approved Capital Budget must be approved by Owner in writing.

Competitive bid rules outlined in Section 4.5 will be observed at all times by Manager for any purchases of Capital Improvements and/or FF&E.

(c)     On or before the date that is thirty (30) days following the Commencement Date, Manager shall submit to Owner the Marketing Plan, which Marketing Plan shall contain advertising, sales and promotional plans prepared by Manager to be used in connection with the marketing of the Hotel and the portfolio of hotels owned by Owner and managed by Manager. On or before November 15th of each year following the Commencement Date, Manager shall submit to Owner an Annual Plan for the next Fiscal Year.  When approved by Owner, the proposed Marketing Plan shall be the approved Marketing Plan. Any revision, substitution or additions to the Marketing Plan must be approved by Owner in writing. The Marketing Plan shall be written with the goal of achieving Gross Revenues as submitted in the Annual Operating Budget for the Fiscal Year or, if less than a full Fiscal Year, the period between the Commencement Date and the December 31 next following the Commencement Date. Manager shall not use Owner's name in any advertising or promotional material without Owner's expressed prior written approval.

(d)     The Management Plan shall contain (i) estimated contributions and distributions from or to Owner; (ii) a leasing plan for the leasing of concessions and other space in the Hotel; (iii) plans and budgets for the disposition and replacement of FF&E; and (iv) such management issues, proposals and projections or modifications as Manager may recommend for the efficient management of the Hotel including but not limited to proposals and assessments as to the Hotel's position in the market, market opportunities, franchise affiliation and disposition strategies. When approved by Owner, the proposed Management Plan shall be the approved Management Plan.

4.5     **Competitive Bidding**. All contracts for repairs, Capital Improvements, FF&E, food and services exceeding $10,000 shall be awarded on the basis of competitive bidding (provided, however, that Manager will not be required to obtain competitive bids for any service for which a single provider exists), solicited in the following manner:

(a)     A minimum of two (2) written bids shall be obtained for each purchase or contract that exceeds $10,000, up to $25,000. Purchases over $25,000 will require a minimum of three (3) bids.

(b)     Each bid will be solicited in a uniform format.

(c)     Subject to approval by Owner, Manager may accept a low bid if the expenditure is for an approved item in the budget and will not result in an excess of the annual budgeted Account Category of the applicable Capital Budget or Annual Operating Budget.

(d)     If Manager desires to accept a bid other than the lowest bid, then Manager shall so advise Owner in writing and recommend that such bid be accepted, with support for such recommendation.

(e)     Owner shall have the right to accept or reject any and all bids for repairs, Capital Improvements, FF&E or foods and services that are not the lowest bid; such acceptance shall not be unreasonably withheld or delayed.

(f)     Manager may request Owner to waive in writing competitive bidding rules for a specific item or service.

In its operation of the Hotel under this Agreement, Manager may purchase goods, supplies and services from itself, Owner or Owner's representatives, or any Affiliates of any of the foregoing so long as the prices and terms thereof are at arm's length and otherwise competitive with, and are not less favorable than prices and terms which could be obtained from independent parties and, if required by Section 4.5, are in compliance with competitive bidding rules, provided that Manager will obtain Owner's consent (not to be unreasonably withheld) regarding any such arrangement.

4.6     **Labor Relations**. Manager shall have no right to enter into any collective bargaining agreement concerning any employees of the Hotel without the prior written approval of Owner, which may be granted or withheld in its sole discretion. Upon Owner's approval of any such agreement, Manager shall be responsible to perform such agreements. To the extent applicable, Manager: (a) represents that it is an equal opportunity employer as described in Section 202 of Executive Order 11246 dated September 24, 1965, as amended, and as such agrees to comply with the provisions of Paragraphs 1 through 7 of Section 202 of said Executive Order during the performance of this Agreement, (b) agrees to comply with the affirmative action requirements of Part 60.741 of Title 41, Code of Federal Regulations, with respect to handicapped workers during the performance of this Agreement, (c) agrees to comply with the affirmative action requirements of Part 60.250 of Title 41, Code of Federal Regulations, with respect to Disabled Veterans and Veterans of the Vietnam Era during the performance of this Agreement, and (d) shall submit to Owner in the form approved by the Director of the Office of Federal Contract Compliance, U.S. Department of Labor, a certification that Manager does not and will not maintain any facilities that provide for their employees in a segregated manner, or permit their employees to perform their services at any location under its control, where segregated facilities are maintained, and that Manager will obtain a similar certification from its contractors.

4.7     **Liquor License**. INTENTIONALLY OMITTED.

4.8     **Employee Discount**. To the extent Manager, Owner or any of their respective Affiliates owns or has any equity interest in other hotels and provides a discounted rate to the employees at such other hotels, such party agrees to provide the same discounted rate (subject to availability and black-out periods) to the employees of the other parties named in this Section 4.8 to the extent allowed under the management and ownership agreements affecting such other hotels.

4.9     **Forms**. Manager shall prepare or cause to be prepared for execution by Owner all forms, reports and returns, if any, required to be filed by Owner under applicable law with respect to the operation of the Hotel; however, Manager shall not be obligated to prepare any of Owner's income tax returns. Without limitation, Manager shall timely prepare and deliver, as

required by law, an Internal Revenue Service Tax Form 1099 with respect to payments made during a calendar year to third party contractors and professionals.

4.10  **Notice of Violations**. Manager shall promptly notify Owner in writing of any written notice received from any regulatory or governmental body regarding an actual or perceived violation of any Legal Requirements.

**ARTICLE 5**
**RELATIONSHIP OF PARTIES**

Except as provided in Section 4.2(a), Owner and Manager acknowledge and agree that this Agreement creates an agency relationship; provided, however, that (a) each Hotel Employee shall be the employee of Manager or Manager's Affiliate and not of Owner, (b) Manager's authority is subject to the terms and conditions of this Agreement, and (c) nothing in this Agreement shall constitute, or be construed to be, or create, a partnership, joint venture or lease or employment arrangement between Owner and Manager with respect to the Hotel or the operation thereof. Employees or agents of Manager are not by this Agreement or by any actions of Owner and/or Manager hereunder made employees of Owner, and are not entitled to the benefits provided by Owner or its Affiliates to its employees, including but not limited to, group insurance, leave and pension plan. This Agreement shall not be deemed at any time to be an interest in real estate or a lien or security interest of any nature against the Hotel, the Premises or any other land used in connection with the Hotel, or any equipment, fixtures, inventory, motor vehicles, contracts, documents, accounts, notes, drafts, acceptances, instruments, chattel paper, general intangibles, or other personal property now existing or that may hereafter be acquired or entered into with respect to the Hotel or the operation thereof.

**ARTICLE 6**
**ADVERTISING**

Subject to and in strict compliance with the provisions of the License Agreement, Manager shall arrange and contract for all advertising, which Manager may reasonably deem necessary, in accordance with Section 4.4, for the operation of the Hotel. So long as the License Agreement may be in effect, Manager generally shall advertise the Hotel under the name "– Petrol Inn & Suites" or such other name as Owner may designate or approve.

**ARTICLE 7**
**RESERVE FOR FF&E**

7.1  **Reserve for Replacement of FF&E**. The Reserve shall be funded pursuant to Section 7.2, and Manager shall use amounts in the Reserve to cover the cost of FF&E expenditures and Capital Improvements, as described in Section 4.4 in conjunction with the Approved Capital Budget. All FF&E, Capital Improvements and the Reserve shall be the property of Owner.

7.2  **Transfers to Reserve for FF&E**. Commencing on the Commencement Date and continuing thereafter during the remainder of the Term, Manager shall deposit monthly into the Reserve for FF&E an amount equal to the amounts required by Lender and/or by Licensor;

provided that in no event will the amounts to be deposited monthly into the Reserve be less than an amount equal to four percent (4%) of Gross Revenues throughout the remainder of the Term.

7.3 **Annual Adjustment**. At the end of each Fiscal Year and following receipt by Manager of the annual accounting referred to in Article 10, an adjustment will be made to such annual account, if necessary and if available, so that the appropriate amount shall have been deposited in the Reserve.

7.4 **Maintenance of Reserve**. Checks or other documents of withdrawal shall be signed by representatives of Manager who shall be bonded or otherwise insured pursuant to the "crime – Theft of Money and Securities" coverage set forth on Exhibit D to this Agreement. The proceeds from the sale of FF&E no longer needed for the operation of the Hotel shall be deposited in the Reserve, but not be credited against the obligation to deposit cash in such fund for the then current Fiscal Year. All interest earned or accrued on amounts invested from the Reserve shall be added to the Reserve (but shall not be credited against Owner's obligations to fund the Reserve), and shall not constitute Gross Revenues or be included therein.

7.5 **Accumulation of Reserve and Additional Cost of FF&E and Capital Improvements**. Owner and Manager acknowledge and agree that portions of the Reserve may, from time to time in accordance with the then-current Annual Plan, be used for more significant expenditures than could be reserved for in a single year. Accordingly, at the end of each Fiscal Year, any amounts remaining in the Reserve shall be carried forward to the next Fiscal Year, and shall be in addition to the amount to be reserved in the next Fiscal Year. In the event at any time there are insufficient funds in the Reserve for any Fiscal Year to pay the cost of FF&E in accordance with the Annual Operating Budget and the Approved Capital Budget, then Owner will, at Owner's option, within sixty (60) days after request therefor by Manager, either provide the additional cash to the Manager to pay for such excess or authorize the funding of such cash from Net Operating Income.

7.6 **Final Remittance**. Upon expiration or termination of this Agreement, Manager shall remit all remaining amounts in the Reserve forthwith to Owner.

## ARTICLE 8
## REPAIRS AND MAINTENANCE AND CAPITAL IMPROVEMENTS

8.1 **Repairs and Maintenance**. Manager shall, from time to time, make such expenditures from Gross Revenues for repairs and maintenance including service contracts ("**Repairs and Maintenance**") as required by the Lender, the License Agreement, the Legal Requirements, the then current Annual Plan or as necessary to maintain the Hotel in good operating condition in compliance with the License Agreement and otherwise in the condition required by this Agreement, including but not limited to repairs and maintenance of HVAC, mechanical and electrical systems, exterior and interior repainting, resurfacing building walls and parking areas, waterproofing of exterior surfaces of floors, roofs, and replacement of plate glass, or the like. It is Owner's intent that the sums allocated for Repairs and Maintenance in accordance with the then current Annual Plan are to be fully expended during that Fiscal Year exclusively for the purposes identified in such Annual Plan. Except in the event of an emergency due to casualty, act of God or otherwise under circumstances in which it would be unreasonable

to seek to obtain prior approval (and provided that Manager shall notify Owner of any such expenditure within a reasonable time given the nature and scope of the emergency), all expenditures for the foregoing shall be as provided in the Annual Operating Budget and the Approved Capital Budget. If any such Repairs or Maintenance shall be made necessary by any condition against the occurrence of which Owner has received the guaranty or warranty of the builder or the Hotel or of any supplier of labor or materials for the Hotel or of any supplier of labor or materials for the construction of the Hotel, then Manager may invoke said guarantees or warranties in Owner's or Manager's name and Owner shall cooperate in all reasonable respects with Manager in the enforcement thereof.

8.2 **Capital Improvements**. Owner may, from time to time, at its sole expense, make such structural repairs, replacements, substitutions, alterations, additions or improvements (exclusive of FF&E) ("**Capital Improvements**") in or to the Hotel as Owner shall determine are necessary to comply with the Operating Standards. If Capital Improvements included in the definition of Building and Appurtenances shall be required at any time during the Term by the terms of any Mortgage, the License Agreement, to maintain the Hotel in good operating condition or by reason of any Legal Requirements, or because Manager and Owner jointly agree upon the desirability thereof, then in such event all such Capital Improvements shall be made with as little hindrance to the operation of the Hotel as reasonably possible. Notwithstanding the foregoing, as long as the Hotel can continue to operate without interruption, Owner shall have the right to contest the need for any such Capital Improvements required by any Legal Requirements and may postpone compliance therewith, if so permitted by law and if such postponement will not expose Manager to any civil or criminal liability. All recommendations by Manager of Capital Improvements shall be submitted in conjunction with the Capital Budget for the Fiscal Year described in Section 4.4(b). In the event that Owner elects to perform Major Renovations to the Hotel, Owner shall have the right to cause (i) Manager, or (ii) a third party, to oversee the performance of the Major Renovations for which oversight, if Manager is overseeing the Major Renovations, Manager shall be paid a project management fee (in addition to the Management Fee) equal to three percent (3%) of the budgeted hard cost items including contingency and any Owner-approved changes of the Major Renovations (the "**Project Fee**"). With respect to (i) Major Renovations as contemplated by this Agreement which Owner elects to have Manager oversee and (ii) improvements that are not Major Renovations, Manager shall oversee such projects in a reasonably prudent manner.

8.3 **Service Contracts**. Manager, without requiring the consent of Owner, shall enter into any contract for cleaning, maintaining, repairing or servicing the Hotel or any of the constituent parts of the Hotel as Manager deems necessary for the operation of the Hotel, except as specifically provided in Section 4.4 or 4.5. Manager shall submit the listing of service contracts entered into for the Hotel required pursuant to Section 4.4(a). Unless otherwise approved by Owner, all service contracts shall: (a) be in the name of Owner or Owner's nominee, (b) to the extent customary, include a provision for cancellation thereof by Owner or Manager upon not more than thirty (30) days written notice, and (c) shall require that all contractors provide evidence of such insurance as is customarily carried by other contractors involved in similar servicing arrangements.

8.4 **Liens**. Owner and Manager shall cooperate and use all commercially reasonable efforts to prevent any liens from being filed against the Hotel that arise from any maintenance,

changes, repairs, alterations, improvements, renewals or replacements in or to the Hotel. If any such liens are filed, Manager shall, subject to the availability of funds therefor in the Operating Accounts or as otherwise supplied by Owner, obtain the release thereof prior to the institution of legal proceedings in connection therewith. The cost of obtaining such release shall be included in Gross Operating Expenses, unless the imposition of the lien results from a default by Owner or Manager, in which event the cost of obtaining such release shall be borne by such defaulting party.

8.5 **Notice of Unavoidable Interruptions**. In the event of any occurrence constituting an Unavoidable Interruption, Manager shall promptly notify Owner of such occurrence and shall keep Owner informed as to the extent and impact thereof on the Hotel.

## ARTICLE 9
## WORKING CAPITAL AND BANK ACCOUNTS; DISTRIBUTION OF NET OPERATING INCOME

9.1 **Working Capital**. Owner shall provide initial Working Capital in the amount of $         in addition to the value of all Inventories. Owner shall at all times cause sufficient funds to be on hand in the Operating Accounts to assure the timely payment of all current liabilities of the Project, including but not limited to Gross Operating Expenses, all other costs and expenses incurred in connection with the Project pursuant to this Agreement and the performance by Manager of its obligations under this Agreement, all fees, charges and reimbursements payable to Manager hereunder and all amounts required hereunder to be transferred into the Reserve. In no event shall Owner permit the balance in the Operating Accounts to be less than an amount equal to the estimated monthly operating expenses of the Project as reflected in the then current Annual Operating Budget. From time to time, upon five (5) days prior written notice from Manager that such funds are required, Owner shall furnish to Manager funds that Manager deems reasonably necessary to assure that the Project shall have adequate working capital as herein provided. In the event Owner fails to supply required working capital in accordance with the provisions of this Section or if Manager otherwise deems such action to be necessary, Manager may use all or part of the funds in the Reserve to supplement the Operating Accounts in order to defray or pay the Project's operating costs and expenses, to the extent permitted by the Mortgage. Owner shall promptly reimburse the Reserve for all sums so used or transferred. All unexpended Working Capital, Inventories and Operating Equipment and Supplies purchased with Working Capital shall remain the property of Owner.

9.2 **Operating Account**. All funds (exclusive of funds deposited in the Reserve and house banks at the Hotel) received by Manager in the operation of or otherwise relating to the Hotel, and funds for Working Capital provided by Owner or retained by Manager from Gross Revenues, shall be deposited in the Operating Account. Manager shall inform such bank in writing that the funds deposited in the Operating Account are owned solely by the Owner. Manager shall not deposit funds attributable to any other property into the Operating Account. To the extent permitted by the Mortgage, amounts in the Operating Account may be temporarily withdrawn and invested by Manager in any Permitted Investments, having due regard for the timing of cash needs, but in no event shall such funds be co-mingled by Manager with any other funds. From the Operating Account, Manager shall pay all Gross Operating Expenses (other than the excess FF&E if funded by or through Owner) before any penalty or interest accrues thereon,

**Management Agreement – Page 21**

however, taking into account sound cash management. All interest earned or accrued on amounts invested from the Operating Account shall be added to the Operating Account. All checks or other documents of withdrawal from the Operating Account shall be signed by representatives of Manager except as provided in Section 9.3 hereof.

9.3 **Maintenance of Operating Account**. Subject to Section 9.4, the Operating Account shall be opened and maintained at all times by Manager and Owner and checks and other documents of withdrawal shall be signed by representatives of Manager who are covered by the required fidelity bond or otherwise insured pursuant to the "Crime – Theft of Money and Securities" coverage set forth on Exhibit D. The Operating Account and any other bank accounts approved by Owner shall be in Owner's name (for example, "*[Owner's name]* d/b/a/ *[Hotel name]*").

Manager shall not change the bank or open or close any bank account described in this Article 9 without Owner's prior written approval. Owner, in its sole and absolute discretion, may in writing direct Manager to change any such bank, signatories or arrangements. The bank in which the Operating Account is located shall be informed by Manager in writing that the funds in such account are held in trust for Owner and that any checks for more than $10,000.00 shall be required to be signed by two (2) authorized signatories on the account.

9.4 **Final Remittance**. Upon the expiration or termination of this Agreement, after payment of all Gross Operating Expenses for which bills were received to such date, Manager's Management Fee, Reimbursable Expenses, any Termination Fee and any other amounts then due and payable to Manager, all remaining amounts in (i) the Reserve, (ii) the Operating Account and (iii) the Permitted Investments, shall be transferred forthwith to Owner by Manager. Owner shall pay Manager any remaining Management Fee, any Termination Fee, Reimbursable Expenses and any other amounts then due and payable and Owner shall pay, or cause to be paid, and shall hold Manager harmless from and against all Gross Operating Expenses accrued in accordance with generally accepted accounting principles and invoices related to Gross Operating Expenses received after Manager has so transferred all funds.

9.5 **Distribution of Excess Cash**. Together with the financial report provided for in Section 10.2(b), Manager shall distribute to Owner all sums in the Operating Accounts in excess of the then working capital requirements of the Hotel determined in accordance with Section 9.1 of this Agreement.

## ARTICLE 10
## BOOKS, RECORDS AND STATEMENTS

10.1 **Books and Records**. Manager shall keep full and adequate books of account and other records reflecting the results of operation of the Hotel in accordance with the Uniform System of Accounts and generally accepted accounting principles. The books of account and all other records relating to or reflecting the operation of the Hotel shall be kept either at the Hotel or at Manager's corporate offices and shall be available to Owner and its representatives and its auditors or accountants, at all reasonable times for examination, audit, inspection and transcription at Owner's sole cost and expense. All of such books and records pertaining to the Hotel including, without limitation, books of account, guest records and front office records at all

times shall be the property of Owner and shall not be removed from the Hotel's or Manager's offices by Manager without Owner's approval and consent. Upon any termination of this Agreement, all of such books and records forthwith shall be turned over to Owner at a location designated by Owner so as to insure the orderly continuance of the operation of the Hotel, but such books and records shall thereafter be available to Manager at all reasonable times for inspection, audit, examination and transcription for a period of two (2) years.

10.2 **Financial Reports**.

(a)     Manager shall deliver to Owner within twenty (20) days following the close of each Accounting Period a monthly profit and loss statement reflecting a comparison of periodic and year-to-date actual revenues and expenses with the Annual Operating Budget as well as a periodic and year-to-date comparison of such actual revenues and expenses with those of the prior Fiscal Year.

(b)     Further, Manager shall provide to Owner within twenty (20) days following the close of each Accounting Period a report prepared in accordance with the example set forth in Exhibit C attached hereto and made a part hereof, which include without limitation, forward bookings, accounts receivable, accounts payable and a monthly sales overview report.

(c)     Further, within seventy-five (75) days after the end of each Fiscal Year, Manager shall deliver to Owner an annual accounting, showing the results of operation of the Hotel during the Fiscal Year and a computation of Gross Revenues, Gross Operating Expenses, and Net Operating Income, if any, and any other information necessary to make the computations required hereby or which may be requested by Owner, all for such Fiscal Year. The annual accounting for any Fiscal Year shall be controlling over the interim accountings for such Fiscal Year. Owner shall have the right to conduct an audit of the books.

(d)     Further, Manager shall prepare and deliver any additional reports or information as Owner is required to provide under the License Agreement.

10.3 **Audits by Owner**. Owner shall have the right to audit, conducted either by Owner's internal personnel or by a third party auditor retained by Owner at its expense, all items of expense and revenue under this Agreement including, but not limited to, Gross Revenues, Gross Operating Expenses, depreciation, the Management Fee and Reserve. Manager shall cooperate and assist with such audit. In the event that an audit reflects an underpayment to Owner or Manager or an overpayment to Manager or Owner, Manager shall correct same by a corrective payment to Owner or Manager, as appropriate, within ten (10) days following notice of the audit results to Manager, subject to Owner's and Manager's right to challenge the audit results in accordance with the provisions of Article 30 of this Agreement. If an audit determines any weaknesses or need for reasonable changes in the internal control systems pertaining to the safeguarding of Owner's assets, Manager will promptly make all necessary changes.

10.4 **Segregation of Accounts**. In any instance where Manager manages several properties for Owner, Manager shall segregate the income and expenses of each property so that Gross Revenues from each property will be applied only to the bills and charges from that property.

## ARTICLE 11
## MANAGER'S MANAGEMENT FEES; TIMING OF PAYMENT TO MANAGER

11.1    **Fees.** For each Fiscal Year or portion thereof, Manager shall receive, by a distribution made by Manager out of Gross Revenues at the end of each Accounting Period in respect of its management services hereunder, a fee (collectively, the "**Management Fee**") calculated as follows:

(a)    a base fee (the "**Base Fee**") in an amount equal to ▮▮▮▮▮▮▮▮▮ of Gross Revenues in respect of any applicable period; plus

(b)    an accounting fee (the "**Accounting Fee**") for accounting services provided by Manager's corporate employees on a "centralized" basis in the amount of ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ plus

(c)    a revenue management fee (the "**Revenue Management Fee**") for an allocation of Manager's revenue management services to be provided by Manager's corporate employees on a "centralized" basis in the amount of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The Management Fee generally shall be computed separately for each Fiscal Year and shall not be accumulated from Fiscal Year to Fiscal Year. Owner shall reimburse Manager for all Reimbursable Expenses incurred by it in connection with the performance of this Agreement. Any such amount shall be payable within thirty (30) days of billing, and upon request of Owner, Manager shall provide a statement showing in reasonable detail the nature and amount of such expenses, together with supporting documentation reasonably requested by Owner.

11.2    **Treatment of Proceeds of Business Interruption Insurance and Condemnation Awards**. In the event of a casualty or condemnation for temporary use resulting in the payment of business interruption insurance (with respect to such casualty) or a condemnation award (with respect to such condemnation for temporary use), the amount of such proceeds shall be considered a part of Gross Revenues for the purpose of computing Manager's Management Fee.

## ARTICLE 12
## INSURANCE

12.1    **Insurance**. Throughout the Term, Manager (unless Owner shall by notice in writing to Manager elect to provide the property and casualty insurance coverage required hereunder) shall provide and maintain the insurance in the minimum amounts and types set forth

on **Exhibit D** to this Agreement, the costs of which shall be charged as part of Gross Operating Expenses.

12.2 **Modification of Insurance**. Owner may require Manager to increase the limits of the above insurance coverage and may require Manager to carry other or additional reasonable and customary insurance. All premiums on any increased limits of, or other or additional, insurance coverage required by Owner under the immediately preceding sentence shall be included in the Gross Operating Expenses. In no event shall insurance coverage be less than that required by Lender, the License Agreement or to comply with Legal Requirements.

12.3 **Contractor's Insurance**. Manager shall require that all major contractors on or about the Hotel Premises have coverage at the contractor's sole expense in the minimum types and amounts set forth in **Exhibit D** to this Agreement. Manager shall require contractors that are not major contractors to carry such insurance coverage that is customary in the applicable trade or industry. A major contractor shall mean any contractor (i) receiving compensation in excess of $25,000 per year (subject to adjustment for adjustments in the CPI between the Commencement Date and the date of such services) or (ii) performing hazardous services. Manager must obtain the Owner's permission in writing to waive any of the above requirements. Higher amounts may be required if the work to be performed is sufficiently hazardous in nature. Manager shall obtain and keep on file a Certificate of Insurance for each such major contractor that shows that the contractor is so insured.

12.4 **Form of Policies**. All insurance required by Sections 12.1, 12.2 and 12.3 shall be in such form and with such companies as shall be reasonably satisfactory to Owner provided that such company shall have a minimum Best rating of A- Class VIII, or as otherwise approved by Owner and Manager, and shall comply with the requirements of any Mortgage and the License Agreement. All property damage insurance shall name Owner as insured, and so long as the Hotel is mortgaged pursuant to any Mortgage or otherwise shall be subject to a standard mortgagee clause in favor of the mortgagee or mortgagees. All other insurance (excepting only the professional liability and workers' compensation lines of coverage) shall be in the name of Owner and Manager. The workers' compensation policy shall name Owner as an additional insured. Policies of insurance (to the extent applicable) shall (i) provide that the insurance company will have no right of subrogation against any mortgagee, Owner, Manager or any of their respective affiliated or subsidiary companies or the agents or employees thereof and (ii) provide that the proceeds thereof in the event of loss or damage shall, to the extent payable to any mortgagee, be payable notwithstanding any act of negligence or breach of warranty by Owner or Manager which might otherwise result in the forfeiture or nonpayment of such insurance proceeds.

12.5 **Certificates**. For the purpose of insuring compliance with the provisions of Article 12, Manager shall furnish to the Owner certificates for all insurance required to be maintained pursuant to this Article 12 within five (5) days prior to renewal. All such certificates shall specify that the policies to which they relate cannot be canceled or modified on less than thirty (30) days' prior written notice to Owner. In the event Owner procures any insurance under this Section 12, Owner shall have the responsibilities set forth in the two preceding sentences for the benefit of Manager.

12.6 **Waiver of Subrogation**. Owner and Manager each waive their respective rights of subrogation against each other.

12.7 **Mortgage Requirements**. Insurance shall be maintained in a manner consistent with the terms and conditions of any Mortgage and any conflict between those terms and conditions and the provisions of this Agreement shall be resolved in favor of the Mortgage.

## ARTICLE 13
## REAL AND PERSONAL PROPERTY TAXES; UTILITIES

13.1 **Taxes**. Manager shall, on behalf of Owner, pay from the Gross Revenues, on or before the dates the same become delinquent, with the right to pay the same in installments to the extent permitted by law, all real estate taxes, all personal property taxes and all betterment assessments levied against the Hotel or any of its component parts. Manager shall promptly deliver to Owner all notices of assessments, valuations and similar documents to be filed by Manager or Owner, which are received from taxing authorities by Manager. Owner shall have the right to hire property tax consultants or like professionals that reasonably provide economic benefits to Owner and the costs thereof shall be a part of Gross Operating Expenses. Notwithstanding the foregoing obligations of Manager, Owner may elect to contest the validity or the amount of any such tax or assessment, provided that such contest does not materially jeopardize Manager's rights under this Agreement. Manager agrees to cooperate with Owner and execute any documents or pleadings required for such purpose, provided Owner agrees to reimburse Manager for any out-of-pocket costs occasioned to Manager by any such contest. At Owner's election, all costs relating to any such contest may be included in Gross Operating Expenses.

13.2 **Utilities, Etc**. Manager shall promptly pay all fuel, gas, light, power, water, sewage, garbage disposal, telephone and other utility bills currently as they are incurred in connection with the Hotel from the Gross Revenues or Working Capital.

## ARTICLE 14
## USE OF NAME

14.1 **Name**. During the Term of this Agreement, the Hotel shall at all times be known and designated as the "La Quinta Inns & Suites Port Arthur" or by such other name as from time to time may be agreed upon by Owner and Manager. Manager shall make or cause to be made any fictitious name filings or disclosures required by the laws of the State with respect to the use of such name for or in connection with the Hotel. Manager shall not use or employ such name unless such use fully complies with the terms of the License Agreement, if any.

## ARTICLE 15
## DAMAGE OR DESTRUCTION; CONDEMNATION

15.1 **Damage or Destruction**.

(a) If the Hotel or any portion thereof shall be damaged or destroyed at any time or times during the Term by fire, casualty or any other cause commonly covered by fire and extended coverage insurance and the cost of repairing such damage and restoring the Hotel to

substantially its condition immediately prior to such damage or destruction, as reasonably estimated by Owner based upon estimates Owner receives from contractors and other reasonable and customary evidence, will not exceed the sum of $250,000 plus adjustments to reflect increases in the CPI for each Fiscal Year after 2014 exclusive of the cost of the foundation and footings ("**Minimum Cost**"), Owner will, at its own cost and expense (subject to Owner's receipt of insurance proceeds sufficient to pay such costs and expenses) and with due diligence repair and/or restore the Hotel so that after such repair and/or restoration, the Hotel shall be in substantially the same condition as it was immediately prior to such damage or destruction.

(b)     If the cost of such repair and/or restoration will, as so reasonably estimated by Owner, exceed the Minimum Cost, then Owner shall, within one hundred twenty (120) days after such damage or destruction, elect by notice to Manager either (x) to carry out such repair and/or restoration, in which case Owner shall complete such repair and/or restoration pursuant to the last sentence of Section 15.1(a) or (y) to terminate this Agreement; should Owner so elect to terminate this Agreement, Owner shall pay to Manager the Termination Fee.

(c)     In the case of damage or destruction which Owner is not required by the preceding provisions of this Section 15.1 to repair or restore and where Owner has not elected under said preceding provisions to terminate this Agreement, Owner shall undertake to notify Manager, within one hundred twenty (120) days after such damage or destruction, whether or not Owner will so repair and/or restore such damage or destruction. If Owner, within such one hundred twenty (120) day period either (i) advises Manager that Owner will not so repair and/or restore such damage or destruction or (ii) fails to advise Manager of Owner's decision, Manager may terminate this Agreement by written notice to Owner, or Owner may terminate this Agreement by such notice to Manager; in either case such written notice must be given within one hundred fifty (150) days after such damage or destruction and neither party shall be entitled to any payment on account of such termination. If in such event Owner within such one hundred twenty (120) day period notifies Manager that Owner will so repair and/or restore such damage or destruction, then neither Owner nor Manager shall have a right to terminate this Agreement on account of such damage or destruction.

15.2     **Condemnation**. If the whole of the Hotel shall be taken or condemned in any eminent domain, condemnation, compulsory acquisition or like proceeding by any competent authority or if such a portion thereof shall be taken or condemned as to make it imprudent or unreasonable, in the sole opinion of Owner, to use the remaining portion as a hotel of the type and class immediately preceding such taking or condemnation, then the Term shall terminate as of the date title vests in the condemning authority. Manager has no interest in any award paid to Owner and Manager shall make no claim against the condemnor for any loss to its business as a result of such condemnation or otherwise. If only a part of the Hotel shall be taken or condemned and the taking or condemnation of such part does not, in the opinion of Owner, make it unreasonable or imprudent to operate the remainder as a hotel of the type and class immediately preceding such taking or condemnation, this Agreement shall not terminate, and so much of any award to Owner shall be made available as shall be reasonably necessary for making alterations or modifications of the Hotel, or any part thereof, so as to make it a satisfactory architectural unit as a hotel of similar type and class as prior to the taking or condemnation.

15.3 **Mortgage Requirements**. Actions as to damage or destruction and condemnation shall be taken only in a manner that is consistent with the terms and conditions of the Mortgage and any conflict between those terms and conditions and the provisions of this Agreement shall be resolved in favor of the Mortgage.

**ARTICLE 16**
**EVENTS OF DEFAULT**

16.1 **Manager Defaults**. Each of the following shall constitute an Event of Default by Manager:

(a) The failure of Manager to pay any sum of money (or, if required by the Mortgage, to deposit into the lockbox account within two (2) business days of receipt) to Owner provided for herein when the same is payable, if such failure is not cured within five (5) days after written notice specifying such failure is given by Owner to Manager.

(b) An assignment by Manager in violation of the provisions of Article 23 hereof.

(c) If Manager shall fail to keep, observe or perform any other material covenant, agreement, term or provision of this Agreement to be kept, observed or performed by Manager and such failure shall continue for a period of thirty (30) days after written notice specifying such failure given by Owner to Manager, or if Manager due to any act or omission on the part of Manager and without the fault of Owner, shall fail to maintain the Permits and such failure shall continue for a period of thirty (30) days after written notice specifying such failure given by Owner to Manager; provided that if such failure is incapable of cure within such thirty (30) day period, then the cure period shall be extended provided that Manager commenced the cure during such initial thirty (30) day period and thereafter diligently and continuously pursues the cure thereof to completion.

(d) If because of any act or omission on the part of Manager, and without the fault of Owner, either (i) the License Agreement or (ii) any required license for the sale of alcoholic beverages at the Hotel, is at any time suspended, terminated or revoked for a period of more than thirty (30) consecutive days, provided, however, if, at the end of such thirty (30) day period the cure has not been effectuated notwithstanding Manager's diligent and continuous attempts to cure, then the cure period shall be extended for an additional period of ninety (90) days.

(e) If Manager shall fail to maintain and operate the Hotel in accordance with the standards required under Section 4.1 and such failure shall not be due to a refusal on the part of Owner to approve the Annual Plan submitted by Manager under Section 4.4 or Owner's failure to properly provide funds requested pursuant to the provisions of Section 9.1 and such failure shall continue for a period of sixty (60) days after written notice by Owner to Manager specifying the matters or conditions which constitute the basis for such Event of Default, provided that if such failure is not reasonably capable of cure within such sixty (60) day period, then the cure period shall be extended provided that Manager commences the cure during such initial sixty (60) day period and thereafter diligently and continuously pursues the cure thereof to completion.

(f)　　If Manager shall apply for or consent to the appointment of a receiver, trustee or liquidator of Manager or of all or a substantial part of its assets, admit in writing its inability to pay its debts as they come due, make a general assignment for the benefit of creditors, take advantage of any insolvency law, or file an answer admitting the material allegations of a petition filed against Manager in any bankruptcy, reorganization or judgment or decree shall be entered by any court of competition jurisdiction, on the application of a creditor, adjudicating Manager bankrupt or insolvent or approving a petition seeking reorganization of Manager or appointing a receiver, trustee or liquidator of Manager or of all or a substantial part of its assets or a decree shall continue unstayed and in effect for any period of ninety (90) consecutive days.

(g)　　The filing of a voluntary petition in bankruptcy or insolvency or a petition for liquidation or reorganization under any bankruptcy law by Manager, or Manager shall consent to, acquiesce in, or fail timely to controvert, an involuntary petition in bankruptcy, insolvency or an involuntary petition for liquidation or reorganization filed against it.

(h)　　The filing against Manager of a petition seeking adjudication of Manager as insolvent or seeking liquidation or reorganization or appointment of a receiver, trustee or liquidator of all or a substantial part of Manager's assets, if such petition is not dismissed within ninety (90) days.

(i)　　Failure of Manager (but excluding such a failure which results from the failure by Owner to provide the necessary funds therefor) to maintain at all times throughout the term hereof all of the insurance required to be maintained by Manager under Article 12, if such failure is not cured within fifteen (15) days after written notice specifying such failure is given by Owner to Manager.

(j)　　The fraud, gross negligence, willful misconduct or criminal conduct of or by Manager and, to the extent same has a material adverse effect on the Hotel or Owner, the General Manager, in connection with the Hotel.

16.2　　**Owner Defaults**. Each of the following shall constitute an Event of Default by Owner:

(a)　　The failure of Owner to pay or furnish to Manager any money Owner is required to pay or furnish to Manager in accordance with the terms hereof on the date the same is payable, if such failure is not cured within five (5) days after written notice specifying such failure is given by Manager to Owner. If any sum of money is not paid within five (5) days following the date same becomes due and payable under this Agreement, and Manager has advanced such sum on behalf of Owner, such sum shall bear interest at the Default Rate from the date Manager advanced such sum on behalf of Owner until the date Owner actually pays such sum. If the failure to pay relates to the Management Fee, such sum shall bear interest at the Default Rate from the date due until the date actually paid.

(b)　　If because of a default under the Mortgage, if any, not caused by the act or omission of Manager, the Mortgage shall be foreclosed, or the Hotel sold in lieu of foreclosure.

(c)　　If Owner shall apply for or consent to the appointment of a receiver, trustee or liquidator of Owner of all or a substantial part of its assets, or admit in writing its inability to pay

its debts as they come due, make a general assignment for the benefit of creditors, take advantage of any insolvency law, or file an answer admitting the material allegations of a petition filed against Owner in any bankruptcy, reorganization or insolvency proceeding, or if an order, judgment or decree shall be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating Owner a bankrupt or insolvent or approving a petition seeking reorganization of Owner or appointing a receiver, trustee or liquidator of Owner or of all or a substantial part of its assets, and such order, judgment or decree shall continue unstayed and in effect for any period of ninety (90) consecutive days.

(d)     The filing of a voluntary petition in bankruptcy or insolvency or a petition for liquidation or reorganization under any bankruptcy law by Owner, or Owner shall consent to, acquiesce in, or fail timely to controvert, an involuntary petition in bankruptcy, insolvency or an involuntary petition for liquidation or reorganization filed against it.

(e)     The filing against Owner of a petition seeking adjudication of Owner as insolvent or seeking liquidation or reorganization or appointment of a receiver, trustee or liquidator of all or a substantial part of Owner's assets, if such petition is not dismissed within ninety (90) days.

(f)     Failure of Owner to maintain at all times throughout the term hereof all of the insurance required to be maintained by Owner under Article 12, if such failure is not cured within fifteen (15) days after written notice specifying such failure is given by Manager to Owner.

(g)     The failure of Owner to perform, keep or fulfill any of the other covenants, undertakings, obligations or conditions set forth in this Agreement, or the failure of Owner to approve expenditures or to authorize procedures necessary to maintain the standards of the Hotel in accordance with the Operating Standards, if such failure shall continue for a period of thirty (30) days after written notice by Manager or Licensor to Owner specifying the matters or conditions which constitute the basis for such Event of Default, provided that if such failure is incapable of cure within such thirty (30) day period, then the cure period shall be extended for up to an additional thirty (30) days provided that Owner commences the cure during such initial thirty (30) day period and thereafter diligently and continuously pursues the cure thereof.

## ARTICLE 17
## TERMINATION UPON EVENT OF DEFAULT; OTHER REMEDIES

17.1     **Termination**. Upon the occurrence of an Event of Default, in addition to and cumulative of any and all rights and remedies available to the non-defaulting party under this Agreement, at law or in equity, the non-defaulting party may: (i) terminate this Agreement without penalty, effective upon receipt of written notice of termination to the defaulting party, provided that termination may be effective immediately in the case of fraud, gross negligence, willful misconduct, criminal conduct or misappropriation of funds; and (ii) pursue any and all other remedies available to the non-defaulting party at law or in equity. In addition to and cumulative of the foregoing, upon the occurrence of any Event of Default on the part of Owner, all Management Fees, Reimbursable Expenses and all other sums payable to Manager under this Agreement shall be immediately due and payable without notice. In no event shall (i) the provisions of this Agreement with respect to the payment of a Termination Fee upon the

termination of this Agreement under certain circumstances be construed as defining or limiting the amount recoverable by Manager from Owner by reason of any Event of Default on the part of Owner; or (ii) entitle Manager to receive a Termination Fee in the event of a termination by reason of any Event of Default on the part of Manager

17.2 **Manager's Rights to Perform**.

(a)    If Owner shall fail to make any payment or to perform any act required of Owner pursuant to this Agreement, Manager may (but shall not be obligated to), without further notice to, or demand upon, Owner and without waiving or releasing Owner from any obligations under this Agreement, make such payment (either with its own funds or with funds withdrawn for such purpose from the Operating Accounts or the Reserve) or perform such act. Manager agrees to provide written notice to Owner within five (5) days after Manager exercises its rights in the preceding sentence.  All sums so paid by Manager and all necessary incidental costs and expenses incurred by Manager in connection with the performance of any such act, together with interest thereon at the Default Rate from the date of making such expenditure by Manager, shall be payable to Manager on demand.

(b)    Manager shall have the right to set-off against any payments to be made to Owner by Manager under any provision of this Agreement and against all funds from time to time in the Operating Accounts and the Reserve, any and all liabilities of Owner to Manager. Manager may withdraw from the Operating Accounts and the Reserve from time to time such amounts as Manager deems desirable in partial or full payment of all or any portion of said liabilities, the amount of such withdrawals to be paid by Owner to Manager on demand and to be replaced in the respective account and fund.

## ARTICLE 18
## OWNER'S ADDITIONAL TERMINATION RIGHTS

18.1 **Sale of the Hotel**. If Owner proposes to sell or otherwise dispose of the Hotel or Owner's interests therein, to a bona fide third-party (the "**Third-Party Purchaser**") during the Term, this Agreement will terminate effective upon the consummation of the closing of such sale. Owner shall provide Manager with written notice of termination of this Agreement not less than sixty (60) days prior to the scheduled date of closing of the sale of the Hotel; provided, however, if such a sale does not actually occur, the notice of termination shall be deemed ineffective.

18.2 **Performance Standard**.





## ARTICLE 19
## AREA OF PROTECTION

19.1

## ARTICLE 20
## TRANSFER TO OWNER UPON TERMINATION

Upon any termination of this Agreement, whether due to the occurrence of an Event of Default or otherwise, Manager shall cooperate with Owner and shall execute all documents or instruments requested by Owner in connection with the transfer, all without consideration to Manager (provided that, if such termination is due to a reason other than a default by Manager under this Agreement, Owner will reimburse Manager for Manager's reasonable expenses to effect such transfer) or the imposition of liability by Manager, to Owner or its nominee of the Permits and the License Agreement used or useful in connection with the operation of the Hotel. Without limiting the generality of the foregoing, Manager shall cause its officials, subject to restrictions provided in any License Agreement or related agreement, to provide all sales lists and customer contacts to Lender and to execute any necessary documents and to visit licensing authorities along with Owner's representatives in order to expedite (i) the orderly transfer to Owner or its designee of the Permits and the License Agreement (ii) the renewal thereof to Owner or Owner's designee if appropriate. In the event that this Agreement terminates due to

any reason other than a default by Manager under this Agreement, a sufficient number of Hotel Employees will be hired by Owner or its successor, assign or designee, and retained for at least 90 days thereafter, so as not to cause a "mass layoff" or "plant closing", as defined in the Workers Adjustment and Retraining Act, 29 USC, sec 2101 et seq.

## ARTICLE 21
## NOTICES

All notices, elections, acceptances, demands, consents and reports (collectively "notice") provided for in this Agreement shall be in writing and shall be given to the other party at the address set forth below or at such other address as any of the parties hereto may hereafter specify in writing.

To Owner:              RREAF O&G PORTFOLIO #2 LLC
                       C/O Spectrum Origination LLC
                       1253 Springfield Avenue, Suite 201
                       New Providence, New Jersey 07974
                       Attention: Jeffrey Schaffer

With a copy to:
                       Spectrum Group Management LLC
                       1250 Broadway, 19th Floor
                       New York, New York 10001
                       Attention: Peter Locke

To Manager:            Channel Point Hospitality LLC
                       2500 North Dallas Parkway
                       Suite 600
                       Plano, Texas 75093

With a copy to:        Carla S. Moreland, Esq.
                       5112 Briargrove Lane
                       Dallas, Texas 75287

Such notice or other communication may be given by Federal Express or other nationally recognized overnight carrier or by electronic facsimile in which case notice shall be deemed given upon confirmed delivery. Notice may be mailed by United States registered or certified mail, return receipt requested, postage prepaid, deposited in a United States post office or a depository for the receipt of mail regularly maintained by the post office. If mailed, then such notice or other communication shall be deemed to have been received by the addressee on the fifth (5th) day following the date of such mailing. Such notices, demands, consents and reports may also be delivered by hand, in which case it shall be deemed received upon delivery.

## ARTICLE 22
## CONSENT AND APPROVAL

Except as herein otherwise provided, whenever in this Agreement the consent or approval of Manager or Owner is required, such consent or approval shall not be unreasonably withheld or delayed. Such consent or approval shall also be in writing only and shall be executed only by an authorized officer or agent of the party granting such consent or approval.

## ARTICLE 23
## NON-ASSIGNABILITY

This Agreement shall not be assignable by Manager or Owner; provided however, that Owner shall be entitled to assign this Agreement to an Affiliate; and Manager shall (i) be entitled to assign this Agreement to an Affiliate of such party as part of a modification to such party's company structure in which all or substantially all of such party's assets are transferred to an Affiliate of such party; and (ii) have the right to assign its rights to receive payments under this Agreement as security for indebtedness or other obligations.

## ARTICLE 24
## INDEMNITY

24.1    **Indemnity by Manager**.



24.2    **Indemnity by Owner**. To the extent that Manager shall not be fully covered by insurance required to be maintained pursuant to this Agreement or if, after giving effect to the provisions of Section 24.1(b) of this Agreement, Gross Revenues are not sufficient to pay all Liabilities, Owner shall indemnify, defend and hold harmless Manager and its directors, officers, employees and agents from and against any damages, loss, liability, cost, action, cause, claim or expense, including attorneys' fees, arising out of, or incurred in connection with the management and operation of the Hotel.

**Management Agreement – Page 34**

24.3 **Survival**. The provisions of this Article 24 shall survive the expiration or earlier termination of this Agreement.

## ARTICLE 25
## PARTIAL INVALIDITY

In the event that any one or more of the phrases, sentences, clauses or paragraphs contained in this Agreement shall be declared invalid by the final and unappealable order, decree or judgment of any court, this Agreement shall be construed as if such phrases, sentences, clauses or paragraphs had not been inserted, unless such construction would substantially destroy the benefit of the bargain of this Agreement to either of the parties hereto.

## ARTICLE 26
## MISCELLANEOUS

26.1 **Disputes**. Whenever any issue or dispute arises under this Agreement relating to the Annual Operating Budget, the Approved Capital Budget and or the calculation and payment of the Reserves, and the Management Fee, such issue or dispute shall be resolved utilizing the Uniform System of Accounts and the by application of generally accepted accounting principles consistently applied.

26.2 **Further Assurances**. Owner and Manager shall execute and deliver all other appropriate supplemental agreements and other instruments, and take any other action necessary to make this Agreement fully and legally effective, binding and enforceable as between them and as against third parties.

26.3 **Waiver**. The waiver of any of the terms and conditions of this Agreement on any occasion or occasions shall not be deemed a waiver of such terms and conditions on any future occasion.

26.4 **Successors and Assigns**. Subject to and limited by Article 23, this Agreement shall be binding upon and inure to the benefit of Owner, its successors and permitted assigns, and shall be binding upon and inure to the benefit of Manager, its successors and permitted assigns.

26.5 **Governing Law**. This Agreement shall be construed, both as to its validity and as to the performance of the parties, in accordance with the laws of the State of Texas.

26.6 **Compliance with Mortgage and License Agreement**. In carrying out their respective duties and obligations under the terms of this Agreement, Owner and Manager shall use commercially reasonable good faith efforts to take no action that could reasonably be expected to constitute a material default under any Mortgage or the License Agreement and will use commercially reasonable good faith efforts to take such actions as are reasonably necessary to comply therewith. Notwithstanding the foregoing or anything in this Agreement to the contrary, if there is a breach by Owner under the Mortgage and such breach is the result of the failure of Manager, such breach shall not be a default by Manager under this Agreement (and Manager shall have no liability therefore) unless such default and/or failure is specifically provided for in Section 16.1 of this Agreement and the applicable notice and cure periods provided for such breach and/or failure, if any, have expired.

26.7    **Amendments**. This Agreement may not be modified, amended, surrendered or changed, except by a written document signed by the Owner and Manager agreeing to be bound thereby.

26.8    **Estoppel Certificates**. Owner and Manager agree, at any time and from time to time, as requested by the other party, upon not less than ten (10) days' prior written notice, to execute and deliver to the other a statement certifying that this Agreement is unmodified and in full force and effect (or if there have been modifications, that the same are in full force and effect as modified and stating the modifications), certifying the dates to which required payments have been paid, and stating whether or not, to the best knowledge of the signer, the other party is in default in performance of any of its obligations under this Agreement, and if so, specifying each such default of which the signer may have knowledge, it being intended that such statement delivered pursuant hereto may be relied upon by others with whom the party requesting such certificate may be dealing.

26.9    **Inspection Rights**. Owner and Lender shall have the right to inspect the Hotel and examine the books and records of Manager pertaining to the Hotel at all reasonable times during the Term upon reasonable notice to Manager, and Owner and the holder of any Mortgage shall have access to the Hotel and the books and records pertaining thereto at all times during the Term to the extent necessary to comply with the terms of any Mortgage, all to the extent consistent with applicable law and regulations and the rights of guests, tenants and concessionaires of the Hotel.

26.10    **Subordination**. This Agreement, any extension hereof and any modification hereof shall be subject and subordinate to a Mortgage as provided therein and, in the event of a foreclosure or deed in lieu of foreclosure, subject to the terms of any subordination agreement with Lender, this Agreement shall terminate unless otherwise assumed by Lender in writing. The provisions of this Section shall be self-operative and no further instrument of subordination shall be required; however, Manager will execute and return to Owner (or to Lender, as designated by Owner) such documentation as Owner or Lender may reasonably request to evidence the subordination of this Agreement to the Mortgage.   In the event of any refinancing of the Property, Manager shall cooperate in all reasonable respects with Owner in effecting such refinancing.

26.11    **Effect of Approval of Plans and Specifications**. Owner and Manager agree that in each instance in this Agreement or elsewhere wherein Manager is required to give its approval of plans, specifications, budgets and/or financing, no such approval shall imply or be deemed to constitute an opinion by Manager, nor impose upon Manager any responsibility for the design or construction of additions to or improvements of the Hotel, including but not limited to structural integrity or life/safety requirements or adequacy of budgets and/or financing. The scope of Manager's review and approval of plans and specifications is limited solely to the adequacy and relationship of spaces and aesthetics of the Hotel in order to comply with the Operating Standards.

26.12    **Entire Agreement**. This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof, superseding all prior agreements or undertakings, oral or written.

26.13   **Time is of the Essence**. Time is of the essence in this Agreement.

26.14   **Interpretation**. No provision of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have structured or dictated such provision.

26.15   **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and need not be signed by more than one of the parties hereto and all of which shall constitute one and the same agreement.

26.16   **No Electronic Transactions**. The parties hereby acknowledge and agree that this Agreement shall not be executed, entered into, altered, amended or modified by electronic means. Without limiting the generality of the foregoing, the parties hereby agree that the transactions contemplated by this Agreement shall not be conducted by electronic means, except as specifically set forth in Article 21 of this Agreement.

26.17   **Prohibited Persons and Transactions**.

(a)     Manager is not, and shall not become, a person or entity with whom U. S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including those named in OFAC's Specially Designated and Blocked Person's List) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, or Support Terrorism), or other governmental action (such persons and entities being "**Prohibited Persons**").

(b)     Owner is not and shall not become a Prohibited Person.

26.18   **Confidentiality.** Owner and Manager agree to keep the terms and conditions of all leases and other occupancy agreements in effect at the Hotel (if any) and all other accruements relating to the Hotel, together with all information and data obtained, possessed, or generated by Manager in connection with the Hotel (collectively, "**Privileged Information**"), strictly confidential and not to make any public announcements or any disclosures to any third parties, either orally or in writing, with respect to any Privileged Information without the express written consent of the other party hereunder; provided, however, the restrictions imposed hereby shall not apply to any Privileged Information (1) which is required to be disclosed in order to comply with any law, ordinance, governmental decree or any rule, regulation or decree of any interested governmental body or (2) which must otherwise be disclosed to relevant third parties, including accountants, attorneys and lenders, in the course of reasonable and diligent management and operation of the Hotel or the business of Owner, or any subsidiary or Affiliate of Owner or Manager. If Manager makes such disclosure, it shall notify such third party of this provision and of the requirement of Owner for confidentiality. The provisions of this Section 26.18 shall survive the expiration or termination of this Agreement

26.19   **No Third Party Rights**. This Agreement shall inure solely to the parties hereto. Notwithstanding any other provision of this Agreement, no third party shall have any rights pursuant to the terms of this Agreement.

## ARTICLE 27
## NO REPRESENTATIONS AS TO INCOME OR FINANCIAL SUCCESS OF HOTEL

In entering into this Agreement, Manager and Owner acknowledge that neither Owner nor Manager has made any representation to the other regarding projected earnings, the possibility of future success or any other similar matter respecting the Hotel, and that Manager and Owner understand that no guarantee is made to the other as to any specific amount of income to be received by Manager or Owner or as to the future financial success of the Hotel.

## ARTICLE 28
## REPRESENTATIONS OF MANAGER

In order to induce Owner to enter into this Agreement, Manager does hereby make the following representations and warranties:

(a)     the execution of this Agreement is permitted by the certificate of formation and partnership agreement of Manager and this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of Manager enforceable in accordance with the terms hereof;

(b)     to the best knowledge of Manager, there is no claim, litigation, proceeding or governmental investigation pending, or, as far as is known to Manager, threatened, against or relating to Manager, the properties or business of Manager or the transactions contemplated by this Agreement which does, or may reasonably be expected to, materially and adversely affect the ability of Manager to enter into this Agreement or to carry out its obligations hereunder, and to the best knowledge of Manager, there is no basis for any such claim, litigation, proceedings or governmental investigation, except as has been fully disclosed in writing to Owner and Lender; and

(c)     neither the consummation of the transactions contemplated by this Agreement on the part of Manager or to be performed, nor the fulfillment of the terms, conditions and provisions of this Agreement, conflicts with or will result in the breach of any of the terms, conditions or provisions of, or constitute a default under, any agreement, indenture, instrument or undertaking to which Manager is a party or by which it is bound.

## ARTICLE 29
## REPRESENTATIONS OF OWNER

In order to induce Manager to enter into this Agreement, Owner does hereby make the following representations and warranties:

(a)     the execution of this Agreement is permitted by the Limited Liability Company Agreement of Owner and this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of Owner enforceable in accordance with the terms hereof;

(b)     there is no claim, litigation, proceeding or governmental investigation pending, or as far as is known to Owner, threatened, against or relating to Owner, the properties or business

of Owner or the transactions contemplated by this Agreement which does, or may reasonably be expected to, materially and adversely affect the ability of Owner to enter into this Agreement or to carry out its obligations hereunder, and there is no basis for any such claim, litigation, proceedings or governmental investigation, except as has been fully disclosed in writing to Manager; and

(c)     neither the consummation of the transactions contemplated by this Agreement by this Agreement on the part of Owner to be performed nor the fulfillment of the terms, conditions and provisions of this Agreement, conflicts with or will result in the breach of any of the terms, conditions or provisions of, or constitute a default under, any agreement, indenture, instrument or undertaking to which Owner is a party or by which it is bound.

## ARTICLE 30
## DISPUTE RESOLUTION

Except as specifically provided in Section 4.4 of this Agreement, Owner and Manager agree that any dispute between the parties related to or arising out of this Agreement that cannot be amicably settled by the parties hereunder, shall first be submitted for non-binding mediation before resorting to any litigation, equitable proceeding or other enforcement action. Such mediation shall be held within a twenty-five mile radius of the Hotel (or such other location mutually agreed by the parties) and the parties shall cooperate in good faith to agree on a mediator who shall be a retired or semi-retired judge having at least ten (10) years of experience on the bench hearing complex commercial transactions. If the parties hereto have failed to designate, by a joint written statement, a mediator within thirty (30) days following the date of a written request therefor by either Manager or Owner to the other, then either Owner or Manager may notify the local office of the American Arbitration Association ("**AAA**") or JAMS and request such entity to select a person to act as the mediator to assist in the resolution of the dispute. The mediation will be a non-binding conference between the parties conducted in accordance with the applicable rules and procedures of AAA or JAMS (as determined by the mediator). The compensation of the mediator and all related expenses shall be borne equally by the parties, each of whom shall bear their own costs, irrespective of the outcome of the mediation. If any dispute remains unresolved between the parties after the mediation is complete, then either party shall be entitled to pursue its rights and remedies at law or in equity. The provisions of this Article 30 shall survive the expiration or earlier termination of this Agreement.

## ARTICLE 31
## ADDITIONAL OBLIGATIONS OF MANAGER

Manager acknowledges that Owner is vitally interested in the qualifications of the individuals designated as the general manager and the director of sales of the Hotel. Manager shall, from time to time, consult with Owner and obtain Owner's approval as to the appointment of individuals to such positions; provided, however, Owner and Manager acknowledge that nothing in this Article is intended to limit or negate the authority of Manager elsewhere provided in this Agreement to remove and replace, in its sole discretion, the general manager and/or director of sales of the Hotel.

## ARTICLE 32
## TERMINATION OF THE LICENSE AGREEMENT

Owner reserves and shall have the absolute right in its sole and unfettered discretion, at any time and without the consent or approval of (but with notice to) Manager, to terminate the License Agreement, provided, however, that (i) Owner shall have no such right in order to establish its own independent operations, such as an operation without a franchise or license or in its own hotel name; (ii) in the event of such a termination by Owner, Manager shall have the right of approval (which right shall be reasonably exercised) of any new franchise or license for the Hotel; and (iii) if Owner's decision to terminate the License Agreement is made without the consent of Manager, then the provisions of Section 18.2 of this Agreement shall no longer apply.

## ARTICLE 33
## RECOURSE

Any provision of this Agreement to the contrary notwithstanding, Manager hereby agrees that no personal, partnership or corporate liability of any kind or character (including, without limitation, the payment of any judgment) whatsoever now attaches or at any time hereafter under any condition shall attach to Owner or any of Owner's constituent entities and affiliates or any mortgagee for payment of any amount payable under this Agreement or for the performance of any obligation under this Agreement. The exclusive remedies of Manager for the failure of Owner to perform any of its obligations under this Agreement shall be to proceed against the interest of Owner in and to the Hotel for Manager's actual, out-of-pocket damages (and not any consequential, punitive or exemplary damages), and Owner shall not be personally liable for any deficiency.

*The rest of this page is intentionally left blank.*

IN WITNESS WHEREOF, Owner has caused this Agreement to be executed and its seal affixed by its partners duly authorized thereunto and Manager has caused this Agreement to be executed and its seal affixed by its officer duly authorized thereunto, the day and year first above written, in duplicate.

**<u>OWNER</u>**:

**RREAF O&G PORTFOLIO #2 LLC**


By: _____
Name: Jeff Schaffer
Title: Chief Executive Officer


**<u>MANAGER</u>**:

**CHANNEL POINT HOSPITALITY LLC**


By: _____
Name: _____
Title: _____

**<u>Signature Page to Management Agreement – Page Solo</u>**
LA QUINTA INNS & SUITES PORT ARTHUR

## EXHIBIT A

## MAJOR ACCOUNT CATEGORIES

Room Sales
Telephone Sales
Food Sales
Beverage Sales
Miscellaneous Income

Room Expense
Telephone Expense
Food Expense
Beverage Expense
Miscellaneous Expense

A&G
Management Fee
Advertising & Business Promotion
R&M
H-L-P

Property Tax
Insurance
CEP Reserve
Leases

**EXHIBIT B**

**DESCRIPTION OF PREMISES**

BEING 1.351 acres of land out of and a part of Lot 7, Block 11, Range "J", Port Arthur Land Company Subdivision, City of Port Arthur, recorded in Volume 1, Page 22, Map Records, Jefferson County, Texas; being the same land conveyed to Ohm Shiv Parvati, Inc., recorded in File No. 2006028797, Official Public Records, Jefferson County, Texas; said 1.351 acre tract being more fully described by metes and bounds as follows, to wit:

COMMENCING at a 1/2" steel rod, capped and marked "TX-RPLS", found on the East right of way line of a dedicated road named US Highway 69, 96, 287 (a.k.a. Memorial Boulevard); said 1/2" steel rod being the Northwest corner of a (Called 0.0798) acre tract or and conveyed to Magna Properties, Ltd. recorded in File No. 2006027416, Official Public Records, Jefferson County, Texas;

THENCE, South 53 deg., 08 min., 08 sec., East (Called South 48 deg., 32 min., 23 sec., East), on the East right of way line of said US Highway 69, 96, 287, same being the West line of the (Called 0.0798) acre tract, a distance of 10.00' to a 1/2" steel rod, capped and marked "SOUTEX", found for the POINT OF BEGINNING; said 1/2" steel rod being the Southwest corner of the (Called 0.0798) acre tract and the Northwest corner of the herein described tract; having a State Plane Coordinate of N: 13922515.80, E: 3557674.59;

THENCE, North 36 deg., 38 min., 25 sec., East (Called North 41 deg., 14 min., 10 sec., East), on the South line of the (Called 0.0798) acre tract, a distance of 399.51' to a 1/2" Steel rod, found on the Westerly right of way line of a dedicated road named Anchor Drive Extension, recorded in File No. 2009002459, Official Public Records, Jefferson County, Texas; said 1/2" steel rod being the Northeast corner of the herein described tract;

THENCE, South 23 deg., 13 min., 35 sec., East (Called South 18 deg., 37 min., 50 sec., East), on the Westerly right of way line of said Anchor Drive Extension, a distance of 6.61' to a 1/2" steel rod, capped and marked "SOUTEX", found for corner;

THENCE, continuing on the Westerly right of way line of said Anchor Drive Extension on the arc of a curve to the left having a radius of 355.00', an arch length of 163.15', a chord bearing of South 35 deg., 56 min., 55 sec., East (Called South 31 deg., 21 min., 10 sec., East), a chord distance of 161.72' to a 1/2" steel rod, capped and marked "SOUTEX", found for the Northeast corner of a (Called 1.500) acre tract of land conveyed to Best Western Motel, recorded in File No. 2007001014, Official Public Records, Jefferson County, Texas; said 1/2" steel rod being the Southeast corner of the herein described tract; having a State Plane Coordinate of N: 13922699.37, E: 3558010.56;

THENCE, South 36 deg.; 37 min., 51 sec., West (Called South 41 deg., 13 min. 36 sec., West), on the North line of the (Called 1.500) acre tract, a distance of 353.83' to a 1/2" steel rod, capped and marked "SOUTEX"; found for the Northwest corner of the (Called 1.500) acre tract on the East right of way line of said US Highway 69, 96, 287; said 1/2" steel rod being the Southwest

<u>Exhibit B – Page 1</u>

corner of the herein described tract; having a State Plane Coordinate of N: 13922415.43, E: 3557799.44;

THENCE, North 47 deg., 33 min., 28 sec., West (Called North 42 deg., 57 min., 43 sec., West), on the East (right of way line of said US Highway 69, 96, 287, a distance of 54.68' to 1/2" steel rod found for corner;

THENCE, North 53 deg., 05 min., 20 sec., West (Called North 48 deg., 29 min., 35 sec., West), continuing on the East right of way line of said US Highway 69, 96, 287, a distance of 105.68' to the POINT OF BEGINNING and containing 1.351 acres of land, more or less.

**Exhibit B – Page 2**

## EXHIBIT C

## EXAMPLE OF MONTHLY TRANSACTIONS REPORT

```
10/09/12  11:35 am                              P&L EXAMPLE ENTITY                              Day  Page:   1
                                                INCOME STATEMENT
                                                End of Year 2012

ACTUAL      %    BUDGET     %   LAST YEAR    %                         ACTUAL     %    BUDGET     %   LAST YEAR    %
--------  -----  ------  ------  --------  -----  ----                 ------  -----  ------  ------  --------  -----
     0    0.00       0   0.00        0   0.00  Total Avl Rooms            0   0.00       0   0.00        0   0.00
     0    0.00       0   0.00        0   0.00  # Room/Occ %               0   0.00       0   0.00        0   0.00
     0    0.00       0   0.00        0   0.00  Revenue/Average Rate       0   0.00       0   0.00        0   0.00
     0    0.00       0   0.00        0   0.00  RevPar                     0   0.00       0   0.00        0   0.00

     0    0.00       0   0.00        0   0.00  ----------REVENUES----------
     0    0.00       0   0.00        0   0.00  Rooms                      0   0.00       0   0.00        0   0.00
     0    0.00       0   0.00        0   0.00  F&B Revenue                0   0.00       0   0.00        0   0.00
     0    0.00       0   0.00        0   0.00  Communications             0   0.00       0   0.00        0   0.00
     0    0.00       0   0.00        0   0.00  Minor Op Depts.            0   0.00       0   0.00        0   0.00
     0    0.00       0   0.00        0   0.00  Rent/Other                 0   0.00       0   0.00        0   0.00
--------       ------         --------          ----                 ------         ------         --------
     0    0.00       0   0.00        0   0.00  TOTAL REVENUES             0   0.00       0   0.00        0   0.00

     0    0.00       0   0.00        0   0.00  -----DEPARTMENTAL EXPENSES----
     0    0.00       0   0.00        0   0.00  Rooms                      0   0.00       0   0.00        0   0.00
     0    0.00       0   0.00        0   0.00  Food & Beverage            0   0.00       0   0.00        0   0.00
     0    0.00       0   0.00        0   0.00  Communications             0   0.00       0   0.00        0   0.00
     0    0.00       0   0.00        0   0.00  Minor Operating            0   0.00       0   0.00        0   0.00
     0    0.00       0   0.00        0   0.00  Rent & Other               0   0.00       0   0.00        0   0.00
--------       ------         --------          ----                 ------         ------         --------
     0    0.00       0   0.00        0   0.00  TOTAL DEPARTMENTAL EXPENSES  0 0.00       0   0.00        0   0.00

     0    0.00       0   0.00        0   0.00  -----DEPARTMENTAL PROFIT-----
     0    0.00       0   0.00        0   0.00  Rooms                      0   0.00       0   0.00        0   0.00
     0    0.00       0   0.00        0   0.00  Food & Beverage            0   0.00       0   0.00        0   0.00
     0    0.00       0   0.00        0   0.00  Communications             0   0.00       0   0.00        0   0.00
     0    0.00       0   0.00        0   0.00  Minor Op Depts             0   0.00       0   0.00        0   0.00
     0    0.00       0   0.00        0   0.00  Rent/Other                 0   0.00       0   0.00        0   0.00
--------       ------         --------          ----                 ------         ------         --------
     0    0.00       0   0.00        0   0.00  GROSS OPER INCOME          0   0.00       0   0.00        0   0.00

     0    0.00       0   0.00        0   0.00  ----UNDISTRIBUTED EXPENSES----
     0    0.00       0   0.00        0   0.00  Admin & General            0   0.00       0   0.00        0   0.00
     0    0.00       0   0.00        0   0.00  Advertising                0   0.00       0   0.00        0   0.00
     0    0.00       0   0.00        0   0.00  Sales/Marketing            0   0.00       0   0.00        0   0.00
     0    0.00       0   0.00        0   0.00  Repairs/Maintenance        0   0.00       0   0.00        0   0.00
     0    0.00       0   0.00        0   0.00  Energy                     0   0.00       0   0.00        0   0.00
--------       ------         --------          ----                 ------         ------         --------
     0    0.00       0   0.00        0   0.00  TOTAL UNDISTRIBUTED        0   0.00       0   0.00        0   0.00

     0    0.00       0   0.00        0   0.00  GROSS OPERATING PROFIT     0   0.00       0   0.00        0   0.00
```

**Exhibit C – Page 1**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
INCOME STATEMENT
End of Year 2012

jay  Page:  2

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Management Fee | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Franchise Fee | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | INCOME BEFORE FIXED CHARGES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | --------FIXED/OTHER-------- | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL FIXED/OTHER | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | EBITDA | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | PROFORMA  N O I | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | DEBT, DEPR/AMORT, CAP & OTHER | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL DEBT, DEPR/AMORT, CAP & | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | NET INC AVAIL/ TAXES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | --ADD BACKS & SUBTRACTIONS-- | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | NET OPERATING INCOME | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 2**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOMS DEPARTMENT
End of Year 2012

Jay  Page:   3

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUE | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | NET REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENTAL PROFIT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 3**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
ROOMS DEPARTMENT
End of Year 2012

jay  Page:   4

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|--------|---|--------|---|-----------|---|---|--------|---|--------|---|-----------|---|
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 4**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOM STATISTICS
End of Year 2012

jay  Page:    5

| | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPIED ROOMS | | | | | | | | | | | | | |
| TOTAL TRANSIENT | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| TOTAL GROUP | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| TOTAL SOLD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| TOTAL OCCUPIED | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| TOTAL AVAILABLE ROOMS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**<u>Exhibit C – Page 5</u>**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
ROOM STATISTICS
End of Year 2012

jay  Page:    6

| ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUE/AVERAGE RATES | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL TRANSIENT | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL GROUP | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL PAYING RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL ROOMS OTHER | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | OVERALL ROOM RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | REVPAR | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 6**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOM STATISTICS
End of Year 2012

jay  Page:    7

| ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **SALARIES / WAGES** | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | Guest Services | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL SALARIES / WAGES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | **BENEFITS** | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL BENEFITS | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & BENEFITS | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | DEPARTMENTAL PROFIT | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 7**

6444430v.1

10/08/12 11:35 am

P&L EXAMPLE ENTITY
ROOM STATISTICS
End of Year 2012

jay Page: 8

| ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | TOTAL OTHER EXPENSES | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |

**Exhibit C – Page 8**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
FOOD & BEVERAGE CONSOLIDATED
End of Year 2012

Jay  Page:   9

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **FOOD REVENUE** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | NET FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **BEVERAGE REVENUE** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | NET BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **OTHER REVENUE** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | NET OTHER REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 9**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
FOOD & BEVERAGE CONSOLIDATED
End of Year 2012

jay  Page:  10

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OVERALL NET FOOD COST | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OVERALL NET BEVERAGE COST | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OTHER COST | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL COST OF GOODS SOLD | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | GROSS PROFIT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES/WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL GENERAL | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES/WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Payroll Taxes & Benefits | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENTAL PROFIT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 10**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
FOOD & BEVERAGE CONSOLIDATED
End of Year 2012

jay  Page:   11

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

<u>**Exhibit C – Page 11**</u>

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

jay  Page:  12

| | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **COVERS & CAPTURE** | | | | | | | | | | | | | |
| TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| **FOOD REVENUE & AVG CHECK** | | | | | | | | | | | | | |
| TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| **BEVG REVENUE & RPOR** | | | | | | | | | | | | | |
| TOTAL BEVG REVENUE & RPOR | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| **BEVG REVENUE & % FOOD** | | | | | | | | | | | | | |
| TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 12**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

Jay  Page:  13

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ROOM SERVICE | | | | | | |
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ================================ | | | | | | |
| | | | | | | RESTAURANT 1 | | | | | | |
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ================================ | | | | | | |
| | | | | | | BANQUETS | | | | | | |
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 13**

10/09/12  11:35 am

F&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

jay Page:   14

| | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | | CATERING | | | | | | |
| | | | | | | | COVERS | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | | BANQUETS & CATERING | | | | | | |
| | | | | | | | COVERS | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | | LOUNGE 1 | | | | | | |
| | | | | | | | BEVG REVENUE & BPCR | | | | | | |

**Exhibit C – Page 14**

6444430v.1

```
10/09/12  11:35 am                              P&L EXAMPLE ENTITY                                        Jay  Page:   15
                                                 F&B STATISTICS
                                                End of Year 2012

        ACTUAL     CALC      BUDGET     CALC    LAST YEAR  CALC                              ACTUAL     CALC      BUDGET    CALC    LAST YEAR  CALC
      ---------   ------   ---------   ------   ---------  ------                          ---------   ------   ---------  ------  ---------  ------
         0  $    0.00       0  $   0.00      0  $   0.00   TOTAL BEVG REVENUE & RPCR           0  $    0.00       0  $   0.00      0  $  0.00


                                                          -----------------------------
                                                          RESTAURANT 2
                                                          COVERS & CAPTURE
                                                          -----------------
         0       0.00       0      0.00      0      0.00   TOTAL COVERS & CAPTURE              0       0.00       0      0.00      0      0.00
                                                          FOOD REVENUE & AVG CHECK
                                                          -----------------------
         0  $    0.00       0  $   0.00      0  $   0.00   TOTAL FOOD REVENUE & AVG CHECK      0  $    0.00       0  $   0.00      0  $  0.00
                                                          BEVG REVENUE & % FOOD
                                                          ---------------------
         0       0.00       0      0.00      0      0.00   TOTAL BEVG REVENUE & % FOOD         0       0.00       0      0.00      0      0.00


                                                          -----------------------------
                                                          LOUNGE 2
                                                          BEVG REVENUE & RPCR
                                                          -------------------
         0  $    0.00       0  $   0.00      0  $   0.00   TOTAL BEVG REVENUE & RPCR           0  $    0.00       0  $   0.00      0  $  0.00

                                                          -----------------------------
                                                          CONFERENCE CENTER
                                                          COVERS & CAPTURE
                                                          -----------------
         0       0.00       0      0.00      0      0.00   TOTAL CAPTURE & COVERS              0       0.00       0      0.00             0.00
                                                          FOOD REVENUE & AVG CHECK
                                                          -----------------------
         0  $    0.00       0  $   0.00      0  $   0.00   TOTAL FOOD REVENUE & AVG CHECK      0  $    0.00       0  $   0.00      0  $  0.00
                                                          BEVG REVENUE & % FOOD
```

**Exhibit C – Page 15**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

Jay  Page:   16

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

IN ROOM BAR

REVENUE & RPOR

| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL REVENUE & RPOR | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 16**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOM SERVICE
End of Year 2012

Jay  Page:  17

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 17**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
RESTAURANT 1
End of Year 2012

Joy  Page:  18

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **FOOD REVENUES** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 18**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
BANQUETS & CATERING
End of Year 2012

jay  Page:  19

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | CATERING | | | | | | |
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 19**

6444430v.1

P&L EXAMPLE ENTITY
BANQUETS & CATERING
End of Year 2012

jay Page:   20

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | TOTAL BANQUETS & CATERING | | | | | | |
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL COMBINED REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARY / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 20**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
BANQUETS & CATERING
End of Year 2012

Jay  Page:  21

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | BANQUETS | | | | | | |
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 21**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
LOUNGE 1
End of Year 2012

jay  Page:  22

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPT REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 22**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
COMMUNICATIONS
End of Year 2012

joy  Page:   23

| ACTUAL | | $POR/% | BUDGET | | $POR/% | LAST YEAR | | $POR/% | | ACTUAL | | $POR/% | BUDGET | | $POR/% | LAST YEAR | | $POR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | REVENUES | | | | | | | | | |
| 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 | TOTAL PHONE REVENUE | 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 |
| 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 | NET PHONE REVENUE | 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 |
| 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 | TOTAL INTERNET REVENUE | 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 |
| 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 | NET INTERNET REVENUE | 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 |
| 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 | NET COMBINED REVENUES | 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 |
| | | | | | | | | | COSTS OF SALES: | | | | | | | | | |
| 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 | COS PHONE | 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 |
| 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 | COS INTERNET | 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 |
| 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 | TOTAL COST OF ALL SALES | 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 |
| 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 | GROSS PROFIT/(LOSS) | 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 |
| 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 | Payroll Taxes & Benefits | 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 |
| 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 | TTL WAGES & BENEFITS | 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 |
| 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 | TOTAL PROFIT/(LOSS) | 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 |

**Exhibit C – Page 23**
6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
IN HOUSE MOVIES
End of Year 2012

Jay  Page:  24

| ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% | | ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUES | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | NET REVENUE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 24**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
GUEST LAUNDRY
End of Year 2012

Jay  Page:   25

| | ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% | | ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REVENUES | | | | | | | | | | | | | |
| NET REVENUE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| GROSS PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| TTL WAGES & BENEFITS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| TOTAL PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 25**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
RENTS & OTHER INCOME
End of Year 2012

jay  Page:  26

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SPACE RENTALS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL RENTALS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | COMMISSIONS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL COMMISSIONS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | MISCELLANEOUS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL MISCELLANEOUS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL RENTS/OTHER INCOME | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 26**

6444430v.1

10/05/12  11:35 am              P&L EXAMPLE ENTITY             jay Page:   27
                                   A&G
                          End of Year 2012

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL A&G EXP | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**<u>Exhibit C – Page 27</u>**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
SALES & MARKETING
End of Year 2012

Jay  Page:  28

| | ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GROUP | | | | | | | | | | | | | |
| TTL GROUP | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| TRANSIENT | | | | | | | | | | | | | |
| Newspaper | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| TTL TRANSIENT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| OTHER EXPENSES | | | | | | | | | | | | | |
| Contingency | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| TTL NON-MEDIA | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| GRAND TTL ADVERTISING | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 28**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
SALES & MARKETING
End of Year 2012

Jay  Page:  29

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Incentive/Svc Charge | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALES & ADVERTISING | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 29**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
REPAIRS & MAINTENANCE
End of Year 2012

Jay  Page:   30

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|--------|---|--------|---|-----------|---|---|--------|---|--------|---|-----------|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Grnds & Land - Outdoor | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Rent - Equipment | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL R&M EXPENSE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

<u>**Exhibit C – Page 30**</u>

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ENERGY
End of Year 2012

jay  Page:   31

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL ENERGY | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL ENERGY | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 31**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
FIXED & OTHER CHARGES
End of Year 2012

jmy  Page:   32

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|--------|---|--------|---|-----------|---|---|--------|---|--------|---|-----------|---|
| | | | | | | FEES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FEES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | RENTS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL RENTS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | LEASES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL LEASES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | INSURANCE | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL INSURANCE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | REAL ESTATE TAXES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REAL ESTATE TAXES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER TAXES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER TAXES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | PARTNERSHIP EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL PARTNERSHIP EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | INTEREST EXPENSE | | | | | | |

**Exhibit C – Page 32**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
FIXED & OTHER CHARGES
End of Year 2012

jay Page:    33

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|--------|---|--------|---|-----------|---|---|--------|---|--------|---|-----------|---|
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL INTEREST EXPENSE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | REIT LEASE | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REIT LEASE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | MISC NON EBITDA | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL MISC NON EBITDA | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | DEPRECIATION/AMORTIZATION &OT | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPRECIATION & AMORTIZAT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | FFE & ADDBACKS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FFE & ADDBACKS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FIXED EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 33**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
EE CAFE
End of Year 2012

Jay  Page:   34

| | ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SALARIES / WAGES | | | | | | | | | | | | | |
| TTL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| BENEFITS | | | | | | | | | | | | | |
| TTL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| OTHER EXPENSES | | | | | | | | | | | | | |
| TTL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| TOTAL EE CAFE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Allocation to PTEB | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| FINAL EE CAFE TOTAL | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 34**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
PT & ER
End of Year 2012

Jay  Page:   35

| | ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **TAXES** | | | | | | | | | | | | | |
| TOTAL TAXES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| **HEALTH INSURANCE** | | | | | | | | | | | | | |
| TOTAL HEALTH INSURANCE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| **OTHER EXPENSES** | | | | | | | | | | | | | |
| 401k Match | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| TOTAL PT & ER | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

% Column is % Total Wages

**Exhibit C – Page 35**

6444430v.1

10/05/12  11:35 am                                    P&L EXAMPLE ENTITY                              Jay  Page:   36
                                                          PT & KB
                                                      End of Year 2012

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

                                                    DISTRIBUTED TO:

| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DISTRIBUTION | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 36**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
PT & EB
End of Year 2012

jay  Page:  37

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES, WAGES & INCENTIVES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Total Food & Beverage | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | GROSS TTL WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | S&W, INCENTIVES, PAID TIME OFF | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Lounge 1 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Total Foood & Beverage | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL ALL PAID WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 37**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
HOUSE LAYMONT
End of Year 2012

jay  Page:  38

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES & WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | DISTRIBUTED TO: | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DISTRIBUTION | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 38**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay  Page:  39

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| ASSETS | | | | | |
| CASH | | | | | |
| TOTAL CASH | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| SEMI-RESTRICTED CASH | | | | | |
| TOTAL SEMI-RESTRICTED CASH | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| RECEIVABLES | | | | | |
| TOTAL RECEIVABLES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| INVENTORIES | | | | | |
| TOTAL INVENTORIES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OPERATING EQUIPMENT | | | | | |
| TOTAL OPERATING EQUIPMENT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Exhibit C – Page 39**

6444430v.1

10/08/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay  Page:  40

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| PREPAIDS | | | | | |
| TOTAL PREPAIDS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| FIXED ASSETS | | | | | |
| Accum Amortization | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL FIXED ASSETS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OTHER ASSETS | | | | | |
| TOTAL OTHER ASSETS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL ASSETS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Exhibit C – Page 40**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay  Page:   41

| | This<br>Month End | Last<br>Month End | Monthly<br>Change | This Month<br>Last Year | Yearly<br>Change |
|---|---|---|---|---|---|
| **LIABILITIES** | | | | | |
| **PAYABLES** | | | | | |
| TOTAL PAYABLES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **DEPOSITS** | | | | | |
| TOTAL DEPOSITS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **OF TAXES AND WITHHOLDINGS** | | | | | |
| TOTAL OF TAXES AND WITHHOLDING | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **ACCRUED OPERATING EXPENSES** | | | | | |
| TTL ACCRUED OPERATING EXPENSES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Exhibit C – Page 41**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay Page:  42

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| **DUE TO/FROM ACCOUNTS** | | | | | |
| Due to XX St Paul | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Due to REIT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL DUE TO/FROM ACCOUNTS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **OTHER LIABILITIES** | | | | | |
| TOTAL OTHER LIABILITIES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **NOTES PAYABLE** | | | | | |
| TOTAL NOTES PAYABLE | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL LIABILITIES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **OWNERS EQUITY** | | | | | |
| Retained Earn - Prior Years | 0.00 | 0.00 | 0.00 | 695.02- | 695.02 |
| Retained Earn - Current Yr | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL OWNERS EQUITY | 0.00 | 0.00 | 0.00 | 695.02- | 695.02 |
| TOTAL LIAB. & OWNERS EQUITY | 0.00 | 0.00 | 0.00 | 695.02- | 695.02 |

**Exhibit C – Page 42**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFIK REPORT
End of Year 2012

Jay  Page:   43

| | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | FULL TIME EQUIVALENT | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | | SUMMARY HOURS & FTE | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOTEL | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | | SUMMARY WAGES & AVG RATE | | | | | | |
| | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 43**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFIR REPORT
End of Year 2012

bay  Page:  44

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ROOMS DEPARTMENT | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL OCCUPIED ROOMS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Room Attendant - Total | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | House Attendant - Total | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | Room Attendant - Total | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | House Attendant - Total | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL WAGES & AVG RATE | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| | | | | | | HOURS & FTE | | | | | | |
| | | | | | | FOOD & BEVERAGE SUMMARY | | | | | | |
| | | | | | | FOOD COVERS | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PROD / TOTAL COV | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVERAGE RATE | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL WAGES & AVG RATE | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 44**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EPIK REPORT
End of Year 2012

Jay  Page:  45

| | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| =============================== | | | | | | | | | | | | | |
| A&G | | | | | | | | | | | | | |
| HOURS & FTE | | | | | | | | | | | | | |
| TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 45**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY KPIB REPORT
End of Year 2012

jay Page:  46

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ROOM SERVICE | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | RESTAURANT 1 | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | RESTAURANT 2 | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 46**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY RPTG REPORT
End of Year 2012

jay  Page:  47

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|--------|------|--------|------|-----------|------|--|--------|------|--------|------|-----------|------|
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ================================ | | | | | | |
| | | | | | | BANQUETS & CATERING | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ================================ | | | | | | |
| | | | | | | CONFERENCE CENTER | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | HOURS & FTE | | | | | | |

**Exhibit C – Page 47**

6444430v.1

```
10/09/12  11:35 am                              P&L EXAMPLE ENTITY                                    Jay  Page:   49
                                               MONTHLY RPTS REPORT
                                               End of Year 2012

        ACTUAL    CALC      BUDGET    CALC      LAST YEAR  CALC                          ACTUAL    CALC      BUDGET    CALC      LAST YEAR  CALC
        --------  ------    --------  ------    ---------  ------                        --------  ------    --------  ------    ---------  ------
                                                                    ------------
            0     0.00          0     0.00          0     0.00      TOTAL HOURS & FTE        0     0.00          0     0.00          0     0.00


                                                                    ====================================
                                                                    LOUNGE 1
                                                                    ------------
            0     0.00          0     0.00          0     0.00      COVERS                   0     0.00          0     0.00          0     0.00
            0     0.00          0     0.00          0     0.00      TOTAL REVENUE            0     0.00          0     0.00          0     0.00
                                                                    HOURS & PRODUCTIVITY
                                                                    --------------------
            0     0.00          0     0.00          0     0.00      TOTAL HOURS & PRODUCTIVITY  0  0.00          0     0.00          0     0.00
                                                                    WAGES & AVG RATE
                                                                    ----------------
            0  $  0.00          0  $  0.00          0  $  0.00      TOTAL WAGES & AVG RATE   0  $  0.00          0  $  0.00          0  $  0.00
                                                                    HOURS & FTE
                                                                    -----------
            0     0.00          0     0.00          0     0.00      TOTAL HOURS & FTE        0     0.00          0     0.00          0     0.00


                                                                    ====================================
                                                                    LOUNGE 2
                                                                    ------------
                                                                    HOURS & PRODUCTIVITY
                                                                    --------------------
            0     0.00          0     0.00          0     0.00      TOTAL HOURS & PRODUCTIVITY  0  0.00          0     0.00          0     0.00
                                                                    WAGES & AVG RATE
                                                                    ----------------
            0  $  0.00          0  $  0.00          0  $  0.00      TOTAL WAGES & AVG RATE   0  $  0.00          0  $  0.00          0  $  0.00
                                                                    HOURS & FTE
                                                                    -----------
            0     0.00          0     0.00          0     0.00      TOTAL HOURS & FTE        0     0.00          0     0.00          0     0.00
```

**Exhibit C – Page 48**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFTK REPORT
End of Year 2012

Jay  Page:  49

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **IN ROOM BASE** | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL OCCUPIED ROOMS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & HRS PER OCC ROOM | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & HOURS PER OCC RO | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | TOTAL WAGES & AVG RATE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 49**

6444430v.1

10/08/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFIK REPORT
End of Year 2012

Jay  Page:   50

| | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CONTRACT LABOR | | | | | | | | | | | | | |
| HOURS & FTE | | | | | | | | | | | | | |
| WAGES & AVG RATE | | | | | | | | | | | | | |
| FOOD & BEVERAGE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |
| TOTAL WAGES & AVG RATE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |

**Exhibit C – Page 50**

6444430v.1

**EXHIBIT D**

**INSURANCE REQUIREMENTS**

1.     **Insurance Requirements for the Hotel**:

General Liability - $1,000,000 per Occurrence/$2,000,000 General and Product Liability Aggregate per Location

Including:
1. Products and Completed Operations
2. Contractual Liability
3. Personal Injury
4. Incidental Medical Malpractice
5. Molestation and Abuse are not Excluded
6. Punitive Damages unless Excluded by Public Policy
7. Fellow Employee Coverage
8. Garage Keepers Liability
9. Liquor Liability
10. Blanket Additional Interests
    a. All Managers or Lessors of Premises
    b. All mortgagors of Premises
    c. Vendors
    d. Volunteer Workers
    e. As required by Contract
11. Severability of Interests
12. Waiver of Subrogation as Required by Contract
13. Terrorism not Excluded or Sub-Limited
14. No Deductible/SIR
15. Coverage is Designated to the Scheduled Premises and is Primary and Non-Contributory

Commercial Automobile - $1,000,000 – Any Auto

Including:
1. Medical Payments - $5,000 per person
2. Personal Injury Protection – As required by State
3. Property Protection Insurance – As required by State
4. Uninsured Motorists - $1,000,000 Limit
5. Underinsured Motorists - $1,000,000 Limit
6. Physical Damage (Owned and Hired Autos) – Comprehensive $1,000 Deductible
7. Physical Damage (Owned and Hired Auto) – Collision $1,000 Deductible
8. Auto Loan/Lease Gap Coverage

Umbrella Liability - $25,000,000 per Occurrence/ $25,000,000 Aggregate per Location

      Including:
1. Retained Limit – 0
2. Follows Scheduled Underlying Policies

Workers Compensation – Provided in All States except as Provided by the State Funds of – ND, OH, WA, WV, WY

Medical Benefits – Statutory
1. Indemnity – Statutory
2. Employers Liability - $500,000
    a. Each Accident
    b. Disease - Each Employee
    c. Disease – Policy Limit

Crime - $1,000,000 Occurrence Limit S/T/A $10,000 per Occurrence Deductible Covering:
1. Employee Theft
2. Forgery or Alteration
3. Computer Fraud
4. Funds Transfer Fraud
5. Theft of Money & Securities
    a. Inside the Premises
    b. Outside the Premises

Guest Property - $10,000 Limit per Occurrence
1. $1,000 deductible
2. Liability Governed by Statute

Professional Liability - $1,000,000 Each Claim / $2,000,000 Aggregate for All Claims
1. Claim Includes Identifiable Loss and Defense Cost
2. A $25,000 Deductible Applies to Loss and Defense

Employment Practices Liability
1. $2,000,000 Aggregate for All Loss Combined (Including Defense Cost)
2. Retention $25,000

2. **Insurance Requirements for Major Contractors**:

    (a)    Worker's Compensation - Statutory amount or its equivalent under applicable law.

<u>**Exhibit D – Page 2**</u>

(b) Employer's Liability - $500,000 minimum, where required by applicable or equivalent law.

(c) Comprehensive General Liability; **either**

 (i)  $100,000 Bodily Injury per Person
   $300,000 per Occurrence
   $100,000 Property Damage

   **-or-**

 (ii)  $1,000,000 combined single limit

6444430v.1

**EXHIBIT E**

**COMPETITIVE SET**



**Exhibit E – Solo Page**
6444430v.1

**MANAGEMENT AGREEMENT**

between

**RREAF O&G PORTFOLIO #3 LLC**
as Owner


and


**CHANNEL POINT HOSPITALITY LLC**
as Manager


FOR

**COMFORT INN MIDLAND**
910 West Interstate 20
Midland, Texas 79701

## MANAGEMENT AGREEMENT

This Management Agreement (the "**Agreement**") made this ___ day of February 2016 between RREAF O&G PORTFOLIO #3 LLC, a Delaware limited liability company (**"Owner"**), as Owner, and **CHANNEL POINT HOSPITALITY LLC**, a Texas limited liability company (**"Manager"**), as Manager.

## RECITALS:

A.      Owner is the fee owner of the Hotel (as defined below).

B.      Manager is experienced in the management and operation of hotels, directly and through affiliated entities.

C.      Owner and Manager desire to enter into this Agreement for the management and operation of the Hotel in accordance with the terms and conditions and subject to the limitations contained in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner and Manager covenant and agree as follows:

## ARTICLE 1
## DEFINITIONS, TERMS AND REFERENCES

1.1      Definitions. In this Agreement and any Exhibits, the following terms shall have the following meanings:

"**Account Category**" shall include the major account categories set forth in Exhibit A attached hereto and made a part hereof as well as other major account categories, which are applicable to the Hotel consistent with the Statement of Income as defined by the Uniform System of Accounts or otherwise approved by Owner.

"**Accounting Fee**" shall have the meaning set forth in Article 11.

"**Accounting Period**" shall mean each calendar month (whether of 28, 29, 30 or 31 days) during each Fiscal Year.

"**Affiliate**" shall mean any person or entity that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with another person or entity. The term "**control**" (and correlative terms) shall mean the power, whether by contract, equity ownership or otherwise, to direct the policies or management of a person or entity. Without limiting the foregoing, an "**Affiliate**" also includes any partner or a partnership of any party to this Agreement, any member or membership parties thereto and any corporation, partnership, individual or trust related to or controlling or controlled by such partnership, individual or trust related to or controlling or controlled by such partnership party or its partners

**Management Agreement – Page 1**

or such membership party or its members. A natural person is related to another natural person if he or she is a spouse, parent, or lineal descendant of the other person.

"**Allocated Services**" shall mean certain support services that Manager obtains from a third party and provides on a central or regional basis to the hotels that it manages because such support services can be provided on a more efficient, effective and economical basis to each individual Manager managed hotel if the expenses of such support services are shared by other Manager managed hotels. Such support services include services in the areas of sales and marketing, food and beverage, human resources, insurance, technology, training and payroll (each such service, an "**Allocated Service**"; collectively, the "**Allocated Services**"). Owner and Manager agree that Manager shall provide Allocated Services to the Hotel and that the Hotel's portion of the cost thereof shall constitute a Gross Operating Expense so long as (i) the costs of the Allocated Services are allocated in good faith on a uniform, fair, equitable and proportionate basis among the Hotel and the other Manager managed hotels benefiting therefrom; and (ii) the Allocated Services shall not include services that do not benefit the Hotel; and (iii) the cost of the Allocated Services are either (a) included by Manager in each Annual Operating Budget or (b) otherwise approved in writing by Owner. The cost of the Allocated Services and the allocation of that cost to the Hotel and other Manager managed hotels shall be subject to audit by Owner pursuant to the terms of Section 10.3 of this Agreement. Manager further agrees that the benefit of any discounts or rebates received by Manager with respect to any of the Allocated Services shall be passed on to the Hotel on a proportionate basis as compared to other hotels managed by Manager or its Affiliates.

"**Annual Operating Budget**" shall mean an annual operating projection for the Hotel prepared and submitted by Manager to Owner and approved by Owner for each Fiscal Year pursuant to Section 4.4(a).

"**Annual Plan**" shall mean an annual business plan for the operation of the Hotel prepared by the Manager and approved by the Owner, which shall include the Annual Operating Budget, the Approved Capital Budget, the Marketing Plan and the Management Plan and any other material included therein by Manager as provided in Section 4.4.

"**Approved Capital Budget**" shall have the meaning set forth in Section 4.4(b).

"**Base Fee**" shall have the meaning set forth in Article 11.

"**Building and Appurtenances**" shall mean (i) the 61 room hotel building located on the Premises, and (ii) landscaping and other related facilities, together with all installations located at, or used in connection with the operation of the building for hotel purposes including, without limitation, any swimming pools, health club and recreational facilities, walkways, parking facilities, heating, lighting, sanitation equipment, air conditioning, laundry facilities, refrigeration, built-in kitchen equipment, and elevators.

"**Capital Budget**" shall mean Manager's proposed estimate of FF&E and Capital Improvements submitted to Owner each Fiscal Year pursuant to Section 4.4(b).

"**Capital Improvements**" shall have the meaning set forth in Section 8.2 hereof.

"**Commencement Date**" shall mean the date on which Manager assumes the management and operation of the Hotel under this Agreement for the benefit of Owner.

"**Competitive Set**" shall mean the properties listed on Exhibit E attached hereto and any revisions to such list agreed upon by Owner and Manager from time to time.

"**CPI**" shall mean the Consumer Price Index for All Urban Consumers, United States City Average, All Items (1982-84=100), issued by the Bureau of Labor Statistics of the United States Department of Labor.

"**Default Rate**" shall mean the lesser of (i) the Prime Rate plus four percent (4%) per annum or (ii) the highest lawful rate permitted by applicable Legal Requirements from time to time.

"**Effective Date**" shall mean the date of this Agreement as set forth on page 1 hereof.

"**Event of Default**" shall mean any of the events described in Article 16, provided that any condition contained therein for the giving of notice or the lapse of time, or both, has been satisfied.

"**Executive Personnel**" shall mean the general manager and the director of sales of the Hotel.

"**Fiscal Year**" shall mean the fiscal year that ends on the last day of each calendar year. The first Fiscal Year shall be the period commencing on the Commencement Date and ending on December 31st of the same calendar year in which the Commencement Date occurs. The words "full Fiscal Year" shall mean any Fiscal Year containing not fewer than 365 days. A partial Fiscal Year after the end of the last full Fiscal Year and ending with the expiration or earlier termination of the Term shall constitute a separate Fiscal Year.

"**Furniture, Fixtures and Equipment**" or "**FF&E**" shall mean all furniture, furnishings, wall coverings, fixtures, carpeting, rugs, fine arts, paintings, statuary, decorations, and hotel equipment and systems (including the costs associated with the purchase, installation and delivery thereof) located at, or used in connection with, the operation of the Building and Appurtenances as a hotel, including without limitation, major equipment and systems required for the operation of kitchens, bars, laundry and dry cleaning facilities, office equipment, dining room wagons, major material handling equipment, major cleaning and engineering equipment, telephone systems, computerized accounting and vehicles (including the costs associated with the purchase, installation and delivery thereof) together with all replacements therefor and additions thereto, but in all events excluding Operating Equipment and Supplies.

"**GOP  Threshold**" ███████████████████████████████████████
████████████████████████████████████████████████████████████

"**Gross Operating Expenses**" shall mean the following expenses actually incurred in the operation of the Hotel:

1.     Cost of sales; salaries, wages, bonuses, payroll taxes; the cost of social insurance which shall include, but not be limited to, life, medical, disability insurance, retirement and other benefits incurred by Manager related to Hotel Employees;

2.     Departmental expenses; administrative and general expenses; the cost of third party vendor sources engaged to print payroll checks and reports or to perform any other services hereunder; the Accounting Fee; the Revenue Management Fee; advertising and business promotion for the Hotel; franchise fees, chain reservation fees and all other fees relating to the License Agreement; the cost of utilities, service contracts; and repairs and maintenance;

3.     The cost of replacing Operating Equipment and Supplies and Inventories as defined herein.

4.     The cost of uncollectible accounts receivables as reasonably determined by the Manager.

5.     The Owner-approved costs and expenses of technical consultants and operational experts for specialized services in connection with non-routine hotel work including roofing consultants, environmental engineers and others.

6.     The cost of insurance as set forth in this Agreement.

7.     The Management Fee.

8.     Real estate and personal property taxes levied or assessed against the Hotel and other like charges.

9.     Allocated Services.

10.  All other costs and expenses incurred in connection with the operation of the Hotel and otherwise approved as part of the Annual Plan or Annual Operating Budget, including but not limited to Reimbursable Expenses.

11.  Risk management costs.

12.  Legal services related to Hotel Employees or Hotel operations or services.

13.  Other amounts expressly set forth in this Agreement or the Annual Operating Budget as being included in Gross Operating Expenses.

All costs and fees of any Independent Public Accountants or other third parties who perform services approved by Owner (other than services provided by any Independent Public Accountants or other third parties in connection with services and/or reports required to be provided by Owner pursuant to the License Agreement) shall be paid by Owner and shall not constitute Gross Operating Expenses.

Except to the extent that the travel budget for Manager's personnel is included as a line item in the Annual Operating Budget, no part of Manager's central office overhead or general or

**Management Agreement – Page 4**

administrative expenses including the cost of travel by Manager's corporate or regional officers (other than Allocated Services) or for travel related to any other hotel operated by Manager or its Affiliates shall be deemed to be part of Gross Operating Expenses and all such costs and expenses shall be the sole responsibility of Manager.

"**Gross Operating Profit**" or "**GOP**" shall mean the amount of the remainder of Gross Revenues of the Hotel less the departmental expenses and undistributed expenses of the Hotel.

"**Gross Revenues**" shall mean for any applicable Accounting Period, all revenues and receipts of every kind derived from the Hotel and all departments and parts thereof during such Accounting Period, as finally determined on an accrual basis in accordance with the Uniform System of Accounts, including, but not limited to, revenues and income (both cash and credit transactions) before commissions and discounts for prompt or cash payments, from the rental of rooms and lobby space, exhibit or sales space of any kind, including without limitation, charges for reservations, deposits and cancellation fees not refunded to guests; income from vending machines, health club membership fees, wholesale and retail sales of merchandise, service fees and charges, business interruption insurance claims (but only for periods during the operating term) in respect of the Hotel, condemnation awards for temporary use of the Hotel, license, lease and concession fees and rentals (but not including the gross receipts of any licensees, lessees and concessionaires), food and beverages sales, and other sales of every kind conducted by, through or under Manager in connection with the Hotel. Gross Revenues shall not include (i) Federal, state and municipal excise, sales and use taxes or similar impositions collected directly from patrons or guests or included as part of the sales price of any goods or services; (ii) gratuities or service charges collected and paid to employees; (iii) credits or refunds to guests; (iv) proceeds arising from the sale or other disposition of property described in Section 1231 of the Internal Revenue Code or of capital assets; (v) proceeds from condemnation and payments received on account of insurance policies (other than the proceeds from business interruption insurance and from condemnation awards for temporary use of the Hotel when received); (vi) proceeds from claims for damages suffered by Manager or Owner, unless in recompense for a lost revenue item; and (vii) interest earned on the Reserve or Permitted Investments.

"**Hotel**" shall mean (a) the Building and Appurtenances and the Premises owned by Owner and (b) all FF&E, all Operating Equipment and Supplies, and all Inventories owned by Owner located at 910 West Interstate 20, Midland, Texas 79701.

"**hotel**" shall mean any hotel (other than the Hotel), inn, motor inn, motor hotel, motel, suite hotel, conference center, meeting center or any other facility providing either or both of short-term lodging and meeting arrangements.

"**Hotel Employees**" shall have the meaning set forth in Section 4.2.

"**Independent Public Accountant**" shall mean a nationally recognized firm of independent certified public accountants having hotel accounting experience, designated from time to time by Owner, subject to Manager's rights of approval, reasonably exercised.

"**Inventories**" shall mean "Inventories of Supplies" as defined in the Uniform System of Accounts, such as soap, toilet paper, stationery, writing pens, food and beverage inventories,

paper products, menus, expendable office and kitchen supplies, fuel, supplies and items similar to any of the foregoing.

"**Legal Proceedings**" shall mean all complaints, counterclaims or cross-claims filed in a court of competent jurisdiction, any notice of any claim of violation of any legal requirement by any governmental agency or authority, or any summons or other legal process, in each instance by or against the Hotel or by or against Owner, or Manager in connection with the Hotel.

"**Legal Requirements**" shall mean (a) all laws, ordinances, statutes, regulations and orders relating to the Hotel and the Premises now or hereafter in effect, including but not limited to, environmental laws and (b) all terms, conditions, requirements and provisions of (i) all Permits; (ii) all leases; and (iii) all liens, restrictive covenants and encumbrances affecting the Hotel or the Premises or any part thereof.

"**License Agreement**" shall mean the franchise or license agreement, if any, from time to time entered into by Owner with respect to the branding and operation of the Hotel. For the purposes of this definition, the following terms used in said section shall have the following meaning: "**Licensor**" shall mean the franchisor or licensor under the franchise or license agreement from time to time entered into by Owner with respect to the branding and operation of the Hotel; "**Licensee**" shall mean Owner; and the "**Manual**" shall mean the Licensor's operating manual and other manuals for Licensor described in its standard license agreement.

"**Major Renovations**" shall mean a contemporaneously made set or series of alterations, additions and/or improvements to the Hotel with a total cost in excess of $100,000 (or a lesser amount in the event a project with a total cost less than $100,000 requires material design and purchasing and installation services related thereto and/or results in a material alteration in the design of the Hotel), but shall not include any Repairs or Maintenance with respect to Capital Improvements or FF&E.

"**Manager**" shall have the meaning set forth in the introductory section of this Agreement.

"**Management Fee**" shall mean the Accounting Fee**,** Revenue Management Fee and Base Fee, all as set forth in Article 11 hereof.

"**Management Plan**" shall have the meaning set forth in Section 4.4(d).

"**Marketing Plan**" shall mean an annual marketing plan for the Hotel prepared and submitted by Manager to Owner and approved by Owner in each Fiscal Year pursuant to Section 4.4(c).

"**Mortgage**" shall mean, collectively, each of the documents evidencing or securing current or future indebtedness on the Hotel in favor of a third party lender or financial institution or any successor thereto or replacement thereof (the "**Lender**").

"**Net Operating Income**" or "**NOI**" shall mean the result of Gross Revenues less Gross Operating Expenses.

"**Open for Business**" shall mean the period of time during which all or substantially all of the Hotel is open for business to the general public.

"**Operating Account**" shall mean a special account or accounts, bearing the name of the Hotel, established by Manager in a federally insured bank or trust company selected by Owner.

"**Operating Equipment and Supplies**" shall mean supply items which constitute "Operating Equipment and Supplies" under the Uniform System of Accounts, all miscellaneous serving equipment, linen, towels, uniforms, silver, glassware, china and similar items.

"**Operating Standards**" shall mean the operation of the Hotel in a manner consistent with (i) the requirements under the License Agreement; (ii) the condition of the Hotel as of the Commencement Date (or, following completion of a Renovation, the condition of the Hotel as of the completion of the Renovation), normal wear and tear excepted; (iii) the condition and level of the operation of hotels of comparable class and standing to the Hotel in its market area; (iv) then current market conditions regarding rental rates and lease terms and conditions with respect to Hotels of comparable class and standing to the Hotel (including but not limited to the Competitive Set); and (v) then current business and management practices (including those related to compliance with Legal Requirements) applicable to the management, operation, leasing, maintenance and repair of a hotel comparable in size, character and location to the Hotel.

"**Owner**" shall have the meaning set forth in the introductory section of this Agreement.

"**Performance Standard**" shall have the meaning set forth in Section 18.2.

"**Permits**" shall mean all governmental or quasi-governmental licenses and permits, including but not limited to any certificate of occupancy, business licenses and liquor licenses.

"**Permitted Investments**" shall mean (subject to modification, addition or deletion from time to time at the option of Owner by written request to Manager) all of which shall be in the name of Owner:

(a)      interest-bearing deposit accounts (which may be represented by certificates of deposit, time deposit open account agreements or other deposit instruments) in commercial banks having a combined capital and surplus of not less than $50,000,000; or

(b)      all other investments approved by Owner.

"**Premises**" shall mean the land on which the Hotel is located, which land is described in Exhibit B attached hereto.

"**Prime Rate**" shall mean the rate per annum announced, designated or published from time to time by JP Morgan Chase Bank N.A. as its "prime", "reference" or "base" rate of interest for commercial loans.

"**Reimbursable Expenses**" shall mean all travel, lodging, entertainment, telephone, facsimile, postage, courier, delivery, employee training and other expenses incurred by Manager

in accordance with the standard policies for expenses incurred by Manager on its own behalf and which are directly related to its performance of this Agreement, but in no event will Reimbursable Expenses include or duplicate expenses for Manager's overhead or Allocated Services.

"**Renovation**" shall mean a renovation of any portion of the Hotel during the Term, pursuant to a plan proposed by Manager and approved by Owner to, among other things, bring the Hotel to a physical condition that satisfies the standards under the License Agreement and to operate in a manner consistent with the assumptions for the then-current Annual Operating Budget and then-current Annual Plan. A Renovation shall be carried out at the expense of Owner pursuant to plans and specifications and a schedule prepared by Manager and approved by Owner and, to the extent required under the License Agreement, by Licensor.

"**Repairs and Maintenance**" shall have the meaning as defined in Section 8.1.

"**Reserve**" shall mean an account maintained as a Permitted Investment for Reserve for replacement of FF&E and/or Capital Improvements, as described in Section 7.1 and funded as provided in Section 7.2.

"**Revenue Data Publication**" shall mean Smith's STR Report, a monthly publication distributed by Smith Travel Research, Inc., or an alternative source, reasonably satisfactory to both parties, of data regarding the average daily rate, occupancy and RevPAR of hotels in the general area of the Hotel, including, without limitation, the Competitive Set.

"**Revenue Management Fee**" shall have the meaning as defined in Section 11.

"**Revenue Per Available Room**" or "**RevPAR**" shall mean for any Test Period the number derived by dividing (i) net room revenue (in accordance with the Uniform System of Accounts), by (ii) the number of available guest rooms in the subject hotel.

"**RevPAR Threshold**" ████████████████████████████████████
████████████████████████████████

"**State**" shall mean the State in which the Hotel is located or other as designated.

"**Term**" shall mean the term of this Agreement, which shall be an initial five (5) year term commencing on the Commencement Date and expiring on the fifth (5th) anniversary of the Commencement Date, as such Term may be extended or shortened as expressly set forth in this Agreement or as otherwise agreed to by Owner and Manager.

"**Termination Fee**" ███████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████

<u>**Management Agreement – Page 8**</u>



"**Test Period**" shall mean each twelve (12) month period during the Term commencing on the first day of the seventh (7th) calendar month following the Commencement Date and each subsequent three (3) calendar months thereafter.  In the event that this Agreement shall terminate on a date other than the last day of a calendar year, the last Test Period shall end on the date of termination.  The term "full Test Period" means any Test Period containing not fewer than 365 days.

"**Third Party Purchaser**" shall have the meaning set forth in Section 18.1.

"**Unavoidable Interruptions**" shall mean interruptions in the operation of or access to the Hotel or any of its essential services on account of an interruption in any one or more of the utility services described in Section 13.2, or on account of labor disputes, strikes, lockouts, fire or other casualty, war, terrorist actions, acts of God and other similar causes beyond the reasonable control of the party claiming an unavoidable interruption, but never financial inability. Other than obligations accruing prior to the occurrence of such event of Unavoidable Interruption or obligations that, if not performed, would cause a material adverse effect on the Hotel or its operations (for instance, the requirement to maintain the Permits or insurance obligations hereunder), the obligations of the party hereunder shall be suspended during the period of an Unavoidable Interruption.

"**Uniform System of Accounts**" shall mean the Uniform System of Accounts for Hotels, 10th Revised Edition, 2006, as published by the Hotel Association of New York City, Inc. or any later edition thereof.

"**Working Capital**" shall mean and refer to the funds which are reasonably necessary for the day-to-day operation of the Hotel's business, including, without limitation, amounts sufficient for the maintenance of petty cash funds, operating bank accounts, receivables, payrolls, prepaid expenses, advance deposits, funds required to maintain inventories, and amounts due to/or from Manager and/or Owner less accounts payable and accrued current liabilities.

     1.2    **Terminology**. All personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, shall include all genders; the singular shall include the plural, and the plural shall include the singular. The titles of Articles, Sections and Subsections in

this Agreement are for convenience only, and neither limit nor amplify the provisions of this Agreement, and all references in this Agreement to Articles, Sections, Subsections, paragraphs, clauses, sub-clauses or exhibits shall refer to the corresponding Article, Section, Subsection, paragraph, clause or sub-clause of, or exhibit attached to, this Agreement, unless specific reference is made to the articles, sections or other subdivisions of, or exhibits to, another document or instrument.

     1.3    **Exhibits**. All exhibits and other attachments attached hereto are by this reference made a part of this Agreement.

## ARTICLE 2
## MANAGEMENT OF HOTEL

Owner hereby engages and appoints Manager, pursuant to the terms of this Agreement, to operate and manage the Hotel, and Manager hereby agrees and contracts to plan, operate, repair and manage the Hotel pursuant to the terms of this Agreement.

Subject to the terms of this Agreement, Hotel operations shall be under the exclusive supervision and control of Manager, which, except as otherwise specifically provided in this Agreement, shall be responsible for the proper and efficient operation**,** maintenance and repair of the Hotel in accordance with the terms of this Agreement. Except as specifically set forth in this Agreement, Manager shall have discretion and control respecting matters relating to management and operation of the Hotel, including, without limitation, charges for rooms and commercial space, credit policies, food and beverage services, other Hotel services, employment policies, granting of concessions or leasing of shops and agencies within the Hotel, receipt, holding and disbursement of funds, maintenance of bank accounts, procurement of inventories, supplies and services, promotion and publicity and, in general, all activities necessary for operation of the Hotel.

Manager shall devote its knowledge, experience and efforts to operate and manage the Hotel pursuant to this Agreement in a businesslike manner in accordance with the Operating Standards. Manager shall make available to Owner the full benefit of the judgment, experience and advice of the members of Manager's organization and staff with respect to the policies pursued by Owner in operating, maintaining, and servicing the Hotel.

## ARTICLE 3
## TERM

     3.1    **Term**. The initial Term automatically shall be extended beyond the initial Term for additional terms of one (1) year each, unless Owner provides written notice to Manager not less than one hundred twenty (120) days prior to the end of the initial Term or the then-current extended Term, as applicable, of Owner's intent not to extend the Term of the Agreement. Notwithstanding the foregoing, the Agreement may be terminated prior to the scheduled expiration of the Term or any extension thereof, (i) without cause by Owner during the first six (6) months following the Commencement Date, provided that Owner provides Manager with not less than thirty (30) days written notice of termination prior to the effective date of such termination, or (provided that in the event that the Workers' Adjustment and Retraining Act, 29

USC, Sec 2101, et seq. (the WARN Act") is applicable to such termination and the replacement manager identified by Owner fails or refuses to retain a sufficient number of employees at the Property so as not to cause a "mass layoff" or "plant closing" under the WARN Act, Owner will extend the effective date of termination to allow the required notices to be provided under the WARN Act, (ii) upon the sale of the Hotel to a bona fide Third Party Purchaser, as provided in Article 18 hereof, provided that Owner provides Manager with not less than sixty (60) days written notice of such termination; and (ii) as otherwise provided in Articles 15, 16, 17 and 18.

3.2    **Surrender.** On the expiration or sooner termination of the Term, Manager shall quit and surrender the Premises to Owner in the condition required pursuant to this Agreement and take such other actions as contemplated by Article 20 hereof.

## ARTICLE 4
## USE AND OPERATION OF THE HOTEL

4.1    **Operation**. Manager shall be the sole and exclusive manager of the Hotel during the Term and shall operate the Hotel in accordance with the Operating Standards and the provisions of this Agreement. Manager shall act in a fiduciary capacity with respect to the proper protection of and accounting for Owner's assets. In this capacity, Manager shall deal at arm's length with Owner and all third parties, and Manager shall manage the Hotel in a manner which shall serve the Owner's interests at all times.

4.2    **Employment**.

(a)    Subject to the terms of this Agreement, Manager shall select, employ, promote, transfer, compensate, terminate where appropriate, supervise, direct, train, and assign the duties of the Executive Personnel and, through the Executive Personnel, a sufficient number of personnel whom Manager reasonably determines to be necessary or appropriate for the proper, adequate and safe operation and management of the Hotel (collectively, the "**Hotel Employees**"). In connection therewith, Manager agrees to cause an employee or employees located in the corporate office of Manager, at no additional cost to Owner, to handle revenue management and sales management for this Property, together with other properties managed by Manager for Owner and its Affiliates. All such employees of the Hotel shall be employees of Manager or Manager's Affiliate. In addition, Manager may, from time to time, assign one or more of its employees to the staff of the Hotel on a full-time, part-time or temporary basis. Notwithstanding the provisions of this Section 4.2 or any other provision of this Agreement, all costs, expenses and liabilities relating to Hotel Employees shall be expenses of operating the Hotel and the responsibility of Manager for acts or omissions of Hotel Employees (or, for Hotel Employees who allocate their time between multiple hotels, an appropriate allocation of the costs for such Hotel Employees) shall not extend beyond responsibility for the gross negligence or willful misconduct of, or the willful violation of Legal Requirements by the Executive Personnel. Manager acknowledges that such Executive Personnel have the duties specified in the first sentence of this Section 4.2 with respect to other Hotel Employees. Manager will negotiate with any union lawfully entitled to represent such employees and may execute collective bargaining agreements or labor contracts resulting therefrom that have been approved by Owner. Manager shall fully comply with all Legal Requirements having to do with worker's compensation, social security, unemployment insurance, hours of labor, wages, working conditions, and other

employer-employee related subjects. With respect to matters of employment, this Agreement is not one of agency by the Manager for Owner but one with the Manager engaged independently in the business of managing properties on its own behalf as an independent contractor (as defined in §856(d)(3) of the Internal Revenue Code with regards to Owner and any Affiliates thereof). The cost of all employment arrangements shall be charged as Gross Operating Expenses of the Hotel and shall be accrued in accordance with generally accepted accounting principles; provided, however, relocation expenses which exceed the budgeted relocation expenses provided in the Annual Plan, shall not be charged as a Gross Operating Expense without the prior approval of Owner, such approval not to be unreasonably withheld, conditioned or delayed. The costs provided for in the immediately preceding sentence shall include, by way of example and not limitation, all reasonable costs and expenses (including, without limitation, all employment related expenses incurred by Manager with respect to the Hotel Employees), such as severance pay, unemployment compensation and health insurance and related costs (i.e., in order to comply with COBRA-type regulations) as a result of the termination of employees and which shall have been paid or accrued in accordance with generally accepted accounting principles. Manager shall use commercially reasonable efforts and exercise reasonable care to select qualified, competent, and trustworthy employees. The Hotel's general cashier and all employees having check signing authority shall be adequately bonded to the satisfaction of Owner and the cost of such bonds shall be an expense of the Hotel. To the extent possible and reasonably available, Manager shall use local labor to fill non-Executive Personnel positions in the operation of the Hotel. Owner may at any time consult or communicate with Manager regarding any of the Hotel Employees, but will not interfere in the day-to-day activities of Hotel Employees. The Manager shall not discriminate against any employee or applicant for employment because of race, color, religion, national origin, ancestry, age, sex or sexual orientation, and all employment advertising shall indicate that Manager and Owner are each an Equal Opportunity Employer as that term is defined under Legal Requirements.

Notwithstanding anything to the contrary contained in this Agreement, the following subparagraphs (b) and (c) shall apply to any liability that may, from time to time, arise out of the Employee Retirement Income Security Act of 1974 ("**ERISA**") and the Multi-employer Pension Plan Amendments Acts of 1980 ("**MEPPA**"), respectively, as from time to time amended.

(b)     Employee Benefits: Any Hotel Employees who are not then represented by a collective bargaining representative shall be entitled to participate in the incentive programs, profit sharing and/or other employee retirement, disability, health, welfare or other benefit plan or plans then made available by Manager to similarly situated employees of other hotels managed by Manager, in accordance with their respective terms. Manager will have the right to charge the Hotel with its allocable share of the cost of any such plan or plans and any contributions to be made thereunder provided that such charges and contributions shall be determined by Manager in good faith on a uniform basis with respect to charges and contributions imposed for the same or similar plans at other hotels then managed by Manager, subject to Legal Requirements. Manager's rights under this Subsection (b) shall be subject to the condition that Manager shall not put into effect any amendment to any existing plan, or adopt any additional plan, which is not imposed upon all other similarly situated hotels managed by Manager.

**Management Agreement – Page 12**

Upon the expiration or termination of this Agreement, the sale of the Hotel or other similar event, Manager shall cooperate with the Owner with respect to disposition of such plan or plans (or plan assets) in a mutually satisfactory manner, all in compliance with then applicable Legal Requirements.

(c)     Collective Bargaining or Other Multi-employer Plans: Manager and Owner agree that with respect to any withdrawal liability arising under any collective bargaining agreement or other "multi-employer plan" (as defined in Section 3(37) of ERISA) in which the Hotel Employees become participants, the obligations of the parties shall be determined as follows:

(1)     Withdrawal liability arising with respect to Hotel Employees shall be the responsibility of Owner, and Owner shall either pay the amount of such withdrawal liability directly to such plan or reimburse Manager for withdrawal liability payments made to such plan by Manager with respect to Hotel Employees (including withdrawal liability arising after the sale or other termination of this Agreement, provided that such liability arises as a result of such sale, disposition, termination or other similar event). To the extent permitted under then applicable laws, regulations and agreements, Manager shall cooperate with Owner in structuring transactions and transferring actual or contingent withdrawal liability to a successor in ownership or purchaser of the Hotel in accordance with "relief" provisions of ERISA, such as ERISA Section 4204 or then applicable statutory or regulatory provisions of a similar nature.

(2)     For purpose of this subparagraph (c), the term "withdrawal liability" shall mean the actual amount assessed by and payable to a multi-employer pension fund upon a complete or partial withdrawal of the Hotel or Hotel Employees from such fund. Manager shall cooperate with Owner in challenging a plan's assessment of such liability, provided that all costs of litigation, arbitration or other procedures shall be paid by Owner (including any bonds that must be posted). If Manager or its Affiliates have employees at other locations who participate in the same multi-employer plan as Hotel Employees, Owner shall be charged with and be responsible only for multi-employer plan withdrawal liability arising solely with respect to the participation of Hotel Employees in such plan.

4.3     **Legal Proceedings**. Legal Proceedings of a "non-extraordinary nature" (hereafter defined), may be instituted by Manager, in accordance with guidelines and policies determined from time to time by Manager and Owner, in the name of Manager or the Hotel or Owner and by counsel designated by Manager pursuant to such guidelines and policies. Legal Proceedings of an "extraordinary nature" (hereafter defined) shall require Owner's prior approval of the proceedings and counsel approved by Owner. Manager shall furnish Owner with quarterly status reports with respect to all Legal Proceedings of an extraordinary nature. In addition, Manager shall have the right to defend, through counsel designated by Manager, Legal Proceedings of a non-extraordinary nature against Owner or Manager resulting from the operation of the Hotel. The defense of Legal Proceedings against the Hotel of an extraordinary nature (including, without limitation, any aspect of any claims against Manager or Owner arising out of the operation of the Hotel as to which the insurance company denies coverage) shall be coordinated with Owner, designated counsel shall be subject to Owner's reasonable approval and Manager shall furnish Owner with quarterly status reports with respect to such actions. All claims against Owner and/or Manager arising out of the management or operation of the Hotel which (i) are not covered by insurance shall be promptly communicated to Owner and (ii) are covered in whole or

**Management Agreement – Page 13**

in part by insurance shall be promptly forwarded by Manager to the appropriate insurer (with a copy thereof to Owner in the case of claims against Owner). Legal Proceedings of a "non-extraordinary nature" shall be proceedings in which the monetary exposure is less than $50,000 that are (i) initiated by Manager or Owner relating to the operation of the Hotel for matters such as collections, maintenance of licenses and permits, enforcement of contracts and proceedings against Hotel tenants; and/or (ii) defense of actions against the Owner or Manager resulting from the operation of the Hotel, for matters such as guest claims for loss of property or injury to persons and claims relating to employment or the application for employment at the Hotel. Legal Proceedings of an "extraordinary nature" shall mean all other Legal Proceedings.

4.4     **Annual Plan**. On or before the date that is forty-five (45) days following the Commencement Date, Manager shall submit to Owner an Annual Plan ("**Annual Plan**") for the remaining portion of the Fiscal Year in which the Commencement Date occurs and Owner either shall accept the initial Annual Plan submitted to Owner as provided above or shall submit to Manager a detailed list of Owner's objections or questions to the Annual Plan. Owner and Manager shall meet and discuss Owner's Annual Plan objections and shall coordinate expeditiously and in good faith to agree upon an Annual Plan for the remaining portion of the Fiscal Year in which the Commencement Date occurs. On or before November 15th of each year following the Commencement Date, Manager shall submit to Owner an Annual Plan for the next Fiscal Year and on or before December 15th of each year following the Commencement Date, Owner either shall accept the Annual Plan submitted to Owner as provided above or shall submit to Manager a detailed list of Owner's objections or questions to the Annual Plan ("**Owner's Annual Plan Objections**"). Within fifteen (15) days after Manager's receipt of Owner's Annual Plan Objections, Owner and Manager shall meet and discuss Owner's Annual Plan Objections with the goal of agreeing upon an Annual Plan for the subject Fiscal Year. Owner, as part of Owner's Annual Plan Objections, shall have the right to object to the entire Annual Plan or to any specific item or items contained in the Annual Plan. In the event Owner objects to the Annual Plan or any specific item or items of expense in the Annual Plan and Owner and Manager are unable to reach agreement thereon as provided above prior to commencement of the Fiscal Year in question, pending such agreement, the Annual Plan or the specific item or items of expense (not revenue) in question shall be suspended and replaced for such period that the Annual Plan or such item(s) are in question by an amount equal to the lesser of (i) that proposed by Manager for such Fiscal Year, or (ii) if an objection to the entire Annual Plan, the Actual Gross Operating Expenses for the immediately preceding Fiscal Year subject to an adjustment equal to the percentage increase in the CPI over the last twelve (12) month period immediately preceding the start of the Fiscal Year in question, or (iii) if an objection to a specific item or items of expense in the Annual Plan, such item or items of expense for the immediately preceding Fiscal Year subject to an adjustment for each item equal to the percentage increase in the CPI over the twelve (12) month period immediately preceding the start of the Fiscal Year in question.

(a)     The Annual Operating Budget shall be prepared in accordance with the Uniform System of Accounts. The proposed Annual Operating Budget shall incorporate Manager's good faith reasonable estimates of the items of revenue and expense contained therein and shall contain the proposed budget for operations for the succeeding Fiscal Year. When approved by Owner, the proposed Annual Operating Budget shall be the approved Annual Operating Budget.

Any revisions, substitutions or additions to the Annual Operating Budget must be approved by the Owner in writing.

As part of the budgeting process, Manager shall provide to Owner, with each proposed Annual Operating Budget, a complete list of all service and other contracts anticipated for the Fiscal Year which is the subject of the Annual Operating Budget having a liability to the Hotel in excess of $25,000 for such Fiscal Year for or covering the Hotel and the payments or expenditures connected or anticipated therewith. So long as any service or other contracts fall within the following guidelines, Owner's approval thereof shall not be required, but Manager shall nevertheless promptly report to Owner the execution of (and provide Owner with a true and complete copy of) each such contract having a liability to the Hotel of in excess of $25,000:

(i)      The term of such contract shall be no longer than one (1) year; and

(ii)     Each contract must be terminable by Owner or Manager without payment or penalty upon not more than thirty (30) days' notice.

In addition, Manager shall provide to Owner for Owner's review, a written schedule for the Hotel listing all executive and management employees to be employed "on-site" in the direct management of the Hotel including, but not limited to the positions of General Manager, Director of Sales, Chief Engineer and the portfolio sales and revenue manager. These schedules shall include such employee's title or job description and the salary range including additional compensation or prerequisites such as lodging, meals, maintenance, moving expenses, bonus/incentive compensation and the like. In the event that any employee's services are shared with (or subsidized through a sharing arrangement with) another hotel, the employee shall be identified together with a description of his/her responsibilities and the amount and source of any subsidy, together with a breakdown of the relative time expended with respect to the Hotel and each other hotel. If Owner notifies Manager that Owner does not believe that some or all of the scheduled wages and salaries are reasonable and customary as required above, then Manager shall promptly provide to Owner a wage and salary survey that supports the scheduled wages and salaries. No proposed amendment including changes in salary or other compensation shall be effective unless the salary or other compensation as changed is reasonable and customary as required above.

(b)      The Capital Budget shall be prepared in accordance with the Uniform System of Accounts. The Capital Budget shall contain the proposed budget for expenditures from the Reserve and the budget for expenditures for Capital Improvements and FF&E for the succeeding Fiscal Year for (i) additions to and substitutions, replacements and renewals of FF&E and (ii) certain non-routine repairs and maintenance to the Project which are normally capitalized under generally accepted accounting principles such as exterior and interior repainting, resurfacing building walls, floors, roof and parking areas, replacing folding walls and similar items. Manager shall submit good faith reasonable estimates for Capital Improvements and for FF&E for the Fiscal Year following the Fiscal Year otherwise covered by the Annual Operating Budget. When approved by Owner, the Capital Budget, or such items as may be specifically approved by Owner, shall be collectively referred to in this Agreement as the "Approved Capital Budget". Approval of the Capital Budget constitutes an authorization for Manager to expend money for Capital Improvements and for FF&E as provided in the Approved Capital Budget, unless the

**Management Agreement – Page 15**

Owner's approval thereof specifically requires Manager to obtain additional approvals prior to commencing such work. Any revisions, substitutions or additions to the Approved Capital Budget must be approved by Owner in writing.

Competitive bid rules outlined in Section 4.5 will be observed at all times by Manager for any purchases of Capital Improvements and/or FF&E.

(c)     On or before the date that is thirty (30) days following the Commencement Date, Manager shall submit to Owner the Marketing Plan, which Marketing Plan shall contain advertising, sales and promotional plans prepared by Manager to be used in connection with the marketing of the Hotel and the portfolio of hotels owned by Owner and managed by Manager. On or before November 15th of each year following the Commencement Date, Manager shall submit to Owner an Annual Plan for the next Fiscal Year.  When approved by Owner, the proposed Marketing Plan shall be the approved Marketing Plan. Any revision, substitution or additions to the Marketing Plan must be approved by Owner in writing. The Marketing Plan shall be written with the goal of achieving Gross Revenues as submitted in the Annual Operating Budget for the Fiscal Year or, if less than a full Fiscal Year, the period between the Commencement Date and the December 31 next following the Commencement Date. Manager shall not use Owner's name in any advertising or promotional material without Owner's expressed prior written approval.

(d)     The Management Plan shall contain (i) estimated contributions and distributions from or to Owner; (ii) a leasing plan for the leasing of concessions and other space in the Hotel; (iii) plans and budgets for the disposition and replacement of FF&E; and (iv) such management issues, proposals and projections or modifications as Manager may recommend for the efficient management of the Hotel including but not limited to proposals and assessments as to the Hotel's position in the market, market opportunities, franchise affiliation and disposition strategies. When approved by Owner, the proposed Management Plan shall be the approved Management Plan.

4.5     **Competitive Bidding**. All contracts for repairs, Capital Improvements, FF&E, food and services exceeding $10,000 shall be awarded on the basis of competitive bidding (provided, however, that Manager will not be required to obtain competitive bids for any service for which a single provider exists), solicited in the following manner:

(a)     A minimum of two (2) written bids shall be obtained for each purchase or contract that exceeds $10,000, up to $25,000. Purchases over $25,000 will require a minimum of three (3) bids.

(b)     Each bid will be solicited in a uniform format.

(c)     Subject to approval by Owner, Manager may accept a low bid if the expenditure is for an approved item in the budget and will not result in an excess of the annual budgeted Account Category of the applicable Capital Budget or Annual Operating Budget.

(d)     If Manager desires to accept a bid other than the lowest bid, then Manager shall so advise Owner in writing and recommend that such bid be accepted, with support for such recommendation.

**Management Agreement – Page 16**

(e)     Owner shall have the right to accept or reject any and all bids for repairs, Capital Improvements, FF&E or foods and services that are not the lowest bid; such acceptance shall not be unreasonably withheld or delayed.

(f)     Manager may request Owner to waive in writing competitive bidding rules for a specific item or service.

In its operation of the Hotel under this Agreement, Manager may purchase goods, supplies and services from itself, Owner or Owner's representatives, or any Affiliates of any of the foregoing so long as the prices and terms thereof are at arm's length and otherwise competitive with, and are not less favorable than prices and terms which could be obtained from independent parties and, if required by Section 4.5, are in compliance with competitive bidding rules, provided that Manager will obtain Owner's consent (not to be unreasonably withheld) regarding any such arrangement.

4.6     **Labor Relations**. Manager shall have no right to enter into any collective bargaining agreement concerning any employees of the Hotel without the prior written approval of Owner, which may be granted or withheld in its sole discretion. Upon Owner's approval of any such agreement, Manager shall be responsible to perform such agreements. To the extent applicable, Manager: (a) represents that it is an equal opportunity employer as described in Section 202 of Executive Order 11246 dated September 24, 1965, as amended, and as such agrees to comply with the provisions of Paragraphs 1 through 7 of Section 202 of said Executive Order during the performance of this Agreement, (b) agrees to comply with the affirmative action requirements of Part 60.741 of Title 41, Code of Federal Regulations, with respect to handicapped workers during the performance of this Agreement, (c) agrees to comply with the affirmative action requirements of Part 60.250 of Title 41, Code of Federal Regulations, with respect to Disabled Veterans and Veterans of the Vietnam Era during the performance of this Agreement, and (d) shall submit to Owner in the form approved by the Director of the Office of Federal Contract Compliance, U.S. Department of Labor, a certification that Manager does not and will not maintain any facilities that provide for their employees in a segregated manner, or permit their employees to perform their services at any location under its control, where segregated facilities are maintained, and that Manager will obtain a similar certification from its contractors.

4.7     **Liquor License**. INTENTIONALLY OMITTED.

4.8     **Employee Discount**. To the extent Manager, Owner or any of their respective Affiliates owns or has any equity interest in other hotels and provides a discounted rate to the employees at such other hotels, such party agrees to provide the same discounted rate (subject to availability and black-out periods) to the employees of the other parties named in this Section 4.8 to the extent allowed under the management and ownership agreements affecting such other hotels.

4.9     **Forms**. Manager shall prepare or cause to be prepared for execution by Owner all forms, reports and returns, if any, required to be filed by Owner under applicable law with respect to the operation of the Hotel; however, Manager shall not be obligated to prepare any of Owner's income tax returns. Without limitation, Manager shall timely prepare and deliver, as

required by law, an Internal Revenue Service Tax Form 1099 with respect to payments made during a calendar year to third party contractors and professionals.

    4.10   **Notice of Violations**. Manager shall promptly notify Owner in writing of any written notice received from any regulatory or governmental body regarding an actual or perceived violation of any Legal Requirements.

## ARTICLE 5
## RELATIONSHIP OF PARTIES

    Except as provided in Section 4.2(a), Owner and Manager acknowledge and agree that this Agreement creates an agency relationship; provided, however, that (a) each Hotel Employee shall be the employee of Manager or Manager's Affiliate and not of Owner, (b) Manager's authority is subject to the terms and conditions of this Agreement, and (c) nothing in this Agreement shall constitute, or be construed to be, or create, a partnership, joint venture or lease or employment arrangement between Owner and Manager with respect to the Hotel or the operation thereof. Employees or agents of Manager are not by this Agreement or by any actions of Owner and/or Manager hereunder made employees of Owner, and are not entitled to the benefits provided by Owner or its Affiliates to its employees, including but not limited to, group insurance, leave and pension plan. This Agreement shall not be deemed at any time to be an interest in real estate or a lien or security interest of any nature against the Hotel, the Premises or any other land used in connection with the Hotel, or any equipment, fixtures, inventory, motor vehicles, contracts, documents, accounts, notes, drafts, acceptances, instruments, chattel paper, general intangibles, or other personal property now existing or that may hereafter be acquired or entered into with respect to the Hotel or the operation thereof.

## ARTICLE 6
## ADVERTISING

    Subject to and in strict compliance with the provisions of the License Agreement, Manager shall arrange and contract for all advertising, which Manager may reasonably deem necessary, in accordance with Section 4.4, for the operation of the Hotel. So long as the License Agreement may be in effect, Manager generally shall advertise the Hotel under the name "– Petrol Inn & Suites" or such other name as Owner may designate or approve.

## ARTICLE 7
## RESERVE FOR FF&E

    7.1   **Reserve for Replacement of FF&E**. The Reserve shall be funded pursuant to Section 7.2, and Manager shall use amounts in the Reserve to cover the cost of FF&E expenditures and Capital Improvements, as described in Section 4.4 in conjunction with the Approved Capital Budget. All FF&E, Capital Improvements and the Reserve shall be the property of Owner.

    7.2   **Transfers to Reserve for FF&E**. Commencing on the Commencement Date and continuing thereafter during the remainder of the Term, Manager shall deposit monthly into the Reserve for FF&E an amount equal to the amounts required by Lender and/or by Licensor;

provided that in no event will the amounts to be deposited monthly into the Reserve be less than an amount equal to four percent (4%) of Gross Revenues throughout the remainder of the Term.

7.3 **Annual Adjustment**. At the end of each Fiscal Year and following receipt by Manager of the annual accounting referred to in Article 10, an adjustment will be made to such annual account, if necessary and if available, so that the appropriate amount shall have been deposited in the Reserve.

7.4 **Maintenance of Reserve**. Checks or other documents of withdrawal shall be signed by representatives of Manager who shall be bonded or otherwise insured pursuant to the "crime – Theft of Money and Securities" coverage set forth on Exhibit D to this Agreement. The proceeds from the sale of FF&E no longer needed for the operation of the Hotel shall be deposited in the Reserve, but not be credited against the obligation to deposit cash in such fund for the then current Fiscal Year. All interest earned or accrued on amounts invested from the Reserve shall be added to the Reserve (but shall not be credited against Owner's obligations to fund the Reserve), and shall not constitute Gross Revenues or be included therein.

7.5 **Accumulation of Reserve and Additional Cost of FF&E and Capital Improvements**. Owner and Manager acknowledge and agree that portions of the Reserve may, from time to time in accordance with the then-current Annual Plan, be used for more significant expenditures than could be reserved for in a single year.  Accordingly, at the end of each Fiscal Year, any amounts remaining in the Reserve shall be carried forward to the next Fiscal Year, and shall be in addition to the amount to be reserved in the next Fiscal Year. In the event at any time there are insufficient funds in the Reserve for any Fiscal Year to pay the cost of FF&E in accordance with the Annual Operating Budget and the Approved Capital Budget, then Owner will, at Owner's option, within sixty (60) days after request therefor by Manager, either provide the additional cash to the Manager to pay for such excess or authorize the funding of such cash from Net Operating Income.

7.6 **Final Remittance**. Upon expiration or termination of this Agreement, Manager shall remit all remaining amounts in the Reserve forthwith to Owner.

<u>**ARTICLE 8**</u>
**REPAIRS AND MAINTENANCE AND CAPITAL IMPROVEMENTS**

8.1 **Repairs and Maintenance**. Manager shall, from time to time, make such expenditures from Gross Revenues for repairs and maintenance including service contracts ("**Repairs and Maintenance**") as required by the Lender, the License Agreement, the Legal Requirements, the then current Annual Plan or as necessary to maintain the Hotel in good operating condition in compliance with the License Agreement and otherwise in the condition required by this Agreement, including but not limited to repairs and maintenance of HVAC, mechanical and electrical systems, exterior and interior repainting, resurfacing building walls and parking areas, waterproofing of exterior surfaces of floors, roofs, and replacement of plate glass, or the like. It is Owner's intent that the sums allocated for Repairs and Maintenance in accordance with the then current Annual Plan are to be fully expended during that Fiscal Year exclusively for the purposes identified in such Annual Plan. Except in the event of an emergency due to casualty, act of God or otherwise under circumstances in which it would be unreasonable

to seek to obtain prior approval (and provided that Manager shall notify Owner of any such expenditure within a reasonable time given the nature and scope of the emergency), all expenditures for the foregoing shall be as provided in the Annual Operating Budget and the Approved Capital Budget. If any such Repairs or Maintenance shall be made necessary by any condition against the occurrence of which Owner has received the guaranty or warranty of the builder or the Hotel or of any supplier of labor or materials for the Hotel or of any supplier of labor or materials for the construction of the Hotel, then Manager may invoke said guarantees or warranties in Owner's or Manager's name and Owner shall cooperate in all reasonable respects with Manager in the enforcement thereof.

8.2    **Capital Improvements**. Owner may, from time to time, at its sole expense, make such structural repairs, replacements, substitutions, alterations, additions or improvements (exclusive of FF&E) ("**Capital Improvements**") in or to the Hotel as Owner shall determine are necessary to comply with the Operating Standards. If Capital Improvements included in the definition of Building and Appurtenances shall be required at any time during the Term by the terms of any Mortgage, the License Agreement, to maintain the Hotel in good operating condition or by reason of any Legal Requirements, or because Manager and Owner jointly agree upon the desirability thereof, then in such event all such Capital Improvements shall be made with as little hindrance to the operation of the Hotel as reasonably possible. Notwithstanding the foregoing, as long as the Hotel can continue to operate without interruption, Owner shall have the right to contest the need for any such Capital Improvements required by any Legal Requirements and may postpone compliance therewith, if so permitted by law and if such postponement will not expose Manager to any civil or criminal liability. All recommendations by Manager of Capital Improvements shall be submitted in conjunction with the Capital Budget for the Fiscal Year described in Section 4.4(b). In the event that Owner elects to perform Major Renovations to the Hotel, Owner shall have the right to cause (i) Manager, or (ii) a third party, to oversee the performance of the Major Renovations for which oversight, if Manager is overseeing the Major Renovations, Manager shall be paid a project management fee (in addition to the Management Fee) equal to three percent (3%) of the budgeted hard cost items including contingency and any Owner-approved changes of the Major Renovations (the "**Project Fee**"). With respect to (i) Major Renovations as contemplated by this Agreement which Owner elects to have Manager oversee and (ii) improvements that are not Major Renovations, Manager shall oversee such projects in a reasonably prudent manner.

8.3    **Service Contracts**. Manager, without requiring the consent of Owner, shall enter into any contract for cleaning, maintaining, repairing or servicing the Hotel or any of the constituent parts of the Hotel as Manager deems necessary for the operation of the Hotel, except as specifically provided in Section 4.4 or 4.5. Manager shall submit the listing of service contracts entered into for the Hotel required pursuant to Section 4.4(a). Unless otherwise approved by Owner, all service contracts shall: (a) be in the name of Owner or Owner's nominee, (b) to the extent customary, include a provision for cancellation thereof by Owner or Manager upon not more than thirty (30) days written notice, and (c) shall require that all contractors provide evidence of such insurance as is customarily carried by other contractors involved in similar servicing arrangements.

8.4    **Liens**. Owner and Manager shall cooperate and use all commercially reasonable efforts to prevent any liens from being filed against the Hotel that arise from any maintenance,

changes, repairs, alterations, improvements, renewals or replacements in or to the Hotel. If any such liens are filed, Manager shall, subject to the availability of funds therefor in the Operating Accounts or as otherwise supplied by Owner, obtain the release thereof prior to the institution of legal proceedings in connection therewith. The cost of obtaining such release shall be included in Gross Operating Expenses, unless the imposition of the lien results from a default by Owner or Manager, in which event the cost of obtaining such release shall be borne by such defaulting party.

8.5     **Notice of Unavoidable Interruptions**. In the event of any occurrence constituting an Unavoidable Interruption, Manager shall promptly notify Owner of such occurrence and shall keep Owner informed as to the extent and impact thereof on the Hotel.

## ARTICLE 9
## WORKING CAPITAL AND BANK ACCOUNTS; DISTRIBUTION OF NET OPERATING INCOME

9.1     **Working Capital**. Owner shall provide initial Working Capital in the amount of $██████ in addition to the value of all Inventories. Owner shall at all times cause sufficient funds to be on hand in the Operating Accounts to assure the timely payment of all current liabilities of the Project, including but not limited to Gross Operating Expenses, all other costs and expenses incurred in connection with the Project pursuant to this Agreement and the performance by Manager of its obligations under this Agreement, all fees, charges and reimbursements payable to Manager hereunder and all amounts required hereunder to be transferred into the Reserve. In no event shall Owner permit the balance in the Operating Accounts to be less than an amount equal to the estimated monthly operating expenses of the Project as reflected in the then current Annual Operating Budget. From time to time, upon five (5) days prior written notice from Manager that such funds are required, Owner shall furnish to Manager funds that Manager deems reasonably necessary to assure that the Project shall have adequate working capital as herein provided. In the event Owner fails to supply required working capital in accordance with the provisions of this Section or if Manager otherwise deems such action to be necessary, Manager may use all or part of the funds in the Reserve to supplement the Operating Accounts in order to defray or pay the Project's operating costs and expenses, to the extent permitted by the Mortgage. Owner shall promptly reimburse the Reserve for all sums so used or transferred. All unexpended Working Capital, Inventories and Operating Equipment and Supplies purchased with Working Capital shall remain the property of Owner.

9.2     **Operating Account**. All funds (exclusive of funds deposited in the Reserve and house banks at the Hotel) received by Manager in the operation of or otherwise relating to the Hotel, and funds for Working Capital provided by Owner or retained by Manager from Gross Revenues, shall be deposited in the Operating Account. Manager shall inform such bank in writing that the funds deposited in the Operating Account are owned solely by the Owner. Manager shall not deposit funds attributable to any other property into the Operating Account. To the extent permitted by the Mortgage, amounts in the Operating Account may be temporarily withdrawn and invested by Manager in any Permitted Investments, having due regard for the timing of cash needs, but in no event shall such funds be co-mingled by Manager with any other funds. From the Operating Account, Manager shall pay all Gross Operating Expenses (other than the excess FF&E if funded by or through Owner) before any penalty or interest accrues thereon,

**Management Agreement – Page 21**

however, taking into account sound cash management. All interest earned or accrued on amounts invested from the Operating Account shall be added to the Operating Account. All checks or other documents of withdrawal from the Operating Account shall be signed by representatives of Manager except as provided in Section 9.3 hereof.

9.3     **Maintenance of Operating Account**. Subject to Section 9.4, the Operating Account shall be opened and maintained at all times by Manager and Owner and checks and other documents of withdrawal shall be signed by representatives of Manager who are covered by the required fidelity bond or otherwise insured pursuant to the "Crime – Theft of Money and Securities" coverage set forth on Exhibit D. The Operating Account and any other bank accounts approved by Owner shall be in Owner's name (for example, "*[Owner's name]* d/b/a/ *[Hotel name]*").

Manager shall not change the bank or open or close any bank account described in this Article 9 without Owner's prior written approval. Owner, in its sole and absolute discretion, may in writing direct Manager to change any such bank, signatories or arrangements. The bank in which the Operating Account is located shall be informed by Manager in writing that the funds in such account are held in trust for Owner and that any checks for more than $10,000.00 shall be required to be signed by two (2) authorized signatories on the account.

9.4     **Final Remittance**. Upon the expiration or termination of this Agreement, after payment of all Gross Operating Expenses for which bills were received to such date, Manager's Management Fee, Reimbursable Expenses, any Termination Fee and any other amounts then due and payable to Manager, all remaining amounts in (i) the Reserve, (ii) the Operating Account and (iii) the Permitted Investments, shall be transferred forthwith to Owner by Manager. Owner shall pay Manager any remaining Management Fee, any Termination Fee, Reimbursable Expenses and any other amounts then due and payable and Owner shall pay, or cause to be paid, and shall hold Manager harmless from and against all Gross Operating Expenses accrued in accordance with generally accepted accounting principles and invoices related to Gross Operating Expenses received after Manager has so transferred all funds.

9.5     **Distribution of Excess Cash**. Together with the financial report provided for in Section 10.2(b), Manager shall distribute to Owner all sums in the Operating Accounts in excess of the then working capital requirements of the Hotel determined in accordance with Section 9.1 of this Agreement.

<u>**ARTICLE 10**</u>
**BOOKS, RECORDS AND STATEMENTS**

10.1     **Books and Records**. Manager shall keep full and adequate books of account and other records reflecting the results of operation of the Hotel in accordance with the Uniform System of Accounts and generally accepted accounting principles. The books of account and all other records relating to or reflecting the operation of the Hotel shall be kept either at the Hotel or at Manager's corporate offices and shall be available to Owner and its representatives and its auditors or accountants, at all reasonable times for examination, audit, inspection and transcription at Owner's sole cost and expense. All of such books and records pertaining to the Hotel including, without limitation, books of account, guest records and front office records at all

times shall be the property of Owner and shall not be removed from the Hotel's or Manager's offices by Manager without Owner's approval and consent. Upon any termination of this Agreement, all of such books and records forthwith shall be turned over to Owner at a location designated by Owner so as to insure the orderly continuance of the operation of the Hotel, but such books and records shall thereafter be available to Manager at all reasonable times for inspection, audit, examination and transcription for a period of two (2) years.

10.2    **Financial Reports**.

(a)    Manager shall deliver to Owner within twenty (20) days following the close of each Accounting Period a monthly profit and loss statement reflecting a comparison of periodic and year-to-date actual revenues and expenses with the Annual Operating Budget as well as a periodic and year-to-date comparison of such actual revenues and expenses with those of the prior Fiscal Year.

(b)    Further, Manager shall provide to Owner within twenty (20) days following the close of each Accounting Period a report prepared in accordance with the example set forth in Exhibit C attached hereto and made a part hereof, which include without limitation, forward bookings, accounts receivable, accounts payable and a monthly sales overview report.

(c)    Further, within seventy-five (75) days after the end of each Fiscal Year, Manager shall deliver to Owner an annual accounting, showing the results of operation of the Hotel during the Fiscal Year and a computation of Gross Revenues, Gross Operating Expenses, and Net Operating Income, if any, and any other information necessary to make the computations required hereby or which may be requested by Owner, all for such Fiscal Year. The annual accounting for any Fiscal Year shall be controlling over the interim accountings for such Fiscal Year. Owner shall have the right to conduct an audit of the books.

(d)    Further, Manager shall prepare and deliver any additional reports or information as Owner is required to provide under the License Agreement.

10.3    **Audits by Owner**. Owner shall have the right to audit, conducted either by Owner's internal personnel or by a third party auditor retained by Owner at its expense, all items of expense and revenue under this Agreement including, but not limited to, Gross Revenues, Gross Operating Expenses, depreciation, the Management Fee and Reserve. Manager shall cooperate and assist with such audit. In the event that an audit reflects an underpayment to Owner or Manager or an overpayment to Manager or Owner, Manager shall correct same by a corrective payment to Owner or Manager, as appropriate, within ten (10) days following notice of the audit results to Manager, subject to Owner's and Manager's right to challenge the audit results in accordance with the provisions of Article 30 of this Agreement. If an audit determines any weaknesses or need for reasonable changes in the internal control systems pertaining to the safeguarding of Owner's assets, Manager will promptly make all necessary changes.

10.4    **Segregation of Accounts**. In any instance where Manager manages several properties for Owner, Manager shall segregate the income and expenses of each property so that Gross Revenues from each property will be applied only to the bills and charges from that property.

## ARTICLE 11
## MANAGER'S MANAGEMENT FEES; TIMING OF
## PAYMENT TO MANAGER

11.1   **Fees.** For each Fiscal Year or portion thereof, Manager shall receive, by a distribution made by Manager out of Gross Revenues at the end of each Accounting Period in respect of its management services hereunder, a fee (collectively, the "**Management Fee**") calculated as follows:

(a)   a base fee (the "**Base Fee**") in an amount equal to ███████████ of Gross Revenues in respect of any applicable period; plus

(b)   an accounting fee (the "**Accounting Fee**") for accounting services provided by Manager's corporate employees on a "centralized" basis in the amount of ███████ ███████████████████████████████████████████████████████████████ plus

(c)   a revenue management fee (the "**Revenue Management Fee**") for an allocation of Manager's revenue management services to be provided by Manager's corporate employees on a "centralized" basis in the amount of █████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████.

The Management Fee generally shall be computed separately for each Fiscal Year and shall not be accumulated from Fiscal Year to Fiscal Year. Owner shall reimburse Manager for all Reimbursable Expenses incurred by it in connection with the performance of this Agreement. Any such amount shall be payable within thirty (30) days of billing, and upon request of Owner, Manager shall provide a statement showing in reasonable detail the nature and amount of such expenses, together with supporting documentation reasonably requested by Owner.

11.2   **Treatment of Proceeds of Business Interruption Insurance and Condemnation Awards**. In the event of a casualty or condemnation for temporary use resulting in the payment of business interruption insurance (with respect to such casualty) or a condemnation award (with respect to such condemnation for temporary use), the amount of such proceeds shall be considered a part of Gross Revenues for the purpose of computing Manager's Management Fee.

## ARTICLE 12
## INSURANCE

12.1   **Insurance**. Throughout the Term, Manager (unless Owner shall by notice in writing to Manager elect to provide the property and casualty insurance coverage required hereunder) shall provide and maintain the insurance in the minimum amounts and types set forth

on **Exhibit D** to this Agreement, the costs of which shall be charged as part of Gross Operating Expenses.

12.2    **Modification of Insurance**. Owner may require Manager to increase the limits of the above insurance coverage and may require Manager to carry other or additional reasonable and customary insurance. All premiums on any increased limits of, or other or additional, insurance coverage required by Owner under the immediately preceding sentence shall be included in the Gross Operating Expenses. In no event shall insurance coverage be less than that required by Lender, the License Agreement or to comply with Legal Requirements.

12.3    **Contractor's Insurance**. Manager shall require that all major contractors on or about the Hotel Premises have coverage at the contractor's sole expense in the minimum types and amounts set forth in **Exhibit D** to this Agreement. Manager shall require contractors that are not major contractors to carry such insurance coverage that is customary in the applicable trade or industry. A major contractor shall mean any contractor (i) receiving compensation in excess of $25,000 per year (subject to adjustment for adjustments in the CPI between the Commencement Date and the date of such services) or (ii) performing hazardous services. Manager must obtain the Owner's permission in writing to waive any of the above requirements. Higher amounts may be required if the work to be performed is sufficiently hazardous in nature. Manager shall obtain and keep on file a Certificate of Insurance for each such major contractor that shows that the contractor is so insured.

12.4    **Form of Policies**. All insurance required by Sections 12.1, 12.2 and 12.3 shall be in such form and with such companies as shall be reasonably satisfactory to Owner provided that such company shall have a minimum Best rating of A- Class VIII, or as otherwise approved by Owner and Manager, and shall comply with the requirements of any Mortgage and the License Agreement. All property damage insurance shall name Owner as insured, and so long as the Hotel is mortgaged pursuant to any Mortgage or otherwise shall be subject to a standard mortgagee clause in favor of the mortgagee or mortgagees. All other insurance (excepting only the professional liability and workers' compensation lines of coverage) shall be in the name of Owner and Manager. The workers' compensation policy shall name Owner as an additional insured. Policies of insurance (to the extent applicable) shall (i) provide that the insurance company will have no right of subrogation against any mortgagee, Owner, Manager or any of their respective affiliated or subsidiary companies or the agents or employees thereof and (ii) provide that the proceeds thereof in the event of loss or damage shall, to the extent payable to any mortgagee, be payable notwithstanding any act of negligence or breach of warranty by Owner or Manager which might otherwise result in the forfeiture or nonpayment of such insurance proceeds.

12.5    **Certificates**. For the purpose of insuring compliance with the provisions of Article 12, Manager shall furnish to the Owner certificates for all insurance required to be maintained pursuant to this Article 12 within five (5) days prior to renewal. All such certificates shall specify that the policies to which they relate cannot be canceled or modified on less than thirty (30) days' prior written notice to Owner. In the event Owner procures any insurance under this Section 12, Owner shall have the responsibilities set forth in the two preceding sentences for the benefit of Manager.

**Management Agreement – Page 25**

12.6 **Waiver of Subrogation**. Owner and Manager each waive their respective rights of subrogation against each other.

12.7 **Mortgage Requirements**. Insurance shall be maintained in a manner consistent with the terms and conditions of any Mortgage and any conflict between those terms and conditions and the provisions of this Agreement shall be resolved in favor of the Mortgage.

**ARTICLE 13**
**REAL AND PERSONAL PROPERTY TAXES; UTILITIES**

13.1 **Taxes**. Manager shall, on behalf of Owner, pay from the Gross Revenues, on or before the dates the same become delinquent, with the right to pay the same in installments to the extent permitted by law, all real estate taxes, all personal property taxes and all betterment assessments levied against the Hotel or any of its component parts. Manager shall promptly deliver to Owner all notices of assessments, valuations and similar documents to be filed by Manager or Owner, which are received from taxing authorities by Manager. Owner shall have the right to hire property tax consultants or like professionals that reasonably provide economic benefits to Owner and the costs thereof shall be a part of Gross Operating Expenses. Notwithstanding the foregoing obligations of Manager, Owner may elect to contest the validity or the amount of any such tax or assessment, provided that such contest does not materially jeopardize Manager's rights under this Agreement. Manager agrees to cooperate with Owner and execute any documents or pleadings required for such purpose, provided Owner agrees to reimburse Manager for any out-of-pocket costs occasioned to Manager by any such contest. At Owner's election, all costs relating to any such contest may be included in Gross Operating Expenses.

13.2 **Utilities, Etc**. Manager shall promptly pay all fuel, gas, light, power, water, sewage, garbage disposal, telephone and other utility bills currently as they are incurred in connection with the Hotel from the Gross Revenues or Working Capital.

**ARTICLE 14**
**USE OF NAME**

14.1 **Name**. During the Term of this Agreement, the Hotel shall at all times be known and designated as the "Comfort Inn Midland" or by such other name as from time to time may be agreed upon by Owner and Manager. Manager shall make or cause to be made any fictitious name filings or disclosures required by the laws of the State with respect to the use of such name for or in connection with the Hotel. Manager shall not use or employ such name unless such use fully complies with the terms of the License Agreement, if any.

**ARTICLE 15**
**DAMAGE OR DESTRUCTION; CONDEMNATION**

15.1 **Damage or Destruction**.

(a) If the Hotel or any portion thereof shall be damaged or destroyed at any time or times during the Term by fire, casualty or any other cause commonly covered by fire and extended coverage insurance and the cost of repairing such damage and restoring the Hotel to

substantially its condition immediately prior to such damage or destruction, as reasonably estimated by Owner based upon estimates Owner receives from contractors and other reasonable and customary evidence, will not exceed the sum of $250,000 plus adjustments to reflect increases in the CPI for each Fiscal Year after 2014 exclusive of the cost of the foundation and footings ("**Minimum Cost**"), Owner will, at its own cost and expense (subject to Owner's receipt of insurance proceeds sufficient to pay such costs and expenses) and with due diligence repair and/or restore the Hotel so that after such repair and/or restoration, the Hotel shall be in substantially the same condition as it was immediately prior to such damage or destruction.

(b)     If the cost of such repair and/or restoration will, as so reasonably estimated by Owner, exceed the Minimum Cost, then Owner shall, within one hundred twenty (120) days after such damage or destruction, elect by notice to Manager either (x) to carry out such repair and/or restoration, in which case Owner shall complete such repair and/or restoration pursuant to the last sentence of Section 15.1(a) or (y) to terminate this Agreement; should Owner so elect to terminate this Agreement, Owner shall pay to Manager the Termination Fee.

(c)     In the case of damage or destruction which Owner is not required by the preceding provisions of this Section 15.1 to repair or restore and where Owner has not elected under said preceding provisions to terminate this Agreement, Owner shall undertake to notify Manager, within one hundred twenty (120) days after such damage or destruction, whether or not Owner will so repair and/or restore such damage or destruction. If Owner, within such one hundred twenty (120) day period either (i) advises Manager that Owner will not so repair and/or restore such damage or destruction or (ii) fails to advise Manager of Owner's decision, Manager may terminate this Agreement by written notice to Owner, or Owner may terminate this Agreement by such notice to Manager; in either case such written notice must be given within one hundred fifty (150) days after such damage or destruction and neither party shall be entitled to any payment on account of such termination. If in such event Owner within such one hundred twenty (120) day period notifies Manager that Owner will so repair and/or restore such damage or destruction, then neither Owner nor Manager shall have a right to terminate this Agreement on account of such damage or destruction.

15.2     **Condemnation**. If the whole of the Hotel shall be taken or condemned in any eminent domain, condemnation, compulsory acquisition or like proceeding by any competent authority or if such a portion thereof shall be taken or condemned as to make it imprudent or unreasonable, in the sole opinion of Owner, to use the remaining portion as a hotel of the type and class immediately preceding such taking or condemnation, then the Term shall terminate as of the date title vests in the condemning authority. Manager has no interest in any award paid to Owner and Manager shall make no claim against the condemnor for any loss to its business as a result of such condemnation or otherwise. If only a part of the Hotel shall be taken or condemned and the taking or condemnation of such part does not, in the opinion of Owner, make it unreasonable or imprudent to operate the remainder as a hotel of the type and class immediately preceding such taking or condemnation, this Agreement shall not terminate, and so much of any award to Owner shall be made available as shall be reasonably necessary for making alterations or modifications of the Hotel, or any part thereof, so as to make it a satisfactory architectural unit as a hotel of similar type and class as prior to the taking or condemnation.

15.3    **Mortgage Requirements**. Actions as to damage or destruction and condemnation shall be taken only in a manner that is consistent with the terms and conditions of the Mortgage and any conflict between those terms and conditions and the provisions of this Agreement shall be resolved in favor of the Mortgage.

**ARTICLE 16**
**EVENTS OF DEFAULT**

16.1    **Manager Defaults**. Each of the following shall constitute an Event of Default by Manager:

(a)    The failure of Manager to pay any sum of money (or, if required by the Mortgage, to deposit into the lockbox account within two (2) business days of receipt) to Owner provided for herein when the same is payable, if such failure is not cured within five (5) days after written notice specifying such failure is given by Owner to Manager.

(b)    An assignment by Manager in violation of the provisions of Article 23 hereof.

(c)    If Manager shall fail to keep, observe or perform any other material covenant, agreement, term or provision of this Agreement to be kept, observed or performed by Manager and such failure shall continue for a period of thirty (30) days after written notice specifying such failure given by Owner to Manager, or if Manager due to any act or omission on the part of Manager and without the fault of Owner, shall fail to maintain the Permits and such failure shall continue for a period of thirty (30) days after written notice specifying such failure given by Owner to Manager; provided that if such failure is incapable of cure within such thirty (30) day period, then the cure period shall be extended provided that Manager commenced the cure during such initial thirty (30) day period and thereafter diligently and continuously pursues the cure thereof to completion.

(d)    If because of any act or omission on the part of Manager, and without the fault of Owner, either (i) the License Agreement or (ii) any required license for the sale of alcoholic beverages at the Hotel, is at any time suspended, terminated or revoked for a period of more than thirty (30) consecutive days, provided, however, if, at the end of such thirty (30) day period the cure has not been effectuated notwithstanding Manager's diligent and continuous attempts to cure, then the cure period shall be extended for an additional period of ninety (90) days.

(e)    If Manager shall fail to maintain and operate the Hotel in accordance with the standards required under Section 4.1 and such failure shall not be due to a refusal on the part of Owner to approve the Annual Plan submitted by Manager under Section 4.4 or Owner's failure to properly provide funds requested pursuant to the provisions of Section 9.1 and such failure shall continue for a period of sixty (60) days after written notice by Owner to Manager specifying the matters or conditions which constitute the basis for such Event of Default, provided that if such failure is not reasonably capable of cure within such sixty (60) day period, then the cure period shall be extended provided that Manager commences the cure during such initial sixty (60) day period and thereafter diligently and continuously pursues the cure thereof to completion.

(f)     If Manager shall apply for or consent to the appointment of a receiver, trustee or liquidator of Manager or of all or a substantial part of its assets, admit in writing its inability to pay its debts as they come due, make a general assignment for the benefit of creditors, take advantage of any insolvency law, or file an answer admitting the material allegations of a petition filed against Manager in any bankruptcy, reorganization or judgment or decree shall be entered by any court of competition jurisdiction, on the application of a creditor, adjudicating Manager bankrupt or insolvent or approving a petition seeking reorganization of Manager or appointing a receiver, trustee or liquidator of Manager or of all or a substantial part of its assets or a decree shall continue unstayed and in effect for any period of ninety (90) consecutive days.

(g)     The filing of a voluntary petition in bankruptcy or insolvency or a petition for liquidation or reorganization under any bankruptcy law by Manager, or Manager shall consent to, acquiesce in, or fail timely to controvert, an involuntary petition in bankruptcy, insolvency or an involuntary petition for liquidation or reorganization filed against it.

(h)     The filing against Manager of a petition seeking adjudication of Manager as insolvent or seeking liquidation or reorganization or appointment of a receiver, trustee or liquidator of all or a substantial part of Manager's assets, if such petition is not dismissed within ninety (90) days.

(i)     Failure of Manager (but excluding such a failure which results from the failure by Owner to provide the necessary funds therefor) to maintain at all times throughout the term hereof all of the insurance required to be maintained by Manager under Article 12, if such failure is not cured within fifteen (15) days after written notice specifying such failure is given by Owner to Manager.

(j)     The fraud, gross negligence, willful misconduct or criminal conduct of or by Manager and, to the extent same has a material adverse effect on the Hotel or Owner, the General Manager, in connection with the Hotel.

16.2    **Owner Defaults**. Each of the following shall constitute an Event of Default by Owner:

(a)     The failure of Owner to pay or furnish to Manager any money Owner is required to pay or furnish to Manager in accordance with the terms hereof on the date the same is payable, if such failure is not cured within five (5) days after written notice specifying such failure is given by Manager to Owner. If any sum of money is not paid within five (5) days following the date same becomes due and payable under this Agreement, and Manager has advanced such sum on behalf of Owner, such sum shall bear interest at the Default Rate from the date Manager advanced such sum on behalf of Owner until the date Owner actually pays such sum. If the failure to pay relates to the Management Fee, such sum shall bear interest at the Default Rate from the date due until the date actually paid.

(b)     If because of a default under the Mortgage, if any, not caused by the act or omission of Manager, the Mortgage shall be foreclosed, or the Hotel sold in lieu of foreclosure.

(c)     If Owner shall apply for or consent to the appointment of a receiver, trustee or liquidator of Owner of all or a substantial part of its assets, or admit in writing its inability to pay

its debts as they come due, make a general assignment for the benefit of creditors, take advantage of any insolvency law, or file an answer admitting the material allegations of a petition filed against Owner in any bankruptcy, reorganization or insolvency proceeding, or if an order, judgment or decree shall be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating Owner a bankrupt or insolvent or approving a petition seeking reorganization of Owner or appointing a receiver, trustee or liquidator of Owner or of all or a substantial part of its assets, and such order, judgment or decree shall continue unstayed and in effect for any period of ninety (90) consecutive days.

(d)     The filing of a voluntary petition in bankruptcy or insolvency or a petition for liquidation or reorganization under any bankruptcy law by Owner, or Owner shall consent to, acquiesce in, or fail timely to controvert, an involuntary petition in bankruptcy, insolvency or an involuntary petition for liquidation or reorganization filed against it.

(e)     The filing against Owner of a petition seeking adjudication of Owner as insolvent or seeking liquidation or reorganization or appointment of a receiver, trustee or liquidator of all or a substantial part of Owner's assets, if such petition is not dismissed within ninety (90) days.

(f)     Failure of Owner to maintain at all times throughout the term hereof all of the insurance required to be maintained by Owner under Article 12, if such failure is not cured within fifteen (15) days after written notice specifying such failure is given by Manager to Owner.

(g)     The failure of Owner to perform, keep or fulfill any of the other covenants, undertakings, obligations or conditions set forth in this Agreement, or the failure of Owner to approve expenditures or to authorize procedures necessary to maintain the standards of the Hotel in accordance with the Operating Standards, if such failure shall continue for a period of thirty (30) days after written notice by Manager or Licensor to Owner specifying the matters or conditions which constitute the basis for such Event of Default, provided that if such failure is incapable of cure within such thirty (30) day period, then the cure period shall be extended for up to an additional thirty (30) days provided that Owner commences the cure during such initial thirty (30) day period and thereafter diligently and continuously pursues the cure thereof.

## ARTICLE 17
## TERMINATION UPON EVENT OF DEFAULT; OTHER REMEDIES

17.1     **Termination**. Upon the occurrence of an Event of Default, in addition to and cumulative of any and all rights and remedies available to the non-defaulting party under this Agreement, at law or in equity, the non-defaulting party may: (i) terminate this Agreement without penalty, effective upon receipt of written notice of termination to the defaulting party, provided that termination may be effective immediately in the case of fraud, gross negligence, willful misconduct, criminal conduct or misappropriation of funds; and (ii) pursue any and all other remedies available to the non-defaulting party at law or in equity. In addition to and cumulative of the foregoing, upon the occurrence of any Event of Default on the part of Owner, all Management Fees, Reimbursable Expenses and all other sums payable to Manager under this Agreement shall be immediately due and payable without notice. In no event shall (i) the provisions of this Agreement with respect to the payment of a Termination Fee upon the

termination of this Agreement under certain circumstances be construed as defining or limiting the amount recoverable by Manager from Owner by reason of any Event of Default on the part of Owner; or (ii) entitle Manager to receive a Termination Fee in the event of a termination by reason of any Event of Default on the part of Manager

**17.2    Manager's Rights to Perform.**

(a)     If Owner shall fail to make any payment or to perform any act required of Owner pursuant to this Agreement, Manager may (but shall not be obligated to), without further notice to, or demand upon, Owner and without waiving or releasing Owner from any obligations under this Agreement, make such payment (either with its own funds or with funds withdrawn for such purpose from the Operating Accounts or the Reserve) or perform such act. Manager agrees to provide written notice to Owner within five (5) days after Manager exercises its rights in the preceding sentence.   All sums so paid by Manager and all necessary incidental costs and expenses incurred by Manager in connection with the performance of any such act, together with interest thereon at the Default Rate from the date of making such expenditure by Manager, shall be payable to Manager on demand.

(b)     Manager shall have the right to set-off against any payments to be made to Owner by Manager under any provision of this Agreement and against all funds from time to time in the Operating Accounts and the Reserve, any and all liabilities of Owner to Manager. Manager may withdraw from the Operating Accounts and the Reserve from time to time such amounts as Manager deems desirable in partial or full payment of all or any portion of said liabilities, the amount of such withdrawals to be paid by Owner to Manager on demand and to be replaced in the respective account and fund.

**ARTICLE 18**
**OWNER'S ADDITIONAL TERMINATION RIGHTS**

**18.1    Sale of the Hotel**. If Owner proposes to sell or otherwise dispose of the Hotel or Owner's interests therein, to a bona fide third-party (the "**Third-Party Purchaser**") during the Term, this Agreement will terminate effective upon the consummation of the closing of such sale. Owner shall provide Manager with written notice of termination of this Agreement not less than sixty (60) days prior to the scheduled date of closing of the sale of the Hotel; provided, however, if such a sale does not actually occur, the notice of termination shall be deemed ineffective.

**18.2    Performance Standard.**





## ARTICLE 19
### AREA OF PROTECTION

19.1

## ARTICLE 20
### TRANSFER TO OWNER UPON TERMINATION

Upon any termination of this Agreement, whether due to the occurrence of an Event of Default or otherwise, Manager shall cooperate with Owner and shall execute all documents or instruments requested by Owner in connection with the transfer, all without consideration to Manager (provided that, if such termination is due to a reason other than a default by Manager under this Agreement, Owner will reimburse Manager for Manager's reasonable expenses to effect such transfer) or the imposition of liability by Manager, to Owner or its nominee of the Permits and the License Agreement used or useful in connection with the operation of the Hotel. Without limiting the generality of the foregoing, Manager shall cause its officials, subject to restrictions provided in any License Agreement or related agreement, to provide all sales lists and customer contacts to Lender and to execute any necessary documents and to visit licensing authorities along with Owner's representatives in order to expedite (i) the orderly transfer to Owner or its designee of the Permits and the License Agreement (ii) the renewal thereof to Owner or Owner's designee if appropriate. In the event that this Agreement terminates due to

any reason other than a default by Manager under this Agreement, a sufficient number of Hotel Employees will be hired by Owner or its successor, assign or designee, and retained for at least 90 days thereafter, so as not to cause a "mass layoff" or "plant closing", as defined in the Workers Adjustment and Retraining Act, 29 USC, sec 2101 et seq.

## ARTICLE 21
## NOTICES

All notices, elections, acceptances, demands, consents and reports (collectively "notice") provided for in this Agreement shall be in writing and shall be given to the other party at the address set forth below or at such other address as any of the parties hereto may hereafter specify in writing.

To Owner:   RREAF O&G PORTFOLIO #3 LLC
C/O Spectrum Origination LLC
1253 Springfield Avenue, Suite 201
New Providence, New Jersey 07974
Attention: Jeffrey Schaffer

With a copy to:
   Spectrum Group Management LLC
1250 Broadway, 19th Floor
New York, New York 10001
Attention: Peter Locke

To Manager:  Channel Point Hospitality LLC
2500 North Dallas Parkway
Suite 600
Plano, Texas 75093

With a copy to:  Carla S. Moreland, Esq.
5112 Briargrove Lane
Dallas, Texas 75287

Such notice or other communication may be given by Federal Express or other nationally recognized overnight carrier or by electronic facsimile in which case notice shall be deemed given upon confirmed delivery. Notice may be mailed by United States registered or certified mail, return receipt requested, postage prepaid, deposited in a United States post office or a depository for the receipt of mail regularly maintained by the post office. If mailed, then such notice or other communication shall be deemed to have been received by the addressee on the fifth (5th) day following the date of such mailing. Such notices, demands, consents and reports may also be delivered by hand, in which case it shall be deemed received upon delivery.

## ARTICLE 22
## CONSENT AND APPROVAL

Except as herein otherwise provided, whenever in this Agreement the consent or approval of Manager or Owner is required, such consent or approval shall not be unreasonably withheld or delayed. Such consent or approval shall also be in writing only and shall be executed only by an authorized officer or agent of the party granting such consent or approval.

## ARTICLE 23
## NON-ASSIGNABILITY

This Agreement shall not be assignable by Manager or Owner; provided however, that Owner shall be entitled to assign this Agreement to an Affiliate; and Manager shall (i) be entitled to assign this Agreement to an Affiliate of such party as part of a modification to such party's company structure in which all or substantially all of such party's assets are transferred to an Affiliate of such party; and (ii) have the right to assign its rights to receive payments under this Agreement as security for indebtedness or other obligations.

## ARTICLE 24
## INDEMNITY

24.1 **Indemnity by Manager**.



24.2 **Indemnity by Owner**. To the extent that Manager shall not be fully covered by insurance required to be maintained pursuant to this Agreement or if, after giving effect to the provisions of Section 24.1(b) of this Agreement, Gross Revenues are not sufficient to pay all Liabilities, Owner shall indemnify, defend and hold harmless Manager and its directors, officers, employees and agents from and against any damages, loss, liability, cost, action, cause, claim or expense, including attorneys' fees, arising out of, or incurred in connection with the management and operation of the Hotel.

**Management Agreement – Page 34**

24.3    **Survival**. The provisions of this Article 24 shall survive the expiration or earlier termination of this Agreement.

## ARTICLE 25
## PARTIAL INVALIDITY

In the event that any one or more of the phrases, sentences, clauses or paragraphs contained in this Agreement shall be declared invalid by the final and unappealable order, decree or judgment of any court, this Agreement shall be construed as if such phrases, sentences, clauses or paragraphs had not been inserted, unless such construction would substantially destroy the benefit of the bargain of this Agreement to either of the parties hereto.

## ARTICLE 26
## MISCELLANEOUS

26.1    **Disputes**. Whenever any issue or dispute arises under this Agreement relating to the Annual Operating Budget, the Approved Capital Budget and or the calculation and payment of the Reserves, and the Management Fee, such issue or dispute shall be resolved utilizing the Uniform System of Accounts and the by application of generally accepted accounting principles consistently applied.

26.2    **Further Assurances**. Owner and Manager shall execute and deliver all other appropriate supplemental agreements and other instruments, and take any other action necessary to make this Agreement fully and legally effective, binding and enforceable as between them and as against third parties.

26.3    **Waiver**. The waiver of any of the terms and conditions of this Agreement on any occasion or occasions shall not be deemed a waiver of such terms and conditions on any future occasion.

26.4    **Successors and Assigns**. Subject to and limited by Article 23, this Agreement shall be binding upon and inure to the benefit of Owner, its successors and permitted assigns, and shall be binding upon and inure to the benefit of Manager, its successors and permitted assigns.

26.5    **Governing Law**. This Agreement shall be construed, both as to its validity and as to the performance of the parties, in accordance with the laws of the State of Texas.

26.6    **Compliance with Mortgage and License Agreement**. In carrying out their respective duties and obligations under the terms of this Agreement, Owner and Manager shall use commercially reasonable good faith efforts to take no action that could reasonably be expected to constitute a material default under any Mortgage or the License Agreement and will use commercially reasonable good faith efforts to take such actions as are reasonably necessary to comply therewith.  Notwithstanding the foregoing or anything in this Agreement to the contrary, if there is a breach by Owner under the Mortgage and such breach is the result of the failure of Manager, such breach shall not be a default by Manager under this Agreement (and Manager shall have no liability therefore) unless such default and/or failure is specifically provided for in Section 16.1 of this Agreement and the applicable notice and cure periods provided for such breach and/or failure, if any, have expired.

26.7 **Amendments**. This Agreement may not be modified, amended, surrendered or changed, except by a written document signed by the Owner and Manager agreeing to be bound thereby.

26.8 **Estoppel Certificates**. Owner and Manager agree, at any time and from time to time, as requested by the other party, upon not less than ten (10) days' prior written notice, to execute and deliver to the other a statement certifying that this Agreement is unmodified and in full force and effect (or if there have been modifications, that the same are in full force and effect as modified and stating the modifications), certifying the dates to which required payments have been paid, and stating whether or not, to the best knowledge of the signer, the other party is in default in performance of any of its obligations under this Agreement, and if so, specifying each such default of which the signer may have knowledge, it being intended that such statement delivered pursuant hereto may be relied upon by others with whom the party requesting such certificate may be dealing.

26.9 **Inspection Rights**. Owner and Lender shall have the right to inspect the Hotel and examine the books and records of Manager pertaining to the Hotel at all reasonable times during the Term upon reasonable notice to Manager, and Owner and the holder of any Mortgage shall have access to the Hotel and the books and records pertaining thereto at all times during the Term to the extent necessary to comply with the terms of any Mortgage, all to the extent consistent with applicable law and regulations and the rights of guests, tenants and concessionaires of the Hotel.

26.10 **Subordination**. This Agreement, any extension hereof and any modification hereof shall be subject and subordinate to a Mortgage as provided therein and, in the event of a foreclosure or deed in lieu of foreclosure, subject to the terms of any subordination agreement with Lender, this Agreement shall terminate unless otherwise assumed by Lender in writing. The provisions of this Section shall be self-operative and no further instrument of subordination shall be required; however, Manager will execute and return to Owner (or to Lender, as designated by Owner) such documentation as Owner or Lender may reasonably request to evidence the subordination of this Agreement to the Mortgage. In the event of any refinancing of the Property, Manager shall cooperate in all reasonable respects with Owner in effecting such refinancing.

26.11 **Effect of Approval of Plans and Specifications**. Owner and Manager agree that in each instance in this Agreement or elsewhere wherein Manager is required to give its approval of plans, specifications, budgets and/or financing, no such approval shall imply or be deemed to constitute an opinion by Manager, nor impose upon Manager any responsibility for the design or construction of additions to or improvements of the Hotel, including but not limited to structural integrity or life/safety requirements or adequacy of budgets and/or financing. The scope of Manager's review and approval of plans and specifications is limited solely to the adequacy and relationship of spaces and aesthetics of the Hotel in order to comply with the Operating Standards.

26.12 **Entire Agreement**. This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof, superseding all prior agreements or undertakings, oral or written.

**Management Agreement – Page 36**

26.13   **Time is of the Essence**. Time is of the essence in this Agreement.

26.14   **Interpretation**. No provision of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have structured or dictated such provision.

26.15   **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and need not be signed by more than one of the parties hereto and all of which shall constitute one and the same agreement.

26.16   **No Electronic Transactions**. The parties hereby acknowledge and agree that this Agreement shall not be executed, entered into, altered, amended or modified by electronic means. Without limiting the generality of the foregoing, the parties hereby agree that the transactions contemplated by this Agreement shall not be conducted by electronic means, except as specifically set forth in Article 21 of this Agreement.

26.17   **Prohibited Persons and Transactions**.

(a)      Manager is not, and shall not become, a person or entity with whom U. S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including those named in OFAC's Specially Designated and Blocked Person's List) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, or Support Terrorism), or other governmental action (such persons and entities being "**Prohibited Persons**").

(b)      Owner is not and shall not become a Prohibited Person.

26.18   **Confidentiality.** Owner and Manager agree to keep the terms and conditions of all leases and other occupancy agreements in effect at the Hotel (if any) and all other accruements relating to the Hotel, together with all information and data obtained, possessed, or generated by Manager in connection with the Hotel (collectively, "**Privileged Information**"), strictly confidential and not to make any public announcements or any disclosures to any third parties, either orally or in writing, with respect to any Privileged Information without the express written consent of the other party hereunder; provided, however, the restrictions imposed hereby shall not apply to any Privileged Information (1) which is required to be disclosed in order to comply with any law, ordinance, governmental decree or any rule, regulation or decree of any interested governmental body or (2) which must otherwise be disclosed to relevant third parties, including accountants, attorneys and lenders, in the course of reasonable and diligent management and operation of the Hotel or the business of Owner, or any subsidiary or Affiliate of Owner or Manager. If Manager makes such disclosure, it shall notify such third party of this provision and of the requirement of Owner for confidentiality. The provisions of this Section 26.18 shall survive the expiration or termination of this Agreement

26.19   **No Third Party Rights**. This Agreement shall inure solely to the parties hereto. Notwithstanding any other provision of this Agreement, no third party shall have any rights pursuant to the terms of this Agreement.

## ARTICLE 27
## NO REPRESENTATIONS AS TO INCOME OR FINANCIAL SUCCESS OF HOTEL

In entering into this Agreement, Manager and Owner acknowledge that neither Owner nor Manager has made any representation to the other regarding projected earnings, the possibility of future success or any other similar matter respecting the Hotel, and that Manager and Owner understand that no guarantee is made to the other as to any specific amount of income to be received by Manager or Owner or as to the future financial success of the Hotel.

## ARTICLE 28
## REPRESENTATIONS OF MANAGER

In order to induce Owner to enter into this Agreement, Manager does hereby make the following representations and warranties:

(a)     the execution of this Agreement is permitted by the certificate of formation and partnership agreement of Manager and this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of Manager enforceable in accordance with the terms hereof;

(b)     to the best knowledge of Manager, there is no claim, litigation, proceeding or governmental investigation pending, or, as far as is known to Manager, threatened, against or relating to Manager, the properties or business of Manager or the transactions contemplated by this Agreement which does, or may reasonably be expected to, materially and adversely affect the ability of Manager to enter into this Agreement or to carry out its obligations hereunder, and to the best knowledge of Manager, there is no basis for any such claim, litigation, proceedings or governmental investigation, except as has been fully disclosed in writing to Owner and Lender; and

(c)     neither the consummation of the transactions contemplated by this Agreement on the part of Manager or to be performed, nor the fulfillment of the terms, conditions and provisions of this Agreement, conflicts with or will result in the breach of any of the terms, conditions or provisions of, or constitute a default under, any agreement, indenture, instrument or undertaking to which Manager is a party or by which it is bound.

## ARTICLE 29
## REPRESENTATIONS OF OWNER

In order to induce Manager to enter into this Agreement, Owner does hereby make the following representations and warranties:

(a)     the execution of this Agreement is permitted by the Limited Liability Company Agreement of Owner and this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of Owner enforceable in accordance with the terms hereof;

(b)     there is no claim, litigation, proceeding or governmental investigation pending, or as far as is known to Owner, threatened, against or relating to Owner, the properties or business

of Owner or the transactions contemplated by this Agreement which does, or may reasonably be expected to, materially and adversely affect the ability of Owner to enter into this Agreement or to carry out its obligations hereunder, and there is no basis for any such claim, litigation, proceedings or governmental investigation, except as has been fully disclosed in writing to Manager; and

(c)     neither the consummation of the transactions contemplated by this Agreement by this Agreement on the part of Owner to be performed nor the fulfillment of the terms, conditions and provisions of this Agreement, conflicts with or will result in the breach of any of the terms, conditions or provisions of, or constitute a default under, any agreement, indenture, instrument or undertaking to which Owner is a party or by which it is bound.

## ARTICLE 30
## DISPUTE RESOLUTION

Except as specifically provided in Section 4.4 of this Agreement, Owner and Manager agree that any dispute between the parties related to or arising out of this Agreement that cannot be amicably settled by the parties hereunder, shall first be submitted for non-binding mediation before resorting to any litigation, equitable proceeding or other enforcement action. Such mediation shall be held within a twenty-five mile radius of the Hotel (or such other location mutually agreed by the parties) and the parties shall cooperate in good faith to agree on a mediator who shall be a retired or semi-retired judge having at least ten (10) years of experience on the bench hearing complex commercial transactions. If the parties hereto have failed to designate, by a joint written statement, a mediator within thirty (30) days following the date of a written request therefor by either Manager or Owner to the other, then either Owner or Manager may notify the local office of the American Arbitration Association ("**AAA**") or JAMS and request such entity to select a person to act as the mediator to assist in the resolution of the dispute. The mediation will be a non-binding conference between the parties conducted in accordance with the applicable rules and procedures of AAA or JAMS (as determined by the mediator). The compensation of the mediator and all related expenses shall be borne equally by the parties, each of whom shall bear their own costs, irrespective of the outcome of the mediation. If any dispute remains unresolved between the parties after the mediation is complete, then either party shall be entitled to pursue its rights and remedies at law or in equity. The provisions of this Article 30 shall survive the expiration or earlier termination of this Agreement.

## ARTICLE 31
## ADDITIONAL OBLIGATIONS OF MANAGER

Manager acknowledges that Owner is vitally interested in the qualifications of the individuals designated as the general manager and the director of sales of the Hotel. Manager shall, from time to time, consult with Owner and obtain Owner's approval as to the appointment of individuals to such positions; provided, however, Owner and Manager acknowledge that nothing in this Article is intended to limit or negate the authority of Manager elsewhere provided in this Agreement to remove and replace, in its sole discretion, the general manager and/or director of sales of the Hotel.

## ARTICLE 32
## TERMINATION OF THE LICENSE AGREEMENT

Owner reserves and shall have the absolute right in its sole and unfettered discretion, at any time and without the consent or approval of (but with notice to) Manager, to terminate the License Agreement, provided, however, that (i) Owner shall have no such right in order to establish its own independent operations, such as an operation without a franchise or license or in its own hotel name; (ii) in the event of such a termination by Owner, Manager shall have the right of approval (which right shall be reasonably exercised) of any new franchise or license for the Hotel; and (iii) if Owner's decision to terminate the License Agreement is made without the consent of Manager, then the provisions of Section 18.2 of this Agreement shall no longer apply.

## ARTICLE 33
## RECOURSE

Any provision of this Agreement to the contrary notwithstanding, Manager hereby agrees that no personal, partnership or corporate liability of any kind or character (including, without limitation, the payment of any judgment) whatsoever now attaches or at any time hereafter under any condition shall attach to Owner or any of Owner's constituent entities and affiliates or any mortgagee for payment of any amount payable under this Agreement or for the performance of any obligation under this Agreement. The exclusive remedies of Manager for the failure of Owner to perform any of its obligations under this Agreement shall be to proceed against the interest of Owner in and to the Hotel for Manager's actual, out-of-pocket damages (and not any consequential, punitive or exemplary damages), and Owner shall not be personally liable for any deficiency.

*The rest of this page is intentionally left blank.*

IN WITNESS WHEREOF, Owner has caused this Agreement to be executed and its seal affixed by its partners duly authorized thereunto and Manager has caused this Agreement to be executed and its seal affixed by its officer duly authorized thereunto, the day and year first above written, in duplicate.

**OWNER**:

**RREAF O&G PORTFOLIO #3 LLC**


By: _____
Name: Jeff Schaffer
Title: Chief Executive Officer


**MANAGER**:

**CHANNEL POINT HOSPITALITY LLC**


By: _____
Name: _____
Title: _____

**Signature Page to Management Agreement – Page Solo**
COMFORT INN MIDLAND

# EXHIBIT A

## MAJOR ACCOUNT CATEGORIES

Room Sales
Telephone Sales
Food Sales
Beverage Sales
Miscellaneous Income

Room Expense
Telephone Expense
Food Expense
Beverage Expense
Miscellaneous Expense

A&G
Management Fee
Advertising & Business Promotion
R&M
H-L-P

Property Tax
Insurance
CEP Reserve
Leases

**Exhibit A – Solo Page**

## EXHIBIT B

## DESCRIPTION OF PREMISES

<u>Parcel 1:</u>

Lot Four (4), Block One (1), AMARON ADDITION, an addition to the City of Midland, Midland County, Texas, according to the map or plat thereof of record in Plat Cabinet C, Page 142, Plat Records, Midland County, Texas.

<u>Parcel 2:</u>

Easement Estate created by that certain Reciprocal Access Easement as granted to subject property in plat of Amaron Addition Section 7, recorded in Cabinet E, Page 378, Plat Records, Midland County, Texas.

# EXHIBIT C

# EXAMPLE OF MONTHLY TRANSACTIONS REPORT

```
10/09/12  11:35 am                              P&L EXAMPLE ENTITY                                    Day  Page:    1
                                                INCOME STATEMENT
                                                End of Year 2012

ACTUAL       %     BUDGET      %    LAST YEAR      %                                   ACTUAL      %     BUDGET      %    LAST YEAR      %
----------  ----  ----------  ----  ----------  ----                                  ----------  ----  ----------  ----  ----------  ----
       0   0.00         0   0.00         0   0.00   Total Avl Rooms                         0   0.00         0   0.00         0   0.00
       0   0.00         0   0.00         0   0.00   # Room/Occ %                            0   0.00         0   0.00         0   0.00
       0   0.00         0   0.00         0   0.00   Revenue/Average Rate                    0   0.00         0   0.00         0   0.00
       0   0.00         0   0.00         0   0.00   RevPar                                  0   0.00         0   0.00         0   0.00

       0   0.00         0   0.00         0   0.00   ----------REVENUES----------
       0   0.00         0   0.00         0   0.00   Rooms                                   0   0.00         0   0.00         0   0.00
       0   0.00         0   0.00         0   0.00   F&B Revenue                             0   0.00         0   0.00         0   0.00
       0   0.00         0   0.00         0   0.00   Communications                          0   0.00         0   0.00         0   0.00
       0   0.00         0   0.00         0   0.00   Minor Op Depts.                         0   0.00         0   0.00         0   0.00
       0   0.00         0   0.00         0   0.00   Rent/Other                              0   0.00         0   0.00         0   0.00
----------  ----  ----------  ----  ----------  ----                                  ----------  ----  ----------  ----  ----------  ----
       0   0.00         0   0.00         0   0.00   TOTAL REVENUES                          0   0.00         0   0.00         0   0.00

       0   0.00         0   0.00         0   0.00   ----DEPARTMENTAL EXPENSES----
       0   0.00         0   0.00         0   0.00   Rooms                                   0   0.00         0   0.00         0   0.00
       0   0.00         0   0.00         0   0.00   Food & Beverage                         0   0.00         0   0.00         0   0.00
       0   0.00         0   0.00         0   0.00   Communications                          0   0.00         0   0.00         0   0.00
       0   0.00         0   0.00         0   0.00   Minor Operating                         0   0.00         0   0.00         0   0.00
       0   0.00         0   0.00         0   0.00   Rent & Other                            0   0.00         0   0.00         0   0.00
----------  ----  ----------  ----  ----------  ----                                  ----------  ----  ----------  ----  ----------  ----
       0   0.00         0   0.00         0   0.00   TOTAL DEPARTMENTAL EXPENSES             0   0.00         0   0.00         0   0.00

       0   0.00         0   0.00         0   0.00   -----DEPARTMENTAL PROFIT-----
       0   0.00         0   0.00         0   0.00   Rooms                                   0   0.00         0   0.00         0   0.00
       0   0.00         0   0.00         0   0.00   Food & Beverage                         0   0.00         0   0.00         0   0.00
       0   0.00         0   0.00         0   0.00   Communications                          0   0.00         0   0.00         0   0.00
       0   0.00         0   0.00         0   0.00   Minor Op Depts                          0   0.00         0   0.00         0   0.00
       0   0.00         0   0.00         0   0.00   Rent/Other                              0   0.00         0   0.00         0   0.00
----------  ----  ----------  ----  ----------  ----                                  ----------  ----  ----------  ----  ----------  ----
       0   0.00         0   0.00         0   0.00   GROSS OPER INCOME                       0   0.00         0   0.00         0   0.00

       0   0.00         0   0.00         0   0.00   ----UNDISTRIBUTED EXPENSES----
       0   0.00         0   0.00         0   0.00   Admin & General                         0   0.00         0   0.00         0   0.00
       0   0.00         0   0.00         0   0.00   Advertising                             0   0.00         0   0.00         0   0.00
       0   0.00         0   0.00         0   0.00   Sales/Marketing                         0   0.00         0   0.00         0   0.00
       0   0.00         0   0.00         0   0.00   Repairs/Maintenance                     0   0.00         0   0.00         0   0.00
       0   0.00         0   0.00         0   0.00   Energy                                  0   0.00         0   0.00         0   0.00
----------  ----  ----------  ----  ----------  ----                                  ----------  ----  ----------  ----  ----------  ----
       0   0.00         0   0.00         0   0.00   TOTAL UNDISTRIBUTED                     0   0.00         0   0.00         0   0.00

       0   0.00         0   0.00         0   0.00   GROSS OPERATING PROFIT                  0   0.00         0   0.00         0   0.00
```

**Exhibit C – Page 1**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
INCOME STATEMENT
End of Year 2012

jay  Page:  2

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Management Fee | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Franchise Fee | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | INCOME BEFORE FIXED CHARGES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | --------FIXED/OTHER-------- | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL FIXED/OTHER | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | EBITDA | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | PROFORMA  N O I | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | DEBT, DEPR/AMORT, CAP & OTHER | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL DEBT, DEPR/AMORT, CAP & | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | NET INC AVAIL/ TAXES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | --ADD BACKS & SUBTRACTIONS-- | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | NET OPERATING INCOME | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**<u>Exhibit C – Page 2</u>**

6444430v.1

10/08/12  11:35 am

P&L EXAMPLE ENTITY
ROOMS DEPARTMENT
End of Year 2012

jay  Page:    3

| | ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REVENUE | | | | | | | | | | | | | |
| TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| NET REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| SALARIES / WAGES | | | | | | | | | | | | | |
| TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| BENEFITS | | | | | | | | | | | | | |
| TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| DEPARTMENTAL PROFIT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 3**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
ROOMS DEPARTMENT
End of Year 2012

jay  Page:  4

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 4**

6444430v.1

10/05/12  11:35 am                                P&L EXAMPLE ENTITY                                          jay  Page:    5
                                                  ROOM STATISTICS
                                                  End of Year 2012

| ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |                     | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|--------|--------|--------|--------|-----------|--------|---------------------|--------|--------|--------|--------|-----------|--------|
|        |        |        |        |           |        | OCCUPIED ROOMS      |        |        |        |        |           |        |
| 0      | 0.00   | 0      | 0.00   | 0         | 0.00   | TOTAL TRANSIENT     | 0      | 0.00   | 0      | 0.00   | 0         | 0.00   |
| 0      | 0.00   | 0      | 0.00   | 0         | 0.00   | TOTAL GROUP         | 0      | 0.00   | 0      | 0.00   | 0         | 0.00   |
| 0      | 0.00   | 0      | 0.00   | 0         | 0.00   | TOTAL SOLD          | 0      | 0.00   | 0      | 0.00   | 0         | 0.00   |
| 0      | 0.00   | 0      | 0.00   | 0         | 0.00   | TOTAL OCCUPIED      | 0      | 0.00   | 0      | 0.00   | 0         | 0.00   |
| 0      | 0.00   | 0      | 0.00   | 0         | 0.00   | TOTAL AVAILABLE ROOMS | 0    | 0.00   | 0      | 0.00   | 0         | 0.00   |

**Exhibit C – Page 5**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOM STATISTICS
End of Year 2012

jay  Page:    6

| ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUE/AVERAGE RATES | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL TRANSIENT | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL GROUP | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL PAYING RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL ROOMS OTHER | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | OVERALL ROOM RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | REVPAR | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 6**

6444430v.1

10/05/12 11:35 am

P&L EXAMPLE ENTITY
ROOM STATISTICS
End of Year 2012

jay Page: 7

| ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | Guest Services | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL SALARIES / WAGES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | BENEFITS | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL BENEFITS | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & BENEFITS | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | DEPARTMENTAL PROFIT | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 7**

6444430v.1

10/08/12  11:35 am

P&L EXAMPLE ENTITY
ROOM STATISTICS
End of Year 2012

jay  Page:  8

| ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

OTHER EXPENSES

| 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | TOTAL OTHER EXPENSES | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |

**Exhibit C – Page 8**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
FOOD & BEVERAGE CONSOLIDATED
End of Year 2012

Jay  Page:  9

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **FOOD REVENUE** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | NET FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **BEVERAGE REVENUE** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | NET BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **OTHER REVENUE** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | NET OTHER REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 9**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
FOOD & BEVERAGE CONSOLIDATED
End of Year 2012

jay  Page:   10

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OVERALL NET FOOD COST | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OVERALL NET BEVERAGE COST | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OTHER COST | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL COST OF GOODS SOLD | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | GROSS PROFIT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES/WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL GENERAL | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES/WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Payroll Taxes & Benefits | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENTAL PROFIT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 10**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
FOOD & BEVERAGE CONSOLIDATED
End of Year 2012

jay  Page:   11

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 11**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

jay Page:  12

| | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| COVERS & CAPTURE | | | | | | | | | | | | | |
| TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| FOOD REVENUE & AVG CHECK | | | | | | | | | | | | | |
| TOTAL FOOD REVENUE & AVG CHECK | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| BEVG REVENUE & BPOR | | | | | | | | | | | | | |
| TOTAL BEVG REVENUE & BPOR | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| BEVG REVENUE & % FOOD | | | | | | | | | | | | | |
| TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 12**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

Jay  Page:   13

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ROOM SERVICE | | | | | | |
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ============================ | | | | | | |
| | | | | | | RESTAURANT 1 | | | | | | |
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ============================ | | | | | | |
| | | | | | | BANQUETS | | | | | | |
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 13**
6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

Jay  Page:  14

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|--------|------|--------|------|-----------|------|---|--------|------|--------|------|-----------|------|
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | CATERING | | | | | | |
| | | | | | | COVERS | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | BANQUETS & CATERING | | | | | | |
| | | | | | | COVERS | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | LOUNGE 1 | | | | | | |
| | | | | | | BEVG REVENUE & BPCR | | | | | | |

**Exhibit C – Page 14**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

jay Page:  15

| | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL BEVG REVENUE & RPOR | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | | RESTAURANT 2 | | | | | | |
| | | | | | | | COVERS & CAPTURE | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | | LOUNGE 2 | | | | | | |
| | | | | | | | BEVG REVENUE & RPOR | | | | | | |
| | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL BEVG REVENUE & RPOR | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | | CONFERENCE CENTER | | | | | | |
| | | | | | | | COVERS & CAPTURE | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL CAPTURE & COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | | BEVG REVENUE & % FOOD | | | | | | |

**Exhibit C – Page 15**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

Jay  Page:  16

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

IN ROOM BAR

REVENUE & RPOR

| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL REVENUE & RPOR | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 16**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOM SERVICE
End of Year 2012

jay  Page:  17

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 17**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
RESTAURANT 1
End of Year 2012

Jay  Page:  18

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|--------|---|--------|---|-----------|---|---|--------|---|--------|---|-----------|---|
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 18**

6444430v.1

10/09/12  11:35 am                                      P&L EXAMPLE ENTITY                                    jay  Page:   19
                                                       BANQUETS & CATERING
                                                       End of Year 2012

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | CATERING | | | | | | |
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

<u>**Exhibit C – Page 19**</u>

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
BANQUETS & CATERING
End of Year 2012

jay  Page:  20

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | TOTAL BANQUETS & CATERING | | | | | | |
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL COMBINED REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARY / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 20**

10/05/12  11:35 am                                P&L EXAMPLE ENTITY                                  Jay  Page:   21
                                                 BANQUETS & CATERING
                                                 End of Year 2012

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | BANQUETS | | | | | | |
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 21**

10/08/12  11:35 am

P&L EXAMPLE ENTITY
LOUNGE 1
End of Year 2012

Jay  Page:   22

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPT REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 22**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
COMMUNICATIONS
End of Year 2012

joy Page: 23

| ACTUAL | | %POA/% | BUDGET | | %POA/% | LAST YEAR | | %POA/% | | | ACTUAL | | %POA/% | BUDGET | | %POA/% | LAST YEAR | | %POA/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | REVENUES | | | | | | | | | | |
| 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 | TOTAL PHONE REVENUE | | 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 |
| 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 | NET PHONE REVENUE | | 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 |
| 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 | TOTAL INTERNET REVENUE | | 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 |
| 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 | NET INTERNET REVENUE | | 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 |
| 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 | NET COMBINED REVENUES | | 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 |
| | | | | | | | | | COSTS OF SALES | | | | | | | | | | |
| 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 | COS PHONE | | 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 |
| 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 | COS INTERNET | | 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 |
| 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 | TOTAL COST OF ALL SALES | | 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 |
| 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 | GROSS PROFIT/(LOSS) | | 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 |
| 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 | Payroll Taxes & Benefits | | 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 |
| 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 | TTL WAGES & BENEFITS | | 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 |
| 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 | TOTAL PROFIT/(LOSS) | | 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 |

**Exhibit C – Page 23**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
IN HOUSE MOVIES
End of Year 2012

Jay  Page:  24

| ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% | | ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUES | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | NET REVENUE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 24**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
GUEST LAUNDRY
End of Year 2012

jay  Page:   25

| | ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% | | ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REVENUES | | | | | | | | | | | | | |
| NET REVENUE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| GROSS PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| TTL WAGES & BENEFITS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| TOTAL PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 25**

6444430v.1

10/08/12  11:35 am

P&L EXAMPLE ENTITY
RENTS & OTHER INCOME
End of Year 2012

Jay Page:  26

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SPACE RENTALS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL RENTALS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | COMMISSIONS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL COMMISSIONS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | MISCELLANEOUS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL MISCELLANEOUS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL RENTS/OTHER INCOME | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 26**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
A&G
End of Year 2012

Jay  Page:   27

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL A&G EXP | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 27**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
SALES & MARKETING
End of Year 2012

jay  Page:   28

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | GROUP | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL GROUP | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | TRANSIENT | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Newspaper | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL TRANSIENT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Contingency | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL NON-MEDIA | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | GRAND TTL ADVERTISING | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 28**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
SALES & MARKETING
End of Year 2012

Jay  Page:  29

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Incentive/Svc Charge | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALES & ADVERTISING | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 29**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
REPAIRS & MAINTENANCE
End of Year 2012

Jay  Page:   30

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|--------|---|--------|---|-----------|---|---|--------|---|--------|---|-----------|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Grnds & Land - Outdoor | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Rent - Equipment | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL R&M EXPENSE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 30**

6444430v.1

10/05/12  11:35 am                           P&L EXAMPLE ENTITY                              Jay Page:   31
                                                  ENERGY
                                              End of Year 2012

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL ENERGY | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL ENERGY | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 31**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
FIXED & OTHER CHARGES
End of Year 2012

jmy  Page:  32

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **FEES** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FEES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **RENTS** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL RENTS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **LEASES** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL LEASES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **INSURANCE** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL INSURANCE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **REAL ESTATE TAXES** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REAL ESTATE TAXES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **OTHER TAXES** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER TAXES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **PARTNERSHIP EXPENSES** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL PARTNERSHIP EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **OTHER EXPENSES** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **INTEREST EXPENSE** | | | | | | |

**Exhibit C – Page 32**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
FIXED & OTHER CHARGES
End of Year 2012

Jay  Page:   33

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL INTEREST EXPENSE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | REIT LEASE | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REIT LEASE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | MISC NON EBITDA | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL MISC NON EBITDA | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | DEPRECIATION/AMORTIZATION 40T | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPRECIATION & AMORTIZAT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | FFE & ADDBACKS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FFE & ADDBACKS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FIXED EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 33**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
EE CAFE
End of Year 2012

jay  Page:   34

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL EE CAFE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Allocation to PTES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | FINAL EE CAFE TOTAL | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 34**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
PT & ES
End of Year 2012

jay  Page:  35

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | TAXES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL TAXES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | HEALTH INSURANCE | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL HEALTH INSURANCE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 401k Match | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL PT & ES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

% Column is % Total Wages

**Exhibit C – Page 35**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
PY & EE
End of Year 2012

jay  Page:  36

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | DISTRIBUTED TO: | | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DISTRIBUTION | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

<u>**Exhibit C – Page 36**</u>

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
PT & EB
End of Year 2012

Jay  Page:  37

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES, WAGES & INCENTIVES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Total Food & Beverage | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | GROSS TTL WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | S&W, INCENTIVES, PAID TIME OFF | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Lounge 1 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Total Food & Beverage | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL ALL PAID WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 37**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
HOUSE LAUNDRY
End of Year 2012

jay  Page:   38

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES & WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | DISTRIBUTED TO: | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DISTRIBUTION | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 38**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay  Page:  39

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **CASH** | | | | | |
| TOTAL CASH | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| SEMI-RESTRICTED CASH | | | | | |
| TOTAL SEMI-RESTRICTED CASH | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| RECEIVABLES | | | | | |
| TOTAL RECEIVABLES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| INVENTORIES | | | | | |
| TOTAL INVENTORIES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OPERATING EQUIPMENT | | | | | |
| TOTAL OPERATING EQUIPMENT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Exhibit C – Page 39**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay  Page:  40

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| PREPAIDS | | | | | |
| TOTAL PREPAIDS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| FIXED ASSETS | | | | | |
| Accum Amortization | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL FIXED ASSETS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OTHER ASSETS | | | | | |
| TOTAL OTHER ASSETS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL ASSETS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Exhibit C – Page 40**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay  Page:  41

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| **LIABILITIES** | | | | | |
| **PAYABLES** | | | | | |
| TOTAL PAYABLES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **DEPOSITS** | | | | | |
| TOTAL DEPOSITS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **OP TAXES AND WITHHOLDINGS** | | | | | |
| TOTAL OP TAXES AND WITHHOLDINGS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **ACCRUED OPERATING EXPENSES** | | | | | |
| TTL ACCRUED OPERATING EXPENSES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Exhibit C – Page 41**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay  Page:  42

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| DUE TO/FROM ACCOUNTS | | | | | |
| Due to XZ St Paul | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Due to REIT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL DUE TO/FROM ACCOUNTS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OTHER LIABILITIES | | | | | |
| TOTAL OTHER LIABILITIES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| NOTES PAYABLE | | | | | |
| TOTAL NOTES PAYABLE | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL LIABILITIES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OWNERS EQUITY | | | | | |
| Retained Earn - Prior Years | 0.00 | 0.00 | 0.00 | 695.02- | 695.02 |
| Retained Earn - Current Yr | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL OWNERS EQUITY | 0.00 | 0.00 | 0.00 | 695.02- | 695.02 |
| TOTAL LIAB. & OWNERS EQUITY | 0.00 | 0.00 | 0.00 | 695.02- | 695.02 |

**Exhibit C – Page 42**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFTK REPORT
End of Year 2012

Jay  Page:  43

| | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FULL TIME EQUIVALENT | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| SUMMARY HOURS & FTE | | | | | | | | | | | | | |
| TOTAL HOTEL | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| SUMMARY WAGES & AVG RATE | | | | | | | | | | | | | |
| TOTAL WAGES & AVG RATE | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |

**Exhibit C – Page 43**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFIS REPORT
End of Year 2012

jay  Page:  44

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ROOMS DEPARTMENT | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL OCCUPIED ROOMS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Room Attendant - Total | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | House Attendant - Total | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | Room Attendant - Total | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | House Attendant - Total | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL WAGES & AVG RATE | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| | | | | | | HOURS & FTE | | | | | | |
| | | | | | | FOOD & BEVERAGE SUMMARY | | | | | | |
| | | | | | | FOOD COVERS | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PROD / TOTAL COV | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVERAGE RATE | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL WAGES & AVG RATE | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 44**

6444430v.1

10/08/12  11:35 am                          P&L EXAMPLE ENTITY                                      jay  Page:   45
                                            MONTHLY EFTR REPORT
                                            End of Year 2012

      ACTUAL    CALC      BUDGET    CALC     LAST YEAR  CALC                        ACTUAL    CALC      BUDGET    CALC     LAST YEAR  CALC
    ---------  ------   ---------  ------   ----------  ------                    ----------  ------   ---------  ------   ----------  ------

                                                        =============================
                                                        A&G
                                                        HOURS & FTE
                                                        -----------
    ---------           ---------           ----------                           ----------           ---------           ----------
            0    0.00           0    0.00            0    0.00  TOTAL HOURS & FTE           0    0.00           0    0.00           0    0.00

**Exhibit C – Page 45**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY KPIS REPORT
End of Year 2012

jay Page:  46

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ROOM SERVICE | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | RESTAURANT 1 | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | RESTAURANT 2 | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 46**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFIN REPORT
End of Year 2012

Jay  Page:  47

| | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WAGES & AVG RATE | | | | | | | | | | | | | |
| TOTAL WAGES & AVG RATE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |
| HOURS & FTE | | | | | | | | | | | | | |
| TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| BANQUETS & CATERING | | | | | | | | | | | | | |
| HOURS & PRODUCTIVITY | | | | | | | | | | | | | |
| TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| WAGES & AVG RATE | | | | | | | | | | | | | |
| TOTAL WAGES & AVG RATE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |
| HOURS & FTE | | | | | | | | | | | | | |
| TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| CONFERENCE CENTER | | | | | | | | | | | | | |
| HOURS & PRODUCTIVITY | | | | | | | | | | | | | |
| TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| WAGES & AVG RATE | | | | | | | | | | | | | |
| TOTAL WAGES & AVG RATE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |
| HOURS & FTE | | | | | | | | | | | | | |

**Exhibit C – Page 47**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFIS REPORT
End of Year 2012

jay Page:  49

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ============================= | | | | | | |
| | | | | | | LOUNGE 1 | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL REVENUE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ============================= | | | | | | |
| | | | | | | LOUNGE 2 | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 48**
6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY KPIX REPORT
End of Year 2012

jay  Page:  49

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **IN ROOM RATE** | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL OCCUPIED ROOMS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & RMS PER OCC ROOM | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & HOURS PER OCC RO | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | TOTAL WAGES & AVG RATE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 49**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFIK REPORT
End of Year 2012

Jay  Page:  50

| | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CONTRACT LABOR | | | | | | | | | | | | | |
| HOURS & FTE | | | | | | | | | | | | | |
| WAGES & AVG RATE | | | | | | | | | | | | | |
| FOOD & BEVERAGE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| TOTAL WAGES $ AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 50**

6444430v.1

## EXHIBIT D

## INSURANCE REQUIREMENTS

1.    **Insurance Requirements for the Hotel**:

General Liability - $1,000,000 per Occurrence/$2,000,000 General and Product Liability Aggregate per Location

Including:
1. Products and Completed Operations
2. Contractual Liability
3. Personal Injury
4. Incidental Medical Malpractice
5. Molestation and Abuse are not Excluded
6. Punitive Damages unless Excluded by Public Policy
7. Fellow Employee Coverage
8. Garage Keepers Liability
9. Liquor Liability
10. Blanket Additional Interests
    a. All Managers or Lessors of Premises
    b. All mortgagors of Premises
    c. Vendors
    d. Volunteer Workers
    e. As required by Contract
11. Severability of Interests
12. Waiver of Subrogation as Required by Contract
13. Terrorism not Excluded or Sub-Limited
14. No Deductible/SIR
15. Coverage is Designated to the Scheduled Premises and is Primary and Non-Contributory

Commercial Automobile - $1,000,000 – Any Auto

Including:
1. Medical Payments - $5,000 per person
2. Personal Injury Protection – As required by State
3. Property Protection Insurance – As required by State
4. Uninsured Motorists - $1,000,000 Limit
5. Underinsured Motorists - $1,000,000 Limit
6. Physical Damage (Owned and Hired Autos) – Comprehensive $1,000 Deductible
7. Physical Damage (Owned and Hired Auto) – Collision $1,000 Deductible
8. Auto Loan/Lease Gap Coverage

Umbrella Liability - $25,000,000 per Occurrence/ $25,000,000 Aggregate per Location

      Including:
1. Retained Limit – 0
2. Follows Scheduled Underlying Policies

Workers Compensation – Provided in All States except as Provided by the State Funds of – ND, OH, WA, WV, WY

Medical Benefits – Statutory
1. Indemnity – Statutory
2. Employers Liability - $500,000
    a. Each Accident
    b. Disease - Each Employee
    c. Disease – Policy Limit

Crime - $1,000,000 Occurrence Limit S/T/A $10,000 per Occurrence Deductible Covering:
1. Employee Theft
2. Forgery or Alteration
3. Computer Fraud
4. Funds Transfer Fraud
5. Theft of Money & Securities
    a. Inside the Premises
    b. Outside the Premises

Guest Property - $10,000 Limit per Occurrence
1. $1,000 deductible
2. Liability Governed by Statute

Professional Liability - $1,000,000 Each Claim / $2,000,000 Aggregate for All Claims
1. Claim Includes Identifiable Loss and Defense Cost
2. A $25,000 Deductible Applies to Loss and Defense

Employment Practices Liability
1. $2,000,000 Aggregate for All Loss Combined (Including Defense Cost)
2. Retention $25,000

2. **Insurance Requirements for Major Contractors**:

(a) Worker's Compensation - Statutory amount or its equivalent under applicable law.

**Exhibit D – Page 2**

(b)    Employer's Liability - $500,000 minimum, where required by applicable or equivalent law.

(c)    Comprehensive General Liability; **either**

    (i)    $100,000 Bodily Injury per Person
           $300,000 per Occurrence
           $100,000 Property Damage

**-or-**

    (ii)    $1,000,000 combined single limit

**EXHIBIT E**

**COMPETITIVE SET**



<u>**Exhibit E – Solo Page**</u>
6444430v.1

**MANAGEMENT AGREEMENT**

between

**RREAF O&G PORTFOLIO #2 LLC**
as Owner

and

**CHANNEL POINT HOSPITALITY LLC**
as Manager

FOR

**COUNTRY INN & SUITES**
920 West Interstate 20
Midland, Texas 79701

## MANAGEMENT AGREEMENT

This Management Agreement (the "**Agreement**") made this ___ day of February 2016 between **RREAF O&G PORTFOLIO #2 LLC**, a Delaware limited liability company (**"Owner"**), as Owner, and **CHANNEL POINT HOSPITALITY LLC**, a Texas limited liability company (**"Manager"**), as Manager.

## RECITALS:

A.      Owner is the fee owner of the Hotel (as defined below).

B.      Manager is experienced in the management and operation of hotels, directly and through affiliated entities.

C.      Owner and Manager desire to enter into this Agreement for the management and operation of the Hotel in accordance with the terms and conditions and subject to the limitations contained in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner and Manager covenant and agree as follows:

## ARTICLE 1
## DEFINITIONS, TERMS AND REFERENCES

1.1      Definitions. In this Agreement and any Exhibits, the following terms shall have the following meanings:

"**Account Category**" shall include the major account categories set forth in Exhibit A attached hereto and made a part hereof as well as other major account categories, which are applicable to the Hotel consistent with the Statement of Income as defined by the Uniform System of Accounts or otherwise approved by Owner.

"**Accounting Fee**" shall have the meaning set forth in Article 11.

"**Accounting Period**" shall mean each calendar month (whether of 28, 29, 30 or 31 days) during each Fiscal Year.

"**Affiliate**" shall mean any person or entity that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with another person or entity. The term "**control**" (and correlative terms) shall mean the power, whether by contract, equity ownership or otherwise, to direct the policies or management of a person or entity. Without limiting the foregoing, an "**Affiliate**" also includes any partner or a partnership of any party to this Agreement, any member or membership parties thereto and any corporation, partnership, individual or trust related to or controlling or controlled by such partnership, individual or trust related to or controlling or controlled by such partnership party or its partners

**Management Agreement – Page 1**

or such membership party or its members. A natural person is related to another natural person if he or she is a spouse, parent, or lineal descendant of the other person.

"**Allocated Services**" shall mean certain support services that Manager obtains from a third party and provides on a central or regional basis to the hotels that it manages because such support services can be provided on a more efficient, effective and economical basis to each individual Manager managed hotel if the expenses of such support services are shared by other Manager managed hotels. Such support services include services in the areas of sales and marketing, food and beverage, human resources, insurance, technology, training and payroll (each such service, an "**Allocated Service**"; collectively, the "**Allocated Services**"). Owner and Manager agree that Manager shall provide Allocated Services to the Hotel and that the Hotel's portion of the cost thereof shall constitute a Gross Operating Expense so long as (i) the costs of the Allocated Services are allocated in good faith on a uniform, fair, equitable and proportionate basis among the Hotel and the other Manager managed hotels benefiting therefrom; and (ii) the Allocated Services shall not include services that do not benefit the Hotel; and (iii) the cost of the Allocated Services are either (a) included by Manager in each Annual Operating Budget or (b) otherwise approved in writing by Owner. The cost of the Allocated Services and the allocation of that cost to the Hotel and other Manager managed hotels shall be subject to audit by Owner pursuant to the terms of Section 10.3 of this Agreement. Manager further agrees that the benefit of any discounts or rebates received by Manager with respect to any of the Allocated Services shall be passed on to the Hotel on a proportionate basis as compared to other hotels managed by Manager or its Affiliates.

"**Annual Operating Budget**" shall mean an annual operating projection for the Hotel prepared and submitted by Manager to Owner and approved by Owner for each Fiscal Year pursuant to Section 4.4(a).

"**Annual Plan**" shall mean an annual business plan for the operation of the Hotel prepared by the Manager and approved by the Owner, which shall include the Annual Operating Budget, the Approved Capital Budget, the Marketing Plan and the Management Plan and any other material included therein by Manager as provided in Section 4.4.

"**Approved Capital Budget**" shall have the meaning set forth in Section 4.4(b).

"**Base Fee**" shall have the meaning set forth in Article 11.

"**Building and Appurtenances**" shall mean (i) the 66 room hotel building located on the Premises, and (ii) landscaping and other related facilities, together with all installations located at, or used in connection with the operation of the building for hotel purposes including, without limitation, any swimming pools, health club and recreational facilities, walkways, parking facilities, heating, lighting, sanitation equipment, air conditioning, laundry facilities, refrigeration, built-in kitchen equipment, and elevators.

"**Capital Budget**" shall mean Manager's proposed estimate of FF&E and Capital Improvements submitted to Owner each Fiscal Year pursuant to Section 4.4(b).

"**Capital Improvements**" shall have the meaning set forth in Section 8.2 hereof.

"**Commencement Date**" shall mean the date on which Manager assumes the management and operation of the Hotel under this Agreement for the benefit of Owner.

"**Competitive Set**" shall mean the properties listed on Exhibit E attached hereto and any revisions to such list agreed upon by Owner and Manager from time to time.

"**CPI**" shall mean the Consumer Price Index for All Urban Consumers, United States City Average, All Items (1982-84=100), issued by the Bureau of Labor Statistics of the United States Department of Labor.

"**Default Rate**" shall mean the lesser of (i) the Prime Rate plus four percent (4%) per annum or (ii) the highest lawful rate permitted by applicable Legal Requirements from time to time.

"**Effective Date**" shall mean the date of this Agreement as set forth on page 1 hereof.

"**Event of Default**" shall mean any of the events described in Article 16, provided that any condition contained therein for the giving of notice or the lapse of time, or both, has been satisfied.

"**Executive Personnel**" shall mean the general manager and the director of sales of the Hotel.

"**Fiscal Year**" shall mean the fiscal year that ends on the last day of each calendar year. The first Fiscal Year shall be the period commencing on the Commencement Date and ending on December 31st of the same calendar year in which the Commencement Date occurs. The words "full Fiscal Year" shall mean any Fiscal Year containing not fewer than 365 days. A partial Fiscal Year after the end of the last full Fiscal Year and ending with the expiration or earlier termination of the Term shall constitute a separate Fiscal Year.

"**Furniture, Fixtures and Equipment**" or "**FF&E**" shall mean all furniture, furnishings, wall coverings, fixtures, carpeting, rugs, fine arts, paintings, statuary, decorations, and hotel equipment and systems (including the costs associated with the purchase, installation and delivery thereof) located at, or used in connection with, the operation of the Building and Appurtenances as a hotel, including without limitation, major equipment and systems required for the operation of kitchens, bars, laundry and dry cleaning facilities, office equipment, dining room wagons, major material handling equipment, major cleaning and engineering equipment, telephone systems, computerized accounting and vehicles (including the costs associated with the purchase, installation and delivery thereof) together with all replacements therefor and additions thereto, but in all events excluding Operating Equipment and Supplies.

"**GOP Threshold**" ███████████████████████

"**Gross Operating Expenses**" shall mean the following expenses actually incurred in the operation of the Hotel:

<u>**Management Agreement – Page 3**</u>

1.   Cost of sales; salaries, wages, bonuses, payroll taxes; the cost of social insurance which shall include, but not be limited to, life, medical, disability insurance, retirement and other benefits incurred by Manager related to Hotel Employees;

2.   Departmental expenses; administrative and general expenses; the cost of third party vendor sources engaged to print payroll checks and reports or to perform any other services hereunder; the Accounting Fee; the Revenue Management Fee; advertising and business promotion for the Hotel; franchise fees, chain reservation fees and all other fees relating to the License Agreement; the cost of utilities, service contracts; and repairs and maintenance;

3.   The cost of replacing Operating Equipment and Supplies and Inventories as defined herein.

4.   The cost of uncollectible accounts receivables as reasonably determined by the Manager.

5.   The Owner-approved costs and expenses of technical consultants and operational experts for specialized services in connection with non-routine hotel work including roofing consultants, environmental engineers and others.

6.   The cost of insurance as set forth in this Agreement.

7.   The Management Fee.

8.   Real estate and personal property taxes levied or assessed against the Hotel and other like charges.

9.   Allocated Services.

10.  All other costs and expenses incurred in connection with the operation of the Hotel and otherwise approved as part of the Annual Plan or Annual Operating Budget, including but not limited to Reimbursable Expenses.

11.  Risk management costs.

12.  Legal services related to Hotel Employees or Hotel operations or services.

13.  Other amounts expressly set forth in this Agreement or the Annual Operating Budget as being included in Gross Operating Expenses.

All costs and fees of any Independent Public Accountants or other third parties who perform services approved by Owner (other than services provided by any Independent Public Accountants or other third parties in connection with services and/or reports required to be provided by Owner pursuant to the License Agreement) shall be paid by Owner and shall not constitute Gross Operating Expenses.

Except to the extent that the travel budget for Manager's personnel is included as a line item in the Annual Operating Budget, no part of Manager's central office overhead or general or

**Management Agreement – Page 4**

administrative expenses including the cost of travel by Manager's corporate or regional officers (other than Allocated Services) or for travel related to any other hotel operated by Manager or its Affiliates shall be deemed to be part of Gross Operating Expenses and all such costs and expenses shall be the sole responsibility of Manager.

"**Gross Operating Profit**" or "**GOP**" shall mean the amount of the remainder of Gross Revenues of the Hotel less the departmental expenses and undistributed expenses of the Hotel.

"**Gross Revenues**" shall mean for any applicable Accounting Period, all revenues and receipts of every kind derived from the Hotel and all departments and parts thereof during such Accounting Period, as finally determined on an accrual basis in accordance with the Uniform System of Accounts, including, but not limited to, revenues and income (both cash and credit transactions) before commissions and discounts for prompt or cash payments, from the rental of rooms and lobby space, exhibit or sales space of any kind, including without limitation, charges for reservations, deposits and cancellation fees not refunded to guests; income from vending machines, health club membership fees, wholesale and retail sales of merchandise, service fees and charges, business interruption insurance claims (but only for periods during the operating term) in respect of the Hotel, condemnation awards for temporary use of the Hotel, license, lease and concession fees and rentals (but not including the gross receipts of any licensees, lessees and concessionaires), food and beverages sales, and other sales of every kind conducted by, through or under Manager in connection with the Hotel. Gross Revenues shall not include (i) Federal, state and municipal excise, sales and use taxes or similar impositions collected directly from patrons or guests or included as part of the sales price of any goods or services; (ii) gratuities or service charges collected and paid to employees; (iii) credits or refunds to guests; (iv) proceeds arising from the sale or other disposition of property described in Section 1231 of the Internal Revenue Code or of capital assets; (v) proceeds from condemnation and payments received on account of insurance policies (other than the proceeds from business interruption insurance and from condemnation awards for temporary use of the Hotel when received); (vi) proceeds from claims for damages suffered by Manager or Owner, unless in recompense for a lost revenue item; and (vii) interest earned on the Reserve or Permitted Investments.

"**Hotel**" shall mean (a) the Building and Appurtenances and the Premises owned by Owner and (b) all FF&E, all Operating Equipment and Supplies, and all Inventories owned by Owner located at 920 West Interstate 20, Midland, Texas 79701.

"**hotel**" shall mean any hotel (other than the Hotel), inn, motor inn, motor hotel, motel, suite hotel, conference center, meeting center or any other facility providing either or both of short-term lodging and meeting arrangements.

"**Hotel Employees**" shall have the meaning set forth in Section 4.2.

"**Independent Public Accountant**" shall mean a nationally recognized firm of independent certified public accountants having hotel accounting experience, designated from time to time by Owner, subject to Manager's rights of approval, reasonably exercised.

"**Inventories**" shall mean "Inventories of Supplies" as defined in the Uniform System of Accounts, such as soap, toilet paper, stationery, writing pens, food and beverage inventories,

paper products, menus, expendable office and kitchen supplies, fuel, supplies and items similar to any of the foregoing.

"**Legal Proceedings**" shall mean all complaints, counterclaims or cross-claims filed in a court of competent jurisdiction, any notice of any claim of violation of any legal requirement by any governmental agency or authority, or any summons or other legal process, in each instance by or against the Hotel or by or against Owner, or Manager in connection with the Hotel.

"**Legal Requirements**" shall mean (a) all laws, ordinances, statutes, regulations and orders relating to the Hotel and the Premises now or hereafter in effect, including but not limited to, environmental laws and (b) all terms, conditions, requirements and provisions of (i) all Permits; (ii) all leases; and (iii) all liens, restrictive covenants and encumbrances affecting the Hotel or the Premises or any part thereof.

"**License Agreement**" shall mean the franchise or license agreement, if any, from time to time entered into by Owner with respect to the branding and operation of the Hotel. For the purposes of this definition, the following terms used in said section shall have the following meaning: "**Licensor**" shall mean the franchisor or licensor under the franchise or license agreement from time to time entered into by Owner with respect to the branding and operation of the Hotel; "**Licensee**" shall mean Owner; and the "**Manual**" shall mean the Licensor's operating manual and other manuals for Licensor described in its standard license agreement.

"**Major Renovations**" shall mean a contemporaneously made set or series of alterations, additions and/or improvements to the Hotel with a total cost in excess of $100,000 (or a lesser amount in the event a project with a total cost less than $100,000 requires material design and purchasing and installation services related thereto and/or results in a material alteration in the design of the Hotel), but shall not include any Repairs or Maintenance with respect to Capital Improvements or FF&E.

"**Manager**" shall have the meaning set forth in the introductory section of this Agreement.

"**Management Fee**" shall mean the Accounting Fee, Revenue Management Fee and Base Fee, all as set forth in Article 11 hereof.

"**Management Plan**" shall have the meaning set forth in Section 4.4(d).

"**Marketing Plan**" shall mean an annual marketing plan for the Hotel prepared and submitted by Manager to Owner and approved by Owner in each Fiscal Year pursuant to Section 4.4(c).

"**Mortgage**" shall mean, collectively, each of the documents evidencing or securing current or future indebtedness on the Hotel in favor of a third party lender or financial institution or any successor thereto or replacement thereof (the "**Lender**").

"**Net Operating Income**" or "**NOI**" shall mean the result of Gross Revenues less Gross Operating Expenses.

**Management Agreement – Page 6**

"**Open for Business**" shall mean the period of time during which all or substantially all of the Hotel is open for business to the general public.

"**Operating Account**" shall mean a special account or accounts, bearing the name of the Hotel, established by Manager in a federally insured bank or trust company selected by Owner.

"**Operating Equipment and Supplies**" shall mean supply items which constitute "Operating Equipment and Supplies" under the Uniform System of Accounts, all miscellaneous serving equipment, linen, towels, uniforms, silver, glassware, china and similar items.

"**Operating Standards**" shall mean the operation of the Hotel in a manner consistent with (i) the requirements under the License Agreement; (ii) the condition of the Hotel as of the Commencement Date (or, following completion of a Renovation, the condition of the Hotel as of the completion of the Renovation), normal wear and tear excepted; (iii) the condition and level of the operation of hotels of comparable class and standing to the Hotel in its market area; (iv) then current market conditions regarding rental rates and lease terms and conditions with respect to Hotels of comparable class and standing to the Hotel (including but not limited to the Competitive Set); and (v) then current business and management practices (including those related to compliance with Legal Requirements) applicable to the management, operation, leasing, maintenance and repair of a hotel comparable in size, character and location to the Hotel.

"**Owner**" shall have the meaning set forth in the introductory section of this Agreement.

"**Performance Standard**" shall have the meaning set forth in Section 18.2.

"**Permits**" shall mean all governmental or quasi-governmental licenses and permits, including but not limited to any certificate of occupancy, business licenses and liquor licenses.

"**Permitted Investments**" shall mean (subject to modification, addition or deletion from time to time at the option of Owner by written request to Manager) all of which shall be in the name of Owner:

> (a)  interest-bearing deposit accounts (which may be represented by certificates of deposit, time deposit open account agreements or other deposit instruments) in commercial banks having a combined capital and surplus of not less than $50,000,000; or

> (b)  all other investments approved by Owner.

"**Premises**" shall mean the land on which the Hotel is located, which land is described in Exhibit B attached hereto.

"**Prime Rate**" shall mean the rate per annum announced, designated or published from time to time by JP Morgan Chase Bank N.A. as its "prime", "reference" or "base" rate of interest for commercial loans.

"**Reimbursable Expenses**" shall mean all travel, lodging, entertainment, telephone, facsimile, postage, courier, delivery, employee training and other expenses incurred by Manager

in accordance with the standard policies for expenses incurred by Manager on its own behalf and which are directly related to its performance of this Agreement, but in no event will Reimbursable Expenses include or duplicate expenses for Manager's overhead or Allocated Services.

"**Renovation**" shall mean a renovation of any portion of the Hotel during the Term, pursuant to a plan proposed by Manager and approved by Owner to, among other things, bring the Hotel to a physical condition that satisfies the standards under the License Agreement and to operate in a manner consistent with the assumptions for the then-current Annual Operating Budget and then-current Annual Plan. A Renovation shall be carried out at the expense of Owner pursuant to plans and specifications and a schedule prepared by Manager and approved by Owner and, to the extent required under the License Agreement, by Licensor.

"**Repairs and Maintenance**" shall have the meaning as defined in Section 8.1.

"**Reserve**" shall mean an account maintained as a Permitted Investment for Reserve for replacement of FF&E and/or Capital Improvements, as described in Section 7.1 and funded as provided in Section 7.2.

"**Revenue Data Publication**" shall mean Smith's STR Report, a monthly publication distributed by Smith Travel Research, Inc., or an alternative source, reasonably satisfactory to both parties, of data regarding the average daily rate, occupancy and RevPAR of hotels in the general area of the Hotel, including, without limitation, the Competitive Set.

"**Revenue Management Fee**" shall have the meaning as defined in Section 11.

"**Revenue Per Available Room**" or "**RevPAR**" shall mean for any Test Period the number derived by dividing (i) net room revenue (in accordance with the Uniform System of Accounts), by (ii) the number of available guest rooms in the subject hotel.

"**RevPAR Threshold**"

"**State**" shall mean the State in which the Hotel is located or other as designated.

"**Term**" shall mean the term of this Agreement, which shall be an initial five (5) year term commencing on the Commencement Date and expiring on the fifth (5th) anniversary of the Commencement Date, as such Term may be extended or shortened as expressly set forth in this Agreement or as otherwise agreed to by Owner and Manager.

"**Termination Fee**"



"**Test Period**" shall mean each twelve (12) month period during the Term commencing on the first day of the seventh (7th) calendar month following the Commencement Date and each subsequent three (3) calendar months thereafter. In the event that this Agreement shall terminate on a date other than the last day of a calendar year, the last Test Period shall end on the date of termination. The term "full Test Period" means any Test Period containing not fewer than 365 days.

"**Third Party Purchaser**" shall have the meaning set forth in Section 18.1.

"**Unavoidable Interruptions**" shall mean interruptions in the operation of or access to the Hotel or any of its essential services on account of an interruption in any one or more of the utility services described in Section 13.2, or on account of labor disputes, strikes, lockouts, fire or other casualty, war, terrorist actions, acts of God and other similar causes beyond the reasonable control of the party claiming an unavoidable interruption, but never financial inability. Other than obligations accruing prior to the occurrence of such event of Unavoidable Interruption or obligations that, if not performed, would cause a material adverse effect on the Hotel or its operations (for instance, the requirement to maintain the Permits or insurance obligations hereunder), the obligations of the party hereunder shall be suspended during the period of an Unavoidable Interruption.

"**Uniform System of Accounts**" shall mean the Uniform System of Accounts for Hotels, 10th Revised Edition, 2006, as published by the Hotel Association of New York City, Inc. or any later edition thereof.

"**Working Capital**" shall mean and refer to the funds which are reasonably necessary for the day-to-day operation of the Hotel's business, including, without limitation, amounts sufficient for the maintenance of petty cash funds, operating bank accounts, receivables, payrolls, prepaid expenses, advance deposits, funds required to maintain inventories, and amounts due to/or from Manager and/or Owner less accounts payable and accrued current liabilities.

1.2 **Terminology**. All personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, shall include all genders; the singular shall include the plural, and the plural shall include the singular. The titles of Articles, Sections and Subsections in

**Management Agreement – Page 9**

this Agreement are for convenience only, and neither limit nor amplify the provisions of this Agreement, and all references in this Agreement to Articles, Sections, Subsections, paragraphs, clauses, sub-clauses or exhibits shall refer to the corresponding Article, Section, Subsection, paragraph, clause or sub-clause of, or exhibit attached to, this Agreement, unless specific reference is made to the articles, sections or other subdivisions of, or exhibits to, another document or instrument.

1.3  **Exhibits**. All exhibits and other attachments attached hereto are by this reference made a part of this Agreement.

## ARTICLE 2
## MANAGEMENT OF HOTEL

Owner hereby engages and appoints Manager, pursuant to the terms of this Agreement, to operate and manage the Hotel, and Manager hereby agrees and contracts to plan, operate, repair and manage the Hotel pursuant to the terms of this Agreement.

Subject to the terms of this Agreement, Hotel operations shall be under the exclusive supervision and control of Manager, which, except as otherwise specifically provided in this Agreement, shall be responsible for the proper and efficient operation, maintenance and repair of the Hotel in accordance with the terms of this Agreement. Except as specifically set forth in this Agreement, Manager shall have discretion and control respecting matters relating to management and operation of the Hotel, including, without limitation, charges for rooms and commercial space, credit policies, food and beverage services, other Hotel services, employment policies, granting of concessions or leasing of shops and agencies within the Hotel, receipt, holding and disbursement of funds, maintenance of bank accounts, procurement of inventories, supplies and services, promotion and publicity and, in general, all activities necessary for operation of the Hotel.

Manager shall devote its knowledge, experience and efforts to operate and manage the Hotel pursuant to this Agreement in a businesslike manner in accordance with the Operating Standards. Manager shall make available to Owner the full benefit of the judgment, experience and advice of the members of Manager's organization and staff with respect to the policies pursued by Owner in operating, maintaining, and servicing the Hotel.

## ARTICLE 3
## TERM

3.1  **Term**. The initial Term automatically shall be extended beyond the initial Term for additional terms of one (1) year each, unless Owner provides written notice to Manager not less than one hundred twenty (120) days prior to the end of the initial Term or the then-current extended Term, as applicable, of Owner's intent not to extend the Term of the Agreement. Notwithstanding the foregoing, the Agreement may be terminated prior to the scheduled expiration of the Term or any extension thereof, (i) without cause by Owner during the first six (6) months following the Commencement Date, provided that Owner provides Manager with not less than thirty (30) days written notice of termination prior to the effective date of such termination, or (provided that in the event that the Workers' Adjustment and Retraining Act, 29

USC, Sec 2101, et seq. (the WARN Act") is applicable to such termination and the replacement manager identified by Owner fails or refuses to retain a sufficient number of employees at the Property so as not to cause a "mass layoff" or "plant closing" under the WARN Act, Owner will extend the effective date of termination to allow the required notices to be provided under the WARN Act, (ii) upon the sale of the Hotel to a bona fide Third Party Purchaser, as provided in Article 18 hereof, provided that Owner provides Manager with not less than sixty (60) days written notice of such termination; and (ii) as otherwise provided in Articles 15, 16, 17 and 18.

3.2 **Surrender.** On the expiration or sooner termination of the Term, Manager shall quit and surrender the Premises to Owner in the condition required pursuant to this Agreement and take such other actions as contemplated by Article 20 hereof.

**ARTICLE 4**
**USE AND OPERATION OF THE HOTEL**

4.1 **Operation**. Manager shall be the sole and exclusive manager of the Hotel during the Term and shall operate the Hotel in accordance with the Operating Standards and the provisions of this Agreement. Manager shall act in a fiduciary capacity with respect to the proper protection of and accounting for Owner's assets. In this capacity, Manager shall deal at arm's length with Owner and all third parties, and Manager shall manage the Hotel in a manner which shall serve the Owner's interests at all times.

4.2 **Employment**.

(a) Subject to the terms of this Agreement, Manager shall select, employ, promote, transfer, compensate, terminate where appropriate, supervise, direct, train, and assign the duties of the Executive Personnel and, through the Executive Personnel, a sufficient number of personnel whom Manager reasonably determines to be necessary or appropriate for the proper, adequate and safe operation and management of the Hotel (collectively, the "**Hotel Employees**"). In connection therewith, Manager agrees to cause an employee or employees located in the corporate office of Manager, at no additional cost to Owner, to handle revenue management and sales management for this Property, together with other properties managed by Manager for Owner and its Affiliates. All such employees of the Hotel shall be employees of Manager or Manager's Affiliate. In addition, Manager may, from time to time, assign one or more of its employees to the staff of the Hotel on a full-time, part-time or temporary basis. Notwithstanding the provisions of this Section 4.2 or any other provision of this Agreement, all costs, expenses and liabilities relating to Hotel Employees shall be expenses of operating the Hotel and the responsibility of Manager for acts or omissions of Hotel Employees (or, for Hotel Employees who allocate their time between multiple hotels, an appropriate allocation of the costs for such Hotel Employees) shall not extend beyond responsibility for the gross negligence or willful misconduct of, or the willful violation of Legal Requirements by the Executive Personnel. Manager acknowledges that such Executive Personnel have the duties specified in the first sentence of this Section 4.2 with respect to other Hotel Employees. Manager will negotiate with any union lawfully entitled to represent such employees and may execute collective bargaining agreements or labor contracts resulting therefrom that have been approved by Owner. Manager shall fully comply with all Legal Requirements having to do with worker's compensation, social security, unemployment insurance, hours of labor, wages, working conditions, and other

employer-employee related subjects. With respect to matters of employment, this Agreement is not one of agency by the Manager for Owner but one with the Manager engaged independently in the business of managing properties on its own behalf as an independent contractor (as defined in §856(d)(3) of the Internal Revenue Code with regards to Owner and any Affiliates thereof). The cost of all employment arrangements shall be charged as Gross Operating Expenses of the Hotel and shall be accrued in accordance with generally accepted accounting principles; provided, however, relocation expenses which exceed the budgeted relocation expenses provided in the Annual Plan, shall not be charged as a Gross Operating Expense without the prior approval of Owner, such approval not to be unreasonably withheld, conditioned or delayed. The costs provided for in the immediately preceding sentence shall include, by way of example and not limitation, all reasonable costs and expenses (including, without limitation, all employment related expenses incurred by Manager with respect to the Hotel Employees), such as severance pay, unemployment compensation and health insurance and related costs (i.e., in order to comply with COBRA-type regulations) as a result of the termination of employees and which shall have been paid or accrued in accordance with generally accepted accounting principles. Manager shall use commercially reasonable efforts and exercise reasonable care to select qualified, competent, and trustworthy employees. The Hotel's general cashier and all employees having check signing authority shall be adequately bonded to the satisfaction of Owner and the cost of such bonds shall be an expense of the Hotel. To the extent possible and reasonably available, Manager shall use local labor to fill non-Executive Personnel positions in the operation of the Hotel. Owner may at any time consult or communicate with Manager regarding any of the Hotel Employees, but will not interfere in the day-to-day activities of Hotel Employees. The Manager shall not discriminate against any employee or applicant for employment because of race, color, religion, national origin, ancestry, age, sex or sexual orientation, and all employment advertising shall indicate that Manager and Owner are each an Equal Opportunity Employer as that term is defined under Legal Requirements.

Notwithstanding anything to the contrary contained in this Agreement, the following subparagraphs (b) and (c) shall apply to any liability that may, from time to time, arise out of the Employee Retirement Income Security Act of 1974 ("**ERISA**") and the Multi-employer Pension Plan Amendments Acts of 1980 ("**MEPPA**"), respectively, as from time to time amended.

(b)     Employee Benefits: Any Hotel Employees who are not then represented by a collective bargaining representative shall be entitled to participate in the incentive programs, profit sharing and/or other employee retirement, disability, health, welfare or other benefit plan or plans then made available by Manager to similarly situated employees of other hotels managed by Manager, in accordance with their respective terms. Manager will have the right to charge the Hotel with its allocable share of the cost of any such plan or plans and any contributions to be made thereunder provided that such charges and contributions shall be determined by Manager in good faith on a uniform basis with respect to charges and contributions imposed for the same or similar plans at other hotels then managed by Manager, subject to Legal Requirements. Manager's rights under this Subsection (b) shall be subject to the condition that Manager shall not put into effect any amendment to any existing plan, or adopt any additional plan, which is not imposed upon all other similarly situated hotels managed by Manager.

Upon the expiration or termination of this Agreement, the sale of the Hotel or other similar event, Manager shall cooperate with the Owner with respect to disposition of such plan or plans (or plan assets) in a mutually satisfactory manner, all in compliance with then applicable Legal Requirements.

(c)     Collective Bargaining or Other Multi-employer Plans: Manager and Owner agree that with respect to any withdrawal liability arising under any collective bargaining agreement or other "multi-employer plan" (as defined in Section 3(37) of ERISA) in which the Hotel Employees become participants, the obligations of the parties shall be determined as follows:

(1)     Withdrawal liability arising with respect to Hotel Employees shall be the responsibility of Owner, and Owner shall either pay the amount of such withdrawal liability directly to such plan or reimburse Manager for withdrawal liability payments made to such plan by Manager with respect to Hotel Employees (including withdrawal liability arising after the sale or other termination of this Agreement, provided that such liability arises as a result of such sale, disposition, termination or other similar event). To the extent permitted under then applicable laws, regulations and agreements, Manager shall cooperate with Owner in structuring transactions and transferring actual or contingent withdrawal liability to a successor in ownership or purchaser of the Hotel in accordance with "relief" provisions of ERISA, such as ERISA Section 4204 or then applicable statutory or regulatory provisions of a similar nature.

(2)     For purpose of this subparagraph (c), the term "withdrawal liability" shall mean the actual amount assessed by and payable to a multi-employer pension fund upon a complete or partial withdrawal of the Hotel or Hotel Employees from such fund. Manager shall cooperate with Owner in challenging a plan's assessment of such liability, provided that all costs of litigation, arbitration or other procedures shall be paid by Owner (including any bonds that must be posted). If Manager or its Affiliates have employees at other locations who participate in the same multi-employer plan as Hotel Employees, Owner shall be charged with and be responsible only for multi-employer plan withdrawal liability arising solely with respect to the participation of Hotel Employees in such plan.

4.3     **Legal Proceedings**. Legal Proceedings of a "non-extraordinary nature" (hereafter defined), may be instituted by Manager, in accordance with guidelines and policies determined from time to time by Manager and Owner, in the name of Manager or the Hotel or Owner and by counsel designated by Manager pursuant to such guidelines and policies. Legal Proceedings of an "extraordinary nature" (hereafter defined) shall require Owner's prior approval of the proceedings and counsel approved by Owner. Manager shall furnish Owner with quarterly status reports with respect to all Legal Proceedings of an extraordinary nature. In addition, Manager shall have the right to defend, through counsel designated by Manager, Legal Proceedings of a non-extraordinary nature against Owner or Manager resulting from the operation of the Hotel. The defense of Legal Proceedings against the Hotel of an extraordinary nature (including, without limitation, any aspect of any claims against Manager or Owner arising out of the operation of the Hotel as to which the insurance company denies coverage) shall be coordinated with Owner, designated counsel shall be subject to Owner's reasonable approval and Manager shall furnish Owner with quarterly status reports with respect to such actions. All claims against Owner and/or Manager arising out of the management or operation of the Hotel which (i) are not covered by insurance shall be promptly communicated to Owner and (ii) are covered in whole or

**Management Agreement – Page 13**

in part by insurance shall be promptly forwarded by Manager to the appropriate insurer (with a copy thereof to Owner in the case of claims against Owner). Legal Proceedings of a "non-extraordinary nature" shall be proceedings in which the monetary exposure is less than $50,000 that are (i) initiated by Manager or Owner relating to the operation of the Hotel for matters such as collections, maintenance of licenses and permits, enforcement of contracts and proceedings against Hotel tenants; and/or (ii) defense of actions against the Owner or Manager resulting from the operation of the Hotel, for matters such as guest claims for loss of property or injury to persons and claims relating to employment or the application for employment at the Hotel. Legal Proceedings of an "extraordinary nature" shall mean all other Legal Proceedings.

4.4     **Annual Plan**. On or before the date that is forty-five (45) days following the Commencement Date, Manager shall submit to Owner an Annual Plan ("**Annual Plan**") for the remaining portion of the Fiscal Year in which the Commencement Date occurs and Owner either shall accept the initial Annual Plan submitted to Owner as provided above or shall submit to Manager a detailed list of Owner's objections or questions to the Annual Plan. Owner and Manager shall meet and discuss Owner's Annual Plan objections and shall coordinate expeditiously and in good faith to agree upon an Annual Plan for the remaining portion of the Fiscal Year in which the Commencement Date occurs. On or before November 15th of each year following the Commencement Date, Manager shall submit to Owner an Annual Plan for the next Fiscal Year and on or before December 15th of each year following the Commencement Date, Owner either shall accept the Annual Plan submitted to Owner as provided above or shall submit to Manager a detailed list of Owner's objections or questions to the Annual Plan ("**Owner's Annual Plan Objections**"). Within fifteen (15) days after Manager's receipt of Owner's Annual Plan Objections, Owner and Manager shall meet and discuss Owner's Annual Plan Objections with the goal of agreeing upon an Annual Plan for the subject Fiscal Year. Owner, as part of Owner's Annual Plan Objections, shall have the right to object to the entire Annual Plan or to any specific item or items contained in the Annual Plan. In the event Owner objects to the Annual Plan or any specific item or items of expense in the Annual Plan and Owner and Manager are unable to reach agreement thereon as provided above prior to commencement of the Fiscal Year in question, pending such agreement, the Annual Plan or the specific item or items of expense (not revenue) in question shall be suspended and replaced for such period that the Annual Plan or such item(s) are in question by an amount equal to the lesser of (i) that proposed by Manager for such Fiscal Year, or (ii) if an objection to the entire Annual Plan, the Actual Gross Operating Expenses for the immediately preceding Fiscal Year subject to an adjustment equal to the percentage increase in the CPI over the last twelve (12) month period immediately preceding the start of the Fiscal Year in question, or (iii) if an objection to a specific item or items of expense in the Annual Plan, such item or items of expense for the immediately preceding Fiscal Year subject to an adjustment for each item equal to the percentage increase in the CPI over the twelve (12) month period immediately preceding the start of the Fiscal Year in question.

(a)     The Annual Operating Budget shall be prepared in accordance with the Uniform System of Accounts. The proposed Annual Operating Budget shall incorporate Manager's good faith reasonable estimates of the items of revenue and expense contained therein and shall contain the proposed budget for operations for the succeeding Fiscal Year. When approved by Owner, the proposed Annual Operating Budget shall be the approved Annual Operating Budget.

Any revisions, substitutions or additions to the Annual Operating Budget must be approved by the Owner in writing.

As part of the budgeting process, Manager shall provide to Owner, with each proposed Annual Operating Budget, a complete list of all service and other contracts anticipated for the Fiscal Year which is the subject of the Annual Operating Budget having a liability to the Hotel in excess of $25,000 for such Fiscal Year for or covering the Hotel and the payments or expenditures connected or anticipated therewith. So long as any service or other contracts fall within the following guidelines, Owner's approval thereof shall not be required, but Manager shall nevertheless promptly report to Owner the execution of (and provide Owner with a true and complete copy of) each such contract having a liability to the Hotel of in excess of $25,000:

(i) The term of such contract shall be no longer than one (1) year; and

(ii) Each contract must be terminable by Owner or Manager without payment or penalty upon not more than thirty (30) days' notice.

In addition, Manager shall provide to Owner for Owner's review, a written schedule for the Hotel listing all executive and management employees to be employed "on-site" in the direct management of the Hotel including, but not limited to the positions of General Manager, Director of Sales, Chief Engineer and the portfolio sales and revenue manager. These schedules shall include such employee's title or job description and the salary range including additional compensation or prerequisites such as lodging, meals, maintenance, moving expenses, bonus/incentive compensation and the like. In the event that any employee's services are shared with (or subsidized through a sharing arrangement with) another hotel, the employee shall be identified together with a description of his/her responsibilities and the amount and source of any subsidy, together with a breakdown of the relative time expended with respect to the Hotel and each other hotel. If Owner notifies Manager that Owner does not believe that some or all of the scheduled wages and salaries are reasonable and customary as required above, then Manager shall promptly provide to Owner a wage and salary survey that supports the scheduled wages and salaries. No proposed amendment including changes in salary or other compensation shall be effective unless the salary or other compensation as changed is reasonable and customary as required above.

(b) The Capital Budget shall be prepared in accordance with the Uniform System of Accounts. The Capital Budget shall contain the proposed budget for expenditures from the Reserve and the budget for expenditures for Capital Improvements and FF&E for the succeeding Fiscal Year for (i) additions to and substitutions, replacements and renewals of FF&E and (ii) certain non-routine repairs and maintenance to the Project which are normally capitalized under generally accepted accounting principles such as exterior and interior repainting, resurfacing building walls, floors, roof and parking areas, replacing folding walls and similar items. Manager shall submit good faith reasonable estimates for Capital Improvements and for FF&E for the Fiscal Year following the Fiscal Year otherwise covered by the Annual Operating Budget. When approved by Owner, the Capital Budget, or such items as may be specifically approved by Owner, shall be collectively referred to in this Agreement as the "Approved Capital Budget". Approval of the Capital Budget constitutes an authorization for Manager to expend money for Capital Improvements and for FF&E as provided in the Approved Capital Budget, unless the

**Management Agreement – Page 15**

Owner's approval thereof specifically requires Manager to obtain additional approvals prior to commencing such work. Any revisions, substitutions or additions to the Approved Capital Budget must be approved by Owner in writing.

Competitive bid rules outlined in Section 4.5 will be observed at all times by Manager for any purchases of Capital Improvements and/or FF&E.

(c)     On or before the date that is thirty (30) days following the Commencement Date, Manager shall submit to Owner the Marketing Plan, which Marketing Plan shall contain advertising, sales and promotional plans prepared by Manager to be used in connection with the marketing of the Hotel and the portfolio of hotels owned by Owner and managed by Manager. On or before November 15th of each year following the Commencement Date, Manager shall submit to Owner an Annual Plan for the next Fiscal Year. When approved by Owner, the proposed Marketing Plan shall be the approved Marketing Plan. Any revision, substitution or additions to the Marketing Plan must be approved by Owner in writing. The Marketing Plan shall be written with the goal of achieving Gross Revenues as submitted in the Annual Operating Budget for the Fiscal Year or, if less than a full Fiscal Year, the period between the Commencement Date and the December 31 next following the Commencement Date. Manager shall not use Owner's name in any advertising or promotional material without Owner's expressed prior written approval.

(d)     The Management Plan shall contain (i) estimated contributions and distributions from or to Owner; (ii) a leasing plan for the leasing of concessions and other space in the Hotel; (iii) plans and budgets for the disposition and replacement of FF&E; and (iv) such management issues, proposals and projections or modifications as Manager may recommend for the efficient management of the Hotel including but not limited to proposals and assessments as to the Hotel's position in the market, market opportunities, franchise affiliation and disposition strategies. When approved by Owner, the proposed Management Plan shall be the approved Management Plan.

4.5     **Competitive Bidding**. All contracts for repairs, Capital Improvements, FF&E, food and services exceeding $10,000 shall be awarded on the basis of competitive bidding (provided, however, that Manager will not be required to obtain competitive bids for any service for which a single provider exists), solicited in the following manner:

(a)     A minimum of two (2) written bids shall be obtained for each purchase or contract that exceeds $10,000, up to $25,000. Purchases over $25,000 will require a minimum of three (3) bids.

(b)     Each bid will be solicited in a uniform format.

(c)     Subject to approval by Owner, Manager may accept a low bid if the expenditure is for an approved item in the budget and will not result in an excess of the annual budgeted Account Category of the applicable Capital Budget or Annual Operating Budget.

(d)     If Manager desires to accept a bid other than the lowest bid, then Manager shall so advise Owner in writing and recommend that such bid be accepted, with support for such recommendation.

**Management Agreement – Page 16**

(e)     Owner shall have the right to accept or reject any and all bids for repairs, Capital Improvements, FF&E or foods and services that are not the lowest bid; such acceptance shall not be unreasonably withheld or delayed.

(f)     Manager may request Owner to waive in writing competitive bidding rules for a specific item or service.

In its operation of the Hotel under this Agreement, Manager may purchase goods, supplies and services from itself, Owner or Owner's representatives, or any Affiliates of any of the foregoing so long as the prices and terms thereof are at arm's length and otherwise competitive with, and are not less favorable than prices and terms which could be obtained from independent parties and, if required by Section 4.5, are in compliance with competitive bidding rules, provided that Manager will obtain Owner's consent (not to be unreasonably withheld) regarding any such arrangement.

4.6     **Labor Relations**. Manager shall have no right to enter into any collective bargaining agreement concerning any employees of the Hotel without the prior written approval of Owner, which may be granted or withheld in its sole discretion. Upon Owner's approval of any such agreement, Manager shall be responsible to perform such agreements. To the extent applicable, Manager: (a) represents that it is an equal opportunity employer as described in Section 202 of Executive Order 11246 dated September 24, 1965, as amended, and as such agrees to comply with the provisions of Paragraphs 1 through 7 of Section 202 of said Executive Order during the performance of this Agreement, (b) agrees to comply with the affirmative action requirements of Part 60.741 of Title 41, Code of Federal Regulations, with respect to handicapped workers during the performance of this Agreement, (c) agrees to comply with the affirmative action requirements of Part 60.250 of Title 41, Code of Federal Regulations, with respect to Disabled Veterans and Veterans of the Vietnam Era during the performance of this Agreement, and (d) shall submit to Owner in the form approved by the Director of the Office of Federal Contract Compliance, U.S. Department of Labor, a certification that Manager does not and will not maintain any facilities that provide for their employees in a segregated manner, or permit their employees to perform their services at any location under its control, where segregated facilities are maintained, and that Manager will obtain a similar certification from its contractors.

4.7     **Liquor License**. INTENTIONALLY OMITTED.

4.8     **Employee Discount**. To the extent Manager, Owner or any of their respective Affiliates owns or has any equity interest in other hotels and provides a discounted rate to the employees at such other hotels, such party agrees to provide the same discounted rate (subject to availability and black-out periods) to the employees of the other parties named in this Section 4.8 to the extent allowed under the management and ownership agreements affecting such other hotels.

4.9     **Forms**. Manager shall prepare or cause to be prepared for execution by Owner all forms, reports and returns, if any, required to be filed by Owner under applicable law with respect to the operation of the Hotel; however, Manager shall not be obligated to prepare any of Owner's income tax returns. Without limitation, Manager shall timely prepare and deliver, as

required by law, an Internal Revenue Service Tax Form 1099 with respect to payments made during a calendar year to third party contractors and professionals.

4.10     **Notice of Violations**. Manager shall promptly notify Owner in writing of any written notice received from any regulatory or governmental body regarding an actual or perceived violation of any Legal Requirements.

## ARTICLE 5
## RELATIONSHIP OF PARTIES

Except as provided in Section 4.2(a), Owner and Manager acknowledge and agree that this Agreement creates an agency relationship; provided, however, that (a) each Hotel Employee shall be the employee of Manager or Manager's Affiliate and not of Owner, (b) Manager's authority is subject to the terms and conditions of this Agreement, and (c) nothing in this Agreement shall constitute, or be construed to be, or create, a partnership, joint venture or lease or employment arrangement between Owner and Manager with respect to the Hotel or the operation thereof. Employees or agents of Manager are not by this Agreement or by any actions of Owner and/or Manager hereunder made employees of Owner, and are not entitled to the benefits provided by Owner or its Affiliates to its employees, including but not limited to, group insurance, leave and pension plan. This Agreement shall not be deemed at any time to be an interest in real estate or a lien or security interest of any nature against the Hotel, the Premises or any other land used in connection with the Hotel, or any equipment, fixtures, inventory, motor vehicles, contracts, documents, accounts, notes, drafts, acceptances, instruments, chattel paper, general intangibles, or other personal property now existing or that may hereafter be acquired or entered into with respect to the Hotel or the operation thereof.

## ARTICLE 6
## ADVERTISING

Subject to and in strict compliance with the provisions of the License Agreement, Manager shall arrange and contract for all advertising, which Manager may reasonably deem necessary, in accordance with Section 4.4, for the operation of the Hotel. So long as the License Agreement may be in effect, Manager generally shall advertise the Hotel under the name "– Petrol Inn & Suites" or such other name as Owner may designate or approve.

## ARTICLE 7
## RESERVE FOR FF&E

7.1     **Reserve for Replacement of FF&E**. The Reserve shall be funded pursuant to Section 7.2, and Manager shall use amounts in the Reserve to cover the cost of FF&E expenditures and Capital Improvements, as described in Section 4.4 in conjunction with the Approved Capital Budget. All FF&E, Capital Improvements and the Reserve shall be the property of Owner.

7.2     **Transfers to Reserve for FF&E**. Commencing on the Commencement Date and continuing thereafter during the remainder of the Term, Manager shall deposit monthly into the Reserve for FF&E an amount equal to the amounts required by Lender and/or by Licensor;

provided that in no event will the amounts to be deposited monthly into the Reserve be less than an amount equal to four percent (4%) of Gross Revenues throughout the remainder of the Term.

7.3 **Annual Adjustment**. At the end of each Fiscal Year and following receipt by Manager of the annual accounting referred to in Article 10, an adjustment will be made to such annual account, if necessary and if available, so that the appropriate amount shall have been deposited in the Reserve.

7.4 **Maintenance of Reserve**. Checks or other documents of withdrawal shall be signed by representatives of Manager who shall be bonded or otherwise insured pursuant to the "crime – Theft of Money and Securities" coverage set forth on Exhibit D to this Agreement. The proceeds from the sale of FF&E no longer needed for the operation of the Hotel shall be deposited in the Reserve, but not be credited against the obligation to deposit cash in such fund for the then current Fiscal Year. All interest earned or accrued on amounts invested from the Reserve shall be added to the Reserve (but shall not be credited against Owner's obligations to fund the Reserve), and shall not constitute Gross Revenues or be included therein.

7.5 **Accumulation of Reserve and Additional Cost of FF&E and Capital Improvements**. Owner and Manager acknowledge and agree that portions of the Reserve may, from time to time in accordance with the then-current Annual Plan, be used for more significant expenditures than could be reserved for in a single year.  Accordingly, at the end of each Fiscal Year, any amounts remaining in the Reserve shall be carried forward to the next Fiscal Year, and shall be in addition to the amount to be reserved in the next Fiscal Year. In the event at any time there are insufficient funds in the Reserve for any Fiscal Year to pay the cost of FF&E in accordance with the Annual Operating Budget and the Approved Capital Budget, then Owner will, at Owner's option, within sixty (60) days after request therefor by Manager, either provide the additional cash to the Manager to pay for such excess or authorize the funding of such cash from Net Operating Income.

7.6 **Final Remittance**. Upon expiration or termination of this Agreement, Manager shall remit all remaining amounts in the Reserve forthwith to Owner.

## ARTICLE 8
## REPAIRS AND MAINTENANCE AND CAPITAL IMPROVEMENTS

8.1 **Repairs and Maintenance**. Manager shall, from time to time, make such expenditures from Gross Revenues for repairs and maintenance including service contracts ("**Repairs and Maintenance**") as required by the Lender, the License Agreement, the Legal Requirements, the then current Annual Plan or as necessary to maintain the Hotel in good operating condition in compliance with the License Agreement and otherwise in the condition required by this Agreement, including but not limited to repairs and maintenance of HVAC, mechanical and electrical systems, exterior and interior repainting, resurfacing building walls and parking areas, waterproofing of exterior surfaces of floors, roofs, and replacement of plate glass, or the like. It is Owner's intent that the sums allocated for Repairs and Maintenance in accordance with the then current Annual Plan are to be fully expended during that Fiscal Year exclusively for the purposes identified in such Annual Plan. Except in the event of an emergency due to casualty, act of God or otherwise under circumstances in which it would be unreasonable

to seek to obtain prior approval (and provided that Manager shall notify Owner of any such expenditure within a reasonable time given the nature and scope of the emergency), all expenditures for the foregoing shall be as provided in the Annual Operating Budget and the Approved Capital Budget. If any such Repairs or Maintenance shall be made necessary by any condition against the occurrence of which Owner has received the guaranty or warranty of the builder or the Hotel or of any supplier of labor or materials for the Hotel or of any supplier of labor or materials for the construction of the Hotel, then Manager may invoke said guarantees or warranties in Owner's or Manager's name and Owner shall cooperate in all reasonable respects with Manager in the enforcement thereof.

8.2    **Capital Improvements**. Owner may, from time to time, at its sole expense, make such structural repairs, replacements, substitutions, alterations, additions or improvements (exclusive of FF&E) ("**Capital Improvements**") in or to the Hotel as Owner shall determine are necessary to comply with the Operating Standards. If Capital Improvements included in the definition of Building and Appurtenances shall be required at any time during the Term by the terms of any Mortgage, the License Agreement, to maintain the Hotel in good operating condition or by reason of any Legal Requirements, or because Manager and Owner jointly agree upon the desirability thereof, then in such event all such Capital Improvements shall be made with as little hindrance to the operation of the Hotel as reasonably possible. Notwithstanding the foregoing, as long as the Hotel can continue to operate without interruption, Owner shall have the right to contest the need for any such Capital Improvements required by any Legal Requirements and may postpone compliance therewith, if so permitted by law and if such postponement will not expose Manager to any civil or criminal liability. All recommendations by Manager of Capital Improvements shall be submitted in conjunction with the Capital Budget for the Fiscal Year described in Section 4.4(b). In the event that Owner elects to perform Major Renovations to the Hotel, Owner shall have the right to cause (i) Manager, or (ii) a third party, to oversee the performance of the Major Renovations for which oversight, if Manager is overseeing the Major Renovations, Manager shall be paid a project management fee (in addition to the Management Fee) equal to three percent (3%) of the budgeted hard cost items including contingency and any Owner-approved changes of the Major Renovations (the "**Project Fee**"). With respect to (i) Major Renovations as contemplated by this Agreement which Owner elects to have Manager oversee and (ii) improvements that are not Major Renovations, Manager shall oversee such projects in a reasonably prudent manner.

8.3    **Service Contracts**. Manager, without requiring the consent of Owner, shall enter into any contract for cleaning, maintaining, repairing or servicing the Hotel or any of the constituent parts of the Hotel as Manager deems necessary for the operation of the Hotel, except as specifically provided in Section 4.4 or 4.5. Manager shall submit the listing of service contracts entered into for the Hotel required pursuant to Section 4.4(a). Unless otherwise approved by Owner, all service contracts shall: (a) be in the name of Owner or Owner's nominee, (b) to the extent customary, include a provision for cancellation thereof by Owner or Manager upon not more than thirty (30) days written notice, and (c) shall require that all contractors provide evidence of such insurance as is customarily carried by other contractors involved in similar servicing arrangements.

8.4    **Liens**. Owner and Manager shall cooperate and use all commercially reasonable efforts to prevent any liens from being filed against the Hotel that arise from any maintenance,

changes, repairs, alterations, improvements, renewals or replacements in or to the Hotel. If any such liens are filed, Manager shall, subject to the availability of funds therefor in the Operating Accounts or as otherwise supplied by Owner, obtain the release thereof prior to the institution of legal proceedings in connection therewith. The cost of obtaining such release shall be included in Gross Operating Expenses, unless the imposition of the lien results from a default by Owner or Manager, in which event the cost of obtaining such release shall be borne by such defaulting party.

8.5  **Notice of Unavoidable Interruptions**. In the event of any occurrence constituting an Unavoidable Interruption, Manager shall promptly notify Owner of such occurrence and shall keep Owner informed as to the extent and impact thereof on the Hotel.

## ARTICLE 9
## WORKING CAPITAL AND BANK ACCOUNTS; DISTRIBUTION OF NET OPERATING INCOME

9.1  **Working Capital**. Owner shall provide initial Working Capital in the amount of $         in addition to the value of all Inventories. Owner shall at all times cause sufficient funds to be on hand in the Operating Accounts to assure the timely payment of all current liabilities of the Project, including but not limited to Gross Operating Expenses, all other costs and expenses incurred in connection with the Project pursuant to this Agreement and the performance by Manager of its obligations under this Agreement, all fees, charges and reimbursements payable to Manager hereunder and all amounts required hereunder to be transferred into the Reserve. In no event shall Owner permit the balance in the Operating Accounts to be less than an amount equal to the estimated monthly operating expenses of the Project as reflected in the then current Annual Operating Budget. From time to time, upon five (5) days prior written notice from Manager that such funds are required, Owner shall furnish to Manager funds that Manager deems reasonably necessary to assure that the Project shall have adequate working capital as herein provided. In the event Owner fails to supply required working capital in accordance with the provisions of this Section or if Manager otherwise deems such action to be necessary, Manager may use all or part of the funds in the Reserve to supplement the Operating Accounts in order to defray or pay the Project's operating costs and expenses, to the extent permitted by the Mortgage. Owner shall promptly reimburse the Reserve for all sums so used or transferred. All unexpended Working Capital, Inventories and Operating Equipment and Supplies purchased with Working Capital shall remain the property of Owner.

9.2  **Operating Account**. All funds (exclusive of funds deposited in the Reserve and house banks at the Hotel) received by Manager in the operation of or otherwise relating to the Hotel, and funds for Working Capital provided by Owner or retained by Manager from Gross Revenues, shall be deposited in the Operating Account. Manager shall inform such bank in writing that the funds deposited in the Operating Account are owned solely by the Owner. Manager shall not deposit funds attributable to any other property into the Operating Account. To the extent permitted by the Mortgage, amounts in the Operating Account may be temporarily withdrawn and invested by Manager in any Permitted Investments, having due regard for the timing of cash needs, but in no event shall such funds be co-mingled by Manager with any other funds. From the Operating Account, Manager shall pay all Gross Operating Expenses (other than the excess FF&E if funded by or through Owner) before any penalty or interest accrues thereon,

however, taking into account sound cash management. All interest earned or accrued on amounts invested from the Operating Account shall be added to the Operating Account. All checks or other documents of withdrawal from the Operating Account shall be signed by representatives of Manager except as provided in Section 9.3 hereof.

9.3 **Maintenance of Operating Account**. Subject to Section 9.4, the Operating Account shall be opened and maintained at all times by Manager and Owner and checks and other documents of withdrawal shall be signed by representatives of Manager who are covered by the required fidelity bond or otherwise insured pursuant to the "Crime – Theft of Money and Securities" coverage set forth on Exhibit D. The Operating Account and any other bank accounts approved by Owner shall be in Owner's name (for example, "*[Owner's name]* d/b/a/ *[Hotel name]*").

Manager shall not change the bank or open or close any bank account described in this Article 9 without Owner's prior written approval. Owner, in its sole and absolute discretion, may in writing direct Manager to change any such bank, signatories or arrangements. The bank in which the Operating Account is located shall be informed by Manager in writing that the funds in such account are held in trust for Owner and that any checks for more than $10,000.00 shall be required to be signed by two (2) authorized signatories on the account.

9.4 **Final Remittance**. Upon the expiration or termination of this Agreement, after payment of all Gross Operating Expenses for which bills were received to such date, Manager's Management Fee, Reimbursable Expenses, any Termination Fee and any other amounts then due and payable to Manager, all remaining amounts in (i) the Reserve, (ii) the Operating Account and (iii) the Permitted Investments, shall be transferred forthwith to Owner by Manager. Owner shall pay Manager any remaining Management Fee, any Termination Fee, Reimbursable Expenses and any other amounts then due and payable and Owner shall pay, or cause to be paid, and shall hold Manager harmless from and against all Gross Operating Expenses accrued in accordance with generally accepted accounting principles and invoices related to Gross Operating Expenses received after Manager has so transferred all funds.

9.5 **Distribution of Excess Cash**. Together with the financial report provided for in Section 10.2(b), Manager shall distribute to Owner all sums in the Operating Accounts in excess of the then working capital requirements of the Hotel determined in accordance with Section 9.1 of this Agreement.

## ARTICLE 10
## BOOKS, RECORDS AND STATEMENTS

10.1 **Books and Records**. Manager shall keep full and adequate books of account and other records reflecting the results of operation of the Hotel in accordance with the Uniform System of Accounts and generally accepted accounting principles. The books of account and all other records relating to or reflecting the operation of the Hotel shall be kept either at the Hotel or at Manager's corporate offices and shall be available to Owner and its representatives and its auditors or accountants, at all reasonable times for examination, audit, inspection and transcription at Owner's sole cost and expense. All of such books and records pertaining to the Hotel including, without limitation, books of account, guest records and front office records at all

times shall be the property of Owner and shall not be removed from the Hotel's or Manager's offices by Manager without Owner's approval and consent. Upon any termination of this Agreement, all of such books and records forthwith shall be turned over to Owner at a location designated by Owner so as to insure the orderly continuance of the operation of the Hotel, but such books and records shall thereafter be available to Manager at all reasonable times for inspection, audit, examination and transcription for a period of two (2) years.

10.2     **Financial Reports**.

(a)     Manager shall deliver to Owner within twenty (20) days following the close of each Accounting Period a monthly profit and loss statement reflecting a comparison of periodic and year-to-date actual revenues and expenses with the Annual Operating Budget as well as a periodic and year-to-date comparison of such actual revenues and expenses with those of the prior Fiscal Year.

(b)     Further, Manager shall provide to Owner within twenty (20) days following the close of each Accounting Period a report prepared in accordance with the example set forth in Exhibit C attached hereto and made a part hereof, which include without limitation, forward bookings, accounts receivable, accounts payable and a monthly sales overview report.

(c)     Further, within seventy-five (75) days after the end of each Fiscal Year, Manager shall deliver to Owner an annual accounting, showing the results of operation of the Hotel during the Fiscal Year and a computation of Gross Revenues, Gross Operating Expenses, and Net Operating Income, if any, and any other information necessary to make the computations required hereby or which may be requested by Owner, all for such Fiscal Year. The annual accounting for any Fiscal Year shall be controlling over the interim accountings for such Fiscal Year. Owner shall have the right to conduct an audit of the books.

(d)     Further, Manager shall prepare and deliver any additional reports or information as Owner is required to provide under the License Agreement.

10.3     **Audits by Owner**. Owner shall have the right to audit, conducted either by Owner's internal personnel or by a third party auditor retained by Owner at its expense, all items of expense and revenue under this Agreement including, but not limited to, Gross Revenues, Gross Operating Expenses, depreciation, the Management Fee and Reserve. Manager shall cooperate and assist with such audit. In the event that an audit reflects an underpayment to Owner or Manager or an overpayment to Manager or Owner, Manager shall correct same by a corrective payment to Owner or Manager, as appropriate, within ten (10) days following notice of the audit results to Manager, subject to Owner's and Manager's right to challenge the audit results in accordance with the provisions of Article 30 of this Agreement. If an audit determines any weaknesses or need for reasonable changes in the internal control systems pertaining to the safeguarding of Owner's assets, Manager will promptly make all necessary changes.

10.4     **Segregation of Accounts**. In any instance where Manager manages several properties for Owner, Manager shall segregate the income and expenses of each property so that Gross Revenues from each property will be applied only to the bills and charges from that property.

**Management Agreement – Page 23**

## ARTICLE 11
## MANAGER'S MANAGEMENT FEES; TIMING OF
## PAYMENT TO MANAGER

11.1 **Fees.** For each Fiscal Year or portion thereof, Manager shall receive, by a distribution made by Manager out of Gross Revenues at the end of each Accounting Period in respect of its management services hereunder, a fee (collectively, the "**Management Fee**") calculated as follows:

(a) a base fee (the "**Base Fee**") in an amount equal to ████████████ of Gross Revenues in respect of any applicable period; plus

(b) an accounting fee (the "**Accounting Fee**") for accounting services provided by Manager's corporate employees on a "centralized" basis in the amount of ████████ ████████████████████████████████████████████████████████████████ plus

(c) a revenue management fee (the "**Revenue Management Fee**") for an allocation of Manager's revenue management services to be provided by Manager's corporate employees on a "centralized" basis in the amount of ████████████████████████████████████ ████████████████████████████████████████████████████████████████

The Management Fee generally shall be computed separately for each Fiscal Year and shall not be accumulated from Fiscal Year to Fiscal Year. Owner shall reimburse Manager for all Reimbursable Expenses incurred by it in connection with the performance of this Agreement. Any such amount shall be payable within thirty (30) days of billing, and upon request of Owner, Manager shall provide a statement showing in reasonable detail the nature and amount of such expenses, together with supporting documentation reasonably requested by Owner.

11.2 **Treatment of Proceeds of Business Interruption Insurance and Condemnation Awards**. In the event of a casualty or condemnation for temporary use resulting in the payment of business interruption insurance (with respect to such casualty) or a condemnation award (with respect to such condemnation for temporary use), the amount of such proceeds shall be considered a part of Gross Revenues for the purpose of computing Manager's Management Fee.

## ARTICLE 12
## INSURANCE

12.1 **Insurance**. Throughout the Term, Manager (unless Owner shall by notice in writing to Manager elect to provide the property and casualty insurance coverage required hereunder) shall provide and maintain the insurance in the minimum amounts and types set forth

on **Exhibit D** to this Agreement, the costs of which shall be charged as part of Gross Operating Expenses.

       12.2    **Modification of Insurance**. Owner may require Manager to increase the limits of the above insurance coverage and may require Manager to carry other or additional reasonable and customary insurance. All premiums on any increased limits of, or other or additional, insurance coverage required by Owner under the immediately preceding sentence shall be included in the Gross Operating Expenses. In no event shall insurance coverage be less than that required by Lender, the License Agreement or to comply with Legal Requirements.

       12.3    **Contractor's Insurance**. Manager shall require that all major contractors on or about the Hotel Premises have coverage at the contractor's sole expense in the minimum types and amounts set forth in **Exhibit D** to this Agreement. Manager shall require contractors that are not major contractors to carry such insurance coverage that is customary in the applicable trade or industry. A major contractor shall mean any contractor (i) receiving compensation in excess of $25,000 per year (subject to adjustment for adjustments in the CPI between the Commencement Date and the date of such services) or (ii) performing hazardous services. Manager must obtain the Owner's permission in writing to waive any of the above requirements. Higher amounts may be required if the work to be performed is sufficiently hazardous in nature. Manager shall obtain and keep on file a Certificate of Insurance for each such major contractor that shows that the contractor is so insured.

       12.4    **Form of Policies**. All insurance required by Sections 12.1, 12.2 and 12.3 shall be in such form and with such companies as shall be reasonably satisfactory to Owner provided that such company shall have a minimum Best rating of A- Class VIII, or as otherwise approved by Owner and Manager, and shall comply with the requirements of any Mortgage and the License Agreement. All property damage insurance shall name Owner as insured, and so long as the Hotel is mortgaged pursuant to any Mortgage or otherwise shall be subject to a standard mortgagee clause in favor of the mortgagee or mortgagees. All other insurance (excepting only the professional liability and workers' compensation lines of coverage) shall be in the name of Owner and Manager. The workers' compensation policy shall name Owner as an additional insured. Policies of insurance (to the extent applicable) shall (i) provide that the insurance company will have no right of subrogation against any mortgagee, Owner, Manager or any of their respective affiliated or subsidiary companies or the agents or employees thereof and (ii) provide that the proceeds thereof in the event of loss or damage shall, to the extent payable to any mortgagee, be payable notwithstanding any act of negligence or breach of warranty by Owner or Manager which might otherwise result in the forfeiture or nonpayment of such insurance proceeds.

       12.5    **Certificates**. For the purpose of insuring compliance with the provisions of Article 12, Manager shall furnish to the Owner certificates for all insurance required to be maintained pursuant to this Article 12 within five (5) days prior to renewal. All such certificates shall specify that the policies to which they relate cannot be canceled or modified on less than thirty (30) days' prior written notice to Owner. In the event Owner procures any insurance under this Section 12, Owner shall have the responsibilities set forth in the two preceding sentences for the benefit of Manager.

12.6 **Waiver of Subrogation**. Owner and Manager each waive their respective rights of subrogation against each other.

12.7 **Mortgage Requirements**. Insurance shall be maintained in a manner consistent with the terms and conditions of any Mortgage and any conflict between those terms and conditions and the provisions of this Agreement shall be resolved in favor of the Mortgage.

## ARTICLE 13
## REAL AND PERSONAL PROPERTY TAXES; UTILITIES

13.1 **Taxes**. Manager shall, on behalf of Owner, pay from the Gross Revenues, on or before the dates the same become delinquent, with the right to pay the same in installments to the extent permitted by law, all real estate taxes, all personal property taxes and all betterment assessments levied against the Hotel or any of its component parts. Manager shall promptly deliver to Owner all notices of assessments, valuations and similar documents to be filed by Manager or Owner, which are received from taxing authorities by Manager. Owner shall have the right to hire property tax consultants or like professionals that reasonably provide economic benefits to Owner and the costs thereof shall be a part of Gross Operating Expenses. Notwithstanding the foregoing obligations of Manager, Owner may elect to contest the validity or the amount of any such tax or assessment, provided that such contest does not materially jeopardize Manager's rights under this Agreement. Manager agrees to cooperate with Owner and execute any documents or pleadings required for such purpose, provided Owner agrees to reimburse Manager for any out-of-pocket costs occasioned to Manager by any such contest. At Owner's election, all costs relating to any such contest may be included in Gross Operating Expenses.

13.2 **Utilities, Etc**. Manager shall promptly pay all fuel, gas, light, power, water, sewage, garbage disposal, telephone and other utility bills currently as they are incurred in connection with the Hotel from the Gross Revenues or Working Capital.

## ARTICLE 14
## USE OF NAME

14.1 **Name**. During the Term of this Agreement, the Hotel shall at all times be known and designated as the "Country Inn & Suites" or by such other name as from time to time may be agreed upon by Owner and Manager. Manager shall make or cause to be made any fictitious name filings or disclosures required by the laws of the State with respect to the use of such name for or in connection with the Hotel. Manager shall not use or employ such name unless such use fully complies with the terms of the License Agreement, if any.

## ARTICLE 15
## DAMAGE OR DESTRUCTION; CONDEMNATION

15.1 **Damage or Destruction**.

(a) If the Hotel or any portion thereof shall be damaged or destroyed at any time or times during the Term by fire, casualty or any other cause commonly covered by fire and extended coverage insurance and the cost of repairing such damage and restoring the Hotel to

substantially its condition immediately prior to such damage or destruction, as reasonably estimated by Owner based upon estimates Owner receives from contractors and other reasonable and customary evidence, will not exceed the sum of $250,000 plus adjustments to reflect increases in the CPI for each Fiscal Year after 2014 exclusive of the cost of the foundation and footings ("**Minimum Cost**"), Owner will, at its own cost and expense (subject to Owner's receipt of insurance proceeds sufficient to pay such costs and expenses) and with due diligence repair and/or restore the Hotel so that after such repair and/or restoration, the Hotel shall be in substantially the same condition as it was immediately prior to such damage or destruction.

(b)      If the cost of such repair and/or restoration will, as so reasonably estimated by Owner, exceed the Minimum Cost, then Owner shall, within one hundred twenty (120) days after such damage or destruction, elect by notice to Manager either (x) to carry out such repair and/or restoration, in which case Owner shall complete such repair and/or restoration pursuant to the last sentence of Section 15.1(a) or (y) to terminate this Agreement; should Owner so elect to terminate this Agreement, Owner shall pay to Manager the Termination Fee.

(c)      In the case of damage or destruction which Owner is not required by the preceding provisions of this Section 15.1 to repair or restore and where Owner has not elected under said preceding provisions to terminate this Agreement, Owner shall undertake to notify Manager, within one hundred twenty (120) days after such damage or destruction, whether or not Owner will so repair and/or restore such damage or destruction. If Owner, within such one hundred twenty (120) day period either (i) advises Manager that Owner will not so repair and/or restore such damage or destruction or (ii) fails to advise Manager of Owner's decision, Manager may terminate this Agreement by written notice to Owner, or Owner may terminate this Agreement by such notice to Manager; in either case such written notice must be given within one hundred fifty (150) days after such damage or destruction and neither party shall be entitled to any payment on account of such termination. If in such event Owner within such one hundred twenty (120) day period notifies Manager that Owner will so repair and/or restore such damage or destruction, then neither Owner nor Manager shall have a right to terminate this Agreement on account of such damage or destruction.

15.2     **Condemnation**. If the whole of the Hotel shall be taken or condemned in any eminent domain, condemnation, compulsory acquisition or like proceeding by any competent authority or if such a portion thereof shall be taken or condemned as to make it imprudent or unreasonable, in the sole opinion of Owner, to use the remaining portion as a hotel of the type and class immediately preceding such taking or condemnation, then the Term shall terminate as of the date title vests in the condemning authority. Manager has no interest in any award paid to Owner and Manager shall make no claim against the condemnor for any loss to its business as a result of such condemnation or otherwise. If only a part of the Hotel shall be taken or condemned and the taking or condemnation of such part does not, in the opinion of Owner, make it unreasonable or imprudent to operate the remainder as a hotel of the type and class immediately preceding such taking or condemnation, this Agreement shall not terminate, and so much of any award to Owner shall be made available as shall be reasonably necessary for making alterations or modifications of the Hotel, or any part thereof, so as to make it a satisfactory architectural unit as a hotel of similar type and class as prior to the taking or condemnation.

15.3    **Mortgage Requirements**. Actions as to damage or destruction and condemnation shall be taken only in a manner that is consistent with the terms and conditions of the Mortgage and any conflict between those terms and conditions and the provisions of this Agreement shall be resolved in favor of the Mortgage.

## ARTICLE 16
## EVENTS OF DEFAULT

16.1    **Manager Defaults**. Each of the following shall constitute an Event of Default by Manager:

(a)    The failure of Manager to pay any sum of money (or, if required by the Mortgage, to deposit into the lockbox account within two (2) business days of receipt) to Owner provided for herein when the same is payable, if such failure is not cured within five (5) days after written notice specifying such failure is given by Owner to Manager.

(b)    An assignment by Manager in violation of the provisions of Article 23 hereof.

(c)    If Manager shall fail to keep, observe or perform any other material covenant, agreement, term or provision of this Agreement to be kept, observed or performed by Manager and such failure shall continue for a period of thirty (30) days after written notice specifying such failure given by Owner to Manager, or if Manager due to any act or omission on the part of Manager and without the fault of Owner, shall fail to maintain the Permits and such failure shall continue for a period of thirty (30) days after written notice specifying such failure given by Owner to Manager; provided that if such failure is incapable of cure within such thirty (30) day period, then the cure period shall be extended provided that Manager commenced the cure during such initial thirty (30) day period and thereafter diligently and continuously pursues the cure thereof to completion.

(d)    If because of any act or omission on the part of Manager, and without the fault of Owner, either (i) the License Agreement or (ii) any required license for the sale of alcoholic beverages at the Hotel, is at any time suspended, terminated or revoked for a period of more than thirty (30) consecutive days, provided, however, if, at the end of such thirty (30) day period the cure has not been effectuated notwithstanding Manager's diligent and continuous attempts to cure, then the cure period shall be extended for an additional period of ninety (90) days.

(e)    If Manager shall fail to maintain and operate the Hotel in accordance with the standards required under Section 4.1 and such failure shall not be due to a refusal on the part of Owner to approve the Annual Plan submitted by Manager under Section 4.4 or Owner's failure to properly provide funds requested pursuant to the provisions of Section 9.1 and such failure shall continue for a period of sixty (60) days after written notice by Owner to Manager specifying the matters or conditions which constitute the basis for such Event of Default, provided that if such failure is not reasonably capable of cure within such sixty (60) day period, then the cure period shall be extended provided that Manager commences the cure during such initial sixty (60) day period and thereafter diligently and continuously pursues the cure thereof to completion.

(f)    If Manager shall apply for or consent to the appointment of a receiver, trustee or liquidator of Manager or of all or a substantial part of its assets, admit in writing its inability to pay its debts as they come due, make a general assignment for the benefit of creditors, take advantage of any insolvency law, or file an answer admitting the material allegations of a petition filed against Manager in any bankruptcy, reorganization or judgment or decree shall be entered by any court of competition jurisdiction, on the application of a creditor, adjudicating Manager bankrupt or insolvent or approving a petition seeking reorganization of Manager or appointing a receiver, trustee or liquidator of Manager or of all or a substantial part of its assets or a decree shall continue unstayed and in effect for any period of ninety (90) consecutive days.

(g)    The filing of a voluntary petition in bankruptcy or insolvency or a petition for liquidation or reorganization under any bankruptcy law by Manager, or Manager shall consent to, acquiesce in, or fail timely to controvert, an involuntary petition in bankruptcy, insolvency or an involuntary petition for liquidation or reorganization filed against it.

(h)    The filing against Manager of a petition seeking adjudication of Manager as insolvent or seeking liquidation or reorganization or appointment of a receiver, trustee or liquidator of all or a substantial part of Manager's assets, if such petition is not dismissed within ninety (90) days.

(i)    Failure of Manager (but excluding such a failure which results from the failure by Owner to provide the necessary funds therefor) to maintain at all times throughout the term hereof all of the insurance required to be maintained by Manager under Article 12, if such failure is not cured within fifteen (15) days after written notice specifying such failure is given by Owner to Manager.

(j)    The fraud, gross negligence, willful misconduct or criminal conduct of or by Manager and, to the extent same has a material adverse effect on the Hotel or Owner, the General Manager, in connection with the Hotel.

16.2    **Owner Defaults**. Each of the following shall constitute an Event of Default by Owner:

(a)    The failure of Owner to pay or furnish to Manager any money Owner is required to pay or furnish to Manager in accordance with the terms hereof on the date the same is payable, if such failure is not cured within five (5) days after written notice specifying such failure is given by Manager to Owner. If any sum of money is not paid within five (5) days following the date same becomes due and payable under this Agreement, and Manager has advanced such sum on behalf of Owner, such sum shall bear interest at the Default Rate from the date Manager advanced such sum on behalf of Owner until the date Owner actually pays such sum. If the failure to pay relates to the Management Fee, such sum shall bear interest at the Default Rate from the date due until the date actually paid.

(b)    If because of a default under the Mortgage, if any, not caused by the act or omission of Manager, the Mortgage shall be foreclosed, or the Hotel sold in lieu of foreclosure.

(c)    If Owner shall apply for or consent to the appointment of a receiver, trustee or liquidator of Owner of all or a substantial part of its assets, or admit in writing its inability to pay

its debts as they come due, make a general assignment for the benefit of creditors, take advantage of any insolvency law, or file an answer admitting the material allegations of a petition filed against Owner in any bankruptcy, reorganization or insolvency proceeding, or if an order, judgment or decree shall be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating Owner a bankrupt or insolvent or approving a petition seeking reorganization of Owner or appointing a receiver, trustee or liquidator of Owner or of all or a substantial part of its assets, and such order, judgment or decree shall continue unstayed and in effect for any period of ninety (90) consecutive days.

(d)     The filing of a voluntary petition in bankruptcy or insolvency or a petition for liquidation or reorganization under any bankruptcy law by Owner, or Owner shall consent to, acquiesce in, or fail timely to controvert, an involuntary petition in bankruptcy, insolvency or an involuntary petition for liquidation or reorganization filed against it.

(e)     The filing against Owner of a petition seeking adjudication of Owner as insolvent or seeking liquidation or reorganization or appointment of a receiver, trustee or liquidator of all or a substantial part of Owner's assets, if such petition is not dismissed within ninety (90) days.

(f)     Failure of Owner to maintain at all times throughout the term hereof all of the insurance required to be maintained by Owner under Article 12, if such failure is not cured within fifteen (15) days after written notice specifying such failure is given by Manager to Owner.

(g)     The failure of Owner to perform, keep or fulfill any of the other covenants, undertakings, obligations or conditions set forth in this Agreement, or the failure of Owner to approve expenditures or to authorize procedures necessary to maintain the standards of the Hotel in accordance with the Operating Standards, if such failure shall continue for a period of thirty (30) days after written notice by Manager or Licensor to Owner specifying the matters or conditions which constitute the basis for such Event of Default, provided that if such failure is incapable of cure within such thirty (30) day period, then the cure period shall be extended for up to an additional thirty (30) days provided that Owner commences the cure during such initial thirty (30) day period and thereafter diligently and continuously pursues the cure thereof.

## ARTICLE 17
## TERMINATION UPON EVENT OF DEFAULT; OTHER REMEDIES

17.1     **Termination**. Upon the occurrence of an Event of Default, in addition to and cumulative of any and all rights and remedies available to the non-defaulting party under this Agreement, at law or in equity, the non-defaulting party may: (i) terminate this Agreement without penalty, effective upon receipt of written notice of termination to the defaulting party, provided that termination may be effective immediately in the case of fraud, gross negligence, willful misconduct, criminal conduct or misappropriation of funds; and (ii) pursue any and all other remedies available to the non-defaulting party at law or in equity. In addition to and cumulative of the foregoing, upon the occurrence of any Event of Default on the part of Owner, all Management Fees, Reimbursable Expenses and all other sums payable to Manager under this Agreement shall be immediately due and payable without notice. In no event shall (i) the provisions of this Agreement with respect to the payment of a Termination Fee upon the

termination of this Agreement under certain circumstances be construed as defining or limiting the amount recoverable by Manager from Owner by reason of any Event of Default on the part of Owner; or (ii) entitle Manager to receive a Termination Fee in the event of a termination by reason of any Event of Default on the part of Manager

17.2 **Manager's Rights to Perform**.

(a) If Owner shall fail to make any payment or to perform any act required of Owner pursuant to this Agreement, Manager may (but shall not be obligated to), without further notice to, or demand upon, Owner and without waiving or releasing Owner from any obligations under this Agreement, make such payment (either with its own funds or with funds withdrawn for such purpose from the Operating Accounts or the Reserve) or perform such act. Manager agrees to provide written notice to Owner within five (5) days after Manager exercises its rights in the preceding sentence. All sums so paid by Manager and all necessary incidental costs and expenses incurred by Manager in connection with the performance of any such act, together with interest thereon at the Default Rate from the date of making such expenditure by Manager, shall be payable to Manager on demand.

(b) Manager shall have the right to set-off against any payments to be made to Owner by Manager under any provision of this Agreement and against all funds from time to time in the Operating Accounts and the Reserve, any and all liabilities of Owner to Manager. Manager may withdraw from the Operating Accounts and the Reserve from time to time such amounts as Manager deems desirable in partial or full payment of all or any portion of said liabilities, the amount of such withdrawals to be paid by Owner to Manager on demand and to be replaced in the respective account and fund.

## ARTICLE 18
## OWNER'S ADDITIONAL TERMINATION RIGHTS

18.1 **Sale of the Hotel**. If Owner proposes to sell or otherwise dispose of the Hotel or Owner's interests therein, to a bona fide third-party (the "**Third-Party Purchaser**") during the Term, this Agreement will terminate effective upon the consummation of the closing of such sale. Owner shall provide Manager with written notice of termination of this Agreement not less than sixty (60) days prior to the scheduled date of closing of the sale of the Hotel; provided, however, if such a sale does not actually occur, the notice of termination shall be deemed ineffective.

18.2 **Performance Standard**.





## ARTICLE 19
## AREA OF PROTECTION

19.1

## ARTICLE 20
## TRANSFER TO OWNER UPON TERMINATION

Upon any termination of this Agreement, whether due to the occurrence of an Event of Default or otherwise, Manager shall cooperate with Owner and shall execute all documents or instruments requested by Owner in connection with the transfer, all without consideration to Manager (provided that, if such termination is due to a reason other than a default by Manager under this Agreement, Owner will reimburse Manager for Manager's reasonable expenses to effect such transfer) or the imposition of liability by Manager, to Owner or its nominee of the Permits and the License Agreement used or useful in connection with the operation of the Hotel. Without limiting the generality of the foregoing, Manager shall cause its officials, subject to restrictions provided in any License Agreement or related agreement, to provide all sales lists and customer contacts to Lender and to execute any necessary documents and to visit licensing authorities along with Owner's representatives in order to expedite (i) the orderly transfer to Owner or its designee of the Permits and the License Agreement (ii) the renewal thereof to Owner or Owner's designee if appropriate. In the event that this Agreement terminates due to

any reason other than a default by Manager under this Agreement, a sufficient number of Hotel Employees will be hired by Owner or its successor, assign or designee, and retained for at least 90 days thereafter, so as not to cause a "mass layoff" or "plant closing", as defined in the Workers Adjustment and Retraining Act, 29 USC, sec 2101 et seq.

## ARTICLE 21
## NOTICES

All notices, elections, acceptances, demands, consents and reports (collectively "notice") provided for in this Agreement shall be in writing and shall be given to the other party at the address set forth below or at such other address as any of the parties hereto may hereafter specify in writing.

To Owner:            RREAF O&G PORTFOLIO #2 LLC
C/O Spectrum Origination LLC
1253 Springfield Avenue, Suite 201
New Providence, New Jersey 07974
Attention: Jeffrey Schaffer

With a copy to:
Spectrum Group Management LLC
1250 Broadway, 19th Floor
New York, New York 10001
Attention: Peter Locke

To Manager:       Channel Point Hospitality LLC
2500 North Dallas Parkway
Suite 600
Plano, Texas 75093

With a copy to:     Carla S. Moreland, Esq.
5112 Briargrove Lane
Dallas, Texas 75287

Such notice or other communication may be given by Federal Express or other nationally recognized overnight carrier or by electronic facsimile in which case notice shall be deemed given upon confirmed delivery. Notice may be mailed by United States registered or certified mail, return receipt requested, postage prepaid, deposited in a United States post office or a depository for the receipt of mail regularly maintained by the post office. If mailed, then such notice or other communication shall be deemed to have been received by the addressee on the fifth (5th) day following the date of such mailing. Such notices, demands, consents and reports may also be delivered by hand, in which case it shall be deemed received upon delivery.

### ARTICLE 22
### CONSENT AND APPROVAL

Except as herein otherwise provided, whenever in this Agreement the consent or approval of Manager or Owner is required, such consent or approval shall not be unreasonably withheld or delayed. Such consent or approval shall also be in writing only and shall be executed only by an authorized officer or agent of the party granting such consent or approval.

### ARTICLE 23
### NON-ASSIGNABILITY

This Agreement shall not be assignable by Manager or Owner; provided however, that Owner shall be entitled to assign this Agreement to an Affiliate; and Manager shall (i) be entitled to assign this Agreement to an Affiliate of such party as part of a modification to such party's company structure in which all or substantially all of such party's assets are transferred to an Affiliate of such party; and (ii) have the right to assign its rights to receive payments under this Agreement as security for indebtedness or other obligations.

### ARTICLE 24
### INDEMNITY

24.1 **Indemnity by Manager**.



24.2 **Indemnity by Owner**. To the extent that Manager shall not be fully covered by insurance required to be maintained pursuant to this Agreement or if, after giving effect to the provisions of Section 24.1(b) of this Agreement, Gross Revenues are not sufficient to pay all Liabilities, Owner shall indemnify, defend and hold harmless Manager and its directors, officers, employees and agents from and against any damages, loss, liability, cost, action, cause, claim or expense, including attorneys' fees, arising out of, or incurred in connection with the management and operation of the Hotel.

**Management Agreement – Page 34**

24.3    **Survival**. The provisions of this Article 24 shall survive the expiration or earlier termination of this Agreement.

**ARTICLE 25**
**PARTIAL INVALIDITY**

In the event that any one or more of the phrases, sentences, clauses or paragraphs contained in this Agreement shall be declared invalid by the final and unappealable order, decree or judgment of any court, this Agreement shall be construed as if such phrases, sentences, clauses or paragraphs had not been inserted, unless such construction would substantially destroy the benefit of the bargain of this Agreement to either of the parties hereto.

**ARTICLE 26**
**MISCELLANEOUS**

26.1    **Disputes**. Whenever any issue or dispute arises under this Agreement relating to the Annual Operating Budget, the Approved Capital Budget and or the calculation and payment of the Reserves, and the Management Fee, such issue or dispute shall be resolved utilizing the Uniform System of Accounts and the by application of generally accepted accounting principles consistently applied.

26.2    **Further Assurances**. Owner and Manager shall execute and deliver all other appropriate supplemental agreements and other instruments, and take any other action necessary to make this Agreement fully and legally effective, binding and enforceable as between them and as against third parties.

26.3    **Waiver**. The waiver of any of the terms and conditions of this Agreement on any occasion or occasions shall not be deemed a waiver of such terms and conditions on any future occasion.

26.4    **Successors and Assigns**. Subject to and limited by Article 23, this Agreement shall be binding upon and inure to the benefit of Owner, its successors and permitted assigns, and shall be binding upon and inure to the benefit of Manager, its successors and permitted assigns.

26.5    **Governing Law**. This Agreement shall be construed, both as to its validity and as to the performance of the parties, in accordance with the laws of the State of Texas.

26.6    **Compliance with Mortgage and License Agreement**. In carrying out their respective duties and obligations under the terms of this Agreement, Owner and Manager shall use commercially reasonable good faith efforts to take no action that could reasonably be expected to constitute a material default under any Mortgage or the License Agreement and will use commercially reasonable good faith efforts to take such actions as are reasonably necessary to comply therewith. Notwithstanding the foregoing or anything in this Agreement to the contrary, if there is a breach by Owner under the Mortgage and such breach is the result of the failure of Manager, such breach shall not be a default by Manager under this Agreement (and Manager shall have no liability therefore) unless such default and/or failure is specifically provided for in Section 16.1 of this Agreement and the applicable notice and cure periods provided for such breach and/or failure, if any, have expired.

26.7 **Amendments**. This Agreement may not be modified, amended, surrendered or changed, except by a written document signed by the Owner and Manager agreeing to be bound thereby.

26.8 **Estoppel Certificates**. Owner and Manager agree, at any time and from time to time, as requested by the other party, upon not less than ten (10) days' prior written notice, to execute and deliver to the other a statement certifying that this Agreement is unmodified and in full force and effect (or if there have been modifications, that the same are in full force and effect as modified and stating the modifications), certifying the dates to which required payments have been paid, and stating whether or not, to the best knowledge of the signer, the other party is in default in performance of any of its obligations under this Agreement, and if so, specifying each such default of which the signer may have knowledge, it being intended that such statement delivered pursuant hereto may be relied upon by others with whom the party requesting such certificate may be dealing.

26.9 **Inspection Rights**. Owner and Lender shall have the right to inspect the Hotel and examine the books and records of Manager pertaining to the Hotel at all reasonable times during the Term upon reasonable notice to Manager, and Owner and the holder of any Mortgage shall have access to the Hotel and the books and records pertaining thereto at all times during the Term to the extent necessary to comply with the terms of any Mortgage, all to the extent consistent with applicable law and regulations and the rights of guests, tenants and concessionaires of the Hotel.

26.10 **Subordination**. This Agreement, any extension hereof and any modification hereof shall be subject and subordinate to a Mortgage as provided therein and, in the event of a foreclosure or deed in lieu of foreclosure, subject to the terms of any subordination agreement with Lender, this Agreement shall terminate unless otherwise assumed by Lender in writing. The provisions of this Section shall be self-operative and no further instrument of subordination shall be required; however, Manager will execute and return to Owner (or to Lender, as designated by Owner) such documentation as Owner or Lender may reasonably request to evidence the subordination of this Agreement to the Mortgage. In the event of any refinancing of the Property, Manager shall cooperate in all reasonable respects with Owner in effecting such refinancing.

26.11 **Effect of Approval of Plans and Specifications**. Owner and Manager agree that in each instance in this Agreement or elsewhere wherein Manager is required to give its approval of plans, specifications, budgets and/or financing, no such approval shall imply or be deemed to constitute an opinion by Manager, nor impose upon Manager any responsibility for the design or construction of additions to or improvements of the Hotel, including but not limited to structural integrity or life/safety requirements or adequacy of budgets and/or financing. The scope of Manager's review and approval of plans and specifications is limited solely to the adequacy and relationship of spaces and aesthetics of the Hotel in order to comply with the Operating Standards.

26.12 **Entire Agreement**. This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof, superseding all prior agreements or undertakings, oral or written.

**Management Agreement – Page 36**

26.13  **Time is of the Essence**. Time is of the essence in this Agreement.

26.14  **Interpretation**. No provision of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have structured or dictated such provision.

26.15  **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and need not be signed by more than one of the parties hereto and all of which shall constitute one and the same agreement.

26.16  **No Electronic Transactions**. The parties hereby acknowledge and agree that this Agreement shall not be executed, entered into, altered, amended or modified by electronic means. Without limiting the generality of the foregoing, the parties hereby agree that the transactions contemplated by this Agreement shall not be conducted by electronic means, except as specifically set forth in Article 21 of this Agreement.

26.17  **Prohibited Persons and Transactions**.

(a)  Manager is not, and shall not become, a person or entity with whom U. S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including those named in OFAC's Specially Designated and Blocked Person's List) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, or Support Terrorism), or other governmental action (such persons and entities being "**Prohibited Persons**").

(b)  Owner is not and shall not become a Prohibited Person.

26.18  **Confidentiality.** Owner and Manager agree to keep the terms and conditions of all leases and other occupancy agreements in effect at the Hotel (if any) and all other accruements relating to the Hotel, together with all information and data obtained, possessed, or generated by Manager in connection with the Hotel (collectively, "**Privileged Information**"), strictly confidential and not to make any public announcements or any disclosures to any third parties, either orally or in writing, with respect to any Privileged Information without the express written consent of the other party hereunder; provided, however, the restrictions imposed hereby shall not apply to any Privileged Information (1) which is required to be disclosed in order to comply with any law, ordinance, governmental decree or any rule, regulation or decree of any interested governmental body or (2) which must otherwise be disclosed to relevant third parties, including accountants, attorneys and lenders, in the course of reasonable and diligent management and operation of the Hotel or the business of Owner, or any subsidiary or Affiliate of Owner or Manager. If Manager makes such disclosure, it shall notify such third party of this provision and of the requirement of Owner for confidentiality. The provisions of this Section 26.18 shall survive the expiration or termination of this Agreement

26.19  **No Third Party Rights**. This Agreement shall inure solely to the parties hereto. Notwithstanding any other provision of this Agreement, no third party shall have any rights pursuant to the terms of this Agreement.

## ARTICLE 27
## NO REPRESENTATIONS AS TO INCOME OR FINANCIAL SUCCESS OF HOTEL

In entering into this Agreement, Manager and Owner acknowledge that neither Owner nor Manager has made any representation to the other regarding projected earnings, the possibility of future success or any other similar matter respecting the Hotel, and that Manager and Owner understand that no guarantee is made to the other as to any specific amount of income to be received by Manager or Owner or as to the future financial success of the Hotel.

## ARTICLE 28
## REPRESENTATIONS OF MANAGER

In order to induce Owner to enter into this Agreement, Manager does hereby make the following representations and warranties:

(a)     the execution of this Agreement is permitted by the certificate of formation and partnership agreement of Manager and this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of Manager enforceable in accordance with the terms hereof;

(b)     to the best knowledge of Manager, there is no claim, litigation, proceeding or governmental investigation pending, or, as far as is known to Manager, threatened, against or relating to Manager, the properties or business of Manager or the transactions contemplated by this Agreement which does, or may reasonably be expected to, materially and adversely affect the ability of Manager to enter into this Agreement or to carry out its obligations hereunder, and to the best knowledge of Manager, there is no basis for any such claim, litigation, proceedings or governmental investigation, except as has been fully disclosed in writing to Owner and Lender; and

(c)     neither the consummation of the transactions contemplated by this Agreement on the part of Manager or to be performed, nor the fulfillment of the terms, conditions and provisions of this Agreement, conflicts with or will result in the breach of any of the terms, conditions or provisions of, or constitute a default under, any agreement, indenture, instrument or undertaking to which Manager is a party or by which it is bound.

## ARTICLE 29
## REPRESENTATIONS OF OWNER

In order to induce Manager to enter into this Agreement, Owner does hereby make the following representations and warranties:

(a)     the execution of this Agreement is permitted by the Limited Liability Company Agreement of Owner and this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of Owner enforceable in accordance with the terms hereof;

(b)     there is no claim, litigation, proceeding or governmental investigation pending, or as far as is known to Owner, threatened, against or relating to Owner, the properties or business

of Owner or the transactions contemplated by this Agreement which does, or may reasonably be expected to, materially and adversely affect the ability of Owner to enter into this Agreement or to carry out its obligations hereunder, and there is no basis for any such claim, litigation, proceedings or governmental investigation, except as has been fully disclosed in writing to Manager; and

(c)     neither the consummation of the transactions contemplated by this Agreement by this Agreement on the part of Owner to be performed nor the fulfillment of the terms, conditions and provisions of this Agreement, conflicts with or will result in the breach of any of the terms, conditions or provisions of, or constitute a default under, any agreement, indenture, instrument or undertaking to which Owner is a party or by which it is bound.

## ARTICLE 30
## DISPUTE RESOLUTION

Except as specifically provided in Section 4.4 of this Agreement, Owner and Manager agree that any dispute between the parties related to or arising out of this Agreement that cannot be amicably settled by the parties hereunder, shall first be submitted for non-binding mediation before resorting to any litigation, equitable proceeding or other enforcement action. Such mediation shall be held within a twenty-five mile radius of the Hotel (or such other location mutually agreed by the parties) and the parties shall cooperate in good faith to agree on a mediator who shall be a retired or semi-retired judge having at least ten (10) years of experience on the bench hearing complex commercial transactions. If the parties hereto have failed to designate, by a joint written statement, a mediator within thirty (30) days following the date of a written request therefor by either Manager or Owner to the other, then either Owner or Manager may notify the local office of the American Arbitration Association ("**AAA**") or JAMS and request such entity to select a person to act as the mediator to assist in the resolution of the dispute. The mediation will be a non-binding conference between the parties conducted in accordance with the applicable rules and procedures of AAA or JAMS (as determined by the mediator). The compensation of the mediator and all related expenses shall be borne equally by the parties, each of whom shall bear their own costs, irrespective of the outcome of the mediation. If any dispute remains unresolved between the parties after the mediation is complete, then either party shall be entitled to pursue its rights and remedies at law or in equity. The provisions of this Article 30 shall survive the expiration or earlier termination of this Agreement.

## ARTICLE 31
## ADDITIONAL OBLIGATIONS OF MANAGER

Manager acknowledges that Owner is vitally interested in the qualifications of the individuals designated as the general manager and the director of sales of the Hotel. Manager shall, from time to time, consult with Owner and obtain Owner's approval as to the appointment of individuals to such positions; provided, however, Owner and Manager acknowledge that nothing in this Article is intended to limit or negate the authority of Manager elsewhere provided in this Agreement to remove and replace, in its sole discretion, the general manager and/or director of sales of the Hotel.

## ARTICLE 32
## TERMINATION OF THE LICENSE AGREEMENT

Owner reserves and shall have the absolute right in its sole and unfettered discretion, at any time and without the consent or approval of (but with notice to) Manager, to terminate the License Agreement, provided, however, that (i) Owner shall have no such right in order to establish its own independent operations, such as an operation without a franchise or license or in its own hotel name; (ii) in the event of such a termination by Owner, Manager shall have the right of approval (which right shall be reasonably exercised) of any new franchise or license for the Hotel; and (iii) if Owner's decision to terminate the License Agreement is made without the consent of Manager, then the provisions of Section 18.2 of this Agreement shall no longer apply.

## ARTICLE 33
## RECOURSE

Any provision of this Agreement to the contrary notwithstanding, Manager hereby agrees that no personal, partnership or corporate liability of any kind or character (including, without limitation, the payment of any judgment) whatsoever now attaches or at any time hereafter under any condition shall attach to Owner or any of Owner's constituent entities and affiliates or any mortgagee for payment of any amount payable under this Agreement or for the performance of any obligation under this Agreement. The exclusive remedies of Manager for the failure of Owner to perform any of its obligations under this Agreement shall be to proceed against the interest of Owner in and to the Hotel for Manager's actual, out-of-pocket damages (and not any consequential, punitive or exemplary damages), and Owner shall not be personally liable for any deficiency.

*The rest of this page is intentionally left blank.*

IN WITNESS WHEREOF, Owner has caused this Agreement to be executed and its seal affixed by its partners duly authorized thereunto and Manager has caused this Agreement to be executed and its seal affixed by its officer duly authorized thereunto, the day and year first above written, in duplicate.

**OWNER**:

**RREAF O&G PORTFOLIO #2 LLC**


By: _____
Name: Jeff Schaffer
Title: Chief Executive Officer


**MANAGER**:

**CHANNEL POINT HOSPITALITY LLC**


By: _____
Name: _____
Title: _____

**Signature Page to Management Agreement – Page Solo**
COUNTRY INN & SUITES

## EXHIBIT A

## MAJOR ACCOUNT CATEGORIES

Room Sales
Telephone Sales
Food Sales
Beverage Sales
Miscellaneous Income

Room Expense
Telephone Expense
Food Expense
Beverage Expense
Miscellaneous Expense

A&G
Management Fee
Advertising & Business Promotion
R&M
H-L-P

Property Tax
Insurance
CEP Reserve
Leases

# EXHIBIT B

## DESCRIPTION OF PREMISES

<u>Tract 1:</u>

Being LOT SIX (6), BLOCK ONE (1), AMARON ADDITION SECTION 7, an addition to the City of Midland, Midland County, Texas, according to the map or plat thereof recorded in Cabinet E, Page 378, Plat Records of Midland County, Texas.

<u>Tract 2:</u>

Ingress-egress reciprocal access easement 70 feet by 90 feet according to plat recorded in Cabinet E, Page 378, Plat Records, Midland County, Texas.

**EXHIBIT C**

## EXAMPLE OF MONTHLY TRANSACTIONS REPORT

| 10/09/12  11:35 am | | | | | | P&L EXAMPLE ENTITY<br>INCOME STATEMENT<br>End of Year 2012 | | | | | | Bay  Page:    1 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Total Avl Rooms | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | # Room/Occ % | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Revenue/Average Rate | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | RevPar | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | -----------REVENUES---------- | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Rooms | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | F&B Revenue | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Communications | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Minor Op Depts. | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Rent/Other | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL REVENUES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | -----DEPARTMENTAL EXPENSES---- | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Rooms | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Food & Beverage | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Communications | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Minor Operating | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Rent & Other | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL DEPARTMENTAL EXPENSES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | -----DEPARTMENTAL PROFIT----- | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Rooms | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Food & Beverage | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Communications | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Minor Op Depts | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Rent/Other | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | GROSS OPER INCOME | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | -----UNDISTRIBUTED EXPENSES---- | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Admin & General | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Advertising | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Sales/Marketing | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Repairs/Maintenance | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Energy | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL UNDISTRIBUTED | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | GROSS OPERATING PROFIT | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 1**

10/08/12  11:35 am

P&L EXAMPLE ENTITY
INCOME STATEMENT
End of Year 2012

jay  Page:  2

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Management Fee | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Franchise Fee | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | INCOME BEFORE FIXED CHARGES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ---------FIXED/OTHER--------- | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL FIXED/OTHER | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | EBITDA | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | PROFORMA  N O I | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | DEBT, DEPR/AMORT, CAP & OTHER | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL DEBT, DEPR/AMORT, CAP & | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | NET INC AVAIL/ TAXES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | --ADD BACKS & SUBTRACTIONS-- | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | NET OPERATING INCOME | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 2**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOMS DEPARTMENT
End of Year 2012

jay  Page:   3

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUE | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | NET REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES / WAGES | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENTAL PROFIT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 3**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
ROOMS DEPARTMENT
End of Year 2012

jay  Page:  4

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 4**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOM STATISTICS
End of Year 2012

jay  Page:     5

| | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPIED ROOMS | | | | | | | | | | | | | |
| TOTAL TRANSIENT | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| TOTAL GROUP | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| TOTAL SOLD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| TOTAL OCCUPIED | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| TOTAL AVAILABLE ROOMS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**<u>Exhibit C – Page 5</u>**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOM STATISTICS
End of Year 2012

jay  Page:    6

| ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUE/AVERAGE RATES | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL TRANSIENT | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL GROUP | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL PAYING RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL ROOMS OTHER | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | OVERALL ROOM RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | REVPAR | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 6**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOM STATISTICS
End of Year 2012

jay  Page:    7

| ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **SALARIES / WAGES** | | | | | | |
| 0  $  0.00 | | 0  $  0.00 | | 0  $  0.00 | | Guest Services | 0  $  0.00 | | 0  $  0.00 | | 0  $  0.00 | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL SALARIES / WAGES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | **BENEFITS** | | | | | | |
| 0  $  0.00 | | 0  $  0.00 | | 0  $  0.00 | | TOTAL BENEFITS | 0  $  0.00 | | 0  $  0.00 | | 0  $  0.00 | |
| 0  $  0.00 | | 0  $  0.00 | | 0  $  0.00 | | TOTAL WAGES & BENEFITS | 0  $  0.00 | | 0  $  0.00 | | 0  $  0.00 | |
| 0  $  0.00 | | 0  $  0.00 | | 0  $  0.00 | | DEPARTMENTAL PROFIT | 0  $  0.00 | | 0  $  0.00 | | 0  $  0.00 | |

**Exhibit C – Page 7**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOM STATISTICS
End of Year 2012

jay  Page:    8

| ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|--------|--------|--------|--------|-----------|--------|--|--------|--------|--------|--------|-----------|--------|
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL OTHER EXPENSES | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 8**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
FOOD & BEVERAGE CONSOLIDATED
End of Year 2012

Jay  Page:   5

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|--------|---|--------|---|-----------|---|---|--------|---|--------|---|-----------|---|
| | | | | | | **FOOD REVENUE** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | NET FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **BEVERAGE REVENUE** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | NET BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **OTHER REVENUE** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | NET OTHER REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 9**
6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
FOOD & BEVERAGE CONSOLIDATED
End of Year 2012

jay  Page:   10

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OVERALL NET FOOD COST | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OVERALL NET BEVERAGE COST | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OTHER COST | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL COST OF GOODS SOLD | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | GROSS PROFIT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES/WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL GENERAL | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES/WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Payroll Taxes & Benefits | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENTAL PROFIT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 10**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
FOOD & REVENUE CONSOLIDATED
End of Year 2012

jay  Page:  11

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|--------|---|--------|---|-----------|---|---|--------|---|--------|---|-----------|---|
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 11**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

Jay  Page:  12

| | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| COVERS & CAPTURE | | | | | | | | | | | | | |
| TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| FOOD REVENUE & AVG CHECK | | | | | | | | | | | | | |
| TOTAL FOOD REVENUE & AVG CHECK | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL FOOD REVENUE & AVG CHECK | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| BEVG REVENUE & RPOR | | | | | | | | | | | | | |
| TOTAL BEVG REVENUE & RPOR | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL BEVG REVENUE & RPOR | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| BEVG REVENUE & % FOOD | | | | | | | | | | | | | |
| TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**<u>Exhibit C – Page 12</u>**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

jay  Page:  13

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ROOM SERVICE | | | | | | |
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ================================ | | | | | | |
| | | | | | | RESTAURANT 1 | | | | | | |
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ================================ | | | | | | |
| | | | | | | BANQUETS | | | | | | |
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 13**
6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

Jay Page: 14

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ================= | | | | | | |
| | | | | | | CATERING | | | | | | |
| | | | | | | COVERS | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ================= | | | | | | |
| | | | | | | BANQUETS & CATERING | | | | | | |
| | | | | | | COVERS | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ================= | | | | | | |
| | | | | | | LOUNGE 1 | | | | | | |
| | | | | | | BEVG REVENUE & BPCR | | | | | | |

**Exhibit C – Page 14**

```
10/09/12  11:35 am                              P&L EXAMPLE ENTITY                                  Jay  Page:   15
                                                F&B STATISTICS
                                               End of Year 2012

        ACTUAL    CALC      BUDGET    CALC     LAST YEAR  CALC                        ACTUAL    CALC      BUDGET    CALC     LAST YEAR  CALC
        --------  ------    --------  ------   ---------  ------                      --------  ------    --------  ------   ---------  ------
        --------            --------           ---------                              --------            --------           ---------
            0  $   0.00         0  $   0.00        0  $   0.00   TOTAL BEVG REVENUE & BPCR         0  $   0.00        0  $   0.00        0  $  0.00


                                                              ==============================
                                                              RESTAURANT 2
                                                              ------------------
                                                              COVERS & CAPTURE
                                                              ------------------
            0      0.00         0      0.00        0      0.00   TOTAL COVERS & CAPTURE           0      0.00        0      0.00        0      0.00
                                                              FOOD REVENUE & AVG CHECK
        --------            --------           ---------      ------------------
            0  $   0.00         0  $   0.00        0  $   0.00   TOTAL FOOD REVENUE & AVG CHECK    0  $   0.00        0  $   0.00        0  $  0.00
                                                              BEVG REVENUE & % FOOD
        --------            --------           ---------      ------------------
            0      0.00         0      0.00        0      0.00   TOTAL BEVG REVENUE & % FOOD      0      0.00        0      0.00        0      0.00


                                                              ==============================
                                                              LOUNGE 2
                                                              ------------------
                                                              BEVG REVENUE & BPCR
        --------            --------           ---------      ------------------
            0  $   0.00         0  $   0.00        0  $   0.00   TOTAL BEVG REVENUE & BPCR         0  $   0.00        0  $   0.00        0  $  0.00
                                                              ==============================
                                                              CONFERENCE CENTER
                                                              ------------------
                                                              COVERS & CAPTURE
                                                              ------------------
            0      0.00         0      0.00        0      0.00   TOTAL CAPTURE & COVERS           0      0.00        0      0.00        0      0.00
                                                              FOOD REVENUE & AVG CHECK
        --------            --------           ---------      ------------------
            0  $   0.00         0  $   0.00        0  $   0.00   TOTAL FOOD REVENUE & AVG CHECK    0  $   0.00        0  $   0.00        0  $  0.00
                                                              BEVG REVENUE & % FOOD
```

**Exhibit C – Page 15**

6444430v.1

10/08/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

Jay  Page:  16

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | IN ROOM BAR | | | | | | |
| | | | | | | REVENUE & RPOR | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL REVENUE & RPOR | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 16**

6444430v.1

P&L EXAMPLE ENTITY
ROOM SERVICE
End of Year 2012

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 17**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
RESTAURANT 1
End of Year 2012

Jay  Page:   18

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|--------|---|--------|---|-----------|---|---|--------|---|--------|---|-----------|---|
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 18**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
BANQUETS & CATERING
End of Year 2012

Jay  Page:  19

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | CATERING | | | | | | |
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 19**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
BANQUETS & CATERING
End of Year 2012

jay  Page:   20

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|--------|---|--------|---|-----------|---|---|--------|---|--------|---|-----------|---|
| | | | | | | TOTAL BANQUETS & CATERING | | | | | | |
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL COMBINED REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARY / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 20**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
BANQUETS & CATERING
End of Year 2012

Jay  Page:    21

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|--------|---|--------|---|-----------|---|---|--------|---|--------|---|-----------|---|
| | | | | | | BANQUETS | | | | | | |
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 21**

6444430v.1

```
10/05/12  11:35 am                              P&L EXAMPLE ENTITY                              jay  Page:   22
                                                   LOUNGE 1
                                                End of Year 2012

   ACTUAL      %    BUDGET      %   LAST YEAR     %                                 ACTUAL     %    BUDGET      %   LAST YEAR     %
 ---------- -----  --------- -----  ---------- -----                             ----------- -----  --------- -----  ---------- -----
                                                        FOOD REVENUES
                                                        -------------
 ----------        ---------        ----------                                  -----------        ---------        -----------
         0   0.0          0   0.0           0    0.0   TOTAL FOOD REVENUE                 0   0.0          0   0.0           0    0.0

                                                        BEVERAGE REVENUES
                                                        -----------------
         0   0.0          0   0.0           0    0.0   TOTAL BEVERAGE REVENUE             0   0.0          0   0.0           0    0.0

                                                        OTHER REVENUES
                                                        --------------
         0   0.0          0   0.0           0    0.0   TOTAL OTHER REVENUES               0   0.0          0   0.0           0    0.0
         0   0.0          0   0.0           0    0.0   TOTAL DEPT REVENUE                 0   0.0          0   0.0           0    0.0

                                                        SALARIES / WAGES
                                                        ----------------
         0   0.0          0   0.0           0    0.0   TOTAL SALARIES / WAGES             0   0.0          0   0.0           0    0.0

         0   0.0          0   0.0           0    0.0   TTL WAGES & BENEFITS               0   0.0          0   0.0           0    0.0
         0   0.0          0   0.0           0    0.0   DEPARTMENT NET                     0   0.0          0   0.0           0    0.0
 ==========        =========        ==========                                  ===========        =========        ===========
```

**Exhibit C – Page 22**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
COMMUNICATIONS
End of Year 2012

joy  Page:  23

| ACTUAL | %POA/% | BUDGET | %POA/% | LAST YEAR | %POA/% | | ACTUAL | %POA/% | BUDGET | %POA/% | LAST YEAR | %POA/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUES | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL PHONE REVENUE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | NET PHONE REVENUE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL INTERNET REVENUE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | NET INTERNET REVENUE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | NET COMBINED REVENUES | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | COSTS OF SALES | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | COS PHONE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | COS INTERNET | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COST OF ALL SALES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | GROSS PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Payroll Taxes & Benefits | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TTL WAGES & BENEFITS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 23**

10/08/12  11:35 am

P&L EXAMPLE ENTITY
IN HOUSE MOVIES
End of Year 2012

Jay  Page:  24

| ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% | | ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **REVENUES** | | | | | | |
| 0  $ | 0.00 | 0  $ | 0.00 | 0  $ | 0.00 | NET REVENUE | 0  $ | 0.00 | 0  $ | 0.00 | 0  $ | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 24**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
GUEST LAUNDRY
End of Year 2012

Jay  Page:  25

| ACTUAL | RPOR/% | BUDGET | RPRO/% | LAST YEAR | RPOR/% | | ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUES | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | NET REVENUE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | GROSS PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TTL WAGES & BENEFITS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 25**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
RENTS & OTHER INCOME
End of Year 2012

Jay  Page:  26

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SPACE RENTALS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL RENTALS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | COMMISSIONS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL COMMISSIONS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | MISCELLANEOUS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL MISCELLANEOUS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL RENTS/OTHER INCOME | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 26**

10/05/12  11:35 am            P&L EXAMPLE ENTITY            Jay Page:   27

A&G

End of Year 2012

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL A&G EXP | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 27**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
SALES & MARKETING
End of Year 2012

jay  Page:  28

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | GROUP | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL GROUP | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | TRANSIENT | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Newspaper | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL TRANSIENT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Contingency | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL NON-MEDIA | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | GRAND TTL ADVERTISING | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 28**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
SALES & MARKETING
End of Year 2012

Jay  Page:  29

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES / WAGES | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Incentive/Svc Charge | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALES & ADVERTISING | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 29**

P&L EXAMPLE ENTITY
REPAIRS & MAINTENANCE
End of Year 2012

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Grnds & Land - Outdoor | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Rent - Equipment | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL R&M EXPENSE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 30**

10/05/12  11:35 am                                    P&L EXAMPLE ENTITY                                      Jay  Page:   31
                                                          ENERGY
                                                      End of Year 2012

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL ENERGY | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL ENERGY | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 31**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
FIXED & OTHER CHARGES
End of Year 2012

jmy  Page:  32

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|--------|---|--------|---|-----------|---|---|--------|---|--------|---|-----------|---|
| | | | | | | FEES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FEES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | RENTS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL RENTS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | LEASES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL LEASES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | INSURANCE | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL INSURANCE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | REAL ESTATE TAXES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REAL ESTATE TAXES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER TAXES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER TAXES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | PARTNERSHIP EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL PARTNERSHIP EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | INTEREST EXPENSE | | | | | | |

**Exhibit C – Page 32**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
FIXED & OTHER CHARGES
End of Year 2012

Jay  Page:   33

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL INTEREST EXPENSE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | REIT LEASE | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REIT LEASE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | MISC NON EBITDA | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL MISC NON EBITDA | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | DEPRECIATION/AMORTIZATION &OT | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPRECIATION & AMORTIZAT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | FFE & ADDBACKS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FFE & ADDBACKS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FIXED EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 33**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
EE CAFE
End of Year 2012

jay  Page:  34

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL EE CAFE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Allocation to PTEB | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | FINAL EE CAFE TOTAL | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 34**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
PY & EB
End of Year 2012

jay  Page:  35

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | TAXES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL TAXES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | HEALTH INSURANCE | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL HEALTH INSURANCE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 401k Match | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL PY & EB | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

% Column is % Total Wages

**Exhibit C – Page 35**

10/05/12  11:35 am                              P&L EXAMPLE ENTITY                                    Jay  Page:    36
                                                     PT & EB
                                                 End of Year 2012

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | DISTRIBUTED TO: | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DISTRIBUTION | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 36**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
PT & EB
End of Year 2012

jay  Page:   37

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES, WAGES & INCENTIVES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Total Food & Beverage | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | GROSS TTL WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | S&W, INCENTIVES, PAID TIME OFF | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Lounge 1 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Total Foood & Beverage | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL ALL PAID WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 37**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
HOUSE LAUNDRY
End of Year 2012

Jay  Page:   38

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES & WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | DISTRIBUTED TO: | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DISTRIBUTION | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 38**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay  Page:  39

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| ASSETS | | | | | |
| CASH | | | | | |
| TOTAL CASH | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| SEMI-RESTRICTED CASH | | | | | |
| TOTAL SEMI-RESTRICTED CASH | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| RECEIVABLES | | | | | |
| TOTAL RECEIVABLES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| INVENTORIES | | | | | |
| TOTAL INVENTORIES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OPERATING EQUIPMENT | | | | | |
| TOTAL OPERATING EQUIPMENT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Exhibit C – Page 39**

6444430v.1

10/05/12  11:35 am                    P&L EXAMPLE ENTITY                           jay  Page:   40
                                  DETAILED BALANCE SHEET
                                   End of Year 2012

                            This            Last          Monthly       This Month         Yearly
                          Month End       Month End        Change        Last Year         Change

PREPAIDS
--------

TOTAL PREPAIDS              0.00            0.00            0.00            0.00             0.00

FIXED ASSETS
------------
    Accum Amortization      0.00            0.00            0.00            0.00             0.00

TOTAL FIXED ASSETS          0.00            0.00            0.00            0.00             0.00

OTHER ASSETS
------------

TOTAL OTHER ASSETS          0.00            0.00            0.00            0.00             0.00

TOTAL ASSETS                0.00            0.00            0.00            0.00             0.00

**<u>Exhibit C – Page 40</u>**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay  Page:   41

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| LIABILITIES | | | | | |
| PAYABLES | | | | | |
| TOTAL PAYABLES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| DEPOSITS | | | | | |
| TOTAL DEPOSITS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OP TAXES AND WITHHOLDINGS | | | | | |
| TOTAL OP TAXES AND WITHHOLDING | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ACCRUED OPERATING EXPENSES | | | | | |
| TTL ACCRUED OPERATING EXPENSES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Exhibit C – Page 41**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay  Page:  42

| | This<br>Month End | Last<br>Month End | Monthly<br>Change | This Month<br>Last Year | Yearly<br>Change |
|---|---|---|---|---|---|
| DUE TO/FROM ACCOUNTS | | | | | |
| Due to ZZ St Paul | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Due to REIT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL DUE TO/FROM ACCOUNTS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OTHER LIABILITIES | | | | | |
| TOTAL OTHER LIABILITIES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| NOTES PAYABLE | | | | | |
| TOTAL NOTES PAYABLE | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL LIABILITIES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OWNERS EQUITY | | | | | |
| Retained Earn - Prior Years | 0.00 | 0.00 | 0.00 | 695.02- | 695.02 |
| Retained Earn - Current Yr | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL OWNERS EQUITY | 0.00 | 0.00 | 0.00 | 695.02- | 695.02 |
| TOTAL LIAB. & OWNERS EQUITY | 0.00 | 0.00 | 0.00 | 695.02- | 695.02 |

**Exhibit C – Page 42**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFTK REPORT
End of Year 2012

Jay  Page:   43

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | FULL TIME EQUIVALENT | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | SUMMARY HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOTEL | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | SUMMARY WAGES & AVG RATE | | | | | | |
| 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | TOTAL WAGES & AVG RATE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |

**Exhibit C – Page 43**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFIR REPORT
End of Year 2012

jay Page:   44

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ROOMS DEPARTMENT | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL OCCUPIED ROOMS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Room Attendant - Total | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | House Attendant - Total | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | Room Attendant - Total | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | House Attendant - Total | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL WAGES & AVG RATE | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| | | | | | | HOURS & FTE | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | FOOD & BEVERAGE SUMMARY | | | | | | |
| | | | | | | FOOD COVERS | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PROD / TOTAL COV | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVERAGE RATE | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL WAGES & AVG RATE | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 44**

6444430v.1

10/08/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFTK REPORT
End of Year 2012

jay  Page:  45

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ===============================  A&G  HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 45**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY KPIR REPORT
End of Year 2012

bay  Page:   46

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ROOM SERVICE | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | RESTAURANT 1 | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | RESTAURANT 2 | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 46**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY KPIS REPORT
End of Year 2012

jay  Page:  47

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL WAGES & AVG RATE | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| | | | | | | HOURS & FTE | | | | | | |
| 0 0.00 | | 0 0.00 | | 0 0.00 | | TOTAL HOURS & FTE | 0 0.00 | | 0 0.00 | | 0 0.00 | |
| | | | | | | ================================ | | | | | | |
| | | | | | | BANQUETS & CATERING | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 0.00 | | 0 0.00 | | 0 0.00 | | TOTAL HOURS & PRODUCTIVITY | 0 0.00 | | 0 0.00 | | 0 0.00 | |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL WAGES & AVG RATE | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| | | | | | | HOURS & FTE | | | | | | |
| 0 0.00 | | 0 0.00 | | 0 0.00 | | TOTAL HOURS & FTE | 0 0.00 | | 0 0.00 | | 0 0.00 | |
| | | | | | | ================================ | | | | | | |
| | | | | | | CONFERENCE CENTER | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 0.00 | | 0 0.00 | | 0 0.00 | | TOTAL HOURS & PRODUCTIVITY | 0 0.00 | | 0 0.00 | | 0 0.00 | |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL WAGES & AVG RATE | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| | | | | | | HOURS & FTE | | | | | | |

**Exhibit C – Page 47**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFIN REPORT
End of Year 2012

jay Page:  48

| | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | | =============================== | | | | | | |
| | | | | | | | LOUNGE 1 | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL REVENUE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | | WAGES & AVG RATE | | | | | | |
| | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | TOTAL WAGES & AVG RATE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |
| | | | | | | | HOURS & FTE | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | | =============================== | | | | | | |
| | | | | | | | LOUNGE 2 | | | | | | |
| | | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | | WAGES & AVG RATE | | | | | | |
| | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | TOTAL WAGES & AVG RATE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |
| | | | | | | | HOURS & FTE | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 48**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFTK REPORT
End of Year 2012

Jay Page:   49

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ================================ | | | | | | |
| | | | | | | IN ROOM RATE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL OCCUPIED ROOMS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & RMS PER OCC ROOM | | | | | | |
| | | | | | | ------------------------ | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & HOURS PER OCC RO | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| | | | | | | ---------------- | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| | | | | | | ----------- | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 49**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY KPIK REPORT
End of Year 2012

Jay  Page:  50

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | CONTRACT LABOR | | | | | | |
| | | | | | | HOURS & FTX | | | | | | |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | FOOD & BEVERAGE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |
| 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | TOTAL WAGES $ AVG RATE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |

**Exhibit C – Page 50**

6444430v.1

**EXHIBIT D**

**INSURANCE REQUIREMENTS**

1.      **Insurance Requirements for the Hotel**:

General Liability - $1,000,000 per Occurrence/$2,000,000 General and Product Liability Aggregate per Location

Including:
1. Products and Completed Operations
2. Contractual Liability
3. Personal Injury
4. Incidental Medical Malpractice
5. Molestation and Abuse are not Excluded
6. Punitive Damages unless Excluded by Public Policy
7. Fellow Employee Coverage
8. Garage Keepers Liability
9. Liquor Liability
10. Blanket Additional Interests
    a. All Managers or Lessors of Premises
    b. All mortgagors of Premises
    c. Vendors
    d. Volunteer Workers
    e. As required by Contract
11. Severability of Interests
12. Waiver of Subrogation as Required by Contract
13. Terrorism not Excluded or Sub-Limited
14. No Deductible/SIR
15. Coverage is Designated to the Scheduled Premises and is Primary and Non-Contributory

Commercial Automobile - $1,000,000 – Any Auto

Including:
1. Medical Payments - $5,000 per person
2. Personal Injury Protection – As required by State
3. Property Protection Insurance – As required by State
4. Uninsured Motorists - $1,000,000 Limit
5. Underinsured Motorists - $1,000,000 Limit
6. Physical Damage (Owned and Hired Autos) – Comprehensive $1,000 Deductible
7. Physical Damage (Owned and Hired Auto) – Collision $1,000 Deductible
8. Auto Loan/Lease Gap Coverage

Umbrella Liability - $25,000,000 per Occurrence/ $25,000,000 Aggregate per Location

    Including:
1. Retained Limit – 0
2. Follows Scheduled Underlying Policies

Workers Compensation – Provided in All States except as Provided by the State Funds of – ND, OH, WA, WV, WY

Medical Benefits – Statutory
1. Indemnity – Statutory
2. Employers Liability - $500,000
    a. Each Accident
    b. Disease - Each Employee
    c. Disease – Policy Limit

Crime - $1,000,000 Occurrence Limit S/T/A $10,000 per Occurrence Deductible Covering:
1. Employee Theft
2. Forgery or Alteration
3. Computer Fraud
4. Funds Transfer Fraud
5. Theft of Money & Securities
    a. Inside the Premises
    b. Outside the Premises

Guest Property - $10,000 Limit per Occurrence
1. $1,000 deductible
2. Liability Governed by Statute

Professional Liability - $1,000,000 Each Claim / $2,000,000 Aggregate for All Claims
1. Claim Includes Identifiable Loss and Defense Cost
2. A $25,000 Deductible Applies to Loss and Defense

Employment Practices Liability
1. $2,000,000 Aggregate for All Loss Combined (Including Defense Cost)
2. Retention $25,000

2. **Insurance Requirements for Major Contractors**:

(a)    Worker's Compensation - Statutory amount or its equivalent under applicable law.

**Exhibit D – Page 2**

(b) Employer's Liability - $500,000 minimum, where required by applicable or equivalent law.

(c) Comprehensive General Liability; **either**

   (i) $100,000 Bodily Injury per Person
     $300,000 per Occurrence
     $100,000 Property Damage

     **-or-**

   (ii) $1,000,000 combined single limit

**EXHIBIT E**

**COMPETITIVE SET**



**Exhibit E – Solo Page**

6444430v.1

**MANAGEMENT AGREEMENT**

between

**RREAF O&G PORTFOLIO #2 LLC**
as Owner

and

**CHANNEL POINT HOSPITALITY LLC**
as Manager

FOR

**HOLIDAY INN EXPRESS & SUITES PEARSALL**
412 Interstate 35
Pearsall, Texas 78061

## MANAGEMENT AGREEMENT

This Management Agreement (the "**Agreement**") made this ___ day of February 2016 between **RREAF O&G PORTFOLIO #2 LLC**, a Delaware limited liability company (**"Owner"**), as Owner, and **CHANNEL POINT HOSPITALITY LLC**, a Texas limited liability company (**"Manager"**), as Manager.

## RECITALS:

A.    Owner is the fee owner of the Hotel (as defined below).

B.    Manager is experienced in the management and operation of hotels, directly and through affiliated entities.

C.    Owner and Manager desire to enter into this Agreement for the management and operation of the Hotel in accordance with the terms and conditions and subject to the limitations contained in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner and Manager covenant and agree as follows:

## ARTICLE 1
## DEFINITIONS, TERMS AND REFERENCES

1.1    Definitions. In this Agreement and any Exhibits, the following terms shall have the following meanings:

"**Account Category**" shall include the major account categories set forth in Exhibit A attached hereto and made a part hereof as well as other major account categories, which are applicable to the Hotel consistent with the Statement of Income as defined by the Uniform System of Accounts or otherwise approved by Owner.

"**Accounting Fee**" shall have the meaning set forth in Article 11.

"**Accounting Period**" shall mean each calendar month (whether of 28, 29, 30 or 31 days) during each Fiscal Year.

"**Affiliate**" shall mean any person or entity that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with another person or entity. The term "**control**" (and correlative terms) shall mean the power, whether by contract, equity ownership or otherwise, to direct the policies or management of a person or entity. Without limiting the foregoing, an "**Affiliate**" also includes any partner or a partnership of any party to this Agreement, any member or membership parties thereto and any corporation, partnership, individual or trust related to or controlling or controlled by such partnership, individual or trust related to or controlling or controlled by such partnership party or its partners

or such membership party or its members. A natural person is related to another natural person if he or she is a spouse, parent, or lineal descendant of the other person.

"**Allocated Services**" shall mean certain support services that Manager obtains from a third party and provides on a central or regional basis to the hotels that it manages because such support services can be provided on a more efficient, effective and economical basis to each individual Manager managed hotel if the expenses of such support services are shared by other Manager managed hotels. Such support services include services in the areas of sales and marketing, food and beverage, human resources, insurance, technology, training and payroll (each such service, an "**Allocated Service**"; collectively, the "**Allocated Services**"). Owner and Manager agree that Manager shall provide Allocated Services to the Hotel and that the Hotel's portion of the cost thereof shall constitute a Gross Operating Expense so long as (i) the costs of the Allocated Services are allocated in good faith on a uniform, fair, equitable and proportionate basis among the Hotel and the other Manager managed hotels benefiting therefrom; and (ii) the Allocated Services shall not include services that do not benefit the Hotel; and (iii) the cost of the Allocated Services are either (a) included by Manager in each Annual Operating Budget or (b) otherwise approved in writing by Owner. The cost of the Allocated Services and the allocation of that cost to the Hotel and other Manager managed hotels shall be subject to audit by Owner pursuant to the terms of Section 10.3 of this Agreement. Manager further agrees that the benefit of any discounts or rebates received by Manager with respect to any of the Allocated Services shall be passed on to the Hotel on a proportionate basis as compared to other hotels managed by Manager or its Affiliates.

"**Annual Operating Budget**" shall mean an annual operating projection for the Hotel prepared and submitted by Manager to Owner and approved by Owner for each Fiscal Year pursuant to Section 4.4(a).

"**Annual Plan**" shall mean an annual business plan for the operation of the Hotel prepared by the Manager and approved by the Owner, which shall include the Annual Operating Budget, the Approved Capital Budget, the Marketing Plan and the Management Plan and any other material included therein by Manager as provided in Section 4.4.

"**Approved Capital Budget**" shall have the meaning set forth in Section 4.4(b).

"**Base Fee**" shall have the meaning set forth in Article 11.

"**Building and Appurtenances**" shall mean (i) the 74 room hotel building located on the Premises, and (ii) landscaping and other related facilities, together with all installations located at, or used in connection with the operation of the building for hotel purposes including, without limitation, any swimming pools, health club and recreational facilities, walkways, parking facilities, heating, lighting, sanitation equipment, air conditioning, laundry facilities, refrigeration, built-in kitchen equipment, and elevators.

"**Capital Budget**" shall mean Manager's proposed estimate of FF&E and Capital Improvements submitted to Owner each Fiscal Year pursuant to Section 4.4(b).

"**Capital Improvements**" shall have the meaning set forth in Section 8.2 hereof.

"**Commencement Date**" shall mean the date on which Manager assumes the management and operation of the Hotel under this Agreement for the benefit of Owner.

"**Competitive Set**" shall mean the properties listed on Exhibit E attached hereto and any revisions to such list agreed upon by Owner and Manager from time to time.

"**CPI**" shall mean the Consumer Price Index for All Urban Consumers, United States City Average, All Items (1982-84=100), issued by the Bureau of Labor Statistics of the United States Department of Labor.

"**Default Rate**" shall mean the lesser of (i) the Prime Rate plus four percent (4%) per annum or (ii) the highest lawful rate permitted by applicable Legal Requirements from time to time.

"**Effective Date**" shall mean the date of this Agreement as set forth on page 1 hereof.

"**Event of Default**" shall mean any of the events described in Article 16, provided that any condition contained therein for the giving of notice or the lapse of time, or both, has been satisfied.

"**Executive Personnel**" shall mean the general manager and the director of sales of the Hotel.

"**Fiscal Year**" shall mean the fiscal year that ends on the last day of each calendar year. The first Fiscal Year shall be the period commencing on the Commencement Date and ending on December 31st of the same calendar year in which the Commencement Date occurs. The words "full Fiscal Year" shall mean any Fiscal Year containing not fewer than 365 days. A partial Fiscal Year after the end of the last full Fiscal Year and ending with the expiration or earlier termination of the Term shall constitute a separate Fiscal Year.

"**Furniture, Fixtures and Equipment**" or "**FF&E**" shall mean all furniture, furnishings, wall coverings, fixtures, carpeting, rugs, fine arts, paintings, statuary, decorations, and hotel equipment and systems (including the costs associated with the purchase, installation and delivery thereof) located at, or used in connection with, the operation of the Building and Appurtenances as a hotel, including without limitation, major equipment and systems required for the operation of kitchens, bars, laundry and dry cleaning facilities, office equipment, dining room wagons, major material handling equipment, major cleaning and engineering equipment, telephone systems, computerized accounting and vehicles (including the costs associated with the purchase, installation and delivery thereof) together with all replacements therefor and additions thereto, but in all events excluding Operating Equipment and Supplies.

"**GOP Threshold**" ███████████████████████████████████████████
███████████████████████████████████████████████████████████████

"**Gross Operating Expenses**" shall mean the following expenses actually incurred in the operation of the Hotel:

1.    Cost of sales; salaries, wages, bonuses, payroll taxes; the cost of social insurance which shall include, but not be limited to, life, medical, disability insurance, retirement and other benefits incurred by Manager related to Hotel Employees;

2.    Departmental expenses; administrative and general expenses; the cost of third party vendor sources engaged to print payroll checks and reports or to perform any other services hereunder; the Accounting Fee; the Revenue Management Fee; advertising and business promotion for the Hotel; franchise fees, chain reservation fees and all other fees relating to the License Agreement; the cost of utilities, service contracts; and repairs and maintenance;

3.    The cost of replacing Operating Equipment and Supplies and Inventories as defined herein.

4.    The cost of uncollectible accounts receivables as reasonably determined by the Manager.

5.    The Owner-approved costs and expenses of technical consultants and operational experts for specialized services in connection with non-routine hotel work including roofing consultants, environmental engineers and others.

6.    The cost of insurance as set forth in this Agreement.

7.    The Management Fee.

8.    Real estate and personal property taxes levied or assessed against the Hotel and other like charges.

9.    Allocated Services.

10. All other costs and expenses incurred in connection with the operation of the Hotel and otherwise approved as part of the Annual Plan or Annual Operating Budget, including but not limited to Reimbursable Expenses.

11. Risk management costs.

12. Legal services related to Hotel Employees or Hotel operations or services.

13. Other amounts expressly set forth in this Agreement or the Annual Operating Budget as being included in Gross Operating Expenses.

All costs and fees of any Independent Public Accountants or other third parties who perform services approved by Owner (other than services provided by any Independent Public Accountants or other third parties in connection with services and/or reports required to be provided by Owner pursuant to the License Agreement) shall be paid by Owner and shall not constitute Gross Operating Expenses.

Except to the extent that the travel budget for Manager's personnel is included as a line item in the Annual Operating Budget, no part of Manager's central office overhead or general or

**Management Agreement – Page 4**

administrative expenses including the cost of travel by Manager's corporate or regional officers (other than Allocated Services) or for travel related to any other hotel operated by Manager or its Affiliates shall be deemed to be part of Gross Operating Expenses and all such costs and expenses shall be the sole responsibility of Manager.

"**Gross Operating Profit**" or "**GOP**" shall mean the amount of the remainder of Gross Revenues of the Hotel less the departmental expenses and undistributed expenses of the Hotel.

"**Gross Revenues**" shall mean for any applicable Accounting Period, all revenues and receipts of every kind derived from the Hotel and all departments and parts thereof during such Accounting Period, as finally determined on an accrual basis in accordance with the Uniform System of Accounts, including, but not limited to, revenues and income (both cash and credit transactions) before commissions and discounts for prompt or cash payments, from the rental of rooms and lobby space, exhibit or sales space of any kind, including without limitation, charges for reservations, deposits and cancellation fees not refunded to guests; income from vending machines, health club membership fees, wholesale and retail sales of merchandise, service fees and charges, business interruption insurance claims (but only for periods during the operating term) in respect of the Hotel, condemnation awards for temporary use of the Hotel, license, lease and concession fees and rentals (but not including the gross receipts of any licensees, lessees and concessionaires), food and beverages sales, and other sales of every kind conducted by, through or under Manager in connection with the Hotel. Gross Revenues shall not include (i) Federal, state and municipal excise, sales and use taxes or similar impositions collected directly from patrons or guests or included as part of the sales price of any goods or services; (ii) gratuities or service charges collected and paid to employees; (iii) credits or refunds to guests; (iv) proceeds arising from the sale or other disposition of property described in Section 1231 of the Internal Revenue Code or of capital assets; (v) proceeds from condemnation and payments received on account of insurance policies (other than the proceeds from business interruption insurance and from condemnation awards for temporary use of the Hotel when received); (vi) proceeds from claims for damages suffered by Manager or Owner, unless in recompense for a lost revenue item; and (vii) interest earned on the Reserve or Permitted Investments.

"**Hotel**" shall mean (a) the Building and Appurtenances and the Premises owned by Owner and (b) all FF&E, all Operating Equipment and Supplies, and all Inventories owned by Owner located at 412 Interstate 35, Pearsall, Texas 78061.

"**hotel**" shall mean any hotel (other than the Hotel), inn, motor inn, motor hotel, motel, suite hotel, conference center, meeting center or any other facility providing either or both of short-term lodging and meeting arrangements.

"**Hotel Employees**" shall have the meaning set forth in Section 4.2.

"**Independent Public Accountant**" shall mean a nationally recognized firm of independent certified public accountants having hotel accounting experience, designated from time to time by Owner, subject to Manager's rights of approval, reasonably exercised.

"**Inventories**" shall mean "Inventories of Supplies" as defined in the Uniform System of Accounts, such as soap, toilet paper, stationery, writing pens, food and beverage inventories,

paper products, menus, expendable office and kitchen supplies, fuel, supplies and items similar to any of the foregoing.

"**Legal Proceedings**" shall mean all complaints, counterclaims or cross-claims filed in a court of competent jurisdiction, any notice of any claim of violation of any legal requirement by any governmental agency or authority, or any summons or other legal process, in each instance by or against the Hotel or by or against Owner, or Manager in connection with the Hotel.

"**Legal Requirements**" shall mean (a) all laws, ordinances, statutes, regulations and orders relating to the Hotel and the Premises now or hereafter in effect, including but not limited to, environmental laws and (b) all terms, conditions, requirements and provisions of (i) all Permits; (ii) all leases; and (iii) all liens, restrictive covenants and encumbrances affecting the Hotel or the Premises or any part thereof.

"**License Agreement**" shall mean the franchise or license agreement, if any, from time to time entered into by Owner with respect to the branding and operation of the Hotel. For the purposes of this definition, the following terms used in said section shall have the following meaning: "**Licensor**" shall mean the franchisor or licensor under the franchise or license agreement from time to time entered into by Owner with respect to the branding and operation of the Hotel; "**Licensee**" shall mean Owner; and the "**Manual**" shall mean the Licensor's operating manual and other manuals for Licensor described in its standard license agreement.

"**Major Renovations**" shall mean a contemporaneously made set or series of alterations, additions and/or improvements to the Hotel with a total cost in excess of $100,000 (or a lesser amount in the event a project with a total cost less than $100,000 requires material design and purchasing and installation services related thereto and/or results in a material alteration in the design of the Hotel), but shall not include any Repairs or Maintenance with respect to Capital Improvements or FF&E.

"**Manager**" shall have the meaning set forth in the introductory section of this Agreement.

"**Management Fee**" shall mean the Accounting Fee**,** Revenue Management Fee and Base Fee, all as set forth in Article 11 hereof.

"**Management Plan**" shall have the meaning set forth in Section 4.4(d).

"**Marketing Plan**" shall mean an annual marketing plan for the Hotel prepared and submitted by Manager to Owner and approved by Owner in each Fiscal Year pursuant to Section 4.4(c).

"**Mortgage**" shall mean, collectively, each of the documents evidencing or securing current or future indebtedness on the Hotel in favor of a third party lender or financial institution or any successor thereto or replacement thereof (the "**Lender**").

"**Net Operating Income**" or "**NOI**" shall mean the result of Gross Revenues less Gross Operating Expenses.

"**Open for Business**" shall mean the period of time during which all or substantially all of the Hotel is open for business to the general public.

"**Operating Account**" shall mean a special account or accounts, bearing the name of the Hotel, established by Manager in a federally insured bank or trust company selected by Owner.

"**Operating Equipment and Supplies**" shall mean supply items which constitute "Operating Equipment and Supplies" under the Uniform System of Accounts, all miscellaneous serving equipment, linen, towels, uniforms, silver, glassware, china and similar items.

"**Operating Standards"** shall mean the operation of the Hotel in a manner consistent with (i) the requirements under the License Agreement; (ii) the condition of the Hotel as of the Commencement Date (or, following completion of a Renovation, the condition of the Hotel as of the completion of the Renovation), normal wear and tear excepted; (iii) the condition and level of the operation of hotels of comparable class and standing to the Hotel in its market area; (iv) then current market conditions regarding rental rates and lease terms and conditions with respect to Hotels of comparable class and standing to the Hotel (including but not limited to the Competitive Set); and (v) then current business and management practices (including those related to compliance with Legal Requirements) applicable to the management, operation, leasing, maintenance and repair of a hotel comparable in size, character and location to the Hotel.

"**Owner**" shall have the meaning set forth in the introductory section of this Agreement.

"**Performance Standard**" shall have the meaning set forth in Section 18.2.

"**Permits**" shall mean all governmental or quasi-governmental licenses and permits, including but not limited to any certificate of occupancy, business licenses and liquor licenses.

"**Permitted Investments**" shall mean (subject to modification, addition or deletion from time to time at the option of Owner by written request to Manager) all of which shall be in the name of Owner:

> (a)  interest-bearing deposit accounts (which may be represented by certificates of deposit, time deposit open account agreements or other deposit instruments) in commercial banks having a combined capital and surplus of not less than $50,000,000; or

> (b)  all other investments approved by Owner.

"**Premises**" shall mean the land on which the Hotel is located, which land is described in Exhibit B attached hereto.

"**Prime Rate**" shall mean the rate per annum announced, designated or published from time to time by JP Morgan Chase Bank N.A. as its "prime", "reference" or "base" rate of interest for commercial loans.

"**Reimbursable Expenses**" shall mean all travel, lodging, entertainment, telephone, facsimile, postage, courier, delivery, employee training and other expenses incurred by Manager

in accordance with the standard policies for expenses incurred by Manager on its own behalf and which are directly related to its performance of this Agreement, but in no event will Reimbursable Expenses include or duplicate expenses for Manager's overhead or Allocated Services.

"**Renovation**" shall mean a renovation of any portion of the Hotel during the Term, pursuant to a plan proposed by Manager and approved by Owner to, among other things, bring the Hotel to a physical condition that satisfies the standards under the License Agreement and to operate in a manner consistent with the assumptions for the then-current Annual Operating Budget and then-current Annual Plan. A Renovation shall be carried out at the expense of Owner pursuant to plans and specifications and a schedule prepared by Manager and approved by Owner and, to the extent required under the License Agreement, by Licensor.

"**Repairs and Maintenance**" shall have the meaning as defined in Section 8.1.

"**Reserve**" shall mean an account maintained as a Permitted Investment for Reserve for replacement of FF&E and/or Capital Improvements, as described in Section 7.1 and funded as provided in Section 7.2.

"**Revenue Data Publication**" shall mean Smith's STR Report, a monthly publication distributed by Smith Travel Research, Inc., or an alternative source, reasonably satisfactory to both parties, of data regarding the average daily rate, occupancy and RevPAR of hotels in the general area of the Hotel, including, without limitation, the Competitive Set.

"**Revenue Management Fee**" shall have the meaning as defined in Section 11.

"**Revenue Per Available Room**" or "**RevPAR**" shall mean for any Test Period the number derived by dividing (i) net room revenue (in accordance with the Uniform System of Accounts), by (ii) the number of available guest rooms in the subject hotel.

"**RevPAR Threshold**" ████████████████████████████████████████████████████████████████████████████████████████

"**State**" shall mean the State in which the Hotel is located or other as designated.

"**Term**" shall mean the term of this Agreement, which shall be an initial five (5) year term commencing on the Commencement Date and expiring on the fifth (5th) anniversary of the Commencement Date, as such Term may be extended or shortened as expressly set forth in this Agreement or as otherwise agreed to by Owner and Manager.

"**Termination Fee**" ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**Management Agreement – Page 8**



"**Test Period**" shall mean each twelve (12) month period during the Term commencing on the first day of the seventh (7th) calendar month following the Commencement Date and each subsequent three (3) calendar months thereafter.  In the event that this Agreement shall terminate on a date other than the last day of a calendar year, the last Test Period shall end on the date of termination.  The term "full Test Period" means any Test Period containing not fewer than 365 days.

"**Third Party Purchaser**" shall have the meaning set forth in Section 18.1.

"**Unavoidable Interruptions**" shall mean interruptions in the operation of or access to the Hotel or any of its essential services on account of an interruption in any one or more of the utility services described in Section 13.2, or on account of labor disputes, strikes, lockouts, fire or other casualty, war, terrorist actions, acts of God and other similar causes beyond the reasonable control of the party claiming an unavoidable interruption, but never financial inability. Other than obligations accruing prior to the occurrence of such event of Unavoidable Interruption or obligations that, if not performed, would cause a material adverse effect on the Hotel or its operations (for instance, the requirement to maintain the Permits or insurance obligations hereunder), the obligations of the party hereunder shall be suspended during the period of an Unavoidable Interruption.

"**Uniform System of Accounts**" shall mean the Uniform System of Accounts for Hotels, 10th Revised Edition, 2006, as published by the Hotel Association of New York City, Inc. or any later edition thereof.

"**Working Capital**" shall mean and refer to the funds which are reasonably necessary for the day-to-day operation of the Hotel's business, including, without limitation, amounts sufficient for the maintenance of petty cash funds, operating bank accounts, receivables, payrolls, prepaid expenses, advance deposits, funds required to maintain inventories, and amounts due to/or from Manager and/or Owner less accounts payable and accrued current liabilities.

    1.2    **Terminology**. All personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, shall include all genders; the singular shall include the plural, and the plural shall include the singular. The titles of Articles, Sections and Subsections in

this Agreement are for convenience only, and neither limit nor amplify the provisions of this Agreement, and all references in this Agreement to Articles, Sections, Subsections, paragraphs, clauses, sub-clauses or exhibits shall refer to the corresponding Article, Section, Subsection, paragraph, clause or sub-clause of, or exhibit attached to, this Agreement, unless specific reference is made to the articles, sections or other subdivisions of, or exhibits to, another document or instrument.

1.3     **Exhibits**. All exhibits and other attachments attached hereto are by this reference made a part of this Agreement.

**ARTICLE 2**
**MANAGEMENT OF HOTEL**

Owner hereby engages and appoints Manager, pursuant to the terms of this Agreement, to operate and manage the Hotel, and Manager hereby agrees and contracts to plan, operate, repair and manage the Hotel pursuant to the terms of this Agreement.

Subject to the terms of this Agreement, Hotel operations shall be under the exclusive supervision and control of Manager, which, except as otherwise specifically provided in this Agreement, shall be responsible for the proper and efficient operation, maintenance and repair of the Hotel in accordance with the terms of this Agreement. Except as specifically set forth in this Agreement, Manager shall have discretion and control respecting matters relating to management and operation of the Hotel, including, without limitation, charges for rooms and commercial space, credit policies, food and beverage services, other Hotel services, employment policies, granting of concessions or leasing of shops and agencies within the Hotel, receipt, holding and disbursement of funds, maintenance of bank accounts, procurement of inventories, supplies and services, promotion and publicity and, in general, all activities necessary for operation of the Hotel.

Manager shall devote its knowledge, experience and efforts to operate and manage the Hotel pursuant to this Agreement in a businesslike manner in accordance with the Operating Standards. Manager shall make available to Owner the full benefit of the judgment, experience and advice of the members of Manager's organization and staff with respect to the policies pursued by Owner in operating, maintaining, and servicing the Hotel.

**ARTICLE 3**
**TERM**

3.1     **Term**. The initial Term automatically shall be extended beyond the initial Term for additional terms of one (1) year each, unless Owner provides written notice to Manager not less than one hundred twenty (120) days prior to the end of the initial Term or the then-current extended Term, as applicable, of Owner's intent not to extend the Term of the Agreement. Notwithstanding the foregoing, the Agreement may be terminated prior to the scheduled expiration of the Term or any extension thereof, (i) without cause by Owner during the first six (6) months following the Commencement Date, provided that Owner provides Manager with not less than thirty (30) days written notice of termination prior to the effective date of such termination, or (provided that in the event that the Workers' Adjustment and Retraining Act, 29

USC, Sec 2101, et seq. (the WARN Act") is applicable to such termination and the replacement manager identified by Owner fails or refuses to retain a sufficient number of employees at the Property so as not to cause a "mass layoff" or "plant closing" under the WARN Act, Owner will extend the effective date of termination to allow the required notices to be provided under the WARN Act, (ii) upon the sale of the Hotel to a bona fide Third Party Purchaser, as provided in Article 18 hereof, provided that Owner provides Manager with not less than sixty (60) days written notice of such termination; and (ii) as otherwise provided in Articles 15, 16, 17 and 18.

3.2 **Surrender.** On the expiration or sooner termination of the Term, Manager shall quit and surrender the Premises to Owner in the condition required pursuant to this Agreement and take such other actions as contemplated by Article 20 hereof.

**ARTICLE 4**
**USE AND OPERATION OF THE HOTEL**

4.1 **Operation**. Manager shall be the sole and exclusive manager of the Hotel during the Term and shall operate the Hotel in accordance with the Operating Standards and the provisions of this Agreement. Manager shall act in a fiduciary capacity with respect to the proper protection of and accounting for Owner's assets. In this capacity, Manager shall deal at arm's length with Owner and all third parties, and Manager shall manage the Hotel in a manner which shall serve the Owner's interests at all times.

4.2 **Employment**.

(a) Subject to the terms of this Agreement, Manager shall select, employ, promote, transfer, compensate, terminate where appropriate, supervise, direct, train, and assign the duties of the Executive Personnel and, through the Executive Personnel, a sufficient number of personnel whom Manager reasonably determines to be necessary or appropriate for the proper, adequate and safe operation and management of the Hotel (collectively, the "**Hotel Employees**"). In connection therewith, Manager agrees to cause an employee or employees located in the corporate office of Manager, at no additional cost to Owner, to handle revenue management and sales management for this Property, together with other properties managed by Manager for Owner and its Affiliates. All such employees of the Hotel shall be employees of Manager or Manager's Affiliate. In addition, Manager may, from time to time, assign one or more of its employees to the staff of the Hotel on a full-time, part-time or temporary basis. Notwithstanding the provisions of this Section 4.2 or any other provision of this Agreement, all costs, expenses and liabilities relating to Hotel Employees shall be expenses of operating the Hotel and the responsibility of Manager for acts or omissions of Hotel Employees (or, for Hotel Employees who allocate their time between multiple hotels, an appropriate allocation of the costs for such Hotel Employees) shall not extend beyond responsibility for the gross negligence or willful misconduct of, or the willful violation of Legal Requirements by the Executive Personnel. Manager acknowledges that such Executive Personnel have the duties specified in the first sentence of this Section 4.2 with respect to other Hotel Employees. Manager will negotiate with any union lawfully entitled to represent such employees and may execute collective bargaining agreements or labor contracts resulting therefrom that have been approved by Owner. Manager shall fully comply with all Legal Requirements having to do with worker's compensation, social security, unemployment insurance, hours of labor, wages, working conditions, and other

employer-employee related subjects. With respect to matters of employment, this Agreement is not one of agency by the Manager for Owner but one with the Manager engaged independently in the business of managing properties on its own behalf as an independent contractor (as defined in §856(d)(3) of the Internal Revenue Code with regards to Owner and any Affiliates thereof). The cost of all employment arrangements shall be charged as Gross Operating Expenses of the Hotel and shall be accrued in accordance with generally accepted accounting principles; provided, however, relocation expenses which exceed the budgeted relocation expenses provided in the Annual Plan, shall not be charged as a Gross Operating Expense without the prior approval of Owner, such approval not to be unreasonably withheld, conditioned or delayed. The costs provided for in the immediately preceding sentence shall include, by way of example and not limitation, all reasonable costs and expenses (including, without limitation, all employment related expenses incurred by Manager with respect to the Hotel Employees), such as severance pay, unemployment compensation and health insurance and related costs (i.e., in order to comply with COBRA-type regulations) as a result of the termination of employees and which shall have been paid or accrued in accordance with generally accepted accounting principles. Manager shall use commercially reasonable efforts and exercise reasonable care to select qualified, competent, and trustworthy employees. The Hotel's general cashier and all employees having check signing authority shall be adequately bonded to the satisfaction of Owner and the cost of such bonds shall be an expense of the Hotel. To the extent possible and reasonably available, Manager shall use local labor to fill non-Executive Personnel positions in the operation of the Hotel. Owner may at any time consult or communicate with Manager regarding any of the Hotel Employees, but will not interfere in the day-to-day activities of Hotel Employees. The Manager shall not discriminate against any employee or applicant for employment because of race, color, religion, national origin, ancestry, age, sex or sexual orientation, and all employment advertising shall indicate that Manager and Owner are each an Equal Opportunity Employer as that term is defined under Legal Requirements.

Notwithstanding anything to the contrary contained in this Agreement, the following subparagraphs (b) and (c) shall apply to any liability that may, from time to time, arise out of the Employee Retirement Income Security Act of 1974 ("**ERISA**") and the Multi-employer Pension Plan Amendments Acts of 1980 ("**MEPPA**"), respectively, as from time to time amended.

(b)     Employee Benefits: Any Hotel Employees who are not then represented by a collective bargaining representative shall be entitled to participate in the incentive programs, profit sharing and/or other employee retirement, disability, health, welfare or other benefit plan or plans then made available by Manager to similarly situated employees of other hotels managed by Manager, in accordance with their respective terms. Manager will have the right to charge the Hotel with its allocable share of the cost of any such plan or plans and any contributions to be made thereunder provided that such charges and contributions shall be determined by Manager in good faith on a uniform basis with respect to charges and contributions imposed for the same or similar plans at other hotels then managed by Manager, subject to Legal Requirements. Manager's rights under this Subsection (b) shall be subject to the condition that Manager shall not put into effect any amendment to any existing plan, or adopt any additional plan, which is not imposed upon all other similarly situated hotels managed by Manager.

**Management Agreement – Page 12**

Upon the expiration or termination of this Agreement, the sale of the Hotel or other similar event, Manager shall cooperate with the Owner with respect to disposition of such plan or plans (or plan assets) in a mutually satisfactory manner, all in compliance with then applicable Legal Requirements.

(c)     Collective Bargaining or Other Multi-employer Plans: Manager and Owner agree that with respect to any withdrawal liability arising under any collective bargaining agreement or other "multi-employer plan" (as defined in Section 3(37) of ERISA) in which the Hotel Employees become participants, the obligations of the parties shall be determined as follows:

(1)     Withdrawal liability arising with respect to Hotel Employees shall be the responsibility of Owner, and Owner shall either pay the amount of such withdrawal liability directly to such plan or reimburse Manager for withdrawal liability payments made to such plan by Manager with respect to Hotel Employees (including withdrawal liability arising after the sale or other termination of this Agreement, provided that such liability arises as a result of such sale, disposition, termination or other similar event). To the extent permitted under then applicable laws, regulations and agreements, Manager shall cooperate with Owner in structuring transactions and transferring actual or contingent withdrawal liability to a successor in ownership or purchaser of the Hotel in accordance with "relief" provisions of ERISA, such as ERISA Section 4204 or then applicable statutory or regulatory provisions of a similar nature.

(2)     For purpose of this subparagraph (c), the term "withdrawal liability" shall mean the actual amount assessed by and payable to a multi-employer pension fund upon a complete or partial withdrawal of the Hotel or Hotel Employees from such fund. Manager shall cooperate with Owner in challenging a plan's assessment of such liability, provided that all costs of litigation, arbitration or other procedures shall be paid by Owner (including any bonds that must be posted). If Manager or its Affiliates have employees at other locations who participate in the same multi-employer plan as Hotel Employees, Owner shall be charged with and be responsible only for multi-employer plan withdrawal liability arising solely with respect to the participation of Hotel Employees in such plan.

4.3     **Legal Proceedings**. Legal Proceedings of a "non-extraordinary nature" (hereafter defined), may be instituted by Manager, in accordance with guidelines and policies determined from time to time by Manager and Owner, in the name of Manager or the Hotel or Owner and by counsel designated by Manager pursuant to such guidelines and policies. Legal Proceedings of an "extraordinary nature" (hereafter defined) shall require Owner's prior approval of the proceedings and counsel approved by Owner. Manager shall furnish Owner with quarterly status reports with respect to all Legal Proceedings of an extraordinary nature. In addition, Manager shall have the right to defend, through counsel designated by Manager, Legal Proceedings of a non-extraordinary nature against Owner or Manager resulting from the operation of the Hotel. The defense of Legal Proceedings against the Hotel of an extraordinary nature (including, without limitation, any aspect of any claims against Manager or Owner arising out of the operation of the Hotel as to which the insurance company denies coverage) shall be coordinated with Owner, designated counsel shall be subject to Owner's reasonable approval and Manager shall furnish Owner with quarterly status reports with respect to such actions. All claims against Owner and/or Manager arising out of the management or operation of the Hotel which (i) are not covered by insurance shall be promptly communicated to Owner and (ii) are covered in whole or

**Management Agreement – Page 13**

in part by insurance shall be promptly forwarded by Manager to the appropriate insurer (with a copy thereof to Owner in the case of claims against Owner). Legal Proceedings of a "non-extraordinary nature" shall be proceedings in which the monetary exposure is less than $50,000 that are (i) initiated by Manager or Owner relating to the operation of the Hotel for matters such as collections, maintenance of licenses and permits, enforcement of contracts and proceedings against Hotel tenants; and/or (ii) defense of actions against the Owner or Manager resulting from the operation of the Hotel, for matters such as guest claims for loss of property or injury to persons and claims relating to employment or the application for employment at the Hotel. Legal Proceedings of an "extraordinary nature" shall mean all other Legal Proceedings.

4.4    **Annual Plan**. On or before the date that is forty-five (45) days following the Commencement Date, Manager shall submit to Owner an Annual Plan ("**Annual Plan**") for the remaining portion of the Fiscal Year in which the Commencement Date occurs and Owner either shall accept the initial Annual Plan submitted to Owner as provided above or shall submit to Manager a detailed list of Owner's objections or questions to the Annual Plan. Owner and Manager shall meet and discuss Owner's Annual Plan objections and shall coordinate expeditiously and in good faith to agree upon an Annual Plan for the remaining portion of the Fiscal Year in which the Commencement Date occurs. On or before November 15th of each year following the Commencement Date, Manager shall submit to Owner an Annual Plan for the next Fiscal Year and on or before December 15th of each year following the Commencement Date, Owner either shall accept the Annual Plan submitted to Owner as provided above or shall submit to Manager a detailed list of Owner's objections or questions to the Annual Plan ("**Owner's Annual Plan Objections**"). Within fifteen (15) days after Manager's receipt of Owner's Annual Plan Objections, Owner and Manager shall meet and discuss Owner's Annual Plan Objections with the goal of agreeing upon an Annual Plan for the subject Fiscal Year. Owner, as part of Owner's Annual Plan Objections, shall have the right to object to the entire Annual Plan or to any specific item or items contained in the Annual Plan. In the event Owner objects to the Annual Plan or any specific item or items of expense in the Annual Plan and Owner and Manager are unable to reach agreement thereon as provided above prior to commencement of the Fiscal Year in question, pending such agreement, the Annual Plan or the specific item or items of expense (not revenue) in question shall be suspended and replaced for such period that the Annual Plan or such item(s) are in question by an amount equal to the lesser of (i) that proposed by Manager for such Fiscal Year, or (ii) if an objection to the entire Annual Plan, the Actual Gross Operating Expenses for the immediately preceding Fiscal Year subject to an adjustment equal to the percentage increase in the CPI over the last twelve (12) month period immediately preceding the start of the Fiscal Year in question, or (iii) if an objection to a specific item or items of expense in the Annual Plan, such item or items of expense for the immediately preceding Fiscal Year subject to an adjustment for each item equal to the percentage increase in the CPI over the twelve (12) month period immediately preceding the start of the Fiscal Year in question.

(a)    The Annual Operating Budget shall be prepared in accordance with the Uniform System of Accounts. The proposed Annual Operating Budget shall incorporate Manager's good faith reasonable estimates of the items of revenue and expense contained therein and shall contain the proposed budget for operations for the succeeding Fiscal Year. When approved by Owner, the proposed Annual Operating Budget shall be the approved Annual Operating Budget.

Any revisions, substitutions or additions to the Annual Operating Budget must be approved by the Owner in writing.

As part of the budgeting process, Manager shall provide to Owner, with each proposed Annual Operating Budget, a complete list of all service and other contracts anticipated for the Fiscal Year which is the subject of the Annual Operating Budget having a liability to the Hotel in excess of $25,000 for such Fiscal Year for or covering the Hotel and the payments or expenditures connected or anticipated therewith. So long as any service or other contracts fall within the following guidelines, Owner's approval thereof shall not be required, but Manager shall nevertheless promptly report to Owner the execution of (and provide Owner with a true and complete copy of) each such contract having a liability to the Hotel of in excess of $25,000:

        (i)      The term of such contract shall be no longer than one (1) year; and

        (ii)      Each contract must be terminable by Owner or Manager without payment or penalty upon not more than thirty (30) days' notice.

In addition, Manager shall provide to Owner for Owner's review, a written schedule for the Hotel listing all executive and management employees to be employed "on-site" in the direct management of the Hotel including, but not limited to the positions of General Manager, Director of Sales, Chief Engineer and the portfolio sales and revenue manager. These schedules shall include such employee's title or job description and the salary range including additional compensation or prerequisites such as lodging, meals, maintenance, moving expenses, bonus/incentive compensation and the like. In the event that any employee's services are shared with (or subsidized through a sharing arrangement with) another hotel, the employee shall be identified together with a description of his/her responsibilities and the amount and source of any subsidy, together with a breakdown of the relative time expended with respect to the Hotel and each other hotel. If Owner notifies Manager that Owner does not believe that some or all of the scheduled wages and salaries are reasonable and customary as required above, then Manager shall promptly provide to Owner a wage and salary survey that supports the scheduled wages and salaries. No proposed amendment including changes in salary or other compensation shall be effective unless the salary or other compensation as changed is reasonable and customary as required above.

(b)      The Capital Budget shall be prepared in accordance with the Uniform System of Accounts. The Capital Budget shall contain the proposed budget for expenditures from the Reserve and the budget for expenditures for Capital Improvements and FF&E for the succeeding Fiscal Year for (i) additions to and substitutions, replacements and renewals of FF&E and (ii) certain non-routine repairs and maintenance to the Project which are normally capitalized under generally accepted accounting principles such as exterior and interior repainting, resurfacing building walls, floors, roof and parking areas, replacing folding walls and similar items. Manager shall submit good faith reasonable estimates for Capital Improvements and for FF&E for the Fiscal Year following the Fiscal Year otherwise covered by the Annual Operating Budget. When approved by Owner, the Capital Budget, or such items as may be specifically approved by Owner, shall be collectively referred to in this Agreement as the "Approved Capital Budget". Approval of the Capital Budget constitutes an authorization for Manager to expend money for Capital Improvements and for FF&E as provided in the Approved Capital Budget, unless the

Owner's approval thereof specifically requires Manager to obtain additional approvals prior to commencing such work. Any revisions, substitutions or additions to the Approved Capital Budget must be approved by Owner in writing.

Competitive bid rules outlined in Section 4.5 will be observed at all times by Manager for any purchases of Capital Improvements and/or FF&E.

(c)     On or before the date that is thirty (30) days following the Commencement Date, Manager shall submit to Owner the Marketing Plan, which Marketing Plan shall contain advertising, sales and promotional plans prepared by Manager to be used in connection with the marketing of the Hotel and the portfolio of hotels owned by Owner and managed by Manager. On or before November 15th of each year following the Commencement Date, Manager shall submit to Owner an Annual Plan for the next Fiscal Year.  When approved by Owner, the proposed Marketing Plan shall be the approved Marketing Plan. Any revision, substitution or additions to the Marketing Plan must be approved by Owner in writing. The Marketing Plan shall be written with the goal of achieving Gross Revenues as submitted in the Annual Operating Budget for the Fiscal Year or, if less than a full Fiscal Year, the period between the Commencement Date and the December 31 next following the Commencement Date. Manager shall not use Owner's name in any advertising or promotional material without Owner's expressed prior written approval.

(d)     The Management Plan shall contain (i) estimated contributions and distributions from or to Owner; (ii) a leasing plan for the leasing of concessions and other space in the Hotel; (iii) plans and budgets for the disposition and replacement of FF&E; and (iv) such management issues, proposals and projections or modifications as Manager may recommend for the efficient management of the Hotel including but not limited to proposals and assessments as to the Hotel's position in the market, market opportunities, franchise affiliation and disposition strategies. When approved by Owner, the proposed Management Plan shall be the approved Management Plan.

4.5     **Competitive Bidding**. All contracts for repairs, Capital Improvements, FF&E, food and services exceeding $10,000 shall be awarded on the basis of competitive bidding (provided, however, that Manager will not be required to obtain competitive bids for any service for which a single provider exists), solicited in the following manner:

(a)     A minimum of two (2) written bids shall be obtained for each purchase or contract that exceeds $10,000, up to $25,000. Purchases over $25,000 will require a minimum of three (3) bids.

(b)     Each bid will be solicited in a uniform format.

(c)     Subject to approval by Owner, Manager may accept a low bid if the expenditure is for an approved item in the budget and will not result in an excess of the annual budgeted Account Category of the applicable Capital Budget or Annual Operating Budget.

(d)     If Manager desires to accept a bid other than the lowest bid, then Manager shall so advise Owner in writing and recommend that such bid be accepted, with support for such recommendation.

(e)     Owner shall have the right to accept or reject any and all bids for repairs, Capital Improvements, FF&E or foods and services that are not the lowest bid; such acceptance shall not be unreasonably withheld or delayed.

(f)     Manager may request Owner to waive in writing competitive bidding rules for a specific item or service.

In its operation of the Hotel under this Agreement, Manager may purchase goods, supplies and services from itself, Owner or Owner's representatives, or any Affiliates of any of the foregoing so long as the prices and terms thereof are at arm's length and otherwise competitive with, and are not less favorable than prices and terms which could be obtained from independent parties and, if required by Section 4.5, are in compliance with competitive bidding rules, provided that Manager will obtain Owner's consent (not to be unreasonably withheld) regarding any such arrangement.

4.6     **Labor Relations**. Manager shall have no right to enter into any collective bargaining agreement concerning any employees of the Hotel without the prior written approval of Owner, which may be granted or withheld in its sole discretion. Upon Owner's approval of any such agreement, Manager shall be responsible to perform such agreements. To the extent applicable, Manager: (a) represents that it is an equal opportunity employer as described in Section 202 of Executive Order 11246 dated September 24, 1965, as amended, and as such agrees to comply with the provisions of Paragraphs 1 through 7 of Section 202 of said Executive Order during the performance of this Agreement, (b) agrees to comply with the affirmative action requirements of Part 60.741 of Title 41, Code of Federal Regulations, with respect to handicapped workers during the performance of this Agreement, (c) agrees to comply with the affirmative action requirements of Part 60.250 of Title 41, Code of Federal Regulations, with respect to Disabled Veterans and Veterans of the Vietnam Era during the performance of this Agreement, and (d) shall submit to Owner in the form approved by the Director of the Office of Federal Contract Compliance, U.S. Department of Labor, a certification that Manager does not and will not maintain any facilities that provide for their employees in a segregated manner, or permit their employees to perform their services at any location under its control, where segregated facilities are maintained, and that Manager will obtain a similar certification from its contractors.

4.7     **Liquor License**. INTENTIONALLY OMITTED.

4.8     **Employee Discount**. To the extent Manager, Owner or any of their respective Affiliates owns or has any equity interest in other hotels and provides a discounted rate to the employees at such other hotels, such party agrees to provide the same discounted rate (subject to availability and black-out periods) to the employees of the other parties named in this Section 4.8 to the extent allowed under the management and ownership agreements affecting such other hotels.

4.9     **Forms**. Manager shall prepare or cause to be prepared for execution by Owner all forms, reports and returns, if any, required to be filed by Owner under applicable law with respect to the operation of the Hotel; however, Manager shall not be obligated to prepare any of Owner's income tax returns. Without limitation, Manager shall timely prepare and deliver, as

required by law, an Internal Revenue Service Tax Form 1099 with respect to payments made during a calendar year to third party contractors and professionals.

4.10    **Notice of Violations**. Manager shall promptly notify Owner in writing of any written notice received from any regulatory or governmental body regarding an actual or perceived violation of any Legal Requirements.

**ARTICLE 5**
**RELATIONSHIP OF PARTIES**

Except as provided in Section 4.2(a), Owner and Manager acknowledge and agree that this Agreement creates an agency relationship; provided, however, that (a) each Hotel Employee shall be the employee of Manager or Manager's Affiliate and not of Owner, (b) Manager's authority is subject to the terms and conditions of this Agreement, and (c) nothing in this Agreement shall constitute, or be construed to be, or create, a partnership, joint venture or lease or employment arrangement between Owner and Manager with respect to the Hotel or the operation thereof. Employees or agents of Manager are not by this Agreement or by any actions of Owner and/or Manager hereunder made employees of Owner, and are not entitled to the benefits provided by Owner or its Affiliates to its employees, including but not limited to, group insurance, leave and pension plan. This Agreement shall not be deemed at any time to be an interest in real estate or a lien or security interest of any nature against the Hotel, the Premises or any other land used in connection with the Hotel, or any equipment, fixtures, inventory, motor vehicles, contracts, documents, accounts, notes, drafts, acceptances, instruments, chattel paper, general intangibles, or other personal property now existing or that may hereafter be acquired or entered into with respect to the Hotel or the operation thereof.

**ARTICLE 6**
**ADVERTISING**

Subject to and in strict compliance with the provisions of the License Agreement, Manager shall arrange and contract for all advertising, which Manager may reasonably deem necessary, in accordance with Section 4.4, for the operation of the Hotel. So long as the License Agreement may be in effect, Manager generally shall advertise the Hotel under the name "– Petrol Inn & Suites" or such other name as Owner may designate or approve.

**ARTICLE 7**
**RESERVE FOR FF&E**

7.1    **Reserve for Replacement of FF&E**. The Reserve shall be funded pursuant to Section 7.2, and Manager shall use amounts in the Reserve to cover the cost of FF&E expenditures and Capital Improvements, as described in Section 4.4 in conjunction with the Approved Capital Budget. All FF&E, Capital Improvements and the Reserve shall be the property of Owner.

7.2    **Transfers to Reserve for FF&E**. Commencing on the Commencement Date and continuing thereafter during the remainder of the Term, Manager shall deposit monthly into the Reserve for FF&E an amount equal to the amounts required by Lender and/or by Licensor;

provided that in no event will the amounts to be deposited monthly into the Reserve be less than an amount equal to four percent (4%) of Gross Revenues throughout the remainder of the Term.

7.3 **Annual Adjustment**. At the end of each Fiscal Year and following receipt by Manager of the annual accounting referred to in Article 10, an adjustment will be made to such annual account, if necessary and if available, so that the appropriate amount shall have been deposited in the Reserve.

7.4 **Maintenance of Reserve**. Checks or other documents of withdrawal shall be signed by representatives of Manager who shall be bonded or otherwise insured pursuant to the "crime – Theft of Money and Securities" coverage set forth on Exhibit D to this Agreement. The proceeds from the sale of FF&E no longer needed for the operation of the Hotel shall be deposited in the Reserve, but not be credited against the obligation to deposit cash in such fund for the then current Fiscal Year. All interest earned or accrued on amounts invested from the Reserve shall be added to the Reserve (but shall not be credited against Owner's obligations to fund the Reserve), and shall not constitute Gross Revenues or be included therein.

7.5 **Accumulation of Reserve and Additional Cost of FF&E and Capital Improvements**. Owner and Manager acknowledge and agree that portions of the Reserve may, from time to time in accordance with the then-current Annual Plan, be used for more significant expenditures than could be reserved for in a single year. Accordingly, at the end of each Fiscal Year, any amounts remaining in the Reserve shall be carried forward to the next Fiscal Year, and shall be in addition to the amount to be reserved in the next Fiscal Year. In the event at any time there are insufficient funds in the Reserve for any Fiscal Year to pay the cost of FF&E in accordance with the Annual Operating Budget and the Approved Capital Budget, then Owner will, at Owner's option, within sixty (60) days after request therefor by Manager, either provide the additional cash to the Manager to pay for such excess or authorize the funding of such cash from Net Operating Income.

7.6 **Final Remittance**. Upon expiration or termination of this Agreement, Manager shall remit all remaining amounts in the Reserve forthwith to Owner.

## ARTICLE 8
## REPAIRS AND MAINTENANCE AND CAPITAL IMPROVEMENTS

8.1 **Repairs and Maintenance**. Manager shall, from time to time, make such expenditures from Gross Revenues for repairs and maintenance including service contracts ("**Repairs and Maintenance**") as required by the Lender, the License Agreement, the Legal Requirements, the then current Annual Plan or as necessary to maintain the Hotel in good operating condition in compliance with the License Agreement and otherwise in the condition required by this Agreement, including but not limited to repairs and maintenance of HVAC, mechanical and electrical systems, exterior and interior repainting, resurfacing building walls and parking areas, waterproofing of exterior surfaces of floors, roofs, and replacement of plate glass, or the like. It is Owner's intent that the sums allocated for Repairs and Maintenance in accordance with the then current Annual Plan are to be fully expended during that Fiscal Year exclusively for the purposes identified in such Annual Plan. Except in the event of an emergency due to casualty, act of God or otherwise under circumstances in which it would be unreasonable

to seek to obtain prior approval (and provided that Manager shall notify Owner of any such expenditure within a reasonable time given the nature and scope of the emergency), all expenditures for the foregoing shall be as provided in the Annual Operating Budget and the Approved Capital Budget. If any such Repairs or Maintenance shall be made necessary by any condition against the occurrence of which Owner has received the guaranty or warranty of the builder or the Hotel or of any supplier of labor or materials for the Hotel or of any supplier of labor or materials for the construction of the Hotel, then Manager may invoke said guarantees or warranties in Owner's or Manager's name and Owner shall cooperate in all reasonable respects with Manager in the enforcement thereof.

  8.2 **Capital Improvements**. Owner may, from time to time, at its sole expense, make such structural repairs, replacements, substitutions, alterations, additions or improvements (exclusive of FF&E) ("**Capital Improvements**") in or to the Hotel as Owner shall determine are necessary to comply with the Operating Standards. If Capital Improvements included in the definition of Building and Appurtenances shall be required at any time during the Term by the terms of any Mortgage, the License Agreement, to maintain the Hotel in good operating condition or by reason of any Legal Requirements, or because Manager and Owner jointly agree upon the desirability thereof, then in such event all such Capital Improvements shall be made with as little hindrance to the operation of the Hotel as reasonably possible. Notwithstanding the foregoing, as long as the Hotel can continue to operate without interruption, Owner shall have the right to contest the need for any such Capital Improvements required by any Legal Requirements and may postpone compliance therewith, if so permitted by law and if such postponement will not expose Manager to any civil or criminal liability. All recommendations by Manager of Capital Improvements shall be submitted in conjunction with the Capital Budget for the Fiscal Year described in Section 4.4(b). In the event that Owner elects to perform Major Renovations to the Hotel, Owner shall have the right to cause (i) Manager, or (ii) a third party, to oversee the performance of the Major Renovations for which oversight, if Manager is overseeing the Major Renovations, Manager shall be paid a project management fee (in addition to the Management Fee) equal to three percent (3%) of the budgeted hard cost items including contingency and any Owner-approved changes of the Major Renovations (the "**Project Fee**"). With respect to (i) Major Renovations as contemplated by this Agreement which Owner elects to have Manager oversee and (ii) improvements that are not Major Renovations, Manager shall oversee such projects in a reasonably prudent manner.

  8.3 **Service Contracts**. Manager, without requiring the consent of Owner, shall enter into any contract for cleaning, maintaining, repairing or servicing the Hotel or any of the constituent parts of the Hotel as Manager deems necessary for the operation of the Hotel, except as specifically provided in Section 4.4 or 4.5. Manager shall submit the listing of service contracts entered into for the Hotel required pursuant to Section 4.4(a). Unless otherwise approved by Owner, all service contracts shall: (a) be in the name of Owner or Owner's nominee, (b) to the extent customary, include a provision for cancellation thereof by Owner or Manager upon not more than thirty (30) days written notice, and (c) shall require that all contractors provide evidence of such insurance as is customarily carried by other contractors involved in similar servicing arrangements.

  8.4 **Liens**. Owner and Manager shall cooperate and use all commercially reasonable efforts to prevent any liens from being filed against the Hotel that arise from any maintenance,

changes, repairs, alterations, improvements, renewals or replacements in or to the Hotel. If any such liens are filed, Manager shall, subject to the availability of funds therefor in the Operating Accounts or as otherwise supplied by Owner, obtain the release thereof prior to the institution of legal proceedings in connection therewith. The cost of obtaining such release shall be included in Gross Operating Expenses, unless the imposition of the lien results from a default by Owner or Manager, in which event the cost of obtaining such release shall be borne by such defaulting party.

8.5    **Notice of Unavoidable Interruptions**. In the event of any occurrence constituting an Unavoidable Interruption, Manager shall promptly notify Owner of such occurrence and shall keep Owner informed as to the extent and impact thereof on the Hotel.

## ARTICLE 9
## WORKING CAPITAL AND BANK ACCOUNTS; DISTRIBUTION OF NET OPERATING INCOME

9.1    **Working Capital**. Owner shall provide initial Working Capital in the amount of $⬛⬛⬛ in addition to the value of all Inventories. Owner shall at all times cause sufficient funds to be on hand in the Operating Accounts to assure the timely payment of all current liabilities of the Project, including but not limited to Gross Operating Expenses, all other costs and expenses incurred in connection with the Project pursuant to this Agreement and the performance by Manager of its obligations under this Agreement, all fees, charges and reimbursements payable to Manager hereunder and all amounts required hereunder to be transferred into the Reserve. In no event shall Owner permit the balance in the Operating Accounts to be less than an amount equal to the estimated monthly operating expenses of the Project as reflected in the then current Annual Operating Budget. From time to time, upon five (5) days prior written notice from Manager that such funds are required, Owner shall furnish to Manager funds that Manager deems reasonably necessary to assure that the Project shall have adequate working capital as herein provided. In the event Owner fails to supply required working capital in accordance with the provisions of this Section or if Manager otherwise deems such action to be necessary, Manager may use all or part of the funds in the Reserve to supplement the Operating Accounts in order to defray or pay the Project's operating costs and expenses, to the extent permitted by the Mortgage. Owner shall promptly reimburse the Reserve for all sums so used or transferred. All unexpended Working Capital, Inventories and Operating Equipment and Supplies purchased with Working Capital shall remain the property of Owner.

9.2    **Operating Account**. All funds (exclusive of funds deposited in the Reserve and house banks at the Hotel) received by Manager in the operation of or otherwise relating to the Hotel, and funds for Working Capital provided by Owner or retained by Manager from Gross Revenues, shall be deposited in the Operating Account. Manager shall inform such bank in writing that the funds deposited in the Operating Account are owned solely by the Owner. Manager shall not deposit funds attributable to any other property into the Operating Account. To the extent permitted by the Mortgage, amounts in the Operating Account may be temporarily withdrawn and invested by Manager in any Permitted Investments, having due regard for the timing of cash needs, but in no event shall such funds be co-mingled by Manager with any other funds. From the Operating Account, Manager shall pay all Gross Operating Expenses (other than the excess FF&E if funded by or through Owner) before any penalty or interest accrues thereon,

however, taking into account sound cash management. All interest earned or accrued on amounts invested from the Operating Account shall be added to the Operating Account. All checks or other documents of withdrawal from the Operating Account shall be signed by representatives of Manager except as provided in Section 9.3 hereof.

9.3     **Maintenance of Operating Account**. Subject to Section 9.4, the Operating Account shall be opened and maintained at all times by Manager and Owner and checks and other documents of withdrawal shall be signed by representatives of Manager who are covered by the required fidelity bond or otherwise insured pursuant to the "Crime – Theft of Money and Securities" coverage set forth on Exhibit D. The Operating Account and any other bank accounts approved by Owner shall be in Owner's name (for example, "*[Owner's name]* d/b/a/ *[Hotel name]*").

Manager shall not change the bank or open or close any bank account described in this Article 9 without Owner's prior written approval. Owner, in its sole and absolute discretion, may in writing direct Manager to change any such bank, signatories or arrangements. The bank in which the Operating Account is located shall be informed by Manager in writing that the funds in such account are held in trust for Owner and that any checks for more than $10,000.00 shall be required to be signed by two (2) authorized signatories on the account.

9.4     **Final Remittance**. Upon the expiration or termination of this Agreement, after payment of all Gross Operating Expenses for which bills were received to such date, Manager's Management Fee, Reimbursable Expenses, any Termination Fee and any other amounts then due and payable to Manager, all remaining amounts in (i) the Reserve, (ii) the Operating Account and (iii) the Permitted Investments, shall be transferred forthwith to Owner by Manager. Owner shall pay Manager any remaining Management Fee, any Termination Fee, Reimbursable Expenses and any other amounts then due and payable and Owner shall pay, or cause to be paid, and shall hold Manager harmless from and against all Gross Operating Expenses accrued in accordance with generally accepted accounting principles and invoices related to Gross Operating Expenses received after Manager has so transferred all funds.

9.5     **Distribution of Excess Cash**. Together with the financial report provided for in Section 10.2(b), Manager shall distribute to Owner all sums in the Operating Accounts in excess of the then working capital requirements of the Hotel determined in accordance with Section 9.1 of this Agreement.

## <u>ARTICLE 10</u>
## BOOKS, RECORDS AND STATEMENTS

10.1     **Books and Records**. Manager shall keep full and adequate books of account and other records reflecting the results of operation of the Hotel in accordance with the Uniform System of Accounts and generally accepted accounting principles. The books of account and all other records relating to or reflecting the operation of the Hotel shall be kept either at the Hotel or at Manager's corporate offices and shall be available to Owner and its representatives and its auditors or accountants, at all reasonable times for examination, audit, inspection and transcription at Owner's sole cost and expense. All of such books and records pertaining to the Hotel including, without limitation, books of account, guest records and front office records at all

times shall be the property of Owner and shall not be removed from the Hotel's or Manager's offices by Manager without Owner's approval and consent. Upon any termination of this Agreement, all of such books and records forthwith shall be turned over to Owner at a location designated by Owner so as to insure the orderly continuance of the operation of the Hotel, but such books and records shall thereafter be available to Manager at all reasonable times for inspection, audit, examination and transcription for a period of two (2) years.

10.2    **Financial Reports**.

(a)    Manager shall deliver to Owner within twenty (20) days following the close of each Accounting Period a monthly profit and loss statement reflecting a comparison of periodic and year-to-date actual revenues and expenses with the Annual Operating Budget as well as a periodic and year-to-date comparison of such actual revenues and expenses with those of the prior Fiscal Year.

(b)    Further, Manager shall provide to Owner within twenty (20) days following the close of each Accounting Period a report prepared in accordance with the example set forth in Exhibit C attached hereto and made a part hereof, which include without limitation, forward bookings, accounts receivable, accounts payable and a monthly sales overview report.

(c)    Further, within seventy-five (75) days after the end of each Fiscal Year, Manager shall deliver to Owner an annual accounting, showing the results of operation of the Hotel during the Fiscal Year and a computation of Gross Revenues, Gross Operating Expenses, and Net Operating Income, if any, and any other information necessary to make the computations required hereby or which may be requested by Owner, all for such Fiscal Year. The annual accounting for any Fiscal Year shall be controlling over the interim accountings for such Fiscal Year. Owner shall have the right to conduct an audit of the books.

(d)    Further, Manager shall prepare and deliver any additional reports or information as Owner is required to provide under the License Agreement.

10.3    **Audits by Owner**. Owner shall have the right to audit, conducted either by Owner's internal personnel or by a third party auditor retained by Owner at its expense, all items of expense and revenue under this Agreement including, but not limited to, Gross Revenues, Gross Operating Expenses, depreciation, the Management Fee and Reserve. Manager shall cooperate and assist with such audit. In the event that an audit reflects an underpayment to Owner or Manager or an overpayment to Manager or Owner, Manager shall correct same by a corrective payment to Owner or Manager, as appropriate, within ten (10) days following notice of the audit results to Manager, subject to Owner's and Manager's right to challenge the audit results in accordance with the provisions of Article 30 of this Agreement. If an audit determines any weaknesses or need for reasonable changes in the internal control systems pertaining to the safeguarding of Owner's assets, Manager will promptly make all necessary changes.

10.4    **Segregation of Accounts**. In any instance where Manager manages several properties for Owner, Manager shall segregate the income and expenses of each property so that Gross Revenues from each property will be applied only to the bills and charges from that property.

**Management Agreement – Page 23**

## ARTICLE 11
## MANAGER'S MANAGEMENT FEES; TIMING OF
## PAYMENT TO MANAGER

11.1 **Fees.** For each Fiscal Year or portion thereof, Manager shall receive, by a distribution made by Manager out of Gross Revenues at the end of each Accounting Period in respect of its management services hereunder, a fee (collectively, the "**Management Fee**") calculated as follows:

(a) a base fee (the "**Base Fee**") in an amount equal to ███████████ of Gross Revenues in respect of any applicable period; plus

(b) an accounting fee (the "**Accounting Fee**") for accounting services provided by Manager's corporate employees on a "centralized" basis in the amount of ████████████ plus

(c) a revenue management fee (the "**Revenue Management Fee**") for an allocation of Manager's revenue management services to be provided by Manager's corporate employees on a "centralized" basis in the amount of ███████████

The Management Fee generally shall be computed separately for each Fiscal Year and shall not be accumulated from Fiscal Year to Fiscal Year. Owner shall reimburse Manager for all Reimbursable Expenses incurred by it in connection with the performance of this Agreement. Any such amount shall be payable within thirty (30) days of billing, and upon request of Owner, Manager shall provide a statement showing in reasonable detail the nature and amount of such expenses, together with supporting documentation reasonably requested by Owner.

11.2 **Treatment of Proceeds of Business Interruption Insurance and Condemnation Awards**. In the event of a casualty or condemnation for temporary use resulting in the payment of business interruption insurance (with respect to such casualty) or a condemnation award (with respect to such condemnation for temporary use), the amount of such proceeds shall be considered a part of Gross Revenues for the purpose of computing Manager's Management Fee.

## ARTICLE 12
## INSURANCE

12.1 **Insurance**. Throughout the Term, Manager (unless Owner shall by notice in writing to Manager elect to provide the property and casualty insurance coverage required hereunder) shall provide and maintain the insurance in the minimum amounts and types set forth

on **Exhibit D** to this Agreement, the costs of which shall be charged as part of Gross Operating Expenses.

12.2    **Modification of Insurance**. Owner may require Manager to increase the limits of the above insurance coverage and may require Manager to carry other or additional reasonable and customary insurance. All premiums on any increased limits of, or other or additional, insurance coverage required by Owner under the immediately preceding sentence shall be included in the Gross Operating Expenses. In no event shall insurance coverage be less than that required by Lender, the License Agreement or to comply with Legal Requirements.

12.3    **Contractor's Insurance**. Manager shall require that all major contractors on or about the Hotel Premises have coverage at the contractor's sole expense in the minimum types and amounts set forth in **Exhibit D** to this Agreement. Manager shall require contractors that are not major contractors to carry such insurance coverage that is customary in the applicable trade or industry. A major contractor shall mean any contractor (i) receiving compensation in excess of $25,000 per year (subject to adjustment for adjustments in the CPI between the Commencement Date and the date of such services) or (ii) performing hazardous services. Manager must obtain the Owner's permission in writing to waive any of the above requirements. Higher amounts may be required if the work to be performed is sufficiently hazardous in nature. Manager shall obtain and keep on file a Certificate of Insurance for each such major contractor that shows that the contractor is so insured.

12.4    **Form of Policies**. All insurance required by Sections 12.1, 12.2 and 12.3 shall be in such form and with such companies as shall be reasonably satisfactory to Owner provided that such company shall have a minimum Best rating of A- Class VIII, or as otherwise approved by Owner and Manager, and shall comply with the requirements of any Mortgage and the License Agreement. All property damage insurance shall name Owner as insured, and so long as the Hotel is mortgaged pursuant to any Mortgage or otherwise shall be subject to a standard mortgagee clause in favor of the mortgagee or mortgagees. All other insurance (excepting only the professional liability and workers' compensation lines of coverage) shall be in the name of Owner and Manager. The workers' compensation policy shall name Owner as an additional insured. Policies of insurance (to the extent applicable) shall (i) provide that the insurance company will have no right of subrogation against any mortgagee, Owner, Manager or any of their respective affiliated or subsidiary companies or the agents or employees thereof and (ii) provide that the proceeds thereof in the event of loss or damage shall, to the extent payable to any mortgagee, be payable notwithstanding any act of negligence or breach of warranty by Owner or Manager which might otherwise result in the forfeiture or nonpayment of such insurance proceeds.

12.5    **Certificates**. For the purpose of insuring compliance with the provisions of Article 12, Manager shall furnish to the Owner certificates for all insurance required to be maintained pursuant to this Article 12 within five (5) days prior to renewal. All such certificates shall specify that the policies to which they relate cannot be canceled or modified on less than thirty (30) days' prior written notice to Owner. In the event Owner procures any insurance under this Section 12, Owner shall have the responsibilities set forth in the two preceding sentences for the benefit of Manager.

12.6 **Waiver of Subrogation**. Owner and Manager each waive their respective rights of subrogation against each other.

12.7 **Mortgage Requirements**. Insurance shall be maintained in a manner consistent with the terms and conditions of any Mortgage and any conflict between those terms and conditions and the provisions of this Agreement shall be resolved in favor of the Mortgage.

**ARTICLE 13**
**REAL AND PERSONAL PROPERTY TAXES; UTILITIES**

13.1 **Taxes**. Manager shall, on behalf of Owner, pay from the Gross Revenues, on or before the dates the same become delinquent, with the right to pay the same in installments to the extent permitted by law, all real estate taxes, all personal property taxes and all betterment assessments levied against the Hotel or any of its component parts. Manager shall promptly deliver to Owner all notices of assessments, valuations and similar documents to be filed by Manager or Owner, which are received from taxing authorities by Manager. Owner shall have the right to hire property tax consultants or like professionals that reasonably provide economic benefits to Owner and the costs thereof shall be a part of Gross Operating Expenses. Notwithstanding the foregoing obligations of Manager, Owner may elect to contest the validity or the amount of any such tax or assessment, provided that such contest does not materially jeopardize Manager's rights under this Agreement. Manager agrees to cooperate with Owner and execute any documents or pleadings required for such purpose, provided Owner agrees to reimburse Manager for any out-of-pocket costs occasioned to Manager by any such contest. At Owner's election, all costs relating to any such contest may be included in Gross Operating Expenses.

13.2 **Utilities, Etc**. Manager shall promptly pay all fuel, gas, light, power, water, sewage, garbage disposal, telephone and other utility bills currently as they are incurred in connection with the Hotel from the Gross Revenues or Working Capital.

**ARTICLE 14**
**USE OF NAME**

14.1 **Name**. During the Term of this Agreement, the Hotel shall at all times be known and designated as the "Holiday Inn Express & Suites Pearsall" or by such other name as from time to time may be agreed upon by Owner and Manager. Manager shall make or cause to be made any fictitious name filings or disclosures required by the laws of the State with respect to the use of such name for or in connection with the Hotel. Manager shall not use or employ such name unless such use fully complies with the terms of the License Agreement, if any.

**ARTICLE 15**
**DAMAGE OR DESTRUCTION; CONDEMNATION**

15.1 **Damage or Destruction**.

(a) If the Hotel or any portion thereof shall be damaged or destroyed at any time or times during the Term by fire, casualty or any other cause commonly covered by fire and extended coverage insurance and the cost of repairing such damage and restoring the Hotel to

substantially its condition immediately prior to such damage or destruction, as reasonably estimated by Owner based upon estimates Owner receives from contractors and other reasonable and customary evidence, will not exceed the sum of $250,000 plus adjustments to reflect increases in the CPI for each Fiscal Year after 2014 exclusive of the cost of the foundation and footings ("**Minimum Cost**"), Owner will, at its own cost and expense (subject to Owner's receipt of insurance proceeds sufficient to pay such costs and expenses) and with due diligence repair and/or restore the Hotel so that after such repair and/or restoration, the Hotel shall be in substantially the same condition as it was immediately prior to such damage or destruction.

(b)      If the cost of such repair and/or restoration will, as so reasonably estimated by Owner, exceed the Minimum Cost, then Owner shall, within one hundred twenty (120) days after such damage or destruction, elect by notice to Manager either (x) to carry out such repair and/or restoration, in which case Owner shall complete such repair and/or restoration pursuant to the last sentence of Section 15.1(a) or (y) to terminate this Agreement; should Owner so elect to terminate this Agreement, Owner shall pay to Manager the Termination Fee.

(c)      In the case of damage or destruction which Owner is not required by the preceding provisions of this Section 15.1 to repair or restore and where Owner has not elected under said preceding provisions to terminate this Agreement, Owner shall undertake to notify Manager, within one hundred twenty (120) days after such damage or destruction, whether or not Owner will so repair and/or restore such damage or destruction. If Owner, within such one hundred twenty (120) day period either (i) advises Manager that Owner will not so repair and/or restore such damage or destruction or (ii) fails to advise Manager of Owner's decision, Manager may terminate this Agreement by written notice to Owner, or Owner may terminate this Agreement by such notice to Manager; in either case such written notice must be given within one hundred fifty (150) days after such damage or destruction and neither party shall be entitled to any payment on account of such termination. If in such event Owner within such one hundred twenty (120) day period notifies Manager that Owner will so repair and/or restore such damage or destruction, then neither Owner nor Manager shall have a right to terminate this Agreement on account of such damage or destruction.

15.2      **Condemnation**. If the whole of the Hotel shall be taken or condemned in any eminent domain, condemnation, compulsory acquisition or like proceeding by any competent authority or if such a portion thereof shall be taken or condemned as to make it imprudent or unreasonable, in the sole opinion of Owner, to use the remaining portion as a hotel of the type and class immediately preceding such taking or condemnation, then the Term shall terminate as of the date title vests in the condemning authority. Manager has no interest in any award paid to Owner and Manager shall make no claim against the condemnor for any loss to its business as a result of such condemnation or otherwise. If only a part of the Hotel shall be taken or condemned and the taking or condemnation of such part does not, in the opinion of Owner, make it unreasonable or imprudent to operate the remainder as a hotel of the type and class immediately preceding such taking or condemnation, this Agreement shall not terminate, and so much of any award to Owner shall be made available as shall be reasonably necessary for making alterations or modifications of the Hotel, or any part thereof, so as to make it a satisfactory architectural unit as a hotel of similar type and class as prior to the taking or condemnation.

15.3    **Mortgage Requirements**. Actions as to damage or destruction and condemnation shall be taken only in a manner that is consistent with the terms and conditions of the Mortgage and any conflict between those terms and conditions and the provisions of this Agreement shall be resolved in favor of the Mortgage.

**ARTICLE 16**
**EVENTS OF DEFAULT**

16.1    **Manager Defaults**. Each of the following shall constitute an Event of Default by Manager:

(a)    The failure of Manager to pay any sum of money (or, if required by the Mortgage, to deposit into the lockbox account within two (2) business days of receipt) to Owner provided for herein when the same is payable, if such failure is not cured within five (5) days after written notice specifying such failure is given by Owner to Manager.

(b)    An assignment by Manager in violation of the provisions of Article 23 hereof.

(c)    If Manager shall fail to keep, observe or perform any other material covenant, agreement, term or provision of this Agreement to be kept, observed or performed by Manager and such failure shall continue for a period of thirty (30) days after written notice specifying such failure given by Owner to Manager, or if Manager due to any act or omission on the part of Manager and without the fault of Owner, shall fail to maintain the Permits and such failure shall continue for a period of thirty (30) days after written notice specifying such failure given by Owner to Manager; provided that if such failure is incapable of cure within such thirty (30) day period, then the cure period shall be extended provided that Manager commenced the cure during such initial thirty (30) day period and thereafter diligently and continuously pursues the cure thereof to completion.

(d)    If because of any act or omission on the part of Manager, and without the fault of Owner, either (i) the License Agreement or (ii) any required license for the sale of alcoholic beverages at the Hotel, is at any time suspended, terminated or revoked for a period of more than thirty (30) consecutive days, provided, however, if, at the end of such thirty (30) day period the cure has not been effectuated notwithstanding Manager's diligent and continuous attempts to cure, then the cure period shall be extended for an additional period of ninety (90) days.

(e)    If Manager shall fail to maintain and operate the Hotel in accordance with the standards required under Section 4.1 and such failure shall not be due to a refusal on the part of Owner to approve the Annual Plan submitted by Manager under Section 4.4 or Owner's failure to properly provide funds requested pursuant to the provisions of Section 9.1 and such failure shall continue for a period of sixty (60) days after written notice by Owner to Manager specifying the matters or conditions which constitute the basis for such Event of Default, provided that if such failure is not reasonably capable of cure within such sixty (60) day period, then the cure period shall be extended provided that Manager commences the cure during such initial sixty (60) day period and thereafter diligently and continuously pursues the cure thereof to completion.

(f)      If Manager shall apply for or consent to the appointment of a receiver, trustee or liquidator of Manager or of all or a substantial part of its assets, admit in writing its inability to pay its debts as they come due, make a general assignment for the benefit of creditors, take advantage of any insolvency law, or file an answer admitting the material allegations of a petition filed against Manager in any bankruptcy, reorganization or judgment or decree shall be entered by any court of competition jurisdiction, on the application of a creditor, adjudicating Manager bankrupt or insolvent or approving a petition seeking reorganization of Manager or appointing a receiver, trustee or liquidator of Manager or of all or a substantial part of its assets or a decree shall continue unstayed and in effect for any period of ninety (90) consecutive days.

(g)      The filing of a voluntary petition in bankruptcy or insolvency or a petition for liquidation or reorganization under any bankruptcy law by Manager, or Manager shall consent to, acquiesce in, or fail timely to controvert, an involuntary petition in bankruptcy, insolvency or an involuntary petition for liquidation or reorganization filed against it.

(h)      The filing against Manager of a petition seeking adjudication of Manager as insolvent or seeking liquidation or reorganization or appointment of a receiver, trustee or liquidator of all or a substantial part of Manager's assets, if such petition is not dismissed within ninety (90) days.

(i)      Failure of Manager (but excluding such a failure which results from the failure by Owner to provide the necessary funds therefor) to maintain at all times throughout the term hereof all of the insurance required to be maintained by Manager under Article 12, if such failure is not cured within fifteen (15) days after written notice specifying such failure is given by Owner to Manager.

(j)      The fraud, gross negligence, willful misconduct or criminal conduct of or by Manager and, to the extent same has a material adverse effect on the Hotel or Owner, the General Manager, in connection with the Hotel.

16.2    **Owner Defaults**. Each of the following shall constitute an Event of Default by Owner:

(a)      The failure of Owner to pay or furnish to Manager any money Owner is required to pay or furnish to Manager in accordance with the terms hereof on the date the same is payable, if such failure is not cured within five (5) days after written notice specifying such failure is given by Manager to Owner. If any sum of money is not paid within five (5) days following the date same becomes due and payable under this Agreement, and Manager has advanced such sum on behalf of Owner, such sum shall bear interest at the Default Rate from the date Manager advanced such sum on behalf of Owner until the date Owner actually pays such sum. If the failure to pay relates to the Management Fee, such sum shall bear interest at the Default Rate from the date due until the date actually paid.

(b)      If because of a default under the Mortgage, if any, not caused by the act or omission of Manager, the Mortgage shall be foreclosed, or the Hotel sold in lieu of foreclosure.

(c)      If Owner shall apply for or consent to the appointment of a receiver, trustee or liquidator of Owner of all or a substantial part of its assets, or admit in writing its inability to pay

its debts as they come due, make a general assignment for the benefit of creditors, take advantage of any insolvency law, or file an answer admitting the material allegations of a petition filed against Owner in any bankruptcy, reorganization or insolvency proceeding, or if an order, judgment or decree shall be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating Owner a bankrupt or insolvent or approving a petition seeking reorganization of Owner or appointing a receiver, trustee or liquidator of Owner or of all or a substantial part of its assets, and such order, judgment or decree shall continue unstayed and in effect for any period of ninety (90) consecutive days.

(d)     The filing of a voluntary petition in bankruptcy or insolvency or a petition for liquidation or reorganization under any bankruptcy law by Owner, or Owner shall consent to, acquiesce in, or fail timely to controvert, an involuntary petition in bankruptcy, insolvency or an involuntary petition for liquidation or reorganization filed against it.

(e)     The filing against Owner of a petition seeking adjudication of Owner as insolvent or seeking liquidation or reorganization or appointment of a receiver, trustee or liquidator of all or a substantial part of Owner's assets, if such petition is not dismissed within ninety (90) days.

(f)     Failure of Owner to maintain at all times throughout the term hereof all of the insurance required to be maintained by Owner under Article 12, if such failure is not cured within fifteen (15) days after written notice specifying such failure is given by Manager to Owner.

(g)     The failure of Owner to perform, keep or fulfill any of the other covenants, undertakings, obligations or conditions set forth in this Agreement, or the failure of Owner to approve expenditures or to authorize procedures necessary to maintain the standards of the Hotel in accordance with the Operating Standards, if such failure shall continue for a period of thirty (30) days after written notice by Manager or Licensor to Owner specifying the matters or conditions which constitute the basis for such Event of Default, provided that if such failure is incapable of cure within such thirty (30) day period, then the cure period shall be extended for up to an additional thirty (30) days provided that Owner commences the cure during such initial thirty (30) day period and thereafter diligently and continuously pursues the cure thereof.

## ARTICLE 17
## TERMINATION UPON EVENT OF DEFAULT; OTHER REMEDIES

17.1     **Termination**. Upon the occurrence of an Event of Default, in addition to and cumulative of any and all rights and remedies available to the non-defaulting party under this Agreement, at law or in equity, the non-defaulting party may: (i) terminate this Agreement without penalty, effective upon receipt of written notice of termination to the defaulting party, provided that termination may be effective immediately in the case of fraud, gross negligence, willful misconduct, criminal conduct or misappropriation of funds; and (ii) pursue any and all other remedies available to the non-defaulting party at law or in equity. In addition to and cumulative of the foregoing, upon the occurrence of any Event of Default on the part of Owner, all Management Fees, Reimbursable Expenses and all other sums payable to Manager under this Agreement shall be immediately due and payable without notice. In no event shall (i) the provisions of this Agreement with respect to the payment of a Termination Fee upon the

termination of this Agreement under certain circumstances be construed as defining or limiting the amount recoverable by Manager from Owner by reason of any Event of Default on the part of Owner; or (ii) entitle Manager to receive a Termination Fee in the event of a termination by reason of any Event of Default on the part of Manager

17.2 **Manager's Rights to Perform**.

(a) If Owner shall fail to make any payment or to perform any act required of Owner pursuant to this Agreement, Manager may (but shall not be obligated to), without further notice to, or demand upon, Owner and without waiving or releasing Owner from any obligations under this Agreement, make such payment (either with its own funds or with funds withdrawn for such purpose from the Operating Accounts or the Reserve) or perform such act. Manager agrees to provide written notice to Owner within five (5) days after Manager exercises its rights in the preceding sentence. All sums so paid by Manager and all necessary incidental costs and expenses incurred by Manager in connection with the performance of any such act, together with interest thereon at the Default Rate from the date of making such expenditure by Manager, shall be payable to Manager on demand.

(b) Manager shall have the right to set-off against any payments to be made to Owner by Manager under any provision of this Agreement and against all funds from time to time in the Operating Accounts and the Reserve, any and all liabilities of Owner to Manager. Manager may withdraw from the Operating Accounts and the Reserve from time to time such amounts as Manager deems desirable in partial or full payment of all or any portion of said liabilities, the amount of such withdrawals to be paid by Owner to Manager on demand and to be replaced in the respective account and fund.

## ARTICLE 18
## OWNER'S ADDITIONAL TERMINATION RIGHTS

18.1 **Sale of the Hotel**. If Owner proposes to sell or otherwise dispose of the Hotel or Owner's interests therein, to a bona fide third-party (the "**Third-Party Purchaser**") during the Term, this Agreement will terminate effective upon the consummation of the closing of such sale. Owner shall provide Manager with written notice of termination of this Agreement not less than sixty (60) days prior to the scheduled date of closing of the sale of the Hotel; provided, however, if such a sale does not actually occur, the notice of termination shall be deemed ineffective.

18.2 **Performance Standard**.





## ARTICLE 19
### AREA OF PROTECTION

19.1

## ARTICLE 20
### TRANSFER TO OWNER UPON TERMINATION

Upon any termination of this Agreement, whether due to the occurrence of an Event of Default or otherwise, Manager shall cooperate with Owner and shall execute all documents or instruments requested by Owner in connection with the transfer, all without consideration to Manager (provided that, if such termination is due to a reason other than a default by Manager under this Agreement, Owner will reimburse Manager for Manager's reasonable expenses to effect such transfer) or the imposition of liability by Manager, to Owner or its nominee of the Permits and the License Agreement used or useful in connection with the operation of the Hotel. Without limiting the generality of the foregoing, Manager shall cause its officials, subject to restrictions provided in any License Agreement or related agreement, to provide all sales lists and customer contacts to Lender and to execute any necessary documents and to visit licensing authorities along with Owner's representatives in order to expedite (i) the orderly transfer to Owner or its designee of the Permits and the License Agreement (ii) the renewal thereof to Owner or Owner's designee if appropriate. In the event that this Agreement terminates due to

**Management Agreement – Page 32**

any reason other than a default by Manager under this Agreement, a sufficient number of Hotel Employees will be hired by Owner or its successor, assign or designee, and retained for at least 90 days thereafter, so as not to cause a "mass layoff" or "plant closing", as defined in the Workers Adjustment and Retraining Act, 29 USC, sec 2101 et seq.

## ARTICLE 21
## NOTICES

All notices, elections, acceptances, demands, consents and reports (collectively "notice") provided for in this Agreement shall be in writing and shall be given to the other party at the address set forth below or at such other address as any of the parties hereto may hereafter specify in writing.

To Owner:           RREAF O&G PORTFOLIO #2 LLC
                    C/O Spectrum Origination LLC
                    1253 Springfield Avenue, Suite 201
                    New Providence, New Jersey 07974
                    Attention: Jeffrey Schaffer

With a copy to:
                    Spectrum Group Management LLC
                    1250 Broadway, 19th Floor
                    New York, New York 10001
                    Attention: Peter Locke

To Manager:         Channel Point Hospitality LLC
                    2500 North Dallas Parkway
                    Suite 600
                    Plano, Texas 75093

With a copy to:     Carla S. Moreland, Esq.
                    5112 Briargrove Lane
                    Dallas, Texas 75287

Such notice or other communication may be given by Federal Express or other nationally recognized overnight carrier or by electronic facsimile in which case notice shall be deemed given upon confirmed delivery. Notice may be mailed by United States registered or certified mail, return receipt requested, postage prepaid, deposited in a United States post office or a depository for the receipt of mail regularly maintained by the post office. If mailed, then such notice or other communication shall be deemed to have been received by the addressee on the fifth (5th) day following the date of such mailing. Such notices, demands, consents and reports may also be delivered by hand, in which case it shall be deemed received upon delivery.

## ARTICLE 22
### CONSENT AND APPROVAL

Except as herein otherwise provided, whenever in this Agreement the consent or approval of Manager or Owner is required, such consent or approval shall not be unreasonably withheld or delayed. Such consent or approval shall also be in writing only and shall be executed only by an authorized officer or agent of the party granting such consent or approval.

## ARTICLE 23
### NON-ASSIGNABILITY

This Agreement shall not be assignable by Manager or Owner; provided however, that Owner shall be entitled to assign this Agreement to an Affiliate; and Manager shall (i) be entitled to assign this Agreement to an Affiliate of such party as part of a modification to such party's company structure in which all or substantially all of such party's assets are transferred to an Affiliate of such party; and (ii) have the right to assign its rights to receive payments under this Agreement as security for indebtedness or other obligations.

## ARTICLE 24
### INDEMNITY

24.1    **Indemnity by Manager**.



24.2    **Indemnity by Owner**. To the extent that Manager shall not be fully covered by insurance required to be maintained pursuant to this Agreement or if, after giving effect to the provisions of Section 24.1(b) of this Agreement, Gross Revenues are not sufficient to pay all Liabilities, Owner shall indemnify, defend and hold harmless Manager and its directors, officers, employees and agents from and against any damages, loss, liability, cost, action, cause, claim or expense, including attorneys' fees, arising out of, or incurred in connection with the management and operation of the Hotel.

**Management Agreement – Page 34**

24.3    **Survival**. The provisions of this Article 24 shall survive the expiration or earlier termination of this Agreement.

## ARTICLE 25
## PARTIAL INVALIDITY

In the event that any one or more of the phrases, sentences, clauses or paragraphs contained in this Agreement shall be declared invalid by the final and unappealable order, decree or judgment of any court, this Agreement shall be construed as if such phrases, sentences, clauses or paragraphs had not been inserted, unless such construction would substantially destroy the benefit of the bargain of this Agreement to either of the parties hereto.

## ARTICLE 26
## MISCELLANEOUS

26.1    **Disputes**. Whenever any issue or dispute arises under this Agreement relating to the Annual Operating Budget, the Approved Capital Budget and or the calculation and payment of the Reserves, and the Management Fee, such issue or dispute shall be resolved utilizing the Uniform System of Accounts and the by application of generally accepted accounting principles consistently applied.

26.2    **Further Assurances**. Owner and Manager shall execute and deliver all other appropriate supplemental agreements and other instruments, and take any other action necessary to make this Agreement fully and legally effective, binding and enforceable as between them and as against third parties.

26.3    **Waiver**. The waiver of any of the terms and conditions of this Agreement on any occasion or occasions shall not be deemed a waiver of such terms and conditions on any future occasion.

26.4    **Successors and Assigns**. Subject to and limited by Article 23, this Agreement shall be binding upon and inure to the benefit of Owner, its successors and permitted assigns, and shall be binding upon and inure to the benefit of Manager, its successors and permitted assigns.

26.5    **Governing Law**. This Agreement shall be construed, both as to its validity and as to the performance of the parties, in accordance with the laws of the State of Texas.

26.6    **Compliance with Mortgage and License Agreement**. In carrying out their respective duties and obligations under the terms of this Agreement, Owner and Manager shall use commercially reasonable good faith efforts to take no action that could reasonably be expected to constitute a material default under any Mortgage or the License Agreement and will use commercially reasonable good faith efforts to take such actions as are reasonably necessary to comply therewith.  Notwithstanding the foregoing or anything in this Agreement to the contrary, if there is a breach by Owner under the Mortgage and such breach is the result of the failure of Manager, such breach shall not be a default by Manager under this Agreement (and Manager shall have no liability therefore) unless such default and/or failure is specifically provided for in Section 16.1 of this Agreement and the applicable notice and cure periods provided for such breach and/or failure, if any, have expired.

26.7 **Amendments**. This Agreement may not be modified, amended, surrendered or changed, except by a written document signed by the Owner and Manager agreeing to be bound thereby.

26.8 **Estoppel Certificates**. Owner and Manager agree, at any time and from time to time, as requested by the other party, upon not less than ten (10) days' prior written notice, to execute and deliver to the other a statement certifying that this Agreement is unmodified and in full force and effect (or if there have been modifications, that the same are in full force and effect as modified and stating the modifications), certifying the dates to which required payments have been paid, and stating whether or not, to the best knowledge of the signer, the other party is in default in performance of any of its obligations under this Agreement, and if so, specifying each such default of which the signer may have knowledge, it being intended that such statement delivered pursuant hereto may be relied upon by others with whom the party requesting such certificate may be dealing.

26.9 **Inspection Rights**. Owner and Lender shall have the right to inspect the Hotel and examine the books and records of Manager pertaining to the Hotel at all reasonable times during the Term upon reasonable notice to Manager, and Owner and the holder of any Mortgage shall have access to the Hotel and the books and records pertaining thereto at all times during the Term to the extent necessary to comply with the terms of any Mortgage, all to the extent consistent with applicable law and regulations and the rights of guests, tenants and concessionaires of the Hotel.

26.10 **Subordination**. This Agreement, any extension hereof and any modification hereof shall be subject and subordinate to a Mortgage as provided therein and, in the event of a foreclosure or deed in lieu of foreclosure, subject to the terms of any subordination agreement with Lender, this Agreement shall terminate unless otherwise assumed by Lender in writing. The provisions of this Section shall be self-operative and no further instrument of subordination shall be required; however, Manager will execute and return to Owner (or to Lender, as designated by Owner) such documentation as Owner or Lender may reasonably request to evidence the subordination of this Agreement to the Mortgage.  In the event of any refinancing of the Property, Manager shall cooperate in all reasonable respects with Owner in effecting such refinancing.

26.11 **Effect of Approval of Plans and Specifications**. Owner and Manager agree that in each instance in this Agreement or elsewhere wherein Manager is required to give its approval of plans, specifications, budgets and/or financing, no such approval shall imply or be deemed to constitute an opinion by Manager, nor impose upon Manager any responsibility for the design or construction of additions to or improvements of the Hotel, including but not limited to structural integrity or life/safety requirements or adequacy of budgets and/or financing. The scope of Manager's review and approval of plans and specifications is limited solely to the adequacy and relationship of spaces and aesthetics of the Hotel in order to comply with the Operating Standards.

26.12 **Entire Agreement**. This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof, superseding all prior agreements or undertakings, oral or written.

26.13    **Time is of the Essence**. Time is of the essence in this Agreement.

26.14    **Interpretation**. No provision of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have structured or dictated such provision.

26.15    **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and need not be signed by more than one of the parties hereto and all of which shall constitute one and the same agreement.

26.16    **No Electronic Transactions**. The parties hereby acknowledge and agree that this Agreement shall not be executed, entered into, altered, amended or modified by electronic means. Without limiting the generality of the foregoing, the parties hereby agree that the transactions contemplated by this Agreement shall not be conducted by electronic means, except as specifically set forth in Article 21 of this Agreement.

26.17    **Prohibited Persons and Transactions**.

(a)     Manager is not, and shall not become, a person or entity with whom U. S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including those named in OFAC's Specially Designated and Blocked Person's List) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, or Support Terrorism), or other governmental action (such persons and entities being "**Prohibited Persons**").

(b)     Owner is not and shall not become a Prohibited Person.

26.18    **Confidentiality.** Owner and Manager agree to keep the terms and conditions of all leases and other occupancy agreements in effect at the Hotel (if any) and all other accruements relating to the Hotel, together with all information and data obtained, possessed, or generated by Manager in connection with the Hotel (collectively, "**Privileged Information**"), strictly confidential and not to make any public announcements or any disclosures to any third parties, either orally or in writing, with respect to any Privileged Information without the express written consent of the other party hereunder; provided, however, the restrictions imposed hereby shall not apply to any Privileged Information (1) which is required to be disclosed in order to comply with any law, ordinance, governmental decree or any rule, regulation or decree of any interested governmental body or (2) which must otherwise be disclosed to relevant third parties, including accountants, attorneys and lenders, in the course of reasonable and diligent management and operation of the Hotel or the business of Owner, or any subsidiary or Affiliate of Owner or Manager. If Manager makes such disclosure, it shall notify such third party of this provision and of the requirement of Owner for confidentiality. The provisions of this Section 26.18 shall survive the expiration or termination of this Agreement

26.19    **No Third Party Rights**. This Agreement shall inure solely to the parties hereto. Notwithstanding any other provision of this Agreement, no third party shall have any rights pursuant to the terms of this Agreement.

## ARTICLE 27
## NO REPRESENTATIONS AS TO INCOME OR FINANCIAL SUCCESS OF HOTEL

In entering into this Agreement, Manager and Owner acknowledge that neither Owner nor Manager has made any representation to the other regarding projected earnings, the possibility of future success or any other similar matter respecting the Hotel, and that Manager and Owner understand that no guarantee is made to the other as to any specific amount of income to be received by Manager or Owner or as to the future financial success of the Hotel.

## ARTICLE 28
## REPRESENTATIONS OF MANAGER

In order to induce Owner to enter into this Agreement, Manager does hereby make the following representations and warranties:

(a)     the execution of this Agreement is permitted by the certificate of formation and partnership agreement of Manager and this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of Manager enforceable in accordance with the terms hereof;

(b)     to the best knowledge of Manager, there is no claim, litigation, proceeding or governmental investigation pending, or, as far as is known to Manager, threatened, against or relating to Manager, the properties or business of Manager or the transactions contemplated by this Agreement which does, or may reasonably be expected to, materially and adversely affect the ability of Manager to enter into this Agreement or to carry out its obligations hereunder, and to the best knowledge of Manager, there is no basis for any such claim, litigation, proceedings or governmental investigation, except as has been fully disclosed in writing to Owner and Lender; and

(c)     neither the consummation of the transactions contemplated by this Agreement on the part of Manager or to be performed, nor the fulfillment of the terms, conditions and provisions of this Agreement, conflicts with or will result in the breach of any of the terms, conditions or provisions of, or constitute a default under, any agreement, indenture, instrument or undertaking to which Manager is a party or by which it is bound.

## ARTICLE 29
## REPRESENTATIONS OF OWNER

In order to induce Manager to enter into this Agreement, Owner does hereby make the following representations and warranties:

(a)     the execution of this Agreement is permitted by the Limited Liability Company Agreement of Owner and this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of Owner enforceable in accordance with the terms hereof;

(b)     there is no claim, litigation, proceeding or governmental investigation pending, or as far as is known to Owner, threatened, against or relating to Owner, the properties or business

of Owner or the transactions contemplated by this Agreement which does, or may reasonably be expected to, materially and adversely affect the ability of Owner to enter into this Agreement or to carry out its obligations hereunder, and there is no basis for any such claim, litigation, proceedings or governmental investigation, except as has been fully disclosed in writing to Manager; and

(c)     neither the consummation of the transactions contemplated by this Agreement by this Agreement on the part of Owner to be performed nor the fulfillment of the terms, conditions and provisions of this Agreement, conflicts with or will result in the breach of any of the terms, conditions or provisions of, or constitute a default under, any agreement, indenture, instrument or undertaking to which Owner is a party or by which it is bound.

## ARTICLE 30
## DISPUTE RESOLUTION

Except as specifically provided in Section 4.4 of this Agreement, Owner and Manager agree that any dispute between the parties related to or arising out of this Agreement that cannot be amicably settled by the parties hereunder, shall first be submitted for non-binding mediation before resorting to any litigation, equitable proceeding or other enforcement action. Such mediation shall be held within a twenty-five mile radius of the Hotel (or such other location mutually agreed by the parties) and the parties shall cooperate in good faith to agree on a mediator who shall be a retired or semi-retired judge having at least ten (10) years of experience on the bench hearing complex commercial transactions. If the parties hereto have failed to designate, by a joint written statement, a mediator within thirty (30) days following the date of a written request therefor by either Manager or Owner to the other, then either Owner or Manager may notify the local office of the American Arbitration Association ("**AAA**") or JAMS and request such entity to select a person to act as the mediator to assist in the resolution of the dispute. The mediation will be a non-binding conference between the parties conducted in accordance with the applicable rules and procedures of AAA or JAMS (as determined by the mediator). The compensation of the mediator and all related expenses shall be borne equally by the parties, each of whom shall bear their own costs, irrespective of the outcome of the mediation. If any dispute remains unresolved between the parties after the mediation is complete, then either party shall be entitled to pursue its rights and remedies at law or in equity. The provisions of this Article 30 shall survive the expiration or earlier termination of this Agreement.

## ARTICLE 31
## ADDITIONAL OBLIGATIONS OF MANAGER

Manager acknowledges that Owner is vitally interested in the qualifications of the individuals designated as the general manager and the director of sales of the Hotel. Manager shall, from time to time, consult with Owner and obtain Owner's approval as to the appointment of individuals to such positions; provided, however, Owner and Manager acknowledge that nothing in this Article is intended to limit or negate the authority of Manager elsewhere provided in this Agreement to remove and replace, in its sole discretion, the general manager and/or director of sales of the Hotel.

## ARTICLE 32
## TERMINATION OF THE LICENSE AGREEMENT

Owner reserves and shall have the absolute right in its sole and unfettered discretion, at any time and without the consent or approval of (but with notice to) Manager, to terminate the License Agreement, provided, however, that (i) Owner shall have no such right in order to establish its own independent operations, such as an operation without a franchise or license or in its own hotel name; (ii) in the event of such a termination by Owner, Manager shall have the right of approval (which right shall be reasonably exercised) of any new franchise or license for the Hotel; and (iii) if Owner's decision to terminate the License Agreement is made without the consent of Manager, then the provisions of Section 18.2 of this Agreement shall no longer apply.

## ARTICLE 33
## RECOURSE

Any provision of this Agreement to the contrary notwithstanding, Manager hereby agrees that no personal, partnership or corporate liability of any kind or character (including, without limitation, the payment of any judgment) whatsoever now attaches or at any time hereafter under any condition shall attach to Owner or any of Owner's constituent entities and affiliates or any mortgagee for payment of any amount payable under this Agreement or for the performance of any obligation under this Agreement. The exclusive remedies of Manager for the failure of Owner to perform any of its obligations under this Agreement shall be to proceed against the interest of Owner in and to the Hotel for Manager's actual, out-of-pocket damages (and not any consequential, punitive or exemplary damages), and Owner shall not be personally liable for any deficiency.

## ARTICLE 34
## REQUIRED FRANCHISE AGREEMENT PROVISIONS

34.1    Manager agrees to accept, abide by and be subject to all rules, regulations, inspections and requirements of Holiday Hospitality Franchising, LLC ("HHF") and/or Six Continents Hotels, Inc. ("SCH");

34.2    If the Holiday Inn Express® & Suites Change of Ownership License Agreement, dated April 30, 2014, between HHF and Owner pertaining to the Hotel shall terminate, the Manager shall cease operating the Hotel as a Holiday Inn Express® & Suites property;

34.3    If there is any conflict between the terms of this Agreement and the terms of the License Agreement, the terms of the License Agreement shall govern and control; and

34.4    Notwithstanding the consent of HHF and SCH to this Agreement, Owner and all guarantors shall remain liable to HHF and/or SCH under the terms of the License Agreement

*The rest of this page is intentionally left blank.*

IN WITNESS WHEREOF, Owner has caused this Agreement to be executed and its seal affixed by its partners duly authorized thereunto and Manager has caused this Agreement to be executed and its seal affixed by its officer duly authorized thereunto, the day and year first above written, in duplicate.

**<u>OWNER</u>**:

**RREAF O&G PORTFOLIO #2 LLC**

By: _____
Name: Jeff Schaffer
Title: Chief Executive Officer

**<u>MANAGER</u>**:

**CHANNEL POINT HOSPITALITY LLC**

By: _____
Name: _____
Title: _____

**<u>Signature Page to Management Agreement – Page Solo</u>**
HOLIDAY INN EXPRESS & SUITES PEARSALL

# EXHIBIT A

## MAJOR ACCOUNT CATEGORIES

Room Sales
Telephone Sales
Food Sales
Beverage Sales
Miscellaneous Income

Room Expense
Telephone Expense
Food Expense
Beverage Expense
Miscellaneous Expense

A&G
Management Fee
Advertising & Business Promotion
R&M
H-L-P

Property Tax
Insurance
CEP Reserve
Leases

**Exhibit A – Solo Page**

## EXHIBIT B

## DESCRIPTION OF PREMISES

<u>Tract I:</u>

Lot Eleven (11), Block Two (2), Plat and Replat of the Frio Hospital Business Park Subdivision, establishing Lot 10, Lot 11, and Lot 12, Block 2, Frio Hospital Business Park Subdivision, recorded in Envelope No. 130 Side A of the Map and Plat Records of Frio County, Texas.

**EXHIBIT C**

## EXAMPLE OF MONTHLY TRANSACTIONS REPORT

| 10/09/12  11:35 am | | | | | | P&L EXAMPLE ENTITY<br>INCOME STATEMENT<br>End of Year 2012 | | | | | | Jay  Page: | 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Total Avl Rooms | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | # Room/Occ % | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Revenue/Average Rate | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | RevPar | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | ----------REVENUES---------- | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Rooms | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | F&B Revenue | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Communications | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Minor Op Depts. | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Rent/Other | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL REVENUES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | -----DEPARTMENTAL EXPENSES---- | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Rooms | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Food & Beverage | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Communications | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Minor Operating | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Rent & Other | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL DEPARTMENTAL EXPENSES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | -----DEPARTMENTAL PROFIT----- | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Rooms | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Food & Beverage | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Communications | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Minor Op Depts | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Rent/Other | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | GROSS OPER INCOME | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | -----UNDISTRIBUTED EXPENSES---- | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Admin & General | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Advertising | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Sales/Marketing | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Repairs/Maintenance | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Energy | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL UNDISTRIBUTED | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | GROSS OPERATING PROFIT | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 1**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
INCOME STATEMENT
End of Year 2012

Jay  Page:  2

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Management Fee | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Franchise Fee | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | INCOME BEFORE FIXED CHARGES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ---------FIXED/OTHER--------- | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL FIXED/OTHER | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | EBITDA | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | PROFORMA  N O I | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | DEBT, DEPR/AMORT, CAP & OTHER | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL DEBT, DEPR/AMORT, CAP & | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | NET INC AVAIL/ TAXES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | --ADD BACKS & SUBTRACTIONS-- | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | NET OPERATING INCOME | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 2**

6444430v.1

10/05/12  11:35 am

**P&L EXAMPLE ENTITY**
**ROOMS DEPARTMENT**
**End of Year 2012**

jay  Page:  3

| | ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | | | | | | | |
| TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| NET REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| **SALARIES / WAGES** | | | | | | | | | | | | | |
| TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| **BENEFITS** | | | | | | | | | | | | | |
| TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| DEPARTMENTAL PROFIT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 3**

6444430v.1

10/05/12  11:35 am                P&L EXAMPLE ENTITY                jay  Page:  4
                                ROOMS DEPARTMENT
                              End of Year 2012

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**<u>Exhibit C – Page 4</u>**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOM STATISTICS
End of Year 2012

jay  Page:   5

| ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | OCCUPIED ROOMS | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL TRANSIENT | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL GROUP | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL SOLD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL OCCUPIED | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL AVAILABLE ROOMS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 5**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOM STATISTICS
End of Year 2012

jay  Page:  6

| ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUE/AVERAGE RATES | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL TRANSIENT | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL GROUP | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL PAYING RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL ROOMS OTHER | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | OVERALL ROOM RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | REVPAR | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 6**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOM STATISTICS
End of Year 2012

jay  Page:    7

| ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **SALARIES / WAGES** | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | Guest Services | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL SALARIES / WAGES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | **BENEFITS** | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL BENEFITS | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & BENEFITS | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | DEPARTMENTAL PROFIT | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 7**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOM STATISTICS
End of Year 2012

jay  Page:    8

| ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL OTHER EXPENSES | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 8**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
FOOD & BEVERAGE CONSOLIDATED
End of Year 2012

Jay  Page:   5

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **FOOD REVENUE** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | NET FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **BEVERAGE REVENUE** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | NET BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **OTHER REVENUE** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | NET OTHER REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 9**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
FOOD & BEVERAGE CONSOLIDATED
End of Year 2012

jay  Page:  10

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OVERALL NET FOOD COST | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OVERALL NET BEVERAGE COST | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OTHER COST | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL COST OF GOODS SOLD | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | GROSS PROFIT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
|  |  |  |  |  |  | SALARIES/WAGES |  |  |  |  |  |  |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL GENERAL | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES/WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
|  |  |  |  |  |  | BENEFITS |  |  |  |  |  |  |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Payroll Taxes & Benefits | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENTAL PROFIT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 10**

10/05/12  11:35 am                                           P&L EXAMPLE ENTITY                                      jay  Page:   11
                                                      FOOD & BEVERAGE CONSOLIDATED
                                                           End of Year 2012

   ACTUAL        %      BUDGET        %     LAST YEAR        %                              ACTUAL       %      BUDGET       %     LAST YEAR       %
-----------   -----  -----------   -----  -----------    -----                          -----------  -----  -----------  -----  -----------   -----
                                                                OTHER EXPENSES
                                                                --------------
-----------          -----------          -----------                                   -----------         -----------         -----------
          0    0.0             0    0.0             0     0.0    TOTAL OTHER EXPENSES               0    0.0            0    0.0            0    0.0

**Exhibit C – Page 11**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

jay Page:  12

| | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| COVERS & CAPTURE | | | | | | | | | | | | | |
| TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| FOOD REVENUE & AVG CHECK | | | | | | | | | | | | | |
| TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| BEVG REVENUE & RPOR | | | | | | | | | | | | | |
| TOTAL BEVG REVENUE & RPOR | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| BEVG REVENUE & % FOOD | | | | | | | | | | | | | |
| TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 12**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

Jay  Page:  13

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ROOM SERVICE | | | | | | |
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ================================= | | | | | | |
| | | | | | | RESTAURANT 1 | | | | | | |
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ================================= | | | | | | |
| | | | | | | BANQUETS | | | | | | |
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 13**

6444430v.1

10/09/12  11:35 am                         F&L EXAMPLE ENTITY                             Jay Page:  14

                                   F&B STATISTICS
                                 End of Year 2012

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ================================ | | | | | | |
| | | | | | | CATERING | | | | | | |
| | | | | | | COVERS | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ================================ | | | | | | |
| | | | | | | BANQUETS & CATERING | | | | | | |
| | | | | | | COVERS | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ================================ | | | | | | |
| | | | | | | LOUNGE 1 | | | | | | |
| | | | | | | BEVG REVENUE & BFCH | | | | | | |

**Exhibit C – Page 14**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

Jay Page:  15

| | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL BEVG REVENUE & RPCR | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | | RESTAURANT 2 | | | | | | | |
| | | | | | | | COVERS & CAPTURE | | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | | FOOD REVENUE & AVG CHECK | | | | | | | |
| | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | | BEVG REVENUE & % FOOD | | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | | LOUNGE 2 | | | | | | | |
| | | | | | | | BEVG REVENUE & RPCR | | | | | | | |
| | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL BEVG REVENUE & RPCR | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | | CONFERENCE CENTER | | | | | | | |
| | | | | | | | COVERS & CAPTURE | | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL CAPTURE & COVERS | | 0 | 0.00 | 0 | 0.00 | | 0.00 |
| | | | | | | | FOOD REVENUE & AVG CHECK | | | | | | | |
| | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | | BEVG REVENUE & % FOOD | | | | | | | |

**Exhibit C – Page 15**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

jay Page:   16

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | IN ROOM BAR | | | | | | |
| | | | | | | REVENUE & RPOR | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL REVENUE & RPOR | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 16**
6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOM SERVICE
End of Year 2012

jay  Page:  17

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 17**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
RESTAURANT 1
End of Year 2012

jay  Page:  18

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | FOOD REVENUES | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES / WAGES | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 18**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
BANQUETS & CATERING
End of Year 2012

Jay  Page:  19

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | CATERING | | | | | | |
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 19**

6444430v.1

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | TOTAL BANQUETS & CATERING | | | | | | |
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL COMBINED REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARY / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 20**

6444430v.1

10/08/12  11:35 am

P&L EXAMPLE ENTITY
BANQUETS & CATERING
End of Year 2012

Jay  Page:  21

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | BANQUETS | | | | | | |
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 21**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
LOUNGE 1
End of Year 2012

jay  Page:   22

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPT REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 22**

6444430v.1

10/09/12  11:35 am

**P&L EXAMPLE ENTITY**
**COMMUNICATIONS**
**End of Year 2012**

jsy  Page:  23

| ACTUAL | | RPOA/% | BUDGET | | RPOA/% | LAST YEAR | | RPOA/% | | ACTUAL | | RPOA/% | BUDGET | | RPOA/% | LAST YEAR | | RPOA/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | REVENUES | | | | | | | | | |
| 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 | TOTAL PHONE REVENUE | 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 |
| 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 | NET PHONE REVENUE | 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 |
| 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 | TOTAL INTERNET REVENUE | 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 |
| 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 | NET INTERNET REVENUE | 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 |
| 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 | NET COMBINED REVENUES | 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 |
| | | | | | | | | | COSTS OF SALES | | | | | | | | | |
| 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 | COS PHONE | 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 |
| 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 | COS INTERNET | 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 |
| 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 | TOTAL COST OF ALL SALES | 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 |
| 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 | GROSS PROFIT/(LOSS) | 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 |
| 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 | Payroll Taxes & Benefits | 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 |
| 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 | TTL WAGES & BENEFITS | 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 |
| 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 | TOTAL PROFIT/(LOSS) | 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 |

**Exhibit C – Page 23**
6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
IN HOUSE MOVIES
End of Year 2012

Jay  Page:   24

| ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% | | ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUES | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | NET REVENUE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 24**

6444430v.1

10/08/12  11:35 am

P&L EXAMPLE ENTITY
GUEST LAUNDRY
End of Year 2012

Jay  Page:  25

| ACTUAL | RPOR/% | BUDGET | RPRO/% | LAST YEAR | RPOR/% | | ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUES | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | NET REVENUE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | GROSS PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TTL WAGES & BENEFITS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 25**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
RENTS & OTHER INCOME
End of Year 2012

Jay  Page:  26

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SPACE RENTALS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL RENTALS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | COMMISSIONS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL COMMISSIONS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | MISCELLANEOUS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL MISCELLANEOUS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL RENTS/OTHER INCOME | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 26**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
A&G
End of Year 2012

jay Page:   27

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL A&G EXP | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 27**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
SALES & MARKETING
End of Year 2012

jay Page: 28

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | GROUP | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL GROUP | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | TRANSIENT | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Newspaper | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL TRANSIENT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Contingency | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL NON-MEDIA | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | GRAND TTL ADVERTISING | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 28**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
SALES & MARKETING
End of Year 2012

jay  Page:  29

| ACTUAL | % | BUDGET | % | LAST YEAR | % |  | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  | **SALARIES / WAGES** |  |  |  |  |  |  |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Incentive/Svc Charge | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
|  |  |  |  |  |  | **BENEFITS** |  |  |  |  |  |  |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
|  |  |  |  |  |  | **OTHER EXPENSES** |  |  |  |  |  |  |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALES & ADVERTISING | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**<u>Exhibit C – Page 29</u>**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
REPAIRS & MAINTENANCE
End of Year 2012

Jay  Page:   30

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|--------|---|--------|---|-----------|---|---|--------|---|--------|---|-----------|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Grnds & Land - Outdoor | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Rent - Equipment | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL R&M EXPENSE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 30**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ENERGY
End of Year 2012

jay  Page:   31

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL ENERGY | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL ENERGY | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 31**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
FIXED & OTHER CHARGES
End of Year 2012

joy  Page:  32

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | FEES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FEES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | RENTS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL RENTS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | LEASES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL LEASES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | INSURANCE | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL INSURANCE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | REAL ESTATE TAXES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REAL ESTATE TAXES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER TAXES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER TAXES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | PARTNERSHIP EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL PARTNERSHIP EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | INTEREST EXPENSE | | | | | | |

**Exhibit C – Page 32**

10/08/12  11:35 am

P&L EXAMPLE ENTITY
FIXED & OTHER CHARGES
End of Year 2012

jay  Page:  33

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL INTEREST EXPENSE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | REIT LEASE | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REIT LEASE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | MISC NON EBITDA | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL MISC NON EBITDA | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | DEPRECIATION/AMORTIZATION &OT | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPRECIATION & AMORTIZAT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | FFE & ADDBACKS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FFE & ADDBACKS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FIXED EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 33**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
EE CAFE
End of Year 2012

Jay  Page:  34

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL EE CAFE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Allocation to PTER | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | FINAL EE CAFE TOTAL | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 34**

6444430v.1

10/08/12  11:35 am

P&L EXAMPLE ENTITY
PT & EB
End of Year 2012

jay  Page:  35

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | TAXES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL TAXES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | HEALTH INSURANCE | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL HEALTH INSURANCE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 401k Match | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL PT & EB | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

% Column is % Total Wages

**Exhibit C – Page 35**

6444430v.1

10/05/12  11:35 am
P&L EXAMPLE ENTITY
PT & ER
End of Year 2012
jay  Page:  36

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | DISTRIBUTED TO: | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DISTRIBUTION | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 36**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
PT & EB
End of Year 2012

Jay  Page:  37

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES, WAGES & INCENTIVES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Total Food & Beverage | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | GROSS TTL WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | S&W, INCENTIVES, PAID TIME OFF | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Lounge 1 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Total Foood & Beverage | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL ALL PAID WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

<u>**Exhibit C – Page 37**</u>

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
HOUSE LAUNDRY
End of Year 2012

jay  Page:  38

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES & WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | DISTRIBUTED TO: | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DISTRIBUTION | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 38**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay  Page:  39

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| ASSETS | | | | | |
| CASH | | | | | |
| TOTAL CASH | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| SEMI-RESTRICTED CASH | | | | | |
| TOTAL SEMI-RESTRICTED CASH | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| RECEIVABLES | | | | | |
| TOTAL RECEIVABLES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| INVENTORIES | | | | | |
| TOTAL INVENTORIES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OPERATING EQUIPMENT | | | | | |
| TOTAL OPERATING EQUIPMENT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Exhibit C – Page 39**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay  Page:  40

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| PREPAIDS | | | | | |
| TOTAL PREPAIDS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| FIXED ASSETS | | | | | |
| Accum Amortization | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL FIXED ASSETS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OTHER ASSETS | | | | | |
| TOTAL OTHER ASSETS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL ASSETS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Exhibit C – Page 40**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay  Page:  41

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| LIABILITIES | | | | | |
| PAYABLES | | | | | |
| TOTAL PAYABLES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| DEPOSITS | | | | | |
| TOTAL DEPOSITS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OF TAXES AND WITHHOLDINGS | | | | | |
| TOTAL OF TAXES AND WITHHOLDING | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ACCRUED OPERATING EXPENSES | | | | | |
| TTL ACCRUED OPERATING EXPENSES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Exhibit C – Page 41**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| DUE TO/FROM ACCOUNTS | | | | | |
| Due to 22 St Paul | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Due to REIT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL DUE TO/FROM ACCOUNTS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OTHER LIABILITIES | | | | | |
| TOTAL OTHER LIABILITIES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| NOTES PAYABLE | | | | | |
| TOTAL NOTES PAYABLE | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL LIABILITIES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OWNERS EQUITY | | | | | |
| Retained Earn - Prior Years | 0.00 | 0.00 | 0.00 | 695.02- | 695.02 |
| Retained Earn - Current Yr | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL OWNERS EQUITY | 0.00 | 0.00 | 0.00 | 695.02- | 695.02 |
| TOTAL LIABS. & OWNERS EQUITY | 0.00 | 0.00 | 0.00 | 695.02- | 695.02 |

**Exhibit C – Page 42**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFTK REPORT
End of Year 2012

jay  Page:  43

| | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | FULL TIME EQUIVALENT | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | | SUMMARY HOURS & FTE | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOTEL | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | | SUMMARY WAGES & AVG RATE | | | | | | |
| | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**<u>Exhibit C – Page 43</u>**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFTE REPORT
End of Year 2012

bay  Page:  44

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ROOMS DEPARTMENT | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL OCCUPIED ROOMS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Room Attendant - Total | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | House Attendant - Total | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | Room Attendant - Total | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | House Attendant - Total | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| | | | | | | FOOD & BEVERAGE SUMMARY | | | | | | |
| | | | | | | FOOD COVERS | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PROD / TOTAL COV | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVERAGE RATE | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 44**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFTE REPORT
End of Year 2012

jay  Page:  45

| | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ================================ | | | | | | | | | | | | | |
| A&G | | | | | | | | | | | | | |
| HOURS & FTE | | | | | | | | | | | | | |
| TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 45**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY KPIE REPORT
End of Year 2012

Jay  Page:  46

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ROOM SERVICE | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ================================ | | | | | | |
| | | | | | | RESTAURANT 1 | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ================================ | | | | | | |
| | | | | | | RESTAURANT 2 | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 46**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFIS REPORT
End of Year 2012

Jay  Page:  47

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ============================== | | | | | | |
| | | | | | | BANQUETS & CATERING | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ============================== | | | | | | |
| | | | | | | CONFERENCE CENTER | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | HOURS & FTE | | | | | | |

**Exhibit C – Page 47**
6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFIS REPORT
End of Year 2012

Jay  Page:   49

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|--------|------|--------|------|-----------|------|--|--------|------|--------|------|-----------|------|
| | | | | | | ------------ | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ============================== | | | | | | |
| | | | | | | LOUNGE 1 | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL REVENUE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | TOTAL WAGES & AVG RATE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ============================== | | | | | | |
| | | | | | | LOUNGE 2 | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | TOTAL WAGES & AVG RATE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 48**

10/05/12  11:35 am
P&L EXAMPLE ENTITY
MONTHLY EFTK REPORT
End of Year 2012

jay  Page:  49

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---------|------|--------|------|-----------|------|--|--------|------|--------|------|-----------|------|
| | | | | | | **IN ROOM BARE** | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL OCCUPIED ROOMS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & RMS PER OCC ROOM | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & HOURS PER OCC RO | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 49**

6444430v.1

10/08/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY KPIK REPORT
End of Year 2012

jay  Page:   50

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | CONTRACT LABOR | | | | | | |
| | | | | | | HOURS & FTE | | | | | | |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | FOOD & BEVERAGE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**<u>Exhibit C – Page 50</u>**

6444430v.1

# EXHIBIT D

## INSURANCE REQUIREMENTS

1.  **Insurance Requirements for the Hotel**:

General Liability - $1,000,000 per Occurrence/$2,000,000 General and Product Liability Aggregate per Location

Including:
1.  Products and Completed Operations
2.  Contractual Liability
3.  Personal Injury
4.  Incidental Medical Malpractice
5.  Molestation and Abuse are not Excluded
6.  Punitive Damages unless Excluded by Public Policy
7.  Fellow Employee Coverage
8.  Garage Keepers Liability
9.  Liquor Liability
10. Blanket Additional Interests
    a.  All Managers or Lessors of Premises
    b.  All mortgagors of Premises
    c.  Vendors
    d.  Volunteer Workers
    e.  As required by Contract
11. Severability of Interests
12. Waiver of Subrogation as Required by Contract
13. Terrorism not Excluded or Sub-Limited
14. No Deductible/SIR
15. Coverage is Designated to the Scheduled Premises and is Primary and Non-Contributory

Commercial Automobile - $1,000,000 – Any Auto

Including:
1.  Medical Payments - $5,000 per person
2.  Personal Injury Protection – As required by State
3.  Property Protection Insurance – As required by State
4.  Uninsured Motorists - $1,000,000 Limit
5.  Underinsured Motorists - $1,000,000 Limit
6.  Physical Damage (Owned and Hired Autos) – Comprehensive $1,000 Deductible
7.  Physical Damage (Owned and Hired Auto) – Collision $1,000 Deductible
8.  Auto Loan/Lease Gap Coverage

Umbrella Liability - $25,000,000 per Occurrence/ $25,000,000 Aggregate per Location

    Including:
1. Retained Limit – 0
2. Follows Scheduled Underlying Policies

Workers Compensation – Provided in All States except as Provided by the State Funds of – ND, OH, WA, WV, WY

Medical Benefits – Statutory
1. Indemnity – Statutory
2. Employers Liability - $500,000
    a. Each Accident
    b. Disease - Each Employee
    c. Disease – Policy Limit

Crime - $1,000,000 Occurrence Limit S/T/A $10,000 per Occurrence Deductible Covering:
1. Employee Theft
2. Forgery or Alteration
3. Computer Fraud
4. Funds Transfer Fraud
5. Theft of Money & Securities
    a. Inside the Premises
    b. Outside the Premises

Guest Property - $10,000 Limit per Occurrence
1. $1,000 deductible
2. Liability Governed by Statute

Professional Liability - $1,000,000 Each Claim / $2,000,000 Aggregate for All Claims
1. Claim Includes Identifiable Loss and Defense Cost
2. A $25,000 Deductible Applies to Loss and Defense

Employment Practices Liability
1. $2,000,000 Aggregate for All Loss Combined (Including Defense Cost)
2. Retention $25,000

2. **Insurance Requirements for Major Contractors**:

    (a) Worker's Compensation - Statutory amount or its equivalent under applicable law.

**Exhibit D – Page 2**

    (b)    Employer's Liability - $500,000 minimum, where required by applicable or equivalent law.

    (c)    Comprehensive General Liability; **either**

        (i)    $100,000 Bodily Injury per Person
                $300,000 per Occurrence
                $100,000 Property Damage

                **-or-**

        (ii)    $1,000,000 combined single limit

**EXHIBIT E**

**COMPETITIVE SET**



**Exhibit E – Solo Page**
6444430v.1

**MANAGEMENT AGREEMENT**

between

**RREAF O&G PORTFOLIO #2 LLC**
as Owner

and

**CHANNEL POINT HOSPITALITY LLC**
as Manager

FOR

**COMFORT SUITES PECOS**
110 Raul Florez Boulevard
Pecos, Texas 79722

## MANAGEMENT AGREEMENT

This Management Agreement (the "**Agreement**") made this ___ day of February 2016 between **RREAF O&G PORTFOLIO #2 LLC**, a Delaware limited liability company (**"Owner"**), as Owner, and **CHANNEL POINT HOSPITALITY LLC**, a Texas limited liability company (**"Manager"**), as Manager.

## RECITALS:

A.     Owner is the fee owner of the Hotel (as defined below).

B.     Manager is experienced in the management and operation of hotels, directly and through affiliated entities.

C.     Owner and Manager desire to enter into this Agreement for the management and operation of the Hotel in accordance with the terms and conditions and subject to the limitations contained in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner and Manager covenant and agree as follows:

## ARTICLE 1
## DEFINITIONS, TERMS AND REFERENCES

1.1     Definitions. In this Agreement and any Exhibits, the following terms shall have the following meanings:

"**Account Category**" shall include the major account categories set forth in Exhibit A attached hereto and made a part hereof as well as other major account categories, which are applicable to the Hotel consistent with the Statement of Income as defined by the Uniform System of Accounts or otherwise approved by Owner.

"**Accounting Fee**" shall have the meaning set forth in Article 11.

"**Accounting Period**" shall mean each calendar month (whether of 28, 29, 30 or 31 days) during each Fiscal Year.

"**Affiliate**" shall mean any person or entity that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with another person or entity. The term "**control**" (and correlative terms) shall mean the power, whether by contract, equity ownership or otherwise, to direct the policies or management of a person or entity. Without limiting the foregoing, an "**Affiliate**" also includes any partner or a partnership of any party to this Agreement, any member or membership parties thereto and any corporation, partnership, individual or trust related to or controlling or controlled by such partnership, individual or trust related to or controlling or controlled by such partnership party or its partners

or such membership party or its members. A natural person is related to another natural person if he or she is a spouse, parent, or lineal descendant of the other person.

"**Allocated Services**" shall mean certain support services that Manager obtains from a third party and provides on a central or regional basis to the hotels that it manages because such support services can be provided on a more efficient, effective and economical basis to each individual Manager managed hotel if the expenses of such support services are shared by other Manager managed hotels. Such support services include services in the areas of sales and marketing, food and beverage, human resources, insurance, technology, training and payroll (each such service, an "**Allocated Service**"; collectively, the "**Allocated Services**"). Owner and Manager agree that Manager shall provide Allocated Services to the Hotel and that the Hotel's portion of the cost thereof shall constitute a Gross Operating Expense so long as (i) the costs of the Allocated Services are allocated in good faith on a uniform, fair, equitable and proportionate basis among the Hotel and the other Manager managed hotels benefiting therefrom; and (ii) the Allocated Services shall not include services that do not benefit the Hotel; and (iii) the cost of the Allocated Services are either (a) included by Manager in each Annual Operating Budget or (b) otherwise approved in writing by Owner. The cost of the Allocated Services and the allocation of that cost to the Hotel and other Manager managed hotels shall be subject to audit by Owner pursuant to the terms of Section 10.3 of this Agreement. Manager further agrees that the benefit of any discounts or rebates received by Manager with respect to any of the Allocated Services shall be passed on to the Hotel on a proportionate basis as compared to other hotels managed by Manager or its Affiliates.

"**Annual Operating Budget**" shall mean an annual operating projection for the Hotel prepared and submitted by Manager to Owner and approved by Owner for each Fiscal Year pursuant to Section 4.4(a).

"**Annual Plan**" shall mean an annual business plan for the operation of the Hotel prepared by the Manager and approved by the Owner, which shall include the Annual Operating Budget, the Approved Capital Budget, the Marketing Plan and the Management Plan and any other material included therein by Manager as provided in Section 4.4.

"**Approved Capital Budget**" shall have the meaning set forth in Section 4.4(b).

"**Base Fee**" shall have the meaning set forth in Article 11.

"**Building and Appurtenances**" shall mean (i) the 58 room hotel building located on the Premises, and (ii) landscaping and other related facilities, together with all installations located at, or used in connection with the operation of the building for hotel purposes including, without limitation, any swimming pools, health club and recreational facilities, walkways, parking facilities, heating, lighting, sanitation equipment, air conditioning, laundry facilities, refrigeration, built-in kitchen equipment, and elevators.

"**Capital Budget**" shall mean Manager's proposed estimate of FF&E and Capital Improvements submitted to Owner each Fiscal Year pursuant to Section 4.4(b).

"**Capital Improvements**" shall have the meaning set forth in Section 8.2 hereof.

"**Commencement Date**" shall mean the date on which Manager assumes the management and operation of the Hotel under this Agreement for the benefit of Owner.

"**Competitive Set**" shall mean the properties listed on Exhibit E attached hereto and any revisions to such list agreed upon by Owner and Manager from time to time.

"**CPI**" shall mean the Consumer Price Index for All Urban Consumers, United States City Average, All Items (1982-84=100), issued by the Bureau of Labor Statistics of the United States Department of Labor.

"**Default Rate**" shall mean the lesser of (i) the Prime Rate plus four percent (4%) per annum or (ii) the highest lawful rate permitted by applicable Legal Requirements from time to time.

"**Effective Date**" shall mean the date of this Agreement as set forth on page 1 hereof.

"**Event of Default**" shall mean any of the events described in Article 16, provided that any condition contained therein for the giving of notice or the lapse of time, or both, has been satisfied.

"**Executive Personnel**" shall mean the general manager and the director of sales of the Hotel.

"**Fiscal Year**" shall mean the fiscal year that ends on the last day of each calendar year. The first Fiscal Year shall be the period commencing on the Commencement Date and ending on December 31st of the same calendar year in which the Commencement Date occurs. The words "full Fiscal Year" shall mean any Fiscal Year containing not fewer than 365 days. A partial Fiscal Year after the end of the last full Fiscal Year and ending with the expiration or earlier termination of the Term shall constitute a separate Fiscal Year.

"**Furniture, Fixtures and Equipment**" or "**FF&E**" shall mean all furniture, furnishings, wall coverings, fixtures, carpeting, rugs, fine arts, paintings, statuary, decorations, and hotel equipment and systems (including the costs associated with the purchase, installation and delivery thereof) located at, or used in connection with, the operation of the Building and Appurtenances as a hotel, including without limitation, major equipment and systems required for the operation of kitchens, bars, laundry and dry cleaning facilities, office equipment, dining room wagons, major material handling equipment, major cleaning and engineering equipment, telephone systems, computerized accounting and vehicles (including the costs associated with the purchase, installation and delivery thereof) together with all replacements therefor and additions thereto, but in all events excluding Operating Equipment and Supplies.

"**GOP Threshold**" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

"**Gross Operating Expenses**" shall mean the following expenses actually incurred in the operation of the Hotel:

1.     Cost of sales; salaries, wages, bonuses, payroll taxes; the cost of social insurance which shall include, but not be limited to, life, medical, disability insurance, retirement and other benefits incurred by Manager related to Hotel Employees;

2.     Departmental expenses; administrative and general expenses; the cost of third party vendor sources engaged to print payroll checks and reports or to perform any other services hereunder; the Accounting Fee; the Revenue Management Fee; advertising and business promotion for the Hotel; franchise fees, chain reservation fees and all other fees relating to the License Agreement; the cost of utilities, service contracts; and repairs and maintenance;

3.     The cost of replacing Operating Equipment and Supplies and Inventories as defined herein.

4.     The cost of uncollectible accounts receivables as reasonably determined by the Manager.

5.     The Owner-approved costs and expenses of technical consultants and operational experts for specialized services in connection with non-routine hotel work including roofing consultants, environmental engineers and others.

6.     The cost of insurance as set forth in this Agreement.

7.     The Management Fee.

8.     Real estate and personal property taxes levied or assessed against the Hotel and other like charges.

9.     Allocated Services.

10.  All other costs and expenses incurred in connection with the operation of the Hotel and otherwise approved as part of the Annual Plan or Annual Operating Budget, including but not limited to Reimbursable Expenses.

11.  Risk management costs.

12.  Legal services related to Hotel Employees or Hotel operations or services.

13.  Other amounts expressly set forth in this Agreement or the Annual Operating Budget as being included in Gross Operating Expenses.

All costs and fees of any Independent Public Accountants or other third parties who perform services approved by Owner (other than services provided by any Independent Public Accountants or other third parties in connection with services and/or reports required to be provided by Owner pursuant to the License Agreement) shall be paid by Owner and shall not constitute Gross Operating Expenses.

Except to the extent that the travel budget for Manager's personnel is included as a line item in the Annual Operating Budget, no part of Manager's central office overhead or general or

**Management Agreement – Page 4**

administrative expenses including the cost of travel by Manager's corporate or regional officers (other than Allocated Services) or for travel related to any other hotel operated by Manager or its Affiliates shall be deemed to be part of Gross Operating Expenses and all such costs and expenses shall be the sole responsibility of Manager.

"**Gross Operating Profit**" or "**GOP**" shall mean the amount of the remainder of Gross Revenues of the Hotel less the departmental expenses and undistributed expenses of the Hotel.

"**Gross Revenues**" shall mean for any applicable Accounting Period, all revenues and receipts of every kind derived from the Hotel and all departments and parts thereof during such Accounting Period, as finally determined on an accrual basis in accordance with the Uniform System of Accounts, including, but not limited to, revenues and income (both cash and credit transactions) before commissions and discounts for prompt or cash payments, from the rental of rooms and lobby space, exhibit or sales space of any kind, including without limitation, charges for reservations, deposits and cancellation fees not refunded to guests; income from vending machines, health club membership fees, wholesale and retail sales of merchandise, service fees and charges, business interruption insurance claims (but only for periods during the operating term) in respect of the Hotel, condemnation awards for temporary use of the Hotel, license, lease and concession fees and rentals (but not including the gross receipts of any licensees, lessees and concessionaires), food and beverages sales, and other sales of every kind conducted by, through or under Manager in connection with the Hotel. Gross Revenues shall not include (i) Federal, state and municipal excise, sales and use taxes or similar impositions collected directly from patrons or guests or included as part of the sales price of any goods or services; (ii) gratuities or service charges collected and paid to employees; (iii) credits or refunds to guests; (iv) proceeds arising from the sale or other disposition of property described in Section 1231 of the Internal Revenue Code or of capital assets; (v) proceeds from condemnation and payments received on account of insurance policies (other than the proceeds from business interruption insurance and from condemnation awards for temporary use of the Hotel when received); (vi) proceeds from claims for damages suffered by Manager or Owner, unless in recompense for a lost revenue item; and (vii) interest earned on the Reserve or Permitted Investments.

"**Hotel**" shall mean (a) the Building and Appurtenances and the Premises owned by Owner and (b) all FF&E, all Operating Equipment and Supplies, and all Inventories owned by Owner located at 110 Raul Florez Boulevard, Pecos, Texas 79722.

"**hotel**" shall mean any hotel (other than the Hotel), inn, motor inn, motor hotel, motel, suite hotel, conference center, meeting center or any other facility providing either or both of short-term lodging and meeting arrangements.

"**Hotel Employees**" shall have the meaning set forth in Section 4.2.

"**Independent Public Accountant**" shall mean a nationally recognized firm of independent certified public accountants having hotel accounting experience, designated from time to time by Owner, subject to Manager's rights of approval, reasonably exercised.

"**Inventories**" shall mean "Inventories of Supplies" as defined in the Uniform System of Accounts, such as soap, toilet paper, stationery, writing pens, food and beverage inventories,

paper products, menus, expendable office and kitchen supplies, fuel, supplies and items similar to any of the foregoing.

"**Legal Proceedings**" shall mean all complaints, counterclaims or cross-claims filed in a court of competent jurisdiction, any notice of any claim of violation of any legal requirement by any governmental agency or authority, or any summons or other legal process, in each instance by or against the Hotel or by or against Owner, or Manager in connection with the Hotel.

"**Legal Requirements**" shall mean (a) all laws, ordinances, statutes, regulations and orders relating to the Hotel and the Premises now or hereafter in effect, including but not limited to, environmental laws and (b) all terms, conditions, requirements and provisions of (i) all Permits; (ii) all leases; and (iii) all liens, restrictive covenants and encumbrances affecting the Hotel or the Premises or any part thereof.

"**License Agreement**" shall mean the franchise or license agreement, if any, from time to time entered into by Owner with respect to the branding and operation of the Hotel. For the purposes of this definition, the following terms used in said section shall have the following meaning: "**Licensor**" shall mean the franchisor or licensor under the franchise or license agreement from time to time entered into by Owner with respect to the branding and operation of the Hotel; "**Licensee**" shall mean Owner; and the "**Manual**" shall mean the Licensor's operating manual and other manuals for Licensor described in its standard license agreement.

"**Major Renovations**" shall mean a contemporaneously made set or series of alterations, additions and/or improvements to the Hotel with a total cost in excess of $100,000 (or a lesser amount in the event a project with a total cost less than $100,000 requires material design and purchasing and installation services related thereto and/or results in a material alteration in the design of the Hotel), but shall not include any Repairs or Maintenance with respect to Capital Improvements or FF&E.

"**Manager**" shall have the meaning set forth in the introductory section of this Agreement.

"**Management Fee**" shall mean the Accounting Fee**,** Revenue Management Fee and Base Fee, all as set forth in Article 11 hereof.

"**Management Plan**" shall have the meaning set forth in Section 4.4(d).

"**Marketing Plan**" shall mean an annual marketing plan for the Hotel prepared and submitted by Manager to Owner and approved by Owner in each Fiscal Year pursuant to Section 4.4(c).

"**Mortgage**" shall mean, collectively, each of the documents evidencing or securing current or future indebtedness on the Hotel in favor of a third party lender or financial institution or any successor thereto or replacement thereof (the "**Lender**").

"**Net Operating Income**" or "**NOI**" shall mean the result of Gross Revenues less Gross Operating Expenses.

**Management Agreement – Page 6**

"**Open for Business**" shall mean the period of time during which all or substantially all of the Hotel is open for business to the general public.

"**Operating Account**" shall mean a special account or accounts, bearing the name of the Hotel, established by Manager in a federally insured bank or trust company selected by Owner.

"**Operating Equipment and Supplies**" shall mean supply items which constitute "Operating Equipment and Supplies" under the Uniform System of Accounts, all miscellaneous serving equipment, linen, towels, uniforms, silver, glassware, china and similar items.

"**Operating Standards**" shall mean the operation of the Hotel in a manner consistent with (i) the requirements under the License Agreement; (ii) the condition of the Hotel as of the Commencement Date (or, following completion of a Renovation, the condition of the Hotel as of the completion of the Renovation), normal wear and tear excepted; (iii) the condition and level of the operation of hotels of comparable class and standing to the Hotel in its market area; (iv) then current market conditions regarding rental rates and lease terms and conditions with respect to Hotels of comparable class and standing to the Hotel (including but not limited to the Competitive Set); and (v) then current business and management practices (including those related to compliance with Legal Requirements) applicable to the management, operation, leasing, maintenance and repair of a hotel comparable in size, character and location to the Hotel.

"**Owner**" shall have the meaning set forth in the introductory section of this Agreement.

"**Performance Standard**" shall have the meaning set forth in Section 18.2.

"**Permits**" shall mean all governmental or quasi-governmental licenses and permits, including but not limited to any certificate of occupancy, business licenses and liquor licenses.

"**Permitted Investments**" shall mean (subject to modification, addition or deletion from time to time at the option of Owner by written request to Manager) all of which shall be in the name of Owner:

(a)    interest-bearing deposit accounts (which may be represented by certificates of deposit, time deposit open account agreements or other deposit instruments) in commercial banks having a combined capital and surplus of not less than $50,000,000; or

(b)    all other investments approved by Owner.

"**Premises**" shall mean the land on which the Hotel is located, which land is described in Exhibit B attached hereto.

"**Prime Rate**" shall mean the rate per annum announced, designated or published from time to time by JP Morgan Chase Bank N.A. as its "prime", "reference" or "base" rate of interest for commercial loans.

"**Reimbursable Expenses**" shall mean all travel, lodging, entertainment, telephone, facsimile, postage, courier, delivery, employee training and other expenses incurred by Manager

in accordance with the standard policies for expenses incurred by Manager on its own behalf and which are directly related to its performance of this Agreement, but in no event will Reimbursable Expenses include or duplicate expenses for Manager's overhead or Allocated Services.

"**Renovation**" shall mean a renovation of any portion of the Hotel during the Term, pursuant to a plan proposed by Manager and approved by Owner to, among other things, bring the Hotel to a physical condition that satisfies the standards under the License Agreement and to operate in a manner consistent with the assumptions for the then-current Annual Operating Budget and then-current Annual Plan. A Renovation shall be carried out at the expense of Owner pursuant to plans and specifications and a schedule prepared by Manager and approved by Owner and, to the extent required under the License Agreement, by Licensor.

"**Repairs and Maintenance**" shall have the meaning as defined in Section 8.1.

"**Reserve**" shall mean an account maintained as a Permitted Investment for Reserve for replacement of FF&E and/or Capital Improvements, as described in Section 7.1 and funded as provided in Section 7.2.

"**Revenue Data Publication**" shall mean Smith's STR Report, a monthly publication distributed by Smith Travel Research, Inc., or an alternative source, reasonably satisfactory to both parties, of data regarding the average daily rate, occupancy and RevPAR of hotels in the general area of the Hotel, including, without limitation, the Competitive Set.

"**Revenue Management Fee**" shall have the meaning as defined in Section 11.

"**Revenue Per Available Room**" **or** "**RevPAR**" shall mean for any Test Period the number derived by dividing (i) net room revenue (in accordance with the Uniform System of Accounts), by (ii) the number of available guest rooms in the subject hotel.

"**RevPAR Threshold**" ████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████

"**State**" shall mean the State in which the Hotel is located or other as designated.

"**Term**" shall mean the term of this Agreement, which shall be an initial five (5) year term commencing on the Commencement Date and expiring on the fifth (5th) anniversary of the Commencement Date, as such Term may be extended or shortened as expressly set forth in this Agreement or as otherwise agreed to by Owner and Manager.

"**Termination Fee**" ██████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████

**Management Agreement – Page 8**



"**Test Period**" shall mean each twelve (12) month period during the Term commencing on the first day of the seventh (7th) calendar month following the Commencement Date and each subsequent three (3) calendar months thereafter.  In the event that this Agreement shall terminate on a date other than the last day of a calendar year, the last Test Period shall end on the date of termination.  The term "full Test Period" means any Test Period containing not fewer than 365 days.

"**Third Party Purchaser**" shall have the meaning set forth in Section 18.1.

"**Unavoidable Interruptions**" shall mean interruptions in the operation of or access to the Hotel or any of its essential services on account of an interruption in any one or more of the utility services described in Section 13.2, or on account of labor disputes, strikes, lockouts, fire or other casualty, war, terrorist actions, acts of God and other similar causes beyond the reasonable control of the party claiming an unavoidable interruption, but never financial inability. Other than obligations accruing prior to the occurrence of such event of Unavoidable Interruption or obligations that, if not performed, would cause a material adverse effect on the Hotel or its operations (for instance, the requirement to maintain the Permits or insurance obligations hereunder), the obligations of the party hereunder shall be suspended during the period of an Unavoidable Interruption.

"**Uniform System of Accounts**" shall mean the Uniform System of Accounts for Hotels, 10th Revised Edition, 2006, as published by the Hotel Association of New York City, Inc. or any later edition thereof.

"**Working Capital**" shall mean and refer to the funds which are reasonably necessary for the day-to-day operation of the Hotel's business, including, without limitation, amounts sufficient for the maintenance of petty cash funds, operating bank accounts, receivables, payrolls, prepaid expenses, advance deposits, funds required to maintain inventories, and amounts due to/or from Manager and/or Owner less accounts payable and accrued current liabilities.

1.2     **Terminology**. All personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, shall include all genders; the singular shall include the plural, and the plural shall include the singular. The titles of Articles, Sections and Subsections in

**Management Agreement – Page 9**

this Agreement are for convenience only, and neither limit nor amplify the provisions of this Agreement, and all references in this Agreement to Articles, Sections, Subsections, paragraphs, clauses, sub-clauses or exhibits shall refer to the corresponding Article, Section, Subsection, paragraph, clause or sub-clause of, or exhibit attached to, this Agreement, unless specific reference is made to the articles, sections or other subdivisions of, or exhibits to, another document or instrument.

1.3     **Exhibits**. All exhibits and other attachments attached hereto are by this reference made a part of this Agreement.

**ARTICLE 2**
**MANAGEMENT OF HOTEL**

Owner hereby engages and appoints Manager, pursuant to the terms of this Agreement, to operate and manage the Hotel, and Manager hereby agrees and contracts to plan, operate, repair and manage the Hotel pursuant to the terms of this Agreement.

Subject to the terms of this Agreement, Hotel operations shall be under the exclusive supervision and control of Manager, which, except as otherwise specifically provided in this Agreement, shall be responsible for the proper and efficient operation**,** maintenance and repair of the Hotel in accordance with the terms of this Agreement. Except as specifically set forth in this Agreement, Manager shall have discretion and control respecting matters relating to management and operation of the Hotel, including, without limitation, charges for rooms and commercial space, credit policies, food and beverage services, other Hotel services, employment policies, granting of concessions or leasing of shops and agencies within the Hotel, receipt, holding and disbursement of funds, maintenance of bank accounts, procurement of inventories, supplies and services, promotion and publicity and, in general, all activities necessary for operation of the Hotel.

Manager shall devote its knowledge, experience and efforts to operate and manage the Hotel pursuant to this Agreement in a businesslike manner in accordance with the Operating Standards. Manager shall make available to Owner the full benefit of the judgment, experience and advice of the members of Manager's organization and staff with respect to the policies pursued by Owner in operating, maintaining, and servicing the Hotel.

**ARTICLE 3**
**TERM**

3.1     **Term**. The initial Term automatically shall be extended beyond the initial Term for additional terms of one (1) year each, unless Owner provides written notice to Manager not less than one hundred twenty (120) days prior to the end of the initial Term or the then-current extended Term, as applicable, of Owner's intent not to extend the Term of the Agreement. Notwithstanding the foregoing, the Agreement may be terminated prior to the scheduled expiration of the Term or any extension thereof, (i) without cause by Owner during the first six (6) months following the Commencement Date, provided that Owner provides Manager with not less than thirty (30) days written notice of termination prior to the effective date of such termination, or (provided that in the event that the Workers' Adjustment and Retraining Act, 29

USC, Sec 2101, et seq. (the WARN Act") is applicable to such termination and the replacement manager identified by Owner fails or refuses to retain a sufficient number of employees at the Property so as not to cause a "mass layoff" or "plant closing" under the WARN Act, Owner will extend the effective date of termination to allow the required notices to be provided under the WARN Act, (ii) upon the sale of the Hotel to a bona fide Third Party Purchaser, as provided in Article 18 hereof, provided that Owner provides Manager with not less than sixty (60) days written notice of such termination; and (ii) as otherwise provided in Articles 15, 16, 17 and 18.

3.2     **Surrender.** On the expiration or sooner termination of the Term, Manager shall quit and surrender the Premises to Owner in the condition required pursuant to this Agreement and take such other actions as contemplated by Article 20 hereof.

**ARTICLE 4**
**USE AND OPERATION OF THE HOTEL**

4.1     **Operation**. Manager shall be the sole and exclusive manager of the Hotel during the Term and shall operate the Hotel in accordance with the Operating Standards and the provisions of this Agreement. Manager shall act in a fiduciary capacity with respect to the proper protection of and accounting for Owner's assets. In this capacity, Manager shall deal at arm's length with Owner and all third parties, and Manager shall manage the Hotel in a manner which shall serve the Owner's interests at all times.

4.2     **Employment**.

(a)     Subject to the terms of this Agreement, Manager shall select, employ, promote, transfer, compensate, terminate where appropriate, supervise, direct, train, and assign the duties of the Executive Personnel and, through the Executive Personnel, a sufficient number of personnel whom Manager reasonably determines to be necessary or appropriate for the proper, adequate and safe operation and management of the Hotel (collectively, the "**Hotel Employees**"). In connection therewith, Manager agrees to cause an employee or employees located in the corporate office of Manager, at no additional cost to Owner, to handle revenue management and sales management for this Property, together with other properties managed by Manager for Owner and its Affiliates. All such employees of the Hotel shall be employees of Manager or Manager's Affiliate. In addition, Manager may, from time to time, assign one or more of its employees to the staff of the Hotel on a full-time, part-time or temporary basis. Notwithstanding the provisions of this Section 4.2 or any other provision of this Agreement, all costs, expenses and liabilities relating to Hotel Employees shall be expenses of operating the Hotel and the responsibility of Manager for acts or omissions of Hotel Employees (or, for Hotel Employees who allocate their time between multiple hotels, an appropriate allocation of the costs for such Hotel Employees) shall not extend beyond responsibility for the gross negligence or willful misconduct of, or the willful violation of Legal Requirements by the Executive Personnel. Manager acknowledges that such Executive Personnel have the duties specified in the first sentence of this Section 4.2 with respect to other Hotel Employees. Manager will negotiate with any union lawfully entitled to represent such employees and may execute collective bargaining agreements or labor contracts resulting therefrom that have been approved by Owner. Manager shall fully comply with all Legal Requirements having to do with worker's compensation, social security, unemployment insurance, hours of labor, wages, working conditions, and other

employer-employee related subjects. With respect to matters of employment, this Agreement is not one of agency by the Manager for Owner but one with the Manager engaged independently in the business of managing properties on its own behalf as an independent contractor (as defined in §856(d)(3) of the Internal Revenue Code with regards to Owner and any Affiliates thereof)**.** The cost of all employment arrangements shall be charged as Gross Operating Expenses of the Hotel and shall be accrued in accordance with generally accepted accounting principles; provided, however, relocation expenses which exceed the budgeted relocation expenses provided in the Annual Plan, shall not be charged as a Gross Operating Expense without the prior approval of Owner, such approval not to be unreasonably withheld, conditioned or delayed. The costs provided for in the immediately preceding sentence shall include, by way of example and not limitation, all reasonable costs and expenses (including, without limitation, all employment related expenses incurred by Manager with respect to the Hotel Employees), such as severance pay, unemployment compensation and health insurance and related costs (i.e., in order to comply with COBRA-type regulations) as a result of the termination of employees and which shall have been paid or accrued in accordance with generally accepted accounting principles. Manager shall use commercially reasonable efforts and exercise reasonable care to select qualified, competent, and trustworthy employees. The Hotel's general cashier and all employees having check signing authority shall be adequately bonded to the satisfaction of Owner and the cost of such bonds shall be an expense of the Hotel. To the extent possible and reasonably available, Manager shall use local labor to fill non-Executive Personnel positions in the operation of the Hotel. Owner may at any time consult or communicate with Manager regarding any of the Hotel Employees, but will not interfere in the day-to-day activities of Hotel Employees. The Manager shall not discriminate against any employee or applicant for employment because of race, color, religion, national origin, ancestry, age, sex or sexual orientation, and all employment advertising shall indicate that Manager and Owner are each an Equal Opportunity Employer as that term is defined under Legal Requirements.

Notwithstanding anything to the contrary contained in this Agreement, the following subparagraphs (b) and (c) shall apply to any liability that may, from time to time, arise out of the Employee Retirement Income Security Act of 1974 ("**ERISA**") and the Multi-employer Pension Plan Amendments Acts of 1980 ("**MEPPA**"), respectively, as from time to time amended.

(b)     Employee Benefits: Any Hotel Employees who are not then represented by a collective bargaining representative shall be entitled to participate in the incentive programs, profit sharing and/or other employee retirement, disability, health, welfare or other benefit plan or plans then made available by Manager to similarly situated employees of other hotels managed by Manager, in accordance with their respective terms. Manager will have the right to charge the Hotel with its allocable share of the cost of any such plan or plans and any contributions to be made thereunder provided that such charges and contributions shall be determined by Manager in good faith on a uniform basis with respect to charges and contributions imposed for the same or similar plans at other hotels then managed by Manager, subject to Legal Requirements. Manager's rights under this Subsection (b) shall be subject to the condition that Manager shall not put into effect any amendment to any existing plan, or adopt any additional plan, which is not imposed upon all other similarly situated hotels managed by Manager.

**Management Agreement – Page 12**

Upon the expiration or termination of this Agreement, the sale of the Hotel or other similar event, Manager shall cooperate with the Owner with respect to disposition of such plan or plans (or plan assets) in a mutually satisfactory manner, all in compliance with then applicable Legal Requirements.

(c)     Collective Bargaining or Other Multi-employer Plans: Manager and Owner agree that with respect to any withdrawal liability arising under any collective bargaining agreement or other "multi-employer plan" (as defined in Section 3(37) of ERISA) in which the Hotel Employees become participants, the obligations of the parties shall be determined as follows:

(1)     Withdrawal liability arising with respect to Hotel Employees shall be the responsibility of Owner, and Owner shall either pay the amount of such withdrawal liability directly to such plan or reimburse Manager for withdrawal liability payments made to such plan by Manager with respect to Hotel Employees (including withdrawal liability arising after the sale or other termination of this Agreement, provided that such liability arises as a result of such sale, disposition, termination or other similar event). To the extent permitted under then applicable laws, regulations and agreements, Manager shall cooperate with Owner in structuring transactions and transferring actual or contingent withdrawal liability to a successor in ownership or purchaser of the Hotel in accordance with "relief" provisions of ERISA, such as ERISA Section 4204 or then applicable statutory or regulatory provisions of a similar nature.

(2)     For purpose of this subparagraph (c), the term "withdrawal liability" shall mean the actual amount assessed by and payable to a multi-employer pension fund upon a complete or partial withdrawal of the Hotel or Hotel Employees from such fund. Manager shall cooperate with Owner in challenging a plan's assessment of such liability, provided that all costs of litigation, arbitration or other procedures shall be paid by Owner (including any bonds that must be posted). If Manager or its Affiliates have employees at other locations who participate in the same multi-employer plan as Hotel Employees, Owner shall be charged with and be responsible only for multi-employer plan withdrawal liability arising solely with respect to the participation of Hotel Employees in such plan.

4.3     **Legal Proceedings**. Legal Proceedings of a "non-extraordinary nature" (hereafter defined), may be instituted by Manager, in accordance with guidelines and policies determined from time to time by Manager and Owner, in the name of Manager or the Hotel or Owner and by counsel designated by Manager pursuant to such guidelines and policies. Legal Proceedings of an "extraordinary nature" (hereafter defined) shall require Owner's prior approval of the proceedings and counsel approved by Owner. Manager shall furnish Owner with quarterly status reports with respect to all Legal Proceedings of an extraordinary nature. In addition, Manager shall have the right to defend, through counsel designated by Manager, Legal Proceedings of a non-extraordinary nature against Owner or Manager resulting from the operation of the Hotel. The defense of Legal Proceedings against the Hotel of an extraordinary nature (including, without limitation, any aspect of any claims against Manager or Owner arising out of the operation of the Hotel as to which the insurance company denies coverage) shall be coordinated with Owner, designated counsel shall be subject to Owner's reasonable approval and Manager shall furnish Owner with quarterly status reports with respect to such actions. All claims against Owner and/or Manager arising out of the management or operation of the Hotel which (i) are not covered by insurance shall be promptly communicated to Owner and (ii) are covered in whole or

in part by insurance shall be promptly forwarded by Manager to the appropriate insurer (with a copy thereof to Owner in the case of claims against Owner). Legal Proceedings of a "non-extraordinary nature" shall be proceedings in which the monetary exposure is less than $50,000 that are (i) initiated by Manager or Owner relating to the operation of the Hotel for matters such as collections, maintenance of licenses and permits, enforcement of contracts and proceedings against Hotel tenants; and/or (ii) defense of actions against the Owner or Manager resulting from the operation of the Hotel, for matters such as guest claims for loss of property or injury to persons and claims relating to employment or the application for employment at the Hotel. Legal Proceedings of an "extraordinary nature" shall mean all other Legal Proceedings.

4.4    **Annual Plan**. On or before the date that is forty-five (45) days following the Commencement Date, Manager shall submit to Owner an Annual Plan ("**Annual Plan**") for the remaining portion of the Fiscal Year in which the Commencement Date occurs and Owner either shall accept the initial Annual Plan submitted to Owner as provided above or shall submit to Manager a detailed list of Owner's objections or questions to the Annual Plan. Owner and Manager shall meet and discuss Owner's Annual Plan objections and shall coordinate expeditiously and in good faith to agree upon an Annual Plan for the remaining portion of the Fiscal Year in which the Commencement Date occurs. On or before November 15th of each year following the Commencement Date, Manager shall submit to Owner an Annual Plan for the next Fiscal Year and on or before December 15th of each year following the Commencement Date, Owner either shall accept the Annual Plan submitted to Owner as provided above or shall submit to Manager a detailed list of Owner's objections or questions to the Annual Plan ("**Owner's Annual Plan Objections**"). Within fifteen (15) days after Manager's receipt of Owner's Annual Plan Objections, Owner and Manager shall meet and discuss Owner's Annual Plan Objections with the goal of agreeing upon an Annual Plan for the subject Fiscal Year. Owner, as part of Owner's Annual Plan Objections, shall have the right to object to the entire Annual Plan or to any specific item or items contained in the Annual Plan. In the event Owner objects to the Annual Plan or any specific item or items of expense in the Annual Plan and Owner and Manager are unable to reach agreement thereon as provided above prior to commencement of the Fiscal Year in question, pending such agreement, the Annual Plan or the specific item or items of expense (not revenue) in question shall be suspended and replaced for such period that the Annual Plan or such item(s) are in question by an amount equal to the lesser of (i) that proposed by Manager for such Fiscal Year, or (ii) if an objection to the entire Annual Plan, the Actual Gross Operating Expenses for the immediately preceding Fiscal Year subject to an adjustment equal to the percentage increase in the CPI over the last twelve (12) month period immediately preceding the start of the Fiscal Year in question, or (iii) if an objection to a specific item or items of expense in the Annual Plan, such item or items of expense for the immediately preceding Fiscal Year subject to an adjustment for each item equal to the percentage increase in the CPI over the twelve (12) month period immediately preceding the start of the Fiscal Year in question.

(a)    The Annual Operating Budget shall be prepared in accordance with the Uniform System of Accounts. The proposed Annual Operating Budget shall incorporate Manager's good faith reasonable estimates of the items of revenue and expense contained therein and shall contain the proposed budget for operations for the succeeding Fiscal Year. When approved by Owner, the proposed Annual Operating Budget shall be the approved Annual Operating Budget.

Any revisions, substitutions or additions to the Annual Operating Budget must be approved by the Owner in writing.

As part of the budgeting process, Manager shall provide to Owner, with each proposed Annual Operating Budget, a complete list of all service and other contracts anticipated for the Fiscal Year which is the subject of the Annual Operating Budget having a liability to the Hotel in excess of $25,000 for such Fiscal Year for or covering the Hotel and the payments or expenditures connected or anticipated therewith. So long as any service or other contracts fall within the following guidelines, Owner's approval thereof shall not be required, but Manager shall nevertheless promptly report to Owner the execution of (and provide Owner with a true and complete copy of) each such contract having a liability to the Hotel of in excess of $25,000:

(i)      The term of such contract shall be no longer than one (1) year; and

(ii)      Each contract must be terminable by Owner or Manager without payment or penalty upon not more than thirty (30) days' notice.

In addition, Manager shall provide to Owner for Owner's review, a written schedule for the Hotel listing all executive and management employees to be employed "on-site" in the direct management of the Hotel including, but not limited to the positions of General Manager, Director of Sales, Chief Engineer and the portfolio sales and revenue manager. These schedules shall include such employee's title or job description and the salary range including additional compensation or prerequisites such as lodging, meals, maintenance, moving expenses, bonus/incentive compensation and the like. In the event that any employee's services are shared with (or subsidized through a sharing arrangement with) another hotel, the employee shall be identified together with a description of his/her responsibilities and the amount and source of any subsidy, together with a breakdown of the relative time expended with respect to the Hotel and each other hotel. If Owner notifies Manager that Owner does not believe that some or all of the scheduled wages and salaries are reasonable and customary as required above, then Manager shall promptly provide to Owner a wage and salary survey that supports the scheduled wages and salaries. No proposed amendment including changes in salary or other compensation shall be effective unless the salary or other compensation as changed is reasonable and customary as required above.

(b)      The Capital Budget shall be prepared in accordance with the Uniform System of Accounts. The Capital Budget shall contain the proposed budget for expenditures from the Reserve and the budget for expenditures for Capital Improvements and FF&E for the succeeding Fiscal Year for (i) additions to and substitutions, replacements and renewals of FF&E and (ii) certain non-routine repairs and maintenance to the Project which are normally capitalized under generally accepted accounting principles such as exterior and interior repainting, resurfacing building walls, floors, roof and parking areas, replacing folding walls and similar items. Manager shall submit good faith reasonable estimates for Capital Improvements and for FF&E for the Fiscal Year following the Fiscal Year otherwise covered by the Annual Operating Budget. When approved by Owner, the Capital Budget, or such items as may be specifically approved by Owner, shall be collectively referred to in this Agreement as the "Approved Capital Budget". Approval of the Capital Budget constitutes an authorization for Manager to expend money for Capital Improvements and for FF&E as provided in the Approved Capital Budget, unless the

**Management Agreement – Page 15**

Owner's approval thereof specifically requires Manager to obtain additional approvals prior to commencing such work. Any revisions, substitutions or additions to the Approved Capital Budget must be approved by Owner in writing.

Competitive bid rules outlined in Section 4.5 will be observed at all times by Manager for any purchases of Capital Improvements and/or FF&E.

(c)     On or before the date that is thirty (30) days following the Commencement Date, Manager shall submit to Owner the Marketing Plan, which Marketing Plan shall contain advertising, sales and promotional plans prepared by Manager to be used in connection with the marketing of the Hotel and the portfolio of hotels owned by Owner and managed by Manager. On or before November 15th of each year following the Commencement Date, Manager shall submit to Owner an Annual Plan for the next Fiscal Year.  When approved by Owner, the proposed Marketing Plan shall be the approved Marketing Plan. Any revision, substitution or additions to the Marketing Plan must be approved by Owner in writing. The Marketing Plan shall be written with the goal of achieving Gross Revenues as submitted in the Annual Operating Budget for the Fiscal Year or, if less than a full Fiscal Year, the period between the Commencement Date and the December 31 next following the Commencement Date. Manager shall not use Owner's name in any advertising or promotional material without Owner's expressed prior written approval.

(d)     The Management Plan shall contain (i) estimated contributions and distributions from or to Owner; (ii) a leasing plan for the leasing of concessions and other space in the Hotel; (iii) plans and budgets for the disposition and replacement of FF&E; and (iv) such management issues, proposals and projections or modifications as Manager may recommend for the efficient management of the Hotel including but not limited to proposals and assessments as to the Hotel's position in the market, market opportunities, franchise affiliation and disposition strategies. When approved by Owner, the proposed Management Plan shall be the approved Management Plan.

4.5     **Competitive Bidding**. All contracts for repairs, Capital Improvements, FF&E, food and services exceeding $10,000 shall be awarded on the basis of competitive bidding (provided, however, that Manager will not be required to obtain competitive bids for any service for which a single provider exists), solicited in the following manner:

(a)     A minimum of two (2) written bids shall be obtained for each purchase or contract that exceeds $10,000, up to $25,000. Purchases over $25,000 will require a minimum of three (3) bids.

(b)     Each bid will be solicited in a uniform format.

(c)     Subject to approval by Owner, Manager may accept a low bid if the expenditure is for an approved item in the budget and will not result in an excess of the annual budgeted Account Category of the applicable Capital Budget or Annual Operating Budget.

(d)     If Manager desires to accept a bid other than the lowest bid, then Manager shall so advise Owner in writing and recommend that such bid be accepted, with support for such recommendation.

<u>**Management Agreement – Page 16**</u>

(e)     Owner shall have the right to accept or reject any and all bids for repairs, Capital Improvements, FF&E or foods and services that are not the lowest bid; such acceptance shall not be unreasonably withheld or delayed.

(f)     Manager may request Owner to waive in writing competitive bidding rules for a specific item or service.

In its operation of the Hotel under this Agreement, Manager may purchase goods, supplies and services from itself, Owner or Owner's representatives, or any Affiliates of any of the foregoing so long as the prices and terms thereof are at arm's length and otherwise competitive with, and are not less favorable than prices and terms which could be obtained from independent parties and, if required by Section 4.5, are in compliance with competitive bidding rules, provided that Manager will obtain Owner's consent (not to be unreasonably withheld) regarding any such arrangement.

4.6     **Labor Relations**. Manager shall have no right to enter into any collective bargaining agreement concerning any employees of the Hotel without the prior written approval of Owner, which may be granted or withheld in its sole discretion. Upon Owner's approval of any such agreement, Manager shall be responsible to perform such agreements. To the extent applicable, Manager: (a) represents that it is an equal opportunity employer as described in Section 202 of Executive Order 11246 dated September 24, 1965, as amended, and as such agrees to comply with the provisions of Paragraphs 1 through 7 of Section 202 of said Executive Order during the performance of this Agreement, (b) agrees to comply with the affirmative action requirements of Part 60.741 of Title 41, Code of Federal Regulations, with respect to handicapped workers during the performance of this Agreement, (c) agrees to comply with the affirmative action requirements of Part 60.250 of Title 41, Code of Federal Regulations, with respect to Disabled Veterans and Veterans of the Vietnam Era during the performance of this Agreement, and (d) shall submit to Owner in the form approved by the Director of the Office of Federal Contract Compliance, U.S. Department of Labor, a certification that Manager does not and will not maintain any facilities that provide for their employees in a segregated manner, or permit their employees to perform their services at any location under its control, where segregated facilities are maintained, and that Manager will obtain a similar certification from its contractors.

4.7     **Liquor License**. INTENTIONALLY OMITTED.

4.8     **Employee Discount**. To the extent Manager, Owner or any of their respective Affiliates owns or has any equity interest in other hotels and provides a discounted rate to the employees at such other hotels, such party agrees to provide the same discounted rate (subject to availability and black-out periods) to the employees of the other parties named in this Section 4.8 to the extent allowed under the management and ownership agreements affecting such other hotels.

4.9     **Forms**. Manager shall prepare or cause to be prepared for execution by Owner all forms, reports and returns, if any, required to be filed by Owner under applicable law with respect to the operation of the Hotel; however, Manager shall not be obligated to prepare any of Owner's income tax returns. Without limitation, Manager shall timely prepare and deliver, as

required by law, an Internal Revenue Service Tax Form 1099 with respect to payments made during a calendar year to third party contractors and professionals.

4.10 **Notice of Violations**. Manager shall promptly notify Owner in writing of any written notice received from any regulatory or governmental body regarding an actual or perceived violation of any Legal Requirements.

## ARTICLE 5
## RELATIONSHIP OF PARTIES

Except as provided in Section 4.2(a), Owner and Manager acknowledge and agree that this Agreement creates an agency relationship; provided, however, that (a) each Hotel Employee shall be the employee of Manager or Manager's Affiliate and not of Owner, (b) Manager's authority is subject to the terms and conditions of this Agreement, and (c) nothing in this Agreement shall constitute, or be construed to be, or create, a partnership, joint venture or lease or employment arrangement between Owner and Manager with respect to the Hotel or the operation thereof. Employees or agents of Manager are not by this Agreement or by any actions of Owner and/or Manager hereunder made employees of Owner, and are not entitled to the benefits provided by Owner or its Affiliates to its employees, including but not limited to, group insurance, leave and pension plan. This Agreement shall not be deemed at any time to be an interest in real estate or a lien or security interest of any nature against the Hotel, the Premises or any other land used in connection with the Hotel, or any equipment, fixtures, inventory, motor vehicles, contracts, documents, accounts, notes, drafts, acceptances, instruments, chattel paper, general intangibles, or other personal property now existing or that may hereafter be acquired or entered into with respect to the Hotel or the operation thereof.

## ARTICLE 6
## ADVERTISING

Subject to and in strict compliance with the provisions of the License Agreement, Manager shall arrange and contract for all advertising, which Manager may reasonably deem necessary, in accordance with Section 4.4, for the operation of the Hotel. So long as the License Agreement may be in effect, Manager generally shall advertise the Hotel under the name "– Petrol Inn & Suites" or such other name as Owner may designate or approve.

## ARTICLE 7
## RESERVE FOR FF&E

7.1 **Reserve for Replacement of FF&E**. The Reserve shall be funded pursuant to Section 7.2, and Manager shall use amounts in the Reserve to cover the cost of FF&E expenditures and Capital Improvements, as described in Section 4.4 in conjunction with the Approved Capital Budget. All FF&E, Capital Improvements and the Reserve shall be the property of Owner.

7.2 **Transfers to Reserve for FF&E**. Commencing on the Commencement Date and continuing thereafter during the remainder of the Term, Manager shall deposit monthly into the Reserve for FF&E an amount equal to the amounts required by Lender and/or by Licensor;

provided that in no event will the amounts to be deposited monthly into the Reserve be less than an amount equal to four percent (4%) of Gross Revenues throughout the remainder of the Term.

7.3     **Annual Adjustment**. At the end of each Fiscal Year and following receipt by Manager of the annual accounting referred to in Article 10, an adjustment will be made to such annual account, if necessary and if available, so that the appropriate amount shall have been deposited in the Reserve.

7.4     **Maintenance of Reserve**. Checks or other documents of withdrawal shall be signed by representatives of Manager who shall be bonded or otherwise insured pursuant to the "crime – Theft of Money and Securities" coverage set forth on Exhibit D to this Agreement. The proceeds from the sale of FF&E no longer needed for the operation of the Hotel shall be deposited in the Reserve, but not be credited against the obligation to deposit cash in such fund for the then current Fiscal Year. All interest earned or accrued on amounts invested from the Reserve shall be added to the Reserve (but shall not be credited against Owner's obligations to fund the Reserve), and shall not constitute Gross Revenues or be included therein.

7.5     **Accumulation of Reserve and Additional Cost of FF&E and Capital Improvements**. Owner and Manager acknowledge and agree that portions of the Reserve may, from time to time in accordance with the then-current Annual Plan, be used for more significant expenditures than could be reserved for in a single year.  Accordingly, at the end of each Fiscal Year, any amounts remaining in the Reserve shall be carried forward to the next Fiscal Year, and shall be in addition to the amount to be reserved in the next Fiscal Year. In the event at any time there are insufficient funds in the Reserve for any Fiscal Year to pay the cost of FF&E in accordance with the Annual Operating Budget and the Approved Capital Budget, then Owner will, at Owner's option, within sixty (60) days after request therefor by Manager, either provide the additional cash to the Manager to pay for such excess or authorize the funding of such cash from Net Operating Income.

7.6     **Final Remittance**. Upon expiration or termination of this Agreement, Manager shall remit all remaining amounts in the Reserve forthwith to Owner.

## ARTICLE 8
## REPAIRS AND MAINTENANCE AND CAPITAL IMPROVEMENTS

8.1     **Repairs and Maintenance**. Manager shall, from time to time, make such expenditures from Gross Revenues for repairs and maintenance including service contracts ("**Repairs and Maintenance**") as required by the Lender, the License Agreement, the Legal Requirements, the then current Annual Plan or as necessary to maintain the Hotel in good operating condition in compliance with the License Agreement and otherwise in the condition required by this Agreement, including but not limited to repairs and maintenance of HVAC, mechanical and electrical systems, exterior and interior repainting, resurfacing building walls and parking areas, waterproofing of exterior surfaces of floors, roofs, and replacement of plate glass, or the like. It is Owner's intent that the sums allocated for Repairs and Maintenance in accordance with the then current Annual Plan are to be fully expended during that Fiscal Year exclusively for the purposes identified in such Annual Plan. Except in the event of an emergency due to casualty, act of God or otherwise under circumstances in which it would be unreasonable

**Management Agreement – Page 19**

to seek to obtain prior approval (and provided that Manager shall notify Owner of any such expenditure within a reasonable time given the nature and scope of the emergency), all expenditures for the foregoing shall be as provided in the Annual Operating Budget and the Approved Capital Budget. If any such Repairs or Maintenance shall be made necessary by any condition against the occurrence of which Owner has received the guaranty or warranty of the builder or the Hotel or of any supplier of labor or materials for the Hotel or of any supplier of labor or materials for the construction of the Hotel, then Manager may invoke said guarantees or warranties in Owner's or Manager's name and Owner shall cooperate in all reasonable respects with Manager in the enforcement thereof.

8.2    **Capital Improvements**. Owner may, from time to time, at its sole expense, make such structural repairs, replacements, substitutions, alterations, additions or improvements (exclusive of FF&E) ("**Capital Improvements**") in or to the Hotel as Owner shall determine are necessary to comply with the Operating Standards. If Capital Improvements included in the definition of Building and Appurtenances shall be required at any time during the Term by the terms of any Mortgage, the License Agreement, to maintain the Hotel in good operating condition or by reason of any Legal Requirements, or because Manager and Owner jointly agree upon the desirability thereof, then in such event all such Capital Improvements shall be made with as little hindrance to the operation of the Hotel as reasonably possible. Notwithstanding the foregoing, as long as the Hotel can continue to operate without interruption, Owner shall have the right to contest the need for any such Capital Improvements required by any Legal Requirements and may postpone compliance therewith, if so permitted by law and if such postponement will not expose Manager to any civil or criminal liability. All recommendations by Manager of Capital Improvements shall be submitted in conjunction with the Capital Budget for the Fiscal Year described in Section 4.4(b). In the event that Owner elects to perform Major Renovations to the Hotel, Owner shall have the right to cause (i) Manager, or (ii) a third party, to oversee the performance of the Major Renovations for which oversight, if Manager is overseeing the Major Renovations, Manager shall be paid a project management fee (in addition to the Management Fee) equal to three percent (3%) of the budgeted hard cost items including contingency and any Owner-approved changes of the Major Renovations (the "**Project Fee**"). With respect to (i) Major Renovations as contemplated by this Agreement which Owner elects to have Manager oversee and (ii) improvements that are not Major Renovations, Manager shall oversee such projects in a reasonably prudent manner.

8.3    **Service Contracts**. Manager, without requiring the consent of Owner, shall enter into any contract for cleaning, maintaining, repairing or servicing the Hotel or any of the constituent parts of the Hotel as Manager deems necessary for the operation of the Hotel, except as specifically provided in Section 4.4 or 4.5. Manager shall submit the listing of service contracts entered into for the Hotel required pursuant to Section 4.4(a). Unless otherwise approved by Owner, all service contracts shall: (a) be in the name of Owner or Owner's nominee, (b) to the extent customary, include a provision for cancellation thereof by Owner or Manager upon not more than thirty (30) days written notice, and (c) shall require that all contractors provide evidence of such insurance as is customarily carried by other contractors involved in similar servicing arrangements.

8.4    **Liens**. Owner and Manager shall cooperate and use all commercially reasonable efforts to prevent any liens from being filed against the Hotel that arise from any maintenance,

changes, repairs, alterations, improvements, renewals or replacements in or to the Hotel. If any such liens are filed, Manager shall, subject to the availability of funds therefor in the Operating Accounts or as otherwise supplied by Owner, obtain the release thereof prior to the institution of legal proceedings in connection therewith. The cost of obtaining such release shall be included in Gross Operating Expenses, unless the imposition of the lien results from a default by Owner or Manager, in which event the cost of obtaining such release shall be borne by such defaulting party.

      8.5    **Notice of Unavoidable Interruptions**. In the event of any occurrence constituting an Unavoidable Interruption, Manager shall promptly notify Owner of such occurrence and shall keep Owner informed as to the extent and impact thereof on the Hotel.

## ARTICLE 9
## WORKING CAPITAL AND BANK ACCOUNTS; DISTRIBUTION OF NET OPERATING INCOME

      9.1    **Working Capital**. Owner shall provide initial Working Capital in the amount of $_____ in addition to the value of all Inventories. Owner shall at all times cause sufficient funds to be on hand in the Operating Accounts to assure the timely payment of all current liabilities of the Project, including but not limited to Gross Operating Expenses, all other costs and expenses incurred in connection with the Project pursuant to this Agreement and the performance by Manager of its obligations under this Agreement, all fees, charges and reimbursements payable to Manager hereunder and all amounts required hereunder to be transferred into the Reserve. In no event shall Owner permit the balance in the Operating Accounts to be less than an amount equal to the estimated monthly operating expenses of the Project as reflected in the then current Annual Operating Budget. From time to time, upon five (5) days prior written notice from Manager that such funds are required, Owner shall furnish to Manager funds that Manager deems reasonably necessary to assure that the Project shall have adequate working capital as herein provided. In the event Owner fails to supply required working capital in accordance with the provisions of this Section or if Manager otherwise deems such action to be necessary, Manager may use all or part of the funds in the Reserve to supplement the Operating Accounts in order to defray or pay the Project's operating costs and expenses, to the extent permitted by the Mortgage. Owner shall promptly reimburse the Reserve for all sums so used or transferred. All unexpended Working Capital, Inventories and Operating Equipment and Supplies purchased with Working Capital shall remain the property of Owner.

      9.2    **Operating Account**. All funds (exclusive of funds deposited in the Reserve and house banks at the Hotel) received by Manager in the operation of or otherwise relating to the Hotel, and funds for Working Capital provided by Owner or retained by Manager from Gross Revenues, shall be deposited in the Operating Account. Manager shall inform such bank in writing that the funds deposited in the Operating Account are owned solely by the Owner. Manager shall not deposit funds attributable to any other property into the Operating Account. To the extent permitted by the Mortgage, amounts in the Operating Account may be temporarily withdrawn and invested by Manager in any Permitted Investments, having due regard for the timing of cash needs, but in no event shall such funds be co-mingled by Manager with any other funds. From the Operating Account, Manager shall pay all Gross Operating Expenses (other than the excess FF&E if funded by or through Owner) before any penalty or interest accrues thereon,

**Management Agreement – Page 21**

however, taking into account sound cash management. All interest earned or accrued on amounts invested from the Operating Account shall be added to the Operating Account. All checks or other documents of withdrawal from the Operating Account shall be signed by representatives of Manager except as provided in Section 9.3 hereof.

9.3    **Maintenance of Operating Account**. Subject to Section 9.4, the Operating Account shall be opened and maintained at all times by Manager and Owner and checks and other documents of withdrawal shall be signed by representatives of Manager who are covered by the required fidelity bond or otherwise insured pursuant to the "Crime – Theft of Money and Securities" coverage set forth on Exhibit D. The Operating Account and any other bank accounts approved by Owner shall be in Owner's name (for example, "*[Owner's name]* d/b/a/ *[Hotel name]*").

Manager shall not change the bank or open or close any bank account described in this Article 9 without Owner's prior written approval. Owner, in its sole and absolute discretion, may in writing direct Manager to change any such bank, signatories or arrangements. The bank in which the Operating Account is located shall be informed by Manager in writing that the funds in such account are held in trust for Owner and that any checks for more than $10,000.00 shall be required to be signed by two (2) authorized signatories on the account.

9.4    **Final Remittance**. Upon the expiration or termination of this Agreement, after payment of all Gross Operating Expenses for which bills were received to such date, Manager's Management Fee, Reimbursable Expenses, any Termination Fee and any other amounts then due and payable to Manager, all remaining amounts in (i) the Reserve, (ii) the Operating Account and (iii) the Permitted Investments, shall be transferred forthwith to Owner by Manager. Owner shall pay Manager any remaining Management Fee, any Termination Fee, Reimbursable Expenses and any other amounts then due and payable and Owner shall pay, or cause to be paid, and shall hold Manager harmless from and against all Gross Operating Expenses accrued in accordance with generally accepted accounting principles and invoices related to Gross Operating Expenses received after Manager has so transferred all funds.

9.5    **Distribution of Excess Cash**. Together with the financial report provided for in Section 10.2(b), Manager shall distribute to Owner all sums in the Operating Accounts in excess of the then working capital requirements of the Hotel determined in accordance with Section 9.1 of this Agreement.

## ARTICLE 10
## BOOKS, RECORDS AND STATEMENTS

10.1    **Books and Records**. Manager shall keep full and adequate books of account and other records reflecting the results of operation of the Hotel in accordance with the Uniform System of Accounts and generally accepted accounting principles. The books of account and all other records relating to or reflecting the operation of the Hotel shall be kept either at the Hotel or at Manager's corporate offices and shall be available to Owner and its representatives and its auditors or accountants, at all reasonable times for examination, audit, inspection and transcription at Owner's sole cost and expense. All of such books and records pertaining to the Hotel including, without limitation, books of account, guest records and front office records at all

times shall be the property of Owner and shall not be removed from the Hotel's or Manager's offices by Manager without Owner's approval and consent. Upon any termination of this Agreement, all of such books and records forthwith shall be turned over to Owner at a location designated by Owner so as to insure the orderly continuance of the operation of the Hotel, but such books and records shall thereafter be available to Manager at all reasonable times for inspection, audit, examination and transcription for a period of two (2) years.

10.2    **Financial Reports**.

(a)    Manager shall deliver to Owner within twenty (20) days following the close of each Accounting Period a monthly profit and loss statement reflecting a comparison of periodic and year-to-date actual revenues and expenses with the Annual Operating Budget as well as a periodic and year-to-date comparison of such actual revenues and expenses with those of the prior Fiscal Year.

(b)    Further, Manager shall provide to Owner within twenty (20) days following the close of each Accounting Period a report prepared in accordance with the example set forth in Exhibit C attached hereto and made a part hereof, which include without limitation, forward bookings, accounts receivable, accounts payable and a monthly sales overview report.

(c)    Further, within seventy-five (75) days after the end of each Fiscal Year, Manager shall deliver to Owner an annual accounting, showing the results of operation of the Hotel during the Fiscal Year and a computation of Gross Revenues, Gross Operating Expenses, and Net Operating Income, if any, and any other information necessary to make the computations required hereby or which may be requested by Owner, all for such Fiscal Year. The annual accounting for any Fiscal Year shall be controlling over the interim accountings for such Fiscal Year. Owner shall have the right to conduct an audit of the books.

(d)    Further, Manager shall prepare and deliver any additional reports or information as Owner is required to provide under the License Agreement.

10.3    **Audits by Owner**. Owner shall have the right to audit, conducted either by Owner's internal personnel or by a third party auditor retained by Owner at its expense, all items of expense and revenue under this Agreement including, but not limited to, Gross Revenues, Gross Operating Expenses, depreciation, the Management Fee and Reserve. Manager shall cooperate and assist with such audit. In the event that an audit reflects an underpayment to Owner or Manager or an overpayment to Manager or Owner, Manager shall correct same by a corrective payment to Owner or Manager, as appropriate, within ten (10) days following notice of the audit results to Manager, subject to Owner's and Manager's right to challenge the audit results in accordance with the provisions of Article 30 of this Agreement. If an audit determines any weaknesses or need for reasonable changes in the internal control systems pertaining to the safeguarding of Owner's assets, Manager will promptly make all necessary changes.

10.4    **Segregation of Accounts**. In any instance where Manager manages several properties for Owner, Manager shall segregate the income and expenses of each property so that Gross Revenues from each property will be applied only to the bills and charges from that property.

**Management Agreement – Page 23**

## ARTICLE 11
### MANAGER'S MANAGEMENT FEES; TIMING OF
### PAYMENT TO MANAGER

11.1  **Fees.** For each Fiscal Year or portion thereof, Manager shall receive, by a distribution made by Manager out of Gross Revenues at the end of each Accounting Period in respect of its management services hereunder, a fee (collectively, the "**Management Fee**") calculated as follows:

(a)  a base fee (the "**Base Fee**") in an amount equal to ███████████████ of Gross Revenues in respect of any applicable period; plus

(b)  an accounting fee (the "**Accounting Fee**") for accounting services provided by Manager's corporate employees on a "centralized" basis in the amount of ████████

███████████████████████████████████████████████████████████████ plus

(c)  a revenue management fee (the "**Revenue Management Fee**") for an allocation of Manager's revenue management services to be provided by Manager's corporate employees on a "centralized" basis in the amount of ████████████████████████████████████

████████████████████████████████████████████████████████████████

The Management Fee generally shall be computed separately for each Fiscal Year and shall not be accumulated from Fiscal Year to Fiscal Year. Owner shall reimburse Manager for all Reimbursable Expenses incurred by it in connection with the performance of this Agreement. Any such amount shall be payable within thirty (30) days of billing, and upon request of Owner, Manager shall provide a statement showing in reasonable detail the nature and amount of such expenses, together with supporting documentation reasonably requested by Owner.

11.2  **Treatment of Proceeds of Business Interruption Insurance and Condemnation Awards**. In the event of a casualty or condemnation for temporary use resulting in the payment of business interruption insurance (with respect to such casualty) or a condemnation award (with respect to such condemnation for temporary use), the amount of such proceeds shall be considered a part of Gross Revenues for the purpose of computing Manager's Management Fee.

## ARTICLE 12
### INSURANCE

12.1  **Insurance**. Throughout the Term, Manager (unless Owner shall by notice in writing to Manager elect to provide the property and casualty insurance coverage required hereunder) shall provide and maintain the insurance in the minimum amounts and types set forth

on **Exhibit D** to this Agreement, the costs of which shall be charged as part of Gross Operating Expenses.

12.2    **Modification of Insurance**. Owner may require Manager to increase the limits of the above insurance coverage and may require Manager to carry other or additional reasonable and customary insurance. All premiums on any increased limits of, or other or additional, insurance coverage required by Owner under the immediately preceding sentence shall be included in the Gross Operating Expenses. In no event shall insurance coverage be less than that required by Lender, the License Agreement or to comply with Legal Requirements.

12.3    **Contractor's Insurance**. Manager shall require that all major contractors on or about the Hotel Premises have coverage at the contractor's sole expense in the minimum types and amounts set forth in **Exhibit D** to this Agreement. Manager shall require contractors that are not major contractors to carry such insurance coverage that is customary in the applicable trade or industry. A major contractor shall mean any contractor (i) receiving compensation in excess of $25,000 per year (subject to adjustment for adjustments in the CPI between the Commencement Date and the date of such services) or (ii) performing hazardous services. Manager must obtain the Owner's permission in writing to waive any of the above requirements. Higher amounts may be required if the work to be performed is sufficiently hazardous in nature. Manager shall obtain and keep on file a Certificate of Insurance for each such major contractor that shows that the contractor is so insured.

12.4    **Form of Policies**. All insurance required by Sections 12.1, 12.2 and 12.3 shall be in such form and with such companies as shall be reasonably satisfactory to Owner provided that such company shall have a minimum Best rating of A- Class VIII, or as otherwise approved by Owner and Manager, and shall comply with the requirements of any Mortgage and the License Agreement. All property damage insurance shall name Owner as insured, and so long as the Hotel is mortgaged pursuant to any Mortgage or otherwise shall be subject to a standard mortgagee clause in favor of the mortgagee or mortgagees. All other insurance (excepting only the professional liability and workers' compensation lines of coverage) shall be in the name of Owner and Manager. The workers' compensation policy shall name Owner as an additional insured. Policies of insurance (to the extent applicable) shall (i) provide that the insurance company will have no right of subrogation against any mortgagee, Owner, Manager or any of their respective affiliated or subsidiary companies or the agents or employees thereof and (ii) provide that the proceeds thereof in the event of loss or damage shall, to the extent payable to any mortgagee, be payable notwithstanding any act of negligence or breach of warranty by Owner or Manager which might otherwise result in the forfeiture or nonpayment of such insurance proceeds.

12.5    **Certificates**. For the purpose of insuring compliance with the provisions of Article 12, Manager shall furnish to the Owner certificates for all insurance required to be maintained pursuant to this Article 12 within five (5) days prior to renewal. All such certificates shall specify that the policies to which they relate cannot be canceled or modified on less than thirty (30) days' prior written notice to Owner. In the event Owner procures any insurance under this Section 12, Owner shall have the responsibilities set forth in the two preceding sentences for the benefit of Manager.

12.6    **Waiver of Subrogation**. Owner and Manager each waive their respective rights of subrogation against each other.

12.7    **Mortgage Requirements**. Insurance shall be maintained in a manner consistent with the terms and conditions of any Mortgage and any conflict between those terms and conditions and the provisions of this Agreement shall be resolved in favor of the Mortgage.

**ARTICLE 13**
**REAL AND PERSONAL PROPERTY TAXES; UTILITIES**

13.1    **Taxes**. Manager shall, on behalf of Owner, pay from the Gross Revenues, on or before the dates the same become delinquent, with the right to pay the same in installments to the extent permitted by law, all real estate taxes, all personal property taxes and all betterment assessments levied against the Hotel or any of its component parts. Manager shall promptly deliver to Owner all notices of assessments, valuations and similar documents to be filed by Manager or Owner, which are received from taxing authorities by Manager. Owner shall have the right to hire property tax consultants or like professionals that reasonably provide economic benefits to Owner and the costs thereof shall be a part of Gross Operating Expenses. Notwithstanding the foregoing obligations of Manager, Owner may elect to contest the validity or the amount of any such tax or assessment, provided that such contest does not materially jeopardize Manager's rights under this Agreement. Manager agrees to cooperate with Owner and execute any documents or pleadings required for such purpose, provided Owner agrees to reimburse Manager for any out-of-pocket costs occasioned to Manager by any such contest. At Owner's election, all costs relating to any such contest may be included in Gross Operating Expenses.

13.2    **Utilities, Etc**. Manager shall promptly pay all fuel, gas, light, power, water, sewage, garbage disposal, telephone and other utility bills currently as they are incurred in connection with the Hotel from the Gross Revenues or Working Capital.

**ARTICLE 14**
**USE OF NAME**

14.1    **Name**. During the Term of this Agreement, the Hotel shall at all times be known and designated as the "Comfort Suites Pecos" or by such other name as from time to time may be agreed upon by Owner and Manager. Manager shall make or cause to be made any fictitious name filings or disclosures required by the laws of the State with respect to the use of such name for or in connection with the Hotel. Manager shall not use or employ such name unless such use fully complies with the terms of the License Agreement, if any.

**ARTICLE 15**
**DAMAGE OR DESTRUCTION; CONDEMNATION**

15.1    **Damage or Destruction**.

(a)    If the Hotel or any portion thereof shall be damaged or destroyed at any time or times during the Term by fire, casualty or any other cause commonly covered by fire and extended coverage insurance and the cost of repairing such damage and restoring the Hotel to

substantially its condition immediately prior to such damage or destruction, as reasonably estimated by Owner based upon estimates Owner receives from contractors and other reasonable and customary evidence, will not exceed the sum of $250,000 plus adjustments to reflect increases in the CPI for each Fiscal Year after 2014 exclusive of the cost of the foundation and footings ("**Minimum Cost**"), Owner will, at its own cost and expense (subject to Owner's receipt of insurance proceeds sufficient to pay such costs and expenses) and with due diligence repair and/or restore the Hotel so that after such repair and/or restoration, the Hotel shall be in substantially the same condition as it was immediately prior to such damage or destruction.

(b)      If the cost of such repair and/or restoration will, as so reasonably estimated by Owner, exceed the Minimum Cost, then Owner shall, within one hundred twenty (120) days after such damage or destruction, elect by notice to Manager either (x) to carry out such repair and/or restoration, in which case Owner shall complete such repair and/or restoration pursuant to the last sentence of Section 15.1(a) or (y) to terminate this Agreement; should Owner so elect to terminate this Agreement, Owner shall pay to Manager the Termination Fee.

(c)      In the case of damage or destruction which Owner is not required by the preceding provisions of this Section 15.1 to repair or restore and where Owner has not elected under said preceding provisions to terminate this Agreement, Owner shall undertake to notify Manager, within one hundred twenty (120) days after such damage or destruction, whether or not Owner will so repair and/or restore such damage or destruction. If Owner, within such one hundred twenty (120) day period either (i) advises Manager that Owner will not so repair and/or restore such damage or destruction or (ii) fails to advise Manager of Owner's decision, Manager may terminate this Agreement by written notice to Owner, or Owner may terminate this Agreement by such notice to Manager; in either case such written notice must be given within one hundred fifty (150) days after such damage or destruction and neither party shall be entitled to any payment on account of such termination. If in such event Owner within such one hundred twenty (120) day period notifies Manager that Owner will so repair and/or restore such damage or destruction, then neither Owner nor Manager shall have a right to terminate this Agreement on account of such damage or destruction.

15.2      **Condemnation**. If the whole of the Hotel shall be taken or condemned in any eminent domain, condemnation, compulsory acquisition or like proceeding by any competent authority or if such a portion thereof shall be taken or condemned as to make it imprudent or unreasonable, in the sole opinion of Owner, to use the remaining portion as a hotel of the type and class immediately preceding such taking or condemnation, then the Term shall terminate as of the date title vests in the condemning authority. Manager has no interest in any award paid to Owner and Manager shall make no claim against the condemnor for any loss to its business as a result of such condemnation or otherwise. If only a part of the Hotel shall be taken or condemned and the taking or condemnation of such part does not, in the opinion of Owner, make it unreasonable or imprudent to operate the remainder as a hotel of the type and class immediately preceding such taking or condemnation, this Agreement shall not terminate, and so much of any award to Owner shall be made available as shall be reasonably necessary for making alterations or modifications of the Hotel, or any part thereof, so as to make it a satisfactory architectural unit as a hotel of similar type and class as prior to the taking or condemnation.

15.3 **Mortgage Requirements**. Actions as to damage or destruction and condemnation shall be taken only in a manner that is consistent with the terms and conditions of the Mortgage and any conflict between those terms and conditions and the provisions of this Agreement shall be resolved in favor of the Mortgage.

**ARTICLE 16**
**EVENTS OF DEFAULT**

16.1 **Manager Defaults**. Each of the following shall constitute an Event of Default by Manager:

(a)  The failure of Manager to pay any sum of money (or, if required by the Mortgage, to deposit into the lockbox account within two (2) business days of receipt) to Owner provided for herein when the same is payable, if such failure is not cured within five (5) days after written notice specifying such failure is given by Owner to Manager.

(b)  An assignment by Manager in violation of the provisions of Article 23 hereof.

(c)  If Manager shall fail to keep, observe or perform any other material covenant, agreement, term or provision of this Agreement to be kept, observed or performed by Manager and such failure shall continue for a period of thirty (30) days after written notice specifying such failure given by Owner to Manager, or if Manager due to any act or omission on the part of Manager and without the fault of Owner, shall fail to maintain the Permits and such failure shall continue for a period of thirty (30) days after written notice specifying such failure given by Owner to Manager; provided that if such failure is incapable of cure within such thirty (30) day period, then the cure period shall be extended provided that Manager commenced the cure during such initial thirty (30) day period and thereafter diligently and continuously pursues the cure thereof to completion.

(d)  If because of any act or omission on the part of Manager, and without the fault of Owner, either (i) the License Agreement or (ii) any required license for the sale of alcoholic beverages at the Hotel, is at any time suspended, terminated or revoked for a period of more than thirty (30) consecutive days, provided, however, if, at the end of such thirty (30) day period the cure has not been effectuated notwithstanding Manager's diligent and continuous attempts to cure, then the cure period shall be extended for an additional period of ninety (90) days.

(e)  If Manager shall fail to maintain and operate the Hotel in accordance with the standards required under Section 4.1 and such failure shall not be due to a refusal on the part of Owner to approve the Annual Plan submitted by Manager under Section 4.4 or Owner's failure to properly provide funds requested pursuant to the provisions of Section 9.1 and such failure shall continue for a period of sixty (60) days after written notice by Owner to Manager specifying the matters or conditions which constitute the basis for such Event of Default, provided that if such failure is not reasonably capable of cure within such sixty (60) day period, then the cure period shall be extended provided that Manager commences the cure during such initial sixty (60) day period and thereafter diligently and continuously pursues the cure thereof to completion.

(f)     If Manager shall apply for or consent to the appointment of a receiver, trustee or liquidator of Manager or of all or a substantial part of its assets, admit in writing its inability to pay its debts as they come due, make a general assignment for the benefit of creditors, take advantage of any insolvency law, or file an answer admitting the material allegations of a petition filed against Manager in any bankruptcy, reorganization or judgment or decree shall be entered by any court of competition jurisdiction, on the application of a creditor, adjudicating Manager bankrupt or insolvent or approving a petition seeking reorganization of Manager or appointing a receiver, trustee or liquidator of Manager or of all or a substantial part of its assets or a decree shall continue unstayed and in effect for any period of ninety (90) consecutive days.

(g)     The filing of a voluntary petition in bankruptcy or insolvency or a petition for liquidation or reorganization under any bankruptcy law by Manager, or Manager shall consent to, acquiesce in, or fail timely to controvert, an involuntary petition in bankruptcy, insolvency or an involuntary petition for liquidation or reorganization filed against it.

(h)     The filing against Manager of a petition seeking adjudication of Manager as insolvent or seeking liquidation or reorganization or appointment of a receiver, trustee or liquidator of all or a substantial part of Manager's assets, if such petition is not dismissed within ninety (90) days.

(i)     Failure of Manager (but excluding such a failure which results from the failure by Owner to provide the necessary funds therefor) to maintain at all times throughout the term hereof all of the insurance required to be maintained by Manager under Article 12, if such failure is not cured within fifteen (15) days after written notice specifying such failure is given by Owner to Manager.

(j)     The fraud, gross negligence, willful misconduct or criminal conduct of or by Manager and, to the extent same has a material adverse effect on the Hotel or Owner, the General Manager, in connection with the Hotel.

16.2    **Owner Defaults**. Each of the following shall constitute an Event of Default by Owner:

(a)     The failure of Owner to pay or furnish to Manager any money Owner is required to pay or furnish to Manager in accordance with the terms hereof on the date the same is payable, if such failure is not cured within five (5) days after written notice specifying such failure is given by Manager to Owner. If any sum of money is not paid within five (5) days following the date same becomes due and payable under this Agreement, and Manager has advanced such sum on behalf of Owner, such sum shall bear interest at the Default Rate from the date Manager advanced such sum on behalf of Owner until the date Owner actually pays such sum. If the failure to pay relates to the Management Fee, such sum shall bear interest at the Default Rate from the date due until the date actually paid.

(b)     If because of a default under the Mortgage, if any, not caused by the act or omission of Manager, the Mortgage shall be foreclosed, or the Hotel sold in lieu of foreclosure.

(c)     If Owner shall apply for or consent to the appointment of a receiver, trustee or liquidator of Owner of all or a substantial part of its assets, or admit in writing its inability to pay

its debts as they come due, make a general assignment for the benefit of creditors, take advantage of any insolvency law, or file an answer admitting the material allegations of a petition filed against Owner in any bankruptcy, reorganization or insolvency proceeding, or if an order, judgment or decree shall be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating Owner a bankrupt or insolvent or approving a petition seeking reorganization of Owner or appointing a receiver, trustee or liquidator of Owner or of all or a substantial part of its assets, and such order, judgment or decree shall continue unstayed and in effect for any period of ninety (90) consecutive days.

(d)    The filing of a voluntary petition in bankruptcy or insolvency or a petition for liquidation or reorganization under any bankruptcy law by Owner, or Owner shall consent to, acquiesce in, or fail timely to controvert, an involuntary petition in bankruptcy, insolvency or an involuntary petition for liquidation or reorganization filed against it.

(e)    The filing against Owner of a petition seeking adjudication of Owner as insolvent or seeking liquidation or reorganization or appointment of a receiver, trustee or liquidator of all or a substantial part of Owner's assets, if such petition is not dismissed within ninety (90) days.

(f)    Failure of Owner to maintain at all times throughout the term hereof all of the insurance required to be maintained by Owner under Article 12, if such failure is not cured within fifteen (15) days after written notice specifying such failure is given by Manager to Owner.

(g)    The failure of Owner to perform, keep or fulfill any of the other covenants, undertakings, obligations or conditions set forth in this Agreement, or the failure of Owner to approve expenditures or to authorize procedures necessary to maintain the standards of the Hotel in accordance with the Operating Standards, if such failure shall continue for a period of thirty (30) days after written notice by Manager or Licensor to Owner specifying the matters or conditions which constitute the basis for such Event of Default, provided that if such failure is incapable of cure within such thirty (30) day period, then the cure period shall be extended for up to an additional thirty (30) days provided that Owner commences the cure during such initial thirty (30) day period and thereafter diligently and continuously pursues the cure thereof.

## ARTICLE 17
## TERMINATION UPON EVENT OF DEFAULT; OTHER REMEDIES

17.1    **Termination**. Upon the occurrence of an Event of Default, in addition to and cumulative of any and all rights and remedies available to the non-defaulting party under this Agreement, at law or in equity, the non-defaulting party may: (i) terminate this Agreement without penalty, effective upon receipt of written notice of termination to the defaulting party, provided that termination may be effective immediately in the case of fraud, gross negligence, willful misconduct, criminal conduct or misappropriation of funds; and (ii) pursue any and all other remedies available to the non-defaulting party at law or in equity. In addition to and cumulative of the foregoing, upon the occurrence of any Event of Default on the part of Owner, all Management Fees, Reimbursable Expenses and all other sums payable to Manager under this Agreement shall be immediately due and payable without notice. In no event shall (i) the provisions of this Agreement with respect to the payment of a Termination Fee upon the

termination of this Agreement under certain circumstances be construed as defining or limiting the amount recoverable by Manager from Owner by reason of any Event of Default on the part of Owner; or (ii) entitle Manager to receive a Termination Fee in the event of a termination by reason of any Event of Default on the part of Manager

### 17.2 **Manager's Rights to Perform**.

(a)     If Owner shall fail to make any payment or to perform any act required of Owner pursuant to this Agreement, Manager may (but shall not be obligated to), without further notice to, or demand upon, Owner and without waiving or releasing Owner from any obligations under this Agreement, make such payment (either with its own funds or with funds withdrawn for such purpose from the Operating Accounts or the Reserve) or perform such act. Manager agrees to provide written notice to Owner within five (5) days after Manager exercises its rights in the preceding sentence.  All sums so paid by Manager and all necessary incidental costs and expenses incurred by Manager in connection with the performance of any such act, together with interest thereon at the Default Rate from the date of making such expenditure by Manager, shall be payable to Manager on demand.

(b)     Manager shall have the right to set-off against any payments to be made to Owner by Manager under any provision of this Agreement and against all funds from time to time in the Operating Accounts and the Reserve, any and all liabilities of Owner to Manager. Manager may withdraw from the Operating Accounts and the Reserve from time to time such amounts as Manager deems desirable in partial or full payment of all or any portion of said liabilities, the amount of such withdrawals to be paid by Owner to Manager on demand and to be replaced in the respective account and fund.

### ARTICLE 18
### OWNER'S ADDITIONAL TERMINATION RIGHTS

18.1     **Sale of the Hotel**. If Owner proposes to sell or otherwise dispose of the Hotel or Owner's interests therein, to a bona fide third-party (the "**Third-Party Purchaser**") during the Term, this Agreement will terminate effective upon the consummation of the closing of such sale. Owner shall provide Manager with written notice of termination of this Agreement not less than sixty (60) days prior to the scheduled date of closing of the sale of the Hotel; provided, however, if such a sale does not actually occur, the notice of termination shall be deemed ineffective.

18.2     **Performance Standard**.





## ARTICLE 19
## AREA OF PROTECTION

19.1

## ARTICLE 20
## TRANSFER TO OWNER UPON TERMINATION

Upon any termination of this Agreement, whether due to the occurrence of an Event of Default or otherwise, Manager shall cooperate with Owner and shall execute all documents or instruments requested by Owner in connection with the transfer, all without consideration to Manager (provided that, if such termination is due to a reason other than a default by Manager under this Agreement, Owner will reimburse Manager for Manager's reasonable expenses to effect such transfer) or the imposition of liability by Manager, to Owner or its nominee of the Permits and the License Agreement used or useful in connection with the operation of the Hotel. Without limiting the generality of the foregoing, Manager shall cause its officials, subject to restrictions provided in any License Agreement or related agreement, to provide all sales lists and customer contacts to Lender and to execute any necessary documents and to visit licensing authorities along with Owner's representatives in order to expedite (i) the orderly transfer to Owner or its designee of the Permits and the License Agreement (ii) the renewal thereof to Owner or Owner's designee if appropriate. In the event that this Agreement terminates due to

**Management Agreement – Page 32**

any reason other than a default by Manager under this Agreement, a sufficient number of Hotel Employees will be hired by Owner or its successor, assign or designee, and retained for at least 90 days thereafter, so as not to cause a "mass layoff" or "plant closing", as defined in the Workers Adjustment and Retraining Act, 29 USC, sec 2101 et seq.

**ARTICLE 21**
**NOTICES**

All notices, elections, acceptances, demands, consents and reports (collectively "notice") provided for in this Agreement shall be in writing and shall be given to the other party at the address set forth below or at such other address as any of the parties hereto may hereafter specify in writing.

To Owner:          RREAF O&G PORTFOLIO #2 LLC
C/O Spectrum Origination LLC
1253 Springfield Avenue, Suite 201
New Providence, New Jersey 07974
Attention: Jeffrey Schaffer

With a copy to:
Spectrum Group Management LLC
1250 Broadway, 19th Floor
New York, New York 10001
Attention: Peter Locke

To Manager:      Channel Point Hospitality LLC
2500 North Dallas Parkway
Suite 600
Plano, Texas 75093

With a copy to:    Carla S. Moreland, Esq.
5112 Briargrove Lane
Dallas, Texas 75287

Such notice or other communication may be given by Federal Express or other nationally recognized overnight carrier or by electronic facsimile in which case notice shall be deemed given upon confirmed delivery. Notice may be mailed by United States registered or certified mail, return receipt requested, postage prepaid, deposited in a United States post office or a depository for the receipt of mail regularly maintained by the post office. If mailed, then such notice or other communication shall be deemed to have been received by the addressee on the fifth (5th) day following the date of such mailing. Such notices, demands, consents and reports may also be delivered by hand, in which case it shall be deemed received upon delivery.

## ARTICLE 22
## CONSENT AND APPROVAL

Except as herein otherwise provided, whenever in this Agreement the consent or approval of Manager or Owner is required, such consent or approval shall not be unreasonably withheld or delayed. Such consent or approval shall also be in writing only and shall be executed only by an authorized officer or agent of the party granting such consent or approval.

## ARTICLE 23
## NON-ASSIGNABILITY

This Agreement shall not be assignable by Manager or Owner; provided however, that Owner shall be entitled to assign this Agreement to an Affiliate; and Manager shall (i) be entitled to assign this Agreement to an Affiliate of such party as part of a modification to such party's company structure in which all or substantially all of such party's assets are transferred to an Affiliate of such party; and (ii) have the right to assign its rights to receive payments under this Agreement as security for indebtedness or other obligations.

## ARTICLE 24
## INDEMNITY

24.1    **Indemnity by Manager**.



24.2    **Indemnity by Owner**. To the extent that Manager shall not be fully covered by insurance required to be maintained pursuant to this Agreement or if, after giving effect to the provisions of Section 24.1(b) of this Agreement, Gross Revenues are not sufficient to pay all Liabilities, Owner shall indemnify, defend and hold harmless Manager and its directors, officers, employees and agents from and against any damages, loss, liability, cost, action, cause, claim or expense, including attorneys' fees, arising out of, or incurred in connection with the management and operation of the Hotel.

24.3    **Survival**. The provisions of this Article 24 shall survive the expiration or earlier termination of this Agreement.

**ARTICLE 25**
**PARTIAL INVALIDITY**

In the event that any one or more of the phrases, sentences, clauses or paragraphs contained in this Agreement shall be declared invalid by the final and unappealable order, decree or judgment of any court, this Agreement shall be construed as if such phrases, sentences, clauses or paragraphs had not been inserted, unless such construction would substantially destroy the benefit of the bargain of this Agreement to either of the parties hereto.

**ARTICLE 26**
**MISCELLANEOUS**

26.1    **Disputes**. Whenever any issue or dispute arises under this Agreement relating to the Annual Operating Budget, the Approved Capital Budget and or the calculation and payment of the Reserves, and the Management Fee, such issue or dispute shall be resolved utilizing the Uniform System of Accounts and the by application of generally accepted accounting principles consistently applied.

26.2    **Further Assurances**. Owner and Manager shall execute and deliver all other appropriate supplemental agreements and other instruments, and take any other action necessary to make this Agreement fully and legally effective, binding and enforceable as between them and as against third parties.

26.3    **Waiver**. The waiver of any of the terms and conditions of this Agreement on any occasion or occasions shall not be deemed a waiver of such terms and conditions on any future occasion.

26.4    **Successors and Assigns**. Subject to and limited by Article 23, this Agreement shall be binding upon and inure to the benefit of Owner, its successors and permitted assigns, and shall be binding upon and inure to the benefit of Manager, its successors and permitted assigns.

26.5    **Governing Law**. This Agreement shall be construed, both as to its validity and as to the performance of the parties, in accordance with the laws of the State of Texas.

26.6    **Compliance with Mortgage and License Agreement**. In carrying out their respective duties and obligations under the terms of this Agreement, Owner and Manager shall use commercially reasonable good faith efforts to take no action that could reasonably be expected to constitute a material default under any Mortgage or the License Agreement and will use commercially reasonable good faith efforts to take such actions as are reasonably necessary to comply therewith. Notwithstanding the foregoing or anything in this Agreement to the contrary, if there is a breach by Owner under the Mortgage and such breach is the result of the failure of Manager, such breach shall not be a default by Manager under this Agreement (and Manager shall have no liability therefore) unless such default and/or failure is specifically provided for in Section 16.1 of this Agreement and the applicable notice and cure periods provided for such breach and/or failure, if any, have expired.

26.7    **Amendments**. This Agreement may not be modified, amended, surrendered or changed, except by a written document signed by the Owner and Manager agreeing to be bound thereby.

26.8    **Estoppel Certificates**. Owner and Manager agree, at any time and from time to time, as requested by the other party, upon not less than ten (10) days' prior written notice, to execute and deliver to the other a statement certifying that this Agreement is unmodified and in full force and effect (or if there have been modifications, that the same are in full force and effect as modified and stating the modifications), certifying the dates to which required payments have been paid, and stating whether or not, to the best knowledge of the signer, the other party is in default in performance of any of its obligations under this Agreement, and if so, specifying each such default of which the signer may have knowledge, it being intended that such statement delivered pursuant hereto may be relied upon by others with whom the party requesting such certificate may be dealing.

26.9    **Inspection Rights**. Owner and Lender shall have the right to inspect the Hotel and examine the books and records of Manager pertaining to the Hotel at all reasonable times during the Term upon reasonable notice to Manager, and Owner and the holder of any Mortgage shall have access to the Hotel and the books and records pertaining thereto at all times during the Term to the extent necessary to comply with the terms of any Mortgage, all to the extent consistent with applicable law and regulations and the rights of guests, tenants and concessionaires of the Hotel.

26.10    **Subordination**. This Agreement, any extension hereof and any modification hereof shall be subject and subordinate to a Mortgage as provided therein and, in the event of a foreclosure or deed in lieu of foreclosure, subject to the terms of any subordination agreement with Lender, this Agreement shall terminate unless otherwise assumed by Lender in writing. The provisions of this Section shall be self-operative and no further instrument of subordination shall be required; however, Manager will execute and return to Owner (or to Lender, as designated by Owner) such documentation as Owner or Lender may reasonably request to evidence the subordination of this Agreement to the Mortgage.   In the event of any refinancing of the Property, Manager shall cooperate in all reasonable respects with Owner in effecting such refinancing.

26.11    **Effect of Approval of Plans and Specifications**. Owner and Manager agree that in each instance in this Agreement or elsewhere wherein Manager is required to give its approval of plans, specifications, budgets and/or financing, no such approval shall imply or be deemed to constitute an opinion by Manager, nor impose upon Manager any responsibility for the design or construction of additions to or improvements of the Hotel, including but not limited to structural integrity or life/safety requirements or adequacy of budgets and/or financing. The scope of Manager's review and approval of plans and specifications is limited solely to the adequacy and relationship of spaces and aesthetics of the Hotel in order to comply with the Operating Standards.

26.12    **Entire Agreement**. This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof, superseding all prior agreements or undertakings, oral or written.

26.13 **Time is of the Essence**. Time is of the essence in this Agreement.

26.14 **Interpretation**. No provision of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have structured or dictated such provision.

26.15 **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and need not be signed by more than one of the parties hereto and all of which shall constitute one and the same agreement.

26.16 **No Electronic Transactions**. The parties hereby acknowledge and agree that this Agreement shall not be executed, entered into, altered, amended or modified by electronic means. Without limiting the generality of the foregoing, the parties hereby agree that the transactions contemplated by this Agreement shall not be conducted by electronic means, except as specifically set forth in Article 21 of this Agreement.

26.17 **Prohibited Persons and Transactions**.

(a) Manager is not, and shall not become, a person or entity with whom U. S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including those named in OFAC's Specially Designated and Blocked Person's List) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, or Support Terrorism), or other governmental action (such persons and entities being "**Prohibited Persons**").

(b) Owner is not and shall not become a Prohibited Person.

26.18 **Confidentiality.** Owner and Manager agree to keep the terms and conditions of all leases and other occupancy agreements in effect at the Hotel (if any) and all other accruements relating to the Hotel, together with all information and data obtained, possessed, or generated by Manager in connection with the Hotel (collectively, "**Privileged Information**"), strictly confidential and not to make any public announcements or any disclosures to any third parties, either orally or in writing, with respect to any Privileged Information without the express written consent of the other party hereunder; provided, however, the restrictions imposed hereby shall not apply to any Privileged Information (1) which is required to be disclosed in order to comply with any law, ordinance, governmental decree or any rule, regulation or decree of any interested governmental body or (2) which must otherwise be disclosed to relevant third parties, including accountants, attorneys and lenders, in the course of reasonable and diligent management and operation of the Hotel or the business of Owner, or any subsidiary or Affiliate of Owner or Manager. If Manager makes such disclosure, it shall notify such third party of this provision and of the requirement of Owner for confidentiality. The provisions of this Section 26.18 shall survive the expiration or termination of this Agreement

26.19 **No Third Party Rights**. This Agreement shall inure solely to the parties hereto. Notwithstanding any other provision of this Agreement, no third party shall have any rights pursuant to the terms of this Agreement.

## ARTICLE 27
## NO REPRESENTATIONS AS TO INCOME OR FINANCIAL SUCCESS OF HOTEL

In entering into this Agreement, Manager and Owner acknowledge that neither Owner nor Manager has made any representation to the other regarding projected earnings, the possibility of future success or any other similar matter respecting the Hotel, and that Manager and Owner understand that no guarantee is made to the other as to any specific amount of income to be received by Manager or Owner or as to the future financial success of the Hotel.

## ARTICLE 28
## REPRESENTATIONS OF MANAGER

In order to induce Owner to enter into this Agreement, Manager does hereby make the following representations and warranties:

(a)     the execution of this Agreement is permitted by the certificate of formation and partnership agreement of Manager and this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of Manager enforceable in accordance with the terms hereof;

(b)     to the best knowledge of Manager, there is no claim, litigation, proceeding or governmental investigation pending, or, as far as is known to Manager, threatened, against or relating to Manager, the properties or business of Manager or the transactions contemplated by this Agreement which does, or may reasonably be expected to, materially and adversely affect the ability of Manager to enter into this Agreement or to carry out its obligations hereunder, and to the best knowledge of Manager, there is no basis for any such claim, litigation, proceedings or governmental investigation, except as has been fully disclosed in writing to Owner and Lender; and

(c)     neither the consummation of the transactions contemplated by this Agreement on the part of Manager or to be performed, nor the fulfillment of the terms, conditions and provisions of this Agreement, conflicts with or will result in the breach of any of the terms, conditions or provisions of, or constitute a default under, any agreement, indenture, instrument or undertaking to which Manager is a party or by which it is bound.

## ARTICLE 29
## REPRESENTATIONS OF OWNER

In order to induce Manager to enter into this Agreement, Owner does hereby make the following representations and warranties:

(a)     the execution of this Agreement is permitted by the Limited Liability Company Agreement of Owner and this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of Owner enforceable in accordance with the terms hereof;

(b)     there is no claim, litigation, proceeding or governmental investigation pending, or as far as is known to Owner, threatened, against or relating to Owner, the properties or business

of Owner or the transactions contemplated by this Agreement which does, or may reasonably be expected to, materially and adversely affect the ability of Owner to enter into this Agreement or to carry out its obligations hereunder, and there is no basis for any such claim, litigation, proceedings or governmental investigation, except as has been fully disclosed in writing to Manager; and

(c)     neither the consummation of the transactions contemplated by this Agreement by this Agreement on the part of Owner to be performed nor the fulfillment of the terms, conditions and provisions of this Agreement, conflicts with or will result in the breach of any of the terms, conditions or provisions of, or constitute a default under, any agreement, indenture, instrument or undertaking to which Owner is a party or by which it is bound.

## ARTICLE 30
## DISPUTE RESOLUTION

Except as specifically provided in Section 4.4 of this Agreement, Owner and Manager agree that any dispute between the parties related to or arising out of this Agreement that cannot be amicably settled by the parties hereunder, shall first be submitted for non-binding mediation before resorting to any litigation, equitable proceeding or other enforcement action. Such mediation shall be held within a twenty-five mile radius of the Hotel (or such other location mutually agreed by the parties) and the parties shall cooperate in good faith to agree on a mediator who shall be a retired or semi-retired judge having at least ten (10) years of experience on the bench hearing complex commercial transactions. If the parties hereto have failed to designate, by a joint written statement, a mediator within thirty (30) days following the date of a written request therefor by either Manager or Owner to the other, then either Owner or Manager may notify the local office of the American Arbitration Association ("**AAA**") or JAMS and request such entity to select a person to act as the mediator to assist in the resolution of the dispute. The mediation will be a non-binding conference between the parties conducted in accordance with the applicable rules and procedures of AAA or JAMS (as determined by the mediator). The compensation of the mediator and all related expenses shall be borne equally by the parties, each of whom shall bear their own costs, irrespective of the outcome of the mediation. If any dispute remains unresolved between the parties after the mediation is complete, then either party shall be entitled to pursue its rights and remedies at law or in equity. The provisions of this Article 30 shall survive the expiration or earlier termination of this Agreement.

## ARTICLE 31
## ADDITIONAL OBLIGATIONS OF MANAGER

Manager acknowledges that Owner is vitally interested in the qualifications of the individuals designated as the general manager and the director of sales of the Hotel. Manager shall, from time to time, consult with Owner and obtain Owner's approval as to the appointment of individuals to such positions; provided, however, Owner and Manager acknowledge that nothing in this Article is intended to limit or negate the authority of Manager elsewhere provided in this Agreement to remove and replace, in its sole discretion, the general manager and/or director of sales of the Hotel.

## ARTICLE 32
## TERMINATION OF THE LICENSE AGREEMENT

Owner reserves and shall have the absolute right in its sole and unfettered discretion, at any time and without the consent or approval of (but with notice to) Manager, to terminate the License Agreement, provided, however, that (i) Owner shall have no such right in order to establish its own independent operations, such as an operation without a franchise or license or in its own hotel name; (ii) in the event of such a termination by Owner, Manager shall have the right of approval (which right shall be reasonably exercised) of any new franchise or license for the Hotel; and (iii) if Owner's decision to terminate the License Agreement is made without the consent of Manager, then the provisions of Section 18.2 of this Agreement shall no longer apply.

## ARTICLE 33
## RECOURSE

Any provision of this Agreement to the contrary notwithstanding, Manager hereby agrees that no personal, partnership or corporate liability of any kind or character (including, without limitation, the payment of any judgment) whatsoever now attaches or at any time hereafter under any condition shall attach to Owner or any of Owner's constituent entities and affiliates or any mortgagee for payment of any amount payable under this Agreement or for the performance of any obligation under this Agreement. The exclusive remedies of Manager for the failure of Owner to perform any of its obligations under this Agreement shall be to proceed against the interest of Owner in and to the Hotel for Manager's actual, out-of-pocket damages (and not any consequential, punitive or exemplary damages), and Owner shall not be personally liable for any deficiency.

*The rest of this page is intentionally left blank.*

IN WITNESS WHEREOF, Owner has caused this Agreement to be executed and its seal affixed by its partners duly authorized thereunto and Manager has caused this Agreement to be executed and its seal affixed by its officer duly authorized thereunto, the day and year first above written, in duplicate.

**<u>OWNER</u>**:

**RREAF O&G PORTFOLIO #2 LLC**


By: _____
Name: Jeff Schaffer
Title: Chief Executive Officer


**<u>MANAGER</u>**:

**CHANNEL POINT HOSPITALITY LLC**


By: _____
Name: _____
Title: _____

**<u>Signature Page to Management Agreement – Page Solo</u>**
COMFORT SUITES PECOS

## EXHIBIT A

## MAJOR ACCOUNT CATEGORIES

Room Sales
Telephone Sales
Food Sales
Beverage Sales
Miscellaneous Income

Room Expense
Telephone Expense
Food Expense
Beverage Expense
Miscellaneous Expense

A&G
Management Fee
Advertising & Business Promotion
R&M
H-L-P

Property Tax
Insurance
CEP Reserve
Leases

**Exhibit A – Solo Page**

# EXHIBIT B

## DESCRIPTION OF PREMISES

2.67 Acres out of a 2.93 acre tract described in Correction Warranty Deed recorded in Volume 841, Page 685 of the Reeves County, Texas deed records, out of the North part of a 15.05 acres tract of land described in Volume 125, Page 555, of said deed records of Reeves County, Texas, and being part of the tract of 5.56 acres of land described by deed recorded in Volume 788, Page 39 of the Official Public Records of said Reeves County, Texas out of the West/2 of Section 13, Block 5,H. & G.N. Railroad Company Survey, in the Town of Pecos City, Reeves County, Texas being described by metes and bounds as follows:

Beginning at a 1/2 inch iron rod with a cap marked "Trujillo RPLS 5358", recovered on the West right of way line of Teague Street, being the Northeast corner of a 2.93 acres tract of land described in Volume 841, Page 685 of the Reeves County, Texas deed records, being the Southeast corner of a dedicated alley shown on a plat recorded in Volume 6, Page 34 of the Reeves County, Texas plat records, whence a 1/2 inch iron rod with a cap marked "Trujillo RPLS 5358", recovered at the Southeast corner of Block 1, East Airport Addition, to the Town of Pecos City, plat shown in Volume 3, Page 96, of said plat records, bears N 12°48'41" E 26.40 feet, for the Northeast corner of this tract;

Thence S 12°48'44" W 287.37 feet:, along said right of way line, to a 1/2 inch iron rod with a cap marked "Trujillo RPLS ,5358", recovered on the North line of a dedicated 15.00 feet wide utility easement, plat recorded in Volume 6, Page 34 of said plat records, whence a 1/2 inch iron rod with a cap marked "Trujillo RPLS 5358", recovered at the Southeast corner of said 2.93 acres tract of land, and said easement, on the North line of U.S. Interstate Highway No. 20, bears S 12°48'44" W I5.00 feet, for the Southeast comer of this tract;

Thence N 76°57' 10" W 67.80 feet, along the North line of said easement.to a 1/2 inch iron rod with a cap marked "Trujillo RPLS 5358", for a corner of this tract;

Thence N 69°59' 48" W 369.50 feet, along the North line of said easement, to a 1/2 inch iron rod with a cap marked "Trujillo RPLS 5358", recovered on the East right of way line of a dedicated street shown on plat recorded in Volume 6, Page 34 of said plat records, whence a 1/2 inch iron rod with a cap marked "Trujillo RPLS 5358", recovered on the South line of said easement, bears S 12°51'28" W 15.00 feet, for-the Southwest corner of this tract;

Thence N 12°51'28" E 241.57 feet, along the East right of way line of said dedicated street, to a 1/2 inch iron rod with a cap marked "Trujillo RPLS 5358", whence another 1/2 inch iron rod with a cap marked "Trujillo RPLS 5358", recovered at the Northwest corner of said 2.93 acres tract of land, bears N '77°06'14" W 20.00 feet, for the Northwest corner of this tract;

Thence S 77°06' 14" E 434.20 feet along the North line of said 2.93 acres tract of land, to the Point of Beginning, containing 2.67 acres of land more or less.

Bearing distance and areas are Grid, TXSPCS, TXSC Zone, NAD83, to convert bearings to True rotate by a theta of -1°38' 11;", to convert distances and areas to ground divide by a combined factor of 0.99978347.

**Exhibit B – Solo Page**

## EXHIBIT C

## EXAMPLE OF MONTHLY TRANSACTIONS REPORT

```
10/09/12  11:35 am                              P&L EXAMPLE ENTITY                              Day  Page:    1
                                                INCOME STATEMENT
                                                End of Year 2012

ACTUAL      %    BUDGET    %    LAST YEAR   %                               ACTUAL    %    BUDGET    %    LAST YEAR    %
-------  -----  -------  -----  ---------  -----                           -------  -----  -------  -----  ---------  -----
     0   0.00       0   0.00        0   0.00  Total Avl Rooms                    0   0.00       0   0.00        0   0.00
     0   0.00       0   0.00        0   0.00  # Room/Occ %                       0   0.00       0   0.00        0   0.00
     0   0.00       0   0.00        0   0.00  Revenue/Average Rate               0   0.00       0   0.00        0   0.00
     0   0.00       0   0.00        0   0.00  RevPar                             0   0.00       0   0.00        0   0.00

     0   0.00       0   0.00        0   0.00  ----------REVENUES----------       0   0.00       0   0.00        0   0.00
     0   0.00       0   0.00        0   0.00  Rooms                              0   0.00       0   0.00        0   0.00
     0   0.00       0   0.00        0   0.00  F&B Revenue                        0   0.00       0   0.00        0   0.00
     0   0.00       0   0.00        0   0.00  Communications                     0   0.00       0   0.00        0   0.00
     0   0.00       0   0.00        0   0.00  Minor Op Depts.                    0   0.00       0   0.00        0   0.00
     0   0.00       0   0.00        0   0.00  Rent/Other                         0   0.00       0   0.00        0   0.00
-------  -----  -------  -----  ---------  -----                           -------  -----  -------  -----  ---------  -----
     0   0.00       0   0.00        0   0.00  TOTAL REVENUES                     0   0.00       0   0.00        0   0.00

     0   0.00       0   0.00        0   0.00  ----DEPARTMENTAL EXPENSES----      0   0.00       0   0.00        0   0.00
     0   0.00       0   0.00        0   0.00  Rooms                              0   0.00       0   0.00        0   0.00
     0   0.00       0   0.00        0   0.00  Food & Beverage                    0   0.00       0   0.00        0   0.00
     0   0.00       0   0.00        0   0.00  Communications                     0   0.00       0   0.00        0   0.00
     0   0.00       0   0.00        0   0.00  Minor Operating                    0   0.00       0   0.00        0   0.00
     0   0.00       0   0.00        0   0.00  Rent & Other                       0   0.00       0   0.00        0   0.00
-------  -----  -------  -----  ---------  -----                           -------  -----  -------  -----  ---------  -----
     0   0.00       0   0.00        0   0.00  TOTAL DEPARTMENTAL EXPENSES        0   0.00       0   0.00        0   0.00

     0   0.00       0   0.00        0   0.00  -----DEPARTMENTAL PROFIT-----      0   0.00       0   0.00        0   0.00
     0   0.00       0   0.00        0   0.00  Rooms                              0   0.00       0   0.00        0   0.00
     0   0.00       0   0.00        0   0.00  Food & Beverage                    0   0.00       0   0.00        0   0.00
     0   0.00       0   0.00        0   0.00  Communications                     0   0.00       0   0.00        0   0.00
     0   0.00       0   0.00        0   0.00  Minor Op Depts                     0   0.00       0   0.00        0   0.00
     0   0.00       0   0.00        0   0.00  Rent/Other                         0   0.00       0   0.00        0   0.00
-------  -----  -------  -----  ---------  -----                           -------  -----  -------  -----  ---------  -----
     0   0.00       0   0.00        0   0.00  GROSS OPER INCOME                  0   0.00       0   0.00        0   0.00

     0   0.00       0   0.00        0   0.00  ----UNDISTRIBUTED EXPENSES----     0   0.00       0   0.00        0   0.00
     0   0.00       0   0.00        0   0.00  Admin & General                    0   0.00       0   0.00        0   0.00
     0   0.00       0   0.00        0   0.00  Advertising                        0   0.00       0   0.00        0   0.00
     0   0.00       0   0.00        0   0.00  Sales/Marketing                    0   0.00       0   0.00        0   0.00
     0   0.00       0   0.00        0   0.00  Repairs/Maintenance                0   0.00       0   0.00        0   0.00
     0   0.00       0   0.00        0   0.00  Energy                             0   0.00       0   0.00        0   0.00
-------  -----  -------  -----  ---------  -----                           -------  -----  -------  -----  ---------  -----
     0   0.00       0   0.00        0   0.00  TOTAL UNDISTRIBUTED                0   0.00       0   0.00        0   0.00

     0   0.00       0   0.00        0   0.00  GROSS OPERATING PROFIT             0   0.00       0   0.00        0   0.00
```

**Exhibit C – Page 1**

6444430v.1

P&L EXAMPLE ENTITY
INCOME STATEMENT
End of Year 2012

jay  Page:   2

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Management Fee | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Franchise Fee | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | INCOME BEFORE FIXED CHARGES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ---------FIXED/OTHER?--------- | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL FIXED/OTHER | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | EBITDA | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | PROFORMA  N O I | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | DEBT, DEPR/AMORT, CAP & OTHER | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL DEBT, DEPR/AMORT, CAP & | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | NET INC AVAIL/ TAXES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | --ADD BACKS & SUBTRACTIONS-- | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | NET OPERATING INCOME | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

<u>**Exhibit C – Page 2**</u>

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOMS DEPARTMENT
End of Year 2012

jay  Page:  3

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUE | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | NET REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES / WAGES | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENTAL PROFIT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 3**
6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOMS DEPARTMENT
End of Year 2012

jay  Page:    4

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**<u>Exhibit C – Page 4</u>**

6444430v.1

10/05/12  11:35 am         P&L EXAMPLE ENTITY         jay  Page:   5
ROOM STATISTICS
End of Year 2012

| ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | OCCUPIED ROOMS | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL TRANSIENT | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL GROUP | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL SOLD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL OCCUPIED | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL AVAILABLE ROOMS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 5**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOM STATISTICS
End of Year 2012

jay  Page:    6

| | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REVENUE/AVERAGE RATES | | | | | | | | | | | | | |
| TOTAL TRANSIENT | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| TOTAL GROUP | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| TOTAL PAYING RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| TOTAL ROOMS OTHER | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| OVERALL ROOM RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| REVPAR | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**<u>Exhibit C – Page 6</u>**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOM STATISTICS
End of Year 2012

jay  Page:    7

| ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **SALARIES / WAGES** | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | Guest Services | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| 0 0.00 | | 0 0.00 | | 0 0.00 | | TOTAL SALARIES / WAGES | 0 0.00 | | 0 0.00 | | 0 0.00 | |
| | | | | | | **BENEFITS** | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL BENEFITS | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL WAGES & BENEFITS | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | DEPARTMENTAL PROFIT | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |

**Exhibit C – Page 7**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOM STATISTICS
End of Year 2012

jay  Page:     8

| ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

OTHER EXPENSES

| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL OTHER EXPENSES | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 8**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
FOOD & BEVERAGE CONSOLIDATED
End of Year 2012

Jay  Page:  9

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | FOOD REVENUE | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | NET FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUE | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | NET BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUE | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | NET OTHER REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 9**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
FOOD & BEVERAGE CONSOLIDATED
End of Year 2012

jay  Page:   10

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OVERALL NET FOOD COST | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OVERALL NET BEVERAGE COST | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OTHER COST | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL COST OF GOODS SOLD | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | GROSS PROFIT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES/WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL GENERAL | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES/WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Payroll Taxes & Benefits | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENTAL PROFIT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 10**

10/05/12  11:35 am                                    P&L EXAMPLE ENTITY                                    jay  Page:   11
                                              FOOD & REVENUE CONSOLIDATED
                                                  End of Year 2012

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 11**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

Jay  Page:  12

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & RPOR | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL BEVG REVENUE & RPOR | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 12**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

Jay  Page:  13

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ROOM SERVICE | | | | | | |
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | =============================== | | | | | | |
| | | | | | | RESTAURANT 1 | | | | | | |
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | =============================== | | | | | | |
| | | | | | | BANQUETS | | | | | | |
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 13**

6444430v.1

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|--------|------|--------|------|-----------|------|---|--------|------|--------|------|-----------|------|
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ================================ | | | | | | |
| | | | | | | CATERING | | | | | | |
| | | | | | | COVERS | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ================================ | | | | | | |
| | | | | | | BANQUETS & CATERING | | | | | | |
| | | | | | | COVERS | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ================================ | | | | | | |
| | | | | | | LOUNGE 1 | | | | | | |
| | | | | | | BEVG REVENUE & RPCB | | | | | | |

**Exhibit C – Page 14**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

Jay  Page:   15

| | ACTUAL | | CALC | BUDGET | | CALC | LAST YEAR | | CALC | | | | ACTUAL | | CALC | BUDGET | | CALC | LAST YEAR | | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 | TOTAL BEVG REVENUE & RPCR | | | 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 |
| | | | | | | | | | | RESTAURANT 2 | | | | | | | | | | | |
| | | | | | | | | | | COVERS & CAPTURE | | | | | | | | | | | |
| | 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 | TOTAL COVERS & CAPTURE | | | 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 |
| | | | | | | | | | | FOOD REVENUE & AVG CHECK | | | | | | | | | | | |
| | 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | | | 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 |
| | | | | | | | | | | BEVG REVENUE & % FOOD | | | | | | | | | | | |
| | 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 | TOTAL BEVG REVENUE & % FOOD | | | 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 |
| | | | | | | | | | | LOUNGE 2 | | | | | | | | | | | |
| | | | | | | | | | | BEVG REVENUE & RPCR | | | | | | | | | | | |
| | 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 | TOTAL BEVG REVENUE & RPCR | | | 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 |
| | | | | | | | | | | CONFERENCE CENTER | | | | | | | | | | | |
| | | | | | | | | | | COVERS & CAPTURE | | | | | | | | | | | |
| | 0 | | 0.00 | 0 | | 0.00 | 0 | | 0.00 | TOTAL CAPTURE & COVERS | | | 0 | | 0.00 | 0 | | 0.00 | | | 0.00 |
| | | | | | | | | | | FOOD REVENUE & AVG CHECK | | | | | | | | | | | |
| | 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | | | 0 | $ | 0.00 | 0 | $ | 0.00 | 0 | $ | 0.00 |
| | | | | | | | | | | BEVG REVENUE & % FOOD | | | | | | | | | | | |

**Exhibit C – Page 15**
6444430v.1

10/05/12 11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

jay Page: 16

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|--------|------|--------|------|-----------|------|---|---|--------|------|--------|------|-----------|------|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | IN ROOM BAR | | | | | | | |
| | | | | | | REVENUE & RFOR | | | | | | | |
| 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | TOTAL REVENUE & RFOR | | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |

**Exhibit C – Page 16**

6444430v.1

10/05/12  11:35 am           P&L EXAMPLE ENTITY           jay Page: 17
          ROOM SERVICE
          End of Year 2012

| ACTUAL | % | BUDGET | % | LAST YEAR | % |  | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  | FOOD REVENUES |  |  |  |  |  |  |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
|  |  |  |  |  |  | BEVERAGE REVENUES |  |  |  |  |  |  |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
|  |  |  |  |  |  | OTHER REVENUES |  |  |  |  |  |  |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
|  |  |  |  |  |  | SALARIES / WAGES |  |  |  |  |  |  |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 17**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
RESTAURANT 1
End of Year 2012

jay  Page:  18

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|--------|---|--------|---|-----------|---|---|--------|---|--------|---|-----------|---|
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 18**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
BANQUETS & CATERING
End of Year 2012

Jay  Page:  19

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | CATERING | | | | | | |
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 19**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
BANQUETS & CATERING
End of Year 2012

jay Page:   20

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|--------|---|--------|---|-----------|---|---|--------|---|--------|---|-----------|---|
| | | | | | | TOTAL BANQUETS & CATERING | | | | | | |
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL COMBINED REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARY / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 20**
6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
BANQUETS & CATERING
End of Year 2012

Jay Page:  21

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **BANQUETS** | | | | | | |
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 21**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
LOUNGE 1
End of Year 2012

Jay  Page:  22

| | ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FOOD REVENUES | | | | | | | | | | | | | |
| TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| BEVERAGE REVENUES | | | | | | | | | | | | | |
| TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| OTHER REVENUES | | | | | | | | | | | | | |
| TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| TOTAL DEPT REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| SALARIES / WAGES | | | | | | | | | | | | | |
| TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 22**

10/09/12  11:35 am       P&L EXAMPLE ENTITY       joy  Page:  23
COMMUNICATIONS
End of Year 2012

| ACTUAL | RPOA/% | BUDGET | RPOA/% | LAST YEAR | RPOA/% | | ACTUAL | RPOA/% | BUDGET | RPOA/% | LAST YEAR | RPOA/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUES | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL PHONE REVENUE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | NET PHONE REVENUE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL INTERNET REVENUE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | NET INTERNET REVENUE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | NET COMBINED REVENUES | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | COSTS OF SALES | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | COS PHONE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | COS INTERNET | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COST OF ALL SALES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | GROSS PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Payroll Taxes & Benefits | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TTL WAGES & BENEFITS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 23**
6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
IN HOUSE MOVIES
End of Year 2012

Jay  Page:  24

| ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% | | ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUES | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | NET REVENUE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 24**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
GUEST LAUNDRY
End of Year 2012

Jay  Page:  25

| ACTUAL | RPOR/% | BUDGET | RPRO/% | LAST YEAR | RPOR/% | | ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUES | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | NET REVENUE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | GROSS PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TTL WAGES & BENEFITS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 25**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
RENTS & OTHER INCOME
End of Year 2012

Jay  Page:  26

| | ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SPACE RENTALS | | | | | | | | | | | | | |
| TOTAL RENTALS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| COMMISSIONS | | | | | | | | | | | | | |
| TOTAL COMMISSIONS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| MISCELLANEOUS | | | | | | | | | | | | | |
| TOTAL MISCELLANEOUS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| TOTAL RENTS/OTHER INCOME | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 26**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
A&G
End of Year 2012

jay  Page:  27

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL A&G EXP | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**<u>Exhibit C – Page 27</u>**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
SALES & MARKETING
End of Year 2012

Jay  Page:  28

| | ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GROUP | | | | | | | | | | | | | |
| TTL GROUP | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| TRANSIENT | | | | | | | | | | | | | |
| Newspaper | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| TTL TRANSIENT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| OTHER EXPENSES | | | | | | | | | | | | | |
| Contingency | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| TTL NON-MEDIA | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| GRAND TTL ADVERTISING | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 28**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
SALES & MARKETING
End of Year 2012

Jay  Page:  29

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Incentive/Svc Charge | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALES & ADVERTISING | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 29**

6444430v.1

10/08/12  11:35 am

P&L EXAMPLE ENTITY
REPAIRS & MAINTENANCE
End of Year 2012

jay  Page:  30

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Grnds & Land - Outdoor | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Rent - Equipment | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL R&M EXPENSE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 30**

6444430v.1

10/05/12  11:35 am
P&L EXAMPLE ENTITY
ENERGY
End of Year 2012
Jay  Page:   31

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|--------|---|--------|---|-----------|---|--|--------|---|--------|---|-----------|---|
| | | | | | | EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL ENERGY | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL ENERGY | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 31**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
FIXED & OTHER CHARGES
End of Year 2012

jay  Page:  32

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **FEES** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FEES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **RENTS** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL RENTS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **LEASES** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL LEASES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **INSURANCE** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL INSURANCE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **REAL ESTATE TAXES** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REAL ESTATE TAXES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **OTHER TAXES** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER TAXES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **PARTNERSHIP EXPENSES** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL PARTNERSHIP EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **OTHER EXPENSES** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **INTEREST EXPENSE** | | | | | | |

**Exhibit C – Page 32**
6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
FIXED & OTHER CHARGES
End of Year 2012

Jay  Page:   33

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL INTEREST EXPENSE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | REIT LEASE | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REIT LEASE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | MISC NON EBITDA | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL MISC NON EBITDA | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | DEPRECIATION/AMORTIZATION &OT | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPRECIATION & AMORTIZAT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | FFE & ADDBACKS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FFE & ADDBACKS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FIXED EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 33**
6444430v.1

10/08/12  11:35 am

P&L EXAMPLE ENTITY
EE CAFE
End of Year 2012

jay Page:   34

| ACTUAL | % | BUDGET | % | LAST YEAR | % |  | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  | SALARIES / WAGES |  |  |  |  |  |  |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
|  |  |  |  |  |  | BENEFITS |  |  |  |  |  |  |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
|  |  |  |  |  |  | OTHER EXPENSES |  |  |  |  |  |  |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL EE CAFE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Allocation to PTEB | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | FINAL EE CAFE TOTAL | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 34**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
PT & EB
End of Year 2012

jay  Page:   35

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | TAXES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL TAXES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | HEALTH INSURANCE | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL HEALTH INSURANCE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 401k Match | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL PT & EB | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

% Column is % Total Wages

**Exhibit C – Page 35**

6444430v.1

P&L EXAMPLE ENTITY
PT & ER
End of Year 2012

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|--------|---|--------|---|-----------|---|---|--------|---|--------|---|-----------|---|
| | | | | | | DISTRIBUTED TO: | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DISTRIBUTION | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 36**

6444430v.1

P&L EXAMPLE ENTITY
FT & EE
End of Year 2012

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES, WAGES & INCENTIVES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Total Food & Beverage | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | GROSS TTL WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | S&W, INCENTIVES, PAID TIME OFF | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Lounge 1 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Total Foood & Beverage | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL ALL PAID WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 37**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
HOUSE LAUNDRY
End of Year 2012

jay  Page:   38

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES & WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | DISTRIBUTED TO: | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DISTRIBUTION | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 38**

10/08/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay  Page:  39

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **CASH** | | | | | |
| TOTAL CASH | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| SEMI-RESTRICTED CASH | | | | | |
| TOTAL SEMI-RESTRICTED CASH | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| RECEIVABLES | | | | | |
| TOTAL RECEIVABLES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| INVENTORIES | | | | | |
| TOTAL INVENTORIES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OPERATING EQUIPMENT | | | | | |
| TOTAL OPERATING EQUIPMENT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Exhibit C – Page 39**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay  Page:  40

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| PREPAIDS | | | | | |
| TOTAL PREPAIDS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| FIXED ASSETS | | | | | |
| Accum Amortization | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL FIXED ASSETS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OTHER ASSETS | | | | | |
| TOTAL OTHER ASSETS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL ASSETS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Exhibit C – Page 40**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay  Page:  41

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| LIABILITIES | | | | | |
| PAYABLES | | | | | |
| TOTAL PAYABLES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| DEPOSITS | | | | | |
| TOTAL DEPOSITS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OF TAXES AND WITHHOLDINGS | | | | | |
| TOTAL OF TAXES AND WITHHOLDING | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ACCRUED OPERATING EXPENSES | | | | | |
| TTL ACCRUED OPERATING EXPENSES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Exhibit C – Page 41**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay  Page:  42

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| DUE TO/FROM ACCOUNTS | | | | | |
| Due to ZZ St Paul | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Due to REIT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL DUE TO/FROM ACCOUNTS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OTHER LIABILITIES | | | | | |
| TOTAL OTHER LIABILITIES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| NOTES PAYABLE | | | | | |
| TOTAL NOTES PAYABLE | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL LIABILITIES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OWNERS EQUITY | | | | | |
| Retained Earn - Prior Years | 0.00 | 0.00 | 0.00 | 695.02- | 695.02 |
| Retained Earn - Current Yr | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL OWNERS EQUITY | 0.00 | 0.00 | 0.00 | 695.02- | 695.02 |
| TOTAL LIABS. & OWNERS EQUITY | 0.00 | 0.00 | 0.00 | 695.02- | 695.02 |

**Exhibit C – Page 42**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFTR REPORT
End of Year 2012

jay  Page:  43

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | FULL TIME EQUIVALENT | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | SUMMARY HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOTEL | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | SUMMARY WAGES & AVG RATE | | | | | | |
| 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | TOTAL WAGES & AVG RATE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |

**Exhibit C – Page 43**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFIS REPORT
End of Year 2012

Jay  Page:   44

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ROOMS DEPARTMENT | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL OCCUPIED ROOMS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Room Attendant - Total | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | House Attendant - Total | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | Room Attendant - Total | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | House Attendant - Total | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL WAGES & AVG RATE | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| | | | | | | HOURS & FTE | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | FOOD & BEVERAGE SUMMARY | | | | | | |
| | | | | | | FOOD COVERS | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PROD / TOTAL COV | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVERAGE RATE | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL WAGES & AVG RATE | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 44**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFTK REPORT
End of Year 2012

jay  Page:  45

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ================================ | | | | | | |
| | | | | | | A&G | | | | | | |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 45**
6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY KPIS REPORT
End of Year 2012

Jay  Page:  46

| | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ROOM SERVICE | | | | | | | | | | | | | |
| HOURS & PRODUCTIVITY | | | | | | | | | | | | | |
| TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| WAGES & AVG RATE | | | | | | | | | | | | | |
| TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| HOURS & FTE | | | | | | | | | | | | | |
| TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| RESTAURANT 1 | | | | | | | | | | | | | |
| HOURS & PRODUCTIVITY | | | | | | | | | | | | | |
| TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| WAGES & AVG RATE | | | | | | | | | | | | | |
| TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| HOURS & FTE | | | | | | | | | | | | | |
| TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| RESTAURANT 2 | | | | | | | | | | | | | |
| HOURS & PRODUCTIVITY | | | | | | | | | | | | | |
| TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 46**
6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY RPTG REPORT
End of Year 2012

jay  Page:  47

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL WAGES & AVG RATE | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| | | | | | | HOURS & FTE | | | | | | |
| 0 0.00 | | 0 0.00 | | 0 0.00 | | TOTAL HOURS & FTE | 0 0.00 | | 0 0.00 | | 0 0.00 | |
| | | | | | | ================================ | | | | | | |
| | | | | | | BANQUETS & CATERING | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 0.00 | | 0 0.00 | | 0 0.00 | | TOTAL HOURS & PRODUCTIVITY | 0 0.00 | | 0 0.00 | | 0 0.00 | |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL WAGES & AVG RATE | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| | | | | | | HOURS & FTE | | | | | | |
| 0 0.00 | | 0 0.00 | | 0 0.00 | | TOTAL HOURS & FTE | 0 0.00 | | 0 0.00 | | 0 0.00 | |
| | | | | | | ================================ | | | | | | |
| | | | | | | CONFERENCE CENTER | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 0.00 | | 0 0.00 | | 0 0.00 | | TOTAL HOURS & PRODUCTIVITY | 0 0.00 | | 0 0.00 | | 0 0.00 | |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL WAGES & AVG RATE | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| | | | | | | HOURS & FTE | | | | | | |

**Exhibit C – Page 47**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY RPTS REPORT
End of Year 2012

Jay  Page:   49

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ================================ | | | | | | |
| | | | | | | LOUNGE 1 | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL REVENUE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | TOTAL WAGES & AVG RATE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ================================ | | | | | | |
| | | | | | | LOUNGE 2 | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | TOTAL WAGES & AVG RATE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 48**
6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFTK REPORT
End of Year 2012

Jay  Page:  49

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **IN ROOM BASE** | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL OCCUPIED ROOMS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & HRS PER OCC ROOM | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & HOURS PER OCC RO | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | TOTAL WAGES & AVG RATE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 49**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFIK REPORT
End of Year 2012

jay  Page:  50

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | CONTRACT LABOR | | | | | | |
| | | | | | | HOURS & FTE | | | | | | |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | FOOD & BEVERAGE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES $ AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 50**

6444430v.1

# EXHIBIT D

# INSURANCE REQUIREMENTS

1. **Insurance Requirements for the Hotel**:

General Liability - $1,000,000 per Occurrence/$2,000,000 General and Product Liability Aggregate per Location

Including:
1. Products and Completed Operations
2. Contractual Liability
3. Personal Injury
4. Incidental Medical Malpractice
5. Molestation and Abuse are not Excluded
6. Punitive Damages unless Excluded by Public Policy
7. Fellow Employee Coverage
8. Garage Keepers Liability
9. Liquor Liability
10. Blanket Additional Interests
    a. All Managers or Lessors of Premises
    b. All mortgagors of Premises
    c. Vendors
    d. Volunteer Workers
    e. As required by Contract
11. Severability of Interests
12. Waiver of Subrogation as Required by Contract
13. Terrorism not Excluded or Sub-Limited
14. No Deductible/SIR
15. Coverage is Designated to the Scheduled Premises and is Primary and Non-Contributory

Commercial Automobile - $1,000,000 – Any Auto

Including:
1. Medical Payments - $5,000 per person
2. Personal Injury Protection – As required by State
3. Property Protection Insurance – As required by State
4. Uninsured Motorists - $1,000,000 Limit
5. Underinsured Motorists - $1,000,000 Limit
6. Physical Damage (Owned and Hired Autos) – Comprehensive $1,000 Deductible
7. Physical Damage (Owned and Hired Auto) – Collision $1,000 Deductible
8. Auto Loan/Lease Gap Coverage

Umbrella Liability - $25,000,000 per Occurrence/ $25,000,000 Aggregate per Location

Including:
1. Retained Limit – 0
2. Follows Scheduled Underlying Policies

Workers Compensation – Provided in All States except as Provided by the State Funds of – ND, OH, WA, WV, WY

Medical Benefits – Statutory
1. Indemnity – Statutory
2. Employers Liability - $500,000
   a. Each Accident
   b. Disease - Each Employee
   c. Disease – Policy Limit

Crime - $1,000,000 Occurrence Limit S/T/A $10,000 per Occurrence Deductible Covering:
1. Employee Theft
2. Forgery or Alteration
3. Computer Fraud
4. Funds Transfer Fraud
5. Theft of Money & Securities
   a. Inside the Premises
   b. Outside the Premises

Guest Property - $10,000 Limit per Occurrence
1. $1,000 deductible
2. Liability Governed by Statute

Professional Liability - $1,000,000 Each Claim / $2,000,000 Aggregate for All Claims
1. Claim Includes Identifiable Loss and Defense Cost
2. A $25,000 Deductible Applies to Loss and Defense

Employment Practices Liability
1. $2,000,000 Aggregate for All Loss Combined (Including Defense Cost)
2. Retention $25,000

2.     **Insurance Requirements for Major Contractors**:

(a)     Worker's Compensation - Statutory amount or its equivalent under applicable law.

**Exhibit D – Page 2**
6444430v.1

(b)     Employer's Liability - $500,000 minimum, where required by applicable or equivalent law.

(c)     Comprehensive General Liability; **either**

    (i)     $100,000 Bodily Injury per Person
              $300,000 per Occurrence
              $100,000 Property Damage

          **-or-**

    (ii)    $1,000,000 combined single limit

**EXHIBIT E**

**COMPETITIVE SET**



**Exhibit E – Solo Page**
6444430v.1

**MANAGEMENT AGREEMENT**

between

**RREAF O&G PORTFOLIO #2 LLC**
as Owner

and

**CHANNEL POINT HOSPITALITY LLC**
as Manager

FOR

[                    ]
308 Park Heights
Cuero, Texas 77954

## MANAGEMENT AGREEMENT

This Management Agreement (the "**Agreement**") made this ___ day of February 2016 between RREAF O&G PORTFOLIO #2 LLC, a Delaware limited liability company (**"Owner"**), as Owner, and **CHANNEL POINT HOSPITALITY LLC**, a Texas limited liability company (**"Manager"**), as Manager.

## RECITALS:

A.      Owner is the fee owner of the Hotel (as defined below).

B.      Manager is experienced in the management and operation of hotels, directly and through affiliated entities.

C.      Owner and Manager desire to enter into this Agreement for the management and operation of the Hotel in accordance with the terms and conditions and subject to the limitations contained in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner and Manager covenant and agree as follows:

## ARTICLE 1
## DEFINITIONS, TERMS AND REFERENCES

1.1      Definitions. In this Agreement and any Exhibits, the following terms shall have the following meanings:

"**Account Category**" shall include the major account categories set forth in Exhibit A attached hereto and made a part hereof as well as other major account categories, which are applicable to the Hotel consistent with the Statement of Income as defined by the Uniform System of Accounts or otherwise approved by Owner.

"**Accounting Fee**" shall have the meaning set forth in Article 11.

"**Accounting Period**" shall mean each calendar month (whether of 28, 29, 30 or 31 days) during each Fiscal Year.

"**Affiliate**" shall mean any person or entity that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with another person or entity. The term "**control**" (and correlative terms) shall mean the power, whether by contract, equity ownership or otherwise, to direct the policies or management of a person or entity. Without limiting the foregoing, an "**Affiliate**" also includes any partner or a partnership of any party to this Agreement, any member or membership parties thereto and any corporation, partnership, individual or trust related to or controlling or controlled by such partnership, individual or trust related to or controlling or controlled by such partnership party or its partners

or such membership party or its members. A natural person is related to another natural person if he or she is a spouse, parent, or lineal descendant of the other person.

"**Allocated Services**" shall mean certain support services that Manager obtains from a third party and provides on a central or regional basis to the hotels that it manages because such support services can be provided on a more efficient, effective and economical basis to each individual Manager managed hotel if the expenses of such support services are shared by other Manager managed hotels. Such support services include services in the areas of sales and marketing, food and beverage, human resources, insurance, technology, training and payroll (each such service, an "**Allocated Service**"; collectively, the "**Allocated Services**"). Owner and Manager agree that Manager shall provide Allocated Services to the Hotel and that the Hotel's portion of the cost thereof shall constitute a Gross Operating Expense so long as (i) the costs of the Allocated Services are allocated in good faith on a uniform, fair, equitable and proportionate basis among the Hotel and the other Manager managed hotels benefiting therefrom; and (ii) the Allocated Services shall not include services that do not benefit the Hotel; and (iii) the cost of the Allocated Services are either (a) included by Manager in each Annual Operating Budget or (b) otherwise approved in writing by Owner. The cost of the Allocated Services and the allocation of that cost to the Hotel and other Manager managed hotels shall be subject to audit by Owner pursuant to the terms of Section 10.3 of this Agreement. Manager further agrees that the benefit of any discounts or rebates received by Manager with respect to any of the Allocated Services shall be passed on to the Hotel on a proportionate basis as compared to other hotels managed by Manager or its Affiliates.

"**Annual Operating Budget**" shall mean an annual operating projection for the Hotel prepared and submitted by Manager to Owner and approved by Owner for each Fiscal Year pursuant to Section 4.4(a).

"**Annual Plan**" shall mean an annual business plan for the operation of the Hotel prepared by the Manager and approved by the Owner, which shall include the Annual Operating Budget, the Approved Capital Budget, the Marketing Plan and the Management Plan and any other material included therein by Manager as provided in Section 4.4.

"**Approved Capital Budget**" shall have the meaning set forth in Section 4.4(b).

"**Base Fee**" shall have the meaning set forth in Article 11.

"**Building and Appurtenances**" shall mean (i) the 79 room hotel building located on the Premises, and (ii) landscaping and other related facilities, together with all installations located at, or used in connection with the operation of the building for hotel purposes including, without limitation, any swimming pools, health club and recreational facilities, walkways, parking facilities, heating, lighting, sanitation equipment, air conditioning, laundry facilities, refrigeration, built-in kitchen equipment, and elevators.

"**Capital Budget**" shall mean Manager's proposed estimate of FF&E and Capital Improvements submitted to Owner each Fiscal Year pursuant to Section 4.4(b).

"**Capital Improvements**" shall have the meaning set forth in Section 8.2 hereof.

"**Commencement Date**" shall mean the date on which Manager assumes the management and operation of the Hotel under this Agreement for the benefit of Owner.

"**Competitive Set**" shall mean the properties listed on Exhibit E attached hereto and any revisions to such list agreed upon by Owner and Manager from time to time.

"**CPI**" shall mean the Consumer Price Index for All Urban Consumers, United States City Average, All Items (1982-84=100), issued by the Bureau of Labor Statistics of the United States Department of Labor.

"**Default Rate**" shall mean the lesser of (i) the Prime Rate plus four percent (4%) per annum or (ii) the highest lawful rate permitted by applicable Legal Requirements from time to time.

"**Effective Date**" shall mean the date of this Agreement as set forth on page 1 hereof.

"**Event of Default**" shall mean any of the events described in Article 16, provided that any condition contained therein for the giving of notice or the lapse of time, or both, has been satisfied.

"**Executive Personnel**" shall mean the general manager and the director of sales of the Hotel.

"**Fiscal Year**" shall mean the fiscal year that ends on the last day of each calendar year. The first Fiscal Year shall be the period commencing on the Commencement Date and ending on December 31st of the same calendar year in which the Commencement Date occurs. The words "full Fiscal Year" shall mean any Fiscal Year containing not fewer than 365 days. A partial Fiscal Year after the end of the last full Fiscal Year and ending with the expiration or earlier termination of the Term shall constitute a separate Fiscal Year.

"**Furniture, Fixtures and Equipment**" or "**FF&E**" shall mean all furniture, furnishings, wall coverings, fixtures, carpeting, rugs, fine arts, paintings, statuary, decorations, and hotel equipment and systems (including the costs associated with the purchase, installation and delivery thereof) located at, or used in connection with, the operation of the Building and Appurtenances as a hotel, including without limitation, major equipment and systems required for the operation of kitchens, bars, laundry and dry cleaning facilities, office equipment, dining room wagons, major material handling equipment, major cleaning and engineering equipment, telephone systems, computerized accounting and vehicles (including the costs associated with the purchase, installation and delivery thereof) together with all replacements therefor and additions thereto, but in all events excluding Operating Equipment and Supplies.

"**GOP  Threshold**" ██████████████████████████████████████

"**Gross Operating Expenses**" shall mean the following expenses actually incurred in the operation of the Hotel:

**Management Agreement – Page 3**
6444430v.1

1.    Cost of sales; salaries, wages, bonuses, payroll taxes; the cost of social insurance which shall include, but not be limited to, life, medical, disability insurance, retirement and other benefits incurred by Manager related to Hotel Employees;

2.    Departmental expenses; administrative and general expenses; the cost of third party vendor sources engaged to print payroll checks and reports or to perform any other services hereunder; the Accounting Fee; the Revenue Management Fee; advertising and business promotion for the Hotel; franchise fees, chain reservation fees and all other fees relating to the License Agreement; the cost of utilities, service contracts; and repairs and maintenance;

3.    The cost of replacing Operating Equipment and Supplies and Inventories as defined herein.

4.    The cost of uncollectible accounts receivables as reasonably determined by the Manager.

5.    The Owner-approved costs and expenses of technical consultants and operational experts for specialized services in connection with non-routine hotel work including roofing consultants, environmental engineers and others.

6.    The cost of insurance as set forth in this Agreement.

7.    The Management Fee.

8.    Real estate and personal property taxes levied or assessed against the Hotel and other like charges.

9.    Allocated Services.

10.    All other costs and expenses incurred in connection with the operation of the Hotel and otherwise approved as part of the Annual Plan or Annual Operating Budget, including but not limited to Reimbursable Expenses.

11.    Risk management costs.

12.    Legal services related to Hotel Employees or Hotel operations or services.

13.    Other amounts expressly set forth in this Agreement or the Annual Operating Budget as being included in Gross Operating Expenses.

All costs and fees of any Independent Public Accountants or other third parties who perform services approved by Owner (other than services provided by any Independent Public Accountants or other third parties in connection with services and/or reports required to be provided by Owner pursuant to the License Agreement) shall be paid by Owner and shall not constitute Gross Operating Expenses.

**Management Agreement – Page 4**

Except to the extent that the travel budget for Manager's personnel is included as a line item in the Annual Operating Budget, no part of Manager's central office overhead or general or administrative expenses including the cost of travel by Manager's corporate or regional officers (other than Allocated Services) or for travel related to any other hotel operated by Manager or its Affiliates shall be deemed to be part of Gross Operating Expenses and all such costs and expenses shall be the sole responsibility of Manager.

"**Gross Operating Profit**" or "**GOP**" shall mean the amount of the remainder of Gross Revenues of the Hotel less the departmental expenses and undistributed expenses of the Hotel.

"**Gross Revenues**" shall mean for any applicable Accounting Period, all revenues and receipts of every kind derived from the Hotel and all departments and parts thereof during such Accounting Period, as finally determined on an accrual basis in accordance with the Uniform System of Accounts, including, but not limited to, revenues and income (both cash and credit transactions) before commissions and discounts for prompt or cash payments, from the rental of rooms and lobby space, exhibit or sales space of any kind, including without limitation, charges for reservations, deposits and cancellation fees not refunded to guests; income from vending machines, health club membership fees, wholesale and retail sales of merchandise, service fees and charges, business interruption insurance claims (but only for periods during the operating term) in respect of the Hotel, condemnation awards for temporary use of the Hotel, license, lease and concession fees and rentals (but not including the gross receipts of any licensees, lessees and concessionaires), food and beverages sales, and other sales of every kind conducted by, through or under Manager in connection with the Hotel. Gross Revenues shall not include (i) Federal, state and municipal excise, sales and use taxes or similar impositions collected directly from patrons or guests or included as part of the sales price of any goods or services; (ii) gratuities or service charges collected and paid to employees; (iii) credits or refunds to guests; (iv) proceeds arising from the sale or other disposition of property described in Section 1231 of the Internal Revenue Code or of capital assets; (v) proceeds from condemnation and payments received on account of insurance policies (other than the proceeds from business interruption insurance and from condemnation awards for temporary use of the Hotel when received); (vi) proceeds from claims for damages suffered by Manager or Owner, unless in recompense for a lost revenue item; and (vii) interest earned on the Reserve or Permitted Investments.

"**Hotel**" shall mean (a) the Building and Appurtenances and the Premises owned by Owner and (b) all FF&E, all Operating Equipment and Supplies, and all Inventories owned by Owner located at 308 Park Heights, Cuero, Texas 77954.

"**hotel**" shall mean any hotel (other than the Hotel), inn, motor inn, motor hotel, motel, suite hotel, conference center, meeting center or any other facility providing either or both of short-term lodging and meeting arrangements.

"**Hotel Employees**" shall have the meaning set forth in Section 4.2.

"**Independent Public Accountant**" shall mean a nationally recognized firm of independent certified public accountants having hotel accounting experience, designated from time to time by Owner, subject to Manager's rights of approval, reasonably exercised.

"**Inventories**" shall mean "Inventories of Supplies" as defined in the Uniform System of Accounts, such as soap, toilet paper, stationery, writing pens, food and beverage inventories, paper products, menus, expendable office and kitchen supplies, fuel, supplies and items similar to any of the foregoing.

"**Legal Proceedings**" shall mean all complaints, counterclaims or cross-claims filed in a court of competent jurisdiction, any notice of any claim of violation of any legal requirement by any governmental agency or authority, or any summons or other legal process, in each instance by or against the Hotel or by or against Owner, or Manager in connection with the Hotel.

"**Legal Requirements**" shall mean (a) all laws, ordinances, statutes, regulations and orders relating to the Hotel and the Premises now or hereafter in effect, including but not limited to, environmental laws and (b) all terms, conditions, requirements and provisions of (i) all Permits; (ii) all leases; and (iii) all liens, restrictive covenants and encumbrances affecting the Hotel or the Premises or any part thereof.

"**License Agreement**" shall mean the franchise or license agreement, if any, from time to time entered into by Owner with respect to the branding and operation of the Hotel. For the purposes of this definition, the following terms used in said section shall have the following meaning: "**Licensor**" shall mean the franchisor or licensor under the franchise or license agreement from time to time entered into by Owner with respect to the branding and operation of the Hotel; "**Licensee**" shall mean Owner; and the "**Manual**" shall mean the Licensor's operating manual and other manuals for Licensor described in its standard license agreement.

"**Major Renovations**" shall mean a contemporaneously made set or series of alterations, additions and/or improvements to the Hotel with a total cost in excess of $100,000 (or a lesser amount in the event a project with a total cost less than $100,000 requires material design and purchasing and installation services related thereto and/or results in a material alteration in the design of the Hotel), but shall not include any Repairs or Maintenance with respect to Capital Improvements or FF&E.

"**Manager**" shall have the meaning set forth in the introductory section of this Agreement.

"**Management Fee**" shall mean the Accounting Fee**,** Revenue Management Fee and Base Fee, all as set forth in Article 11 hereof.

"**Management Plan**" shall have the meaning set forth in Section 4.4(d).

"**Marketing Plan**" shall mean an annual marketing plan for the Hotel prepared and submitted by Manager to Owner and approved by Owner in each Fiscal Year pursuant to Section 4.4(c).

"**Mortgage**" shall mean, collectively, each of the documents evidencing or securing current or future indebtedness on the Hotel in favor of a third party lender or financial institution or any successor thereto or replacement thereof (the "**Lender**").

"**Net Operating Income**" or "**NOI**" shall mean the result of Gross Revenues less Gross Operating Expenses.

"**Open for Business**" shall mean the period of time during which all or substantially all of the Hotel is open for business to the general public.

"**Operating Account**" shall mean a special account or accounts, bearing the name of the Hotel, established by Manager in a federally insured bank or trust company selected by Owner.

"**Operating Equipment and Supplies**" shall mean supply items which constitute "Operating Equipment and Supplies" under the Uniform System of Accounts, all miscellaneous serving equipment, linen, towels, uniforms, silver, glassware, china and similar items.

"**Operating Standards**" shall mean the operation of the Hotel in a manner consistent with (i) the requirements under the License Agreement; (ii) the condition of the Hotel as of the Commencement Date (or, following completion of a Renovation, the condition of the Hotel as of the completion of the Renovation), normal wear and tear excepted; (iii) the condition and level of the operation of hotels of comparable class and standing to the Hotel in its market area; (iv) then current market conditions regarding rental rates and lease terms and conditions with respect to Hotels of comparable class and standing to the Hotel (including but not limited to the Competitive Set); and (v) then current business and management practices (including those related to compliance with Legal Requirements) applicable to the management, operation, leasing, maintenance and repair of a hotel comparable in size, character and location to the Hotel.

"**Owner**" shall have the meaning set forth in the introductory section of this Agreement.

"**Performance Standard**" shall have the meaning set forth in Section 18.2.

"**Permits**" shall mean all governmental or quasi-governmental licenses and permits, including but not limited to any certificate of occupancy, business licenses and liquor licenses.

"**Permitted Investments**" shall mean (subject to modification, addition or deletion from time to time at the option of Owner by written request to Manager) all of which shall be in the name of Owner:

(a)    interest-bearing deposit accounts (which may be represented by certificates of deposit, time deposit open account agreements or other deposit instruments) in commercial banks having a combined capital and surplus of not less than $50,000,000; or

(b)    all other investments approved by Owner.

"**Premises**" shall mean the land on which the Hotel is located, which land is described in Exhibit B attached hereto.

**Management Agreement – Page 7**

"**Prime Rate**" shall mean the rate per annum announced, designated or published from time to time by JP Morgan Chase Bank N.A. as its "prime", "reference" or "base" rate of interest for commercial loans.

"**Reimbursable Expenses**" shall mean all travel, lodging, entertainment, telephone, facsimile, postage, courier, delivery, employee training and other expenses incurred by Manager in accordance with the standard policies for expenses incurred by Manager on its own behalf and which are directly related to its performance of this Agreement, but in no event will Reimbursable Expenses include or duplicate expenses for Manager's overhead or Allocated Services.

"**Renovation**" shall mean a renovation of any portion of the Hotel during the Term, pursuant to a plan proposed by Manager and approved by Owner to, among other things, bring the Hotel to a physical condition that satisfies the standards under the License Agreement and to operate in a manner consistent with the assumptions for the then-current Annual Operating Budget and then-current Annual Plan. A Renovation shall be carried out at the expense of Owner pursuant to plans and specifications and a schedule prepared by Manager and approved by Owner and, to the extent required under the License Agreement, by Licensor.

"**Repairs and Maintenance**" shall have the meaning as defined in Section 8.1.

"**Reserve**" shall mean an account maintained as a Permitted Investment for Reserve for replacement of FF&E and/or Capital Improvements, as described in Section 7.1 and funded as provided in Section 7.2.

"**Revenue Data Publication**" shall mean Smith's STR Report, a monthly publication distributed by Smith Travel Research, Inc., or an alternative source, reasonably satisfactory to both parties, of data regarding the average daily rate, occupancy and RevPAR of hotels in the general area of the Hotel, including, without limitation, the Competitive Set.

"**Revenue Management Fee**" shall have the meaning as defined in Section 11.

"**Revenue Per Available Room**" or "**RevPAR**" shall mean for any Test Period the number derived by dividing (i) net room revenue (in accordance with the Uniform System of Accounts), by (ii) the number of available guest rooms in the subject hotel.

"**RevPAR Threshold**" ████████████████████████████████████████

"**State**" shall mean the State in which the Hotel is located or other as designated.

"**Term**" shall mean the term of this Agreement, which shall be an initial five (5) year term commencing on the Commencement Date and expiring on the fifth (5th) anniversary of the Commencement Date, as such Term may be extended or shortened as expressly set forth in this Agreement or as otherwise agreed to by Owner and Manager.

**Management Agreement – Page 8**

**"Termination Fee"**



"**Test Period**" shall mean each twelve (12) month period during the Term commencing on the first day of the seventh (7th) calendar month following the Commencement Date and each subsequent three (3) calendar months thereafter.  In the event that this Agreement shall terminate on a date other than the last day of a calendar year, the last Test Period shall end on the date of termination.  The term "full Test Period" means any Test Period containing not fewer than 365 days.

"**Third Party Purchaser**" shall have the meaning set forth in Section 18.1.

"**Unavoidable Interruptions**" shall mean interruptions in the operation of or access to the Hotel or any of its essential services on account of an interruption in any one or more of the utility services described in Section 13.2, or on account of labor disputes, strikes, lockouts, fire or other casualty, war, terrorist actions, acts of God and other similar causes beyond the reasonable control of the party claiming an unavoidable interruption, but never financial inability. Other than obligations accruing prior to the occurrence of such event of Unavoidable Interruption or obligations that, if not performed, would cause a material adverse effect on the Hotel or its operations (for instance, the requirement to maintain the Permits or insurance obligations hereunder), the obligations of the party hereunder shall be suspended during the period of an Unavoidable Interruption.

"**Uniform System of Accounts**" shall mean the Uniform System of Accounts for Hotels, 10th Revised Edition, 2006, as published by the Hotel Association of New York City, Inc. or any later edition thereof.

"**Working Capital**" shall mean and refer to the funds which are reasonably necessary for the day-to-day operation of the Hotel's business, including, without limitation, amounts

sufficient for the maintenance of petty cash funds, operating bank accounts, receivables, payrolls, prepaid expenses, advance deposits, funds required to maintain inventories, and amounts due to/or from Manager and/or Owner less accounts payable and accrued current liabilities.

1.2 **Terminology**. All personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, shall include all genders; the singular shall include the plural, and the plural shall include the singular. The titles of Articles, Sections and Subsections in this Agreement are for convenience only, and neither limit nor amplify the provisions of this Agreement, and all references in this Agreement to Articles, Sections, Subsections, paragraphs, clauses, sub-clauses or exhibits shall refer to the corresponding Article, Section, Subsection, paragraph, clause or sub-clause of, or exhibit attached to, this Agreement, unless specific reference is made to the articles, sections or other subdivisions of, or exhibits to, another document or instrument.

1.3 **Exhibits**. All exhibits and other attachments attached hereto are by this reference made a part of this Agreement.

## ARTICLE 2
## MANAGEMENT OF HOTEL

Owner hereby engages and appoints Manager, pursuant to the terms of this Agreement, to operate and manage the Hotel, and Manager hereby agrees and contracts to plan, operate, repair and manage the Hotel pursuant to the terms of this Agreement.

Subject to the terms of this Agreement, Hotel operations shall be under the exclusive supervision and control of Manager, which, except as otherwise specifically provided in this Agreement, shall be responsible for the proper and efficient operation**,** maintenance and repair of the Hotel in accordance with the terms of this Agreement. Except as specifically set forth in this Agreement, Manager shall have discretion and control respecting matters relating to management and operation of the Hotel, including, without limitation, charges for rooms and commercial space, credit policies, food and beverage services, other Hotel services, employment policies, granting of concessions or leasing of shops and agencies within the Hotel, receipt, holding and disbursement of funds, maintenance of bank accounts, procurement of inventories, supplies and services, promotion and publicity and, in general, all activities necessary for operation of the Hotel.

Manager shall devote its knowledge, experience and efforts to operate and manage the Hotel pursuant to this Agreement in a businesslike manner in accordance with the Operating Standards. Manager shall make available to Owner the full benefit of the judgment, experience and advice of the members of Manager's organization and staff with respect to the policies pursued by Owner in operating, maintaining, and servicing the Hotel.

## ARTICLE 3
## TERM

3.1 **Term**. The initial Term automatically shall be extended beyond the initial Term for additional terms of one (1) year each, unless Owner provides written notice to Manager not

less than one hundred twenty (120) days prior to the end of the initial Term or the then-current extended Term, as applicable, of Owner's intent not to extend the Term of the Agreement. Notwithstanding the foregoing, the Agreement may be terminated prior to the scheduled expiration of the Term or any extension thereof, (i) without cause by Owner during the first six (6) months following the Commencement Date, provided that Owner provides Manager with not less than thirty (30) days written notice of termination prior to the effective date of such termination, or (provided that in the event that the Workers' Adjustment and Retraining Act, 29 USC, Sec 2101, et seq. (the WARN Act") is applicable to such termination and the replacement manager identified by Owner fails or refuses to retain a sufficient number of employees at the Property so as not to cause a "mass layoff" or "plant closing" under the WARN Act, Owner will extend the effective date of termination to allow the required notices to be provided under the WARN Act, (ii) upon the sale of the Hotel to a bona fide Third Party Purchaser, as provided in Article 18 hereof, provided that Owner provides Manager with not less than sixty (60) days written notice of such termination; and (ii) as otherwise provided in Articles 15, 16, 17 and 18.

3.2 **Surrender.** On the expiration or sooner termination of the Term, Manager shall quit and surrender the Premises to Owner in the condition required pursuant to this Agreement and take such other actions as contemplated by Article 20 hereof.

## ARTICLE 4
## USE AND OPERATION OF THE HOTEL

4.1 **Operation**. Manager shall be the sole and exclusive manager of the Hotel during the Term and shall operate the Hotel in accordance with the Operating Standards and the provisions of this Agreement. Manager shall act in a fiduciary capacity with respect to the proper protection of and accounting for Owner's assets. In this capacity, Manager shall deal at arm's length with Owner and all third parties, and Manager shall manage the Hotel in a manner which shall serve the Owner's interests at all times.

4.2 **Employment**.

(a) Subject to the terms of this Agreement, Manager shall select, employ, promote, transfer, compensate, terminate where appropriate, supervise, direct, train, and assign the duties of the Executive Personnel and, through the Executive Personnel, a sufficient number of personnel whom Manager reasonably determines to be necessary or appropriate for the proper, adequate and safe operation and management of the Hotel (collectively, the "**Hotel Employees**"). In connection therewith, Manager agrees to cause an employee or employees located in the corporate office of Manager, at no additional cost to Owner, to handle revenue management and sales management for this Property, together with other properties managed by Manager for Owner and its Affiliates. All such employees of the Hotel shall be employees of Manager or Manager's Affiliate. In addition, Manager may, from time to time, assign one or more of its employees to the staff of the Hotel on a full-time, part-time or temporary basis. Notwithstanding the provisions of this Section 4.2 or any other provision of this Agreement, all costs, expenses and liabilities relating to Hotel Employees shall be expenses of operating the Hotel and the responsibility of Manager for acts or omissions of Hotel Employees (or, for Hotel Employees who allocate their time between multiple hotels, an appropriate allocation of the costs

for such Hotel Employees) shall not extend beyond responsibility for the gross negligence or willful misconduct of, or the willful violation of Legal Requirements by the Executive Personnel. Manager acknowledges that such Executive Personnel have the duties specified in the first sentence of this Section 4.2 with respect to other Hotel Employees. Manager will negotiate with any union lawfully entitled to represent such employees and may execute collective bargaining agreements or labor contracts resulting therefrom that have been approved by Owner. Manager shall fully comply with all Legal Requirements having to do with worker's compensation, social security, unemployment insurance, hours of labor, wages, working conditions, and other employer-employee related subjects. With respect to matters of employment, this Agreement is not one of agency by the Manager for Owner but one with the Manager engaged independently in the business of managing properties on its own behalf as an independent contractor (as defined in §856(d)(3) of the Internal Revenue Code with regards to Owner and any Affiliates thereof). The cost of all employment arrangements shall be charged as Gross Operating Expenses of the Hotel and shall be accrued in accordance with generally accepted accounting principles; provided, however, relocation expenses which exceed the budgeted relocation expenses provided in the Annual Plan, shall not be charged as a Gross Operating Expense without the prior approval of Owner, such approval not to be unreasonably withheld, conditioned or delayed. The costs provided for in the immediately preceding sentence shall include, by way of example and not limitation, all reasonable costs and expenses (including, without limitation, all employment related expenses incurred by Manager with respect to the Hotel Employees), such as severance pay, unemployment compensation and health insurance and related costs (i.e., in order to comply with COBRA-type regulations) as a result of the termination of employees and which shall have been paid or accrued in accordance with generally accepted accounting principles. Manager shall use commercially reasonable efforts and exercise reasonable care to select qualified, competent, and trustworthy employees. The Hotel's general cashier and all employees having check signing authority shall be adequately bonded to the satisfaction of Owner and the cost of such bonds shall be an expense of the Hotel. To the extent possible and reasonably available, Manager shall use local labor to fill non-Executive Personnel positions in the operation of the Hotel. Owner may at any time consult or communicate with Manager regarding any of the Hotel Employees, but will not interfere in the day-to-day activities of Hotel Employees. The Manager shall not discriminate against any employee or applicant for employment because of race, color, religion, national origin, ancestry, age, sex or sexual orientation, and all employment advertising shall indicate that Manager and Owner are each an Equal Opportunity Employer as that term is defined under Legal Requirements.

Notwithstanding anything to the contrary contained in this Agreement, the following subparagraphs (b) and (c) shall apply to any liability that may, from time to time, arise out of the Employee Retirement Income Security Act of 1974 ("**ERISA**") and the Multi-employer Pension Plan Amendments Acts of 1980 ("**MEPPA**"), respectively, as from time to time amended.

(b) Employee Benefits: Any Hotel Employees who are not then represented by a collective bargaining representative shall be entitled to participate in the incentive programs, profit sharing and/or other employee retirement, disability, health, welfare or other benefit plan or plans then made available by Manager to similarly situated employees of other hotels managed by Manager, in accordance with their respective terms. Manager will have the right to charge the Hotel with its allocable share of the cost of any such plan or plans and any

**Management Agreement – Page 12**
6444430v.1

contributions to be made thereunder provided that such charges and contributions shall be determined by Manager in good faith on a uniform basis with respect to charges and contributions imposed for the same or similar plans at other hotels then managed by Manager, subject to Legal Requirements. Manager's rights under this Subsection (b) shall be subject to the condition that Manager shall not put into effect any amendment to any existing plan, or adopt any additional plan, which is not imposed upon all other similarly situated hotels managed by Manager.

Upon the expiration or termination of this Agreement, the sale of the Hotel or other similar event, Manager shall cooperate with the Owner with respect to disposition of such plan or plans (or plan assets) in a mutually satisfactory manner, all in compliance with then applicable Legal Requirements.

(c)     Collective Bargaining or Other Multi-employer Plans: Manager and Owner agree that with respect to any withdrawal liability arising under any collective bargaining agreement or other "multi-employer plan" (as defined in Section 3(37) of ERISA) in which the Hotel Employees become participants, the obligations of the parties shall be determined as follows:

(1)     Withdrawal liability arising with respect to Hotel Employees shall be the responsibility of Owner, and Owner shall either pay the amount of such withdrawal liability directly to such plan or reimburse Manager for withdrawal liability payments made to such plan by Manager with respect to Hotel Employees (including withdrawal liability arising after the sale or other termination of this Agreement, provided that such liability arises as a result of such sale, disposition, termination or other similar event). To the extent permitted under then applicable laws, regulations and agreements, Manager shall cooperate with Owner in structuring transactions and transferring actual or contingent withdrawal liability to a successor in ownership or purchaser of the Hotel in accordance with "relief" provisions of ERISA, such as ERISA Section 4204 or then applicable statutory or regulatory provisions of a similar nature.

(2)     For purpose of this subparagraph (c), the term "withdrawal liability" shall mean the actual amount assessed by and payable to a multi-employer pension fund upon a complete or partial withdrawal of the Hotel or Hotel Employees from such fund. Manager shall cooperate with Owner in challenging a plan's assessment of such liability, provided that all costs of litigation, arbitration or other procedures shall be paid by Owner (including any bonds that must be posted). If Manager or its Affiliates have employees at other locations who participate in the same multi-employer plan as Hotel Employees, Owner shall be charged with and be responsible only for multi-employer plan withdrawal liability arising solely with respect to the participation of Hotel Employees in such plan.

4.3     **Legal Proceedings**. Legal Proceedings of a "non-extraordinary nature" (hereafter defined), may be instituted by Manager, in accordance with guidelines and policies determined from time to time by Manager and Owner, in the name of Manager or the Hotel or Owner and by counsel designated by Manager pursuant to such guidelines and policies. Legal Proceedings of an "extraordinary nature" (hereafter defined) shall require Owner's prior approval of the proceedings and counsel approved by Owner. Manager shall furnish Owner with quarterly status reports with respect to all Legal Proceedings of an extraordinary nature. In addition, Manager

shall have the right to defend, through counsel designated by Manager, Legal Proceedings of a non-extraordinary nature against Owner or Manager resulting from the operation of the Hotel. The defense of Legal Proceedings against the Hotel of an extraordinary nature (including, without limitation, any aspect of any claims against Manager or Owner arising out of the operation of the Hotel as to which the insurance company denies coverage) shall be coordinated with Owner, designated counsel shall be subject to Owner's reasonable approval and Manager shall furnish Owner with quarterly status reports with respect to such actions. All claims against Owner and/or Manager arising out of the management or operation of the Hotel which (i) are not covered by insurance shall be promptly communicated to Owner and (ii) are covered in whole or in part by insurance shall be promptly forwarded by Manager to the appropriate insurer (with a copy thereof to Owner in the case of claims against Owner). Legal Proceedings of a "non-extraordinary nature" shall be proceedings in which the monetary exposure is less than $50,000 that are (i) initiated by Manager or Owner relating to the operation of the Hotel for matters such as collections, maintenance of licenses and permits, enforcement of contracts and proceedings against Hotel tenants; and/or (ii) defense of actions against the Owner or Manager resulting from the operation of the Hotel, for matters such as guest claims for loss of property or injury to persons and claims relating to employment or the application for employment at the Hotel. Legal Proceedings of an "extraordinary nature" shall mean all other Legal Proceedings.

4.4     **Annual Plan**. On or before the date that is forty-five (45) days following the Commencement Date, Manager shall submit to Owner an Annual Plan ("**Annual Plan**") for the remaining portion of the Fiscal Year in which the Commencement Date occurs and Owner either shall accept the initial Annual Plan submitted to Owner as provided above or shall submit to Manager a detailed list of Owner's objections or questions to the Annual Plan. Owner and Manager shall meet and discuss Owner's Annual Plan objections and shall coordinate expeditiously and in good faith to agree upon an Annual Plan for the remaining portion of the Fiscal Year in which the Commencement Date occurs. On or before November 15th of each year following the Commencement Date, Manager shall submit to Owner an Annual Plan for the next Fiscal Year and on or before December 15th of each year following the Commencement Date, Owner either shall accept the Annual Plan submitted to Owner as provided above or shall submit to Manager a detailed list of Owner's objections or questions to the Annual Plan ("**Owner's Annual Plan Objections**"). Within fifteen (15) days after Manager's receipt of Owner's Annual Plan Objections, Owner and Manager shall meet and discuss Owner's Annual Plan Objections with the goal of agreeing upon an Annual Plan for the subject Fiscal Year. Owner, as part of Owner's Annual Plan Objections, shall have the right to object to the entire Annual Plan or to any specific item or items contained in the Annual Plan. In the event Owner objects to the Annual Plan or any specific item or items of expense in the Annual Plan and Owner and Manager are unable to reach agreement thereon as provided above prior to commencement of the Fiscal Year in question, pending such agreement, the Annual Plan or the specific item or items of expense (not revenue) in question shall be suspended and replaced for such period that the Annual Plan or such item(s) are in question by an amount equal to the lesser of (i) that proposed by Manager for such Fiscal Year, or (ii) if an objection to the entire Annual Plan, the Actual Gross Operating Expenses for the immediately preceding Fiscal Year subject to an adjustment equal to the percentage increase in the CPI over the last twelve (12) month period immediately preceding the start of the Fiscal Year in question, or (iii) if an objection to a specific item or items of expense in the Annual Plan, such item or items of expense for the immediately

preceding Fiscal Year subject to an adjustment for each item equal to the percentage increase in the CPI over the twelve (12) month period immediately preceding the start of the Fiscal Year in question.

(a)     The Annual Operating Budget shall be prepared in accordance with the Uniform System of Accounts. The proposed Annual Operating Budget shall incorporate Manager's good faith reasonable estimates of the items of revenue and expense contained therein and shall contain the proposed budget for operations for the succeeding Fiscal Year. When approved by Owner, the proposed Annual Operating Budget shall be the approved Annual Operating Budget. Any revisions, substitutions or additions to the Annual Operating Budget must be approved by the Owner in writing.

As part of the budgeting process, Manager shall provide to Owner, with each proposed Annual Operating Budget, a complete list of all service and other contracts anticipated for the Fiscal Year which is the subject of the Annual Operating Budget having a liability to the Hotel in excess of $25,000 for such Fiscal Year for or covering the Hotel and the payments or expenditures connected or anticipated therewith. So long as any service or other contracts fall within the following guidelines, Owner's approval thereof shall not be required, but Manager shall nevertheless promptly report to Owner the execution of (and provide Owner with a true and complete copy of) each such contract having a liability to the Hotel of in excess of $25,000:

(i)     The term of such contract shall be no longer than one (1) year; and

(ii)     Each contract must be terminable by Owner or Manager without payment or penalty upon not more than thirty (30) days' notice.

In addition, Manager shall provide to Owner for Owner's review, a written schedule for the Hotel listing all executive and management employees to be employed "on-site" in the direct management of the Hotel including, but not limited to the positions of General Manager, Director of Sales, Chief Engineer and the portfolio sales and revenue manager. These schedules shall include such employee's title or job description and the salary range including additional compensation or prerequisites such as lodging, meals, maintenance, moving expenses, bonus/incentive compensation and the like. In the event that any employee's services are shared with (or subsidized through a sharing arrangement with) another hotel, the employee shall be identified together with a description of his/her responsibilities and the amount and source of any subsidy, together with a breakdown of the relative time expended with respect to the Hotel and each other hotel. If Owner notifies Manager that Owner does not believe that some or all of the scheduled wages and salaries are reasonable and customary as required above, then Manager shall promptly provide to Owner a wage and salary survey that supports the scheduled wages and salaries. No proposed amendment including changes in salary or other compensation shall be effective unless the salary or other compensation as changed is reasonable and customary as required above.

(b)     The Capital Budget shall be prepared in accordance with the Uniform System of Accounts. The Capital Budget shall contain the proposed budget for expenditures from the Reserve and the budget for expenditures for Capital Improvements and FF&E for the succeeding

Fiscal Year for (i) additions to and substitutions, replacements and renewals of FF&E and (ii) certain non-routine repairs and maintenance to the Project which are normally capitalized under generally accepted accounting principles such as exterior and interior repainting, resurfacing building walls, floors, roof and parking areas, replacing folding walls and similar items. Manager shall submit good faith reasonable estimates for Capital Improvements and for FF&E for the Fiscal Year following the Fiscal Year otherwise covered by the Annual Operating Budget. When approved by Owner, the Capital Budget, or such items as may be specifically approved by Owner, shall be collectively referred to in this Agreement as the "Approved Capital Budget". Approval of the Capital Budget constitutes an authorization for Manager to expend money for Capital Improvements and for FF&E as provided in the Approved Capital Budget, unless the Owner's approval thereof specifically requires Manager to obtain additional approvals prior to commencing such work. Any revisions, substitutions or additions to the Approved Capital Budget must be approved by Owner in writing.

Competitive bid rules outlined in Section 4.5 will be observed at all times by Manager for any purchases of Capital Improvements and/or FF&E.

(c)     On or before the date that is thirty (30) days following the Commencement Date, Manager shall submit to Owner the Marketing Plan, which Marketing Plan shall contain advertising, sales and promotional plans prepared by Manager to be used in connection with the marketing of the Hotel and the portfolio of hotels owned by Owner and managed by Manager. On or before November 15th of each year following the Commencement Date, Manager shall submit to Owner an Annual Plan for the next Fiscal Year.  When approved by Owner, the proposed Marketing Plan shall be the approved Marketing Plan. Any revision, substitution or additions to the Marketing Plan must be approved by Owner in writing. The Marketing Plan shall be written with the goal of achieving Gross Revenues as submitted in the Annual Operating Budget for the Fiscal Year or, if less than a full Fiscal Year, the period between the Commencement Date and the December 31 next following the Commencement Date. Manager shall not use Owner's name in any advertising or promotional material without Owner's expressed prior written approval.

(d)     The Management Plan shall contain (i) estimated contributions and distributions from or to Owner; (ii) a leasing plan for the leasing of concessions and other space in the Hotel; (iii) plans and budgets for the disposition and replacement of FF&E; and (iv) such management issues, proposals and projections or modifications as Manager may recommend for the efficient management of the Hotel including but not limited to proposals and assessments as to the Hotel's position in the market, market opportunities, franchise affiliation and disposition strategies. When approved by Owner, the proposed Management Plan shall be the approved Management Plan.

4.5     **Competitive Bidding**. All contracts for repairs, Capital Improvements, FF&E, food and services exceeding $10,000 shall be awarded on the basis of competitive bidding (provided, however, that Manager will not be required to obtain competitive bids for any service for which a single provider exists), solicited in the following manner:

(a)  A minimum of two (2) written bids shall be obtained for each purchase or contract that exceeds $10,000, up to $25,000. Purchases over $25,000 will require a minimum of three (3) bids.

(b)  Each bid will be solicited in a uniform format.

(c)  Subject to approval by Owner, Manager may accept a low bid if the expenditure is for an approved item in the budget and will not result in an excess of the annual budgeted Account Category of the applicable Capital Budget or Annual Operating Budget.

(d)  If Manager desires to accept a bid other than the lowest bid, then Manager shall so advise Owner in writing and recommend that such bid be accepted, with support for such recommendation.

(e)  Owner shall have the right to accept or reject any and all bids for repairs, Capital Improvements, FF&E or foods and services that are not the lowest bid; such acceptance shall not be unreasonably withheld or delayed.

(f)  Manager may request Owner to waive in writing competitive bidding rules for a specific item or service.

In its operation of the Hotel under this Agreement, Manager may purchase goods, supplies and services from itself, Owner or Owner's representatives, or any Affiliates of any of the foregoing so long as the prices and terms thereof are at arm's length and otherwise competitive with, and are not less favorable than prices and terms which could be obtained from independent parties and, if required by Section 4.5, are in compliance with competitive bidding rules, provided that Manager will obtain Owner's consent (not to be unreasonably withheld) regarding any such arrangement.

4.6  **Labor Relations**. Manager shall have no right to enter into any collective bargaining agreement concerning any employees of the Hotel without the prior written approval of Owner, which may be granted or withheld in its sole discretion. Upon Owner's approval of any such agreement, Manager shall be responsible to perform such agreements. To the extent applicable, Manager: (a) represents that it is an equal opportunity employer as described in Section 202 of Executive Order 11246 dated September 24, 1965, as amended, and as such agrees to comply with the provisions of Paragraphs 1 through 7 of Section 202 of said Executive Order during the performance of this Agreement, (b) agrees to comply with the affirmative action requirements of Part 60.741 of Title 41, Code of Federal Regulations, with respect to handicapped workers during the performance of this Agreement, (c) agrees to comply with the affirmative action requirements of Part 60.250 of Title 41, Code of Federal Regulations, with respect to Disabled Veterans and Veterans of the Vietnam Era during the performance of this Agreement, and (d) shall submit to Owner in the form approved by the Director of the Office of Federal Contract Compliance, U.S. Department of Labor, a certification that Manager does not and will not maintain any facilities that provide for their employees in a segregated manner, or permit their employees to perform their services at any location under its control, where segregated facilities are maintained, and that Manager will obtain a similar certification from its contractors.

**Management Agreement – Page 17**

6444430v.1

4.7    **Liquor License**. INTENTIONALLY OMITTED.

4.8    **Employee Discount**. To the extent Manager, Owner or any of their respective Affiliates owns or has any equity interest in other hotels and provides a discounted rate to the employees at such other hotels, such party agrees to provide the same discounted rate (subject to availability and black-out periods) to the employees of the other parties named in this Section 4.8 to the extent allowed under the management and ownership agreements affecting such other hotels.

4.9    **Forms**. Manager shall prepare or cause to be prepared for execution by Owner all forms, reports and returns, if any, required to be filed by Owner under applicable law with respect to the operation of the Hotel; however, Manager shall not be obligated to prepare any of Owner's income tax returns. Without limitation, Manager shall timely prepare and deliver, as required by law, an Internal Revenue Service Tax Form 1099 with respect to payments made during a calendar year to third party contractors and professionals.

4.10    **Notice of Violations**. Manager shall promptly notify Owner in writing of any written notice received from any regulatory or governmental body regarding an actual or perceived violation of any Legal Requirements.

## ARTICLE 5
## RELATIONSHIP OF PARTIES

Except as provided in Section 4.2(a), Owner and Manager acknowledge and agree that this Agreement creates an agency relationship; provided, however, that (a) each Hotel Employee shall be the employee of Manager or Manager's Affiliate and not of Owner, (b) Manager's authority is subject to the terms and conditions of this Agreement, and (c) nothing in this Agreement shall constitute, or be construed to be, or create, a partnership, joint venture or lease or employment arrangement between Owner and Manager with respect to the Hotel or the operation thereof. Employees or agents of Manager are not by this Agreement or by any actions of Owner and/or Manager hereunder made employees of Owner, and are not entitled to the benefits provided by Owner or its Affiliates to its employees, including but not limited to, group insurance, leave and pension plan. This Agreement shall not be deemed at any time to be an interest in real estate or a lien or security interest of any nature against the Hotel, the Premises or any other land used in connection with the Hotel, or any equipment, fixtures, inventory, motor vehicles, contracts, documents, accounts, notes, drafts, acceptances, instruments, chattel paper, general intangibles, or other personal property now existing or that may hereafter be acquired or entered into with respect to the Hotel or the operation thereof.

## ARTICLE 6
## ADVERTISING

Subject to and in strict compliance with the provisions of the License Agreement, Manager shall arrange and contract for all advertising, which Manager may reasonably deem necessary, in accordance with Section 4.4, for the operation of the Hotel. So long as the License Agreement may be in effect, Manager generally shall advertise the Hotel under the name "– Petrol Inn & Suites" or such other name as Owner may designate or approve.

## ARTICLE 7
## RESERVE FOR FF&E

7.1     **Reserve for Replacement of FF&E**. The Reserve shall be funded pursuant to Section 7.2, and Manager shall use amounts in the Reserve to cover the cost of FF&E expenditures and Capital Improvements, as described in Section 4.4 in conjunction with the Approved Capital Budget. All FF&E, Capital Improvements and the Reserve shall be the property of Owner.

7.2     **Transfers to Reserve for FF&E**. Commencing on the Commencement Date and continuing thereafter during the remainder of the Term, Manager shall deposit monthly into the Reserve for FF&E an amount equal to the amounts required by Lender and/or by Licensor; provided that in no event will the amounts to be deposited monthly into the Reserve be less than an amount equal to four percent (4%) of Gross Revenues throughout the remainder of the Term.

7.3     **Annual Adjustment**. At the end of each Fiscal Year and following receipt by Manager of the annual accounting referred to in Article 10, an adjustment will be made to such annual account, if necessary and if available, so that the appropriate amount shall have been deposited in the Reserve.

7.4     **Maintenance of Reserve**. Checks or other documents of withdrawal shall be signed by representatives of Manager who shall be bonded or otherwise insured pursuant to the "crime – Theft of Money and Securities" coverage set forth on Exhibit D to this Agreement. The proceeds from the sale of FF&E no longer needed for the operation of the Hotel shall be deposited in the Reserve, but not be credited against the obligation to deposit cash in such fund for the then current Fiscal Year. All interest earned or accrued on amounts invested from the Reserve shall be added to the Reserve (but shall not be credited against Owner's obligations to fund the Reserve), and shall not constitute Gross Revenues or be included therein.

7.5     **Accumulation of Reserve and Additional Cost of FF&E and Capital Improvements**. Owner and Manager acknowledge and agree that portions of the Reserve may, from time to time in accordance with the then-current Annual Plan, be used for more significant expenditures than could be reserved for in a single year.  Accordingly, at the end of each Fiscal Year, any amounts remaining in the Reserve shall be carried forward to the next Fiscal Year, and shall be in addition to the amount to be reserved in the next Fiscal Year. In the event at any time there are insufficient funds in the Reserve for any Fiscal Year to pay the cost of FF&E in accordance with the Annual Operating Budget and the Approved Capital Budget, then Owner will, at Owner's option, within sixty (60) days after request therefor by Manager, either provide the additional cash to the Manager to pay for such excess or authorize the funding of such cash from Net Operating Income.

7.6     **Final Remittance**. Upon expiration or termination of this Agreement, Manager shall remit all remaining amounts in the Reserve forthwith to Owner.

## ARTICLE 8
## REPAIRS AND MAINTENANCE AND CAPITAL IMPROVEMENTS

8.1    **Repairs and Maintenance**. Manager shall, from time to time, make such expenditures from Gross Revenues for repairs and maintenance including service contracts ("**Repairs and Maintenance**") as required by the Lender, the License Agreement, the Legal Requirements, the then current Annual Plan or as necessary to maintain the Hotel in good operating condition in compliance with the License Agreement and otherwise in the condition required by this Agreement, including but not limited to repairs and maintenance of HVAC, mechanical and electrical systems, exterior and interior repainting, resurfacing building walls and parking areas, waterproofing of exterior surfaces of floors, roofs, and replacement of plate glass, or the like. It is Owner's intent that the sums allocated for Repairs and Maintenance in accordance with the then current Annual Plan are to be fully expended during that Fiscal Year exclusively for the purposes identified in such Annual Plan. Except in the event of an emergency due to casualty, act of God or otherwise under circumstances in which it would be unreasonable to seek to obtain prior approval (and provided that Manager shall notify Owner of any such expenditure within a reasonable time given the nature and scope of the emergency), all expenditures for the foregoing shall be as provided in the Annual Operating Budget and the Approved Capital Budget. If any such Repairs or Maintenance shall be made necessary by any condition against the occurrence of which Owner has received the guaranty or warranty of the builder or the Hotel or of any supplier of labor or materials for the Hotel or of any supplier of labor or materials for the construction of the Hotel, then Manager may invoke said guarantees or warranties in Owner's or Manager's name and Owner shall cooperate in all reasonable respects with Manager in the enforcement thereof.

8.2    **Capital Improvements**. Owner may, from time to time, at its sole expense, make such structural repairs, replacements, substitutions, alterations, additions or improvements (exclusive of FF&E) ("**Capital Improvements**") in or to the Hotel as Owner shall determine are necessary to comply with the Operating Standards. If Capital Improvements included in the definition of Building and Appurtenances shall be required at any time during the Term by the terms of any Mortgage, the License Agreement, to maintain the Hotel in good operating condition or by reason of any Legal Requirements, or because Manager and Owner jointly agree upon the desirability thereof, then in such event all such Capital Improvements shall be made with as little hindrance to the operation of the Hotel as reasonably possible. Notwithstanding the foregoing, as long as the Hotel can continue to operate without interruption, Owner shall have the right to contest the need for any such Capital Improvements required by any Legal Requirements and may postpone compliance therewith, if so permitted by law and if such postponement will not expose Manager to any civil or criminal liability. All recommendations by Manager of Capital Improvements shall be submitted in conjunction with the Capital Budget for the Fiscal Year described in Section 4.4(b). In the event that Owner elects to perform Major Renovations to the Hotel, Owner shall have the right to cause (i) Manager, or (ii) a third party, to oversee the performance of the Major Renovations for which oversight, if Manager is overseeing the Major Renovations, Manager shall be paid a project management fee (in addition to the Management Fee) equal to three percent (3%) of the budgeted hard cost items including contingency and any Owner-approved changes of the Major Renovations (the "**Project Fee**"). With respect to (i) Major Renovations as contemplated by this Agreement which Owner elects to

have Manager oversee and (ii) improvements that are not Major Renovations, Manager shall oversee such projects in a reasonably prudent manner.

8.3     **Service Contracts**. Manager, without requiring the consent of Owner, shall enter into any contract for cleaning, maintaining, repairing or servicing the Hotel or any of the constituent parts of the Hotel as Manager deems necessary for the operation of the Hotel, except as specifically provided in Section 4.4 or 4.5. Manager shall submit the listing of service contracts entered into for the Hotel required pursuant to Section 4.4(a). Unless otherwise approved by Owner, all service contracts shall: (a) be in the name of Owner or Owner's nominee, (b) to the extent customary, include a provision for cancellation thereof by Owner or Manager upon not more than thirty (30) days written notice, and (c) shall require that all contractors provide evidence of such insurance as is customarily carried by other contractors involved in similar servicing arrangements.

8.4     **Liens**. Owner and Manager shall cooperate and use all commercially reasonable efforts to prevent any liens from being filed against the Hotel that arise from any maintenance, changes, repairs, alterations, improvements, renewals or replacements in or to the Hotel. If any such liens are filed, Manager shall, subject to the availability of funds therein in the Operating Accounts or as otherwise supplied by Owner, obtain the release thereof prior to the institution of legal proceedings in connection therewith. The cost of obtaining such release shall be included in Gross Operating Expenses, unless the imposition of the lien results from a default by Owner or Manager, in which event the cost of obtaining such release shall be borne by such defaulting party.

8.5     **Notice of Unavoidable Interruptions**. In the event of any occurrence constituting an Unavoidable Interruption, Manager shall promptly notify Owner of such occurrence and shall keep Owner informed as to the extent and impact thereof on the Hotel.

<u>ARTICLE 9</u>
**WORKING CAPITAL AND BANK ACCOUNTS; DISTRIBUTION OF NET OPERATING INCOME**

9.1     **Working Capital**. Owner shall provide initial Working Capital in the amount of $\_\_\_\_\_ in addition to the value of all Inventories. Owner shall at all times cause sufficient funds to be on hand in the Operating Accounts to assure the timely payment of all current liabilities of the Project, including but not limited to Gross Operating Expenses, all other costs and expenses incurred in connection with the Project pursuant to this Agreement and the performance by Manager of its obligations under this Agreement, all fees, charges and reimbursements payable to Manager hereunder and all amounts required hereunder to be transferred into the Reserve. In no event shall Owner permit the balance in the Operating Accounts to be less than an amount equal to the estimated monthly operating expenses of the Project as reflected in the then current Annual Operating Budget. From time to time, upon five (5) days prior written notice from Manager that such funds are required, Owner shall furnish to Manager funds that Manager deems reasonably necessary to assure that the Project shall have adequate working capital as herein provided. In the event Owner fails to supply required working capital in accordance with the provisions of this Section or if Manager otherwise deems such

<u>**Management Agreement – Page 21**</u>
6444430v.1

action to be necessary, Manager may use all or part of the funds in the Reserve to supplement the Operating Accounts in order to defray or pay the Project's operating costs and expenses, to the extent permitted by the Mortgage. Owner shall promptly reimburse the Reserve for all sums so used or transferred. All unexpended Working Capital, Inventories and Operating Equipment and Supplies purchased with Working Capital shall remain the property of Owner.

9.2 **Operating Account**. All funds (exclusive of funds deposited in the Reserve and house banks at the Hotel) received by Manager in the operation of or otherwise relating to the Hotel, and funds for Working Capital provided by Owner or retained by Manager from Gross Revenues, shall be deposited in the Operating Account. Manager shall inform such bank in writing that the funds deposited in the Operating Account are owned solely by the Owner. Manager shall not deposit funds attributable to any other property into the Operating Account. To the extent permitted by the Mortgage, amounts in the Operating Account may be temporarily withdrawn and invested by Manager in any Permitted Investments, having due regard for the timing of cash needs, but in no event shall such funds be co-mingled by Manager with any other funds. From the Operating Account, Manager shall pay all Gross Operating Expenses (other than the excess FF&E if funded by or through Owner) before any penalty or interest accrues thereon, however, taking into account sound cash management. All interest earned or accrued on amounts invested from the Operating Account shall be added to the Operating Account. All checks or other documents of withdrawal from the Operating Account shall be signed by representatives of Manager except as provided in Section 9.3 hereof.

9.3 **Maintenance of Operating Account**. Subject to Section 9.4, the Operating Account shall be opened and maintained at all times by Manager and Owner and checks and other documents of withdrawal shall be signed by representatives of Manager who are covered by the required fidelity bond or otherwise insured pursuant to the "Crime – Theft of Money and Securities" coverage set forth on Exhibit D. The Operating Account and any other bank accounts approved by Owner shall be in Owner's name (for example, "*[Owner's name]* d/b/a/ *[Hotel name]*").

Manager shall not change the bank or open or close any bank account described in this Article 9 without Owner's prior written approval. Owner, in its sole and absolute discretion, may in writing direct Manager to change any such bank, signatories or arrangements. The bank in which the Operating Account is located shall be informed by Manager in writing that the funds in such account are held in trust for Owner and that any checks for more than $10,000.00 shall be required to be signed by two (2) authorized signatories on the account.

9.4 **Final Remittance**. Upon the expiration or termination of this Agreement, after payment of all Gross Operating Expenses for which bills were received to such date, Manager's Management Fee, Reimbursable Expenses, any Termination Fee and any other amounts then due and payable to Manager, all remaining amounts in (i) the Reserve, (ii) the Operating Account and (iii) the Permitted Investments, shall be transferred forthwith to Owner by Manager. Owner shall pay Manager any remaining Management Fee, any Termination Fee, Reimbursable Expenses and any other amounts then due and payable and Owner shall pay, or cause to be paid, and shall hold Manager harmless from and against all Gross Operating Expenses accrued in

accordance with generally accepted accounting principles and invoices related to Gross Operating Expenses received after Manager has so transferred all funds.

9.5     **Distribution of Excess Cash**. Together with the financial report provided for in Section 10.2(b), Manager shall distribute to Owner all sums in the Operating Accounts in excess of the then working capital requirements of the Hotel determined in accordance with Section 9.1 of this Agreement.

**ARTICLE 10**
**BOOKS, RECORDS AND STATEMENTS**

10.1     **Books and Records**. Manager shall keep full and adequate books of account and other records reflecting the results of operation of the Hotel in accordance with the Uniform System of Accounts and generally accepted accounting principles. The books of account and all other records relating to or reflecting the operation of the Hotel shall be kept either at the Hotel or at Manager's corporate offices and shall be available to Owner and its representatives and its auditors or accountants, at all reasonable times for examination, audit, inspection and transcription at Owner's sole cost and expense. All of such books and records pertaining to the Hotel including, without limitation, books of account, guest records and front office records at all times shall be the property of Owner and shall not be removed from the Hotel's or Manager's offices by Manager without Owner's approval and consent. Upon any termination of this Agreement, all of such books and records forthwith shall be turned over to Owner at a location designated by Owner so as to insure the orderly continuance of the operation of the Hotel, but such books and records shall thereafter be available to Manager at all reasonable times for inspection, audit, examination and transcription for a period of two (2) years.

10.2     **Financial Reports**.

(a)     Manager shall deliver to Owner within twenty (20) days following the close of each Accounting Period a monthly profit and loss statement reflecting a comparison of periodic and year-to-date actual revenues and expenses with the Annual Operating Budget as well as a periodic and year-to-date comparison of such actual revenues and expenses with those of the prior Fiscal Year.

(b)     Further, Manager shall provide to Owner within twenty (20) days following the close of each Accounting Period a report prepared in accordance with the example set forth in Exhibit C attached hereto and made a part hereof, which include without limitation, forward bookings, accounts receivable, accounts payable and a monthly sales overview report.

(c)     Further, within seventy-five (75) days after the end of each Fiscal Year, Manager shall deliver to Owner an annual accounting, showing the results of operation of the Hotel during the Fiscal Year and a computation of Gross Revenues, Gross Operating Expenses, and Net Operating Income, if any, and any other information necessary to make the computations required hereby or which may be requested by Owner, all for such Fiscal Year. The annual accounting for any Fiscal Year shall be controlling over the interim accountings for such Fiscal Year. Owner shall have the right to conduct an audit of the books.

(d)     Further, Manager shall prepare and deliver any additional reports or information as Owner is required to provide under the License Agreement.

10.3    **Audits by Owner**. Owner shall have the right to audit, conducted either by Owner's internal personnel or by a third party auditor retained by Owner at its expense, all items of expense and revenue under this Agreement including, but not limited to, Gross Revenues, Gross Operating Expenses, depreciation, the Management Fee and Reserve. Manager shall cooperate and assist with such audit. In the event that an audit reflects an underpayment to Owner or Manager or an overpayment to Manager or Owner, Manager shall correct same by a corrective payment to Owner or Manager, as appropriate, within ten (10) days following notice of the audit results to Manager, subject to Owner's and Manager's right to challenge the audit results in accordance with the provisions of Article 30 of this Agreement. If an audit determines any weaknesses or need for reasonable changes in the internal control systems pertaining to the safeguarding of Owner's assets, Manager will promptly make all necessary changes.

10.4    **Segregation of Accounts**. In any instance where Manager manages several properties for Owner, Manager shall segregate the income and expenses of each property so that Gross Revenues from each property will be applied only to the bills and charges from that property.

**ARTICLE 11**
**MANAGER'S MANAGEMENT FEES; TIMING OF**
**PAYMENT TO MANAGER**

11.1    **Fees.** For each Fiscal Year or portion thereof, Manager shall receive, by a distribution made by Manager out of Gross Revenues at the end of each Accounting Period in respect of its management services hereunder, a fee (collectively, the "**Management Fee**") calculated as follows:

(a)     a base fee (the "**Base Fee**") in an amount equal to ███████████ of Gross Revenues in respect of any applicable period; plus

(b)     an accounting fee (the "**Accounting Fee**") for accounting services provided by Manager's corporate employees on a "centralized" basis in the amount of ███████ ████████████████████████████████████████████████████ plus

(c)     a revenue management fee (the "**Revenue Management Fee**") for an allocation of Manager's revenue management services to be provided by Manager's corporate employees on a "centralized" basis in the amount of ████████████████████████████████ ████████████████████████████████████████████████████

The Management Fee generally shall be computed separately for each Fiscal Year and shall not be accumulated from Fiscal Year to Fiscal Year. Owner shall reimburse Manager for all Reimbursable Expenses incurred by it in connection with the performance of this Agreement. Any such amount shall be payable within thirty (30) days of billing, and upon request of Owner, Manager shall provide a statement showing in reasonable detail the nature and amount of such expenses, together with supporting documentation reasonably requested by Owner.

11.2 **Treatment of Proceeds of Business Interruption Insurance and Condemnation Awards**. In the event of a casualty or condemnation for temporary use resulting in the payment of business interruption insurance (with respect to such casualty) or a condemnation award (with respect to such condemnation for temporary use), the amount of such proceeds shall be considered a part of Gross Revenues for the purpose of computing Manager's Management Fee.

## ARTICLE 12
## INSURANCE

12.1 **Insurance**. Throughout the Term, Manager (unless Owner shall by notice in writing to Manager elect to provide the property and casualty insurance coverage required hereunder) shall provide and maintain the insurance in the minimum amounts and types set forth on **Exhibit D** to this Agreement, the costs of which shall be charged as part of Gross Operating Expenses.

12.2 **Modification of Insurance**. Owner may require Manager to increase the limits of the above insurance coverage and may require Manager to carry other or additional reasonable and customary insurance. All premiums on any increased limits of, or other or additional, insurance coverage required by Owner under the immediately preceding sentence shall be included in the Gross Operating Expenses. In no event shall insurance coverage be less than that required by Lender, the License Agreement or to comply with Legal Requirements.

12.3 **Contractor's Insurance**. Manager shall require that all major contractors on or about the Hotel Premises have coverage at the contractor's sole expense in the minimum types and amounts set forth in **Exhibit D** to this Agreement. Manager shall require contractors that are not major contractors to carry such insurance coverage that is customary in the applicable trade or industry. A major contractor shall mean any contractor (i) receiving compensation in excess of $25,000 per year (subject to adjustment for adjustments in the CPI between the Commencement Date and the date of such services) or (ii) performing hazardous services. Manager must obtain the Owner's permission in writing to waive any of the above requirements. Higher amounts may be required if the work to be performed is sufficiently hazardous in nature. Manager shall obtain and keep on file a Certificate of Insurance for each such major contractor that shows that the contractor is so insured.

12.4 **Form of Policies**. All insurance required by Sections 12.1, 12.2 and 12.3 shall be in such form and with such companies as shall be reasonably satisfactory to Owner provided that such company shall have a minimum Best rating of A- Class VIII, or as otherwise approved by Owner and Manager, and shall comply with the requirements of any Mortgage and the License

**Management Agreement – Page 25**
6444430v.1

Agreement. All property damage insurance shall name Owner as insured, and so long as the Hotel is mortgaged pursuant to any Mortgage or otherwise shall be subject to a standard mortgagee clause in favor of the mortgagee or mortgagees. All other insurance (excepting only the professional liability and workers' compensation lines of coverage) shall be in the name of Owner and Manager. The workers' compensation policy shall name Owner as an additional insured. Policies of insurance (to the extent applicable) shall (i) provide that the insurance company will have no right of subrogation against any mortgagee, Owner, Manager or any of their respective affiliated or subsidiary companies or the agents or employees thereof and (ii) provide that the proceeds thereof in the event of loss or damage shall, to the extent payable to any mortgagee, be payable notwithstanding any act of negligence or breach of warranty by Owner or Manager which might otherwise result in the forfeiture or nonpayment of such insurance proceeds.

12.5 **Certificates**. For the purpose of insuring compliance with the provisions of Article 12, Manager shall furnish to the Owner certificates for all insurance required to be maintained pursuant to this Article 12 within five (5) days prior to renewal. All such certificates shall specify that the policies to which they relate cannot be canceled or modified on less than thirty (30) days' prior written notice to Owner. In the event Owner procures any insurance under this Section 12, Owner shall have the responsibilities set forth in the two preceding sentences for the benefit of Manager.

12.6 **Waiver of Subrogation**. Owner and Manager each waive their respective rights of subrogation against each other.

12.7 **Mortgage Requirements**. Insurance shall be maintained in a manner consistent with the terms and conditions of any Mortgage and any conflict between those terms and conditions and the provisions of this Agreement shall be resolved in favor of the Mortgage.

## ARTICLE 13
## REAL AND PERSONAL PROPERTY TAXES; UTILITIES

13.1 **Taxes**. Manager shall, on behalf of Owner, pay from the Gross Revenues, on or before the dates the same become delinquent, with the right to pay the same in installments to the extent permitted by law, all real estate taxes, all personal property taxes and all betterment assessments levied against the Hotel or any of its component parts. Manager shall promptly deliver to Owner all notices of assessments, valuations and similar documents to be filed by Manager or Owner, which are received from taxing authorities by Manager. Owner shall have the right to hire property tax consultants or like professionals that reasonably provide economic benefits to Owner and the costs thereof shall be a part of Gross Operating Expenses. Notwithstanding the foregoing obligations of Manager, Owner may elect to contest the validity or the amount of any such tax or assessment, provided that such contest does not materially jeopardize Manager's rights under this Agreement. Manager agrees to cooperate with Owner and execute any documents or pleadings required for such purpose, provided Owner agrees to reimburse Manager for any out-of-pocket costs occasioned to Manager by any such contest. At Owner's election, all costs relating to any such contest may be included in Gross Operating Expenses.

13.2    **Utilities, Etc**. Manager shall promptly pay all fuel, gas, light, power, water, sewage, garbage disposal, telephone and other utility bills currently as they are incurred in connection with the Hotel from the Gross Revenues or Working Capital.

## ARTICLE 14
## USE OF NAME

14.1    **Name**. During the Term of this Agreement, the Hotel shall at all times be known and designated as the "[               ]" or by such other name as from time to time may be agreed upon by Owner and Manager. Manager shall make or cause to be made any fictitious name filings or disclosures required by the laws of the State with respect to the use of such name for or in connection with the Hotel. Manager shall not use or employ such name unless such use fully complies with the terms of the License Agreement, if any.

## ARTICLE 15
## DAMAGE OR DESTRUCTION; CONDEMNATION

15.1    **Damage or Destruction**.

(a)    If the Hotel or any portion thereof shall be damaged or destroyed at any time or times during the Term by fire, casualty or any other cause commonly covered by fire and extended coverage insurance and the cost of repairing such damage and restoring the Hotel to substantially its condition immediately prior to such damage or destruction, as reasonably estimated by Owner based upon estimates Owner receives from contractors and other reasonable and customary evidence, will not exceed the sum of $250,000 plus adjustments to reflect increases in the CPI for each Fiscal Year after 2014 exclusive of the cost of the foundation and footings ("**Minimum Cost**"), Owner will, at its own cost and expense (subject to Owner's receipt of insurance proceeds sufficient to pay such costs and expenses) and with due diligence repair and/or restore the Hotel so that after such repair and/or restoration, the Hotel shall be in substantially the same condition as it was immediately prior to such damage or destruction.

(b)    If the cost of such repair and/or restoration will, as so reasonably estimated by Owner, exceed the Minimum Cost, then Owner shall, within one hundred twenty (120) days after such damage or destruction, elect by notice to Manager either (x) to carry out such repair and/or restoration, in which case Owner shall complete such repair and/or restoration pursuant to the last sentence of Section 15.1(a) or (y) to terminate this Agreement; should Owner so elect to terminate this Agreement, Owner shall pay to Manager the Termination Fee.

(c)    In the case of damage or destruction which Owner is not required by the preceding provisions of this Section 15.1 to repair or restore and where Owner has not elected under said preceding provisions to terminate this Agreement, Owner shall undertake to notify Manager, within one hundred twenty (120) days after such damage or destruction, whether or not Owner will so repair and/or restore such damage or destruction. If Owner, within such one hundred twenty (120) day period either (i) advises Manager that Owner will not so repair and/or restore such damage or destruction or (ii) fails to advise Manager of Owner's decision, Manager may terminate this Agreement by written notice to Owner, or Owner may terminate this Agreement by such notice to Manager; in either case such written notice must be given within

**Management Agreement – Page 27**
6444430v.1

one hundred fifty (150) days after such damage or destruction and neither party shall be entitled to any payment on account of such termination. If in such event Owner within such one hundred twenty (120) day period notifies Manager that Owner will so repair and/or restore such damage or destruction, then neither Owner nor Manager shall have a right to terminate this Agreement on account of such damage or destruction.

15.2 **Condemnation**. If the whole of the Hotel shall be taken or condemned in any eminent domain, condemnation, compulsory acquisition or like proceeding by any competent authority or if such a portion thereof shall be taken or condemned as to make it imprudent or unreasonable, in the sole opinion of Owner, to use the remaining portion as a hotel of the type and class immediately preceding such taking or condemnation, then the Term shall terminate as of the date title vests in the condemning authority. Manager has no interest in any award paid to Owner and Manager shall make no claim against the condemnor for any loss to its business as a result of such condemnation or otherwise. If only a part of the Hotel shall be taken or condemned and the taking or condemnation of such part does not, in the opinion of Owner, make it unreasonable or imprudent to operate the remainder as a hotel of the type and class immediately preceding such taking or condemnation, this Agreement shall not terminate, and so much of any award shall be made available as shall be reasonably necessary for making alterations or modifications of the Hotel, or any part thereof, so as to make it a satisfactory architectural unit as a hotel of similar type and class as prior to the taking or condemnation.

15.3 **Mortgage Requirements**. Actions as to damage or destruction and condemnation shall be taken only in a manner that is consistent with the terms and conditions of the Mortgage and any conflict between those terms and conditions and the provisions of this Agreement shall be resolved in favor of the Mortgage.

## ARTICLE 16
## EVENTS OF DEFAULT

16.1 **Manager Defaults**. Each of the following shall constitute an Event of Default by Manager:

(a) The failure of Manager to pay any sum of money (or, if required by the Mortgage, to deposit into the lockbox account within two (2) business days of receipt) to Owner provided for herein when the same is payable, if such failure is not cured within five (5) days after written notice specifying such failure is given by Owner to Manager.

(b) An assignment by Manager in violation of the provisions of Article 23 hereof.

(c) If Manager shall fail to keep, observe or perform any other material covenant, agreement, term or provision of this Agreement to be kept, observed or performed by Manager and such failure shall continue for a period of thirty (30) days after written notice specifying such failure given by Owner to Manager, or if Manager due to any act or omission on the part of Manager and without the fault of Owner, shall fail to maintain the Permits and such failure shall continue for a period of thirty (30) days after written notice specifying such failure given by Owner to Manager; provided that if such failure is incapable of cure within such thirty (30) day period, then the cure period shall be extended provided that Manager commenced the cure during

**Management Agreement – Page 28**
6444430v.1

such initial thirty (30) day period and thereafter diligently and continuously pursues the cure thereof to completion.

(d)     If because of any act or omission on the part of Manager, and without the fault of Owner, either (i) the License Agreement or (ii) any required license for the sale of alcoholic beverages at the Hotel, is at any time suspended, terminated or revoked for a period of more than thirty (30) consecutive days, provided, however, if, at the end of such thirty (30) day period the cure has not been effectuated notwithstanding Manager's diligent and continuous attempts to cure, then the cure period shall be extended for an additional period of ninety (90) days.

(e)     If Manager shall fail to maintain and operate the Hotel in accordance with the standards required under Section 4.1 and such failure shall not be due to a refusal on the part of Owner to approve the Annual Plan submitted by Manager under Section 4.4 or Owner's failure to properly provide funds requested pursuant to the provisions of Section 9.1 and such failure shall continue for a period of sixty (60) days after written notice by Owner to Manager specifying the matters or conditions which constitute the basis for such Event of Default, provided that if such failure is not reasonably capable of cure within such sixty (60) day period, then the cure period shall be extended provided that Manager commences the cure during such initial sixty (60) day period and thereafter diligently and continuously pursues the cure thereof to completion.

(f)     If Manager shall apply for or consent to the appointment of a receiver, trustee or liquidator of Manager or of all or a substantial part of its assets, admit in writing its inability to pay its debts as they come due, make a general assignment for the benefit of creditors, take advantage of any insolvency law, or file an answer admitting the material allegations of a petition filed against Manager in any bankruptcy, reorganization or judgment or decree shall be entered by any court of competition jurisdiction, on the application of a creditor, adjudicating Manager bankrupt or insolvent or approving a petition seeking reorganization of Manager or appointing a receiver, trustee or liquidator of Manager or of all or a substantial part of its assets or a decree shall continue unstayed and in effect for any period of ninety (90) consecutive days.

(g)     The filing of a voluntary petition in bankruptcy or insolvency or a petition for liquidation or reorganization under any bankruptcy law by Manager, or Manager shall consent to, acquiesce in, or fail timely to controvert, an involuntary petition in bankruptcy, insolvency or an involuntary petition for liquidation or reorganization filed against it.

(h)     The filing against Manager of a petition seeking adjudication of Manager as insolvent or seeking liquidation or reorganization or appointment of a receiver, trustee or liquidator of all or a substantial part of Manager's assets, if such petition is not dismissed within ninety (90) days.

(i)     Failure of Manager (but excluding such a failure which results from the failure by Owner to provide the necessary funds therefor) to maintain at all times throughout the term hereof all of the insurance required to be maintained by Manager under Article 12, if such failure is not cured within fifteen (15) days after written notice specifying such failure is given by Owner to Manager.

**Management Agreement – Page 29**

(j)     The fraud, gross negligence, willful misconduct or criminal conduct of or by Manager and, to the extent same has a material adverse effect on the Hotel or Owner, the General Manager, in connection with the Hotel.

16.2     **Owner Defaults**. Each of the following shall constitute an Event of Default by Owner:

(a)     The failure of Owner to pay or furnish to Manager any money Owner is required to pay or furnish to Manager in accordance with the terms hereof on the date the same is payable, if such failure is not cured within five (5) days after written notice specifying such failure is given by Manager to Owner. If any sum of money is not paid within five (5) days following the date same becomes due and payable under this Agreement, and Manager has advanced such sum on behalf of Owner, such sum shall bear interest at the Default Rate from the date Manager advanced such sum on behalf of Owner until the date Owner actually pays such sum. If the failure to pay relates to the Management Fee, such sum shall bear interest at the Default Rate from the date due until the date actually paid.

(b)     If because of a default under the Mortgage, if any, not caused by the act or omission of Manager, the Mortgage shall be foreclosed, or the Hotel sold in lieu of foreclosure.

(c)     If Owner shall apply for or consent to the appointment of a receiver, trustee or liquidator of Owner of all or a substantial part of its assets, or admit in writing its inability to pay its debts as they come due, make a general assignment for the benefit of creditors, take advantage of any insolvency law, or file an answer admitting the material allegations of a petition filed against Owner in any bankruptcy, reorganization or insolvency proceeding, or if an order, judgment or decree shall be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating Owner a bankrupt or insolvent or approving a petition seeking reorganization of Owner or appointing a receiver, trustee or liquidator of Owner or of all or a substantial part of its assets, and such order, judgment or decree shall continue unstayed and in effect for any period of ninety (90) consecutive days.

(d)     The filing of a voluntary petition in bankruptcy or insolvency or a petition for liquidation or reorganization under any bankruptcy law by Owner, or Owner shall consent to, acquiesce in, or fail timely to controvert, an involuntary petition in bankruptcy, insolvency or an involuntary petition for liquidation or reorganization filed against it.

(e)     The filing against Owner of a petition seeking adjudication of Owner as insolvent or seeking liquidation or reorganization or appointment of a receiver, trustee or liquidator of all or a substantial part of Owner's assets, if such petition is not dismissed within ninety (90) days.

(f)     Failure of Owner to maintain at all times throughout the term hereof all of the insurance required to be maintained by Owner under Article 12, if such failure is not cured within fifteen (15) days after written notice specifying such failure is given by Manager to Owner.

(g)     The failure of Owner to perform, keep or fulfill any of the other covenants, undertakings, obligations or conditions set forth in this Agreement, or the failure of Owner to

approve expenditures or to authorize procedures necessary to maintain the standards of the Hotel in accordance with the Operating Standards, if such failure shall continue for a period of thirty (30) days after written notice by Manager or Licensor to Owner specifying the matters or conditions which constitute the basis for such Event of Default, provided that if such failure is incapable of cure within such thirty (30) day period, then the cure period shall be extended for up to an additional thirty (30) days provided that Owner commences the cure during such initial thirty (30) day period and thereafter diligently and continuously pursues the cure thereof.

## ARTICLE 17
## TERMINATION UPON EVENT OF DEFAULT; OTHER REMEDIES

17.1    **Termination**. Upon the occurrence of an Event of Default, in addition to and cumulative of any and all rights and remedies available to the non-defaulting party under this Agreement, at law or in equity, the non-defaulting party may: (i) terminate this Agreement without penalty, effective upon receipt of written notice of termination to the defaulting party, provided that termination may be effective immediately in the case of fraud, gross negligence, willful misconduct, criminal conduct or misappropriation of funds; and (ii) pursue any and all other remedies available to the non-defaulting party at law or in equity. In addition to and cumulative of the foregoing, upon the occurrence of any Event of Default on the part of Owner, all Management Fees, Reimbursable Expenses and all other sums payable to Manager under this Agreement shall be immediately due and payable without notice. In no event shall (i) the provisions of this Agreement with respect to the payment of a Termination Fee upon the termination of this Agreement under certain circumstances be construed as defining or limiting the amount recoverable by Manager from Owner by reason of any Event of Default on the part of Owner; or (ii) entitle Manager to receive a Termination Fee in the event of a termination by reason of any Event of Default on the part of Manager

17.2    **Manager's Rights to Perform**.

(a)      If Owner shall fail to make any payment or to perform any act required of Owner pursuant to this Agreement, Manager may (but shall not be obligated to), without further notice to, or demand upon, Owner and without waiving or releasing Owner from any obligations under this Agreement, make such payment (either with its own funds or with funds withdrawn for such purpose from the Operating Accounts or the Reserve) or perform such act. Manager agrees to provide written notice to Owner within five (5) days after Manager exercises its rights in the preceding sentence.  All sums so paid by Manager and all necessary incidental costs and expenses incurred by Manager in connection with the performance of any such act, together with interest thereon at the Default Rate from the date of making such expenditure by Manager, shall be payable to Manager on demand.

(b)      Manager shall have the right to set-off against any payments to be made to Owner by Manager under any provision of this Agreement and against all funds from time to time in the Operating Accounts and the Reserve, any and all liabilities of Owner to Manager. Manager may withdraw from the Operating Accounts and the Reserve from time to time such amounts as Manager deems desirable in partial or full payment of all or any portion of said liabilities, the

amount of such withdrawals to be paid by Owner to Manager on demand and to be replaced in the respective account and fund.

## ARTICLE 18
## OWNER'S ADDITIONAL TERMINATION RIGHTS

18.1 **Sale of the Hotel**. If Owner proposes to sell or otherwise dispose of the Hotel or Owner's interests therein, to a bona fide third-party (the "**Third-Party Purchaser**") during the Term, this Agreement will terminate effective upon the consummation of the closing of such sale. Owner shall provide Manager with written notice of termination of this Agreement not less than sixty (60) days prior to the scheduled date of closing of the sale of the Hotel; provided, however, if such a sale does not actually occur, the notice of termination shall be deemed ineffective.

18.2 **Performance Standard**.



████████████████████████████████████████████

## ARTICLE 19
### AREA OF PROTECTION

19.1 ████████████████████████████████████████

## ARTICLE 20
### TRANSFER TO OWNER UPON TERMINATION

Upon any termination of this Agreement, whether due to the occurrence of an Event of Default or otherwise, Manager shall cooperate with Owner and shall execute all documents or instruments requested by Owner in connection with the transfer, all without consideration to Manager (provided that, if such termination is due to a reason other than a default by Manager under this Agreement, Owner will reimburse Manager for Manager's reasonable expenses to effect such transfer) or the imposition of liability by Manager, to Owner or its nominee of the Permits and the License Agreement used or useful in connection with the operation of the Hotel. Without limiting the generality of the foregoing, Manager shall cause its officials, subject to restrictions provided in any License Agreement or related agreement, to provide all sales lists and customer contacts to Lender and to execute any necessary documents and to visit licensing authorities along with Owner's representatives in order to expedite (i) the orderly transfer to Owner or its designee of the Permits and the License Agreement (ii) the renewal thereof to Owner or Owner's designee if appropriate. In the event that this Agreement terminates due to any reason other than a default by Manager under this Agreement, a sufficient number of Hotel Employees will be hired by Owner or its successor, assign or designee, and retained for at least 90 days thereafter, so as not to cause a "mass layoff" or "plant closing", as defined in the Workers Adjustment and Retraining Act, 29 USC, sec 2101 et seq.

## ARTICLE 21
### NOTICES

All notices, elections, acceptances, demands, consents and reports (collectively "notice") provided for in this Agreement shall be in writing and shall be given to the other party at the address set forth below or at such other address as any of the parties hereto may hereafter specify in writing.

To Owner:       RREAF O&G PORTFOLIO #2 LLC
C/O Spectrum Origination LLC
1253 Springfield Avenue, Suite 201
New Providence, New Jersey 07974
Attention: Jeffrey Schaffer

**Management Agreement – Page 33**
6444430v.1

With a copy to:

    Spectrum Group Management LLC
    1250 Broadway, 19th Floor
    New York, New York 10001
    Attention: Peter Locke

To Manager:

    Channel Point Hospitality LLC
    2500 North Dallas Parkway
    Suite 600
    Plano, Texas 75093

With a copy to:

    Carla S. Moreland, Esq.
    5112 Briargrove Lane
    Dallas, Texas 75287

Such notice or other communication may be given by Federal Express or other nationally recognized overnight carrier or by electronic facsimile in which case notice shall be deemed given upon confirmed delivery. Notice may be mailed by United States registered or certified mail, return receipt requested, postage prepaid, deposited in a United States post office or a depository for the receipt of mail regularly maintained by the post office. If mailed, then such notice or other communication shall be deemed to have been received by the addressee on the fifth (5th) day following the date of such mailing. Such notices, demands, consents and reports may also be delivered by hand, in which case it shall be deemed received upon delivery.

## ARTICLE 22
## CONSENT AND APPROVAL

Except as herein otherwise provided, whenever in this Agreement the consent or approval of Manager or Owner is required, such consent or approval shall not be unreasonably withheld or delayed. Such consent or approval shall also be in writing only and shall be executed only by an authorized officer or agent of the party granting such consent or approval.

## ARTICLE 23
## NON-ASSIGNABILITY

This Agreement shall not be assignable by Manager or Owner; provided however, that Owner shall be entitled to assign this Agreement to an Affiliate; and Manager shall (i) be entitled to assign this Agreement to an Affiliate of such party as part of a modification to such party's company structure in which all or substantially all of such party's assets are transferred to an Affiliate of such party; and (ii) have the right to assign its rights to receive payments under this Agreement as security for indebtedness or other obligations.

**Management Agreement – Page 34**
6444430v.1

## ARTICLE 24
## INDEMNITY

24.1 **Indemnity by Manager**.



24.2 **Indemnity by Owner**. To the extent that Manager shall not be fully covered by insurance required to be maintained pursuant to this Agreement or if, after giving effect to the provisions of Section 24.1(b) of this Agreement, Gross Revenues are not sufficient to pay all Liabilities, Owner shall indemnify, defend and hold harmless Manager and its directors, officers, employees and agents from and against any damages, loss, liability, cost, action, cause, claim or expense, including attorneys' fees, arising out of, or incurred in connection with the management and operation of the Hotel.

24.3 **Survival**. The provisions of this Article 24 shall survive the expiration or earlier termination of this Agreement.

## ARTICLE 25
## PARTIAL INVALIDITY

In the event that any one or more of the phrases, sentences, clauses or paragraphs contained in this Agreement shall be declared invalid by the final and unappealable order, decree or judgment of any court, this Agreement shall be construed as if such phrases, sentences, clauses or paragraphs had not been inserted, unless such construction would substantially destroy the benefit of the bargain of this Agreement to either of the parties hereto.

## ARTICLE 26
## MISCELLANEOUS

26.1 **Disputes**. Whenever any issue or dispute arises under this Agreement relating to the Annual Operating Budget, the Approved Capital Budget and or the calculation and payment

of the Reserves, and the Management Fee, such issue or dispute shall be resolved utilizing the Uniform System of Accounts and the by application of generally accepted accounting principles consistently applied.

26.2 **Further Assurances**. Owner and Manager shall execute and deliver all other appropriate supplemental agreements and other instruments, and take any other action necessary to make this Agreement fully and legally effective, binding and enforceable as between them and as against third parties.

26.3 **Waiver**. The waiver of any of the terms and conditions of this Agreement on any occasion or occasions shall not be deemed a waiver of such terms and conditions on any future occasion.

26.4 **Successors and Assigns**. Subject to and limited by Article 23, this Agreement shall be binding upon and inure to the benefit of Owner, its successors and permitted assigns, and shall be binding upon and inure to the benefit of Manager, its successors and permitted assigns.

26.5 **Governing Law**. This Agreement shall be construed, both as to its validity and as to the performance of the parties, in accordance with the laws of the State of Texas.

26.6 **Compliance with Mortgage and License Agreement**. In carrying out their respective duties and obligations under the terms of this Agreement, Owner and Manager shall use commercially reasonable good faith efforts to take no action that could reasonably be expected to constitute a material default under any Mortgage or the License Agreement and will use commercially reasonable good faith efforts to take such actions as are reasonably necessary to comply therewith. Notwithstanding the foregoing or anything in this Agreement to the contrary, if there is a breach by Owner under the Mortgage and such breach is the result of the failure of Manager, such breach shall not be a default by Manager under this Agreement (and Manager shall have no liability therefore) unless such default and/or failure is specifically provided for in Section 16.1 of this Agreement and the applicable notice and cure periods provided for such breach and/or failure, if any, have expired.

26.7 **Amendments**. This Agreement may not be modified, amended, surrendered or changed, except by a written document signed by the Owner and Manager agreeing to be bound thereby.

26.8 **Estoppel Certificates**. Owner and Manager agree, at any time and from time to time, as requested by the other party, upon not less than ten (10) days' prior written notice, to execute and deliver to the other a statement certifying that this Agreement is unmodified and in full force and effect (or if there have been modifications, that the same are in full force and effect as modified and stating the modifications), certifying the dates to which required payments have been paid, and stating whether or not, to the best knowledge of the signer, the other party is in default in performance of any of its obligations under this Agreement, and if so, specifying each such default of which the signer may have knowledge, it being intended that such statement delivered pursuant hereto may be relied upon by others with whom the party requesting such certificate may be dealing.

26.9    **Inspection Rights**. Owner and Lender shall have the right to inspect the Hotel and examine the books and records of Manager pertaining to the Hotel at all reasonable times during the Term upon reasonable notice to Manager, and Owner and the holder of any Mortgage shall have access to the Hotel and the books and records pertaining thereto at all times during the Term to the extent necessary to comply with the terms of any Mortgage, all to the extent consistent with applicable law and regulations and the rights of guests, tenants and concessionaires of the Hotel.

26.10    **Subordination**. This Agreement, any extension hereof and any modification hereof shall be subject and subordinate to a Mortgage as provided therein and, in the event of a foreclosure or deed in lieu of foreclosure, subject to the terms of any subordination agreement with Lender, this Agreement shall terminate unless otherwise assumed by Lender in writing. The provisions of this Section shall be self-operative and no further instrument of subordination shall be required; however, Manager will execute and return to Owner (or to Lender, as designated by Owner) such documentation as Owner or Lender may reasonably request to evidence the subordination of this Agreement to the Mortgage.  In the event of any refinancing of the Property, Manager shall cooperate in all reasonable respects with Owner in effecting such refinancing.

26.11    **Effect of Approval of Plans and Specifications**. Owner and Manager agree that in each instance in this Agreement or elsewhere wherein Manager is required to give its approval of plans, specifications, budgets and/or financing, no such approval shall imply or be deemed to constitute an opinion by Manager, nor impose upon Manager any responsibility for the design or construction of additions to or improvements of the Hotel, including but not limited to structural integrity or life/safety requirements or adequacy of budgets and/or financing. The scope of Manager's review and approval of plans and specifications is limited solely to the adequacy and relationship of spaces and aesthetics of the Hotel in order to comply with the Operating Standards.

26.12    **Entire Agreement**. This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof, superseding all prior agreements or undertakings, oral or written.

26.13    **Time is of the Essence**. Time is of the essence in this Agreement.

26.14    **Interpretation**. No provision of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have structured or dictated such provision.

26.15    **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and need not be signed by more than one of the parties hereto and all of which shall constitute one and the same agreement.

26.16    **No Electronic Transactions**. The parties hereby acknowledge and agree that this Agreement shall not be executed, entered into, altered, amended or modified by electronic means. Without limiting the generality of the foregoing, the parties hereby agree that the

transactions contemplated by this Agreement shall not be conducted by electronic means, except as specifically set forth in Article 21 of this Agreement.

26.17 **Prohibited Persons and Transactions**.

(a)     Manager is not, and shall not become, a person or entity with whom U. S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including those named in OFAC's Specially Designated and Blocked Person's List) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, or Support Terrorism), or other governmental action (such persons and entities being "**Prohibited Persons**").

(b)     Owner is not and shall not become a Prohibited Person.

26.18 **Confidentiality.** Owner and Manager agree to keep the terms and conditions of all leases and other occupancy agreements in effect at the Hotel (if any) and all other accruements relating to the Hotel, together with all information and data obtained, possessed, or generated by Manager in connection with the Hotel (collectively, "**Privileged Information**"), strictly confidential and not to make any public announcements or any disclosures to any third parties, either orally or in writing, with respect to any Privileged Information without the express written consent of the other party hereunder; provided, however, the restrictions imposed hereby shall not apply to any Privileged Information (1) which is required to be disclosed in order to comply with any law, ordinance, governmental decree or any rule, regulation or decree of any interested governmental body or (2) which must otherwise be disclosed to relevant third parties, including accountants, attorneys and lenders, in the course of reasonable and diligent management and operation of the Hotel or the business of Owner, or any subsidiary or Affiliate of Owner or Manager. If Manager makes such disclosure, it shall notify such third party of this provision and of the requirement of Owner for confidentiality. The provisions of this Section 26.18 shall survive the expiration or termination of this Agreement

26.19 **No Third Party Rights**. This Agreement shall inure solely to the parties hereto. Notwithstanding any other provision of this Agreement, no third party shall have any rights pursuant to the terms of this Agreement.

<u>**ARTICLE 27**</u>
**NO REPRESENTATIONS AS TO INCOME OR FINANCIAL SUCCESS OF HOTEL**

In entering into this Agreement, Manager and Owner acknowledge that neither Owner nor Manager has made any representation to the other regarding projected earnings, the possibility of future success or any other similar matter respecting the Hotel, and that Manager and Owner understand that no guarantee is made to the other as to any specific amount of income to be received by Manager or Owner or as to the future financial success of the Hotel.

## ARTICLE 28
## REPRESENTATIONS OF MANAGER

In order to induce Owner to enter into this Agreement, Manager does hereby make the following representations and warranties:

(a)      the execution of this Agreement is permitted by the certificate of formation and partnership agreement of Manager and this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of Manager enforceable in accordance with the terms hereof;

(b)      to the best knowledge of Manager, there is no claim, litigation, proceeding or governmental investigation pending, or, as far as is known to Manager, threatened, against or relating to Manager, the properties or business of Manager or the transactions contemplated by this Agreement which does, or may reasonably be expected to, materially and adversely affect the ability of Manager to enter into this Agreement or to carry out its obligations hereunder, and to the best knowledge of Manager, there is no basis for any such claim, litigation, proceedings or governmental investigation, except as has been fully disclosed in writing to Owner and Lender; and

(c)      neither the consummation of the transactions contemplated by this Agreement on the part of Manager or to be performed, nor the fulfillment of the terms, conditions and provisions of this Agreement, conflicts with or will result in the breach of any of the terms, conditions or provisions of, or constitute a default under, any agreement, indenture, instrument or undertaking to which Manager is a party or by which it is bound.

## ARTICLE 29
## REPRESENTATIONS OF OWNER

In order to induce Manager to enter into this Agreement, Owner does hereby make the following representations and warranties:

(a)      the execution of this Agreement is permitted by the Limited Liability Company Agreement of Owner and this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of Owner enforceable in accordance with the terms hereof;

(b)      there is no claim, litigation, proceeding or governmental investigation pending, or as far as is known to Owner, threatened, against or relating to Owner, the properties or business of Owner or the transactions contemplated by this Agreement which does, or may reasonably be expected to, materially and adversely affect the ability of Owner to enter into this Agreement or to carry out its obligations hereunder, and there is no basis for any such claim, litigation, proceedings or governmental investigation, except as has been fully disclosed in writing to Manager; and

(c)      neither the consummation of the transactions contemplated by this Agreement by this Agreement on the part of Owner to be performed nor the fulfillment of the terms, conditions

and provisions of this Agreement, conflicts with or will result in the breach of any of the terms, conditions or provisions of, or constitute a default under, any agreement, indenture, instrument or undertaking to which Owner is a party or by which it is bound.

## ARTICLE 30
## DISPUTE RESOLUTION

Except as specifically provided in Section 4.4 of this Agreement, Owner and Manager agree that any dispute between the parties related to or arising out of this Agreement that cannot be amicably settled by the parties hereunder, shall first be submitted for non-binding mediation before resorting to any litigation, equitable proceeding or other enforcement action. Such mediation shall be held within a twenty-five mile radius of the Hotel (or such other location mutually agreed by the parties) and the parties shall cooperate in good faith to agree on a mediator who shall be a retired or semi-retired judge having at least ten (10) years of experience on the bench hearing complex commercial transactions. If the parties hereto have failed to designate, by a joint written statement, a mediator within thirty (30) days following the date of a written request therefor by either Manager or Owner to the other, then either Owner or Manager may notify the local office of the American Arbitration Association ("**AAA**") or JAMS and request such entity to select a person to act as the mediator to assist in the resolution of the dispute. The mediation will be a non-binding conference between the parties conducted in accordance with the applicable rules and procedures of AAA or JAMS (as determined by the mediator). The compensation of the mediator and all related expenses shall be borne equally by the parties, each of whom shall bear their own costs, irrespective of the outcome of the mediation. If any dispute remains unresolved between the parties after the mediation is complete, then either party shall be entitled to pursue its rights and remedies at law or in equity. The provisions of this Article 30 shall survive the expiration or earlier termination of this Agreement.

## ARTICLE 31
## ADDITIONAL OBLIGATIONS OF MANAGER

Manager acknowledges that Owner is vitally interested in the qualifications of the individuals designated as the general manager and the director of sales of the Hotel. Manager shall, from time to time, consult with Owner and obtain Owner's approval as to the appointment of individuals to such positions; provided, however, Owner and Manager acknowledge that nothing in this Article is intended to limit or negate the authority of Manager elsewhere provided in this Agreement to remove and replace, in its sole discretion, the general manager and/or director of sales of the Hotel.

## ARTICLE 32
## TERMINATION OF THE LICENSE AGREEMENT

Owner reserves and shall have the absolute right in its sole and unfettered discretion, at any time and without the consent or approval of (but with notice to) Manager, to terminate the License Agreement, provided, however, that (i) Owner shall have no such right in order to establish its own independent operations, such as an operation without a franchise or license or in its own hotel name; (ii) in the event of such a termination by Owner, Manager shall have the

right of approval (which right shall be reasonably exercised) of any new franchise or license for the Hotel; and (iii) if Owner's decision to terminate the License Agreement is made without the consent of Manager, then the provisions of Section 18.2 of this Agreement shall no longer apply.

<u>**ARTICLE 33**</u>
<u>**RECOURSE**</u>

Any provision of this Agreement to the contrary notwithstanding, Manager hereby agrees that no personal, partnership or corporate liability of any kind or character (including, without limitation, the payment of any judgment) whatsoever now attaches or at any time hereafter under any condition shall attach to Owner or any of Owner's constituent entities and affiliates or any mortgagee for payment of any amount payable under this Agreement or for the performance of any obligation under this Agreement. The exclusive remedies of Manager for the failure of Owner to perform any of its obligations under this Agreement shall be to proceed against the interest of Owner in and to the Hotel for Manager's actual, out-of-pocket damages (and not any consequential, punitive or exemplary damages), and Owner shall not be personally liable for any deficiency.

*The rest of this page is intentionally left blank.*

IN WITNESS WHEREOF, Owner has caused this Agreement to be executed and its seal affixed by its partners duly authorized thereunto and Manager has caused this Agreement to be executed and its seal affixed by its officer duly authorized thereunto, the day and year first above written, in duplicate.

**OWNER**:

**RREAF O&G PORTFOLIO #2 LLC**

By: _____
Name: Jeff Schaffer
Title: Chief Executive Officer

**MANAGER**:

**CHANNEL POINT HOSPITALITY LLC**

By: _____
Name: _____
Title: _____

**Signature Page to Management Agreement – Page Solo**
**[HOTEL NAME TBD]**

# EXHIBIT A

## MAJOR ACCOUNT CATEGORIES

Room Sales
Telephone Sales
Food Sales
Beverage Sales
Miscellaneous Income

Room Expense
Telephone Expense
Food Expense
Beverage Expense
Miscellaneous Expense

A&G
Management Fee
Advertising & Business Promotion
R&M
H-L-P

Property Tax
Insurance
CEP Reserve
Leases

# EXHIBIT B

## DESCRIPTION OF PREMISES

4.859 ACRES OF LAND LOCATED IN THE J.A.V.Y GONZALES SURVEY A-47, WITHIN THE CORPORATE LIMITS OF THE CITY OF CUERO, DEWITT COUNTY, TEXAS, BEING A PORTION OF A 10.43 ACRE TRACT DESCRIBED IN DEED TO CUERO LODGE NUMBER 409 A.F. & A.M. RECORDED IN VOLUME 121, PAGE 84, DEED RECORDS, DEWITT COUNTY, TEXAS, AND BEING THE SAME PROPERTY DESCRIBED IN DEED TO YOGAISHWARI, LLC FROM DAVIS CONTRACTORS, LTD., RECORDED IN VOLUME 239, PAGE 865 IN THE OFFICIAL PUBLIC RECORDS, DEWITT COUNTY, TEXAS.  SAID 4.859 ACRES OF LAND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A CONCRETE MONUMENT FOUND ON THE SOUTHEAST RIGHT-OF-WAY LINE OF TERRY STREET MARKING THE MOST WESTERLY CORNER OF THE RAFAEL C. GONZALES SUBDIVISION, AS RECORDED IN VOLUME 130, PAGE 428, DEED RECORDS, DEWITT COUNTY, TEXAS;

THENCE SOUTH 67 DEGREES 12 MINUTES 06 SECONDS EAST 898.66 FEET ALONG THE SOUTH LINE OF SAID RAFAEL C. GONZALES SUBDIVISION TO A CONCRETE MONUMENT FOUND ON THE NORTHWEST RIGHT-OF-WAY LINE OF PARK HEIGHTS DRIVE MARKING THE MOST SOUTHERLY SOUTH CORNER OF SAID RAFAEL C. GONZALES SUBDIVISION;

THENCE SOUTH 22 DEGREES 33 MINUTES 24 SECONDS WEST 414.91 FEET ALONG THE NORTHWEST RIGHT-OF-WAY LINE OF PARK HEIGHTS DRIVE TO A 5/8" IRON ROD FOUND MARKING THE MOST SOUTHERLY CORNER OF THIS TRACT;

THENCE NORTH 48 DEGREES 30 MINUTES 22 SECONDS WEST 338.65 FEET TO A 1/2" IRON ROD FOUND WITH CAP MARKED "RPLS 6371";

THENCE NORTH 65 DEGREES 17 MINUTES 46 SECONDS WEST 180.98 FEET TO A 5/8" IRON ROD FOUND;

THENCE NORTH 23 DEGREES 00 MINUTES 15 SECONDS EAST 196.62 FEET TO 1/2" IRON ROD FOUND;

THENCE NORTH 67 DEGREES 18 MINUTES 52 SECONDS WEST 400.02 FEET TO A 1/2" IRON ROD FOUND ON THE SOUTHEAST RIGHT-OF-WAY LINE OF TERRY STREET MARKING THE MOST WESTERLY CORNER OF THIS TRACT;

THENCE NORTH 23 DEGREES 05 MINUTES 52 SECONDS EAST 104.48 FEET  ALONG THE SOUTHEAST RIGHT-OF-WAY LINE OF TERRY STREET TO THE POINT OF BEGINNING, AND CONTAINING 4.859 ACRES OF LAND.

## EXHIBIT C

## EXAMPLE OF MONTHLY TRANSACTIONS REPORT

```
10/09/12  11:35 am                              P&L EXAMPLE ENTITY                                      Day  Page:   1
                                                INCOME STATEMENT
                                                End of Year 2012

ACTUAL     %     BUDGET     %    LAST YEAR     %                              ACTUAL     %     BUDGET     %    LAST YEAR     %
-------- ------ -------- ------ --------- ------ -----                       -------- ------ -------- ------ --------- ------
      0   0.00        0   0.00         0   0.00  Total Avl Rooms                    0   0.00        0   0.00         0   0.00
      0   0.00        0   0.00         0   0.00  # Room/Occ %                       0   0.00        0   0.00         0   0.00
      0   0.00        0   0.00         0   0.00  Revenue/Average Rate               0   0.00        0   0.00         0   0.00
      0   0.00        0   0.00         0   0.00  RevPar                             0   0.00        0   0.00         0   0.00

      0   0.00        0   0.00         0   0.00  ----------REVENUES----------
      0   0.00        0   0.00         0   0.00  Rooms                              0   0.00        0   0.00         0   0.00
      0   0.00        0   0.00         0   0.00  F&B Revenue                        0   0.00        0   0.00         0   0.00
      0   0.00        0   0.00         0   0.00  Communications                     0   0.00        0   0.00         0   0.00
      0   0.00        0   0.00         0   0.00  Minor Op Depts.                    0   0.00        0   0.00         0   0.00
      0   0.00        0   0.00         0   0.00  Rent/Other                         0   0.00        0   0.00         0   0.00
-------- ------ -------- ------ --------- ------                             -------- ------ -------- ------ --------- ------
      0   0.00        0   0.00         0   0.00  TOTAL REVENUES                     0   0.00        0   0.00         0   0.00

      0   0.00        0   0.00         0   0.00  -----DEPARTMENTAL EXPENSES----
      0   0.00        0   0.00         0   0.00  Rooms                              0   0.00        0   0.00         0   0.00
      0   0.00        0   0.00         0   0.00  Food & Beverage                    0   0.00        0   0.00         0   0.00
      0   0.00        0   0.00         0   0.00  Communications                     0   0.00        0   0.00         0   0.00
      0   0.00        0   0.00         0   0.00  Minor Operating                    0   0.00        0   0.00         0   0.00
      0   0.00        0   0.00         0   0.00  Rent & Other                       0   0.00        0   0.00         0   0.00
-------- ------ -------- ------ --------- ------                             -------- ------ -------- ------ --------- ------
      0   0.00        0   0.00         0   0.00  TOTAL DEPARTMENTAL EXPENSES        0   0.00        0   0.00         0   0.00

      0   0.00        0   0.00         0   0.00  -----DEPARTMENTAL PROFIT-----
      0   0.00        0   0.00         0   0.00  Rooms                              0   0.00        0   0.00         0   0.00
      0   0.00        0   0.00         0   0.00  Food & Beverage                    0   0.00        0   0.00         0   0.00
      0   0.00        0   0.00         0   0.00  Communications                     0   0.00        0   0.00         0   0.00
      0   0.00        0   0.00         0   0.00  Minor Op Depts                     0   0.00        0   0.00         0   0.00
      0   0.00        0   0.00         0   0.00  Rent/Other                         0   0.00        0   0.00         0   0.00
-------- ------ -------- ------ --------- ------                             -------- ------ -------- ------ --------- ------
      0   0.00        0   0.00         0   0.00  GROSS OPER INCOME                  0   0.00        0   0.00         0   0.00

      0   0.00        0   0.00         0   0.00  ----UNDISTRIBUTED EXPENSES----
      0   0.00        0   0.00         0   0.00  Admin & General                    0   0.00        0   0.00         0   0.00
      0   0.00        0   0.00         0   0.00  Advertising                        0   0.00        0   0.00         0   0.00
      0   0.00        0   0.00         0   0.00  Sales/Marketing                    0   0.00        0   0.00         0   0.00
      0   0.00        0   0.00         0   0.00  Repairs/Maintenance                0   0.00        0   0.00         0   0.00
      0   0.00        0   0.00         0   0.00  Energy                             0   0.00        0   0.00         0   0.00
-------- ------ -------- ------ --------- ------                             -------- ------ -------- ------ --------- ------
      0   0.00        0   0.00         0   0.00  TOTAL UNDISTRIBUTED                0   0.00        0   0.00         0   0.00

      0   0.00        0   0.00         0   0.00  GROSS OPERATING PROFIT             0   0.00        0   0.00         0   0.00
```

**Exhibit C – Page 1**

6444430v.1

P&L EXAMPLE ENTITY
INCOME STATEMENT
End of Year 2012

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Management Fee | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Franchise Fee | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | INCOME BEFORE FIXED CHARGES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ---------FIXED/OTHER---------- | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL FIXED/OTHER | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | EBITDA | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | PROFORMA  N O I | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | DEBT, DEPR/AMORT, CAP & OTHER | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL DEBT, DEPR/AMORT, CAP & | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | NET INC AVAIL/ TAXES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | --ADD BACKS & SUBTRACTIONS-- | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | NET OPERATING INCOME | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

<u>**Exhibit C – Page 2**</u>

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOMS DEPARTMENT
End of Year 2012

jay  Page:  3

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUE | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | NET REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENTAL PROFIT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 3**

10/08/12  11:35 am

P&L EXAMPLE ENTITY
ROOMS DEPARTMENT
End of Year 2012

Jay  Page:  4

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

<u>**Exhibit C – Page 4**</u>

6444430v.1

10/05/12  11:35 am
                                  P&L EXAMPLE ENTITY                                          jay  Page:    5
                                   ROOM STATISTICS
                                   End of Year 2012

| ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | OCCUPIED ROOMS | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL TRANSIENT | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL GROUP | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL SOLD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL OCCUPIED | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL AVAILABLE ROOMS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 5**
6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOM STATISTICS
End of Year 2012

jay  Page:    6

| ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUE/AVERAGE RATES | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL TRANSIENT | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL GROUP | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL PAYING RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL ROOMS OTHER | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | OVERALL ROOM RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | REVPAR | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 6**

6444430v.1

10/05/12  11:35 am                          P&L EXAMPLE ENTITY                                jay  Page:   7

                                       ROOM STATISTICS
                                      End of Year 2012

| ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **SALARIES / WAGES** | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | Guest Services | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL SALARIES / WAGES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | **BENEFITS** | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL BENEFITS | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL WAGES & BENEFITS | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | DEPARTMENTAL PROFIT | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |

**Exhibit C – Page 7**

6444430v.1

10/05/12  11:35 am                        P&L EXAMPLE ENTITY                            jay  Page:    8
                                              ROOM STATISTICS
                                          End of Year 2012

| ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL OTHER EXPENSES | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 8**
6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
FOOD & BEVERAGE CONSOLIDATED
End of Year 2012

Jay  Page:  9

| | ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FOOD REVENUE | | | | | | | | | | | | | |
| TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| NET FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| BEVERAGE REVENUE | | | | | | | | | | | | | |
| TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| NET BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| OTHER REVENUE | | | | | | | | | | | | | |
| NET OTHER REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 9**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
FOOD & BEVERAGE CONSOLIDATED
End of Year 2012

jay  Page:  10

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OVERALL NET FOOD COST | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OVERALL NET BEVERAGE COST | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OTHER COST | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL COST OF GOODS SOLD | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | GROSS PROFIT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES/WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL GENERAL | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES/WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Payroll Taxes & Benefits | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENTAL PROFIT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 10**

10/08/12  11:35 am

P&L EXAMPLE ENTITY
FOOD & REVENUE CONSOLIDATED
End of Year 2012

Jay  Page:   11

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 11**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

Jay Page:  12

| | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| COVERS & CAPTURE | | | | | | | | | | | | | | |
| TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| FOOD REVENUE & AVG CHECK | | | | | | | | | | | | | | |
| TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| BEVG REVENUE & RPOR | | | | | | | | | | | | | | |
| TOTAL BEVG REVENUE & RPOR | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| BEVG REVENUE & % FOOD | | | | | | | | | | | | | | |
| TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 12**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

hay  Page:   13

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ROOM SERVICE | | | | | | |
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ================================ | | | | | | |
| | | | | | | RESTAURANT 1 | | | | | | |
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ================================ | | | | | | |
| | | | | | | BANQUETS | | | | | | |
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 13**
6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

Jay Page:  14

| | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BEVG REVENUE & % FOOD** | | | | | | | | | | | | | |
| TOTAL BEVG REVENUE & % FOOD | 0 | 0.30 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.30 | 0 | 0.00 | 0 | 0.00 |
| **CATERING** | | | | | | | | | | | | | |
| **COVERS** | | | | | | | | | | | | | |
| TOTAL COVERS | 0 | 0.30 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.30 | 0 | 0.00 | 0 | 0.00 |
| **FOOD REVENUE & AVG CHECK** | | | | | | | | | | | | | |
| TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | | 0 $ | 0.00 | 0 $ | 0.08 | 0 $ | 0.00 |
| **BEVG REVENUE & % FOOD** | | | | | | | | | | | | | |
| TOTAL BEVG REVENUE & % FOOD | 0 | 0.30 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.30 | 0 | 0.00 | 0 | 0.00 |
| **BANQUETS & CATERING** | | | | | | | | | | | | | |
| **COVERS** | | | | | | | | | | | | | |
| TOTAL COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| **FOOD REVENUE & AVG CHECK** | | | | | | | | | | | | | |
| TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | | 0 $ | 0.00 | 0 $ | 0.08 | 0 $ | 0.00 |
| **BEVG REVENUE & % FOOD** | | | | | | | | | | | | | |
| TOTAL BEVG REVENUE & % FOOD | 0 | 0.30 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.30 | 0 | 0.00 | 0 | 0.00 |
| **LOUNGE 1** | | | | | | | | | | | | | |
| **BEVG REVENUE & BPCR** | | | | | | | | | | | | | |

**Exhibit C – Page 14**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

jay  Page:  15

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|--------|------|--------|------|-----------|------|---|--------|------|--------|------|-----------|------|
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL BEVG REVENUE & RPOR | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

RESTAURANT 2

COVERS & CAPTURE
-----------------

| | | | | | | | | | | | | |
|--------|------|--------|------|-----------|------|---|--------|------|--------|------|-----------|------|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

FOOD REVENUE & AVG CHECK
------------------------

| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
|--------|------|--------|------|-----------|------|---|--------|------|--------|------|-----------|------|

BEVG REVENUE & % FOOD

| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
|--------|------|--------|------|-----------|------|---|--------|------|--------|------|-----------|------|

LOUNGE 2

BEVG REVENUE & RPOR

| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL BEVG REVENUE & RPOR | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
|--------|------|--------|------|-----------|------|---|--------|------|--------|------|-----------|------|

CONFERENCE CENTER

COVERS & CAPTURE
-----------------

| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL CAPTURE & COVERS | 0 | 0.00 | 0 | 0.00 | | 0.00 |
|--------|------|--------|------|-----------|------|---|--------|------|--------|------|-----------|------|

FOOD REVENUE & AVG CHECK

| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
|--------|------|--------|------|-----------|------|---|--------|------|--------|------|-----------|------|

BEVG REVENUE & % FOOD

**Exhibit C – Page 15**

10/08/12  11:35 am

jay  Page:   16

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | IN ROOM BAR | | | | | | |
| | | | | | | REVENUE & RPOR | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL REVENUE & RPOR | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 16**

6444430v.1

10/08/12  11:35 am

P&L EXAMPLE ENTITY
ROOM SERVICE
End of Year 2012

jay  Page:   17

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 17**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
RESTAURANT 1
End of Year 2012

Jay  Page:  18

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **FOOD REVENUES** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **BEVERAGE REVENUES** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **OTHER REVENUES** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **SALARIES / WAGES** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 18**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
BANQUETS & CATERING
End of Year 2012

Jay  Page:  19

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | CATERING | | | | | | |
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 19**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
BANQUETS & CATERING
End of Year 2012

jay  Page:  20

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | TOTAL BANQUETS & CATERING | | | | | | |
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL COMBINED REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARY / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 20**

6444430v.1

P&L EXAMPLE ENTITY
BANQUETS & CATERING
End of Year 2012

Jay  Page:  21

|  | ACTUAL | % | BUDGET | % | LAST YEAR | % |  | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BANQUETS |  |  |  |  |  |  |  |  |  |  |  |  |  |
| FOOD REVENUES |  |  |  |  |  |  |  |  |  |  |  |  |  |
| TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |  | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| BEVERAGE REVENUES |  |  |  |  |  |  |  |  |  |  |  |  |  |
| TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |  | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| OTHER REVENUES |  |  |  |  |  |  |  |  |  |  |  |  |  |
| TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |  | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |  | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 21**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
LOUNGE 1
End of Year 2012

Jay  Page:  22

| | ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FOOD REVENUES | | | | | | | | | | | | | |
| TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| BEVERAGE REVENUES | | | | | | | | | | | | | |
| TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| OTHER REVENUES | | | | | | | | | | | | | |
| TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| TOTAL DEPT REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| SALARIES / WAGES | | | | | | | | | | | | | |
| TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 22**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
COMMUNICATIONS
End of Year 2011

joy  Page:  23

| ACTUAL | RFOA/% | BUDGET | RFOA/% | LAST YEAR | RFOA/% | | ACTUAL | RFOA/% | BUDGET | RFOA/% | LAST YEAR | RFOA/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUES | | | | | | |
| 0  $ | 0.00 | 0  $ | 0.00 | 0  $ | 0.00 | TOTAL PHONE REVENUE | 0  $ | 0.00 | 0  $ | 0.00 | 0  $ | 0.00 |
| 0  $ | 0.00 | 0  $ | 0.00 | 0  $ | 0.00 | NET PHONE REVENUE | 0  $ | 0.00 | 0  $ | 0.00 | 0  $ | 0.00 |
| 0  $ | 0.00 | 0  $ | 0.00 | 0  $ | 0.00 | TOTAL INTERNET REVENUE | 0  $ | 0.00 | 0  $ | 0.00 | 0  $ | 0.00 |
| 0  $ | 0.00 | 0  $ | 0.00 | 0  $ | 0.00 | NET INTERNET REVENUE | 0  $ | 0.00 | 0  $ | 0.00 | 0  $ | 0.00 |
| 0  $ | 0.00 | 0  $ | 0.00 | 0  $ | 0.00 | NET COMBINED REVENUES | 0  $ | 0.00 | 0  $ | 0.00 | 0  $ | 0.00 |
| | | | | | | COSTS OF SALES | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | COS PHONE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | COS INTERNET | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COST OF ALL SALES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | GROSS PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Payroll Taxes & Benefits | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TTL WAGES & BENEFITS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 23**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
IN HOUSE MOVIES
End of Year 2012

Jay  Page:  24

| ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% | | ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUES | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | NET REVENUE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 24**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
GUEST LAUNDRY
End of Year 2012

Jay  Page:  25

| ACTUAL | RPOR/% | BUDGET | RPRO/% | LAST YEAR | RPOR/% | | ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUES | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | NET REVENUE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | GROSS PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TTL WAGES & BENEFITS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 25**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
RENTS & OTHER INCOME
End of Year 2012

jay  Page:  26

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SPACE RENTALS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL RENTALS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | COMMISSIONS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL COMMISSIONS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | MISCELLANEOUS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL MISCELLANEOUS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL RENTS/OTHER INCOME | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 26**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
A&G
End of Year 2012

Jay  Page:   27

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL A&G EXP | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 27**

10/08/12  11:35 am

P&L EXAMPLE ENTITY
SALES & MARKETING
End of Year 2012

jay  Page:  28

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | GROUP | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL GROUP | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | TRANSIENT | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Newspaper | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL TRANSIENT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Contingency | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL NON-MEDIA | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | GRAND TTL ADVERTISING | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 28**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
SALES & MARKETING
End of Year 2012

jay  Page:   29

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|--------|---|--------|---|-----------|---|---|--------|---|--------|---|-----------|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Incentive/Svc Charge | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALES & ADVERTISING | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 29**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
REPAIRS & MAINTENANCE
End of Year 2012

jay  Page:  30

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Grnds & Land - Outdoor | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Rent - Equipment | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL R&M EXPENSE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 30**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ENERGY
End of Year 2012

jay Pages:  31

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL ENERGY | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL ENERGY | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 31**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
FIXED & OTHER CHARGES
End of Year 2012

jay  Page:  32

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|--------|---|--------|---|-----------|---|---|--------|---|--------|---|-----------|---|
| | | | | | | FEES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FEES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | RENTS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL RENTS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | LEASES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL LEASES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | INSURANCE | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL INSURANCE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | REAL ESTATE TAXES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REAL ESTATE TAXES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER TAXES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER TAXES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | PARTNERSHIP EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL PARTNERSHIP EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | INTEREST EXPENSE | | | | | | |

**Exhibit C – Page 32**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
FIXED & OTHER CHARGES
End of Year 2012

Jay  Page:   33

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL INTEREST EXPENSE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | REIT LEASE | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REIT LEASE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | MISC NON EBITDA | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL MISC NON EBITDA | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | DEPRECIATION/AMORTIZATION 40T | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPRECIATION & AMORTIZAT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | FFE & ADDBACKS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FFE & ADDBACKS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FIXED EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 33**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
EE CAFE
End of Year 2012

jay  Page:  34

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL EE CAFE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Allocation to PTES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | FINAL EE CAFE TOTAL | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 34**
6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
PT & EB
End of Year 2012

jay  Page:  35

| | ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TAXES | | | | | | | | | | | | | |
| TOTAL TAXES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| HEALTH INSURANCE | | | | | | | | | | | | | |
| TOTAL HEALTH INSURANCE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| OTHER EXPENSES | | | | | | | | | | | | | |
| 401k Match | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| TOTAL PT & EB | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

% Column is % Total Wages

**Exhibit C – Page 35**

6444430v.1

10/05/12  11:35 am                          P&L EXAMPLE ENTITY                                          jay  Page:   36
                                                 PT & EB
                                            End of Year 2012

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | DISTRIBUTED TO: | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DISTRIBUTION | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**<u>Exhibit C – Page 36</u>**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
PT & EB
End of Year 2012

jay  Page:  37

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES, WAGES & INCENTIVES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Total Food & Beverage | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | GROSS TTL WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | S&W, INCENTIVES, PAID TIME OFF | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Lounge 1 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Total Foood & Beverage | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL ALL PAID WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 37**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
HOUSE LAUNDRY
End of Year 2012

jay  Page:  38

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES & WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | DISTRIBUTED TO: | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DISTRIBUTION | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 38**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay  Page:  39

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **CASH** | | | | | |
| TOTAL CASH | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| SEMI-RESTRICTED CASH | | | | | |
| TOTAL SEMI-RESTRICTED CASH | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| RECEIVABLES | | | | | |
| TOTAL RECEIVABLES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| INVENTORIES | | | | | |
| TOTAL INVENTORIES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OPERATING EQUIPMENT | | | | | |
| TOTAL OPERATING EQUIPMENT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Exhibit C – Page 39**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay  Page:  40

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| PREPAIDS | | | | | |
| TOTAL PREPAIDS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| FIXED ASSETS | | | | | |
| Accum Amortization | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL FIXED ASSETS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OTHER ASSETS | | | | | |
| TOTAL OTHER ASSETS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL ASSETS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Exhibit C – Page 40**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay  Page:   41

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| **LIABILITIES** | | | | | |
| PAYABLES | | | | | |
| TOTAL PAYABLES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| DEPOSITS | | | | | |
| TOTAL DEPOSITS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OF TAXES AND WITHHOLDINGS | | | | | |
| TOTAL OF TAXES AND WITHHOLDING | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ACCRUED OPERATING EXPENSES | | | | | |
| TTL ACCRUED OPERATING EXPENSES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

<u>**Exhibit C – Page 41**</u>

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay Page:  42

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| DUE TO/FROM ACCOUNTS | | | | | |
| Due to ZZ St Paul | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Due to REIT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL DUE TO/FROM ACCOUNTS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OTHER LIABILITIES | | | | | |
| TOTAL OTHER LIABILITIES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| NOTES PAYABLE | | | | | |
| TOTAL NOTES PAYABLE | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL LIABILITIES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OWNERS EQUITY | | | | | |
| Retained Earn - Prior Years | 0.00 | 0.00 | 0.00 | 695.02- | 695.02 |
| Retained Earn - Current Yr | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL OWNERS EQUITY | 0.00 | 0.00 | 0.00 | 695.02- | 695.02 |
| TOTAL LIABS. & OWNERS EQUITY | 0.00 | 0.00 | 0.00 | 695.02- | 695.02 |

**Exhibit C – Page 42**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFTE REPORT
End of Year 2012

Jay  Page:   43

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | FULL TIME EQUIVALENT | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | SUMMARY HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOTEL | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | SUMMARY WAGES & AVG RATE | | | | | | |
| 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | TOTAL WAGES & AVG RATE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |

**Exhibit C – Page 43**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFIS REPORT
End of Year 2012

buy  Page:   44

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ROOMS DEPARTMENT | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL OCCUPIED ROOMS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Room Attendant - Total | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | House Attendant - Total | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ 0.00 | 0 $ 0.00 | 0 $ 0.00 | Room Attendant - Total | 0 $ 0.00 | 0 $ 0.00 | 0 $ 0.00 |
| 0 $ 0.00 | 0 $ 0.00 | 0 $ 0.00 | House Attendant - Total | 0 $ 0.00 | 0 $ 0.00 | 0 $ 0.00 |
| 0 $ 0.00 | 0 $ 0.00 | 0 $ 0.00 | TOTAL WAGES & AVG RATE | 0 $ 0.00 | 0 $ 0.00 | 0 $ 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| | | | | | | FOOD & BEVERAGE SUMMARY | | | | | | |
| | | | | | | FOOD COVERS | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PROD / TOTAL COV | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVERAGE RATE | | | | | | |
| 0 $ 0.00 | 0 $ 0.00 | 0 $ 0.00 | TOTAL WAGES & AVG RATE | 0 $ 0.00 | 0 $ 0.00 | 0 $ 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 44**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFTK REPORT
End of Year 2012

jay  Page:  45

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ================================== | | | | | | |
| | | | | | | A&G | | | | | | |
| | | | | | | HOURS & FTE | | | | | | |
| | | | | | | ------------ | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 45**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY KPIS REPORT
End of Year 2012

jay Page:   46

| | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ROOM SERVICE | | | | | | | | | | | | | |
| HOURS & PRODUCTIVITY | | | | | | | | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| WAGES & AVG RATE | | | | | | | | | | | | | |
| | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| HOURS & FTE | | | | | | | | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| RESTAURANT 1 | | | | | | | | | | | | | |
| HOURS & PRODUCTIVITY | | | | | | | | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| WAGES & AVG RATE | | | | | | | | | | | | | |
| | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| HOURS & FTE | | | | | | | | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| RESTAURANT 2 | | | | | | | | | | | | | |
| HOURS & PRODUCTIVITY | | | | | | | | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 46**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY KPI8 REPORT
End of Year 2012

Jay  Page:  47

| | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WAGES & AVG RATE | | | | | | | | | | | | | |
| TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| HOURS & FTE | | | | | | | | | | | | | |
| TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| **BANQUETS & CATERING** | | | | | | | | | | | | | |
| HOURS & PRODUCTIVITY | | | | | | | | | | | | | |
| TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| WAGES & AVG RATE | | | | | | | | | | | | | |
| TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| HOURS & FTE | | | | | | | | | | | | | |
| TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| **CONFERENCE CENTER** | | | | | | | | | | | | | |
| HOURS & PRODUCTIVITY | | | | | | | | | | | | | |
| TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| WAGES & AVG RATE | | | | | | | | | | | | | |
| TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| HOURS & FTE | | | | | | | | | | | | | |

**Exhibit C – Page 47**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY KPIS REPORT
End of Year 2012

Jay  Page:   49

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | =============================== | | | | | | |
| | | | | | | LOUNGE 1 | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL REVENUE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | TOTAL WAGES & AVG RATE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | =============================== | | | | | | |
| | | | | | | LOUNGE 2 | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | TOTAL WAGES & AVG RATE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 48**
6444430v.1

10/05/12 11:35 am

P&L EXAMPLE ENTITY
MONTHLY RPTK REPORT
End of Year 2012

Jay Page: 49

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ================================= | | | | | | |
| | | | | | | IN ROOM BASE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL OCCUPIED ROOMS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & RMS PER OCC ROOM | | | | | | |
| | | | | | | ------------------------ | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & HOURS PER OCC RO | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| | | | | | | ---------------- | | | | | | |
| 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | TOTAL WAGES & AVG RATE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| | | | | | | ----------- | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 49**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFIK REPORT
End of Year 2012

jay  Page:   50

| | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | CONTRACT LABOR | | | | | | | |
| | | | | | | | HOURS & FTE | | | | | | | |
| | | | | | | | WAGES & AVG RATE | | | | | | | |
| | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | FOOD & BEVERAGE | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES $ AVG RATE | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 50**

6444430v.1

**EXHIBIT D**

**INSURANCE REQUIREMENTS**

1.      **Insurance Requirements for the Hotel**:

General Liability - $1,000,000 per Occurrence/$2,000,000 General and Product Liability Aggregate per Location

Including:
1. Products and Completed Operations
2. Contractual Liability
3. Personal Injury
4. Incidental Medical Malpractice
5. Molestation and Abuse are not Excluded
6. Punitive Damages unless Excluded by Public Policy
7. Fellow Employee Coverage
8. Garage Keepers Liability
9. Liquor Liability
10. Blanket Additional Interests
    a. All Managers or Lessors of Premises
    b. All mortgagors of Premises
    c. Vendors
    d. Volunteer Workers
    e. As required by Contract
11. Severability of Interests
12. Waiver of Subrogation as Required by Contract
13. Terrorism not Excluded or Sub-Limited
14. No Deductible/SIR
15. Coverage is Designated to the Scheduled Premises and is Primary and Non-Contributory

Commercial Automobile - $1,000,000 – Any Auto

Including:
1. Medical Payments - $5,000 per person
2. Personal Injury Protection – As required by State
3. Property Protection Insurance – As required by State
4. Uninsured Motorists - $1,000,000 Limit
5. Underinsured Motorists - $1,000,000 Limit
6. Physical Damage (Owned and Hired Autos) – Comprehensive $1,000 Deductible
7. Physical Damage (Owned and Hired Auto) – Collision $1,000 Deductible
8. Auto Loan/Lease Gap Coverage

Umbrella Liability - $25,000,000 per Occurrence/ $25,000,000 Aggregate per Location

      Including:
1. Retained Limit – 0
2. Follows Scheduled Underlying Policies

    Workers Compensation – Provided in All States except as Provided by the State Funds of – ND, OH, WA, WV, WY

Medical Benefits – Statutory
1. Indemnity – Statutory
2. Employers Liability - $500,000
    a. Each Accident
    b. Disease - Each Employee
    c. Disease – Policy Limit

    Crime - $1,000,000 Occurrence Limit S/T/A $10,000 per Occurrence Deductible Covering:
1. Employee Theft
2. Forgery or Alteration
3. Computer Fraud
4. Funds Transfer Fraud
5. Theft of Money & Securities
    a. Inside the Premises
    b. Outside the Premises

Guest Property - $10,000 Limit per Occurrence
1. $1,000 deductible
2. Liability Governed by Statute

Professional Liability - $1,000,000 Each Claim / $2,000,000 Aggregate for All Claims
1. Claim Includes Identifiable Loss and Defense Cost
2. A $25,000 Deductible Applies to Loss and Defense

Employment Practices Liability
1. $2,000,000 Aggregate for All Loss Combined (Including Defense Cost)
2. Retention $25,000

2. **Insurance Requirements for Major Contractors**:

    (a)    Worker's Compensation - Statutory amount or its equivalent under applicable law.

<u>**Exhibit D – Page 2**</u>

      (b)     Employer's Liability - $500,000 minimum, where required by applicable or equivalent law.

      (c)     Comprehensive General Liability; **either**

         (i)     $100,000 Bodily Injury per Person
                    $300,000 per Occurrence
                    $100,000 Property Damage

                 **-or-**

         (ii)     $1,000,000 combined single limit

**EXHIBIT E**

**COMPETITIVE SET**



**Exhibit E – Solo Page**

6444430v.1

**MANAGEMENT AGREEMENT**

between

**RREAF O&G PORTFOLIO #2 LLC**
as Owner

and

**CHANNEL POINT HOSPITALITY LLC**
as Manager

FOR

**OAKWOOD SUITES**
601 South Main Street
Andrews, Texas 79714

## MANAGEMENT AGREEMENT

This Management Agreement (the "**Agreement**") made this ___ day of February 2016 between RREAF O&G PORTFOLIO #2 LLC, a Delaware limited liability company (**"Owner"**), as Owner, and **CHANNEL POINT HOSPITALITY LLC**, a Texas limited liability company (**"Manager"**), as Manager.

## RECITALS:

A.      Owner is the fee owner of the Hotel (as defined below).

B.      Manager is experienced in the management and operation of hotels, directly and through affiliated entities.

C.      Owner and Manager desire to enter into this Agreement for the management and operation of the Hotel in accordance with the terms and conditions and subject to the limitations contained in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner and Manager covenant and agree as follows:

## ARTICLE 1
## DEFINITIONS, TERMS AND REFERENCES

1.1      Definitions. In this Agreement and any Exhibits, the following terms shall have the following meanings:

"**Account Category**" shall include the major account categories set forth in Exhibit A attached hereto and made a part hereof as well as other major account categories, which are applicable to the Hotel consistent with the Statement of Income as defined by the Uniform System of Accounts or otherwise approved by Owner.

"**Accounting Fee**" shall have the meaning set forth in Article 11.

"**Accounting Period**" shall mean each calendar month (whether of 28, 29, 30 or 31 days) during each Fiscal Year.

"**Affiliate**" shall mean any person or entity that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with another person or entity. The term "**control**" (and correlative terms) shall mean the power, whether by contract, equity ownership or otherwise, to direct the policies or management of a person or entity. Without limiting the foregoing, an "**Affiliate**" also includes any partner or a partnership of any party to this Agreement, any member or membership parties thereto and any corporation, partnership, individual or trust related to or controlling or controlled by such partnership, individual or trust related to or controlling or controlled by such partnership party or its partners

or such membership party or its members. A natural person is related to another natural person if he or she is a spouse, parent, or lineal descendant of the other person.

"**Allocated Services**" shall mean certain support services that Manager obtains from a third party and provides on a central or regional basis to the hotels that it manages because such support services can be provided on a more efficient, effective and economical basis to each individual Manager managed hotel if the expenses of such support services are shared by other Manager managed hotels. Such support services include services in the areas of sales and marketing, food and beverage, human resources, insurance, technology, training and payroll (each such service, an "**Allocated Service**"; collectively, the "**Allocated Services**"). Owner and Manager agree that Manager shall provide Allocated Services to the Hotel and that the Hotel's portion of the cost thereof shall constitute a Gross Operating Expense so long as (i) the costs of the Allocated Services are allocated in good faith on a uniform, fair, equitable and proportionate basis among the Hotel and the other Manager managed hotels benefiting therefrom; and (ii) the Allocated Services shall not include services that do not benefit the Hotel; and (iii) the cost of the Allocated Services are either (a) included by Manager in each Annual Operating Budget or (b) otherwise approved in writing by Owner. The cost of the Allocated Services and the allocation of that cost to the Hotel and other Manager managed hotels shall be subject to audit by Owner pursuant to the terms of Section 10.3 of this Agreement. Manager further agrees that the benefit of any discounts or rebates received by Manager with respect to any of the Allocated Services shall be passed on to the Hotel on a proportionate basis as compared to other hotels managed by Manager or its Affiliates.

"**Annual Operating Budget**" shall mean an annual operating projection for the Hotel prepared and submitted by Manager to Owner and approved by Owner for each Fiscal Year pursuant to Section 4.4(a).

"**Annual Plan**" shall mean an annual business plan for the operation of the Hotel prepared by the Manager and approved by the Owner, which shall include the Annual Operating Budget, the Approved Capital Budget, the Marketing Plan and the Management Plan and any other material included therein by Manager as provided in Section 4.4.

"**Approved Capital Budget**" shall have the meaning set forth in Section 4.4(b).

"**Base Fee**" shall have the meaning set forth in Article 11.

"**Building and Appurtenances**" shall mean (i) the 62 room hotel building located on the Premises, and (ii) landscaping and other related facilities, together with all installations located at, or used in connection with the operation of the building for hotel purposes including, without limitation, any swimming pools, health club and recreational facilities, walkways, parking facilities, heating, lighting, sanitation equipment, air conditioning, laundry facilities, refrigeration, built-in kitchen equipment, and elevators.

"**Capital Budget**" shall mean Manager's proposed estimate of FF&E and Capital Improvements submitted to Owner each Fiscal Year pursuant to Section 4.4(b).

"**Capital Improvements**" shall have the meaning set forth in Section 8.2 hereof.

"**Commencement Date**" shall mean the date on which Manager assumes the management and operation of the Hotel under this Agreement for the benefit of Owner.

"**Competitive Set**" shall mean the properties listed on Exhibit E attached hereto and any revisions to such list agreed upon by Owner and Manager from time to time.

"**CPI**" shall mean the Consumer Price Index for All Urban Consumers, United States City Average, All Items (1982-84=100), issued by the Bureau of Labor Statistics of the United States Department of Labor.

"**Default Rate**" shall mean the lesser of (i) the Prime Rate plus four percent (4%) per annum or (ii) the highest lawful rate permitted by applicable Legal Requirements from time to time.

"**Effective Date**" shall mean the date of this Agreement as set forth on page 1 hereof.

"**Event of Default**" shall mean any of the events described in Article 16, provided that any condition contained therein for the giving of notice or the lapse of time, or both, has been satisfied.

"**Executive Personnel**" shall mean the general manager and the director of sales of the Hotel.

"**Fiscal Year**" shall mean the fiscal year that ends on the last day of each calendar year. The first Fiscal Year shall be the period commencing on the Commencement Date and ending on December 31st of the same calendar year in which the Commencement Date occurs. The words "full Fiscal Year" shall mean any Fiscal Year containing not fewer than 365 days. A partial Fiscal Year after the end of the last full Fiscal Year and ending with the expiration or earlier termination of the Term shall constitute a separate Fiscal Year.

"**Furniture, Fixtures and Equipment**" or "**FF&E**" shall mean all furniture, furnishings, wall coverings, fixtures, carpeting, rugs, fine arts, paintings, statuary, decorations, and hotel equipment and systems (including the costs associated with the purchase, installation and delivery thereof) located at, or used in connection with, the operation of the Building and Appurtenances as a hotel, including without limitation, major equipment and systems required for the operation of kitchens, bars, laundry and dry cleaning facilities, office equipment, dining room wagons, major material handling equipment, major cleaning and engineering equipment, telephone systems, computerized accounting and vehicles (including the costs associated with the purchase, installation and delivery thereof) together with all replacements therefor and additions thereto, but in all events excluding Operating Equipment and Supplies.

"**GOP Threshold**" ███████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

"**Gross Operating Expenses**" shall mean the following expenses actually incurred in the operation of the Hotel:

**Management Agreement – Page 3**

1. Cost of sales; salaries, wages, bonuses, payroll taxes; the cost of social insurance which shall include, but not be limited to, life, medical, disability insurance, retirement and other benefits incurred by Manager related to Hotel Employees;

2. Departmental expenses; administrative and general expenses; the cost of third party vendor sources engaged to print payroll checks and reports or to perform any other services hereunder; the Accounting Fee; the Revenue Management Fee; advertising and business promotion for the Hotel; franchise fees, chain reservation fees and all other fees relating to the License Agreement; the cost of utilities, service contracts; and repairs and maintenance;

3. The cost of replacing Operating Equipment and Supplies and Inventories as defined herein.

4. The cost of uncollectible accounts receivables as reasonably determined by the Manager.

5. The Owner-approved costs and expenses of technical consultants and operational experts for specialized services in connection with non-routine hotel work including roofing consultants, environmental engineers and others.

6. The cost of insurance as set forth in this Agreement.

7. The Management Fee.

8. Real estate and personal property taxes levied or assessed against the Hotel and other like charges.

9. Allocated Services.

10. All other costs and expenses incurred in connection with the operation of the Hotel and otherwise approved as part of the Annual Plan or Annual Operating Budget, including but not limited to Reimbursable Expenses.

11. Risk management costs.

12. Legal services related to Hotel Employees or Hotel operations or services.

13. Other amounts expressly set forth in this Agreement or the Annual Operating Budget as being included in Gross Operating Expenses.

All costs and fees of any Independent Public Accountants or other third parties who perform services approved by Owner (other than services provided by any Independent Public Accountants or other third parties in connection with services and/or reports required to be provided by Owner pursuant to the License Agreement) shall be paid by Owner and shall not constitute Gross Operating Expenses.

Except to the extent that the travel budget for Manager's personnel is included as a line item in the Annual Operating Budget, no part of Manager's central office overhead or general or

**Management Agreement – Page 4**

administrative expenses including the cost of travel by Manager's corporate or regional officers (other than Allocated Services) or for travel related to any other hotel operated by Manager or its Affiliates shall be deemed to be part of Gross Operating Expenses and all such costs and expenses shall be the sole responsibility of Manager.

"**Gross Operating Profit**" or "**GOP**" shall mean the amount of the remainder of Gross Revenues of the Hotel less the departmental expenses and undistributed expenses of the Hotel.

"**Gross Revenues**" shall mean for any applicable Accounting Period, all revenues and receipts of every kind derived from the Hotel and all departments and parts thereof during such Accounting Period, as finally determined on an accrual basis in accordance with the Uniform System of Accounts, including, but not limited to, revenues and income (both cash and credit transactions) before commissions and discounts for prompt or cash payments, from the rental of rooms and lobby space, exhibit or sales space of any kind, including without limitation, charges for reservations, deposits and cancellation fees not refunded to guests; income from vending machines, health club membership fees, wholesale and retail sales of merchandise, service fees and charges, business interruption insurance claims (but only for periods during the operating term) in respect of the Hotel, condemnation awards for temporary use of the Hotel, license, lease and concession fees and rentals (but not including the gross receipts of any licensees, lessees and concessionaires), food and beverages sales, and other sales of every kind conducted by, through or under Manager in connection with the Hotel. Gross Revenues shall not include (i) Federal, state and municipal excise, sales and use taxes or similar impositions collected directly from patrons or guests or included as part of the sales price of any goods or services; (ii) gratuities or service charges collected and paid to employees; (iii) credits or refunds to guests; (iv) proceeds arising from the sale or other disposition of property described in Section 1231 of the Internal Revenue Code or of capital assets; (v) proceeds from condemnation and payments received on account of insurance policies (other than the proceeds from business interruption insurance and from condemnation awards for temporary use of the Hotel when received); (vi) proceeds from claims for damages suffered by Manager or Owner, unless in recompense for a lost revenue item; and (vii) interest earned on the Reserve or Permitted Investments.

"**Hotel**" shall mean (a) the Building and Appurtenances and the Premises owned by Owner and (b) all FF&E, all Operating Equipment and Supplies, and all Inventories owned by Owner located at 601 South Main Street, Andrews, Texas 79714.

"**hotel**" shall mean any hotel (other than the Hotel), inn, motor inn, motor hotel, motel, suite hotel, conference center, meeting center or any other facility providing either or both of short-term lodging and meeting arrangements.

"**Hotel Employees**" shall have the meaning set forth in Section 4.2.

"**Independent Public Accountant**" shall mean a nationally recognized firm of independent certified public accountants having hotel accounting experience, designated from time to time by Owner, subject to Manager's rights of approval, reasonably exercised.

"**Inventories**" shall mean "Inventories of Supplies" as defined in the Uniform System of Accounts, such as soap, toilet paper, stationery, writing pens, food and beverage inventories,

paper products, menus, expendable office and kitchen supplies, fuel, supplies and items similar to any of the foregoing.

"**Legal Proceedings**" shall mean all complaints, counterclaims or cross-claims filed in a court of competent jurisdiction, any notice of any claim of violation of any legal requirement by any governmental agency or authority, or any summons or other legal process, in each instance by or against the Hotel or by or against Owner, or Manager in connection with the Hotel.

"**Legal Requirements**" shall mean (a) all laws, ordinances, statutes, regulations and orders relating to the Hotel and the Premises now or hereafter in effect, including but not limited to, environmental laws and (b) all terms, conditions, requirements and provisions of (i) all Permits; (ii) all leases; and (iii) all liens, restrictive covenants and encumbrances affecting the Hotel or the Premises or any part thereof.

"**License Agreement**" shall mean the franchise or license agreement, if any, from time to time entered into by Owner with respect to the branding and operation of the Hotel. For the purposes of this definition, the following terms used in said section shall have the following meaning: "**Licensor**" shall mean the franchisor or licensor under the franchise or license agreement from time to time entered into by Owner with respect to the branding and operation of the Hotel; "**Licensee**" shall mean Owner; and the "**Manual**" shall mean the Licensor's operating manual and other manuals for Licensor described in its standard license agreement.

"**Major Renovations**" shall mean a contemporaneously made set or series of alterations, additions and/or improvements to the Hotel with a total cost in excess of $100,000 (or a lesser amount in the event a project with a total cost less than $100,000 requires material design and purchasing and installation services related thereto and/or results in a material alteration in the design of the Hotel), but shall not include any Repairs or Maintenance with respect to Capital Improvements or FF&E.

"**Manager**" shall have the meaning set forth in the introductory section of this Agreement.

"**Management Fee**" shall mean the Accounting Fee**,** Revenue Management Fee and Base Fee, all as set forth in Article 11 hereof.

"**Management Plan**" shall have the meaning set forth in Section 4.4(d).

"**Marketing Plan**" shall mean an annual marketing plan for the Hotel prepared and submitted by Manager to Owner and approved by Owner in each Fiscal Year pursuant to Section 4.4(c).

"**Mortgage**" shall mean, collectively, each of the documents evidencing or securing current or future indebtedness on the Hotel in favor of a third party lender or financial institution or any successor thereto or replacement thereof (the "**Lender**").

"**Net Operating Income**" or "**NOI**" shall mean the result of Gross Revenues less Gross Operating Expenses.

"**Open for Business**" shall mean the period of time during which all or substantially all of the Hotel is open for business to the general public.

"**Operating Account**" shall mean a special account or accounts, bearing the name of the Hotel, established by Manager in a federally insured bank or trust company selected by Owner.

"**Operating Equipment and Supplies**" shall mean supply items which constitute "Operating Equipment and Supplies" under the Uniform System of Accounts, all miscellaneous serving equipment, linen, towels, uniforms, silver, glassware, china and similar items.

"**Operating Standards**" shall mean the operation of the Hotel in a manner consistent with (i) the requirements under the License Agreement; (ii) the condition of the Hotel as of the Commencement Date (or, following completion of a Renovation, the condition of the Hotel as of the completion of the Renovation), normal wear and tear excepted; (iii) the condition and level of the operation of hotels of comparable class and standing to the Hotel in its market area; (iv) then current market conditions regarding rental rates and lease terms and conditions with respect to Hotels of comparable class and standing to the Hotel (including but not limited to the Competitive Set); and (v) then current business and management practices (including those related to compliance with Legal Requirements) applicable to the management, operation, leasing, maintenance and repair of a hotel comparable in size, character and location to the Hotel.

"**Owner**" shall have the meaning set forth in the introductory section of this Agreement.

"**Performance Standard**" shall have the meaning set forth in Section 18.2.

"**Permits**" shall mean all governmental or quasi-governmental licenses and permits, including but not limited to any certificate of occupancy, business licenses and liquor licenses.

"**Permitted Investments**" shall mean (subject to modification, addition or deletion from time to time at the option of Owner by written request to Manager) all of which shall be in the name of Owner:

      (a)    interest-bearing deposit accounts (which may be represented by certificates of deposit, time deposit open account agreements or other deposit instruments) in commercial banks having a combined capital and surplus of not less than $50,000,000; or

      (b)    all other investments approved by Owner.

"**Premises**" shall mean the land on which the Hotel is located, which land is described in Exhibit B attached hereto.

"**Prime Rate**" shall mean the rate per annum announced, designated or published from time to time by JP Morgan Chase Bank N.A. as its "prime", "reference" or "base" rate of interest for commercial loans.

"**Reimbursable Expenses**" shall mean all travel, lodging, entertainment, telephone, facsimile, postage, courier, delivery, employee training and other expenses incurred by Manager

in accordance with the standard policies for expenses incurred by Manager on its own behalf and which are directly related to its performance of this Agreement, but in no event will Reimbursable Expenses include or duplicate expenses for Manager's overhead or Allocated Services.

"**Renovation**" shall mean a renovation of any portion of the Hotel during the Term, pursuant to a plan proposed by Manager and approved by Owner to, among other things, bring the Hotel to a physical condition that satisfies the standards under the License Agreement and to operate in a manner consistent with the assumptions for the then-current Annual Operating Budget and then-current Annual Plan. A Renovation shall be carried out at the expense of Owner pursuant to plans and specifications and a schedule prepared by Manager and approved by Owner and, to the extent required under the License Agreement, by Licensor.

"**Repairs and Maintenance**" shall have the meaning as defined in Section 8.1.

"**Reserve**" shall mean an account maintained as a Permitted Investment for Reserve for replacement of FF&E and/or Capital Improvements, as described in Section 7.1 and funded as provided in Section 7.2.

"**Revenue Data Publication**" shall mean Smith's STR Report, a monthly publication distributed by Smith Travel Research, Inc., or an alternative source, reasonably satisfactory to both parties, of data regarding the average daily rate, occupancy and RevPAR of hotels in the general area of the Hotel, including, without limitation, the Competitive Set.

"**Revenue Management Fee**" shall have the meaning as defined in Section 11.

"**Revenue Per Available Room**" or "**RevPAR**" shall mean for any Test Period the number derived by dividing (i) net room revenue (in accordance with the Uniform System of Accounts), by (ii) the number of available guest rooms in the subject hotel.

"**RevPAR Threshold**"

"**State**" shall mean the State in which the Hotel is located or other as designated.

"**Term**" shall mean the term of this Agreement, which shall be an initial five (5) year term commencing on the Commencement Date and expiring on the fifth (5th) anniversary of the Commencement Date, as such Term may be extended or shortened as expressly set forth in this Agreement or as otherwise agreed to by Owner and Manager.

"**Termination Fee**"

**Management Agreement – Page 8**



"**Test Period**" shall mean each twelve (12) month period during the Term commencing on the first day of the seventh (7th) calendar month following the Commencement Date and each subsequent three (3) calendar months thereafter.  In the event that this Agreement shall terminate on a date other than the last day of a calendar year, the last Test Period shall end on the date of termination.  The term "full Test Period" means any Test Period containing not fewer than 365 days.

"**Third Party Purchaser**" shall have the meaning set forth in Section 18.1.

"**Unavoidable Interruptions**" shall mean interruptions in the operation of or access to the Hotel or any of its essential services on account of an interruption in any one or more of the utility services described in Section 13.2, or on account of labor disputes, strikes, lockouts, fire or other casualty, war, terrorist actions, acts of God and other similar causes beyond the reasonable control of the party claiming an unavoidable interruption, but never financial inability. Other than obligations accruing prior to the occurrence of such event of Unavoidable Interruption or obligations that, if not performed, would cause a material adverse effect on the Hotel or its operations (for instance, the requirement to maintain the Permits or insurance obligations hereunder), the obligations of the party hereunder shall be suspended during the period of an Unavoidable Interruption.

"**Uniform System of Accounts**" shall mean the Uniform System of Accounts for Hotels, 10th Revised Edition, 2006, as published by the Hotel Association of New York City, Inc. or any later edition thereof.

"**Working Capital**" shall mean and refer to the funds which are reasonably necessary for the day-to-day operation of the Hotel's business, including, without limitation, amounts sufficient for the maintenance of petty cash funds, operating bank accounts, receivables, payrolls, prepaid expenses, advance deposits, funds required to maintain inventories, and amounts due to/or from Manager and/or Owner less accounts payable and accrued current liabilities.

1.2     **Terminology**. All personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, shall include all genders; the singular shall include the plural, and the plural shall include the singular. The titles of Articles, Sections and Subsections in

this Agreement are for convenience only, and neither limit nor amplify the provisions of this Agreement, and all references in this Agreement to Articles, Sections, Subsections, paragraphs, clauses, sub-clauses or exhibits shall refer to the corresponding Article, Section, Subsection, paragraph, clause or sub-clause of, or exhibit attached to, this Agreement, unless specific reference is made to the articles, sections or other subdivisions of, or exhibits to, another document or instrument.

1.3    **Exhibits**. All exhibits and other attachments attached hereto are by this reference made a part of this Agreement.

**ARTICLE 2**
**MANAGEMENT OF HOTEL**

Owner hereby engages and appoints Manager, pursuant to the terms of this Agreement, to operate and manage the Hotel, and Manager hereby agrees and contracts to plan, operate, repair and manage the Hotel pursuant to the terms of this Agreement.

Subject to the terms of this Agreement, Hotel operations shall be under the exclusive supervision and control of Manager, which, except as otherwise specifically provided in this Agreement, shall be responsible for the proper and efficient operation**,** maintenance and repair of the Hotel in accordance with the terms of this Agreement. Except as specifically set forth in this Agreement, Manager shall have discretion and control respecting matters relating to management and operation of the Hotel, including, without limitation, charges for rooms and commercial space, credit policies, food and beverage services, other Hotel services, employment policies, granting of concessions or leasing of shops and agencies within the Hotel, receipt, holding and disbursement of funds, maintenance of bank accounts, procurement of inventories, supplies and services, promotion and publicity and, in general, all activities necessary for operation of the Hotel.

Manager shall devote its knowledge, experience and efforts to operate and manage the Hotel pursuant to this Agreement in a businesslike manner in accordance with the Operating Standards. Manager shall make available to Owner the full benefit of the judgment, experience and advice of the members of Manager's organization and staff with respect to the policies pursued by Owner in operating, maintaining, and servicing the Hotel.

**ARTICLE 3**
**TERM**

3.1    **Term**. The initial Term automatically shall be extended beyond the initial Term for additional terms of one (1) year each, unless Owner provides written notice to Manager not less than one hundred twenty (120) days prior to the end of the initial Term or the then-current extended Term, as applicable, of Owner's intent not to extend the Term of the Agreement. Notwithstanding the foregoing, the Agreement may be terminated prior to the scheduled expiration of the Term or any extension thereof, (i) without cause by Owner during the first six (6) months following the Commencement Date, provided that Owner provides Manager with not less than thirty (30) days written notice of termination prior to the effective date of such termination, or (provided that in the event that the Workers' Adjustment and Retraining Act, 29

USC, Sec 2101, et seq. (the WARN Act") is applicable to such termination and the replacement manager identified by Owner fails or refuses to retain a sufficient number of employees at the Property so as not to cause a "mass layoff" or "plant closing" under the WARN Act, Owner will extend the effective date of termination to allow the required notices to be provided under the WARN Act, (ii) upon the sale of the Hotel to a bona fide Third Party Purchaser, as provided in Article 18 hereof, provided that Owner provides Manager with not less than sixty (60) days written notice of such termination; and (ii) as otherwise provided in Articles 15, 16, 17 and 18.

3.2 **Surrender.** On the expiration or sooner termination of the Term, Manager shall quit and surrender the Premises to Owner in the condition required pursuant to this Agreement and take such other actions as contemplated by Article 20 hereof.

## ARTICLE 4
## USE AND OPERATION OF THE HOTEL

4.1 **Operation**. Manager shall be the sole and exclusive manager of the Hotel during the Term and shall operate the Hotel in accordance with the Operating Standards and the provisions of this Agreement. Manager shall act in a fiduciary capacity with respect to the proper protection of and accounting for Owner's assets. In this capacity, Manager shall deal at arm's length with Owner and all third parties, and Manager shall manage the Hotel in a manner which shall serve the Owner's interests at all times.

4.2 **Employment**.

(a)     Subject to the terms of this Agreement, Manager shall select, employ, promote, transfer, compensate, terminate where appropriate, supervise, direct, train, and assign the duties of the Executive Personnel and, through the Executive Personnel, a sufficient number of personnel whom Manager reasonably determines to be necessary or appropriate for the proper, adequate and safe operation and management of the Hotel (collectively, the "**Hotel Employees**"). In connection therewith, Manager agrees to cause an employee or employees located in the corporate office of Manager, at no additional cost to Owner, to handle revenue management and sales management for this Property, together with other properties managed by Manager for Owner and its Affiliates. All such employees of the Hotel shall be employees of Manager or Manager's Affiliate. In addition, Manager may, from time to time, assign one or more of its employees to the staff of the Hotel on a full-time, part-time or temporary basis. Notwithstanding the provisions of this Section 4.2 or any other provision of this Agreement, all costs, expenses and liabilities relating to Hotel Employees shall be expenses of operating the Hotel and the responsibility of Manager for acts or omissions of Hotel Employees (or, for Hotel Employees who allocate their time between multiple hotels, an appropriate allocation of the costs for such Hotel Employees) shall not extend beyond responsibility for the gross negligence or willful misconduct of, or the willful violation of Legal Requirements by the Executive Personnel. Manager acknowledges that such Executive Personnel have the duties specified in the first sentence of this Section 4.2 with respect to other Hotel Employees. Manager will negotiate with any union lawfully entitled to represent such employees and may execute collective bargaining agreements or labor contracts resulting therefrom that have been approved by Owner. Manager shall fully comply with all Legal Requirements having to do with worker's compensation, social security, unemployment insurance, hours of labor, wages, working conditions, and other

employer-employee related subjects. With respect to matters of employment, this Agreement is not one of agency by the Manager for Owner but one with the Manager engaged independently in the business of managing properties on its own behalf as an independent contractor (as defined in §856(d)(3) of the Internal Revenue Code with regards to Owner and any Affiliates thereof). The cost of all employment arrangements shall be charged as Gross Operating Expenses of the Hotel and shall be accrued in accordance with generally accepted accounting principles; provided, however, relocation expenses which exceed the budgeted relocation expenses provided in the Annual Plan, shall not be charged as a Gross Operating Expense without the prior approval of Owner, such approval not to be unreasonably withheld, conditioned or delayed. The costs provided for in the immediately preceding sentence shall include, by way of example and not limitation, all reasonable costs and expenses (including, without limitation, all employment related expenses incurred by Manager with respect to the Hotel Employees), such as severance pay, unemployment compensation and health insurance and related costs (i.e., in order to comply with COBRA-type regulations) as a result of the termination of employees and which shall have been paid or accrued in accordance with generally accepted accounting principles. Manager shall use commercially reasonable efforts and exercise reasonable care to select qualified, competent, and trustworthy employees. The Hotel's general cashier and all employees having check signing authority shall be adequately bonded to the satisfaction of Owner and the cost of such bonds shall be an expense of the Hotel. To the extent possible and reasonably available, Manager shall use local labor to fill non-Executive Personnel positions in the operation of the Hotel. Owner may at any time consult or communicate with Manager regarding any of the Hotel Employees, but will not interfere in the day-to-day activities of Hotel Employees. The Manager shall not discriminate against any employee or applicant for employment because of race, color, religion, national origin, ancestry, age, sex or sexual orientation, and all employment advertising shall indicate that Manager and Owner are each an Equal Opportunity Employer as that term is defined under Legal Requirements.

Notwithstanding anything to the contrary contained in this Agreement, the following subparagraphs (b) and (c) shall apply to any liability that may, from time to time, arise out of the Employee Retirement Income Security Act of 1974 ("**ERISA**") and the Multi-employer Pension Plan Amendments Acts of 1980 ("**MEPPA**"), respectively, as from time to time amended.

(b)     Employee Benefits: Any Hotel Employees who are not then represented by a collective bargaining representative shall be entitled to participate in the incentive programs, profit sharing and/or other employee retirement, disability, health, welfare or other benefit plan or plans then made available by Manager to similarly situated employees of other hotels managed by Manager, in accordance with their respective terms. Manager will have the right to charge the Hotel with its allocable share of the cost of any such plan or plans and any contributions to be made thereunder provided that such charges and contributions shall be determined by Manager in good faith on a uniform basis with respect to charges and contributions imposed for the same or similar plans at other hotels then managed by Manager, subject to Legal Requirements. Manager's rights under this Subsection (b) shall be subject to the condition that Manager shall not put into effect any amendment to any existing plan, or adopt any additional plan, which is not imposed upon all other similarly situated hotels managed by Manager.

**Management Agreement – Page 12**

Upon the expiration or termination of this Agreement, the sale of the Hotel or other similar event, Manager shall cooperate with the Owner with respect to disposition of such plan or plans (or plan assets) in a mutually satisfactory manner, all in compliance with then applicable Legal Requirements.

(c)     Collective Bargaining or Other Multi-employer Plans: Manager and Owner agree that with respect to any withdrawal liability arising under any collective bargaining agreement or other "multi-employer plan" (as defined in Section 3(37) of ERISA) in which the Hotel Employees become participants, the obligations of the parties shall be determined as follows:

(1)     Withdrawal liability arising with respect to Hotel Employees shall be the responsibility of Owner, and Owner shall either pay the amount of such withdrawal liability directly to such plan or reimburse Manager for withdrawal liability payments made to such plan by Manager with respect to Hotel Employees (including withdrawal liability arising after the sale or other termination of this Agreement, provided that such liability arises as a result of such sale, disposition, termination or other similar event). To the extent permitted under then applicable laws, regulations and agreements, Manager shall cooperate with Owner in structuring transactions and transferring actual or contingent withdrawal liability to a successor in ownership or purchaser of the Hotel in accordance with "relief" provisions of ERISA, such as ERISA Section 4204 or then applicable statutory or regulatory provisions of a similar nature.

(2)     For purpose of this subparagraph (c), the term "withdrawal liability" shall mean the actual amount assessed by and payable to a multi-employer pension fund upon a complete or partial withdrawal of the Hotel or Hotel Employees from such fund. Manager shall cooperate with Owner in challenging a plan's assessment of such liability, provided that all costs of litigation, arbitration or other procedures shall be paid by Owner (including any bonds that must be posted). If Manager or its Affiliates have employees at other locations who participate in the same multi-employer plan as Hotel Employees, Owner shall be charged with and be responsible only for multi-employer plan withdrawal liability arising solely with respect to the participation of Hotel Employees in such plan.

4.3     **Legal Proceedings**. Legal Proceedings of a "non-extraordinary nature" (hereafter defined), may be instituted by Manager, in accordance with guidelines and policies determined from time to time by Manager and Owner, in the name of Manager or the Hotel or Owner and by counsel designated by Manager pursuant to such guidelines and policies. Legal Proceedings of an "extraordinary nature" (hereafter defined) shall require Owner's prior approval of the proceedings and counsel approved by Owner. Manager shall furnish Owner with quarterly status reports with respect to all Legal Proceedings of an extraordinary nature. In addition, Manager shall have the right to defend, through counsel designated by Manager, Legal Proceedings of a non-extraordinary nature against Owner or Manager resulting from the operation of the Hotel. The defense of Legal Proceedings against the Hotel of an extraordinary nature (including, without limitation, any aspect of any claims against Manager or Owner arising out of the operation of the Hotel as to which the insurance company denies coverage) shall be coordinated with Owner, designated counsel shall be subject to Owner's reasonable approval and Manager shall furnish Owner with quarterly status reports with respect to such actions. All claims against Owner and/or Manager arising out of the management or operation of the Hotel which (i) are not covered by insurance shall be promptly communicated to Owner and (ii) are covered in whole or

in part by insurance shall be promptly forwarded by Manager to the appropriate insurer (with a copy thereof to Owner in the case of claims against Owner). Legal Proceedings of a "non-extraordinary nature" shall be proceedings in which the monetary exposure is less than $50,000 that are (i) initiated by Manager or Owner relating to the operation of the Hotel for matters such as collections, maintenance of licenses and permits, enforcement of contracts and proceedings against Hotel tenants; and/or (ii) defense of actions against the Owner or Manager resulting from the operation of the Hotel, for matters such as guest claims for loss of property or injury to persons and claims relating to employment or the application for employment at the Hotel. Legal Proceedings of an "extraordinary nature" shall mean all other Legal Proceedings.

4.4     **Annual Plan**. On or before the date that is forty-five (45) days following the Commencement Date, Manager shall submit to Owner an Annual Plan ("**Annual Plan**") for the remaining portion of the Fiscal Year in which the Commencement Date occurs and Owner either shall accept the initial Annual Plan submitted to Owner as provided above or shall submit to Manager a detailed list of Owner's objections or questions to the Annual Plan. Owner and Manager shall meet and discuss Owner's Annual Plan objections and shall coordinate expeditiously and in good faith to agree upon an Annual Plan for the remaining portion of the Fiscal Year in which the Commencement Date occurs. On or before November 15th of each year following the Commencement Date, Manager shall submit to Owner an Annual Plan for the next Fiscal Year and on or before December 15th of each year following the Commencement Date, Owner either shall accept the Annual Plan submitted to Owner as provided above or shall submit to Manager a detailed list of Owner's objections or questions to the Annual Plan ("**Owner's Annual Plan Objections**"). Within fifteen (15) days after Manager's receipt of Owner's Annual Plan Objections, Owner and Manager shall meet and discuss Owner's Annual Plan Objections with the goal of agreeing upon an Annual Plan for the subject Fiscal Year. Owner, as part of Owner's Annual Plan Objections, shall have the right to object to the entire Annual Plan or to any specific item or items contained in the Annual Plan. In the event Owner objects to the Annual Plan or any specific item or items of expense in the Annual Plan and Owner and Manager are unable to reach agreement thereon as provided above prior to commencement of the Fiscal Year in question, pending such agreement, the Annual Plan or the specific item or items of expense (not revenue) in question shall be suspended and replaced for such period that the Annual Plan or such item(s) are in question by an amount equal to the lesser of (i) that proposed by Manager for such Fiscal Year, or (ii) if an objection to the entire Annual Plan, the Actual Gross Operating Expenses for the immediately preceding Fiscal Year subject to an adjustment equal to the percentage increase in the CPI over the last twelve (12) month period immediately preceding the start of the Fiscal Year in question, or (iii) if an objection to a specific item or items of expense in the Annual Plan, such item or items of expense for the immediately preceding Fiscal Year subject to an adjustment for each item equal to the percentage increase in the CPI over the twelve (12) month period immediately preceding the start of the Fiscal Year in question.

(a)     The Annual Operating Budget shall be prepared in accordance with the Uniform System of Accounts. The proposed Annual Operating Budget shall incorporate Manager's good faith reasonable estimates of the items of revenue and expense contained therein and shall contain the proposed budget for operations for the succeeding Fiscal Year. When approved by Owner, the proposed Annual Operating Budget shall be the approved Annual Operating Budget.

Any revisions, substitutions or additions to the Annual Operating Budget must be approved by the Owner in writing.

As part of the budgeting process, Manager shall provide to Owner, with each proposed Annual Operating Budget, a complete list of all service and other contracts anticipated for the Fiscal Year which is the subject of the Annual Operating Budget having a liability to the Hotel in excess of $25,000 for such Fiscal Year for or covering the Hotel and the payments or expenditures connected or anticipated therewith. So long as any service or other contracts fall within the following guidelines, Owner's approval thereof shall not be required, but Manager shall nevertheless promptly report to Owner the execution of (and provide Owner with a true and complete copy of) each such contract having a liability to the Hotel of in excess of $25,000:

      (i)     The term of such contract shall be no longer than one (1) year; and

      (ii)    Each contract must be terminable by Owner or Manager without payment or penalty upon not more than thirty (30) days' notice.

In addition, Manager shall provide to Owner for Owner's review, a written schedule for the Hotel listing all executive and management employees to be employed "on-site" in the direct management of the Hotel including, but not limited to the positions of General Manager, Director of Sales, Chief Engineer and the portfolio sales and revenue manager. These schedules shall include such employee's title or job description and the salary range including additional compensation or prerequisites such as lodging, meals, maintenance, moving expenses, bonus/incentive compensation and the like. In the event that any employee's services are shared with (or subsidized through a sharing arrangement with) another hotel, the employee shall be identified together with a description of his/her responsibilities and the amount and source of any subsidy, together with a breakdown of the relative time expended with respect to the Hotel and each other hotel. If Owner notifies Manager that Owner does not believe that some or all of the scheduled wages and salaries are reasonable and customary as required above, then Manager shall promptly provide to Owner a wage and salary survey that supports the scheduled wages and salaries. No proposed amendment including changes in salary or other compensation shall be effective unless the salary or other compensation as changed is reasonable and customary as required above.

      (b)    The Capital Budget shall be prepared in accordance with the Uniform System of Accounts. The Capital Budget shall contain the proposed budget for expenditures from the Reserve and the budget for expenditures for Capital Improvements and FF&E for the succeeding Fiscal Year for (i) additions to and substitutions, replacements and renewals of FF&E and (ii) certain non-routine repairs and maintenance to the Project which are normally capitalized under generally accepted accounting principles such as exterior and interior repainting, resurfacing building walls, floors, roof and parking areas, replacing folding walls and similar items. Manager shall submit good faith reasonable estimates for Capital Improvements and for FF&E for the Fiscal Year following the Fiscal Year otherwise covered by the Annual Operating Budget. When approved by Owner, the Capital Budget, or such items as may be specifically approved by Owner, shall be collectively referred to in this Agreement as the "Approved Capital Budget". Approval of the Capital Budget constitutes an authorization for Manager to expend money for Capital Improvements and for FF&E as provided in the Approved Capital Budget, unless the

**Management Agreement – Page 15**

Owner's approval thereof specifically requires Manager to obtain additional approvals prior to commencing such work. Any revisions, substitutions or additions to the Approved Capital Budget must be approved by Owner in writing.

Competitive bid rules outlined in Section 4.5 will be observed at all times by Manager for any purchases of Capital Improvements and/or FF&E.

(c)     On or before the date that is thirty (30) days following the Commencement Date, Manager shall submit to Owner the Marketing Plan, which Marketing Plan shall contain advertising, sales and promotional plans prepared by Manager to be used in connection with the marketing of the Hotel and the portfolio of hotels owned by Owner and managed by Manager. On or before November 15th of each year following the Commencement Date, Manager shall submit to Owner an Annual Plan for the next Fiscal Year.  When approved by Owner, the proposed Marketing Plan shall be the approved Marketing Plan. Any revision, substitution or additions to the Marketing Plan must be approved by Owner in writing. The Marketing Plan shall be written with the goal of achieving Gross Revenues as submitted in the Annual Operating Budget for the Fiscal Year or, if less than a full Fiscal Year, the period between the Commencement Date and the December 31 next following the Commencement Date. Manager shall not use Owner's name in any advertising or promotional material without Owner's expressed prior written approval.

(d)     The Management Plan shall contain (i) estimated contributions and distributions from or to Owner; (ii) a leasing plan for the leasing of concessions and other space in the Hotel; (iii) plans and budgets for the disposition and replacement of FF&E; and (iv) such management issues, proposals and projections or modifications as Manager may recommend for the efficient management of the Hotel including but not limited to proposals and assessments as to the Hotel's position in the market, market opportunities, franchise affiliation and disposition strategies. When approved by Owner, the proposed Management Plan shall be the approved Management Plan.

4.5     **Competitive Bidding**. All contracts for repairs, Capital Improvements, FF&E, food and services exceeding $10,000 shall be awarded on the basis of competitive bidding (provided, however, that Manager will not be required to obtain competitive bids for any service for which a single provider exists), solicited in the following manner:

(a)     A minimum of two (2) written bids shall be obtained for each purchase or contract that exceeds $10,000, up to $25,000. Purchases over $25,000 will require a minimum of three (3) bids.

(b)     Each bid will be solicited in a uniform format.

(c)     Subject to approval by Owner, Manager may accept a low bid if the expenditure is for an approved item in the budget and will not result in an excess of the annual budgeted Account Category of the applicable Capital Budget or Annual Operating Budget.

(d)     If Manager desires to accept a bid other than the lowest bid, then Manager shall so advise Owner in writing and recommend that such bid be accepted, with support for such recommendation.

**Management Agreement – Page 16**

(e)  Owner shall have the right to accept or reject any and all bids for repairs, Capital Improvements, FF&E or foods and services that are not the lowest bid; such acceptance shall not be unreasonably withheld or delayed.

(f)  Manager may request Owner to waive in writing competitive bidding rules for a specific item or service.

In its operation of the Hotel under this Agreement, Manager may purchase goods, supplies and services from itself, Owner or Owner's representatives, or any Affiliates of any of the foregoing so long as the prices and terms thereof are at arm's length and otherwise competitive with, and are not less favorable than prices and terms which could be obtained from independent parties and, if required by Section 4.5, are in compliance with competitive bidding rules, provided that Manager will obtain Owner's consent (not to be unreasonably withheld) regarding any such arrangement.

4.6  **Labor Relations**. Manager shall have no right to enter into any collective bargaining agreement concerning any employees of the Hotel without the prior written approval of Owner, which may be granted or withheld in its sole discretion. Upon Owner's approval of any such agreement, Manager shall be responsible to perform such agreements. To the extent applicable, Manager: (a) represents that it is an equal opportunity employer as described in Section 202 of Executive Order 11246 dated September 24, 1965, as amended, and as such agrees to comply with the provisions of Paragraphs 1 through 7 of Section 202 of said Executive Order during the performance of this Agreement, (b) agrees to comply with the affirmative action requirements of Part 60.741 of Title 41, Code of Federal Regulations, with respect to handicapped workers during the performance of this Agreement, (c) agrees to comply with the affirmative action requirements of Part 60.250 of Title 41, Code of Federal Regulations, with respect to Disabled Veterans and Veterans of the Vietnam Era during the performance of this Agreement, and (d) shall submit to Owner in the form approved by the Director of the Office of Federal Contract Compliance, U.S. Department of Labor, a certification that Manager does not and will not maintain any facilities that provide for their employees in a segregated manner, or permit their employees to perform their services at any location under its control, where segregated facilities are maintained, and that Manager will obtain a similar certification from its contractors.

4.7  **Liquor License**. INTENTIONALLY OMITTED.

4.8  **Employee Discount**. To the extent Manager, Owner or any of their respective Affiliates owns or has any equity interest in other hotels and provides a discounted rate to the employees at such other hotels, such party agrees to provide the same discounted rate (subject to availability and black-out periods) to the employees of the other parties named in this Section 4.8 to the extent allowed under the management and ownership agreements affecting such other hotels.

4.9  **Forms**. Manager shall prepare or cause to be prepared for execution by Owner all forms, reports and returns, if any, required to be filed by Owner under applicable law with respect to the operation of the Hotel; however, Manager shall not be obligated to prepare any of Owner's income tax returns. Without limitation, Manager shall timely prepare and deliver, as

required by law, an Internal Revenue Service Tax Form 1099 with respect to payments made during a calendar year to third party contractors and professionals.

4.10    **Notice of Violations**. Manager shall promptly notify Owner in writing of any written notice received from any regulatory or governmental body regarding an actual or perceived violation of any Legal Requirements.

## ARTICLE 5
## RELATIONSHIP OF PARTIES

Except as provided in Section 4.2(a), Owner and Manager acknowledge and agree that this Agreement creates an agency relationship; provided, however, that (a) each Hotel Employee shall be the employee of Manager or Manager's Affiliate and not of Owner, (b) Manager's authority is subject to the terms and conditions of this Agreement, and (c) nothing in this Agreement shall constitute, or be construed to be, or create, a partnership, joint venture or lease or employment arrangement between Owner and Manager with respect to the Hotel or the operation thereof. Employees or agents of Manager are not by this Agreement or by any actions of Owner and/or Manager hereunder made employees of Owner, and are not entitled to the benefits provided by Owner or its Affiliates to its employees, including but not limited to, group insurance, leave and pension plan. This Agreement shall not be deemed at any time to be an interest in real estate or a lien or security interest of any nature against the Hotel, the Premises or any other land used in connection with the Hotel, or any equipment, fixtures, inventory, motor vehicles, contracts, documents, accounts, notes, drafts, acceptances, instruments, chattel paper, general intangibles, or other personal property now existing or that may hereafter be acquired or entered into with respect to the Hotel or the operation thereof.

## ARTICLE 6
## ADVERTISING

Subject to and in strict compliance with the provisions of the License Agreement, Manager shall arrange and contract for all advertising, which Manager may reasonably deem necessary, in accordance with Section 4.4, for the operation of the Hotel. So long as the License Agreement may be in effect, Manager generally shall advertise the Hotel under the name "–Petrol Inn & Suites" or such other name as Owner may designate or approve.

## ARTICLE 7
## RESERVE FOR FF&E

7.1    **Reserve for Replacement of FF&E**. The Reserve shall be funded pursuant to Section 7.2, and Manager shall use amounts in the Reserve to cover the cost of FF&E expenditures and Capital Improvements, as described in Section 4.4 in conjunction with the Approved Capital Budget. All FF&E, Capital Improvements and the Reserve shall be the property of Owner.

7.2    **Transfers to Reserve for FF&E**. Commencing on the Commencement Date and continuing thereafter during the remainder of the Term, Manager shall deposit monthly into the Reserve for FF&E an amount equal to the amounts required by Lender and/or by Licensor;

**Management Agreement – Page 18**

provided that in no event will the amounts to be deposited monthly into the Reserve be less than an amount equal to four percent (4%) of Gross Revenues throughout the remainder of the Term.

7.3     **Annual Adjustment**. At the end of each Fiscal Year and following receipt by Manager of the annual accounting referred to in Article 10, an adjustment will be made to such annual account, if necessary and if available, so that the appropriate amount shall have been deposited in the Reserve.

7.4     **Maintenance of Reserve**. Checks or other documents of withdrawal shall be signed by representatives of Manager who shall be bonded or otherwise insured pursuant to the "crime – Theft of Money and Securities" coverage set forth on Exhibit D to this Agreement. The proceeds from the sale of FF&E no longer needed for the operation of the Hotel shall be deposited in the Reserve, but not be credited against the obligation to deposit cash in such fund for the then current Fiscal Year. All interest earned or accrued on amounts invested from the Reserve shall be added to the Reserve (but shall not be credited against Owner's obligations to fund the Reserve), and shall not constitute Gross Revenues or be included therein.

7.5     **Accumulation of Reserve and Additional Cost of FF&E and Capital Improvements**. Owner and Manager acknowledge and agree that portions of the Reserve may, from time to time in accordance with the then-current Annual Plan, be used for more significant expenditures than could be reserved for in a single year.  Accordingly, at the end of each Fiscal Year, any amounts remaining in the Reserve shall be carried forward to the next Fiscal Year, and shall be in addition to the amount to be reserved in the next Fiscal Year. In the event at any time there are insufficient funds in the Reserve for any Fiscal Year to pay the cost of FF&E in accordance with the Annual Operating Budget and the Approved Capital Budget, then Owner will, at Owner's option, within sixty (60) days after request therefor by Manager, either provide the additional cash to the Manager to pay for such excess or authorize the funding of such cash from Net Operating Income.

7.6     **Final Remittance**. Upon expiration or termination of this Agreement, Manager shall remit all remaining amounts in the Reserve forthwith to Owner.

## ARTICLE 8
## REPAIRS AND MAINTENANCE AND CAPITAL IMPROVEMENTS

8.1     **Repairs and Maintenance**. Manager shall, from time to time, make such expenditures from Gross Revenues for repairs and maintenance including service contracts ("**Repairs and Maintenance**") as required by the Lender, the License Agreement, the Legal Requirements, the then current Annual Plan or as necessary to maintain the Hotel in good operating condition in compliance with the License Agreement and otherwise in the condition required by this Agreement, including but not limited to repairs and maintenance of HVAC, mechanical and electrical systems, exterior and interior repainting, resurfacing building walls and parking areas, waterproofing of exterior surfaces of floors, roofs, and replacement of plate glass, or the like. It is Owner's intent that the sums allocated for Repairs and Maintenance in accordance with the then current Annual Plan are to be fully expended during that Fiscal Year exclusively for the purposes identified in such Annual Plan. Except in the event of an emergency due to casualty, act of God or otherwise under circumstances in which it would be unreasonable

to seek to obtain prior approval (and provided that Manager shall notify Owner of any such expenditure within a reasonable time given the nature and scope of the emergency), all expenditures for the foregoing shall be as provided in the Annual Operating Budget and the Approved Capital Budget. If any such Repairs or Maintenance shall be made necessary by any condition against the occurrence of which Owner has received the guaranty or warranty of the builder or the Hotel or of any supplier of labor or materials for the Hotel or of any supplier of labor or materials for the construction of the Hotel, then Manager may invoke said guarantees or warranties in Owner's or Manager's name and Owner shall cooperate in all reasonable respects with Manager in the enforcement thereof.

8.2    **Capital Improvements**. Owner may, from time to time, at its sole expense, make such structural repairs, replacements, substitutions, alterations, additions or improvements (exclusive of FF&E) ("**Capital Improvements**") in or to the Hotel as Owner shall determine are necessary to comply with the Operating Standards. If Capital Improvements included in the definition of Building and Appurtenances shall be required at any time during the Term by the terms of any Mortgage, the License Agreement, to maintain the Hotel in good operating condition or by reason of any Legal Requirements, or because Manager and Owner jointly agree upon the desirability thereof, then in such event all such Capital Improvements shall be made with as little hindrance to the operation of the Hotel as reasonably possible. Notwithstanding the foregoing, as long as the Hotel can continue to operate without interruption, Owner shall have the right to contest the need for any such Capital Improvements required by any Legal Requirements and may postpone compliance therewith, if so permitted by law and if such postponement will not expose Manager to any civil or criminal liability. All recommendations by Manager of Capital Improvements shall be submitted in conjunction with the Capital Budget for the Fiscal Year described in Section 4.4(b). In the event that Owner elects to perform Major Renovations to the Hotel, Owner shall have the right to cause (i) Manager, or (ii) a third party, to oversee the performance of the Major Renovations for which oversight, if Manager is overseeing the Major Renovations, Manager shall be paid a project management fee (in addition to the Management Fee) equal to three percent (3%) of the budgeted hard cost items including contingency and any Owner-approved changes of the Major Renovations (the "**Project Fee**"). With respect to (i) Major Renovations as contemplated by this Agreement which Owner elects to have Manager oversee and (ii) improvements that are not Major Renovations, Manager shall oversee such projects in a reasonably prudent manner.

8.3    **Service Contracts**. Manager, without requiring the consent of Owner, shall enter into any contract for cleaning, maintaining, repairing or servicing the Hotel or any of the constituent parts of the Hotel as Manager deems necessary for the operation of the Hotel, except as specifically provided in Section 4.4 or 4.5. Manager shall submit the listing of service contracts entered into for the Hotel required pursuant to Section 4.4(a). Unless otherwise approved by Owner, all service contracts shall: (a) be in the name of Owner or Owner's nominee, (b) to the extent customary, include a provision for cancellation thereof by Owner or Manager upon not more than thirty (30) days written notice, and (c) shall require that all contractors provide evidence of such insurance as is customarily carried by other contractors involved in similar servicing arrangements.

8.4    **Liens**. Owner and Manager shall cooperate and use all commercially reasonable efforts to prevent any liens from being filed against the Hotel that arise from any maintenance,

changes, repairs, alterations, improvements, renewals or replacements in or to the Hotel. If any such liens are filed, Manager shall, subject to the availability of funds therefor in the Operating Accounts or as otherwise supplied by Owner, obtain the release thereof prior to the institution of legal proceedings in connection therewith. The cost of obtaining such release shall be included in Gross Operating Expenses, unless the imposition of the lien results from a default by Owner or Manager, in which event the cost of obtaining such release shall be borne by such defaulting party.

8.5 **Notice of Unavoidable Interruptions**. In the event of any occurrence constituting an Unavoidable Interruption, Manager shall promptly notify Owner of such occurrence and shall keep Owner informed as to the extent and impact thereof on the Hotel.

## ARTICLE 9
## WORKING CAPITAL AND BANK ACCOUNTS; DISTRIBUTION OF NET OPERATING INCOME

9.1 **Working Capital**. Owner shall provide initial Working Capital in the amount of $█████ in addition to the value of all Inventories. Owner shall at all times cause sufficient funds to be on hand in the Operating Accounts to assure the timely payment of all current liabilities of the Project, including but not limited to Gross Operating Expenses, all other costs and expenses incurred in connection with the Project pursuant to this Agreement and the performance by Manager of its obligations under this Agreement, all fees, charges and reimbursements payable to Manager hereunder and all amounts required hereunder to be transferred into the Reserve. In no event shall Owner permit the balance in the Operating Accounts to be less than an amount equal to the estimated monthly operating expenses of the Project as reflected in the then current Annual Operating Budget. From time to time, upon five (5) days prior written notice from Manager that such funds are required, Owner shall furnish to Manager funds that Manager deems reasonably necessary to assure that the Project shall have adequate working capital as herein provided. In the event Owner fails to supply required working capital in accordance with the provisions of this Section or if Manager otherwise deems such action to be necessary, Manager may use all or part of the funds in the Reserve to supplement the Operating Accounts in order to defray or pay the Project's operating costs and expenses, to the extent permitted by the Mortgage. Owner shall promptly reimburse the Reserve for all sums so used or transferred. All unexpended Working Capital, Inventories and Operating Equipment and Supplies purchased with Working Capital shall remain the property of Owner.

9.2 **Operating Account**. All funds (exclusive of funds deposited in the Reserve and house banks at the Hotel) received by Manager in the operation of or otherwise relating to the Hotel, and funds for Working Capital provided by Owner or retained by Manager from Gross Revenues, shall be deposited in the Operating Account. Manager shall inform such bank in writing that the funds deposited in the Operating Account are owned solely by the Owner. Manager shall not deposit funds attributable to any other property into the Operating Account. To the extent permitted by the Mortgage, amounts in the Operating Account may be temporarily withdrawn and invested by Manager in any Permitted Investments, having due regard for the timing of cash needs, but in no event shall such funds be co-mingled by Manager with any other funds. From the Operating Account, Manager shall pay all Gross Operating Expenses (other than the excess FF&E if funded by or through Owner) before any penalty or interest accrues thereon,

**Management Agreement – Page 21**

however, taking into account sound cash management. All interest earned or accrued on amounts invested from the Operating Account shall be added to the Operating Account. All checks or other documents of withdrawal from the Operating Account shall be signed by representatives of Manager except as provided in Section 9.3 hereof.

9.3  **Maintenance of Operating Account**. Subject to Section 9.4, the Operating Account shall be opened and maintained at all times by Manager and Owner and checks and other documents of withdrawal shall be signed by representatives of Manager who are covered by the required fidelity bond or otherwise insured pursuant to the "Crime – Theft of Money and Securities" coverage set forth on Exhibit D. The Operating Account and any other bank accounts approved by Owner shall be in Owner's name (for example, "*[Owner's name]* d/b/a/ *[Hotel name]*").

Manager shall not change the bank or open or close any bank account described in this Article 9 without Owner's prior written approval. Owner, in its sole and absolute discretion, may in writing direct Manager to change any such bank, signatories or arrangements. The bank in which the Operating Account is located shall be informed by Manager in writing that the funds in such account are held in trust for Owner and that any checks for more than $10,000.00 shall be required to be signed by two (2) authorized signatories on the account.

9.4  **Final Remittance**. Upon the expiration or termination of this Agreement, after payment of all Gross Operating Expenses for which bills were received to such date, Manager's Management Fee, Reimbursable Expenses, any Termination Fee and any other amounts then due and payable to Manager, all remaining amounts in (i) the Reserve, (ii) the Operating Account and (iii) the Permitted Investments, shall be transferred forthwith to Owner by Manager. Owner shall pay Manager any remaining Management Fee, any Termination Fee, Reimbursable Expenses and any other amounts then due and payable and Owner shall pay, or cause to be paid, and shall hold Manager harmless from and against all Gross Operating Expenses accrued in accordance with generally accepted accounting principles and invoices related to Gross Operating Expenses received after Manager has so transferred all funds.

9.5  **Distribution of Excess Cash**. Together with the financial report provided for in Section 10.2(b), Manager shall distribute to Owner all sums in the Operating Accounts in excess of the then working capital requirements of the Hotel determined in accordance with Section 9.1 of this Agreement.

## ARTICLE 10
## BOOKS, RECORDS AND STATEMENTS

10.1  **Books and Records**. Manager shall keep full and adequate books of account and other records reflecting the results of operation of the Hotel in accordance with the Uniform System of Accounts and generally accepted accounting principles. The books of account and all other records relating to or reflecting the operation of the Hotel shall be kept either at the Hotel or at Manager's corporate offices and shall be available to Owner and its representatives and its auditors or accountants, at all reasonable times for examination, audit, inspection and transcription at Owner's sole cost and expense. All of such books and records pertaining to the Hotel including, without limitation, books of account, guest records and front office records at all

times shall be the property of Owner and shall not be removed from the Hotel's or Manager's offices by Manager without Owner's approval and consent. Upon any termination of this Agreement, all of such books and records forthwith shall be turned over to Owner at a location designated by Owner so as to insure the orderly continuance of the operation of the Hotel, but such books and records shall thereafter be available to Manager at all reasonable times for inspection, audit, examination and transcription for a period of two (2) years.

10.2    **Financial Reports**.

(a)    Manager shall deliver to Owner within twenty (20) days following the close of each Accounting Period a monthly profit and loss statement reflecting a comparison of periodic and year-to-date actual revenues and expenses with the Annual Operating Budget as well as a periodic and year-to-date comparison of such actual revenues and expenses with those of the prior Fiscal Year.

(b)    Further, Manager shall provide to Owner within twenty (20) days following the close of each Accounting Period a report prepared in accordance with the example set forth in Exhibit C attached hereto and made a part hereof, which include without limitation, forward bookings, accounts receivable, accounts payable and a monthly sales overview report.

(c)    Further, within seventy-five (75) days after the end of each Fiscal Year, Manager shall deliver to Owner an annual accounting, showing the results of operation of the Hotel during the Fiscal Year and a computation of Gross Revenues, Gross Operating Expenses, and Net Operating Income, if any, and any other information necessary to make the computations required hereby or which may be requested by Owner, all for such Fiscal Year. The annual accounting for any Fiscal Year shall be controlling over the interim accountings for such Fiscal Year. Owner shall have the right to conduct an audit of the books.

(d)    Further, Manager shall prepare and deliver any additional reports or information as Owner is required to provide under the License Agreement.

10.3    **Audits by Owner**. Owner shall have the right to audit, conducted either by Owner's internal personnel or by a third party auditor retained by Owner at its expense, all items of expense and revenue under this Agreement including, but not limited to, Gross Revenues, Gross Operating Expenses, depreciation, the Management Fee and Reserve. Manager shall cooperate and assist with such audit. In the event that an audit reflects an underpayment to Owner or Manager or an overpayment to Manager or Owner, Manager shall correct same by a corrective payment to Owner or Manager, as appropriate, within ten (10) days following notice of the audit results to Manager, subject to Owner's and Manager's right to challenge the audit results in accordance with the provisions of Article 30 of this Agreement. If an audit determines any weaknesses or need for reasonable changes in the internal control systems pertaining to the safeguarding of Owner's assets, Manager will promptly make all necessary changes.

10.4    **Segregation of Accounts**. In any instance where Manager manages several properties for Owner, Manager shall segregate the income and expenses of each property so that Gross Revenues from each property will be applied only to the bills and charges from that property.

**Management Agreement – Page 23**

## ARTICLE 11
## MANAGER'S MANAGEMENT FEES; TIMING OF
## PAYMENT TO MANAGER

11.1    **Fees.** For each Fiscal Year or portion thereof, Manager shall receive, by a distribution made by Manager out of Gross Revenues at the end of each Accounting Period in respect of its management services hereunder, a fee (collectively, the "**Management Fee**") calculated as follows:

(a)    a base fee (the "**Base Fee**") in an amount equal to ▮▮▮▮▮▮▮▮▮▮ of Gross Revenues in respect of any applicable period; plus

(b)    an accounting fee (the "**Accounting Fee**") for accounting services provided by Manager's corporate employees on a "centralized" basis in the amount of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ plus

(c)    a revenue management fee (the "**Revenue Management Fee**") for an allocation of Manager's revenue management services to be provided by Manager's corporate employees on a "centralized" basis in the amount of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The Management Fee generally shall be computed separately for each Fiscal Year and shall not be accumulated from Fiscal Year to Fiscal Year. Owner shall reimburse Manager for all Reimbursable Expenses incurred by it in connection with the performance of this Agreement. Any such amount shall be payable within thirty (30) days of billing, and upon request of Owner, Manager shall provide a statement showing in reasonable detail the nature and amount of such expenses, together with supporting documentation reasonably requested by Owner.

11.2    **Treatment of Proceeds of Business Interruption Insurance and Condemnation Awards**. In the event of a casualty or condemnation for temporary use resulting in the payment of business interruption insurance (with respect to such casualty) or a condemnation award (with respect to such condemnation for temporary use), the amount of such proceeds shall be considered a part of Gross Revenues for the purpose of computing Manager's Management Fee.

## ARTICLE 12
## INSURANCE

12.1    **Insurance**. Throughout the Term, Manager (unless Owner shall by notice in writing to Manager elect to provide the property and casualty insurance coverage required hereunder) shall provide and maintain the insurance in the minimum amounts and types set forth

on **Exhibit D** to this Agreement, the costs of which shall be charged as part of Gross Operating Expenses.

12.2     **Modification of Insurance**. Owner may require Manager to increase the limits of the above insurance coverage and may require Manager to carry other or additional reasonable and customary insurance. All premiums on any increased limits of, or other or additional, insurance coverage required by Owner under the immediately preceding sentence shall be included in the Gross Operating Expenses. In no event shall insurance coverage be less than that required by Lender, the License Agreement or to comply with Legal Requirements.

12.3     **Contractor's Insurance**. Manager shall require that all major contractors on or about the Hotel Premises have coverage at the contractor's sole expense in the minimum types and amounts set forth in **Exhibit D** to this Agreement. Manager shall require contractors that are not major contractors to carry such insurance coverage that is customary in the applicable trade or industry. A major contractor shall mean any contractor (i) receiving compensation in excess of $25,000 per year (subject to adjustment for adjustments in the CPI between the Commencement Date and the date of such services) or (ii) performing hazardous services. Manager must obtain the Owner's permission in writing to waive any of the above requirements. Higher amounts may be required if the work to be performed is sufficiently hazardous in nature. Manager shall obtain and keep on file a Certificate of Insurance for each such major contractor that shows that the contractor is so insured.

12.4     **Form of Policies**. All insurance required by Sections 12.1, 12.2 and 12.3 shall be in such form and with such companies as shall be reasonably satisfactory to Owner provided that such company shall have a minimum Best rating of A- Class VIII, or as otherwise approved by Owner and Manager, and shall comply with the requirements of any Mortgage and the License Agreement. All property damage insurance shall name Owner as insured, and so long as the Hotel is mortgaged pursuant to any Mortgage or otherwise shall be subject to a standard mortgagee clause in favor of the mortgagee or mortgagees. All other insurance (excepting only the professional liability and workers' compensation lines of coverage) shall be in the name of Owner and Manager. The workers' compensation policy shall name Owner as an additional insured. Policies of insurance (to the extent applicable) shall (i) provide that the insurance company will have no right of subrogation against any mortgagee, Owner, Manager or any of their respective affiliated or subsidiary companies or the agents or employees thereof and (ii) provide that the proceeds thereof in the event of loss or damage shall, to the extent payable to any mortgagee, be payable notwithstanding any act of negligence or breach of warranty by Owner or Manager which might otherwise result in the forfeiture or nonpayment of such insurance proceeds.

12.5     **Certificates**. For the purpose of insuring compliance with the provisions of Article 12, Manager shall furnish to the Owner certificates for all insurance required to be maintained pursuant to this Article 12 within five (5) days prior to renewal. All such certificates shall specify that the policies to which they relate cannot be canceled or modified on less than thirty (30) days' prior written notice to Owner. In the event Owner procures any insurance under this Section 12, Owner shall have the responsibilities set forth in the two preceding sentences for the benefit of Manager.

12.6    **Waiver of Subrogation**. Owner and Manager each waive their respective rights of subrogation against each other.

12.7    **Mortgage Requirements**. Insurance shall be maintained in a manner consistent with the terms and conditions of any Mortgage and any conflict between those terms and conditions and the provisions of this Agreement shall be resolved in favor of the Mortgage.

## ARTICLE 13
## REAL AND PERSONAL PROPERTY TAXES; UTILITIES

13.1    **Taxes**. Manager shall, on behalf of Owner, pay from the Gross Revenues, on or before the dates the same become delinquent, with the right to pay the same in installments to the extent permitted by law, all real estate taxes, all personal property taxes and all betterment assessments levied against the Hotel or any of its component parts. Manager shall promptly deliver to Owner all notices of assessments, valuations and similar documents to be filed by Manager or Owner, which are received from taxing authorities by Manager. Owner shall have the right to hire property tax consultants or like professionals that reasonably provide economic benefits to Owner and the costs thereof shall be a part of Gross Operating Expenses. Notwithstanding the foregoing obligations of Manager, Owner may elect to contest the validity or the amount of any such tax or assessment, provided that such contest does not materially jeopardize Manager's rights under this Agreement. Manager agrees to cooperate with Owner and execute any documents or pleadings required for such purpose, provided Owner agrees to reimburse Manager for any out-of-pocket costs occasioned to Manager by any such contest. At Owner's election, all costs relating to any such contest may be included in Gross Operating Expenses.

13.2    **Utilities, Etc**. Manager shall promptly pay all fuel, gas, light, power, water, sewage, garbage disposal, telephone and other utility bills currently as they are incurred in connection with the Hotel from the Gross Revenues or Working Capital.

## ARTICLE 14
## USE OF NAME

14.1    **Name**. During the Term of this Agreement, the Hotel shall at all times be known and designated as the "Oakwood Suites" or by such other name as from time to time may be agreed upon by Owner and Manager. Manager shall make or cause to be made any fictitious name filings or disclosures required by the laws of the State with respect to the use of such name for or in connection with the Hotel. Manager shall not use or employ such name unless such use fully complies with the terms of the License Agreement, if any.

## ARTICLE 15
## DAMAGE OR DESTRUCTION; CONDEMNATION

15.1    **Damage or Destruction**.

(a)      If the Hotel or any portion thereof shall be damaged or destroyed at any time or times during the Term by fire, casualty or any other cause commonly covered by fire and extended coverage insurance and the cost of repairing such damage and restoring the Hotel to

substantially its condition immediately prior to such damage or destruction, as reasonably estimated by Owner based upon estimates Owner receives from contractors and other reasonable and customary evidence, will not exceed the sum of $250,000 plus adjustments to reflect increases in the CPI for each Fiscal Year after 2014 exclusive of the cost of the foundation and footings ("**Minimum Cost**"), Owner will, at its own cost and expense (subject to Owner's receipt of insurance proceeds sufficient to pay such costs and expenses) and with due diligence repair and/or restore the Hotel so that after such repair and/or restoration, the Hotel shall be in substantially the same condition as it was immediately prior to such damage or destruction.

(b)     If the cost of such repair and/or restoration will, as so reasonably estimated by Owner, exceed the Minimum Cost, then Owner shall, within one hundred twenty (120) days after such damage or destruction, elect by notice to Manager either (x) to carry out such repair and/or restoration, in which case Owner shall complete such repair and/or restoration pursuant to the last sentence of Section 15.1(a) or (y) to terminate this Agreement; should Owner so elect to terminate this Agreement, Owner shall pay to Manager the Termination Fee.

(c)     In the case of damage or destruction which Owner is not required by the preceding provisions of this Section 15.1 to repair or restore and where Owner has not elected under said preceding provisions to terminate this Agreement, Owner shall undertake to notify Manager, within one hundred twenty (120) days after such damage or destruction, whether or not Owner will so repair and/or restore such damage or destruction. If Owner, within such one hundred twenty (120) day period either (i) advises Manager that Owner will not so repair and/or restore such damage or destruction or (ii) fails to advise Manager of Owner's decision, Manager may terminate this Agreement by written notice to Owner, or Owner may terminate this Agreement by such notice to Manager; in either case such written notice must be given within one hundred fifty (150) days after such damage or destruction and neither party shall be entitled to any payment on account of such termination. If in such event Owner within such one hundred twenty (120) day period notifies Manager that Owner will so repair and/or restore such damage or destruction, then neither Owner nor Manager shall have a right to terminate this Agreement on account of such damage or destruction.

15.2    **Condemnation**. If the whole of the Hotel shall be taken or condemned in any eminent domain, condemnation, compulsory acquisition or like proceeding by any competent authority or if such a portion thereof shall be taken or condemned as to make it imprudent or unreasonable, in the sole opinion of Owner, to use the remaining portion as a hotel of the type and class immediately preceding such taking or condemnation, then the Term shall terminate as of the date title vests in the condemning authority. Manager has no interest in any award paid to Owner and Manager shall make no claim against the condemnor for any loss to its business as a result of such condemnation or otherwise. If only a part of the Hotel shall be taken or condemned and the taking or condemnation of such part does not, in the opinion of Owner, make it unreasonable or imprudent to operate the remainder as a hotel of the type and class immediately preceding such taking or condemnation, this Agreement shall not terminate, and so much of any award to Owner shall be made available as shall be reasonably necessary for making alterations or modifications of the Hotel, or any part thereof, so as to make it a satisfactory architectural unit as a hotel of similar type and class as prior to the taking or condemnation.

15.3     **Mortgage Requirements**. Actions as to damage or destruction and condemnation shall be taken only in a manner that is consistent with the terms and conditions of the Mortgage and any conflict between those terms and conditions and the provisions of this Agreement shall be resolved in favor of the Mortgage.

**ARTICLE 16**
**EVENTS OF DEFAULT**

16.1     **Manager Defaults**. Each of the following shall constitute an Event of Default by Manager:

(a)     The failure of Manager to pay any sum of money (or, if required by the Mortgage, to deposit into the lockbox account within two (2) business days of receipt) to Owner provided for herein when the same is payable, if such failure is not cured within five (5) days after written notice specifying such failure is given by Owner to Manager.

(b)     An assignment by Manager in violation of the provisions of Article 23 hereof.

(c)     If Manager shall fail to keep, observe or perform any other material covenant, agreement, term or provision of this Agreement to be kept, observed or performed by Manager and such failure shall continue for a period of thirty (30) days after written notice specifying such failure given by Owner to Manager, or if Manager due to any act or omission on the part of Manager and without the fault of Owner, shall fail to maintain the Permits and such failure shall continue for a period of thirty (30) days after written notice specifying such failure given by Owner to Manager; provided that if such failure is incapable of cure within such thirty (30) day period, then the cure period shall be extended provided that Manager commenced the cure during such initial thirty (30) day period and thereafter diligently and continuously pursues the cure thereof to completion.

(d)     If because of any act or omission on the part of Manager, and without the fault of Owner, either (i) the License Agreement or (ii) any required license for the sale of alcoholic beverages at the Hotel, is at any time suspended, terminated or revoked for a period of more than thirty (30) consecutive days, provided, however, if, at the end of such thirty (30) day period the cure has not been effectuated notwithstanding Manager's diligent and continuous attempts to cure, then the cure period shall be extended for an additional period of ninety (90) days.

(e)     If Manager shall fail to maintain and operate the Hotel in accordance with the standards required under Section 4.1 and such failure shall not be due to a refusal on the part of Owner to approve the Annual Plan submitted by Manager under Section 4.4 or Owner's failure to properly provide funds requested pursuant to the provisions of Section 9.1 and such failure shall continue for a period of sixty (60) days after written notice by Owner to Manager specifying the matters or conditions which constitute the basis for such Event of Default, provided that if such failure is not reasonably capable of cure within such sixty (60) day period, then the cure period shall be extended provided that Manager commences the cure during such initial sixty (60) day period and thereafter diligently and continuously pursues the cure thereof to completion.

(f)　　If Manager shall apply for or consent to the appointment of a receiver, trustee or liquidator of Manager or of all or a substantial part of its assets, admit in writing its inability to pay its debts as they come due, make a general assignment for the benefit of creditors, take advantage of any insolvency law, or file an answer admitting the material allegations of a petition filed against Manager in any bankruptcy, reorganization or judgment or decree shall be entered by any court of competition jurisdiction, on the application of a creditor, adjudicating Manager bankrupt or insolvent or approving a petition seeking reorganization of Manager or appointing a receiver, trustee or liquidator of Manager or of all or a substantial part of its assets or a decree shall continue unstayed and in effect for any period of ninety (90) consecutive days.

(g)　　The filing of a voluntary petition in bankruptcy or insolvency or a petition for liquidation or reorganization under any bankruptcy law by Manager, or Manager shall consent to, acquiesce in, or fail timely to controvert, an involuntary petition in bankruptcy, insolvency or an involuntary petition for liquidation or reorganization filed against it.

(h)　　The filing against Manager of a petition seeking adjudication of Manager as insolvent or seeking liquidation or reorganization or appointment of a receiver, trustee or liquidator of all or a substantial part of Manager's assets, if such petition is not dismissed within ninety (90) days.

(i)　　Failure of Manager (but excluding such a failure which results from the failure by Owner to provide the necessary funds therefor) to maintain at all times throughout the term hereof all of the insurance required to be maintained by Manager under Article 12, if such failure is not cured within fifteen (15) days after written notice specifying such failure is given by Owner to Manager.

(j)　　The fraud, gross negligence, willful misconduct or criminal conduct of or by Manager and, to the extent same has a material adverse effect on the Hotel or Owner, the General Manager, in connection with the Hotel.

16.2　　**Owner Defaults**. Each of the following shall constitute an Event of Default by Owner:

(a)　　The failure of Owner to pay or furnish to Manager any money Owner is required to pay or furnish to Manager in accordance with the terms hereof on the date the same is payable, if such failure is not cured within five (5) days after written notice specifying such failure is given by Manager to Owner. If any sum of money is not paid within five (5) days following the date same becomes due and payable under this Agreement, and Manager has advanced such sum on behalf of Owner, such sum shall bear interest at the Default Rate from the date Manager advanced such sum on behalf of Owner until the date Owner actually pays such sum. If the failure to pay relates to the Management Fee, such sum shall bear interest at the Default Rate from the date due until the date actually paid.

(b)　　If because of a default under the Mortgage, if any, not caused by the act or omission of Manager, the Mortgage shall be foreclosed, or the Hotel sold in lieu of foreclosure.

(c)　　If Owner shall apply for or consent to the appointment of a receiver, trustee or liquidator of Owner of all or a substantial part of its assets, or admit in writing its inability to pay

its debts as they come due, make a general assignment for the benefit of creditors, take advantage of any insolvency law, or file an answer admitting the material allegations of a petition filed against Owner in any bankruptcy, reorganization or insolvency proceeding, or if an order, judgment or decree shall be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating Owner a bankrupt or insolvent or approving a petition seeking reorganization of Owner or appointing a receiver, trustee or liquidator of Owner or of all or a substantial part of its assets, and such order, judgment or decree shall continue unstayed and in effect for any period of ninety (90) consecutive days.

(d) The filing of a voluntary petition in bankruptcy or insolvency or a petition for liquidation or reorganization under any bankruptcy law by Owner, or Owner shall consent to, acquiesce in, or fail timely to controvert, an involuntary petition in bankruptcy, insolvency or an involuntary petition for liquidation or reorganization filed against it.

(e) The filing against Owner of a petition seeking adjudication of Owner as insolvent or seeking liquidation or reorganization or appointment of a receiver, trustee or liquidator of all or a substantial part of Owner's assets, if such petition is not dismissed within ninety (90) days.

(f) Failure of Owner to maintain at all times throughout the term hereof all of the insurance required to be maintained by Owner under Article 12, if such failure is not cured within fifteen (15) days after written notice specifying such failure is given by Manager to Owner.

(g) The failure of Owner to perform, keep or fulfill any of the other covenants, undertakings, obligations or conditions set forth in this Agreement, or the failure of Owner to approve expenditures or to authorize procedures necessary to maintain the standards of the Hotel in accordance with the Operating Standards, if such failure shall continue for a period of thirty (30) days after written notice by Manager or Licensor to Owner specifying the matters or conditions which constitute the basis for such Event of Default, provided that if such failure is incapable of cure within such thirty (30) day period, then the cure period shall be extended for up to an additional thirty (30) days provided that Owner commences the cure during such initial thirty (30) day period and thereafter diligently and continuously pursues the cure thereof.

## ARTICLE 17
## TERMINATION UPON EVENT OF DEFAULT; OTHER REMEDIES

17.1 **Termination**. Upon the occurrence of an Event of Default, in addition to and cumulative of any and all rights and remedies available to the non-defaulting party under this Agreement, at law or in equity, the non-defaulting party may: (i) terminate this Agreement without penalty, effective upon receipt of written notice of termination to the defaulting party, provided that termination may be effective immediately in the case of fraud, gross negligence, willful misconduct, criminal conduct or misappropriation of funds; and (ii) pursue any and all other remedies available to the non-defaulting party at law or in equity. In addition to and cumulative of the foregoing, upon the occurrence of any Event of Default on the part of Owner, all Management Fees, Reimbursable Expenses and all other sums payable to Manager under this Agreement shall be immediately due and payable without notice. In no event shall (i) the provisions of this Agreement with respect to the payment of a Termination Fee upon the

termination of this Agreement under certain circumstances be construed as defining or limiting the amount recoverable by Manager from Owner by reason of any Event of Default on the part of Owner; or (ii) entitle Manager to receive a Termination Fee in the event of a termination by reason of any Event of Default on the part of Manager

17.2 **Manager's Rights to Perform**.

(a) If Owner shall fail to make any payment or to perform any act required of Owner pursuant to this Agreement, Manager may (but shall not be obligated to), without further notice to, or demand upon, Owner and without waiving or releasing Owner from any obligations under this Agreement, make such payment (either with its own funds or with funds withdrawn for such purpose from the Operating Accounts or the Reserve) or perform such act. Manager agrees to provide written notice to Owner within five (5) days after Manager exercises its rights in the preceding sentence.  All sums so paid by Manager and all necessary incidental costs and expenses incurred by Manager in connection with the performance of any such act, together with interest thereon at the Default Rate from the date of making such expenditure by Manager, shall be payable to Manager on demand.

(b) Manager shall have the right to set-off against any payments to be made to Owner by Manager under any provision of this Agreement and against all funds from time to time in the Operating Accounts and the Reserve, any and all liabilities of Owner to Manager. Manager may withdraw from the Operating Accounts and the Reserve from time to time such amounts as Manager deems desirable in partial or full payment of all or any portion of said liabilities, the amount of such withdrawals to be paid by Owner to Manager on demand and to be replaced in the respective account and fund.

## ARTICLE 18
## OWNER'S ADDITIONAL TERMINATION RIGHTS

18.1 **Sale of the Hotel**. If Owner proposes to sell or otherwise dispose of the Hotel or Owner's interests therein, to a bona fide third-party (the "**Third-Party Purchaser**") during the Term, this Agreement will terminate effective upon the consummation of the closing of such sale. Owner shall provide Manager with written notice of termination of this Agreement not less than sixty (60) days prior to the scheduled date of closing of the sale of the Hotel; provided, however, if such a sale does not actually occur, the notice of termination shall be deemed ineffective.

18.2 **Performance Standard**.





## ARTICLE 19
## AREA OF PROTECTION

19.1

## ARTICLE 20
## TRANSFER TO OWNER UPON TERMINATION

Upon any termination of this Agreement, whether due to the occurrence of an Event of Default or otherwise, Manager shall cooperate with Owner and shall execute all documents or instruments requested by Owner in connection with the transfer, all without consideration to Manager (provided that, if such termination is due to a reason other than a default by Manager under this Agreement, Owner will reimburse Manager for Manager's reasonable expenses to effect such transfer) or the imposition of liability by Manager, to Owner or its nominee of the Permits and the License Agreement used or useful in connection with the operation of the Hotel. Without limiting the generality of the foregoing, Manager shall cause its officials, subject to restrictions provided in any License Agreement or related agreement, to provide all sales lists and customer contacts to Lender and to execute any necessary documents and to visit licensing authorities along with Owner's representatives in order to expedite (i) the orderly transfer to Owner or its designee of the Permits and the License Agreement (ii) the renewal thereof to Owner or Owner's designee if appropriate. In the event that this Agreement terminates due to

any reason other than a default by Manager under this Agreement, a sufficient number of Hotel Employees will be hired by Owner or its successor, assign or designee, and retained for at least 90 days thereafter, so as not to cause a "mass layoff" or "plant closing", as defined in the Workers Adjustment and Retraining Act, 29 USC, sec 2101 et seq.

## ARTICLE 21
## NOTICES

All notices, elections, acceptances, demands, consents and reports (collectively "notice") provided for in this Agreement shall be in writing and shall be given to the other party at the address set forth below or at such other address as any of the parties hereto may hereafter specify in writing.

To Owner:        RREAF O&G PORTFOLIO #2 LLC
                 C/O Spectrum Origination LLC
                 1253 Springfield Avenue, Suite 201
                 New Providence, New Jersey 07974
                 Attention: Jeffrey Schaffer

With a copy to:
                 Spectrum Group Management LLC
                 1250 Broadway, 19th Floor
                 New York, New York 10001
                 Attention: Peter Locke

To Manager:      Channel Point Hospitality LLC
                 2500 North Dallas Parkway
                 Suite 600
                 Plano, Texas 75093

With a copy to:  Carla S. Moreland, Esq.
                 5112 Briargrove Lane
                 Dallas, Texas 75287

Such notice or other communication may be given by Federal Express or other nationally recognized overnight carrier or by electronic facsimile in which case notice shall be deemed given upon confirmed delivery. Notice may be mailed by United States registered or certified mail, return receipt requested, postage prepaid, deposited in a United States post office or a depository for the receipt of mail regularly maintained by the post office. If mailed, then such notice or other communication shall be deemed to have been received by the addressee on the fifth (5th) day following the date of such mailing. Such notices, demands, consents and reports may also be delivered by hand, in which case it shall be deemed received upon delivery.

### ARTICLE 22
### CONSENT AND APPROVAL

Except as herein otherwise provided, whenever in this Agreement the consent or approval of Manager or Owner is required, such consent or approval shall not be unreasonably withheld or delayed. Such consent or approval shall also be in writing only and shall be executed only by an authorized officer or agent of the party granting such consent or approval.

### ARTICLE 23
### NON-ASSIGNABILITY

This Agreement shall not be assignable by Manager or Owner; provided however, that Owner shall be entitled to assign this Agreement to an Affiliate; and Manager shall (i) be entitled to assign this Agreement to an Affiliate of such party as part of a modification to such party's company structure in which all or substantially all of such party's assets are transferred to an Affiliate of such party; and (ii) have the right to assign its rights to receive payments under this Agreement as security for indebtedness or other obligations.

### ARTICLE 24
### INDEMNITY

24.1    **Indemnity by Manager**.



24.2    **Indemnity by Owner**. To the extent that Manager shall not be fully covered by insurance required to be maintained pursuant to this Agreement or if, after giving effect to the provisions of Section 24.1(b) of this Agreement, Gross Revenues are not sufficient to pay all Liabilities, Owner shall indemnify, defend and hold harmless Manager and its directors, officers, employees and agents from and against any damages, loss, liability, cost, action, cause, claim or expense, including attorneys' fees, arising out of, or incurred in connection with the management and operation of the Hotel.

**Management Agreement – Page 34**

24.3     **Survival**. The provisions of this Article 24 shall survive the expiration or earlier termination of this Agreement.

**ARTICLE 25**
**PARTIAL INVALIDITY**

In the event that any one or more of the phrases, sentences, clauses or paragraphs contained in this Agreement shall be declared invalid by the final and unappealable order, decree or judgment of any court, this Agreement shall be construed as if such phrases, sentences, clauses or paragraphs had not been inserted, unless such construction would substantially destroy the benefit of the bargain of this Agreement to either of the parties hereto.

**ARTICLE 26**
**MISCELLANEOUS**

26.1     **Disputes**. Whenever any issue or dispute arises under this Agreement relating to the Annual Operating Budget, the Approved Capital Budget and or the calculation and payment of the Reserves, and the Management Fee, such issue or dispute shall be resolved utilizing the Uniform System of Accounts and the by application of generally accepted accounting principles consistently applied.

26.2     **Further Assurances**. Owner and Manager shall execute and deliver all other appropriate supplemental agreements and other instruments, and take any other action necessary to make this Agreement fully and legally effective, binding and enforceable as between them and as against third parties.

26.3     **Waiver**. The waiver of any of the terms and conditions of this Agreement on any occasion or occasions shall not be deemed a waiver of such terms and conditions on any future occasion.

26.4     **Successors and Assigns**. Subject to and limited by Article 23, this Agreement shall be binding upon and inure to the benefit of Owner, its successors and permitted assigns, and shall be binding upon and inure to the benefit of Manager, its successors and permitted assigns.

26.5     **Governing Law**. This Agreement shall be construed, both as to its validity and as to the performance of the parties, in accordance with the laws of the State of Texas.

26.6     **Compliance with Mortgage and License Agreement**. In carrying out their respective duties and obligations under the terms of this Agreement, Owner and Manager shall use commercially reasonable good faith efforts to take no action that could reasonably be expected to constitute a material default under any Mortgage or the License Agreement and will use commercially reasonable good faith efforts to take such actions as are reasonably necessary to comply therewith.  Notwithstanding the foregoing or anything in this Agreement to the contrary, if there is a breach by Owner under the Mortgage and such breach is the result of the failure of Manager, such breach shall not be a default by Manager under this Agreement (and Manager shall have no liability therefore) unless such default and/or failure is specifically provided for in Section 16.1 of this Agreement and the applicable notice and cure periods provided for such breach and/or failure, if any, have expired.

26.7 **Amendments**. This Agreement may not be modified, amended, surrendered or changed, except by a written document signed by the Owner and Manager agreeing to be bound thereby.

26.8 **Estoppel Certificates**. Owner and Manager agree, at any time and from time to time, as requested by the other party, upon not less than ten (10) days' prior written notice, to execute and deliver to the other a statement certifying that this Agreement is unmodified and in full force and effect (or if there have been modifications, that the same are in full force and effect as modified and stating the modifications), certifying the dates to which required payments have been paid, and stating whether or not, to the best knowledge of the signer, the other party is in default in performance of any of its obligations under this Agreement, and if so, specifying each such default of which the signer may have knowledge, it being intended that such statement delivered pursuant hereto may be relied upon by others with whom the party requesting such certificate may be dealing.

26.9 **Inspection Rights**. Owner and Lender shall have the right to inspect the Hotel and examine the books and records of Manager pertaining to the Hotel at all reasonable times during the Term upon reasonable notice to Manager, and Owner and the holder of any Mortgage shall have access to the Hotel and the books and records pertaining thereto at all times during the Term to the extent necessary to comply with the terms of any Mortgage, all to the extent consistent with applicable law and regulations and the rights of guests, tenants and concessionaires of the Hotel.

26.10 **Subordination**. This Agreement, any extension hereof and any modification hereof shall be subject and subordinate to a Mortgage as provided therein and, in the event of a foreclosure or deed in lieu of foreclosure, subject to the terms of any subordination agreement with Lender, this Agreement shall terminate unless otherwise assumed by Lender in writing. The provisions of this Section shall be self-operative and no further instrument of subordination shall be required; however, Manager will execute and return to Owner (or to Lender, as designated by Owner) such documentation as Owner or Lender may reasonably request to evidence the subordination of this Agreement to the Mortgage.  In the event of any refinancing of the Property, Manager shall cooperate in all reasonable respects with Owner in effecting such refinancing.

26.11 **Effect of Approval of Plans and Specifications**. Owner and Manager agree that in each instance in this Agreement or elsewhere wherein Manager is required to give its approval of plans, specifications, budgets and/or financing, no such approval shall imply or be deemed to constitute an opinion by Manager, nor impose upon Manager any responsibility for the design or construction of additions to or improvements of the Hotel, including but not limited to structural integrity or life/safety requirements or adequacy of budgets and/or financing. The scope of Manager's review and approval of plans and specifications is limited solely to the adequacy and relationship of spaces and aesthetics of the Hotel in order to comply with the Operating Standards.

26.12 **Entire Agreement**. This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof, superseding all prior agreements or undertakings, oral or written.

26.13 **Time is of the Essence**. Time is of the essence in this Agreement.

26.14 **Interpretation**. No provision of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have structured or dictated such provision.

26.15 **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and need not be signed by more than one of the parties hereto and all of which shall constitute one and the same agreement.

26.16 **No Electronic Transactions**. The parties hereby acknowledge and agree that this Agreement shall not be executed, entered into, altered, amended or modified by electronic means. Without limiting the generality of the foregoing, the parties hereby agree that the transactions contemplated by this Agreement shall not be conducted by electronic means, except as specifically set forth in Article 21 of this Agreement.

26.17 **Prohibited Persons and Transactions**.

(a) Manager is not, and shall not become, a person or entity with whom U. S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including those named in OFAC's Specially Designated and Blocked Person's List) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, or Support Terrorism), or other governmental action (such persons and entities being "**Prohibited Persons**").

(b) Owner is not and shall not become a Prohibited Person.

26.18 **Confidentiality.** Owner and Manager agree to keep the terms and conditions of all leases and other occupancy agreements in effect at the Hotel (if any) and all other accruements relating to the Hotel, together with all information and data obtained, possessed, or generated by Manager in connection with the Hotel (collectively, "**Privileged Information**"), strictly confidential and not to make any public announcements or any disclosures to any third parties, either orally or in writing, with respect to any Privileged Information without the express written consent of the other party hereunder; provided, however, the restrictions imposed hereby shall not apply to any Privileged Information (1) which is required to be disclosed in order to comply with any law, ordinance, governmental decree or any rule, regulation or decree of any interested governmental body or (2) which must otherwise be disclosed to relevant third parties, including accountants, attorneys and lenders, in the course of reasonable and diligent management and operation of the Hotel or the business of Owner, or any subsidiary or Affiliate of Owner or Manager. If Manager makes such disclosure, it shall notify such third party of this provision and of the requirement of Owner for confidentiality. The provisions of this Section 26.18 shall survive the expiration or termination of this Agreement

26.19 **No Third Party Rights**. This Agreement shall inure solely to the parties hereto. Notwithstanding any other provision of this Agreement, no third party shall have any rights pursuant to the terms of this Agreement.

## ARTICLE 27
## NO REPRESENTATIONS AS TO INCOME OR FINANCIAL SUCCESS OF HOTEL

In entering into this Agreement, Manager and Owner acknowledge that neither Owner nor Manager has made any representation to the other regarding projected earnings, the possibility of future success or any other similar matter respecting the Hotel, and that Manager and Owner understand that no guarantee is made to the other as to any specific amount of income to be received by Manager or Owner or as to the future financial success of the Hotel.

## ARTICLE 28
## REPRESENTATIONS OF MANAGER

In order to induce Owner to enter into this Agreement, Manager does hereby make the following representations and warranties:

(a)     the execution of this Agreement is permitted by the certificate of formation and partnership agreement of Manager and this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of Manager enforceable in accordance with the terms hereof;

(b)     to the best knowledge of Manager, there is no claim, litigation, proceeding or governmental investigation pending, or, as far as is known to Manager, threatened, against or relating to Manager, the properties or business of Manager or the transactions contemplated by this Agreement which does, or may reasonably be expected to, materially and adversely affect the ability of Manager to enter into this Agreement or to carry out its obligations hereunder, and to the best knowledge of Manager, there is no basis for any such claim, litigation, proceedings or governmental investigation, except as has been fully disclosed in writing to Owner and Lender; and

(c)     neither the consummation of the transactions contemplated by this Agreement on the part of Manager or to be performed, nor the fulfillment of the terms, conditions and provisions of this Agreement, conflicts with or will result in the breach of any of the terms, conditions or provisions of, or constitute a default under, any agreement, indenture, instrument or undertaking to which Manager is a party or by which it is bound.

## ARTICLE 29
## REPRESENTATIONS OF OWNER

In order to induce Manager to enter into this Agreement, Owner does hereby make the following representations and warranties:

(a)     the execution of this Agreement is permitted by the Limited Liability Company Agreement of Owner and this Agreement has been duly authorized, executed and delivered and constitutes the legal, valid and binding obligation of Owner enforceable in accordance with the terms hereof;

(b)     there is no claim, litigation, proceeding or governmental investigation pending, or as far as is known to Owner, threatened, against or relating to Owner, the properties or business

of Owner or the transactions contemplated by this Agreement which does, or may reasonably be expected to, materially and adversely affect the ability of Owner to enter into this Agreement or to carry out its obligations hereunder, and there is no basis for any such claim, litigation, proceedings or governmental investigation, except as has been fully disclosed in writing to Manager; and

(c)     neither the consummation of the transactions contemplated by this Agreement by this Agreement on the part of Owner to be performed nor the fulfillment of the terms, conditions and provisions of this Agreement, conflicts with or will result in the breach of any of the terms, conditions or provisions of, or constitute a default under, any agreement, indenture, instrument or undertaking to which Owner is a party or by which it is bound.

## ARTICLE 30
## DISPUTE RESOLUTION

Except as specifically provided in Section 4.4 of this Agreement, Owner and Manager agree that any dispute between the parties related to or arising out of this Agreement that cannot be amicably settled by the parties hereunder, shall first be submitted for non-binding mediation before resorting to any litigation, equitable proceeding or other enforcement action. Such mediation shall be held within a twenty-five mile radius of the Hotel (or such other location mutually agreed by the parties) and the parties shall cooperate in good faith to agree on a mediator who shall be a retired or semi-retired judge having at least ten (10) years of experience on the bench hearing complex commercial transactions. If the parties hereto have failed to designate, by a joint written statement, a mediator within thirty (30) days following the date of a written request therefor by either Manager or Owner to the other, then either Owner or Manager may notify the local office of the American Arbitration Association ("**AAA**") or JAMS and request such entity to select a person to act as the mediator to assist in the resolution of the dispute. The mediation will be a non-binding conference between the parties conducted in accordance with the applicable rules and procedures of AAA or JAMS (as determined by the mediator). The compensation of the mediator and all related expenses shall be borne equally by the parties, each of whom shall bear their own costs, irrespective of the outcome of the mediation. If any dispute remains unresolved between the parties after the mediation is complete, then either party shall be entitled to pursue its rights and remedies at law or in equity. The provisions of this Article 30 shall survive the expiration or earlier termination of this Agreement.

## ARTICLE 31
## ADDITIONAL OBLIGATIONS OF MANAGER

Manager acknowledges that Owner is vitally interested in the qualifications of the individuals designated as the general manager and the director of sales of the Hotel. Manager shall, from time to time, consult with Owner and obtain Owner's approval as to the appointment of individuals to such positions; provided, however, Owner and Manager acknowledge that nothing in this Article is intended to limit or negate the authority of Manager elsewhere provided in this Agreement to remove and replace, in its sole discretion, the general manager and/or director of sales of the Hotel.

## ARTICLE 32
## TERMINATION OF THE LICENSE AGREEMENT

Owner reserves and shall have the absolute right in its sole and unfettered discretion, at any time and without the consent or approval of (but with notice to) Manager, to terminate the License Agreement, provided, however, that (i) Owner shall have no such right in order to establish its own independent operations, such as an operation without a franchise or license or in its own hotel name; (ii) in the event of such a termination by Owner, Manager shall have the right of approval (which right shall be reasonably exercised) of any new franchise or license for the Hotel; and (iii) if Owner's decision to terminate the License Agreement is made without the consent of Manager, then the provisions of Section 18.2 of this Agreement shall no longer apply.

## ARTICLE 33
## RECOURSE

Any provision of this Agreement to the contrary notwithstanding, Manager hereby agrees that no personal, partnership or corporate liability of any kind or character (including, without limitation, the payment of any judgment) whatsoever now attaches or at any time hereafter under any condition shall attach to Owner or any of Owner's constituent entities and affiliates or any mortgagee for payment of any amount payable under this Agreement or for the performance of any obligation under this Agreement. The exclusive remedies of Manager for the failure of Owner to perform any of its obligations under this Agreement shall be to proceed against the interest of Owner in and to the Hotel for Manager's actual, out-of-pocket damages (and not any consequential, punitive or exemplary damages), and Owner shall not be personally liable for any deficiency.

*The rest of this page is intentionally left blank.*

IN WITNESS WHEREOF, Owner has caused this Agreement to be executed and its seal affixed by its partners duly authorized thereunto and Manager has caused this Agreement to be executed and its seal affixed by its officer duly authorized thereunto, the day and year first above written, in duplicate.

**<u>OWNER</u>**:

**RREAF O&G PORTFOLIO #2 LLC**

By: _____
Name: Jeff Schaffer
Title: Chief Executive Officer

**<u>MANAGER</u>**:

**CHANNEL POINT HOSPITALITY LLC**

By: _____
Name: _____
Title: _____

**<u>Signature Page to Management Agreement – Page Solo</u>**
OAKWOOD SUITES

# EXHIBIT A

## MAJOR ACCOUNT CATEGORIES

Room Sales
Telephone Sales
Food Sales
Beverage Sales
Miscellaneous Income

Room Expense
Telephone Expense
Food Expense
Beverage Expense
Miscellaneous Expense

A&G
Management Fee
Advertising & Business Promotion
R&M
H-L-P

Property Tax
Insurance
CEP Reserve
Leases

**Exhibit A – Solo Page**

# EXHIBIT B

## DESCRIPTION OF PREMISES

Tract 1:

A portion of that certain 3.569 acre tract of land out of Section 4, Block A-44, Public School Lands, Andrews County, Texas, as more particularly described in Notice of Correction dated August 7, 2012, executed by Leslie Lee, Escrow Officer for Big Country Title Services, LLC, filed August 17, 2012, recorded in Book 1041, Page 702, Official Public Records, Andrews County, Texas. Being more particularly described as follows:

Beginning at the intersection of the Easterly right of way line of Main Street (U.S. Highway 385) and the Southerly right of way line of SE Avenue E; Thence along said Southerly right of way line North 74° 14' 24" East, a distance of 260.08 feet; Thence departing the Southerly right of way line South 16° 16' 30" East, a distance of 357.46 feet; Thence South 73° 46' 44" West, a distance of 260.07 feet to a point on the Easterly right of way line of Main Street (U.S. Highway 385): Thence along said Easterly right of way line North 16° 16' 30" West, a distance of 359.56 feet to the Point of Beginning.

Containing 2.140 acres (93,238 square feet), more or less.

Tract 2

A portion of that certain 3.569 acre tract of land out of Section 4, Block A-44, Public School Lands, Andrews County, Texas, as more particularly described in Notice of Correction dated August 7, 2012, executed by Leslie Lee, Escrow Officer for Big Country Title Services, LLC, filed August 17, 2012, recorded in Book 1041, Page 702, Official Public Records, Andrews County, Texas. Being more particularly described as follows:

Commence at the intersection of the Easterly right of way line of Main Street (U.S. Highway 385) and the Southerly right of way of SE Avenue E; Thence along said Easterly right of way line south 16° 16' 30" East, a distance of 359.56 feet to the Point of Beginning; Thence North 73° 46' 44" East, a distance of 260.07 feet; Thence South 16° 16' 30" East, a distance of 239.65 feet; Thence South 73° 46' 44" West, a distance of 260.07 feet to a point on the Easterly right of way line of Main Street (U.S. Highway 385): Thence along said Easterly right of way line North 16° 16' 30" West, a distance of 239.65 feet to the Point of Beginning.

Containing 1.431 acres (62,325 square feet), more or less.

## EXHIBIT C

## EXAMPLE OF MONTHLY TRANSACTIONS REPORT

```
10/09/12  11:35 am                          P&L EXAMPLE ENTITY                                    Jay  Page:    1
                                            INCOME STATEMENT
                                            End of Year 2012

ACTUAL        %    BUDGET      %    LAST YEAR      %                              ACTUAL        %    BUDGET      %    LAST YEAR      %
---------  -----  --------  -----  ---------  -----  -----------------------  ---------  -----  --------  -----  ---------  -----
       0   0.00         0   0.00          0   0.00   Total Avl Rooms                  0   0.00         0   0.00          0   0.00
       0   0.00         0   0.00          0   0.00   # Room/Occ %                     0   0.00         0   0.00          0   0.00
       0   0.00         0   0.00          0   0.00   Revenue/Average Rate             0   0.00         0   0.00          0   0.00
       0   0.00         0   0.00          0   0.00   RevPar                           0   0.00         0   0.00          0   0.00

       0   0.00         0   0.00          0   0.00   ----------REVENUES----------
       0   0.00         0   0.00          0   0.00   Rooms                            0   0.00         0   0.00          0   0.00
       0   0.00         0   0.00          0   0.00   F&B Revenue                      0   0.00         0   0.00          0   0.00
       0   0.00         0   0.00          0   0.00   Communications                   0   0.00         0   0.00          0   0.00
       0   0.00         0   0.00          0   0.00   Minor Op Depts.                  0   0.00         0   0.00          0   0.00
       0   0.00         0   0.00          0   0.00   Rent/Other                       0   0.00         0   0.00          0   0.00
---------        --------        ---------                                   ---------        --------        ---------
       0   0.00         0   0.00          0   0.00   TOTAL REVENUES                   0   0.00         0   0.00          0   0.00

       0   0.00         0   0.00          0   0.00   ----DEPARTMENTAL EXPENSES----
       0   0.00         0   0.00          0   0.00   Rooms                            0   0.00         0   0.00          0   0.00
       0   0.00         0   0.00          0   0.00   Food & Beverage                  0   0.00         0   0.00          0   0.00
       0   0.00         0   0.00          0   0.00   Communications                   0   0.00         0   0.00          0   0.00
       0   0.00         0   0.00          0   0.00   Minor Operating                  0   0.00         0   0.00          0   0.00
       0   0.00         0   0.00          0   0.00   Rent & Other                     0   0.00         0   0.00          0   0.00
---------        --------        ---------                                   ---------        --------        ---------
       0   0.00         0   0.00          0   0.00   TOTAL DEPARTMENTAL EXPENSES      0   0.00         0   0.00          0   0.00

       0   0.00         0   0.00          0   0.00   -----DEPARTMENTAL PROFIT-----
       0   0.00         0   0.00          0   0.00   Rooms                            0   0.00         0   0.00          0   0.00
       0   0.00         0   0.00          0   0.00   Food & Beverage                  0   0.00         0   0.00          0   0.00
       0   0.00         0   0.00          0   0.00   Communications                   0   0.00         0   0.00          0   0.00
       0   0.00         0   0.00          0   0.00   Minor Op Depts                   0   0.00         0   0.00          0   0.00
       0   0.00         0   0.00          0   0.00   Rent/Other                       0   0.00         0   0.00          0   0.00
---------        --------        ---------                                   ---------        --------        ---------
       0   0.00         0   0.00          0   0.00   GROSS OPER INCOME                0   0.00         0   0.00          0   0.00

       0   0.00         0   0.00          0   0.00   ----UNDISTRIBUTED EXPENSES----
       0   0.00         0   0.00          0   0.00   Admin & General                  0   0.00         0   0.00          0   0.00
       0   0.00         0   0.00          0   0.00   Advertising                      0   0.00         0   0.00          0   0.00
       0   0.00         0   0.00          0   0.00   Sales/Marketing                  0   0.00         0   0.00          0   0.00
       0   0.00         0   0.00          0   0.00   Repairs/Maintenance              0   0.00         0   0.00          0   0.00
       0   0.00         0   0.00          0   0.00   Energy                           0   0.00         0   0.00          0   0.00
---------        --------        ---------                                   ---------        --------        ---------
       0   0.00         0   0.00          0   0.00   TOTAL UNDISTRIBUTED              0   0.00         0   0.00          0   0.00

       0   0.00         0   0.00          0   0.00   GROSS OPERATING PROFIT           0   0.00         0   0.00          0   0.00
```

**Exhibit C – Page 1**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
INCOME STATEMENT
End of Year 2012

jay  Page:  2

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Management Fee | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Franchise Fee | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | INCOME BEFORE FIXED CHARGES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | ---------FIXED/OTHER--------- | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL FIXED/OTHER | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | EBITDA | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | PROFORMA  N O I | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | DEBT, DEPR/AMORT, CAP & OTHER | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL DEBT, DEPR/AMORT, CAP & | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | NET INC AVAIL/ TAXES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | --ADD BACKS & SUBTRACTIONS-- | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | NET OPERATING INCOME | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 2**

6444430v.1

10/05/12  11:35 am

**P&L EXAMPLE ENTITY**
**ROOMS DEPARTMENT**
**End of Year 2012**

Jay  Page:  3

| | ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REVENUE | | | | | | | | | | | | | |
| TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| NET REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| SALARIES / WAGES | | | | | | | | | | | | | |
| TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| BENEFITS | | | | | | | | | | | | | |
| TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| DEPARTMENTAL PROFIT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 3**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
ROOMS DEPARTMENT
End of Year 2012

jay  Page:    4

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 4**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOM STATISTICS
End of Year 2012

jay  Page:    5

| | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCCUPIED ROOMS | | | | | | | | | | | | | |
| TOTAL TRANSIENT | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| TOTAL GROUP | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| TOTAL SOLD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| TOTAL OCCUPIED | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| TOTAL AVAILABLE ROOMS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 5**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOM STATISTICS
End of Year 2012

jay  Page:    6

| ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUE/AVERAGE RATES | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL TRANSIENT | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL GROUP | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL PAYING RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL ROOMS OTHER | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | OVERALL ROOM RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | REVPAR | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 6**

```
10/05/12  11:35 am                              P&L EXAMPLE ENTITY                              jay  Page:    7
                                                 ROOM STATISTICS
                                                End of Year 2012

          ACTUAL    CPOR/%      BUDGET    CPOR/%     LAST YEAR  CPOR/%                    ACTUAL    CPOR/%      BUDGET    CPOR/%     LAST YEAR  CPOR/%
        ----------  ------    ----------  ------    ----------  ------                  ----------  ------    ----------  ------    ----------  ------

                                                              SALARIES / WAGES
                                                              ----------------
              0  $    0.00        0  $    0.00         0  $    0.00  Guest Services           0  $    0.00         0  $    0.00         0  $    0.00
        ----------          ----------          ----------          TOTAL SALARIES / WAGES  ----------          ----------          ----------
              0       0.00        0       0.00         0       0.00                           0       0.00         0       0.00         0       0.00
        ==========          ==========          ==========                                 ==========          ==========          ==========

                                                              BENEFITS
                                                              --------
        ----------          ----------          ----------          TOTAL BENEFITS
              0  $    0.00        0  $    0.00         0  $    0.00                           0  $    0.00         0  $    0.00         0  $    0.00
        ==========          ==========          ==========          TOTAL WAGES & BENEFITS  ==========          ==========          ==========
              0  $    0.00        0  $    0.00         0  $    0.00                           0  $    0.00         0  $    0.00         0  $    0.00

        ==========          ==========          ==========                                 ==========          ==========          ==========
              0  $    0.00        0  $    0.00         0  $    0.00  DEPARTMENTAL PROFIT      0  $    0.00         0  $    0.00         0  $    0.00
        ==========          ==========          ==========                                 ==========          ==========          ==========
```

**Exhibit C – Page 7**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ROOM STATISTICS
End of Year 2012

jay  Page:    8

| ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% | | ACTUAL | CPOR/% | BUDGET | CPOR/% | LAST YEAR | CPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

OTHER EXPENSES

| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL OTHER EXPENSES | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 8**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
FOOD & BEVERAGE CONSOLIDATED
End of Year 2012

Jay  Page:  9

| | ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **FOOD REVENUE** | | | | | | | | | | | | | |
| TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| NET FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| **BEVERAGE REVENUE** | | | | | | | | | | | | | |
| TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| NET BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| **OTHER REVENUE** | | | | | | | | | | | | | |
| NET OTHER REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| TOTAL REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 9**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
FOOD & BEVERAGE CONSOLIDATED
End of Year 2012

jay  Page:   10

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OVERALL NET FOOD COST | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OVERALL NET BEVERAGE COST | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OTHER COST | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL COST OF GOODS SOLD | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | GROSS PROFIT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES/WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL GENERAL | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES/WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Payroll Taxes & Benefits | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENTAL PROFIT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 10**

6444430v.1

10/05/12  11:35 am
P&L EXAMPLE ENTITY
FOOD & BEVERAGE CONSOLIDATED
End of Year 2012
jay  Page:  11

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 11**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

Jay  Page:  12

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|--------|------|--------|------|-----------|------|---|--------|------|--------|------|-----------|------|
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & RPOR | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL BEVG REVENUE & RPOR | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**<u>Exhibit C – Page 12</u>**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

jay  Page:   13

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ROOM SERVICE | | | | | | |
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | RESTAURANT 1 | | | | | | |
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | BANQUETS | | | | | | |
| | | | | | | COVERS & CAPTURE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

**Exhibit C – Page 13**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
F&B STATISTICS
End of Year 2012

jay  Page:  14

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | CATERING | | | | | | |
| | | | | | | COVERS | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | BANQUETS & CATERING | | | | | | |
| | | | | | | COVERS | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | FOOD REVENUE & AVG CHECK | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | BEVG REVENUE & % FOOD | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | LOUNGE 1 | | | | | | |
| | | | | | | BEVG REVENUE & BPCR | | | | | | |

**Exhibit C – Page 14**

6444430v.1

10/09/12  11:35 am                P&L EXAMPLE ENTITY                  jay  Page:  15
F&B STATISTICS
End of Year 2012

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL BEVG REVENUE & RPCR | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

RESTAURANT 2
COVERS & CAPTURE

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS & CAPTURE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

FOOD REVENUE & AVG CHECK

| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

BEVG REVENUE & % FOOD

| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL BEVG REVENUE & % FOOD | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

LOUNGE 2
BEVG REVENUE & RPCR

| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL BEVG REVENUE & RPCR | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

CONFERENCE CENTER
COVERS & CAPTURE

| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL CAPTURE & COVERS | 0 | 0.00 | 0 | 0.00 | | 0.00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

FOOD REVENUE & AVG CHECK

| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL FOOD REVENUE & AVG CHECK | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

BEVG REVENUE & % FOOD

**Exhibit C – Page 15**

10/05/12  11:35 am                                    P&L EXAMPLE ENTITY                                      jay  Page:   16
                                                        F&B STATISTICS
                                                       End of Year 2012

    ACTUAL    CALC      BUDGET    CALC      LAST YEAR  CALC                              ACTUAL    CALC      BUDGET    CALC      LAST YEAR  CALC
   ---------- ------   ---------- ------   ---------- ------                            ---------- ------   ---------- ------   ---------- ------

   ---------- ------   ---------- ------   ---------- ------   -----------------------  ---------- ------   ---------- ------   ---------- ------
        0      0.00         0      0.00         0      0.00   TOTAL BEVG REVENUE & % FOOD     0      0.00         0      0.00         0      0.00

                                                             ==========================
                                                             IN ROOM BAR

                                                             REVENUE & RPOR

   ---------- ------   ---------- ------   ---------- ------   -----------------------  ---------- ------   ---------- ------   ---------- ------
        0  $   0.00         0  $   0.00         0  $   0.00   TOTAL REVENUE & RPOR            0  $   0.00         0  $   0.00         0  $  0.00
                                                             ==========================

**<u>Exhibit C – Page 16</u>**
6444430v.1

P&L EXAMPLE ENTITY
ROOM SERVICE
End of Year 2012

jay  Page:  17

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 17**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
RESTAURANT 1
End of Year 2012

Joy  Page:   18

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | FOOD REVENUES | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARIES / WAGES | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 18**

6444430v.1

BANQUETS & CATERING
End of Year 2012

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | CATERING | | | | | | |
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 19**
6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
BANQUETS & CATERING
End of Year 2012

jay  Page:  20

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | TOTAL BANQUETS & CATERING | | | | | | |
| | | | | | | FOOD REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL COMBINED REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | SALARY / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 20**

6444430v.1

10/08/12  11:35 am

P&L EXAMPLE ENTITY
BANQUETS & CATERING
End of Year 2012

Jay  Page:  21

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | BANQUETS | | | | | | | |
| | | | | | | FOOD REVENUES | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BEVERAGE REVENUES | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER REVENUES | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPARTMENTAL REV | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 21**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
LOUNGE 1
End of Year 2012

Jay  Page:  22

| | ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FOOD REVENUES | | | | | | | | | | | | | |
| TOTAL FOOD REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| BEVERAGE REVENUES | | | | | | | | | | | | | |
| TOTAL BEVERAGE REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| OTHER REVENUES | | | | | | | | | | | | | |
| TOTAL OTHER REVENUES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| TOTAL DEPT REVENUE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| SALARIES / WAGES | | | | | | | | | | | | | |
| TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| DEPARTMENT NET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 22**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
COMMUNICATIONS
End of Year 2012

jay  Page:  23

| ACTUAL | RFOA/% | BUDGET | RFOA/% | LAST YEAR | RFOA/% | | ACTUAL | RFOA/% | BUDGET | RFOA/% | LAST YEAR | RFOA/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUES | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL PHONE REVENUE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | NET PHONE REVENUE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL INTERNET REVENUE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | NET INTERNET REVENUE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | NET COMBINED REVENUES | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | COSTS OF SALES | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | COS PHONE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | COS INTERNET | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COST OF ALL SALES | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | GROSS PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Payroll Taxes & Benefits | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TTL WAGES & BENEFITS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 23**

6444430v.1

10/09/12  11:35 am            P&L EXAMPLE ENTITY            Jay  Page:   24
                  IN HOUSE MOVIES
                  End of Year 2012

| ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% | | ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | REVENUES | | | | | | |
| 0  $ | 0.00 | 0  $ | 0.00 | 0  $ | 0.00 | NET REVENUE | 0  $ | 0.00 | 0  $ | 0.00 | 0  $ | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 24**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
GUEST LAUNDRY
End of Year 2012

Jay  Page:  25

| | ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% | | ACTUAL | RPOR/% | BUDGET | RPOR/% | LAST YEAR | RPOR/% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REVENUES | | | | | | | | | | | | | |
| NET REVENUE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| GROSS PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| TTL WAGES & BENEFITS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| TOTAL PROFIT/(LOSS) | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 25**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
RENTS & OTHER INCOME
End of Year 2012

jay  Page:  26

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SPACE RENTALS | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL RENTALS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | COMMISSIONS | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL COMMISSIONS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | MISCELLANEOUS | | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL MISCELLANEOUS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL RENTS/OTHER INCOME | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 26**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
A&G
End of Year 2012

Jay Page:   27

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL A&G EXP | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**<u>Exhibit C – Page 27</u>**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
SALES & MARKETING
End of Year 2012

Jay  Page:   28

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | GROUP | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL GROUP | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | TRANSIENT | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Newspaper | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL TRANSIENT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Contingency | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL NON-MEDIA | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | GRAND TTL ADVERTISING | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 28**

6444430v.1

P&L EXAMPLE ENTITY
SALES & MARKETING
End of Year 2012

jay  Page:  29

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Incentive/Svc Charge | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALES & ADVERTISING | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 29**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
REPAIRS & MAINTENANCE
End of Year 2012

Jay  Page:   30

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|--------|---|--------|---|-----------|---|---|--------|---|--------|---|-----------|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Grnds & Land - Outdoor | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Rent - Equipment | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL R&M EXPENSE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

<u>**Exhibit C – Page 30**</u>

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
ENERGY
End of Year 2012

jay Page:  31

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL ENERGY | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL ENERGY | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 31**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
FIXED & OTHER CHARGES
End of Year 2012

jay  Page:  32

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | FEES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FEES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | RENTS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL RENTS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | LEASES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL LEASES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | INSURANCE | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL INSURANCE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | REAL ESTATE TAXES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REAL ESTATE TAXES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER TAXES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER TAXES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | PARTNERSHIP EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL PARTNERSHIP EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | INTEREST EXPENSE | | | | | | |

**Exhibit C – Page 32**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
FIXED & OTHER CHARGES
End of Year 2012

jay  Page:   33

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|--------|---|--------|---|-----------|---|---|--------|---|--------|---|-----------|---|
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL INTEREST EXPENSE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | REIT LEASE | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL REIT LEASE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | MISC NON EBITDA | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL MISC NON EBITDA | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | DEPRECIATION/AMORTIZATION &OT | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DEPRECIATION & AMORTIZAT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | FFE & ADDBACKS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FFE & ADDBACKS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL FIXED EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**<u>Exhibit C – Page 33</u>**

10/05/12  11:35 am

P&L EXAMPLE ENTITY
EE CAFE
End of Year 2012

jay  Page:   34

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES / WAGES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL SALARIES / WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TTL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL EE CAFE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Allocation to PTER | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | FINAL EE CAFE TOTAL | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 34**

10/08/12  11:35 am

P&L EXAMPLE ENTITY
PT & EE
End of Year 2012

jay  Page:  35

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **TAXES** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL TAXES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **HEALTH INSURANCE** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL HEALTH INSURANCE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | **OTHER EXPENSES** | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 401k Match | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL PT & EE | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

% Column is % Total Wages

**Exhibit C – Page 35**

10/05/12 11:35 am                 P&L EXAMPLE ENTITY                jay Page: 36
PT & EE
End of Year 2012

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | DISTRIBUTED TO: | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DISTRIBUTION | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 36**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
PT & EB
End of Year 2012

Jay  Page:   37

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SALARIES, WAGES & INCENTIVES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Total Food & Beverage | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | GROSS TTL WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | S&W, INCENTIVES, PAID TIME OFF | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Lounge 1 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | Total Foood & Beverage | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL ALL PAID WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 37**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
HOUSE LAUNDRY
End of Year 2012

Jay  Page:  38

| ACTUAL | % | BUDGET | % | LAST YEAR | % | | ACTUAL | % | BUDGET | % | LAST YEAR | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL SALARIES & WAGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | BENEFITS | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL WAGES & BENEFITS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | OTHER EXPENSES | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL OTHER | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| | | | | | | DISTRIBUTED TO: | | | | | | |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | TOTAL DISTRIBUTION | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

**Exhibit C – Page 38**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay  Page:  39

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **CASH** | | | | | |
| TOTAL CASH | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **SEMI-RESTRICTED CASH** | | | | | |
| TOTAL SEMI-RESTRICTED CASH | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **RECEIVABLES** | | | | | |
| TOTAL RECEIVABLES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **INVENTORIES** | | | | | |
| TOTAL INVENTORIES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **OPERATING EQUIPMENT** | | | | | |
| TOTAL OPERATING EQUIPMENT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Exhibit C – Page 39**

10/08/12  11:35 am             P&L EXAMPLE ENTITY             jay  Page:   40
                           DETAILED BALANCE SHEET
                           End of Year 2012

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| PREPAIDS | | | | | |
| TOTAL PREPAIDS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| FIXED ASSETS | | | | | |
| Accum Amortization | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL FIXED ASSETS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OTHER ASSETS | | | | | |
| TOTAL OTHER ASSETS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL ASSETS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Exhibit C – Page 40**

6444430v.1

10/08/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay  Page:  41

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| **LIABILITIES** | | | | | |
| PAYABLES | | | | | |
| TOTAL PAYABLES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| DEPOSITS | | | | | |
| TOTAL DEPOSITS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OF TAXES AND WITHHOLDINGS | | | | | |
| TOTAL OF TAXES AND WITHHOLDING | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| ACCRUED OPERATING EXPENSES | | | | | |
| TTL ACCRUED OPERATING EXPENSES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Exhibit C – Page 41**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
DETAILED BALANCE SHEET
End of Year 2012

jay  Page:  42

| | This Month End | Last Month End | Monthly Change | This Month Last Year | Yearly Change |
|---|---|---|---|---|---|
| DUE TO/FROM ACCOUNTS | | | | | |
| Due to ZZ St Paul | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Due to REIT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL DUE TO/FROM ACCOUNTS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OTHER LIABILITIES | | | | | |
| TOTAL OTHER LIABILITIES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| NOTES PAYABLE | | | | | |
| TOTAL NOTES PAYABLE | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL LIABILITIES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| OWNERS EQUITY | | | | | |
| Retained Earn - Prior Years | 0.00 | 0.00 | 0.00 | 695.02- | 695.02 |
| Retained Earn - Current Yr | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL OWNERS EQUITY | 0.00 | 0.00 | 0.00 | 695.02- | 695.02 |
| TOTAL LIAB. & OWNERS EQUITY | 0.00 | 0.00 | 0.00 | 695.02- | 695.02 |

**Exhibit C – Page 42**

6444430v.1

10/08/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFTK REPORT
End of Year 2012

Jay  Page:  43

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | FULL TIME EQUIVALENT | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | SUMMARY HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOTEL | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | SUMMARY WAGES & AVG RATE | | | | | | |
| 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | TOTAL WAGES & AVG RATE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |

**Exhibit C – Page 43**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFIB REPORT
End of Year 2012

Jay  Page:  44

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ROOMS DEPARTMENT | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL OCCUPIED ROOMS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | Room Attendant - Total | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | House Attendant - Total | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | Room Attendant - Total | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | House Attendant - Total | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL WAGES & AVG RATE | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| | | | | | | HOURS & FTE | | | | | | |
| | | | | | | FOOD & BEVERAGE SUMMARY | | | | | | |
| | | | | | | FOOD COVERS | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PROD / TOTAL COV | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVERAGE RATE | | | | | | |
| 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | | TOTAL WAGES & AVG RATE | 0 $ 0.00 | | 0 $ 0.00 | | 0 $ 0.00 | |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 44**

6444430v.1

10/08/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EPIK REPORT
End of Year 2012

jay  Page:  45

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | =============================== | | | | | | |
| | | | | | | A&G | | | | | | |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**<u>Exhibit C – Page 45</u>**

6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY KPIS REPORT
End of Year 2012

Jay Page:  46

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | ROOM SERVICE | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | RESTAURANT 1 | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | RESTAURANT 2 | | | | | | |
| | | | | | | HOURS & PRODUCTIVITY | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 46**
6444430v.1

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY KPIR REPORT
End of Year 2012

jay  Page:  47

| | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | WAGES & AVG RATE | | | | | | | |
| | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | | HOURS & FTE | | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | | ================================ | | | | | | | |
| | | | | | | | BANQUETS & CATERING | | | | | | | |
| | | | | | | | HOURS & PRODUCTIVITY | | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | | WAGES & AVG RATE | | | | | | | |
| | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | | HOURS & FTE | | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | | ================================ | | | | | | | |
| | | | | | | | CONFERENCE CENTER | | | | | | | |
| | | | | | | | HOURS & PRODUCTIVITY | | | | | | | |
| | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | | WAGES & AVG RATE | | | | | | | |
| | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | | HOURS & FTE | | | | | | | |

**Exhibit C – Page 47**

10/09/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY KPIR REPORT
End of Year 2012

Jay  Page:   40

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|--------|------|--------|------|-----------|------|--|--------|------|--------|------|-----------|------|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

================================
LOUNGE 1

| | | | | | | | | | | | | |
|--------|------|--------|------|-----------|------|--|--------|------|--------|------|-----------|------|
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | COVERS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL REVENUE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

HOURS & PRODUCTIVITY
--------------------

| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

WAGES & AVG RATE
----------------

| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

HOURS & FTE
-----------

| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

================================
LOUNGE 2

HOURS & PRODUCTIVITY
--------------------

| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & PRODUCTIVITY | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

WAGES & AVG RATE
----------------

| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |

HOURS & FTE
-----------

| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 48**
6444430v.1

10/08/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY EFIK REPORT
End of Year 2012

Jay  Page:  49

| ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **IN ROOM BASE** | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL OCCUPIED ROOMS | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | HOURS & HRS PER OCC ROOM | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & HOURS PER OCC RO | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| | | | | | | WAGES & AVG RATE | | | | | | |
| 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 | TOTAL WAGES & AVG RATE | 0 $ | 0.00 | 0 $ | 0.00 | 0 $ | 0.00 |
| | | | | | | HOURS & FTE | | | | | | |
| 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | TOTAL HOURS & FTE | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |

**Exhibit C – Page 49**

6444430v.1

10/05/12  11:35 am

P&L EXAMPLE ENTITY
MONTHLY KPIK REPORT
End of Year 2012

jay Page:  50

| | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC | | ACTUAL | CALC | BUDGET | CALC | LAST YEAR | CALC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CONTRACT LABOR | | | | | | | | | | | | | |
| HOURS & FTE | | | | | | | | | | | | | |
| WAGES & AVG RATE | | | | | | | | | | | | | |
| FOOD & BEVERAGE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |
| TOTAL WAGES & AVG RATE | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 | | 0 | $ 0.00 | 0 | $ 0.00 | 0 | $ 0.00 |

**Exhibit C – Page 50**

6444430v.1

## EXHIBIT D

## INSURANCE REQUIREMENTS

1.    **Insurance Requirements for the Hotel**:

General Liability - $1,000,000 per Occurrence/$2,000,000 General and Product Liability Aggregate per Location

Including:
1.   Products and Completed Operations
2.   Contractual Liability
3.   Personal Injury
4.   Incidental Medical Malpractice
5.   Molestation and Abuse are not Excluded
6.   Punitive Damages unless Excluded by Public Policy
7.   Fellow Employee Coverage
8.   Garage Keepers Liability
9.   Liquor Liability
10.  Blanket Additional Interests
     a.   All Managers or Lessors of Premises
     b.   All mortgagors of Premises
     c.   Vendors
     d.   Volunteer Workers
     e.   As required by Contract
11.  Severability of Interests
12.  Waiver of Subrogation as Required by Contract
13.  Terrorism not Excluded or Sub-Limited
14.  No Deductible/SIR
15.  Coverage is Designated to the Scheduled Premises and is Primary and Non-Contributory

Commercial Automobile - $1,000,000 – Any Auto

Including:
1.   Medical Payments - $5,000 per person
2.   Personal Injury Protection – As required by State
3.   Property Protection Insurance – As required by State
4.   Uninsured Motorists - $1,000,000 Limit
5.   Underinsured Motorists - $1,000,000 Limit
6.   Physical Damage (Owned and Hired Autos) – Comprehensive $1,000 Deductible
7.   Physical Damage (Owned and Hired Auto) – Collision $1,000 Deductible
8.   Auto Loan/Lease Gap Coverage

**Exhibit D – Page 1**

Umbrella Liability - $25,000,000 per Occurrence/ $25,000,000 Aggregate per Location

      Including:
1. Retained Limit – 0
2. Follows Scheduled Underlying Policies

Workers Compensation – Provided in All States except as Provided by the State Funds of – ND, OH, WA, WV, WY

Medical Benefits – Statutory
1. Indemnity – Statutory
2. Employers Liability - $500,000
    a. Each Accident
    b. Disease - Each Employee
    c. Disease – Policy Limit

Crime - $1,000,000 Occurrence Limit S/T/A $10,000 per Occurrence Deductible Covering:
1. Employee Theft
2. Forgery or Alteration
3. Computer Fraud
4. Funds Transfer Fraud
5. Theft of Money & Securities
    a. Inside the Premises
    b. Outside the Premises

Guest Property - $10,000 Limit per Occurrence
1. $1,000 deductible
2. Liability Governed by Statute

Professional Liability - $1,000,000 Each Claim / $2,000,000 Aggregate for All Claims
1. Claim Includes Identifiable Loss and Defense Cost
2. A $25,000 Deductible Applies to Loss and Defense

Employment Practices Liability
1. $2,000,000 Aggregate for All Loss Combined (Including Defense Cost)
2. Retention $25,000

2. **Insurance Requirements for Major Contractors**:

(a) Worker's Compensation - Statutory amount or its equivalent under applicable law.

**Exhibit D – Page 2**

(b)     Employer's Liability - $500,000 minimum, where required by applicable or equivalent law.

(c)     Comprehensive General Liability; **either**

    (i)     $100,000 Bodily Injury per Person
             $300,000 per Occurrence
             $100,000 Property Damage

           **-or-**

    (ii)     $1,000,000 combined single limit

**EXHIBIT E**

**COMPETITIVE SET**



<u>**Exhibit E – Solo Page**</u>
6444430v.1

## Exhibit D

**Contracts Schedule**

(see attached)

#38342300

| Counterparty Name and Address | Contract Type | Description of Contract(s) | Cure Amount | Assumed Under Refinancing Confirmation Option | Assumed Under the Conversion Confirmation Option |
|---|---|---|---|---|---|
| Best Western International, Inc., c/o Janel M. Glynn, Gallagher & Kennedy, PA2575 E. Camelback Road, Suite 1100, Phoenix, AZ 85016 | Franchise Agreement | Franchise Agreement – Best Western, Cuero, TX | $18,906.55 | NA | No - Rejected |
| Channel Point Hospitality LLC, c/o Holland N. O'Neill, Gardere Wynne Sewell LLP1601 Elm Street, Suite 3000, Dallas, TX 75201 | Management Services Agreement | Management Services Agreements:  Best Western, Cuero, TX, Comfort Inn, Midland, TX, Comfort Suites, Pecos, TX, Country Inn & Suites, Midland, TX, Holiday Inn Express, Pearsall, TX, La Quinta Inn, Hobbs, NM, La Quinta Inn, Port Arthur, TX, Oakwood Suites, Andrews, TX | $0.00 | NA | Yes Assumed by Agreement |
| Choice Hotels International, Inc., c/o Bill D. Bensinger, 505 North 20th Street, Suite 1800, Birmingham, AL 35203 | Franchise Agreement | Franchise Agreement – Comfort Suites, Pecos, TX | $   108,503.35 | NA | Yes Assumed by Agreement |
| Choice Hotels International, Inc., c/o Bill D. Bensinger, 505 North 20th Street, Suite 1800, Birmingham, AL 35203 | Franchise Agreement | Franchise Agreement – Comfort Inn, Midland, TX | $    60,391.24 | NA | Yes Assumed by Agreement |
| Country Inn by Carlson, c/o Phillip Bohl, Gray Plant Mooty, 80 South Eighth Street, Minneapolis, MN 55402 | Franchise Agreement | Franchise Agreement – Country Inn & Suites, Midland, TX | $98,465.29 | NA | No - Rejected** |
| Holiday Hospitality Franchising LLC, c/o Leib M. Lerner, Alston & Bird LLP, 333 S. Hope Street, 16th Floor, Los Angeles, CA 90071 | Franchise Agreement | Franchise Agreement – Holiday Inn Express, Pearsall, TX | $    49,171.05 | NA | No - Rejected** |
| LaQuinta Franchising LLC, c/o Gregory G. Hesse, Hunton & Williams, LLP, 1445 Ross Avenue, Suite 3700, Dallas, TX 75202 | Franchise Agreement | Franchise Agreements:  La Quinta Inn, Hobbs, NM, La Quinta Inn, Port Arthur, TX | $169,098.32 | NA | Yes- Assumed by Agreement |
| American Light and Power PO Box 732281 Dallas, TX 75373  American Light and Power PO Box 840683 Dallas, TX 75284 | Utility Agreement | Electricity Agreement – Comfort Suites, Pecos, TX | $0.00 | NA | Yes |
| AT&T PO Box 105414 Atlanta, GA 30308  AT&T PO Box 5901 Carol Stream, IL 60197  AT&T PO Box 5094 Carol Stream, IL 60197 | Utility Agreement | Phone/Internet Agreement – Holiday Inn, Pearsall, TX | $0.00 | NA | Yes |
| AT&T PO Box 105414 Atlanta, GA 30308  AT&T PO Box 5901 Carol Stream, IL 60197  AT&T PO Box 5094 Carol Stream, IL 60197 | Utility Agreement | Phone/Internet Agreement – La Quinta Inn, Port Arthur, TX | $0.00 | NA | Yes |
| Atmos Energy PO Box 78108 Phoenix, AZ 85062  Atmos Energy PO Box 790311 St. Louis, MO 63179 | Utility Agreement | Gas Agreement – Comfort Inn, Midland, TX | $0.00 | NA | Yes |

| Counterparty Name and Address | Contract Type | Description of Contract(s) | Cure Amount | Assumed Under Refinancing Confirmation Option | Assumed Under the Conversion Confirmation Option |
|---|---|---|---|---|---|
| Atmos Energy PO Box 78108 Phoenix, AZ 85062 Atmos Energy PO Box 790311 St. Louis, MO 63179 | Utility Agreement | Gas Agreement – Country Inn, Midland, TX | $0.00 | NA | Yes |
| City of Andrews 111 Logsdon Andrews, TX 79714 | Utility Agreement | Water/Sewer Agreement – Oakwood Suites, Andrews, TX | $0.00 | NA | Yes |
| City of Cuero, TX PO Box 848 Cuero, TX 77954 | Utility Agreement | Electricity Agreement – Best Western, Cuero, TX | $0.00 | NA | Yes |
| City of Hobbs, NM 200 East Broadway Hobbs, NM 88240 | Utility Agreement | Water/Sewer Agreement – La Quinta Inn, Hobbs, NM | $0.00 | NA | Yes |
| City of Midland, TX PO Box 1152 Midland, TX 79702 | Utility Agreement | Water & Sewer Agreement – Midland, TX | $0.00 | NA | Yes |
| City of Midland, TX PO Box 1152 Midland, TX 79702 | Utility Agreement | Water/Sewer Agreement – Country Inn, Midland, TX | $0.00 | NA | Yes |
| City of Pearsall, TX 215 South Ash Pearsall, TX 78061 | Utility Agreement | Gas/Water/Sewer Agreement - Holiday Inn, Pearsall, TX | $0.00 | NA | Yes |
| City of Port Arthur, TX PO Box 1089 Port Arthur, TX 77641 | Utility Agreement | Water/Sewer Agreement – La Quinta Inn, Port Arthur, TX | $0.00 | NA | Yes |
| DirecTV PO Box 60036 Los Angeles, CA 90060 | Utility Agreement | Cable Agreement – La Quinta Inn, Hobbs, NM | $0.00 | NA | Yes |
| Entergy PO Box 8104 Baton Rouge, LA 70891 | Utility Agreement | Electricity Agreement – La Quinta Inn, Port Arthur, TX | $0.00 | NA | Yes |
| Medina Electricity Cooperativec/o Gil Hamberg1038 Darby DriveYardley, PA 19067 | Utility Agreement | Electricity Agreement – Holiday Inn, Pearsall, TX | $1,682.09 | NA | Yes |
| Reliant Energy PO Box 650475 Dallas, TX 75265 | Utility Agreement | Electricity Agreement – Oakwood Suites, Andrews, TX | $0.00 | NA | Yes |
| Suddenlink PO Box 660365 Dallas, TX 75266 | Utility Agreement | Cable Agreement and Phone/Internet Agreement – Comfort Inn, Midland, TX | $0.00 | NA | Yes |
| Suddenlink PO Box 660365 Dallas, TX 75266 | Utility Agreement | Cable Agreement – Oakwood Suites, Andrews, TX | $0.00 | NA | Yes |
| Suddenlink PO Box 660365 Dallas, TX 75266 | Utility Agreement | Phone/Internet Agreement – Oakwood Suites, Andrews, TX | $0.00 | NA | Yes |
| Suddenlink PO Box 660365 Dallas, TX 75266 | Utility Agreement | Cable Agreement – Country Inn, Midland, TX | $0.00 | NA | Yes |
| Suddenlink PO Box 660365 Dallas, TX 75266 | Utility Agreement | Phone/Internet Agreement – Country Inn, Midland, TX | $0.00 | NA | Yes |
| Suddenlink PO Box 660365 Dallas, TX 75266 | Utility Agreement | Cable Agreement – Comfort Suites, Pecos, TX | $0.00 | NA | Yes |
| TDS 2827 North Dal Paso, Ste 129 Hobbs, NM 88240 | Utility Agreement | Phone/Internet Agreement – La Quinta Inn, Hobbs, NM | $0.00 | NA | Yes |
| Texas Gas Service PO Box 219913 Kansas City, MO 64121 | Utility Agreement | Gas Agreement – Best Western, Cuero, TX | $0.00 | NA | Yes |
| Texas Gas PO Box 31427 El Paso, TX 79931 | Utility Agreement | Gas Agreement – Oakwood Suites, Andrews, TX | $0.00 | NA | Yes |
| Texas Gas PO Box 31427 El Paso, TX 79931 | Utility Agreement | Gas Agreement – Comfort Suites, Pecos, TX | $0.00 | NA | Yes |
| Texas Gas PO Box 31427 El Paso, TX 79931 | Utility Agreement | Gas Agreement – La Quinta Inn, Port Arthur, TX | $0.00 | NA | Yes |

| Counterparty Name and Address | Contract Type | Description of Contract(s) | Cure Amount | Assumed Under Refinancing Confirmation Option | Assumed Under the Conversion Confirmation Option |
|---|---|---|---|---|---|
| Time Warner Cable<br>PO Box 60074<br>City of Industry, CA 91716 | Utility Agreement | Cable Agreement – Best Western, Cuero, TX | $0.00 | NA | Yes |
| Time Warner Cable<br>PO Box 60074<br>City of Industry, CA 91716 | Utility Agreement | Phone/Internet Agreement – Best Western, Cuero, TX | $0.00 | NA | Yes |
| Time Warner<br>PO Box 60074<br>City of Industry, CA 91716 | Utility Agreement | Cable Agreement – Oakwood Suites, Andrews, TX | $0.00 | NA | Yes |
| Time Warner<br>PO Box 60074<br>City of Industry, CA 91716 | Utility Agreement | Phone/Internet Agreement – Oakwood Suites, Andrews, TX | $0.00 | NA | Yes |
| Time Warner<br>PO Box 60074<br>City of Industry, CA 91716 | Utility Agreement | Cable Agreement – Holiday Inn, Pearsall, TX | $0.00 | NA | Yes |
| Time Warner<br>PO Box 60074<br>City of Industry, CA 91716 | Utility Agreement | Phone/Internet Agreement – Holiday Inn, Pearsall, TX | $0.00 | NA | Yes |
| Time Warner<br>PO Box 60074<br>City of Industry, CA 91716 | Utility Agreement | Cable Agreement – La Quinta Inn, Port Arthur, TX | $0.00 | NA | Yes |
| Town of Pecos, TX<br>PO Box 929<br>Pecos, TX 79722 | Utility Agreement | Water/Sewer Agreements – Comfort Suites, Pecos, TX | $0.00 | NA | Yes |
| TXU Energy<br>PO Box 650638<br>Dallas, TX 75265 | Utility Agreement | Electricity Agreement – Comfort Inn, Midland, TX | $0.00 | NA | Yes |
| TXU Energy<br>PO Box 650638<br>Dallas, TX 75265 | Utility Agreement | Electricity Agreement – Country Inn, Midland, TX | $0.00 | NA | Yes |
| Verizon<br>PO Box 660072<br>Dallas, TX 75266<br><br>Verizon<br>PO Box 660720<br>Dallas, TX 75268 | Utility Agreement | Phone/Internet Agreement – La Quinta Inn, Port Arthur, TX | $0.00 | NA | Yes |
| Windstream<br>PO Box 9001908<br>Louisville, KY 40290 | Utility Agreement | Phone/Internet Agreement – La Quinta Inn, Hobbs, NM | $0.00 | NA | Yes |
| Windstream<br>PO Box 9001908<br>Louisville, KY 40290 | Utility Agreement | Phone/Internet Agreement – Comfort Suites, Pecos, TX | $0.00 | NA | Yes |
| Xcel<br>PO Box 9477<br>Minneapolis, MN 55484 | Utility Agreement | Electricity Agreement – La Quinta Inn, Hobbs, NM | $0.00 | NA | Yes |
| Zia Natural Gas Company<br>3700 West Piacho Ave<br>Las Cruces,NM 88007 | Utility Agreement | Gas Agreement – La Quinta Inn, Hobbs, NM | $0.00 | NA | Yes |

**Parties have negotiated the terms of a new agreement and are awaiting documentation.

## Exhibit E

### Identify of Initial Directors, Officers, Managers, or Members of the Reorganized Debtors

**Conversion Confirmation Option**:  After the Plan is implemented pursuant to the Conversion Confirmation Option, the  officers and managing members of each applicable Debtor shall be the persons identified in the table below:

| Debtor: | Managing Member | Officers |
|---|---|---|
| RREAF O&G Portfolio #2 LLC | Spectrum Origination, LLC | Chief Executive Officer: Jeff Schaffer |
| RREAF O&G Portfolio #2 Manager LLC | Spectrum Origination, LLC | Chief Executive Officer: Jeff Schaffer |
| RREAF O&G Portfolio #3 LLC | Spectrum Origination, LLC | Chief Executive Officer: Jeff Schaffer |
| RREAF O&G Portfolio #3 Manager LLC | Spectrum Origination, LLC | Chief Executive Officer: Jeff Schaffer |

#38342300

**Exhibit F**

**Detail of RREAF2 Specified General Unsecured Claims and RREAF3 Specified General Unsecured Claims**

At this time, Spectrum Origination does not anticipate that there will be any RREAF2 Specified General Unsecured Claims or RREAF3 Specified General Unsecured Claims. However, as set forth above, the Debtors and Spectrum Origination reserve the right to subsequently modify the Plan Supplement (including this Exhibit F) at any time prior to the Plan's Effective Date.

#38342300

## **Exhibit G**

### **Form of Pledged Equity Option**

(see attached)

## PLEDGED EQUITY OPTION LETTER AGREEMENT

_____, 2016

Reference is made to that certain *Second Amended Plan of Reorganization of RREAF O&G Portfolio #2 LLC, RREAF O&G Portfolio #2 Manager LLC, RREAF O&G Portfolio #3 LLC, and RREAF O&G Portfolio #3 Manager LLC Proposed by the Debtors and Spectrum Origination LLC, as Modified*, dated February 8, 2016 (the "**Plan**").  Capitalized terms not otherwise defined herein shall have the meanings set forth in the Plan.

WHEREAS, Spectrum Origination has asserted that it holds Liens on or in the Pledged Equity;

WHEREAS, the Plan constitutes a global settlement of certain claims, Liens, and equity interests held by Spectrum Origination;

WHEREAS, pursuant to the Plan, Spectrum Origination (and its assignees of Senior Lender Claims) is required to distribute the Pledged Equity Option to the Pledgors, which Pledged Equity Option shall, among other things, enable the Pledgors to require Spectrum Origination to release its Liens on or in the Pledged Equity in exchange for a release price equal to the Exercise Price (as defined herein) to be paid to Spectrum Origination by the Pledgors on or before January 15, 2017;

NOW, THEREFORE, in consideration of the prosecution and confirmation of the Plan, and for other valuable consideration provided in connection with Plan confirmation, we agree to the following:

1.       Spectrum Origination (and its assignees of Senior Lender Claims) grants to the Pledgors  an option (the "**Call Option**") to obtain from Spectrum Origination (and its assignees of Senior Lender Claims) a release of any and all Liens that Spectrum Origination (and its assignees of Senior Lender Claims) may hold on or in the Pledged Equity, upon payment by one of the Pledgors to Spectrum Origination, in cash, of an amount equal to the Exercise Price (as defined below) on or before the Exercise Deadline (as defined below).  The Call Option is exercisable upon delivery to Spectrum Origination of a written notice, in substantially in the form of Schedule 1 (the "**Call Option Notice**"), executed by both Pledgors, declaring that at least one of the Pledgors is exercising the Call Option.  The Call Option may be exercised at any time on or before January 15, 2017 (the "**Exercise Deadline**").  If the Exercise Price is not paid by one or more of the Pledgors to Spectrum Origination on or before the Exercise Deadline, this Pledged Equity Option Letter Agreement shall automatically terminate and the Pledgors shall have no further rights hereunder.

2.       The exercise of the Call Option is conditional upon payment of the Exercise Price by one of the Pledgors within thirty (30) days following delivery of the Call Option Notice and no later than January 15, 2017.

3.      Within five (5) Business Days following the receipt of a Call Option Notice, Spectrum Origination (and its assignees of Senior Lender Claims) hereby covenants and agrees to complete and issue to the Pledgors an acknowledgment substantially in the form of  Schedule 2 hereto.

4.      The "*Exercise Payment Date*" means the date for payment of the Exercise Price, as specified in a Call Option Notice, which date shall be on or before January 15, 2017 and no later than thirty (30) days after the date of such notice.  Upon receipt of the Exercise Price by Spectrum Origination (and/or its assignees of Senior Lender Claims) on or before the Exercise Payment Date: (a) all Liens held by Spectrum Origination (and its assignees of Senior Lender Claims) on or in the Pledged Equity shall (without requiring any further action by any of the Pledgors) be automatically terminated, released, and discharged; (b) Spectrum Origination (and/or its assignees of Senior Lender Claims) shall, at the sole expense of the Pledgors, take such further action reasonably requested by the Pledgors in order to evidence the termination and release of such Liens, including, without limitation, executing UCC-3 termination statements and other termination statements, collateral releases, or other documents or instruments reasonably requested by the Pledgors in order to reflect of public record the release and discharge of all Liens held by Spectrum Origination (or any of its assigns) on or in the Pledged Equity.

5.      "*Exercise Price*" means one million dollars ($1,000,000), less any dividends or other distributions in respect of the Pledged Equity paid to or received by Spectrum Origination (or any of its affiliates or assignees of Senior Lender Claims) at any time prior to the exercise of this Pledged Equity Option Letter Agreement.

6.      The provisions of the Plan and Confirmation Order are hereby incorporated herein by reference to the same extent and with the same force as if fully set forth herein.  This Pledged Equity Option Letter Agreement may not be amended, modified or terminated except by written agreement signed by each of the undersigned parties hereto.

7.      For the avoidance of doubt, this Pledged Equity Option Letter Agreement will not obligate any of the Pledgors to exercise the Call Option granted herein, and any exercise of the Call Option or any other rights granted to any of the Pledgors in this Pledged Equity Option Letter Agreement shall be at the sole and absolute discretion of such Pledgors.

8.      Each of the parties hereto hereby represents and warrants the following to the Pledgors:

(a)      it is duly organized, validly existing and in good standing under the laws of its state of organization and is duly qualified to do business and is in good standing in such state and every other jurisdiction where the failure to so qualify would have a material adverse effect on the enforceability of this Pledged Equity Option Letter Agreement, and is not subject to any bankruptcy, insolvency or other similar proceedings;

(b)      it has full power, authority and legal right to execute, deliver and perform this Pledged Equity Option Letter Agreement and the execution, delivery and performance hereof has been duly authorized by all necessary company action;

(c)     this Pledged Equity Option Letter Agreement has been duly executed and delivered by such party and constitutes a legal, valid and binding obligation of such party enforceable in accordance with its terms; and

(d)     the execution, delivery and performance of this Pledged Equity Option Letter Agreement (i) is not in contravention of any agreement or indenture by which such party is bound, (ii) does not require any company approval, or any approval or consent of, or filing or registration with, any governmental body or regulatory authority or agency, unless such approval or consent has been obtained and (iii) does not contravene any law, regulation, judgment or decree applicable to such party or any of its organizational documents (including, without limitation, its limited liability company agreement or certificate of formation).

9.     The provisions of this Pledged Equity Option Letter Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

[Signature Page to Follow]

**IN WITNESS WHEREOF**, the undersigned has caused this Pledged Equity Option Letter Agreement to be duly executed as of the date first above written.

**SPECTRUM ORIGINATION LLC**

By: _____
      Name:
      Title:

[Signature Page to Pledged Equity Option Letter Agreement]

**SEEN AND AGREED:**

**RREAF HOLDINGS, LLC,**
a Texas limited liability company

By: _____
     Name:
     Title:

[Signature Page to Pledged Equity Option Letter Agreement]

**SEEN AND AGREED:**

**DM FLORIDA, LLC,**
a Tennessee limited liability company


By: _____
    Name:
    Title:

SCHEDULE 1

<u>CALL OPTION NOTICE</u>

_____, 201___


Spectrum Origination LLC
1250 Broadway, 19th Floor
New York, NY  10001
Attn:  Jeffrey Schaffer


    Re: Pledged Equity Option Letter Agreement, dated as of _____, 2016

Dear Sir/Madam:

1. We refer to the above-referenced Pledged Equity Option Letter Agreement issued in connection with the *Second Amended Plan of Reorganization of RREAF O&G Portfolio #2 LLC, RREAF O&G Portfolio #2 Manager LLC, RREAF O&G Portfolio #3 LLC, and RREAF O&G Portfolio #3 Manager LLC Proposed by the Debtors and Spectrum Origination LLC, as Modified*, dated February 8, 2016.  Terms defined in the Pledged Equity Option Letter Agreement have the same meanings herein unless otherwise indicated.

2. We hereby exercise our Call Option to obtain a release of Spectrum Origination's Liens in the Pledged Equity in exchange for payment of the Exercise Price on or before the Exercise Payment Date, which shall be the following date: _____.

3. Effective upon the undersigned's receipt of the acknowledgement contemplated by paragraph 3 of the Pledged Equity Option Letter Agreement, the undersigned, on behalf of themselves and their respective agents, representatives, officers, directors, subsidiaries, affiliates, successors and assigns (collectively, "<u>Releasors</u>" and individually a "<u>Releasor</u>") hereby releases, acquits and forever discharges each Releasee (as hereinafter defined) from any and all liabilities, claims, demands, actions or causes of action of any kind (if any there be), whether absolute or contingent, due or to become due, disputed or undisputed, liquidated or unliquidated, at law or in equity, or known or unknown (collectively, "<u>Claims</u>") that any Releasor now has, ever had or hereafter may have against Spectrum Origination LLC in any capacity, or any officer, director, employee, agent, attorney, representative, partner, subsidiary, participant, affiliate and member of Spectrum Origination LLC (collectively, the "<u>Releasees</u>" and individually a "<u>Releasee</u>") based on acts (other than acts of fraud, willful misconduct or gross negligence by any Releasee), transactions, or circumstances occurring on or before the date of this Agreement that relate to (i) the Pledged Equity Option Letter Agreement, (ii) the Pledged Equity, (iii) the Plan (provided, however, that nothing in this release, the Pledged Equity Option Agreement, or otherwise shall release any rights or claims furnished to such

S-1

Releasor pursuant to the Plan, including, without limitation, the right to exercise the Plan's Redemption Option), (iv) the Prepetition Loan Agreements (as defined in the Plan), (v) the Pledge Agreements (as defined in the Plan), or (vi) any transaction, action or omission expressly contemplated by or under any of the foregoing. The provisions of this paragraph shall be binding upon each Pledgor and shall inure to the benefit of the Releasees and each of their respective heirs, executors, administrators, successors, participants and assigns (and each of their respective affiliates). Each Pledgor hereby covenants that it will not sue, sue further, or otherwise prosecute in any way any claim, person, or entity released hereby on account of or otherwise relating to any Claims released herein.

**RREAF HOLDINGS, LLC,**
a Texas limited liability company


By: _____
    Name:
    Title:


**DM FLORIDA, LLC,**
a Tennessee limited liability company


By: _____
    Name:
    Title:

[Signature Page to Pledged Equity Option Letter Agreement]

SCHEDULE 2

<u>ACKNOWLEDGMENT</u>

_____, 201____


[Pledgor Contact Information]

      Re:    Pledged Equity Option Letter Agreement, dated _____, 2016

Dear Sir/Madam:

1.    We refer to that certain Pledged Equity Option Letter Agreement, dated as of _____, 2016 (the "***Pledged Equity Option***"), and to the Call Option Notice received by us from one or more of the Pledgors on _____ (the "***Call Option Notice***").  Terms defined in the Pledged Equity Option and the Call Option Notice have the same meanings herein unless otherwise indicated.

2.    Spectrum Origination hereby confirms its receipt of the Call Option Notice and confirms that upon receipt of the Exercise Price by Spectrum Origination (and/or its assignees of Senior Lender Claims) on or before the Exercise Payment Date specified in the Call Option Notice: (a) all Liens held by Spectrum Origination (and its assignees of Senior Lender Claims) on or in any of the Pledged Equity shall (without requiring any further action by any of the Pledgors) be automatically terminated, released, and discharged; and (b) Spectrum Origination (and/or its assignees of Senior Lender Claims) shall, at the sole expense of the Pledgors, take such further action reasonably requested by the Pledgors in order to evidence the termination and release of such Liens, including, without limitation, executing UCC-3 termination statements, and other termination statements, collateral releases, or other documents or instruments reasonably requested by the Pledgors in order to reflect of public record the release and discharge of all Liens held by Spectrum Origination on or in the Pledged Equity.  The foregoing release shall only be effective upon the payment of the Exercise Price by one of the Pledgors to Spectrum Origination on or before the Exercise Payment Date specified in the Call Option Notice.


**SPECTRUM ORIGINATION LLC**


By: _____
       Name:
       Title:


S-3

### Exhibit H

**Form of Agreed Mutual Release Agreement**

(see attached)

#38342300

## AGREED MUTUAL RELEASE AGREEMENT

**THIS AGREED MUTUAL RELEASE AGREEMENT** (this "**Agreement**"), dated as of February [__], 2016, is by and among:

a. Spectrum Origination LLC, a Delaware limited liability company ("**Spectrum**");

b. Webb M. ("Kip") Sowden, III ("**Sowden**");

c. William Douglas McKnight ("**McKnight**");

d. The Webb and Marinelle Sowden Irrevocable Trust established on June 22, 2007 (the "**Sowden Trust**", and collectively, with Sowden and McKnight, the "**Guarantors**");

e. RREAF Holdings LLC, a Texas limited liability company ("**RREAF Holdings**"); and

f. DM Florida, LLC, a Tennessee limited liability company ("**DM Florida**" and collectively, with RREAF Holdings, the "**Pledgors**").

## PRELIMINARY STATEMENTS

1.     Certain debtors and debtors-in-possession that are both affiliates of one or more of the Guarantors or Pledgors, and borrowers under one or more loan agreements where Spectrum serves as the sole lender, commenced voluntary bankruptcy proceedings and have proposed that certain *Second Amended Plan of Reorganization of RREAF O&G Portfolio #2 LLC, RREAF O&G Portfolio #2 Manager LLC, RREAF O&G Portfolio #3 LLC, and RREAF O&G Portfolio #3 Manager LLC Proposed by the Debtors and Spectrum Origination LLC, as Modified* (the "**Plan**").

2.     The Plan proposes to modify, adjust, or impact one or more rights available to Spectrum, the Guarantors, and/or the Pledgors.

3.     Pursuant to Article 7.B.3(v) of the Plan, is a condition to the Effective Date of the Plan that Spectrum, the Guarantors, and the Pledgors execute mutual releases of claims by and among themselves.

4.     In consideration of the mutual releases described herein, and in furtherance of consummating and implementing the Plan, Spectrum, the Guarantors, and the Pledgors have each agreed to provide the releases set forth herein.

## ARTICLE I - RELEASES

Section 1.1.     Definitions.

(a)     The following terms shall have the following meanings when used in capitalized form herein:

(i)    "**Representatives**" means with respect to any person or entity, such person or entity's current and former parents, subsidiaries, affiliates, officers, directors, employees, advisors, members, attorneys, professionals, accountants, investment bankers, financial advisors, consultants, agents, and other representatives.

(ii)    "**Spectrum Documents**" means, the Plan, the Prepetition Guaranty Documents, the Prepetition Loan Agreements, the Prepetition Loan Documents, and any Equity Interests in any of the Debtors or affiliates of the Debtors.

(b)    Capitalized terms used, but not otherwise defined herein shall have the meaning ascribed to them in the Plan.

Section 1.1.    <u>Release</u>.

(a)    Spectrum and its Representatives (each a "**Spectrum Releasing Party**" and collectively, the "**Spectrum Releasing Parties**") hereby fully and unconditionally release and forever discharge each of the Guarantors, the Pledgors, the respective Representatives of each of the Guarantors and Pledgors, the successors and/or assigns of each of the foregoing (each, a "**Spectrum Released Party**" and collectively, the "**Spectrum Released Parties**"), of and from any and all claims, suits, allegations, causes of action, costs, demands and liabilities available at common law or in equity, that in each case relate to or are otherwise in any way connected with the Debtors, their Chapter 11 Cases, or the Spectrum Documents, from the beginning of time to immediately prior to the Plan's Effective Date, whether known or unknown, liquidated or unliquidated, fixed or contingent, asserted or unasserted, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, anticipated or unanticipated, which each Spectrum Releasing Party has, had, claims to have had or hereafter claims to have against the Spectrum Released Parties by reason of any act or omission on the part of the Spectrum Released Parties, or any of them, occurring prior to the Effective Date (collectively, all of the foregoing, the "**Spectrum Released Claims**").  Each Spectrum Releasing Party represents and warrants that the foregoing constitutes a full and complete release of all Spectrum Released Claims.

(b)    Each of the Guarantors and their Representatives (each a "**Guarantor Releasing Party**" and collectively, the "**Guarantor Releasing Parties**") hereby fully and unconditionally release and forever discharge Spectrum, its respective Representatives, the successors and/or assigns of each of the foregoing (each, a "**RREAF Released Party**" and collectively, the "**RREAF Released Parties**"), of and from any and all claims, suits, allegations, causes of action, costs, demands and liabilities available at common law or in equity, that in each case relate to or are otherwise in any way connected with the Debtors, their Chapter 11 Cases, or the Spectrum Documents, from the beginning of time to immediately prior to the Plan's Effective Date, whether known or unknown, liquidated or unliquidated, fixed or contingent, asserted or unasserted, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, anticipated or unanticipated, which each Guarantor Releasing Party has, had, claims to have had or hereafter claims to have against the RREAF Released Parties by reason of any act or omission on the part of the RREAF Released Parties, or any of them, occurring prior to the Effective Date (collectively, all of the foregoing, the "**Guarantor Released Claims**").  Each Guarantor Releasing Party represents and warrants that the foregoing constitutes a full and complete release of all Guarantor Released Claims.

(c)     Each of the Pledgors and their Representatives (each a "**Pledgor Released Party**" and collectively, the "**Pledgor Releasing Parties**") hereby fully and unconditionally release and forever discharge the RREAF Released Parties, of and from any and all claims, suits, allegations, causes of action, costs, demands and liabilities available at common law or in equity, that in each case relate to or are otherwise in any way connected with the Debtors, their Chapter 11 Cases, or the Spectrum Documents, from the beginning of time to immediately prior to the Plan's Effective Date, whether known or unknown, liquidated or unliquidated, fixed or contingent, asserted or unasserted, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, anticipated or unanticipated, which each Pledgor Releasing Party has, had, claims to have had or hereafter claims to have against the RREAF Released Parties by reason of any act or omission on the part of the RREAF Released Parties, or any of them, occurring prior to the Effective Date (collectively, all of the foregoing, the "**Pledgor Released Claims**").    Each Pledgor Releasing Party represents and warrants that the foregoing constitutes a full and complete release of all Pledgor Released Claims.

(d)     The releases described in the foregoing subsections (a), (b), and (c) shall not apply to, and shall be subject in all respects to, the following scope limitations:

(i)     none of the releases described in the foregoing subsections (a), (b), or (c) shall release any claims, suits, allegations, causes of action, costs, demands or liabilities relating to fraud or willful misconduct;

(ii)     none of the releases in the foregoing subsections (a), (b), or (c) shall release the Pledgors from their obligations under the Pledge Agreements; provided, that such Pledge Agreement obligations shall be subject in all respects to the Pledged Equity Option;

(iii)     none of the releases in the foregoing subsections (a), (b), or (c) shall release Spectrum's Liens upon or interests in the Pledged Equity or rights and remedies of Spectrum under the Pledge Agreements, provided, however, that such Liens, interests, rights, and remedies of Spectrum in and to the Pledged Equity shall be subject in all respects to the Pledged Equity Option.

## ARTICLE II REPRESENTATIONS

Section 2.1.  Representations.  Each of the parties hereto hereby represents and warrants the following:

(a)     it is duly organized, validly existing and in good standing under the laws of its state of organization and is duly qualified to do business and is in good standing in such state and every other jurisdiction where the failure to so qualify would have a material adverse effect on the enforceability of this Agreement, and is not subject to any bankruptcy, insolvency or other similar proceedings;

(b)     it has full power, authority, and legal right to execute, deliver, and perform this Agreement;

(c)     this Agreement has been duly executed and delivered by such party and constitutes a legal, valid, and binding obligation of such party enforceable in accordance with the terms of this Agreement; and

(d)     the execution, delivery, and performance of this Agreement (i) has been duly authorized by all necessary company action; (ii) is not in contravention of any agreement or indenture by which such party is bound, (iii) does not require any approval or consent of, or filing or registration with, any governmental body or regulatory authority or agency, beyond any such approval or consent that has been obtained as of the date of this Agreement and (iv) does not contravene any law, regulation, judgment, or decree applicable to such party or any of its organizational documents (including, without limitation, its limited liability company agreement or certificate of formation).

## ARTICLE III - MISCELLANEOUS

Section 3.1.  <u>Governing Law; Jurisdiction</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas.

Section 3.2.  <u>Entire Agreement</u>.  This Agreement contains the entire agreement between Spectrum, the Guarantors, and the Pledgors with respect to the subject matter hereof.

Section 3.3.  <u>Binding Effect</u>.  This Agreement shall be binding upon and inure to the benefit of Spectrum, the Guarantors, the Pledgors, and each of their respective successors and assigns.  Each such successor and assign shall in every respect be bound by the terms and conditions of this Agreement.

Section 3.4.  <u>Execution in Counterparts</u>.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute but one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile, email, or other electronic means shall be effective as delivery of a manually executed counterpart of this Agreement.

[Remainder of page intentionally left blank – signature pages follow]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

SPECTRUM ORIGINATION LLC

By: _____
    Name:
    Title:

WEBB M. ("KIP") SOWDEN, III

_____

WILLIAM DOUGLAS MCKNIGHT

_____

THE WEBB AND MARINELLE SOWDEN
IRREVOCABLE TRUST


By: _____
Name: Webb M. ("Kip") Sowden, III
Title:   Co-Trustee and Beneficiary



By: _____
Name: Marinelle Sowden
Title:   Co-Trustee and Beneficiary


*[Signature Page to Agreed Mutual Release Agreement]*

RREAF HOLDINGS LLC

By: _____
　　　Name:
　　　Title:

DM FLORIDA, LLC


By: _____
    Name:
    Title:

*[Signature Page to Agreed Mutual Release Agreement]*